**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

RECEIVED

2008 FEB 12 P 3: 03

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| Richard Marshall, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | 2:06-701-ID |
| | * | |
| Chris West; Lashun Hutson, | * | |
| | * | |
| Defendants. | * | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**BRIEF IN SUPPORT THEREOF**

COMES NOW the defendant, Lashun Hutson, and moves the Court for summary judgment as to each of Plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant supports his motion for summary judgment with the following:

1. Pleadings;

2. Argument in support of Defendant's motion for summary judgment;

3. Deposition of Richard Marshall, attached hereto as Exhibit 1;

4. Deposition of Chris West, attached hereto as Exhibit 2;

5. Deposition of Lashun Hutson, attached hereto as Exhibit 3;

6. Deposition of Kelvin Carmichael, attached hereto as Exhibit 4;

7. Photographs taken following stop, attached hereto as Exhibit 5;

8. Inter-Agency Agreement, attached hereto as Exhibit 6;

9. Alabama Department of Economic and Community Affairs, attached hereto as Exhibit 7.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

Defendants Chris West and Lashun Hutson are members of the 2nd Judicial Drug Task Force, a federally funded, multi-jurisdictional law enforcement group with the specific task of drug investigation and interdiction in Lowndes County. (Exhibit 2, p. 6, ll. 20-23). Lieutenant Chris West is the commander of the Drug Task Force. (Exhibit 2, p. 6, line 10). At the time of the incident made the basis of Plaintiff's Complaint, Lashun Hutson was both a police officer with the Town of Hayneville and a member of the Drug Task Force. (Exhibit 3, p. 5, ll. 15-20). Using federal grant funds, the Town of Hayneville, as well as other municipalities, sends one officer to the Drug Task Force. (Exhibit 2, p. 7, ll. 5-17). Upon selection for the task force, the employee no longer works for the municipality or takes orders from the police chief of the municipality. The employee is simply paid by the municipality and is an employee of the Drug Task Force. (Exhibit 2, p. 7 ll. 1-23, p. 8 ll. 1-23).

Members of the 2nd Judicial Drug Task Force, including Chris West and Lashun Hutson, are responsible for drug investigations in Lowndes County. On June 28, 2005, Chris West received information that the Plaintiff, Richard Marshall, was selling illegal drugs at his residence in Lowndes County. (Exhibit 2, p. 14, ll. 1-4). Chris West and Lashun Hutson went to Mr. Marshall's house to find that he was not present, and the officers left. (Exhibit 2, p. 16, ll. 2-16). The two were riding in an unmarked Lincoln Town Car used by the Drug Task Force. (Exhibit 2, p. 13, ll. 1-21). Chris West was driving and Lashun Hutson was the passenger. (Exhibit 2, p. 12, ll. 12-23)[1]. As the officers drove back toward Hayneville, they came upon Richard Marshall as he was driving down

---

[1]The Plaintiff's complaint actually states that Lashun Hutson was driving, but this is incorrect.

the road. (Exhibit 2, p. 19, ll. 1-18).

Chris West pulled behind the Plaintiff's Chevrolet Nova and noticed that Mr. Marshall was not wearing his seat belt. (Exhibit 2, p.19, ll. 20-23). Plaintiff admits that neither he nor his cousin were wearing a seat belt. (Exhibit 1, p. 28, ll. 20-23, p. 29, ll. 1-2). Lieutenant West activated the portable blue police light in his vehicle and placed in onto the dashboard, but Mr. Marshall did not stop his vehicle. (Exhibit 2, p. 20, ll. 1-7). During a short chase, Chris West positioned the Lincoln Town Car directly behind the Plaintiff's 1976 Nova. Chris West then pulled alongside parallel to Richard Marshall's automobile and Lashun Hutson removed the flashing light off of the dash and held it up to the window along with his badge. (Exhibit 2,p. 21, ll. 19-23, p. 22, ll. 1-23). Richard Marshall responded by saying "fuck you" and kept driving, toward Wilcox County. (Id; p. 24, ll. 11-12.). Chris West and Lashun Hutson attempted this maneuver once more, again unsuccessful. (Exhibit 2, p. 24, ll. 11-23). At that point, Chris West implemented a precision intervention technique, or "PIT" maneuver by placing his Lincoln Town Car's bumper directly against the Nova's bumper and spinning the Nova out of control. (Exhibit 2, p. 29, ll. 3-21). This maneuver was successful and the Nova came to rest off the road. (Exhibit 2, p. 30, ll. 2-4). At that point, Chris West and Lashun Hutson exited their vehicle and pointed their weapons directly at the passengers in the Nova. (Exhibit 2, p. 30, ll. 18-23). Riding in the Nova was the Plaintiff, Richard Marshall, and his cousin, Kelvin Carmichael. The cousin remained still. (Exhibit 2, p. 31, ll. 18-23). Richard Marshall exited the car and stood up and began to wave his arms and shout at the officers. (Exhibit 2, p. 32, ll. 8-21). Richard Marshall would not comply with Chris West's commands that he get on the ground, and Chris West fired a warning shot. (Id.). This startled Richard Marshall and he froze. (Exhibit 2, p. 32, ll. 22-23, p. 33, ll. 1-7). The officers were then able to take Richard Marshall away

3

from the Nova and put him on the ground. (Id.).

After the Plaintiff and his cousin were removed from the car, the officers looked into the Nova, where a loaded .357 magnum was discovered on the driver's seat in the automobile. (Exhibit 2, p. 33, ll. 15-22; Exhibit 5).    There were also a number of .357 rounds in the ashtray, the floorboard, and the seat. (Id.; Exhibit 5).

After this incident, Chris West filed charges against Richard Marshall, for possession of a controlled substance and carrying a pistol without a permit. (Exhibit 1, p. 138, ll. 10-13).  Lashun Hutson did not have any involvement whatsoever in prosecuting Richard Marshall. (Exhibit 3, p. 36, ll. 11-20).

On August 8, 2006, Richard Marshall filed suit in the U.S. District Court for the Middle District of Alabama. (Complaint).  The causes of action in the complaint were violation of Fourth Amendment proscriptions against unreasonable searches and unreasonable and excessive force. The complaint also contained causes of action for assault and battery and conversion. Upon the motion of the defendant Chris West, this Court dismissed the state law claims. (Doc 12). On May 29, 2007, the Plaintiff filed an amended complaint. (Doc 16). The causes of action currently pending before the Court are a Fourth Amendment False Arrest/False Imprisonment claim, a  Fourth Amendment Unreasonable and Excessive Force claim, a Fourth Amendment Unlawful Search and Seizure, and a Malicious Prosecution claim under state law.

Defendant Lashun Hutson now moves for summary judgment as to each of Plaintiff's claims, as there are no genuine issues of material fact and this Defendant is entitled to judgment as a matter of law.  This defendant also adopts any and all arguments made by Chris West.

4

## SUMMARY JUDGMENT STANDARD

Summary judgment must be entered on a claim if it is shown "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, although the Court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970), "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party that fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Furthermore, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

**ARGUMENT**

I.  **PLAINTIFF'S FOURTH AMENDMENT EXCESSIVE FORCE, FALSE ARREST, AND UNREASONABLE SEARCH AND SEIZURE CLAIMS ARE DUE TO BE DISMISSED AS THERE WAS ARGUABLE PROBABLE CAUSE FOR THE STOP AND ARREST AND LASHUN HUTSON IS ENTITLED TO IMMUNITY**

    A.    **Fourth Amendment Law**

The United States Supreme Court has stated that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395, (1989). The reasonableness inquiry is an objective test. The question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham,* 490 U.S. at 397. The reasonableness test under the Fourth Amendment is not capable of precise definition, therefore, its application requires careful attention to the facts and circumstances of each case. *Graham,* 490 U.S. at 396. Reasonableness is judged:

> from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.... With respect to a claim of excessive force ... not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances – that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham,* 490 U.S. at 396-97 (internal citations omitted).

The right to make an arrest, seizure, or investigatory stop necessarily carries with it the right

to use some degree of physical coercion or threat thereof to effect. *Id.* Painful handcuffing, by itself, is not excessive force in cases where the resulting injuries are minimal. *Rodriguez v. Farrell*, 280 F. 3d 1341, 1352 (11th Cir. 2002).

### B.    Qualified Immunity Law

The federal constitutional claims against Officer Hutson must be dismissed as the officer is clearly entitled to immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F. 3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982)). In effect, qualified immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Vinyard v. Wilson*, 311 F. 3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982)). In effect, qualified immunity "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* The analysis of qualified immunity is undertaken utilizing a two-part analysis set forth by the United States Supreme Court. Under the analysis, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct.

7

2508, 153 L.Ed. 2d 666 (2002). If a constitutional right would have been violated under the plaintiff's version of the facts, "the 'next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed. 2d 272 (2001).

Furthermore, there is no bright-line rule for identifying force as excessive. *Graham, supra at* 396. Therefore, unless a controlling and factually similar case declares the official's conduct unconstitutional, an excessive force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw. *Smith v. Mattox*, 127 F. 3d 1416, 1419 (11th Cir. 1997) (citations omitted).

### C.    Lashun Hutson did not violate the Fourth Amendment

The undisputed material facts do not show that the defendant's actions were objectively unreasonable under the Fourth Amendment, or so unreasonable that an officer faced with these officers' situation would have inevitably believed the force used was unlawful. Here, the officers were dealing with a known drug dealer who had a history of violence. In fact, their beliefs were proven correct when they found a loaded .357 Magnum in Plaintiff's car following the stop. (Exhibit 2, p. 33, ll. 15-22; Exhibit 5). Prior to the stop, Chris West, co-defendant, received information that Plaintiff was selling illegal drugs at his residence in Lowndes County. (Exhibit 2, p. 14, ll. 1-4). West and Hutson went to Plaintiff's house to find him, but he was not present. (Exhibit 2, p. 16, ll. 2-16). As the two officers were riding in an unmarked Lincoln Town Car, they came upon Plaintiff. (Exhibit 2, p. 19, ll. 1-18). The officers discovered that Plaintiff was not wearing a seatbelt, in violation of Alabama law, and attempted to make a stop. (Exhibit 2, p. 19, ll. 20-23). Plaintiff confirms that the officers had probable cause to make the stop because he admits that neither he nor

his cousin were wearing a seatbelt at the time of the stop. (Exhibit 1, p. 28, ll. 20-23, p. 29, ll. 1-2).

Lieutenant West activated the blue police light in the vehicle and placed it onto the dash. (Exhibit 2, p. 20, ll. 1-7). However, Plaintiff did not stop his automobile. During the short chase, Chris West positioned the Lincoln Town Car directly beside Plaintiff's automobile. At this position, Lashun Hutson removed the flashing light off the dash and held it up to the window along with his badge. Plaintiff responded by saying "fuck you" and kept driving toward Wilcox County. (Id; p. 24, ll. 11-12). After two attempts to stop Plaintiff, Officer West implemented a precision intervention technique by placing the Lincoln Town Car's bumper directly against Plaintiff's automobile's bumper and spinning Plaintiff's automobile out of control. (Exhibit 2, p. 29, ll. 3-21). Chris West and Lashun Hutson exited the vehicle and pointed their weapons directly at the passengers in the Nova, based on the information that Plaintiff was a drug dealer and was possibly armed. (Exhibit 2, p. 30, ll. 18-23). Plaintiff exited his automobile and stood up, approximately two feet from a loaded .357 Magnum, and would not comply with Chris West's commands that he get on the ground. (Exhibit 2, p. 32, ll. 8-21) Accordingly, Chris West fired a warning shot. (Id.). This startled Plaintiff and the officers were able to gain control over him.(Id.)

As noted above, the reasonableness inquiry is an objective test. The question is whether the officers' actions were objectively reasonable in light of the facts and the circumstances confronting them, without regard to their underlying intent or motivation. Here, any officer faced with the same circumstance, i.e. having credible information that Plaintiff was a drug dealer and seeing him without a seatbelt, would or should have performed a traffic stop. When Plaintiff blatantly ignored the attempts to stop his vehicle, Chris West performed the correct technique. This Defendant, Lashun Hudson's only actions in this case were to hold up a flashing light and a badge, and draw his weapon

after Plaintiff's automobile came to a rest. Based on the knowledge the Plaintiff had violence tendencies, Lashun Hutson drew his weapon in an attempt to subdue Plaintiff. When Plaintiff exited his automobile, he was two feet away from a loaded .357 Magnum. Prophetically, Lashun Hutson drew his weapon and was able to subdue Plaintiff.

There are no genuine issues of material fact and Lashun Hutson is entitled to a judgment as a matter of law. His actions were objectively reasonable under the Fourth Amendment and summary judgment is due to be entered in favor of Lashun Hudson.

**D.    Lashun Hutson is entitled to Qualified Immunity**

Lashun Hutson is also entitled to qualified immunity as to Plaintiff's Fourth Amendment false arrest and unlawful seizure claims. In the context of an alleged Fourth Amendment violation, qualified immunity applies whenever there was <u>arguable</u> probable cause for a search or seizure, even if actual probable cause did not exist. *Jones v. Cannon*, 174 F. 3d. 1271, 1285 n. 3 (11th Cir. 1999). Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity analysis. Arguable probable cause exists if, under all the facts and circumstances, an officer reasonably could - - not necessarily would - - have believed that probable cause was present. *Durruthy v. Pastor*, 351 F. 3d. 1080, 1089 (11th Cir. 2003). Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

In the present case, the seizure of Plaintiffs was legal under the Fourth Amendment. However, even if it could be argued that the officers did not have actual probable cause for the seizure, an officer may, consistent with the Fourth Amendment, effect such a seizure or an investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is

10

afoot. *Illinois v. Wardlow*, 528 U.S. 119 (2000). As set out above, the officers saw, and the Plaintiff admits, that he was not wearing his seatbelt, a violation of Ala. Code (1975) § 32-5B-4. Thus, it is clear that Lashun Hutson and Chris West had at least arguable probable cause to effect a traffic stop. Further, Plaintiff failed to stop his vehicle when directed by the officers, instead cursing the officers and accelerating away. The officers clearly had reasonable suspicion that criminal activity was afoot, and probable cause to stop the Plaintiff.

Accordingly, Lashun Hutson is entitled to qualified immunity and is entitled to summary judgment on Plaintiff's Fourth Amendment claims.

## II.    LASHUN HUTSON IS ENTITLED TO ABSOLUTE IMMUNITY

Under Ala. Const. of 1901, § 14, the State of Alabama has absolute immunity from lawsuits. This absolute immunity also extends to arms or agencies of the state, as well as sheriffs and other executive officers of the state, when the sheriffs or deputies are "acting within the line and scope of their employment." *Ex parte Sumter County*, 953 So. 2d 1235, 1239 (Ala. 2006). See, *e.g., Ex parte Blankenship*, 893 So. 2d 303, 305 (Ala. 2004) (a deputy sheriff who acts within the scope of his duties is protected from negligence and wantonness claims under § 14, Ala. Const. 1901); *Ex parte Purvis*, 689 So. 2d 794, 796 (Ala. 1996) (sheriffs and their deputies who act within the scope of their duties are "immune from suit under the provisions of Art. I, § 14, Alabama Constitution 1901"); *Tinney v. Shores*, 77 F. 3d 378, 383 (11th Cir. 1996) (reversing district court's failure to grant absolute immunity to sheriff and deputy and holding "the only exceptions to a sheriff's immunity from suit are actions brought to enjoin the sheriff's conduct.")

An agent with the Drug Task Force is an officer of the state. While the Drug Task Force is federally funded, and authorized by Public Law 104-208 at Title VI, Subtitle C, as amended, also

11

known as the Anti-Drug Act of 1988, the request for grant funds is made by the state itself. Alabama's program, pursuant to the Anti-Drug Act, is reviewed by the State Legislature's designated body, the Alabama Department of Economic and Community Affairs (ADECA) Law Enforcement and Traffic Safety Division (LETS division). Thus, the Drug Task Forces across the state are clearly an "arm or agency" of the State of Alabama, and entitled to the absolute immunity afforded the state as well. (See Alabama Department of Economic and Community Affairs, Exhibit 7, pp. ii, 13; 2nd Judicial Circuit Drug Task Force Inter-Agency Agreement, Exhibit 6).

At the time of this incident, Lashun Hutson was acting as a Drug Task Force officer. All of the events alleged to have occurred involving Lashun Hutson were in Hutson's capacity as a Drug Task Force agent, and it is undisputed that Hutson was acting within the line and scope of that employment. Accordingly, Lashun Hutson is also entitled to absolute immunity from Plaintiff's claims.

## III.    PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS AS A MATTER OF LAW

Plaintiff also brings a malicious prosecution claim against Defendants. A Fourth Amendment malicious prosecution claim requires a plaintiff to prove "a violation of his Fourth Amendment right to be free from unreasonable seizures, in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F. 3d 872 (11th Cir. 2003). Under Alabama law, the common law tort of malicious prosecution requires a plaintiff to show that (1) a prior judicial proceeding was instituted by the defendant, (2) the defendant acted without probable cause, (3) the defendant acted with malice in instituting the prior proceeding, (4) the prior proceeding ended in favor of the plaintiff, and (5) the plaintiff was damaged. *U.S. Steel, LLC v. Tieco, Inc.*, 261 F. 3d

12

1275, 1289-90 (11th Cir. 2001).

As set out above, defendants had probable cause for their actions. However, even more importantly, Defendant Lashun Hutson had no part whatsoever in the charges made against Plaintiff, or in the institution of the criminal proceeding against him. Therefore, Plaintiff cannot sustain his claim of malicious prosecution against this Defendant, and it must be dismissed.

## IV.    DEFENDANT IS ENTITLED TO DISCRETIONARY FUNCTION IMMUNITY

Lashun Hutson is also entitled to discretionary function immunity for Plaintiff's claim arising under Alabama law. In 1994, the Alabama Legislature enacted Ala. Code § 6-5-338, which provides, in pertinent part, as follows:

> (a)    Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, *and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.*

> (b)    This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers....

13

*Ala. Code* § 6-5-338 (emphasis added).

To apply discretionary function immunity, a court must first determine whether the police officer was performing a discretionary function when the alleged wrong occurred. If so, the burden shifts to the plaintiff to demonstrate that the defendant acted in bad faith, with malice or willfulness in order to deny him immunity. *Bullard, supra,* at *22, citing *Scarbrough v. Myles*, 245 F. 3d 1299, 1303 n.9 (11th Cir. 2001) (alteration in original)(applying Alabama law and quoting *Sheth v. Webster*, 145 F. 3d 1231, 1239 (11th Cir. 1998) (per curiam).

Alabama law defines "discretionary acts" as "[t]hose acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and [involving] what is just and proper under the circumstances. *L.S.B. v. Howard*, 659 So. 2d 43, 44 (Ala. 1995). Discretionary acts require "constant decision making and judgment." *Phillips v. Thomas*, 555 So. 2d 81, 85 (Ala. 1989). The Alabama Supreme Court further noted that § 6-5-338 extended discretionary immunity to a municipal police officer "unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Wright v. Wynn*, 682 So. 2d 1 (Ala. 1996). Simply stated, the statute "shields every defendant who (1) is a 'peace officer' (2) is performing 'law enforcement duties', and (3) is exercising judgment or discretion." *Howard v. City of Atmore*, 887 So. 2d 201, 204 (Ala. 2003).

It is undisputed that Lashun Hutson qualifies as a "peace officer", and was performing law enforcement duties. There is no doubt that Hutson was serving in the capacity of an officer of the 2nd Judicial Drug Task Force. Further, there is no evidence of the malice, willfulness, or bad faith required to overcome the immunity granted by the statute. An officer is entitled to discretionary

14

function immunity if the officer's acts occurred in the line and scope of his duties as a police officer, and when decisions must be made where there are no hard and fast rules as to the course of conduct one must or must not take, absent malice or willful conduct. *Bullard,* supra. Therefore, Lashun Hutson is entitled to immunity and Plaintiff's state law claims are due to be dismissed.

## CONCLUSION

Based on the foregoing, Defendant Lashun Hutson is entitled to summary judgment as to each of Plaintiff's claims, as there are no genuine issues of material fact and this Defendant is entitled to judgment as a matter of law. Plaintiff cannot present substantial evidence to support his claims of Fourth Amendment violations, or his claim asserted under state law. Further, Lashun Hutson is entitled to qualified, absolute, and discretionary immunity.

_____
ALEX L. HOLTSFORD, JR. (HOL048)
RICK A. HOWARD (HOW045)
APRIL W. MCKAY (WIL304)
Attorneys for Defendants

OF COUNSEL:

Nix Holtsford Gilliland
        Higgins & Hitson, P.C.
P.O. Box 4128
Montgomery, AL 36103-4128
(334) 215-8585

15

## CERTIFICATE OF SERVICE

I hereby certify that I have this day sent by electronic means through the Court's electronic filing system, an exact copy of the foregoing document to:

Jay Lewis
P.O. Box 5059
Montgomery, AL 36103

C. Richard Hill
WEBB & ELEY
P.O. Box 240909
Montgomery, AL 36124

This the 12th day of February, 2008.

_____
OF COUNSEL

16

# DEPOSITION OF RICHARD MARSHALL

## November 14, 2007

## Pages 1 through 156

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

1

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3               NORTHERN DIVISION
 4
 5   RICHARD MARSHALL,
 6        Plaintiff,
 7   vs.           CIVIL ACTION NO.
              2:06-cv-701-ID.CSC
 8
 9   CHRIS WEST, in his individual
     capacity, LASHUN HUTSON, in his
     individual capacity,
10
     Defendants.
11
12
13
             * * * * * * * * * * * * *
14
15
16   DEPOSITION OF RICHARD MARSHALL, taken
17   pursuant to stipulation and agreement before Lyn
18   Daugherty, ACCR #66, Certified Court Reporter and
19   Commissioner for the State of Alabama at Large, in
20   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
21   Drive, Montgomery, Alabama, on Wednesday, November
22   14, 2007, commencing at approximately 10:00 a.m.
23           * * * * * * * * * * * * *
```

**Page 3**

```
 1    2   Photograph                    28
 2    3   Photograph                    29
 3    4   Photograph                    31
 4    5   MapQuest map                    36
 5    6   Interview sheet               58
 6    7   Photograph                    79
 7    8   Photograph                    79
 8    9   Photograph                   107
 9   10   Photograph                   108
10   11   Photograph                   108
11   12   Inmate property release slip    133
12
13
14
15
16
         * * * * * * * * * * * * *
17
18
19
20
21
22
23
```

**Page 2**

```
 1           APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Jay Lewis
     Mr. Fred L. Clements
 4   LAW OFFICES OF JAY LEWIS
     Attorneys at Law
 5   847 South McDonough Street
     Montgomery, Alabama  36104
 6
 7   FOR THE DEFENDANT WEST:
 8   Mr. Gary Wilford
     Mr. Daryl L. Masters
 9   WEBB & ELEY, P.C.
     Attorneys at Law
10   7475 Halcyon Pointe Drive
     P.O. Box 240909
11   Montgomery, Alabama  36124
12
13         * * * * * * * * * * * * *
14        EXAMINATION INDEX
15
     RICHARD MARSHALL
16
       BY MR. WILFORD . . . . . . . . . .  5
17
       BY MR. LEWIS . . . . . . . . . . .  153
18
19        EXHIBIT INDEX
20                      MAR
     Defendant
21
     1  Alabama uniform arrest report       17
22
        (Index continued on next page)
23
```

**Page 4**

```
 1           STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of RICHARD MARSHALL is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Deposition of Richard Marshall

Page 5

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4           * * * * * * * * * * *
5          RICHARD MARSHALL
6     The witness, after having first been duly sworn
7    to speak the truth, the whole truth and nothing but
8    the truth testified as follows:
9            EXAMINATION
10   BY MR. WILFORD:
11   Q.  Would you please state your name for the
12      record, sir.
13   A.  Richard Marshall.
14   Q.  Mr. Marshall, my name is Gary Wilford, and
15      together with Daryl Masters, who is also
16      here in the room, we're representing the
17      defendants that you have sued in this
18      case -- well, excuse me -- one of the
19      defendants that you've sued in this case,
20      Chris West. Where do you live?
21   A.  Lowndes County, Farmersville.
22   Q.  How long have you lived there?
23   A.  Basically all my life.

Page 6

1   Q.  Have you ever given a deposition before?
2   A.  No, sir.
3   Q.  Let me cover just a few ground rules here.
4      As you can see, we've got a court reporter,
5      and one of the things that she's doing is
6      she's taking down everything that we're
7      saying in the room here today; okay? And
8      I'm going to be asking you some questions
9      and you're going to be answering those
10     questions for me. And when you do that,
11     because we've got the court reporter here,
12     there's a couple of things we need to keep
13     in mind. The first thing is let's try not
14     to talk over the top of each other because
15     it makes it difficult for her to get a good
16     transcription down. Wait for me to ask my
17     question completely and then go ahead and
18     give me a verbal response. And by that I
19     mean a yes, no, or whatever it may be.
20     Shaking your head and saying huh-uh and
21     uh-huh as we tend to do in normal
22     conversation is, again, one of those things
23     that's kind of hard for the court reporter

Page 7

1    to get down. If I ask a question that you
2    don't understand, please let me know and
3    I'll be happy to rephrase it, try to put it
4    another way so that you know exactly what
5    it is that I'm asking you; all right?
6   A.  Okay.
7   Q.  Because when I ask you a question and you
8      give me an answer, I'm expecting that you
9      understood my question. Can we have that
10     understanding?
11   A.  Okay.
12   Q.  This isn't an inquisition. If you need a
13     break, if you need to talk to your lawyer,
14     get something to drink, whatever the case
15     may be, let me know and we can take a
16     break; all right?
17   A.  Okay.
18   Q.  And we'll probably do it on our end once or
19     twice as well.
20   A.  All right.
21   Q.  Other than your lawyers, who are with you
22     here today, have you spoken with anyone to
23     prepare for your deposition today?

Page 8

1   A.  No, sir.
2   Q.  I noticed when you came in this morning I
3     saw you and Mr. Carmichael walking up
4     together. Did y'all ride in together
5     today?
6   A.  Yes, sir.
7   Q.  Did y'all talk about this case on the ride
8     up?
9   A.  No, sir.
10   Q.  Have you ever talked to Mr. Carmichael
11     about this case?
12   A.  No, sir.
13   Q.  At any time?
14   A.  No, sir.
15   Q.  Are you related to Mr. Carmichael?
16   A.  Yes. My cousin.
17   Q.  Cousin?
18   A.  (Witness nods head).
19   Q.  Did you review any documents in preparing
20     for your deposition today?
21   A.  Not today, but I have -- through my lawyer
22     I have.
23   Q.  To prepare for this deposition?

2 (Pages 5 to 8)

Page 9

1  A.  Not to prepare for the deposition, but for
2     the case.
3  Q.  What documents did you review?
4  A.  Just basically disclosure, whatever from
5     the other party.
6  Q.  The information that we gave you?
7  A.  Yeah.
8  Q.  Anything that you provided your attorneys,
9     any documents you provided your attorneys?
10  A.  None other than what y'all requested.
11  Q.  What's your date of birth, sir?
12  A.  2/24/74.
13  Q.  And how old does that make you? I'm not
14     very good at math.
15  A.  33.
16  Q.  Where were you born?
17  A.  Lowndes County. Well, Farmersville through
18     the -- what did they call it back then?
19     Housewife? Selma Hospital is where I was
20     taken. I was born at home.
21  Q.  With a midwife?
22  A.  Midwife, yeah.
23  Q.  Okay. I got you.

Page 10

1     Are you married?
2  A.  No, sir.
3  Q.  Have you ever been married?
4  A.  Yes, sir.
5  Q.  How many times have you been married?
6  A.  Once.
7  Q.  And who were you married to?
8  A.  Stephanie Mallory.
9  Q.  When were y'all married?
10  A.  In '97. May, I think.
11  Q.  How long did y'all stay married?
12  A.  Well, the divorce hasn't been finalized.
13  Q.  So technically you're still married to her;
14     is that right?
15  A.  Yes.
16  Q.  When did y'all file for divorce?
17  A.  Well, she was in the service. She was
18     really supposed to be handling that. And I
19     haven't really been in contact with her
20     over the years. Just hasn't been
21     finalized.
22  Q.  When was the last time that y'all lived
23     together?

Page 11

1  A.  We never actually lived together. She was
2     in the service at the time. Never shared a
3     residence.
4  Q.  All right. Do you work now, sir?
5  A.  No, sir.
6  Q.  What was the last job that you held?
7  A.  M & M Logging last -- I think I was laid
8     off January of last year.
9  Q.  January of '06?
10  A.  Yes, sir.
11  Q.  How long did you work for them?
12  A.  I think I was employed around August '05,
13     somewhere August '05.
14  Q.  And worked with them until January of '06?
15  A.  Yes, sir.
16  Q.  What did you do for them?
17  A.  I was a topper. Operate power saw.
18  Q.  How much did you get paid there?
19  A.  I was making $10 an hour.
20  Q.  Who was your supervisor?
21  A.  David Matthews.
22  Q.  Did you work prior to August of '05?
23  A.  The last job before that was Alabama

Page 12

1     Power. I got laid off in '04.
2  Q.  Do you remember about what month that was?
3  A.  January.
4  Q.  January is not a good month for you, huh?
5  A.  Well, you know, it was shutdown jobs.
6     Contract's up. Layoff time.
7  Q.  How long did you work for Alabama Power?
8  A.  I started December the previous year. That
9     would be '03, December '03.
10  Q.  So that was only about a two-month temp
11     job? Is that about right?
12  A.  Somewhere around there. I caught the end
13     part of the contract. I worked through my
14     uncle. He was the supervisor.
15  Q.  Who was your uncle?
16  A.  Curtis Marshall.
17  Q.  Prior to December of '03, when was the last
18     time that you worked?
19  A.  I have to say it would have to be Big Lots
20     in Montgomery. I think that's what ...
21  Q.  When did you start working for Big Lots?
22  A.  I would say September of '99.
23  Q.  And you worked for them until when?

Page 13

1  A.  I want to say November -- I think it was
2      November 2000, somewhere along in there.
3  Q.  What did you do for Big Lots?
4  A.  Forklift operator.
5  Q.  Forklift operator?
6  A.  Yeah.
7  Q.  And what did you do for Alabama Power? Let
8      me go back to that.
9  A.  I was a cement finisher helper.  Mixed
10     mortar, poured concrete.
11 Q.  And what did you get paid when you were at
12     Alabama Power?
13 A.  I was making 15.50, something like that.
14 Q.  What was your rate of pay at Big Lots?
15 A.  Start pay was 7.50 and end off at like $10.
16 Q.  Have you ever owned your own business?
17 A.  No, sir.
18 Q.  Never been self-employed?
19 A.  Not really.  Well, I contract barber, a
20     trade of mine, hair cutting.  But I never
21     owned my own business.
22 Q.  When did you do that?
23 A.  '93 out of high school a couple of years

Page 14

1      off and on.
2  Q.  Did you graduate from high school?
3  A.  Yes, sir.
4  Q.  What high school did you graduate from?
5  A.  Central High, Hayneville.
6  Q.  What year did you graduate?
7  A.  '92.
8  Q.  Have you ever attended a college?
9  A.  Briefly J.P. Tech for barbering.  But I
10     found out I have to have a license to cut
11     hair.  Went straight to the barber shop.
12 Q.  And that was here in Montgomery; right?
13 A.  Yeah.
14 Q.  When did you attend J.P. Tech?
15 A.  I think it was '93.
16 Q.  Any other college or trade school that you
17     have?
18 A.  No, sir.
19 Q.  Now, you live at 64 Youngblood Road in
20     Farmersville; is that right?
21 A.  Yes, sir.
22 Q.  And how long did you tell me that you've
23     lived there?  You said you've lived in

Page 15

1      Lowndes County pretty much all your life.
2      How long have you lived at that address?
3  A.  That's my mother's address.  Most all my
4      life I stayed next door with my grandmother
5      most of my life until I moved out with a
6      friend or two.
7  Q.  Where were you living in 2005?
8  A.  Still Lowndes County off of Highway 21 with
9      a friend.
10 Q.  The whole year?
11 A.  Yeah.  Yeah.
12 Q.  What's the address at your grandmother's
13     house that you said is next door?
14 A.  It's probably going to be -- Probably --
15     I'm not sure.  The address has changed.  It
16     used to be Route 2, Box 140, but I'm not
17     sure.  I'm not sure right now.  I know
18     that's the old address, Route 2, Box 140.
19 Q.  Do you have any children, Mr. Marshall?
20 A.  Yes.
21 Q.  How many children do you have?
22 A.  Two boys.
23 Q.  Are any of them 19 or older?

Page 16

1  A.  No, sir.
2  Q.  Do you have a lot of relatives in Lowndes
3      County?
4  A.  Fairly, but not a lot.  Close relatives.
5      MR. WILFORD:  Jay, can we get a
6          stipulation, just for the
7          venire information, that he'll
8          give us a list of relatives in
9          the middle district?
10     MR. LEWIS:  Sure.
11     MR. WILFORD:  That will save us
12         some time.
13 Q.  Are you a member of a trade union?
14 A.  No, sir.
15 Q.  Do you go to church?
16 A.  I used to.  I haven't been in a while.
17 Q.  When you went to church, what church did
18     you attend?
19 A.  First Baptist in Farmersville.
20 Q.  Are you a member of any social
21     organizations like, you know, Elks, VFW,
22     anything like that?
23 A.  No, sir.

Deposition of Richard Marshall                                      November 14, 2007

---

Page 17

1    Q.  Other than this lawsuit that we're here on
2        today, have you ever been a party in any
3        other lawsuit either as a plaintiff or a
4        defendant?
5    A.  No, sir.
6    Q.  So this is your first one?
7    A.  Yes.
8    Q.  We had asked you in the interrogatories if
9        you had ever been arrested before, and you
10       gave us three arrests; one in April 25th --
11       25 of '97 in Butler County, the second one
12       was the one that we're here -- I'm sorry --
13       the second one was in '98 in Tuscaloosa,
14       and the third one was the one that we're on
15       here today.  Do you have any other arrests
16       besides those?
17   A.  No, sir.
18          (Defendant's Exhibit 1 was marked
19           for identification.)
20   Q.  Let me show you what I'm going to mark as
21       Defendant's Exhibit 1.  Let me give you
22       just a minute to take a look at that,
23       Mr. Marshall.

---

Page 18

1           (Brief pause.)
2    Q.  Have you had a chance to take a look at
3        that?
4    A.  Yeah.
5    Q.  Does that refresh your recollection as to
6        any other arrests you might have had?
7    A.  Yeah.  I forgot about that.  Seat belt,
8        whatever it was.  I think it was June -- I
9        want to say June.
10   Q.  June of this year?
11   A.  Yeah.
12   Q.  Were you actually incarcerated as a result
13       of that arrest?  Put in jail?
14   A.  Yeah.  I was taken in for three days, but I
15       got a chance to talk to the judge.  It was
16       a miss -- following the incident we're here
17       now on.  They suspended my license for a
18       ticket that I already sat out while I was
19       in there.  She took the ticket up plus the
20       ticket that they wrote me that day and
21       released me.
22   Q.  So you spent two days in jail on this
23       charge and then the judge dismissed all the

---

Page 19

1        charges?
2    A.  Yes.
3    Q.  Is that what you're telling me?
4    A.  Yeah.
5    Q.  Do you remember who it was that arrested
6        you on this June of '07 arrest?
7    A.  The officer -- my first time seeing him.
8        But they did call Shawn Hutson up.  When
9        they ran my name, he was the first officer
10       pulled up.  So they pulled him up and they
11       took me in.
12   Q.  Oh, you're saying Shawn Hutson came to
13       the --
14   A.  Yes, sir.
15   Q.  -- to the stop?
16   A.  Yep.
17   Q.  But he wasn't the one who originally pulled
18       you over; correct?
19   A.  He didn't pull me over.
20   Q.  Do you remember what department that
21       officer might have worked from, the one who
22       originally pulled you over?
23   A.  Oh, it was Lowndes County.

---

Page 20

1    Q.  Was it the DTF?
2    A.  Just a regular city cop, whatever.
3    Q.  City or county?
4    A.  County, city.  I mean, I don't exactly know
5        which one it was.
6    Q.  Do you remember what color uniform the
7        officer wore?
8    A.  I want to say dark-colored, dark-colored
9        uniforms.  May be county.  In a white
10       vehicle.
11   Q.  All right.  Other than this one and the
12       three that you told us about in the
13       interrogatories, any other arrests?
14   A.  No.
15   Q.  On the first arrest in April of '97, did
16       you have to spend any time in jail on that
17       one?
18   A.  '97, yeah.
19   Q.  How long did you spend in jail on that one?
20   A.  Approximately two or three weeks before the
21       charge was dropped.
22   Q.  Do you know why the charges were dismissed?
23   A.  Yeah.  It was bogus charges.  It was a

---

Deposition of Richard Marshall                                          November 14, 2007

|  | Page 21 |
|---|---|
| 1 | misunderstanding between me and my kids' |
| 2 | mom.  She went down there to make false |
| 3 | statements about a vehicle we purchased |
| 4 | together, and two or three weeks later she |
| 5 | came to an agreement and dropped the |
| 6 | charge. |
| 7 | Q.  You say your kids' mom.  Is that the lady |
| 8 |      that you're currently married to? |
| 9 | A.  No, sir. |
| 10 | Q.  What was that lady's name? |
| 11 | A.  Which one? |
| 12 | Q.  The mother of your children. |
| 13 | A.  Shavonne Bailey. |
| 14 | Q.  Do you know where she lives now? |
| 15 | A.  Tuscaloosa. |
| 16 | Q.  Was she the one that was involved in the |
| 17 |      arrest in Tuscaloosa in '98? |
| 18 | A.  Yes, sir. |
| 19 | Q.  Do you have an address on Ms. Bailey? |
| 20 | A.  Not off the top of my head, but I have it. |
| 21 |      I have an address, but I don't know it by |
| 22 |      heart. |
| 23 | Q.  Do you know her phone number? |

|  | Page 22 |
|---|---|
| 1 | A.  I don't know it by heart either. |
| 2 | Q.  When was the last time you talked to her? |
| 3 | A.  Last month. |
| 4 | Q.  Did you spend any time in jail in |
| 5 |      Tuscaloosa? |
| 6 | A.  Overnight. |
| 7 | Q.  Just overnight? |
| 8 | A.  Yeah. |
| 9 | Q.  That was in Tuscaloosa City Jail? |
| 10 | A.  Yeah. |
| 11 | Q.  Or the county jail? |
| 12 | A.  I'm not sure.  I'd have to look at the |
| 13 |      paper and see.  It's been a while. |
| 14 | Q.  The arrest in Butler County, were you in |
| 15 |      the Butler County Jail?  It says you were |
| 16 |      arrested by the Butler City Police |
| 17 |      Department. |
| 18 | A.  Well, they only have one jail.  I don't |
| 19 |      know whether it's under the city or the |
| 20 |      county.  It's the only one they have -- |
| 21 |      still have. |
| 22 | Q.  All right.  And you've been in the Lowndes |
| 23 |      County jail twice; is that correct? |

|  | Page 23 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  Any other times that you've been in jail |
| 3 |      that we haven't talked about? |
| 4 | A.  No, sir. |
| 5 | Q.  Have you ever been treated for alcohol or |
| 6 |      drug addiction? |
| 7 | A.  No, sir. |
| 8 | Q.  Ever been treated for mental illness? |
| 9 | A.  No, sir. |
| 10 | Q.  All right.  Let me draw your attention to |
| 11 |      the day that this incident that this |
| 12 |      lawsuit is about occurred.  Would you agree |
| 13 |      with me that that was June 28th of 2005? |
| 14 | A.  I would agree. |
| 15 | Q.  Do you recall what day of the week that |
| 16 |      was? |
| 17 | A.  I think it was Tuesday. |
| 18 | Q.  You weren't employed on June 28th of '05, |
| 19 |      were you? |
| 20 | A.  No, sir. |
| 21 | Q.  What did you have to do that day, if |
| 22 |      anything? |
| 23 | A.  Early that morning I went to my aunt's |

|  | Page 24 |
|---|---|
| 1 | house and we pulled the motor and |
| 2 | transmission out of a vehicle. |
| 3 | Q.  You said we.  Who is we? |
| 4 | A.  Me and Kevin and two more cousins. |
| 5 | Q.  Kevin Carmichael? |
| 6 | A.  Yes, sir. |
| 7 | Q.  Who were the other two cousins? |
| 8 | A.  Darrell Howard, Charles Howard. |
| 9 | Q.  And you said you were pulling a motor out |
| 10 |      of a car? |
| 11 | A.  Yeah. |
| 12 | Q.  Was it your aunt's car? |
| 13 | A.  No.  It was my cousin's car. |
| 14 | Q.  Were you being paid to do that? |
| 15 | A.  No. |
| 16 | Q.  What time did you get up to go pull that |
| 17 |      motor? |
| 18 | A.  Probably about eight o'clock. |
| 19 | Q.  Did you have anything to eat when you woke |
| 20 |      up? |
| 21 | A.  No, sir. |
| 22 | Q.  Just went straight over there and started |
| 23 |      working on a motor? |

6 (Pages 21 to 24)

Page 25

1    A.   (Witness nods head).
2    Q.   Did y'all eat anything while you were over
3         there?
4    A.   No, sir.
5    Q.   Did you have anything alcoholic to drink
6         while y'all were working on that motor?
7    A.   No, sir.
8    Q.   Take any drugs that day?
9    A.   No, sir.
10   Q.   Prescription drugs?
11   A.   No drugs.
12   Q.   Where is your aunt's house at?
13   A.   It's in Farmersville also.
14   Q.   What's the address there?
15   A.   I don't know the address right off the top
16        of my head.
17   Q.   How far is it from your house?
18   A.   Approximately a mile.
19   Q.   So did you get that motor out that day?
20   A.   Yes, sir.
21   Q.   How were you dressed?
22   A.   T-shirt and shorts.
23   Q.   Pretty hot that day?

Page 26

1    A.   Yeah. It was a pretty hot summer. It was
2         warm that day.
3    Q.   How long did it take y'all to get that
4         motor out?
5    A.   I think we finished up sometime between
6         11:30 -- sometime before noon.
7    Q.   What were you going to do after that?
8    A.   Go home and take a bath and get some rest.
9    Q.   And was that -- When you say going home,
10        was that the 64 Youngblood Road address?
11   A.   No. That's the residence off of 21 where I
12        was residing at the time.
13   Q.   Off of Highway 21?
14   A.   Yes, sir.
15   Q.   Is that on County Road 7?
16   A.   Off of County Road 7, right off of the
17        State Highway 21.
18   Q.   Is that at the intersection of County Road
19        7 and Highway 21?
20   A.   Yeah.
21   Q.   Where did Mr. Howard -- well, the two
22        Mr. Howards, Darrell and Charles, go after
23        y'all got done with that engine?

Page 27

1    A.   They was at their house where we took it
2         out. That's his mother.
3    Q.   So they didn't go anywhere?
4    A.   They were home already.
5    Q.   Did you have any plans for the rest of the
6         day other than just going home?
7    A.   No plans.
8    Q.   Was there anybody in the car with you when
9         you went home?
10   A.   Kevin Carmichael.
11   Q.   Did you stop anywhere between your aunt's
12        house and where your encounter with the
13        defendants began?
14   A.   No, sir.
15   Q.   Can you describe for me the vehicle that
16        you were in?
17   A.   1971 blue Nova.
18   Q.   '71?
19   A.   Yes, sir.
20   Q.   That's a Chevrolet; right?
21   A.   Yes.
22   Q.   Was that your car?
23   A.   Yes.

Page 28

1    Q.   How long had you had that car?
2    A.   I think I purchased it in July of '04.
3             (Defendant's Exhibit 2 was marked
4             for identification.)
5    Q.   Let me show you what we'll mark as
6         Defendant's Exhibit 2 after your attorneys
7         get a chance to look at it. Is that your
8         car?
9    A.   That's my car.
10   Q.   That's in Defendant's Exhibit 2?
11   A.   That's it.
12   Q.   Who all besides you had access to that car?
13   A.   No one.
14   Q.   So you had the only set of keys; correct?
15   A.   That's correct.
16   Q.   Had you loaned it to anyone recently?
17   A.   No, sir.
18   Q.   I'm sorry?
19   A.   No, sir.
20   Q.   Was that car equipped with seat belts?
21   A.   Yes, sir.
22   Q.   Were you wearing your seat belt that day?
23   A.   No, sir.

Page 29

1  Q.  What about Kevin, was he wearing his?
2  A.  No.
3  Q.  Was there any alcohol in that car?
4  A.  No, sir.
5        (Defendant's Exhibit 3 was marked
6        for identification.)
7  Q.  Let me show you what we're going to mark as
8        Defendant's Exhibit 3.  Let me ask you,
9        does that look like the front seat of your
10       car on June 28th, 2005, Defendant's Exhibit
11       3?
12 A.  That's it.
13 Q.  Fairly and accurately depict what was on
14       the front seat of your car that day?
15 A.  Yes, sir.
16 Q.  What was in that flask that's there on the
17       seat next to the gun?
18 A.  At one time it had contained alcohol, but
19       it was no alcohol in it that day.
20 Q.  Well, what was in it when it was -- What
21       was the alcohol that was in there?
22 A.  Vodka.
23 Q.  When did you drink that -- or did you --

Page 30

1        let me back up.  Did you drink that?
2  A.  It's been in there for some while.
3        Probably a week prior when I had a drink.
4  Q.  So you had emptied it about a week prior;
5        is that right?
6  A.  Yeah.
7  Q.  Now, Defendant's Exhibit 3 also has a gun
8        in that picture; correct?
9  A.  Uh-huh (positive response).
10 Q.  Was that your gun?
11 A.  No, sir.
12 Q.  But you knew it was in the car that day;
13       right?
14 A.  Yes, sir.
15 Q.  Whose gun is it?
16 A.  It belongs to D.C. McWilliams.
17 Q.  Who is D.C. McWilliams?
18 A.  A friend of mine.
19 Q.  How did it get in the car?
20 A.  Well, he left it in there.  One day I give
21       him a ride when he was having car trouble.
22       It was starting to rain.  He came along and
23       said he wanted to go back and get his gun

Page 31

1        and his books.  And I give him a ride home
2        right before dark.  It started raining even
3        harder before we got there.  When I pulled
4        up in his driveway, he jumped out of the
5        car and left the gun.
6  Q.  How long ago before -- Let me back up and
7        regroup.  How long before June 28th, 2005
8        did you give Mr. McWilliams a ride?
9  A.  Approximately three or four days earlier
10       than that.
11 Q.  Where does Mr. McWilliams live?
12 A.  Right off of Highway 21.
13 Q.  Do you know the address?
14 A.  Not right offhand.
15 Q.  How far is it from your house?
16 A.  Approximately three or four miles.
17       (Defendant's Exhibit 4 was marked
18       for identification.)
19 Q.  Let me show you what we'll mark as
20       Defendant's Exhibit 4.  Does that look like
21       the ashtray that was in your Nova?
22 A.  It is.
23 Q.  And you can see in there there's some

Page 32

1        bullets in there; right?
2  A.  Yes, sir.
3  Q.  Why were those bullets in your ashtray?
4  A.  Like I said, he left the box of bullets in
5        there which had got wet from the rain.  The
6        box was deteriorating, therefore tearing
7        up.  So I took the bullets, put them in the
8        ashtray.  And there probably was some on
9        the seat also because all of them couldn't
10       fit in there.
11 Q.  If you look back at Defendant's 3,
12       I believe it is, I think you're right.
13       There is a bullet lying there on the seat,
14       isn't there?
15 A.  Yeah.
16 Q.  So he left the gun and a box of bullets in
17       your car?
18 A.  Yes, sir.
19 Q.  And he left it there for three to four
20       days?
21 A.  That's approximately how long it was.
22 Q.  Had he tried to get ahold of you to get his
23       gun and his bullets back prior to that

Page 33

1    time?
2  A.  He may have, but I was in and out of my
3      residence probably and missed him. I even
4      called him, but I couldn't get up with him.
5  Q.  Does Mr. McWilliams still live there off
6      Highway 21?
7  A.  I'm certain he does.
8  Q.  Did you have a concealed weapon permit?
9  A.  No, sir.
10  Q.  Had you ever had a concealed weapon permit?
11  A.  No, sir.
12  Q.  How much money did you have on you that
13      day?
14  A.  500.
15  Q.  Exactly 500?
16  A.  Yes, sir.
17  Q.  In what denomination were the bills?
18  A.  I know two $100 bills and the rest were
19      twenties.
20  Q.  Where did that money come from?
21  A.  I previously was drawing unemployment when
22      I got laid off from one job and I saved
23      money. And during that time I was having a

Page 34

1    fairly decent streak at the gambling
2    casinos. During the time I won a
3    substantial amount of money.
4  Q.  Which casino?
5  A.  White Hall Gaming Casino. Also Biloxi,
6      Mississippi I won some money.
7  Q.  Which casino in Biloxi?
8  A.  I'm not sure right offhand. I'd have to
9      check receipts or something. I don't want
10      to say the wrong one.
11  Q.  When did you win that money?
12  A.  I won the money in Mississippi in '04. The
13      month I'm not exactly -- I'm not sure of
14      the month. I won money in White Hall in
15      '05, March.
16  Q.  Well, how much did you win in Biloxi?
17  A.  About 1600.
18  Q.  And how much at White Hall?
19  A.  3600.
20  Q.  And you're saying that this money was
21      left -- what was left of your winnings? Am
22      I understanding you correctly?
23  A.  Yeah.

Page 35

1  Q.  Did you report those winnings on your
2      income tax?
3  A.  I took a waiver out -- tax waiver out each
4      time.
5  Q.  Tax waiver. You have to explain that to me
6      because I'm not a gambler.
7  A.  When you have to sign to have your taxes
8      taken out of winnings to report your W-2s
9      from the casino.
10  Q.  Right. Okay. But when you filed your
11      income tax at the end of the year, did you
12      report that income?
13  A.  I haven't filed but once since '05. I
14      think child support ended up being on
15      that. I'm not sure if I had it in there or
16      not.
17  Q.  Where was that money at?
18  A.  What money?
19  Q.  The $500 that we're talking about. That's
20      a good point. When I ask a bad question,
21      you go right ahead and ask me to clarify.
22      I'm talking about the $500 now. Where did
23      you have that at?

Page 36

1  A.  In my short right-hand pocket.
2  Q.  Was it in a wallet, or how were you
3      carrying it?
4  A.  Just together folded.
5  Q.  When was the first time that you remember
6      seeing the two officers that you ran into
7      later that day?
8  A.  The first time that I seen two unknown
9      persons was on County Road 7 immediately
10      coming from my aunt's house.
11  Q.  That's good. Let's back up and regroup on
12      that just a minute. Did you turn off of
13      Highway 21 going down County Road 7 to your
14      house?
15  A.  I turned off of Highway 16 onto County Road
16      7 where I met the officers.
17      (Defendant's Exhibit 5 was marked
18      for identification.)
19  Q.  Just so I'm clear, I'm going to show you
20      what we're going to mark as Defendant's
21      Exhibit 5, which I'll tell you is just a
22      little map that I got off the Internet of
23      the area. Kind of centered in it is County

Deposition of Richard Marshall

November 14, 2007

Page 37

1      Road 7 and Highway 21 and we'll just kind
2      of refer to that. Now, you said you came
3      off -- was it County Road 16 and onto --
4      I'm sorry. Let me move all this stuff out
5      of your way. I don't see County Road 16 on
6      that map, and I might not have it zoomed in
7      in enough detail.
8  A.  Well, it's -- the road coming from
9      Farmersville I think leads to be County
10      Road 16 and then you make a right on County
11      Road 7.
12  Q.  There's Farmersville right there. So does
13      County Road 16 kind of come --
14  A.  Yeah. And you make a right onto County
15      Road 7. Then you make another right on
16      Highway 21.
17  Q.  I tell you what. Let me give you my pen
18      here and if you would just draw a
19      little line there from that dot under
20      Farmersville. Just your best guess at how
21      County Road 16 goes into County Road 7.
22  A.  It would have to be coming from this
23      direction and make a right on County Road

Page 38

1      7.
2  Q.  Just draw that to where it intersects into
3      County Road 7. Just make your line go into
4      County Road 7.
5  A.  (Witness complies).
6  Q.  There we go. That's good. And if you
7      would, just put a 16 under that so we'll
8      know what we're talking about.
9  A.  (Witness complies).
10  Q.  All right. Now, if you would on here just
11      put a little X about where your house was
12      back in June of '05.
13  A.  The residence where I was going to?
14  Q.  Yes, sir.
15  A.  Well, it's off of Highway 21. Braggs.
16      This is 263 exit. I stayed approximately a
17      mile or two, three miles from the 263
18      exit. So I would have to say somewhere in
19      here approximately.
20  Q.  Can you put a little bit larger X so when
21      we copy that?
22  A.  (Witness complies).
23  Q.  And if you would, just write home under

Page 39

1      that.
2  A.  (Witness complies).
3  Q.  All right. So make sure I understand what
4      you're telling me. You left Farmersville
5      where your aunt's house was?
6  A.  Yes, sir.
7  Q.  Traveled down County Road 16?
8  A.  Uh-huh (positive response).
9  Q.  Took a right on County Road 7 from County
10      Road 16?
11  A.  (Witness nods head).
12  Q.  Where did you first see who you later
13      learned to be the defendants in this case?
14  A.  Approximately a quarter mile after turning
15      on County Road 7 I met a dark-colored
16      Lincoln Town Car, who I first thought was a
17      drunken driver or something that slowed
18      down, hit the brakes hard. And I didn't
19      know who it was, so I kept driving.
20  Q.  Okay. There's a whole bunch of things I
21      need to ask you about there. You said it
22      was a dark-colored Lincoln Town Car?
23  A.  Yes, sir.

Page 40

1  Q.  Had you ever seen that car before?
2  A.  No, sir.
3  Q.  Did it have any distinguishing features on
4      it, like a license plate on the front or
5      anything that stood out in your mind?
6  A.  Didn't even pay it no attention. Wasn't
7      registering in my mind. Just another
8      vehicle.
9  Q.  Had you passed any vehicles on County Road
10      7 prior to seeing that dark-colored
11      Lincoln?
12  A.  No, sir. That's the first vehicle I saw.
13  Q.  Had you passed any on County Road 16?
14  A.  No, sir.
15  Q.  So you're all alone on a road there?
16  A.  Yes, sir.
17  Q.  All right. You also said that you thought
18      it was a drunk driver. What made you think
19      it was a drunk driver?
20  A.  Because immediately upon meeting the car
21      the car slammed on brakes and took a nose
22      dive, and I thought that to be strange at
23      the time. Looked in my rear view mirror,

Page 41

1  saw that the car was veering off to the
2  side of the road. So I thought maybe they
3  had a flat or something, so I kept driving.
4  Q. You didn't see it swerving in the road as
5  it was coming towards you; right?
6  A. No, sir.
7  Q. So the only thing that made you think it
8  was a drunk driver was it slammed on the
9  brakes and then veered off the road?
10  A. Yes, sir.
11  Q. Did you get a look at who was in the
12  vehicle as it went by you?
13  A. No, sir.
14  Q. County Road 7 where you encountered this
15  dark-colored Lincoln, is that a two-lane
16  road?
17  A. It's a small rural road, one lane.
18  Q. One lane in each direction?
19  A. Yeah. One lane in each direction.
20  Q. Did you see any kind of blue lights on the
21  vehicle when it went by you?
22  A. There was no lights.
23  Q. When you say no lights, no blue lights?

Page 42

1  A. Right.
2  Q. It had headlights; right?
3  A. I'm certain it did.
4  Q. Had you ever seen Chris West before that
5  day?
6  A. No, sir.
7  Q. How about LaShun Hutson, had you ever seen
8  him before that day?
9  A. No, sir.
10  Q. Did you know of them?
11  A. I never know of Shawn Hutson, but I have
12  heard Chris West's name.
13  Q. You'd heard Chris West's name prior to the
14  28th of June of '05?
15  A. Yes, sir.
16  Q. What did you know about Chris West prior to
17  June 28 of '05?
18  A. Only that he was a law enforcement officer.
19  Q. Do you remember who you heard that from or
20  how you heard it?
21  A. No, sir. Just open conversation.
22  Q. Do you know who might have told you that?
23  A. No one told me. Just heard it. Just heard

Page 43

1  of him.
2  Q. Did you know he worked with the drug task
3  force?
4  A. No, sir.
5  Q. Other than slamming on the brakes and
6  veering off the road, did they do anything
7  else unusual?
8  A. That's all I know is right then.
9  Q. You say right then. Did they do anything
10  else after that?
11  A. Yeah. Next thing I know is they was upside
12  my car.
13  Q. So from the time -- Let me make sure I got
14  your testimony right. From the time you
15  saw them slam on brakes and veer off the
16  road until they were next to you, you
17  didn't see them. Is that what you're
18  telling me?
19  A. Yes, sir.
20  Q. Were there any cars coming behind that
21  Lincoln that you saw?
22  A. No, sir.
23  Q. Okay. Now, you said they came alongside of

Page 44

1  you. How did they do that? Describe that
2  for me.
3  A. After seeing the car slam on brakes and,
4  like I said, I looked in my back mirror and
5  saw them veer off. I kept driving. Didn't
6  know what was happening. Approximately 30
7  seconds to a minute later they had pulled
8  up beside me in the passing lane. All I
9  saw was two black males in black T-shirts
10  trying to flag me to pull over on first
11  glance.
12  Q. You said trying to flag you. What were
13  they doing?
14  A. I just seen the hand signal (indicating)
15  and pull over.
16  Q. Was there anything -- Let me back up. Who
17  was doing the hand signal? Was it the
18  passenger or the driver?
19  A. Passenger.
20  Q. And just kind of describe what you did a
21  second ago. For the record you were using
22  your right hand and kind of pushing at
23  shoulder level off to the side?

Deposition of Richard Marshall

November 14, 2007

Page 45

1   A.  Yes, sir.
2   Q.  Did you later learn who the passenger was
3       that was giving you the hand signal?
4   A.  I believe it was Shawn Hutson.
5   Q.  So Chris West was driving; is that right?
6   A.  I think he was. Had to be.
7   Q.  Was there anybody else in the car besides
8       those two?
9   A.  No, sir.
10   Q.  Was your window up or down in your car?
11   A.  Down.
12   Q.  Does the air conditioning work in that car?
13   A.  No, sir.
14   Q.  So you had 2 by 55 air conditioning?
15   A.  I mean, wind?
16   Q.  Yeah.
17   A.  Yeah. That's it.
18   Q.  And I'm just going to start referring to
19       them by name now. We know that based on
20       your testimony Shawn was the passenger and
21       Chris was the driver. Did Shawn say
22       anything to you when he was initially
23       giving you that hand signal?

Page 46

1   A.  I really couldn't hear if he had said
2       anything anyway. As you can see in my
3       trunk, I had amplifiers and music that was
4       blasting during the time. I was driving
5       35, 40 miles per hour. All I could really
6       see was a hand signal.
7   Q.  Well, did it look like he was trying to say
8       something?
9   A.  I can't recollect. I can't say that
10       because it happened so quick. Just a brief
11       glance and that's all I looked over there.
12   Q.  Let me back up and ask you something here.
13       In paragraph 16 of your amended complaint
14       you alleged that you've been robbed
15       before.
16   A.  Yes, sir.
17   Q.  How many times had you been robbed before?
18   A.  Once.
19   Q.  When was that?
20   A.  August '03.
21   Q.  Where was it?
22   A.  In Montgomery.
23   Q.  What happened?

Page 47

1   A.  I was at the hotel, Peddler's Inn, and I
2       had a guy pull a gun on me and demanded
3       money.
4   Q.  Were you in a car or were you just
5       walking? Where were you?
6   A.  Coming out my room -- hotel room.
7   Q.  Did he get any money off of you?
8   A.  He took some money.
9   Q.  Did you report it to the police?
10   A.  Yeah. I went in for questioning and made a
11       statement.
12   Q.  Did they ever catch the guy who did it?
13   A.  Yes.
14   Q.  What was his name?
15   A.  I want to say Jerome Titus.
16   Q.  What happened with Mr. Titus?
17   A.  I guess they prosecuted him or whatever. I
18       don't know the full extent.
19   Q.  Did you ever have to testify at trial?
20   A.  No. I got a letter from the DA, Ellen
21       Brooks, saying it wasn't enough evidence or
22       something. I don't know. It was
23       dismissed.

Page 48

1   Q.  So he wasn't convicted?
2   A.  Not to my knowledge.
3   Q.  All right. So that was the only time that
4       you were robbed previously?
5   A.  Yes, sir.
6   Q.  Have you been robbed since?
7   A.  No, sir.
8   Q.  All right. So we got to the point where
9       their car -- are they about even with you
10       going down County Road 7?
11   A.  Yeah. They pulled right up beside me.
12   Q.  Going about 35, 40 miles an hour; is that
13       right?
14   A.  Yeah. I wasn't driving fast.
15   Q.  What's the speed limit there?
16   A.  Approximately 45, 50 maybe, anywhere in
17       that range.
18   Q.  About how long did they stay alongside of
19       you like that?
20   A.  Approximately 10 seconds.
21   Q.  What did they do after that 10 seconds?
22   A.  They veered behind me and trailed me out to
23       Highway 21.

Page 49

1    Q.   Did they try to come up alongside of you
2         again prior to getting to Highway 21?
3    A.   No, sir.
4    Q.   Did you look at them in your rear view
5         mirror?
6    A.   I took a glance in my rear view mirror and
7         noticed that they was riding my bumper.
8    Q.   Did you see a blue light at that time?
9    A.   There was no blue light.
10   Q.   Could you see what the two occupants of the
11        car were doing in your rear view mirror?
12   A.   No, sir. I didn't glance. Just quick
13        glance to see that they was still behind
14        me.
15   Q.   Let me back up for just a second. When
16        they were alongside of you here this first
17        time, did you say anything to them?
18   A.   On first glance when they pulled up, yeah,
19        I may have said -- asked them what they
20        want, not in that nice a way, though.
21   Q.   Not in a nice way?
22   A.   Yeah. Not in a nice way.
23   Q.   Can you tell me exactly what you said?

Page 50

1    A.   What the fuck y'all want.
2    Q.   Did you think to turn the stereo down?
3    A.   No. Because it was my first understanding
4         that it was somebody trying to rob me and
5         I'm not going to be courteous to them.
6    Q.   So you couldn't hear what they were saying
7         to you; right?
8    A.   No, sir.
9    Q.   And you asked them what you asked them?
10   A.   Yes, sir.
11   Q.   And the stereo is still going the whole
12        time?
13   A.   Yes, sir.
14   Q.   Did it look like either one of them
15        responded when you asked them that question?
16   A.   No, sir.
17   Q.   Because you just glanced at them real
18        quick; right?
19   A.   Yes, sir.
20   Q.   All right. They trailed you all the way up
21        to Highway 21; correct?
22   A.   Yes, sir.
23   Q.   What did you do when you got to Highway 21?

Page 51

1    A.   I turned right. Turned going toward my
2         residence.
3    Q.   Turned right going towards your house?
4    A.   Yes, sir.
5    Q.   Which I guess on this map takes us back to
6         the west; is that right? I think this is
7         west over here on the left-hand side.
8    A.   I don't know if it's west or not. All I
9         knew --
10   Q.   Kind of southwest really?
11   A.   I turned right on Highway 21.
12   Q.   We'll go with that. You turned right on
13        Highway 21 heading towards your house. Is
14        there a stop sign there at 7 and 21?
15   A.   Caution light, yield sign.
16   Q.   A yield sign?
17   A.   Uh-huh (positive response).
18   Q.   Was there any traffic coming on Highway 21?
19   A.   No, sir. I didn't see any traffic.
20   Q.   Either way?
21   A.   No, sir.
22   Q.   What is Highway 21? Is it another
23        two-lane, one lane each way, or is it

Page 52

1         four-lane?
2    A.   Two-lane, one lane each way. State
3         highway.
4    Q.   Did you stop at the intersection of 7 and
5         21?
6    A.   Brief caution, brake in the road at the
7         yield sign and proceeded to go right toward
8         my residence.
9    Q.   Kind of a rolling stop?
10   A.   Yeah. Rolling stop.
11   Q.   Wheels never really came to a complete
12        rest?
13   A.   No, sir.
14   Q.   And you took the right going onto Highway
15        21?
16   A.   Yes, sir.
17   Q.   What did the Lincoln do?
18   A.   Still behind me.
19   Q.   It followed you out on Highway 21?
20   A.   Yes, sir.
21   Q.   Did you get a chance to look in your rear
22        view mirror as you were going down 21?
23   A.   Well, right after turning on Highway 21 the

Page 53

1      vehicle pulled up beside me again.
2   Q.  So up again on the left-hand side of your
3       vehicle coming in the oncoming traffic
4       lane; is that right?
5   A.  Yes, sir.
6   Q.  How fast were you going at that time?
7   A.  Approximately 55, somewhere around there.
8   Q.  What's the speed limit on Highway 21?
9   A.  I'm quite sure it's 55.
10  Q.  And I should have asked you this before.
11      The rest of the time that you were on
12      County Road 7, did you stay going 35, 40
13      miles an hour?
14  A.  Around 35, 40 miles an hour.  Because they
15      were bumper to bumper on me.  ———
16  Q.  So you sped up a little bit?
17  A.  It was a wavy road, so I really didn't want
18      to travel fast.
19  Q.  Well, you did speed up a little if you got
20      up to 45; right?
21  A.  Well, like I said, I was driving around 35
22      to 45 on County Road 7.
23  Q.  Well, were you trying to get them off your

Page 54

1      bumper at all?
2   A.  I wasn't trying to because I knew I
3       couldn't.  They was trailing my bumper.
4       And like I said, it was a wavy road.  I
5       didn't want to hurt myself.
6   Q.  So you turned onto Highway 21 and they came
7       up alongside of you.  What happened when
8       they came alongside of you?
9   A.  They came alongside me and I saw the same
10      thing again, hand motion and I glanced and
11      kept driving.
12  Q.  Was there anything in -- And you said the
13      hand motion.  Was that the passenger again,
14      Shawn?
15  A.  Yes.
16  Q.  Could you see anything that Chris might be
17      doing?
18  A.  I didn't have time to just lock in on him.
19  Q.  Did Shawn have anything in his hands this
20      time when they pulled up alongside of you
21      on 21?
22  A.  On second glance it appeared to be a weapon
23      at a glance and kept driving.

Page 55

1   Q.  Did you see anything besides the weapon?
2   A.  No, sir.  I just seen the right hand.
3   Q.  I'm sorry?
4   A.  I just saw his right hand gesturing and I
5       just kept driving.
6   Q.  Is that the only hand he had in view?
7   A.  That's the only hand I saw.
8   Q.  Did he say anything to you?
9   A.  I didn't hear him say anything if he did
10      for the music.
11  Q.  You still had the music going?
12  A.  Yes, sir.
13  Q.  Could you tell that he was trying to say
14      anything to you?  Could you see his lips
15      moving?
16  A.  I didn't have time to just lock on to what
17      he was saying, lips moving, because I'm
18      watching traffic and watch the incident.
19      All I did is glance.  When the car pulled
20      up beside me, I glanced, put my eyes back
21      on the highway and kept driving.
22  Q.  You just said watching traffic.  Are there
23      cars coming now?

Page 56

1   A.  No cars coming, but I'm looking for a car.
2   Q.  So still y'all are the only two vehicles on
3       the road?
4   A.  Yes, sir.
5   Q.  Describe that weapon that you saw for me.
6   A.  I can't describe it.  All I know is I saw a
7       weapon.  I don't know what brand --
8   Q.  Was it a knife?  A gun?
9   A.  A gun, yeah.  A gun.
10  Q.  Was it black?  Shiny?
11  A.  It was black.
12  Q.  Big gun?  Little gun?
13  A.  I don't know.  I can't lock in on the
14      size.  I glanced at the weapon I saw.
15  Q.  Was it pointed at you?
16  A.  I can't say that it was pointed at me.  All
17      I seen was a hand gesture going like to
18      pull over or whatever.
19  Q.  He was gesturing with the gun?
20  A.  That's what I saw.
21  Q.  Did you say anything to him?
22  A.  I didn't say anything else.  I was still
23      just driving.

Page 57

1    Q.  While all this was going on up to this
2        point, what's Kevin doing?
3    A.  Sitting in the seat asking me, Cuz, who is
4        this trying to run us off the road?  I tell
5        him I don't know; looks like somebody
6        trying to rob us; I'm not going to stop.
7        He was scared.
8    Q.  Well, I understand that you were driving
9        the vehicle.  Was he watching them?
10   A.  He wasn't watching them.  He was just aware
11       of what was going on.
12   Q.  Did he tell you at some point that the
13       police were behind you?
14   A.  He didn't tell me that.
15   Q.  He did not tell you that?
16   A.  No, sir.
17   Q.  Well, did he ever tell you to pull over at
18       any time?
19   A.  He didn't tell me to pull over.  He's
20       asking me who is this and what they trying
21       to do.  He just said, it looked like
22       they're going to run us off the road and
23       kill us if we don't pull over.

Page 58

1            (Defendant's Exhibit 6 was marked
2            for identification.)
3    Q.  Let me show you what we'll mark as
4        Defendant's Exhibit 6.  Let me give you
5        just a minute to look at Defendant's
6        Exhibit 6.
7            (Brief pause.)
8    Q.  Had you ever seen that document before
9        today, Mr. Marshall?
10   A.  I have.
11   Q.  When did you get a chance to see that
12       document?
13   A.  When we turned the information over.
14   Q.  Those initial disclosures; is that right?
15   A.  Yeah.
16   Q.  Now, this is a statement that Kevin gave to
17       the police that day.  And in it he says
18       that he saw that it was the police and he
19       advised you to pull over.  Is it your
20       testimony that he didn't tell you to pull
21       over?
22   A.  He didn't tell me to pull over, because by
23       the time we both realized it was the police

Page 59

1        we already had been spun off the road
2        before we realized who it was.
3    Q.  Now, you still had the music going pretty
4        good at that time?
5    A.  The music was going until Chris West turned
6        it off.
7    Q.  Is it possible that you just didn't hear
8        what Kevin was saying to you because of the
9        music?
10   A.  It's possible.
11   Q.  All right.  How long did they stay up
12       alongside of you the second time?
13   A.  Still approximately 10 seconds.
14   Q.  Did you see a blue light this time?
15   A.  I didn't see a light.
16   Q.  Did you see a badge?
17   A.  I didn't see a badge either.
18   Q.  And you told me before that they were
19       wearing black T-shirts.  Did those black
20       T-shirts have any writing on them?
21   A.  Not that I can recollect.  I just seen it
22       was black T-shirts.
23   Q.  What did they do after that 10 seconds of

Page 60

1        being alongside of you?
2    A.  Veered back behind me and trailed me
3        approximately another mile and a half or
4        two and they started to ram the vehicle.
5    Q.  Between the time that they pulled back
6        behind you and as you described the ramming
7        started, did you get a chance to look in
8        your rear view mirror at them?
9    A.  I didn't look in the mirror.
10   Q.  You didn't look again?
11   A.  (Witness shakes head).
12   Q.  So you couldn't see anything that they were
13       doing back there?
14   A.  I don't know what they was doing.
15   Q.  Let me back up again to the second time
16       they were beside you.  I might have asked
17       you this before.  If I did, I apologize.
18       Did you say anything to the passenger that
19       second time?
20   A.  No, sir.
21   Q.  Make any motions to him?
22   A.  I don't remember making any motions.  I
23       just remember glancing at him and keep

Page 61

1    driving.
2    Q.  While all this was going on, where was this
3        gun that's in Defendant's 3?
4    A.  Laying on the seat.
5    Q.  About where it is in Defendant's 3?
6    A.  Approximately somewhere.
7    Q.  Let me show it to you again.  And is
8        that -- you can see in the left-hand side,
9        is that the steering wheel?
10   A.  Yes, sir.
11   Q.  So it's -- is it fair to say that it's
12       fairly close to the driver?
13   A.  Yes, sir.
14   Q.  Was that gun just out in the open like
15       that, or was it tucked up under you
16       somehow?  How was that gun?
17   A.  It was down between the seat.
18   Q.  What do you mean down between the seat?
19   A.  Approximately somewhere around here where
20       it wouldn't be sliding.  It was laying
21       there.
22   Q.  You're pointing to the right-hand side what
23       looks like seat belts.  Are those seat

Page 62

1    belts there?
2    A.  Yeah.
3    Q.  Those little black things on the right-hand
4        side?
5    A.  Uh-huh (positive response).
6    Q.  So was it -- How was it in there?  You've
7        got it barrel down.  Describe for me how
8        it's in between the seats there.
9    A.  I'm certain the barrel was in there so it
10       wouldn't be moving pointing toward the --
11       back in the seat.
12   Q.  Did you touch the gun at any time while
13       this pursuit was going on?
14   A.  I don't know.  I probably touched it if it
15       was moving or whatever, but I didn't reach
16       for it or nothing.
17   Q.  Was the gun loaded?
18   A.  Yes, sir.
19   Q.  What kind of gun is that?
20   A.  .357.
21   Q.  Do you know what kind of bullets were in
22       it?
23   A.  .357 hollow points.

Page 63

1    Q.  At any time during this pursuit did you
2        pick that gun up?
3    A.  No, sir.
4    Q.  So it's just there kind of tucked down in
5        the seat?
6    A.  Yeah.  Until they was ramming.  It probably
7        was moving when they was ramming the
8        vehicle.  That's probably about the only
9        time I probably touched it.
10   Q.  Did the gun move at any time during the
11       pursuit?  Did it stay here until the
12       ramming started?
13   A.  I'm quite sure it did.  But when they was
14       ramming the car, my head was jerking.  I'm
15       quite sure it was moving along with
16       everything else on the seat.
17   Q.  Let's talk about the ramming.  Describe for
18       me what you mean when you say they rammed
19       you.
20   A.  Like I say, after they pulled beside me for
21       the second time, they veered back behind me
22       approximately -- a mile and they started
23       hitting -- hitting the back end of my

Page 64

1    vehicle like two or three times.  Each time
2    it was knocking the car in a wiggling
3    motion off the highway.
4    Q.  How fast were you going at that point?
5    A.  Initially I probably was going about 55
6        until they started ramming me and I was
7        losing control of the car and I slowed down
8        approximately about 35, 40 miles an hour
9        because I didn't want the car to flip out
10       of control.
11   Q.  What part of their car was striking your
12       car?
13   A.  I would have to say their bumper to
14       bumper.  I wasn't aware of the ramming
15       until I was hit.
16   Q.  Okay.  Was it -- And when you say ramming,
17       were they hitting you center on, or were
18       they off to one side or the other?  How was
19       that?
20   A.  They were hitting me center on up until the
21       point where they spinned me out.  And
22       that's when they hit me on the driver's
23       side bumper and spinned me out of control.

Page 65

1      MR. WILFORD: Let's take a quick
2   break. We've been going for
3   an hour.
4      (Brief recess was taken.)
5   Q.  Okay. When we broke, Mr. Marshall, we were
6   talking about the ramming had begun. About
7   how many times did the Lincoln come into
8   contact with your car?
9   A.  First ramming I'm quite sure he rammed me
10   twice -- two or three times. Made the car
11   sort of lose control and then I regained.
12   Q.  That's what I want to do. I want to take
13   them one by one so you can tell me what
14   happened each time he made contact with
15   you. The first time that he hit you, was
16   that, again, head-on his front to roughly
17   the center of your bumper; is that right?
18   A.  Yes, sir.
19   Q.  And how fast were you going at the time
20   when he first hit you?
21   A.  I may have been going approximately 45 to
22   55 miles an hour at the first ramming.
23   Q.  What did you do when you felt the impact?

Page 66

1   A.  Well, on impact it jerked my neck and for a
2   brief moment I lost control of the car like
3   swerved from the ramming. And I looked in
4   the mirror at this time to see what was
5   going on, but I still couldn't see what
6   they was doing back there. I drove
7   approximately another quarter mile.
8   Q.  Hang on just a second. You said you looked
9   back in the rear view mirror. About how
10   long did you look?
11   A.  Just a glance up after they rammed.
12   Q.  Could you see what they were doing?
13   A.  No. I couldn't make visual what they were
14   doing.
15   Q.  Did you see a blue light?
16   A.  No, sir.
17   Q.  Did you see any badges?
18   A.  No, sir.
19      COURT REPORTER: Can I stop for
20   two seconds?
21      MR. WILFORD: Sure.
22      (Brief pause.)
23   Q.  All right. After you got control of the

Page 67

1   car after the first hit, what, if anything,
2   did you do?
3   A.  Continued to drive.
4   Q.  Did you slow down or speed up?
5   A.  Yeah. I slowed down.
6   Q.  How slow did you get down to?
7   A.  Probably I want to say around 30, 35 miles
8   an hour.
9   Q.  Did you make any moves to pull the vehicle
10   off the road?
11   A.  No.
12   Q.  You said your neck got jerked around. Did
13   you come in contact with anything in the
14   car?
15   A.  Not -- At that time I didn't.
16   Q.  How long did you drive at 35 miles an hour
17   before something else happened?
18   A.  Approximately 10 seconds and got rammed
19   again.
20   Q.  So this would be ram number two; correct?
21   A.  Yes, sir.
22   Q.  How did he hit you that time?
23   A.  Same way, bumper.

Page 68

1   Q.  Center on?
2   A.  Yes, sir.
3   Q.  Do you have any estimate of how fast they
4   were going? Let's go back to the first
5   time he hit you. Do you have any idea how
6   fast he was going when he hit you?
7   A.  I would estimate not too much faster than
8   me, because they were riding my bumper the
9   whole time.
10   Q.  So he couldn't have accelerated too much
11   before he came in contact; right?
12   A.  I guess not.
13   Q.  What about the second time, do you have any
14   idea how fast he was going?
15   A.  I can't approximate how fast he was going.
16   I just know the impact was variably the
17   same.
18   Q.  Did he stay on your bumper between the
19   first and the second impact?
20   A.  After the first impact I don't think he was
21   riding my bumper as close. Because like I
22   say, I sort of lost control. He probably
23   fell back a little until I regained control

Page 69

1  and then I felt the ram again.
2  Q.  About how far did he fall back?
3  A.  I can't say how far because I really didn't
4     look back.  I just know I was swerving and
5     I'm quite sure he wasn't on my bumper while
6     I'm swerving.
7  Q.  Right.  When you did that glance into the
8     rear view mirror, though, about where was
9     he?  Was he still back on your bumper?  Had
10    he fallen back?
11 A.  No.  He had fell back approximately 20, 30
12    yards after he first bumped me.
13 Q.  All right.  So the second impact was about
14    as hard as the first impact; right?
15 A.  Yes, sir.
16 Q.  What happened immediately after the second
17    impact?
18 A.  Immediately after the second impact, the
19    car veered a little more, and immediately
20    following that that's when he bumped it
21    again on my driver's side bumper and
22    spinned me out of control.  That's when my
23    head hit the steering wheel.  I snatched

Page 70

1  the vehicle.  It jumped Highway 21 and
2  landed on the opposite side of the highway
3  in a ditch on a spinout.
4  Q.  Okay.  So you're saying that the hit where
5     he spun you out came fairly quickly after
6     the second ram; is that right?
7  A.  Yes, sir.
8  Q.  Were you still going about 35 miles an hour
9     when the spinout hit occurred?
10 A.  Yes, sir.  Approximately.
11 Q.  Were you able to take any kind of
12    corrective action with the car between the
13    time of the second hit and the spinout hit?
14 A.  After he rammed me the second time, like I
15    say, I guess because I wasn't going as
16    fast, the car just like jerked.  And before
17    I can regroup, he had hit me again on the
18    bumper.  And that's when I spinned out
19    toward the bluff.  My head hit the steering
20    wheel.  Knowing it's a deep bluff right
21    here, I snatched the steering wheel, and
22    all I know the car jumped or skid across
23    Highway 21.  Because when my head came up,

Page 71

1  I was on the opposite side of the road in a
2  daze.  By the time I opened the car door
3  they was already out of their vehicle with
4  guns drawn.
5  Q.  Let's talk about your head hitting the
6     steering wheel.  What part of your head hit
7     the steering while?
8  A.  My right -- left temple.
9  Q.  Right above your eye there?
10 A.  Yeah.  I've still got a knot up there from
11    it.
12 Q.  And you weren't wearing your seat belt at
13    the time; right?
14 A.  No, sir.
15 Q.  Was that from the second hit or the spinout
16    hit that sent your head into the steering
17    wheel?
18 A.  Had to be the spinout, because when he hit
19    me, it like threw me off the seat out of
20    control and I just snatched the wheel and
21    the car just went where it went.
22 Q.  So it went all the way across the oncoming
23    lane; is that right?

Page 72

1  A.  Yeah.  It went -- When he spinned me out,
2     the car went off the bluff toward the bluff
3     to the right of the road on two wheels.  I
4     snatched it and all I can remember is it
5     clearing the highway or whatever.  I ended
6     on the opposite side of the road facing the
7     way we just came.
8  Q.  So you went off to the left from your
9     direction of travel; is that right?
10 A.  That's where --
11 Q.  Your car went to the left?
12 A.  That's where it landed.
13 Q.  Your initial direction of travel?
14 A.  Yes, sir.
15 Q.  And the stereo was still going the whole
16    time; right?
17 A.  Whole time.
18 Q.  Between the first time that you were hit
19    and what we're calling the spinout hit
20    here, did Kevin say anything to you that
21    you heard?
22 A.  No, sir.
23 Q.  Do you recall saying anything?

Deposition of Richard Marshall

November 14, 2007

|  | Page 73 |
|---|---|

1    A. I was probably mumbling to myself, they're
2        trying to kill me, what they doing,
3        something to that effect.
4    Q. Did you ever think to pick up that gun and
5        defend yourself with it?
6    A. No, sir.
7    Q. Did you have a cell phone with you that day?
8    A. I'm quite sure I did.
9    Q. Do you remember what the phone number was?
10    A. I don't remember.
11    Q. Did you try to call anybody?
12    A. No, sir. I didn't have time.
13    Q. That's a good point. From the time that
14        you saw Lincoln break back on County
15        Road 7 until the time that you came to a
16        stop on Highway 21, how much time had
17        passed?
18    A. If I had to estimate, I'd approximately say
19        anywhere from five to 10 minutes.
20    Q. Did Kevin have a cell phone?
21    A. No, sir.
22    Q. All right. So in that entire five- to
23        10-minute period, you never picked up the

|  | Page 74 |
|---|---|

1        phone to make a call?
2    A. No, sir.
3    Q. Never thought to call for help?
4    A. It's a panic situation. You think you're
5        getting robbed. You ain't got time to call
6        for no help when I'm driving.
7    Q. The entire time that passed between the
8        first time that you were hit until you were
9        spun out, were there any vehicles on the
10        road besides yours and the Lincoln?
11    A. I didn't meet any traffic on County Road 7,
12        and I don't recall meeting any traffic on
13        County Road 21 until after the incident was
14        over.
15    Q. Did you throw anything out the window at
16        any time?
17    A. The only thing I had in my hand was a
18        cigarette butt. I was smoking previous to
19        the whole incident. If anything was
20        thrown, it had to be a cigarette butt
21        because I didn't have anything else.
22    Q. Where did you throw that cigarette butt
23        out? Was it on County Road 7 or Highway

|  | Page 75 |
|---|---|

1        21?
2    A. Probably had to be on Highway 21.
3    Q. What is this area here in this intersection
4        of 7 and 21 like? Is it built up? Are
5        there a lot of buildings? Is it wooded?
6        Give me an idea of what the area around
7        there looks like.
8    A. This area where --
9    Q. I tell you what. Let's start on County
10        Road 7 from basically where you turned off
11        on 16 up to 21. Are there any houses or
12        churches or anything like that there?
13    A. Well, after coming through what's called
14        the swamp on County Road 16, swampy area,
15        no houses. I don't know what's in the
16        woods. No houses. Two bridges. On County
17        Road 7 there's a church right to your
18        left. As soon as you turn onto it there's
19        a church.
20    Q. At the intersection of 16 and 7?
21    A. Yeah. That's the intersection. It's a
22        church there. And immediately turning on
23        County Road 7 I know there's a house and

|  | Page 76 |
|---|---|

1        another house or two on your left. And
2        after that --
3    Q. Is this as you're traveling towards 21 that
4        you're describing for me?
5    A. Immediately turning onto County Road 7
6        approximately a quarter mile you'll run up
7        on a house and a trailer and approximately
8        two houses on your left. Then it's just
9        another wooded stretch and a bridge.
10    Q. What about on 21 where you turned right
11        there, what's the area like around there?
12    A. It's a caution light. It's a big -- two
13        big ponds and used to be a junkyard. Guy
14        owned a big house on the hill up from the
15        ponds and probably two older model houses
16        on your left. Then you've got a another
17        stretch -- bridge and stretch or whatever.
18    Q. Any churches or anything like that around
19        there?
20    A. Not right there on Highway 21. Not right
21        there.
22    Q. Any gas stations or stores?
23    A. Yeah. There's a store probably a quarter

Page 77

1    mile to your left from the caution light.
2    Q.   Going back towards Braggs?
3    A.   Yeah.  Going back towards Braggs.
4         Community store right there.
5    Q.   What about in the direction that you
6         traveled on 21, are there any stores or gas
7         stations or anything like that?
8    A.   The direction I traveled that day going
9         home?
10   Q.   Yes, sir.
11   A.   No gas station.  No store.
12   Q.   And your house is on Highway 21?
13   A.   Right off the dirt road.  Turn right off of
14        21.
15   Q.   About how far back off of 21?
16   A.   Just a couple hundred yards.
17   Q.   Are there any other houses around that one?
18   A.   Yeah.  It's a couple houses right at the
19        caution light about a quarter -- about 2,
20        300 yards from where I live, caution light,
21        and there's a couple more residences in the
22        area.
23   Q.   Is that a different caution light than the

Page 78

1    one you've been telling me about on 7/21?
2    A.   Yeah.
3    Q.   So that's further on down?
4    A.   Yeah.  Right down from my home there's
5         another caution light right down there.
6    Q.   You're pointing right about where 21
7         intersects the Lowndes/Wilcox County line.
8    A.   Yeah.
9    Q.   I'm just trying to describe for the record
10        where you were pointing.
11   A.   Wilcox County line actually was about a
12        mile from the --
13   Q.   From your home or from where you wound up?
14   A.   From my home.
15   Q.   How far were you from your home when you
16        were spun out?
17   A.   Approximately a mile.
18   Q.   Did your car hit anything when it was spun
19        out other than the Lincoln?
20   A.   Probably embankment is all I can say.
21   Q.   Didn't hit a mailbox or --
22   A.   No.  It's no mailbox in the area.
23   Q.   And we showed you already Defendant's

Page 79

1    Exhibit 2.  Is that where your car came to
2    rest?  Does that depict where your car came
3    to rest after being spun out?
4    A.   Yes, sir.
5             (Defendant's Exhibits 7 and 8 was
6             marked for identification.)
7    Q.   I'm going to show you a couple more
8         pictures here.  I want to show you what
9         we're going to mark as Defendant's 7 and 8
10        and let you and your lawyers take a look at
11        those pictures.  Now, do those pictures
12        also show the way your car wound up on
13        Highway 21 on June 28th, 2005?
14   A.   Yes, sir.
15   Q.   And we can also see another car in
16        Defendant's 7 and 8.  Is that the Lincoln
17        that you've been describing?
18   A.   Yes, sir.
19   Q.   Is that how the Lincoln wound up after you
20        were spun out?
21   A.   They pulled down in the direction.  They
22        pulled off the road in front of me.
23   Q.   And then they turned around and came back;

Page 80

1    is that right?
2    A.   No.  They pulled down after -- This is
3         where I landed.
4    Q.   Right.
5    A.   And by the time my head is up off the
6         steering wheel, my door -- they had already
7         pulled down and standing in the doorway
8         with guns drawn.
9    Q.   That's -- Actually you make a good point
10        there.  Let me -- Did you see what happened
11        to the Lincoln after it made contact --
12        made the contact with your vehicle that
13        spun you out?
14   A.   No.  Once I went spinning, I didn't see
15        anything else until the car came to rest.
16        And like I say, my head hit the steering
17        wheel.  I had like a daze.  And when I
18        leaned back and opened my eyes, the Lincoln
19        was pulling down right there and they
20        jumped out of the car with pistols drawn.
21        I didn't have an opportunity to get out.  I
22        just opened the door and they was already
23        up.

Page 81

1  Q.  So you saw the Lincoln -- I want to make
2      sure I got you right.  You saw the Lincoln
3      come to that position that we see it in in
4      Defendant's 7 and 8; is that right?
5  A.  Yeah.  I saw it pull down.
6  Q.  And is that where that car was when, as you
7      described, they got out with their guns
8      drawn?
9  A.  Yes, sir.
10 Q.  So the two cars in 7 and 8 are where they
11     were at that time that they got out and
12     drew down on you; is that right?
13 A.  Yes, sir.
14 Q.  Defendant's Exhibit 7, that's the rear of
15     your car; correct?
16 A.  Yes, sir.
17 Q.  What is that license plate?
18 A.  BRich3.
19 Q.  That's a personalized plate; is that right?
20 A.  Yes, sir.
21 Q.  Did you select that?
22 A.  Yes, sir.
23 Q.  What does that mean?

Page 82

1  A.  Just a nickname.  I had the same license on
2      two other vehicles.  That's just the third
3      vehicle I had purchased.  I had another
4      Nova.
5  Q.  So your nickname is B Rich; is that right?
6  A.  Uh-huh (positive response).
7  Q.  Where does that come from?
8  A.  Just a nickname.  Gained a little weight
9      over the years.  People started calling me
10     Big Rich.  I used to be a skinny guy.
11 Q.  I got you.  So the Rich is short for
12     Richard?
13 A.  Yeah.
14 Q.  I got you.  So you at some point had
15     vehicles that had BRich1 and BRich2 on
16     them?
17 A.  Yeah.
18 Q.  When you hit your head on the steering
19     wheel, did it get cut?
20 A.  No, sir.  Just a knot.
21 Q.  All right.  You saw the Lincoln pull up to
22     where we see it on 7 and 8 and they got out
23     with guns drawn.  Did both officers get out

Page 83

1      with guns drawn?
2  A.  Yes, sir.
3  Q.  You saw the guns, then, at that time?
4  A.  Yes, sir.
5  Q.  Now, when they got out -- and I want to
6      make sure I understood what you told me --
7      were you still inside the car or had you
8      gotten out?
9  A.  No.  I hadn't gotten out.  When they was
10     rolling up and jumped out of the car with
11     guns, I hadn't had an opportunity to get
12     out.  I had opened the door, but like I
13     say, I was in a daze.  And I got out of the
14     car after that and that's when they started
15     yelling commands.  At that time is where I
16     seen a shield or whatever they had hanging
17     around their neck.
18 Q.  Both of them?
19 A.  Well, I know I saw the passenger because he
20     was more out, which was Chris West.  He was
21     on the passenger's side at this time.  I
22     really couldn't see what Mr. Hutson had on.
23 Q.  Chris West was on the passenger side when

Page 84

1      you saw him?
2  A.  Yeah.
3  Q.  And where was Hutson?
4  A.  On the other side of the door.
5  Q.  On the driver's door?
6  A.  Uh-huh (positive response).
7  Q.  Did you see how they got to that position?
8      Because I think you told me earlier that
9      Chris was driving.
10 A.  No.  I didn't say he was driving.  I said
11     that they got out with their guns drawn.  I
12     never said Chris was driving because Shawn
13     Hutson was on the passenger side.  But all
14     I knew is when I leaned up Chris West was
15     on this side of the car because he's the
16     one that took me down.  Shawn Hutson was on
17     the other door.
18 Q.  Okay.  I'm a bit confused here, so we've
19     got to get this right.  When the car pulled
20     up alongside of you twice, it was Shawn
21     Hutson who was gesturing at you to pull
22     over; right?
23 A.  Yeah.

Page 85

```
 1   Q.   And he was on the passenger's side; right?
 2        Is that right?
 3   A.   I understood it to be him.  I know it was a
 4        skinnier guy.
 5   Q.   I understand you didn't know him at the
 6        time.
 7   A.   Uh-huh (positive response).
 8   Q.   And Chris and Shawn were the only two in
 9        the Lincoln; right?
10   A.   Yes, sir.  The only two.
11   Q.   So doesn't that basically mean that Chris
12        had to have been driving?
13   A.   Yeah.  I guess he was driving, yeah.
14   Q.   So let me go back to my question.  Did you
15        see how it was that Chris wound up on the
16        passenger's side of the car after you were
17        spun out and Shawn wound up on the driver's
18        side?
19   A.   I didn't see that, but it was Chris West
20        that was on the passenger's side with the
21        gun on me.
22   Q.   And you said you saw the shield on Shawn;
23        is that right?
```

Page 86

```
 1   A.   Saw the shield on Chris.  I really couldn't
 2        see --
 3   Q.   Keep me straight.  Shield on Chris.  Did
 4        you get out of the car on their command or
 5        on your own?
 6   A.   Well, after -- Like I say, they was already
 7        out.  They may have commanded me, but I was
 8        dizzy in the head.  I got out of the car
 9        and stood in the door with my hands up.
10        And I was asking them what's going on, and
11        they were just telling me, get on the
12        ground, get on the ground, get on the
13        ground.
14   Q.   So you could hear them now; right?
15   A.   Yeah.  I could hear them.
16   Q.   Music still going?
17   A.   Still going.
18   Q.   But now you can hear them?
19   A.   Yeah.  I'm out of the car.
20   Q.   At this time is the gun that was in your
21        car where it is in Defendant's 3?
22   A.   Yes, sir.  It was laying there.
23   Q.   Just like that?
```

Page 87

```
 1   A.   (Witness nods head).
 2   Q.   When they told you to get on the ground,
 3        did you get on the ground?
 4   A.   No, sir.
 5   Q.   Why did you not get on the ground?
 6   A.   Because I was agitated.  I didn't know what
 7        was going on, why this was happening.  But
 8        I still had my hands on top of the door
 9        letting them know I wasn't posing a threat,
10        but I just didn't feel like getting on the
11        ground at the time.
12   Q.   Did you say anything to them?
13   A.   I'm quite sure I did.
14   Q.   What did you say?
15   A.   Why y'all doing this, what's going on,
16        something to that effect, what's this all
17        about.
18   Q.   At this point you'd seen the badge on
19        Chris; right?
20   A.   Yeah, I saw it.
21   Q.   So you knew they were police at this time;
22        right?
23   A.   I did.
```

Page 88

```
 1   Q.   What did they say, if anything, when you
 2        said what you said to them?
 3   A.   Shawn Hutson, he wasn't focusing on me.  He
 4        didn't say anything.  Chris West was just
 5        saying get on the ground.  He said a couple
 6        of dirty words, too; get on the ground, get
 7        on the ground, get on the ground.  And he
 8        just eased up on me and slammed me to the
 9        ground.
10   Q.   You said Shawn wasn't focused on you.  What
11        was he doing?
12   A.   He was more or less watching my cousin.
13   Q.   After y'all came to a stop, what did Kevin
14        do?
15   A.   I really couldn't tell you what he was
16        doing.  I was focusing on them.  After the
17        car came to a stop and they drawed out, my
18        attention was on them.  So I really don't
19        know what he was doing.
20   Q.   Well, when was the next time that you
21        became aware of what Kevin was doing?
22   A.   When Shawn Hutson came around and got him
23        out of the car and put him in cuffs.
```

Page 89

1    Q.  Was that before or after Chris West had
2         approached you?
3    A.  He had already came along and subdued me.
4    Q.  Other than commanding you to get on the
5         ground initially, did Chris or Shawn say
6         anything else?
7    A.  At that time I can't recollect.  Up until
8         the point where he -- Chris West put me on
9         the ground I can't recall anything they
10       said besides get down.
11   Q.  Did they identify themselves, DTF or
12       sheriff's department or anything like that?
13   A.  They didn't identify nothing.
14   Q.  Other than the badges that they had on --
15       well, the badge that Chris had on?
16   A.  The badge.
17   Q.  All right.  You said Chris came and
18       approached you and you were still standing
19       up at that time; right?
20   A.  Yes, sir.
21   Q.  What happened when he got to you?
22   A.  He got to me, kick slammed me to the
23       ground.

Page 90

1    Q.  Describe that for me.  You say kick slammed
2         you to the ground.  How did that happen?
3    A.  I had my hands up right above my door.  He
4         eased up on me with the gun drawn and he
5         got close enough until he grabbed me and
6         swept my feet with his feet and slammed me
7         face down on the ground.  He put his foot
8         on my back and handcuffed me.  Then he had
9         his foot on my neck.
10   Q.  He cuffed you behind your back?
11   A.  Yes, sir.
12   Q.  As he was approaching you, did he say
13       anything to you?
14   A.  I don't remember him saying anything but
15       just get down and he walked up on me.
16   Q.  Did you say anything back to him as he was
17       coming up on you?
18   A.  I didn't say anything then.
19   Q.  Did you ever at any time make any move back
20       inside that car?
21   A.  No, I didn't.  I was standing in the car in
22       a daze and --
23   Q.  You said your hands were up on top of the

Page 91

1         car.  Were they on top of the --
2    A.  Top of the door.  I was standing in the
3         door with my hands like this (indicating)
4         so he can clearly see.
5    Q.  We're going to look at Defendant's 2
6         again.  You can see here you've got both
7         the driver's side front and rear door
8         open.  I'm sure the driver's side rear door
9         wasn't open while all this was going on;
10       right?  That was later?
11   A.  Yes, sir.
12   Q.  Was the front door open about like it is --
13   A.  Yes.
14   Q.  -- while this initial confrontation between
15       you and the officers was going on?
16   A.  Yes, sir.  I was standing in my doorway
17       with my hands up right here on top while
18       they was drawn and commanding me.
19   Q.  Did anybody give any commands to Kevin that
20       you heard?
21   A.  Like I say, I really can't recall any
22       commands being given to Kevin, because the
23       music is still loud and I'm just focusing

Page 92

1         on this gun is drawn on me and I can
2         clearly see what he's doing.
3    Q.  Now, at the point from where Chris drew
4         down on you until he came up on you, you
5         got a pretty good look at him; right?
6    A.  Uh-huh (positive response).
7    Q.  What else did he have on him, if anything,
8         as far as on his person?  Did you see any
9         equipment belt or anything like that?
10   A.  Only thing I can recognize is he had on a
11       black T-shirt with the shield and he had on
12       regular short pants like I had on, tennis
13       shoes or something to that effect.
14   Q.  Did you see anything on his belt?
15   A.  I can't recall.  I wasn't paying any
16       attention to that.  All I was focusing on
17       was the gun on me.
18   Q.  From the time Chris initially yelled at you
19       to get on the ground until the time that he
20       approached you and as you said foot-swept
21       you and cuffed you, did he do anything else
22       that we haven't talked about?
23   A.  Not from the time he came from there and

Page 93

1  foot-swept me on the ground he didn't.
2 Q. After you were in cuffs and on the ground,
3  I think you told me earlier that's when
4  they cuffed Kevin; right?
5 A. Yes. Shawn Hutson went and pulled him out.
6 Q. Were you able to see that --
7 A. Yes.
8 Q. -- from where you were?
9 A. Yeah.
10 Q. How were you -- Let's go back to
11  Defendant's Exhibit 2 again. Once you were
12  cuffed and on the ground, can you show me
13  how you were laying by referencing
14  Defendant's 2?
15 A. Well, when he foot-swept me and kicked me
16  on the ground, I was laying out toward --
17  like in this direction headed toward this
18  direction.
19 Q. So you're out --
20 A. Out from the door.
21 Q. -- to the lower part of the picture
22  underneath the door -- the front door?
23 A. Out from the door, yeah.

Page 94

1 Q. Is that with your head facing back towards
2  Highway 21?
3 A. My head is out this way where I can see
4  Highway 21 and I can see in my car.
5 Q. Looking at Defendant's 2, where is the
6  Lincoln at? Can you point for me the
7  general direction the Lincoln was in?
8 A. The Lincoln was still up here at the front
9  where it was.
10 Q. You're kind of pointing off to the
11  left-hand side of Defendant's 2 kind of in
12  the middle; is that right?
13 A. Up in front of the vehicle where it was
14  resting on the other picture. The Lincoln
15  was still there.
16 Q. How did Kevin get out of the car?
17 A. Shawn Hutson pulled him out of it.
18 Q. I understand that. But what side of the
19  car did he come out of?
20 A. Passenger's side.
21 Q. So Shawn came around to the passenger's
22  side of the car and took him out?
23 A. Yes, sir.

Page 95

1 Q. How did he take him out? Describe that
2  process for me.
3 A. Only thing I can see he grabbed him and
4  pulled him out of the car.
5 Q. Was it through an open door or through the
6  window?
7 A. The door. The door was open.
8 Q. And what did he do to him once he pulled
9  him out of the car?
10 A. Put him in handcuffs and set him up there
11  on that hill.
12 Q. Where we see him in Defendant's 7 and 8?
13 A. Yeah.
14 Q. Did he pretty much stay there for the rest
15  of the time until he was taken from the
16  scene?
17 A. Yes, sir.
18 Q. All right. Once Kevin was cuffed, what
19  happened?
20 A. Chris West got me up off the ground and put
21  me back upside my car door. My back door
22  wasn't open at the time. My back is
23  against my door and in cuffs, and he

Page 96

1  started asking me, you ain't seen the
2  badge, you ain't see this, you ain't see
3  that. I said, man, I ain't seen nothing
4  but the gun. He didn't like what I was
5  saying, so he grabbed my pants and he
6  shoved me against the car. I said, man,
7  what you doing. He started going in my
8  pockets. I know he took my wallet out. I
9  didn't even see him take the money out. He
10  took my wallet out, open it up, throw it
11  inside my car on the seat.
12 Q. Which seat? The back seat or the front
13  seat?
14 A. It was on the front seat.
15 Q. Did we see your wallet in any of these
16  pictures?
17 A. I didn't see it.
18 Q. So he searched your pants?
19 A. Yeah. He put his hands in all my pockets
20  and he came out with the wallet and looked
21  in it. And like I say, I didn't see him
22  come out with the money. But I was still
23  standing there. He was raving on about why

Deposition of Richard Marshall

November 14, 2007

---

Page 97

1    I ain't stopped, this and that. I told him
2    I didn't know who he was; I thought you was
3    somebody trying to rob me. You know who I
4    was, this and that back and forth.
5    Q.  Let me stop you right there. Other than
6    your wallet -- You said you didn't see him
7    take the money out?
8    A.  I didn't see him take it out, but he put
9    his hand in the pocket where my money was.
10    Q.  Did he take anything else out of your
11    pockets?
12    A.  Just my wallet in my sight. I saw him take
13    the wallet out and go through it and throw
14    it down.
15    Q.  Did he search any other part of your person
16    other than the pockets of your pants?
17    A.  He had -- Like I say, he had his hands
18    verbally in -- like in the belt part of my
19    pants and pulled them first like shoved me
20    against the car. Then he started searching
21    me. After that he went to the trunk of the
22    car and started tearing it up, opening it

---

Page 98

1    up.
2    Q.  Okay. About how long did his search of
3    your person take?
4    A.  I would approximately say 10 minutes.
5    Q.  10 minutes?
6    A.  Approximately. Because he went through the
7    trunk and everything.
8    Q.  I'm just talking about your person.
9    A.  Oh, me?
10    Q.  Yeah. Your person.
11    A.  Couple of minutes. Couple of minutes.
12    Q.  While this was going on, were you able to
13    see or hear what was going on with Kevin?
14    A.  No. I ain't heard -- As far as I know,
15    Shawn had placed him over there sitting
16    down. He wasn't going nowhere.
17    Q.  Was Shawn present while you were being
18    searched by Chris West?
19    A.  Yes, sir.
20    Q.  Was he standing there?
21    A.  He was more or less out around the Lincoln
22    Town Car around the vehicle. Chris was
23    searching me, searching the trunk or

---

Page 99

1    whatever. Shawn was more or less over by
2    the vehicle.
3    Q.  I'm just focusing on the time right now
4    while Chris was searching your person, not
5    the vehicle yet. Was Shawn standing
6    nearby?
7    A.  I can't recollect where he was then. I
8    know he had got Kevin out of the car and he
9    wasn't in our immediate space.
10    Q.  All right. Once he got done -- Once Chris
11    got done searching you, what did he do with
12    you, if anything?
13    A.  I was standing right there, as I say, in my
14    car door. The passenger rear door is still
15    closed. He wanted me to get in the back
16    seat of the car. I said, man, you see this
17    tight space; I can't get in there with my
18    handcuffs on; I'm a big guy; I can't get in
19    there. He got mad and grabbed me inside my
20    pants and rammed me against the car and he
21    snatched my back. That's when my pants hit
22    the ground off my leg because he busted the
23    zipper and the button. My pants was on the

---

Page 100

1    ground. I said, man, what you doing. I
2    said, you see I can't get in there; put me
3    in the patrol car or whatever you're going
4    to do. You're going to get in here; such
5    and such, such and such. So at this time
6    cars started coming up Highway 21. He
7    stopped doing what he's doing, went to the
8    Lincoln Town Car, reached in there, got a
9    light. He put the light on top of the
10    car. The light wouldn't even work. He
11    beat on the light three or four times
12    before the light started flashing. That's
13    how I was able to know there was no light
14    present throughout the whole incident. He
15    put the light on the car after he had did
16    all this and I'm watching him doing this.
17    Q.  You watched him take the light out of the
18    car and put it up on --
19    A.  I watched him reach inside the car and come
20    out with a light. He stuck it on top of
21    the car and he beat on it three times
22    before it even started flashing.
23    Q.  How much did you weigh in June of '05?

---

25 (Pages 97 to 100)

Page 101

1   A.  I was probably weighing about 275, 280 back
2       then.
3   Q.  How tall were you?
4   A.  5-9.
5   Q.  The shorts you were wearing that day, were
6       they tight on you?  Baggy?  Were you
7       wearing them low slung?
8   A.  Just snug fit, average fit.
9   Q.  Did you have a belt on?
10  A.  No belt.
11  Q.  You were wearing boxers underneath them; is
12      that right?
13  A.  Yes, sir.
14  Q.  You said the zipper broke on the shorts?
15  A.  The zipper bust and the button popped off,
16      because he stuck his hands in the inside of
17      my crotch and gripped the pants and forced
18      me back in the car while I'm already in
19      cuffs.  Then he choked me because I was
20      asking what he was doing.  I said, man,
21      what this all about.  When I wouldn't get
22      in the car -- That's what made me get in
23      the back seat of the car.  He verbally

Page 102

1       choked me until I couldn't breathe, and
2       that's when I subdued and got in the back
3       seat of the car.
4   Q.  Describe for me how he choked you.
5   A.  Doing the motion.  When he slammed me
6       against the car, I still wouldn't get in
7       the back seat of the car because I
8       couldn't -- it's a small car.  I know I
9       couldn't hardly get in there.  And I
10      wouldn't obey what he was doing.  He said,
11      you're going to get in the back seat of
12      this car because traffic coming at the
13      time.  He grabbed one hand on the back of
14      my neck some kind of full nelson choke and
15      my head was like this (indicating).  You're
16      going to get in the car.  That's what he
17      said.  You're going to get in.  And
18      when I stopped -- couldn't breathe, I gave
19      up and crawled in the back seat of the
20      car.  You see my legs are still out.  I
21      couldn't get my whole body in there.
22  Q.  So he had one arm in the front of your neck
23      and one arm in the back of your neck; is

Page 103

1       that right?
2   A.  Full nelson, some type of chokehold.
3       That's all I know.  I can't describe
4       exactly how it was.  All I know I was being
5       choked.  He was in front of me and he was
6       choking me.  Cut my air off.
7   Q.  Once you got in the car, did he stop
8       choking you?
9   A.  He stopped choking me while I was still
10      standing there because I gave up
11      resisting.  I told him, okay, I'll get in
12      the car because I couldn't breathe.
13  Q.  So you agreed to get in the car and he
14      released his hold; is that right?
15  A.  Yes.
16  Q.  About how long were you in that hold?
17  A.  Long enough for my breath to get cut off.
18  Q.  Seconds?  Minutes?
19  A.  Seconds.  Wasn't no minutes.  Seconds.
20  Q.  10 seconds?  Five seconds?
21  A.  I don't know how many seconds.
22      Approximately five to 10 seconds.
23  Q.  We do see you in the car in these pictures;

Page 104

1       right?  Let's look at Defendant's 7.  Is
2       that you in the back seat of the car there?
3   A.  Yes, sir.
4   Q.  And Defendant's 8, is that you in the back
5       seat of the car?
6   A.  Yes, sir.
7   Q.  And I think you told me he searched your
8       car too.  Was that before or after he put
9       you in the back seat of your car?
10  A.  I know he searched it -- the inside part
11      with me standing right here just reaching
12      in.  I'm standing here.  He just reached in
13      and he got the keys out during that time
14      and he went to the trunk of the car, opened
15      it with the keys and started going through
16      the trunk while I was standing there.  And
17      he came back and slammed the trunk or
18      whatever and came back around.
19  Q.  At some point did he find the gun?
20  A.  Oh, he already saw the gun.
21  Q.  Tell me when you first became aware that he
22      was aware of the gun.
23  A.  After he had slammed me down on the ground

Deposition of Richard Marshall

November 14, 2007

Page 105

1    and put me in cuffs they saw the gun,
2    because they was making little smart
3    comments about the gun on the seat and this
4    and that.
5  Q.  Who made the comment about the gun?
6  A.  Shawn Hutson. Oh, he got a big gun; oh, it
7    ain't no cheap gun either; all this and
8    that. I told them it's not my gun. That's
9    your gun? I said, it ain't my gun, man.
10 Q.  Had the radio been turned off at this
11    point?
12 A.  Chris West turned the radio down after he
13    put me in cuffs.
14 Q.  After he put you in cuffs?
15 A.  Yeah.
16 Q.  Is that about the same time that he found
17    the gun?
18 A.  Yeah. He saw the gun right after he
19    reached in the car or whatever.
20 Q.  Did he take the gun, did he move the gun,
21    or did he just leave it right there where
22    we see it?
23 A.  He left it right there.

Page 106

1  Q.  All right. Then he did a complete search
2    of your car; is that right?
3  A.  He went to the trunk. He already had
4    visually searched the little front part,
5    which is not too much concealed. He went
6    to the trunk and that's where he did most
7    of the searching, moving stuff doing this
8    and that, whatever he was doing back
9    there. He came back a little while where I
10    was.
11 Q.  Did he bring anything with him when he came
12    back up there where you were?
13 A.  No, sir.
14 Q.  Did he tell you that he had found anything?
15 A.  No, sir.
16 Q.  About how long did it take him to search
17    the car?
18 A.  I'd say the whole search probably I'd say
19    five to 10 minutes.
20 Q.  While Chris was searching the car, what was
21    Shawn doing?
22 A.  Shawn was back toward the Lincoln Town Car
23    and Chris made the statement about the gun

Page 107

1    or whatever. Then Shawn came over where he
2    was and they were making little small talk
3    about the caliber and the model of the gun
4    or whatever, this and that.
5  Q.  Any other conversation that you heard?
6  A.  No, sir. After that incident, Chris West
7    took me up there and put me on the hill
8    beside Kevin.
9  Q.  Took you back out of your car?
10 A.  Yes, sir.
11        (Defendant's Exhibit 9 was marked
12        for identification.)
13 Q.  I'm going to show you what we'll mark as
14    Defendant's Exhibit 9.
15 A.  Uh-huh (positive response).
16 Q.  Mr. Marshall, do you recognize what's in
17    Defendant's Exhibit 9?
18 A.  Appear to be some money.
19 Q.  Looks like it's on some carpet too; right?
20 A.  Appear to be.
21 Q.  Is that the same kind of carpet that you
22    have in your Nova?
23 A.  My Nova doesn't even have carpet in it, so

Page 108

1    I don't know what that is.
2  Q.  Did you have money like that that day, a
3    five and what looks like a bunch of ones?
4  A.  I had $500. If that's the money, I don't
5    know whose it is. It ain't mine. I had
6    two $100 bills and the rest in twenties.
7  Q.  So it's your testimony that that money
8    wasn't in your car that day?
9  A.  I can't say it wasn't in my car. It may
10    have been Kevin's money, but it's not mine.
11 Q.  So you don't recognize anything in
12    Defendant's Exhibit 9 at all?
13 A.  It's not my money.
14 Q.  That's not what I asked you. I understand
15    that you know that it's money. Do you
16    recognize what Defendant's Exhibit 9 shows?
17 A.  I don't recognize that.
18        (Defendant's Exhibits 10 and 11
19        were marked for identification.)
20 Q.  Mr. Marshall, I'm going to show you two
21    more pictures, Defendant's 10 and 11. Were
22    those pictures taken of you on June 28th,
23    2005?

27 (Pages 105 to 108)

Page 109

1  A.  Yes.
2  Q.  Is that what you were wearing at the time?
3  A.  Yes.
4  Q.  And that is you in those pictures; right?
5  A.  Yes.
6      MR. WILFORD:  Let's get something
7      to eat.
8      (Whereupon lunch recess was taken.)
9  Q.  (Continuing by Mr. Wilford) Mr. Marshall,
10     you testified before we took a break that
11     at some point you were taken and put over
12     on the side of the hill there next to
13     Kevin; right?
14 A.  Yes.
15 Q.  What, if anything, happened after you were
16     put over there by Kevin?
17 A.  They ran my name, his name in and --
18 Q.  What do you mean they ran his name in?
19 A.  Warrant check or whatever, social security
20     number.  Ran both our names and --
21 Q.  Did any other police units arrive?
22 A.  Probably 30 to 45 minutes later they called
23     back to Hayneville for a sheriff's deputy

Page 110

1      vehicle.  It arrived, which I was placed
2      in.
3  Q.  I'm sorry I interrupted you.  So they
4      called his information in?
5  A.  Called both of us in.
6  Q.  Anything happen after they called that in?
7  A.  No.  We just was sitting there on the grass
8      and they was walking around talking among
9      themselves.  I heard them calling in for
10     the vehicle.
11 Q.  Did they call over a radio or cell phone,
12     or how did they do that?
13 A.  Over the dispatch (indicating).
14 Q.  You're doing --
15 A.  Police dispatch.
16 Q.  Over the radio?
17 A.  I saw them reach in the car, yeah.
18 Q.  Could you hear what they were saying?
19 A.  Only what I could make out of it my social
20     security number and name being called and
21     they was running or whatever over the loud
22     speaker.
23 Q.  And so you sat there on the side of the

Page 111

1      hill for 30 to 45 minutes before another
2      vehicle came?
3  A.  Yes.  Before the police vehicle came.
4  Q.  Anything else happen during that time
5      besides your information being called in?
6  A.  Not during that time I was sitting on the
7      hill.  Nothing happened then.
8  Q.  So nothing happened between that time and
9      the time that another police unit showed
10     up; is that right?
11 A.  No.  Nothing happened.  The only thing that
12     I forgot to leave out that happened is
13     backing up to when Chris West initially
14     drawed down on me he did fire his weapon in
15     my direction.
16 Q.  You forgot to mention that?
17 A.  Yeah.
18 Q.  Was that after you had a chance to talk to
19     your lawyers at lunchtime?
20     MR. LEWIS:  Object.
21 A.  I just --
22     MR. LEWIS:  Don't discuss anything
23     that you and I might have

Page 112

1      talked about.
2  Q.  I'm not asking about the substance of the
3      conversation.  I'm just -- Were you
4      reminded of it at lunchtime?
5  A.  No, I wasn't reminded of it.
6  Q.  Well, what happened with this shooting?
7  A.  It just -- That's the first thing -- After
8      he drew down, he fired the weapon before
9      coming to approach me.
10 Q.  Before who approached you?
11 A.  Before he approached me he had already
12     fired the weapon.
13 Q.  Let's back up, then, and as you say
14     completely regroup.  He got out of the car
15     and he had his weapon pointed at you; is
16     that right?
17 A.  Yes, sir.
18 Q.  Did he give you commands?
19 A.  He said get on the ground or something to
20     that effect.
21 Q.  And you didn't comply with those commands.
22     You told me that earlier; right?
23 A.  No, I didn't comply.

Page 113

1    Q.   So you were still standing there?
2    A.   In the doorway, yeah.
3    Q.   In the doorway of the car?
4    A.   Uh-huh (positive response).
5    Q.   And he fired?
6    A.   Yeah.
7    Q.   This was after giving you commands and you
8       not complying; right?
9    A.   Yeah. He had given some kind of command.
10   Q.   And you hadn't complied?
11   A.   No.
12   Q.   Where did he shoot?
13   A.   Right out -- if I may.
14   Q.   Sure.
15   A.   In this general direction (indicating).
16   Q.   We're looking at Defendant's Exhibit 2.
17   A.   Right down past the doorway.
18   Q.   You're making a pretty broad motion there.
19   A.   I'm standing in the doorway, but he fired
20      right out from -- past the doorway in this
21      direction down --
22   Q.   Towards the front of your car or --
23   A.   I heard the bullet hit the ground. I heard

Page 114

1      the gunshot. It hit the ground somewhere
2      in this direction. He fired down there.
3    Q.   Did the bullet strike the ground in front
4      of you or off to the side of you?
5    A.   I can't say exactly where it struck,
6      gunfire. But I did hear it hit the ground
7      in this area right here. I heard it.
8    Q.   How many times did he shoot?
9    A.   One shot.
10   Q.   And did you comply with his commands after
11      he shot at the ground?
12   A.   I still had my hands up over the vehicle.
13      I asked him, why are you shooting at me,
14      what are you doing, and he was just still
15      saying, get on the ground, this or that,
16      get on the ground. That's when he was
17      walking up on me.
18   Q.   Okay. So this man just fired a round at
19      your feet? This man that you know to be a
20      police officer and you still didn't do what
21      he said?
22   A.   He fired at me, but I didn't -- like I
23      said, I didn't run out to jump on the

Page 115

1      ground. I've been arrested before. That's
2      why I had my hands up to show I wasn't
3      posing a threat. But I didn't see any
4      reason why he had to fire at me.
5    Q.   Well, when you were arrested before, did
6      you do what the police told you to do?
7    A.   Yeah.
8    Q.   And you have no idea where the round hit
9      the ground other than it was generally
10      somewhere out in front of your car on the
11      passenger's side?
12   A.   I can't specifically say where it hit, but
13      I know it was right in the direction of the
14      front driver's door somewhere before the
15      end of the car. I heard it hit the ground
16      when he shot.
17   Q.   Did it kick up any dirt or grass or
18      anything like that?
19   A.   Just like (indicating) quick.
20   Q.   Did any of it hit you?
21   A.   No. Didn't no dirt or -- it didn't hit me.
22   Q.   All right. Up until the point that another
23      police vehicle arrived, have you told me

Page 116

1      everything that happened out there after
2      you were put on the side of the road?
3    A.   Yeah. Up until he placed me beside Kevin.
4      The only other thing happened is the
5      vehicle pulled up and they placed me in
6      that vehicle and put Kevin in the Lincoln
7      Town Car.
8    Q.   Let's talk about -- How many other vehicles
9      showed up?
10   A.   Just one.
11   Q.   What kind of car was it?
12   A.   Brown Ford Crown Vic, county sheriff.
13   Q.   It was a county sheriff's vehicle?
14   A.   Yeah.
15   Q.   All right. Do you know -- How many
16      officers showed up in that car?
17   A.   One officer.
18   Q.   Do you know the name of that officer?
19   A.   No, I don't.
20   Q.   Can you describe him for me?
21   A.   Appeared to be a younger white guy, kind of
22      stocky build, Army cut.
23   Q.   And you were placed in the back of his car?

Page 117

1    A.  Yes, sir.
2    Q.  When did that occur?  Was it right after he
3         arrived, or how much time passed?
4    A.  Well, I'll say approximately 10 minutes, 15
5         minutes max after he arrived after they
6         figured out who was going to get in what.
7         The guy placed me in the back of the county
8         sheriff car and placed Kevin in the front
9         seat of the Lincoln Town Car.  And Shawn
10        Hutson drove off in my car.
11   Q.  You watched him drive off in your car?
12   A.  Uh-huh (positive response).  He left first.
13   Q.  You were still there on the scene?
14   A.  Uh-huh (positive response).
15   Q.  How long did you stay there on the scene
16        after your car was driven off?
17   A.  Approximately five minutes.
18   Q.  Did anything happen during that five
19        minutes?
20   A.  No.  I just was driven off by the county
21        deputy sheriff.
22   Q.  Did you leave first, or did Chris leave
23        first?

Page 118

1    A.  Shawn Hutson left first.
2    Q.  Yeah.  We established that.
3    A.  Then I left in the deputy sheriff car.  And
4         we only went halfway up 21 when they
5         stopped and got out of the car and started
6         looking for something.  Shawn Hutson turned
7         around in my vehicle and came back and
8         stopped and got out with Chris West walking
9         down 21 appeared to be looking for
10        something.  I was in the county sheriff
11        car.  Kevin was in the Lincoln Town Car
12        behind us.
13   Q.  All right.  Where did you stop?  Was it
14        before County Road 7 or after County Road
15        7?
16   A.  On Highway 21 right up the road.  After
17        turning on Highway 21, they stopped right
18        there and -- all three vehicles.
19   Q.  I understand it was on Highway 21.  I'm
20        just trying to figure out.  Let's go back
21        and look at Defendant's Exhibit 5.  About
22        where on County Road 21 did they stop and
23        look?

Page 119

1    A.  This would be 263 crossing.
2    Q.  Right.
3    A.  I would say somewhere in here right down
4         from the turn on County Road -- off County
5         Road 7 on 21.
6    Q.  Looks like you're kind of pointing -- and
7         correct me if I'm wrong -- about halfway
8         between County Road 7 and your home on
9         Highway 21.
10   A.  Right off County Road 7 probably a couple
11        hundred feet.  That's where they stopped.
12   Q.  Did they find anything?
13   A.  Not to my knowledge.  I didn't see them
14        find anything.
15   Q.  Has it come to your attention at some point
16        later that they found anything?
17   A.  It was said that he picked a baggy up
18        beside the road or something.
19   Q.  Did you ever see the baggy?
20   A.  No, sir.
21   Q.  How long did it take them to search on the
22        side of Highway 21?
23   A.  I'll say approximately 15 minutes or so.

Page 120

1    Q.  Was Kevin there, too, in their car?
2    A.  He was in the Lincoln.
3    Q.  What happened after they got done
4         searching?
5    A.  Chris West came back to the Lincoln, waved
6         Shawn Hutson to go on.  And the sheriff car
7         pulled off with me and then they stopped at
8         the store right up the road I was telling
9         you about, Howard's Country Store.  Shawn
10        Hutson pulled up on the gas tank, put gas
11        in my vehicle.  Chris West, the deputy, and
12        Shawn Hutson went inside the store.
13        Probably got something to drink or
14        whatever.  I had a flat -- They had a flat
15        on the sheriff's car.  They changed the
16        flat while I was still in the car, Chris
17        West and the deputy sheriff.
18   Q.  There at the gas station?
19   A.  Yes, sir.  They changed the flat.  And
20        Shawn Hutson, he left about 10 minutes
21        earlier and went up 21 in my car.
22   Q.  Was your car almost out of gas?
23   A.  Yeah.  It was on E.

Page 121

1  Q.  How long did that take there at the gas
2      station for them to do all that?
3  A.  I'll say approximately another 20 minutes.
4  Q.  Was there any conversation with you that
5      took place at that time?
6  A.  No. I was in the back seat of the patrol
7      car the whole time.
8  Q.  Nobody talked to you?
9  A.  No, sir.
10 Q.  Did anything else happen as far as
11     something happening to you personally while
12     you were there at the gas station?
13 A.  No, sir.
14 Q.  Just sat there and waited for them?
15 A.  (Witness nods head). Yes, sir.
16 Q.  What happened after the gas station?
17 A.  After changing the tire, Chris West got in
18     the Lincoln. He left first. The deputy
19     sheriff got in and proceeded to go to the
20     Lowndes County Detention Facility.
21 Q.  Between the gas station and the detention
22     facility, did you have any conversation
23     with the deputy?

Page 122

1  A.  No. He didn't say anything.
2  Q.  Did you hear anything on the radio?
3  A.  No, sir.
4  Q.  What happened when you got to the jail --
5      excuse me -- detention facility?
6  A.  The deputy radioed to come in through the
7      gate and Chris West came in also. And he
8      brought -- Deputy got me out of the back
9      seat of the car and brought us into the
10     facility into booking.
11 Q.  Anything out of the ordinary happen from
12     the time you got out of the car and you got
13     to the booking area?
14 A.  No.
15 Q.  Did you have any conversation with the
16     deputy?
17 A.  No.
18 Q.  Who escorted you from the car to the
19     booking area?
20 A.  The deputy.
21 Q.  What happened when you got to the booking
22     area?
23 A.  I think Chris West told us to stand back

Page 123

1      toward the wall. The deputy was standing
2      over to the right by the counter. Told me
3      to take off -- Well, he took the cuffs
4      off. He told me to take off jewelry,
5      et cetera.
6  Q.  Who told you to do that?
7  A.  Chris West. Told me to take off the
8      jewelry. So I took the jewelry off, put it
9      on the counter. And at this point they was
10     fixing to log whatever possessions in the
11     booking. Chris West put what was supposed
12     to have been my money on the counter, which
13     I see was only twenties, $100 bill. I
14     immediately asked him where is the rest of
15     my money. The deputy reached to get the
16     money and tried to count it. Chris West
17     snatched it out of his hand and told him
18     don't worry about it, put him in the hole.
19     They put me in the hole.
20 Q.  How much did he put on the counter?
21 A.  $100, five twenties.
22 Q.  Five twenties?
23 A.  Uh-huh (positive response).

Page 124

1  Q.  I take it at some point you had to have
2      been taken out of handcuffs, right --
3  A.  Yes, sir.
4  Q.  -- to take all your stuff off?
5  A.  Yes, sir.
6  Q.  When were you taken out of handcuffs?
7  A.  Not -- A couple of minutes after coming
8      into booking after Chris got behind the
9      desk and told them to take me out of the
10     cuffs so I can take my belongings off.
11 Q.  Who took you out of the cuffs?
12 A.  The deputy.
13 Q.  Was there anybody present in the room
14     besides you, the deputy, and Chris?
15 A.  Kevin. And another lady in booking was
16     behind the desk.
17 Q.  There was a lady in booking?
18 A.  Uh-huh (positive response).
19 Q.  What about Shawn Hutson, was he present?
20 A.  Shawn Hutson wasn't in there.
21 Q.  Where was the lady that you described being
22     in booking when the discussion of the money
23     occurred?

Page 125

1   A.  Standing right there. She was in her
2     desk. But when Chris came in, she got up
3     and Chris got in the desk and started
4     getting the paper or whatever. She was
5     standing right beside him when he put the
6     money on the counter and I immediately
7     said, man, that's not all my money, where
8     is the rest of my money. And the deputy
9     reached for it to start counting it and
10    Chris snatched it from him and told him,
11    don't worry about it, put him in the hole.
12   Q.  Do you remember what this lady's name was?
13   A.  I can't recall.
14   Q.  Can you describe her for me?
15   A.  I probably know her if I see her. It's
16    been a while. I've seen her since I've
17    been back up there. But I probably have to
18    see her. I'm not sure if it's
19    Ms. Cottrell. It's one of them. I don't
20    know who is in booking. It was around
21    two -- between two and 2:30 when we finally
22    reached the facility that evening. From 12
23    that evening when the incident started, it

Page 126

1    was two to 2:30 when I finally reached the
2    building.
3   Q.  You're saying evening. 12 noon?
4   A.  It was somewhere around 12 noon when the
5    incident began. When I finally arrived
6    there, it was somewhere between two --
7    after two o'clock.
8   Q.  P.m. or a.m.?
9   A.  P.m.
10   Q.  Okay. I'm just making sure.
11      All right. Now, you made a statement
12    about your money there, a verbal statement;
13    correct?
14   A.  Yes, sir.
15   Q.  At any time did you ever make a written
16    statement about your money while you were
17    in the jail?
18   A.  No, sir.
19   Q.  Did you ever file a grievance?
20   A.  No, sir.
21   Q.  Have you ever filed a report with any
22    police agency about your money being taken?
23   A.  No, sir.

Page 127

1   Q.  Did you ever talk to the sheriff about it?
2   A.  No, sir.
3   Q.  Did you ask for any medical attention?
4   A.  I did upon going to jail, but I never did
5    get any.
6   Q.  When did you first ask for medical
7    attention?
8   A.  Approximately the next morning I told them
9    I had a headache and I had bumped my head;
10    I had lacerations on my wrists from the
11    cuffs being tight; I need to see a doctor;
12    but no response.
13   Q.  How did you ask to get treatment?
14   A.  They have a -- press the button for verbal
15    response and you have to fill out a paper,
16    a request or something for it. But I never
17    did get a chance to go.
18   Q.  Did you fill out the paper?
19   A.  Actually, I don't even recall. I can't
20    really be certain. But I know I mashed the
21    intercom to request a doctor.
22   Q.  Do you know who you would have spoken to?
23   A.  At the time it was just the jailer on duty

Page 128

1    in the booth, whoever was in the booth at
2    that time.
3   Q.  And you don't know who that is?
4   A.  I can't recall.
5   Q.  Was that the only time you asked?
6   A.  Yes. After I didn't get no reply, I just
7    left it alone.
8   Q.  Was there anyone who witnessed you asking
9    for medical attention besides the person
10    you talked to in the booth?
11   A.  Inmates.
12   Q.  Do you recall any of their names?
13   A.  I don't really -- didn't know anybody in
14    there. Just dayroom area people. I don't
15    know any of them.
16   Q.  You didn't know any of them at the time?
17   A.  Not the present day when I requested
18    medical treatment.
19   Q.  Have you spoken to anybody who was an
20    inmate in there with you since then?
21   A.  No.
22   Q.  As you sit here today, you can't tell me
23    any names of any of the inmates who were in

Deposition of Richard Marshall
November 14, 2007

Page 129

1    there with you?
2    A.  Maybe one or two that I got to know while I
3        was in there, but I haven't seen them since
4        I made bond.
5    Q.  Who are they?
6    A.  I know Joshua Bullard.  He was in there.  I
7        know it was somebody else in there I knew.
8        I can't really recall right now off the top
9        of my head.
10   Q.  How long were you in the jail after being
11       placed in there on the 28th of June?
12   A.  I made bond August 5th.
13   Q.  How did you make bond?
14   A.  Bail bondsman.
15   Q.  Who arranged that?
16   A.  My girlfriend and me.
17   Q.  Who was your girlfriend?
18   A.  Ernestine Powell.
19   Q.  Ernestine?
20   A.  Uh-huh (positive response).
21   Q.  Powell?
22   A.  Yes, sir.
23   Q.  Are you still in contact with Ms. Powell?

Page 130

1    A.  Yes.
2    Q.  Where does she live?
3    A.  Greenville.
4    Q.  Have you got an address?
5    A.  22 Cherrywood Lane.  She was on my bond.
6    Q.  Did she put up the money?
7    A.  Half of it.
8    Q.  Half?
9    A.  (Witness nods head).
10   Q.  How much was your bond?
11   A.  Initially 10,000.  10,000.
12   Q.  There's an allegation in your amended
13       complaint at paragraph 39 that an aunt
14       tried to do a property bond for you.  Who
15       was that aunt?
16   A.  Marzett Wright.
17   Q.  Can you spell that first name for me?
18   A.  M-A-R-Z-E-T-T.
19   Q.  W-R-I-G-H-T?
20   A.  Yes, sir.
21   Q.  Where does she live?
22   A.  Mosses Highway.
23   Q.  Do you have an address for that?

Page 131

1    A.  Not right off the top of my head I don't.
2    Q.  Was it her property that she was going to
3        put up for you?
4    A.  Yes, sir.
5    Q.  Do you know where that property is?
6    A.  It's in Mosses.
7    Q.  Is it her residence?
8    A.  Yeah.  Brick home.
9    Q.  What happened with that?
10   A.  From my understanding I talked with her
11       three times on the phone.  She told me that
12       she contacted Sheriff Vaughner and he told
13       her that on first account that he would
14       give it some thought.  Second account he
15       said -- he just blew it off.  And the third
16       time he seen her that Wednesday and asked
17       him was he going to let her sign my bond.
18       He told her something to the effect I'm
19       going to let him sit there a while; I'll
20       have to think about it.  And after that I
21       didn't even get in contact with her
22       anymore.  She wouldn't try to do it, I
23       guess.

Page 132

1    Q.  That's what supposedly Sheriff Vaughner
2        told her?
3    A.  Yeah.  That's what she told me Sheriff
4        Vaughner told her.  She's the county
5        commissioner over District 5.
6    Q.  Do you know what the value of her property
7        is there in Mosses?
8    A.  Not exactly.  I know it's a Jim Walter Home
9        she had purchased some years ago.
10   Q.  Did she own it outright?
11   A.  Yes, sir.
12   Q.  Did you ever personally speak with Sheriff
13       Vaughner about your bond?
14   A.  I requested to talk to Sheriff Vaughner but
15       never came through with the request.  But
16       one day he did happen to come in the back
17       area where I did verbally ask him why
18       wouldn't he let my aunt sign my bond, and
19       he act as if he didn't know what I was
20       talking about.  He told me, you give her a
21       call and he'll see what he can do.  That's
22       what he told me that day.
23   Q.  When was that?

Page 133

1  A.  Approximately a week after I had been in
2     there, after she told me she had did all of
3     that.
4  Q.  Okay.  Did you have any visitation while
5     you were in jail?
6  A.  Yes.
7  Q.  Who came to visit you?
8  A.  My aunt came once to retrieve my jewelry
9     and the $100.
10  Q.  Is that the same aunt that was going to put
11     up the house?
12  A.  Shirley Marshall.  It's my aunt.  It's who
13     I released $99 to because I took a dollar
14     for two aspirin I took in there.  She took
15     my jewelry and $99 off the book to go
16     toward my bond.
17        (Defendant's Exhibit 12 was marked
18         for identification.)
19  Q.  Since we're talking about that, let me show
20     you Defendant's Exhibit 12.  Have you ever
21     seen Defendant's Exhibit 12 before,
22     Mr. Marshall?
23  A.  Yes.  I had to sign that to release my

Page 134

1     jewelry and the money.
2  Q.  That's your signature there?
3  A.  Yes, sir.
4  Q.  And that's where Ms. Marshall came and
5     picked up your property and your $99.50 it
6     says?
7  A.  Yes, sir.
8  Q.  Anybody else besides Ms. Marshall come and
9     visit you?
10  A.  Girlfriend, Ernestine.
11  Q.  Anyone else?
12  A.  If anyone else came, I never saw them.
13  Q.  And you were able to make some telephone
14     calls because you were telling me about
15     talking to your Aunt Wright.
16  A.  Yes, sir.
17  Q.  Did you make any other telephone calls -- I
18     tell you what.  Let's back up and talk
19     about the 28th of June when you were
20     initially brought to the detention
21     facility.  Were you able to make a phone
22     call that day?
23  A.  Yeah.

Page 135

1  Q.  Who did you call?
2  A.  My aunt, Shirley Marshall.
3  Q.  Shirley Marshall?
4  A.  Yes, sir.
5  Q.  And what did y'all talk about?
6  A.  I told her that I had been arrested and I
7     needed her to come up here and see could
8     she get me out.
9  Q.  And what did she say?
10  A.  Asked me what happened and where is she
11     going to get the money from.  I told her to
12     come get my money and come get my jewelry
13     and pawn it and try to get some bail when I
14     get -- when I get a bond.
15  Q.  What kind of telephone did you use to make
16     that call?
17  A.  Phone right there on the desk.
18  Q.  Just a regular old phone?
19  A.  I guess the office phone they use in
20     booking.  The phone in booking.
21  Q.  Do they have phones in the detention
22     facility back in the dayroom areas and the
23     cell blocks?

Page 136

1  A.  Yes, sir.
2  Q.  Did you ever make any phone calls on those
3     phones?
4  A.  Yes, sir.
5  Q.  How does that work?
6  A.  Got to call collect and get somebody on the
7     other end to accept.
8  Q.  And who did you call on that phone -- on
9     those phones?
10  A.  In the back?
11  Q.  Yes, sir.
12  A.  Called Marzett Wright a couple of times.  I
13     called my uncle.  Uncle tried to post
14     bond.  Didn't come through.
15  Q.  Which uncle was that?
16  A.  My father -- father's brother from New
17     York.  Now stays in Selma.
18  Q.  What's his name?
19  A.  John -- I want to say John Cowans.  Call
20     him Bip.
21  Q.  Bip?
22  A.  Yeah.  That's all I know him from my
23     childhood.  Just moved from New York about

Page 137

```
 1        three years ago.
 2    Q.  Anybody else?
 3    A.  I called Shirley and her daughter on
 4        three-way.  That's mostly who I was getting
 5        to call.  And I had her to call my lawyer,
 6        Charlotte, and go to Charlotte's office for
 7        me.
 8    Q.  Who is Shirley's daughter?  You said her
 9        daughter.
10    A.  Cherry Marshall.
11    Q.  How old is she?
12    A.  Just estimating.  I don't know.  She go
13        along with Kevin.  However old Kevin is.
14        I'm the oldest of all of them.  However old
15        he is.  20-something.  They're the same
16        age.
17    Q.  Did anything happen to you while you were
18        there at the detention facility?
19    A.  Nothing physical, no.
20    Q.  And you said you were there until the 5th
21        of August; is that right?
22    A.  Yes, sir.
23    Q.  And you were released on bond?
```

Page 138

```
 1    A.  Yes, sir.
 2    Q.  You didn't miss any work while you were in
 3        the jail; right?
 4    A.  I wasn't working at the time.
 5    Q.  So you didn't miss any work?
 6    A.  No.
 7    Q.  What happened after you got out of jail?
 8    A.  Started trying to get a lawyer to see what
 9        was going on with the charges.
10    Q.  What charges did you have as a result of
11        the June 28th incident?
12    A.  Pistol carrying without a permit and
13        possession of a controlled substance.
14    Q.  What was the controlled substance?
15    A.  I don't know.  That's all they told me,
16        possession of a controlled substance.
17    Q.  They never told you what it was?
18    A.  No, sir.
19    Q.  Did you ever have to go to trial on those
20        charges?
21    A.  Yes, sir.
22    Q.  What happened at trial?
23    A.  I came to trial with my lawyer.  They
```

Page 139

```
 1        called my name on the docket.  And Chris
 2        West called my lawyer in the corner and she
 3        told me that he was throwing it out and I
 4        can go home.
 5    Q.  That Chris West was throwing it out?
 6    A.  That's who she was in the corner and, you
 7        know, had a little mediation with and came
 8        back to me.
 9    Q.  Did you ever learn why it was thrown out?
10    A.  No.  I ain't ever known.  No.  She just
11        told me they was throwing it out.  He asked
12        her permission to come speak to me and told
13        me I can pick my vehicle up the next day,
14        which they had it impounded since that
15        incident.  This was January 4th or 5th I
16        want to say before the 6th when I went to
17        court.
18    Q.  Was there any damage to your vehicle?
19    A.  Yeah.  Knocked out of alignment.  Pipes was
20        hanging down.
21    Q.  What kind of pipes?
22    A.  Exhaust.  Exhaust pipe was rattling.  Rear
23        bumper bent.
```

Page 140

```
 1    Q.  Can you show me where on the pictures?
 2    A.  You can see right there the bumper is bent
 3        up on the light where he rammed me at.  And
 4        you can't really tell, but after I got it
 5        back out of the pound, it just drive like
 6        it wasn't the same car no more.
 7    Q.  Looks like when you were describing where
 8        he hit you it was the -- was it the back --
 9    A.  Yeah.  It was pushed up.
10    Q.  -- driver's side right underneath the
11        taillight there?
12    A.  And it have been also burglarized while it
13        was in the pound.  All the music equipment
14        was stolen out, radio.  The lock was
15        jimmied out and the side glass was broke.
16    Q.  Where was the impound at?
17    A.  Randy's Impound in Ft. Deposit.
18    Q.  Did you ever get any money out of them or
19        any redress for what happened to your car?
20    A.  They told me to call Chris West.
21    Q.  What all was taken out of the car?
22    A.  Stereo from the inside, all speakers,
23        woofers and amps out of the trunk, CDs,
```

Page 141

1     et cetera.
2   Q.   Anything else?
3   A.   That's it.
4   Q.   What happened to the gun?
5   A.   I don't even know. All I know they stopped
6     the case. I don't know anything else about
7     it.
8   Q.   Did they drop the charge on that too?
9   A.   Yes.
10   Q.   Has Mr. McWilliams ever come to you and
11     asked for his gun back?
12   A.   He asked me what happened to it. I told
13     him it was in the car that day and as far
14     as I know the police got it.
15   Q.   How many times have y'all talked about that
16     gun?
17   A.   I've seen him on two or three occasions in
18     the past two years since the incident and
19     he asked me about whatever happened to his
20     gun and I told him as far as I know the
21     police got it.
22   Q.   Well, has he blamed you for losing his gun?
23   A.   I mean, he knows what happened that day.

Page 142

1     He ain't really pointing no blame. He just
2     asked me was it -- what happened, can he
3     go -- can he pick it up. I told him I
4     don't know. I went to court and they
5     tossed it is all I know.
6   Q.   Do you know if he's ever tried to get it
7     back?
8   A.   I don't.
9   Q.   When's the last time you talked to him?
10   A.   I would have to say a couple months ago.
11     Probably a couple months ago last incident.
12   Q.   Did he ask you about the gun then?
13   A.   Yeah.
14   Q.   I'm sorry?
15   A.   Yes, sir.
16   Q.   Do you know who the prosecutor was in your
17     case?
18   A.   I really don't even know.
19   Q.   Other than, of course, Kevin who was in the
20     car with you, do you know of anybody else
21     who claims to have witnessed the chase from
22     County Road 7 up to where you wound up on
23     Highway 21?

Page 143

1   A.   No. I don't know anybody who have
2     claimed. All I know it was vehicles
3     passing along. I'm not sure who witnessed
4     it. But not anyone to my knowledge that I
5     know.
6   Q.   You're talking about after y'all came to a
7     stop on 21?
8   A.   Yeah. After we came to a stop it was some
9     vehicles started passing by.
10   Q.   Did you recognize any of those vehicles?
11   A.   I recognized one vehicle that stopped when
12     I was standing beside the road in my
13     boxers. It was relative -- a distant
14     relative that stay down the road from me.
15     And she turned around. Actually that's
16     when Chris stopped doing what he was doing
17     to go get the light and put on top of the
18     car because she slowed down when she saw me
19     beside the road and turned around and came
20     back down the road and they was waving them
21     on. And after that she went back up the
22     road. I ain't see her again.
23   Q.   What's her name?

Page 144

1   A.   Margaret, Margaret Wright.
2   Q.   Margaret Wright?
3   A.   Yes, sir.
4   Q.   And where does she live at? Do you have an
5     address?
6   A.   Right down the road. Dutch Bend area. I
7     don't know the number -- address. It's
8     right down the road from the residence
9     where I was residing at the time.
10   Q.   Which way?
11   A.   Approximately this far from where I'm at.
12     It's a caution light there.
13   Q.   She lives down by the caution light past
14     your house going out towards Wilcox County?
15   A.   Yeah.
16   Q.   Any other vehicles that you recognized pass
17     by that day?
18   A.   I didn't recognize any other vehicle.
19   Q.   Has anyone come up to you and said they
20     witnessed your vehicle being knocked off
21     the road?
22   A.   No, sir.
23   Q.   Do you know of anyone who has claimed to

Page 145

1    have witnessed that?
2  A.  No, sir.
3  Q.  And, again, I'm excluding Kevin because I
4     know he was involved.
5        Anyone besides Margaret Wright that
6     you're aware of who witnessed what happened
7     after you were stopped there at the side of
8     the road?
9  A.  No, sir.
10 Q.  Is there anyone else besides you who can
11    testify about the $500 that you supposedly
12    had on you that day?
13 A.  As far as I know Kevin.  No one else.
14 Q.  How would Kevin know that you had $500 on
15    you that day?
16 A.  Because the motor we was pulling out for
17    one I took small -- a payment on from
18    my cousin.  I had sold him the engine.  We
19    was pulling the engine out of his car to
20    put the engine that I sold him in.
21 Q.  You had already collected payment for that?
22 A.  He had gave me like $50 toward it.  But he
23    still owed me the balance after we get the

Page 146

1     car back running.  We was pulling the dead
2     engine out.  But I had sold him an engine,
3     but we hadn't ever got a chance to put it
4     in.
5  Q.  So that money that you had that day $50 of
6     it was from him.  And who is he?  What's
7     his name again?
8  A.  That would be Herman.  His name is Herman,
9     the one that owned the car.
10 Q.  $50 from Herman and the other $450 was left
11    over from your gambling winnings.  Is that
12    what your testimony is?
13 A.  The $50 he had previously given me -- I had
14    money that I saved.  It may have been the
15    $50.  But I had $1,000 from gambling, you
16    know.  That's what was left over from
17    everything, you know.
18 Q.  So explain to me again how the $50 for the
19    engine ties in with Kevin knowing that you
20    had $500 on you.
21 A.  Because during the time that Herman came to
22    purchase the engine, he gave me $50 toward
23    it.  Kevin would see that I reached in my

Page 147

1     pocket and had more than $50 in my pocket.
2     He was staying with me at the time.
3  Q.  So he just knows that you had more than $50
4     on you?
5  A.  Yes, sir.
6  Q.  Is that what you're telling me?
7  A.  Yeah.
8  Q.  To your knowledge, does he know exactly how
9     much you had on you?
10 A.  No.  I don't think he knows exact amount.
11    He just knows I had more than that.
12 Q.  What damages are you claiming that you're
13    entitled to as a result of Chris West's
14    conduct?
15 A.  Well, for one I can't seem to acquire
16    employment since this incident.  In my
17    field of warehousing every time I apply for
18    a job I'm being turned down since the
19    incident happened.  And I usually acquire
20    employment very rapidly.  I claim the
21    damage to my vehicle that I have lost, my
22    possessions, lost bond money, loss of time
23    of suffering in jail for something I didn't

Page 148

1     have.
2  Q.  Let me stop you there real quick.  Didn't
3     you tell me that your girlfriend put up the
4     bond money?
5  A.  She put up half of it.  The rest of it was
6     mine.
7  Q.  How much did you put up?
8  A.  I put up like 450 --
9  Q.  $450?
10 A.  -- that I recovered from pawning my jewelry
11    and the money left over that I had on the
12    book.  She put up the rest.
13 Q.  I'm sorry.  I interrupted you.  The bond
14    money and what else?
15 A.  Like I said, my vehicle damages I lost
16    there.  And just me sitting in jail for
17    something I didn't do.  I mean, it's just
18    unfair.
19 Q.  You haven't had any medical expenses;
20    right?
21 A.  No, sir.
22 Q.  And you weren't employed at the time?
23 A.  No, sir.

Deposition of Richard Marshall                                      November 14, 2007

Page 149

1   Q.   You told me that you still have the knot on
2        your head.  Are there any other permanent
3        conditions that you have as far as your
4        body goes as a result of what happened on
5        June 28th?
6   A.   Just that -- Just a lot of mental anguish,
7        just suffering, anxiety attacks.  A lot of
8        nights I can't sleep at night for being
9        shot at.  I already been robbed.  It took
10       me a while to get over that.  I had a gun
11       put in my face behind that.  It took me a
12       while to get over that.
13  Q.   I'm not asking about your mental condition
14       right now.  I'm just asking about your body
15       condition.  Anything besides the knot on
16       your head?
17  A.   Oh, no.  Just that knot left when I hit the
18       steering wheel, as far as that.
19  Q.   Describe your mental anguish for me that
20       you're talking about.
21  A.   I just -- I just have a lot of nights where
22       I can't sleep, just anxiety attacks a lot
23       about the whole ordeal and --

Page 150

1   Q.   Describe an anxiety attack for me.
2   A.   Just nightmares of being shot at and ran
3        off the road by the police and being
4        suspect every time I'm being sighted in
5        Lowndes County by the police.  I'm getting
6        strange looks.  Or stopped like the
7        incident where I went to jail.  It was
8        supposed to be a traffic stop, but they
9        called Shawn Hutson who was on the drug
10       task force that day.  Every time they lay
11       eyes on me they harass me about stuff like
12       that even though I just -- I don't
13       understand.
14  Q.   Have you seen Chris West again since that
15       day?
16  A.   I haven't seen Chris West since I went to
17       court in January '06.
18  Q.   So that's the only time you saw him?
19  A.   Uh-huh (positive response).
20  Q.   So he hasn't pulled you over since then;
21       right?
22  A.   No.  I haven't seen him.
23            MR. WILFORD:  Let's take a short

Page 151

1        break.
2            (Brief recess was taken.)
3   Q.   Just a few more questions, Mr. Marshall,
4        and we'll be done.  With respect to the
5        anxiety attacks and things that you were
6        telling me about, have you tried to get any
7        kind of mental health treatment for that?
8   A.   Well, right now I'm in dire straits.  I
9        can't afford anything.  I haven't seeked
10       any professional help for it.  I've just
11       been trying to deal with the stress, you
12       know.  Somehow I hope it goes away over
13       time.
14  Q.   You say you haven't tried.  Your
15       interrogatory responses you told us you
16       couldn't afford it.  I'm just asking you if
17       you've tried.
18  A.   No, sir, I haven't.
19  Q.   Has anybody recommended to you that you try
20       to get some mental health treatment?
21  A.   I haven't referred to anybody.  It's all on
22       my own.
23  Q.   After the robbery that you described for us

Page 152

1        today, did you get any mental health
2        treatment for that?
3   A.   No, sir.
4   Q.   Did you try?
5   A.   No, sir.
6   Q.   Did anybody recommend to you that you
7        needed it?
8   A.   Just deal with my own -- on my own.  I
9        really don't have anybody but me, so I try
10       to deal with things among myself.  But it
11       took a little time for me to get my
12       mind-set back, you know, where I can be out
13       around people.  Everybody just -- I feel
14       like they out to get me, you know.
15  Q.   Are you set back right now as you put it?
16  A.   I'm still having some anxiety attacks at
17       night.  Still can't sleep some nights.  But
18       if I'm somewhere around some people, you
19       know, I'm fairly being compromised.  I kind
20       of cope with it.
21  Q.   You told me earlier -- I need to go back on
22       you a little more when you were first
23       brought into booking.  Chris West said

38 (Pages 149 to 152)



Page 153

1   something about put him in the hole.
2   A.  Yes, sir.
3   Q.  Were you put in a hole?
4   A.  The holding cell up front.  That's what I
5       meant.
6   Q.  So you were placed in the holding cell?
7   A.  Yes, sir.
8   Q.  At some point you were put back in the
9       back; is that right?
10  A.  I think later that night dressed me out and
11      took me to a cell.
12  Q.  So you stayed in a holding cell for a few
13      hours?
14  A.  Yes, sir.
15  Q.  Is that fair to say?
16  A.  Yes, sir.
17  Q.  I think that's all I have.  Thank you very
18      much.
19  A.  Thanks.
20              EXAMINATION
21  BY MR. LEWIS:
22  Q.  I have one question.  When you're standing
23      up there on the side of the road in your

Page 155

1              REPORTER'S CERTIFICATE
2   STATE OF ALABAMA:
3   MONTGOMERY COUNTY:
4       I, Lyn Daugherty, Certified Shorthand
5   Reporter and Commissioner for the State of Alabama
6   at Large, do hereby certify that I reported the
7   deposition of:
8          RICHARD MARSHALL
9   who was duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the
11  matter of:
12         RICHARD MARSHALL,
13         Plaintiff,
14  vs.
15  CHRIS WEST, in his individual
16  capacity, LASHUN HUTSON, in his
17  individual capacity,
18  Defendants.
19      IN THE UNITED STATES DISTRICT COURT
20      FOR THE MIDDLE DISTRICT OF ALABAMA
21      NORTHERN DIVISION
22      Civil Action No. 2:06-cv-701-ID.CSC
23  on Wednesday, November 14, 2007.

Page 154

1   boxer shorts, how were you feeling then?
2   A.  Humiliated because traffic was coming along
3       and people seeing me beside the road in
4       cuffs in my underwear.
5          MR. LEWIS:  Okay.  That's it.
6       (Deposition was concluded at
7       approximately 1:55 p.m.)
8
9
10      * * * * * * * * * * * * * *
11      FURTHER DEPONENT SAITH NOT
12      * * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 156

1       The foregoing 155 computer-printed pages
2   contain a true and correct transcript of the
3   examination of said witness by counsel for the
4   parties set out herein.  The reading and signing is
5   hereby waived.
6       I further certify that I am neither of kin
7   nor of counsel to the parties to said cause nor in
8   any manner interested in the results thereof.
9       This 13th day of December 2007.
10
11
12
        _____
13      Lyn Daugherty, ACCR #66
        Expiration Date: 9-30-2008
        Certified Court Reporter
14      And Commissioner for the
        State of Alabama at Large
15
16
17
18
19
20
21
22
23

39 (Pages 153 to 156)

**A**

able 70:11 93:6 98:12
  100:13 134:13,21
about 8:7,11 12:2,10
  12:11 18:7 20:12
  21:3 23:3,12 24:18
  29:1 30:4 34:17
  35:19,22 38:8,11
  39:21 42:7,16 48:9
  48:12,18 61:5 63:8
  63:17 64:5,8 65:6,6
  66:9 68:13 69:2,8,13
  70:8 71:5 76:10 77:5
  77:15,19,19 78:1,6
  78:11 87:17 91:12
  92:22 96:23 98:2,8
  101:1,21 103:16
  105:3,5,16 106:16,23
  107:3 112:1,2 116:8
  118:21 119:7 120:9
  120:20 123:18
  124:19 125:11
  126:12,16,22 127:1
  131:20 132:13,20
  133:19 134:14,19
  135:5 136:23 141:6
  141:15,19 142:12
  143:6 145:11 149:13
  149:14,20,23 150:11
  151:6 153:1
above 71:9 90:3
accelerated 68:10
accept 136:7
access 28:12
account 131:13,14
ACCR 1:17 156:12
accurately 29:13
acquire 147:15,19
across 70:22 71:22
act 132:19
action 1:7 70:12 155:22
actually 1:1 18:12
  78:11 80:9 127:19
  143:15
addiction 23:6
address 15:2,3,12,15
  15:18 21:19,21 25:14
  25:15 26:10 31:13
  130:4,23 144:5,7
advised 58:19
afford 151:9,16
after 5:6 26:7,22 28:6
  39:14 43:10 44:3
  48:21 52:23 59:23
  63:20 66:11,23 67:1
  68:20 69:12,16,18
  70:5,14 74:13 75:13
  76:2 79:3,19 80:2,11

83:14 85:16 86:6
  88:13,16 89:1 93:2
  97:22 100:15 104:8
  104:23 105:12,14,18
  107:6 109:15 110:6
  111:18 112:7 113:7
  114:10 116:1 117:2,5
  117:5,16 118:14,16
  120:3 121:16,17
  124:7,8 126:7 128:6
  129:10 131:20 133:1
  133:2 138:7 140:4
  143:6,8,21 145:7,23
  151:23
again 6:22 49:2 53:1,2
  54:10,13 60:10,15
  61:7 65:16 67:19
  69:1,21 70:17 91:6
  93:11 143:22 145:3
  146:7,18 150:14
against 95:23 96:6
  97:21 99:20 102:6
age 131:22
agency 126:22
agitated 87:6
ago 31:6 44:21 132:9
  137:1 142:10,11
agree 23:12,14
agreed 4:2,16,23
  103:13
agreement 1:16 21:5
ahead 6:17 35:21
ahold 32:22
ain't 74:5 96:1,2,2,3
  97:1 98:14 105:7,9
  108:5 139:10 142:1
  143:22
air 45:12,14 103:6
Alabama 1:2,18,20 2:5
  2:11,21 4:8 11:23
  12:7 13:7,12 155:2,5
  155:20 156:14
alcohol 23:5 29:3,18,19
  29:21
alcoholic 25:5
alignment 139:19
allegation 130:12
alleged 46:14
almost 120:22
alone 40:15 128:7
along 13:2 30:22 63:15
  89:3 137:13 143:3
  154:2
alongside 43:23 48:18
  49:1,16 54:7,8,9,20
  59:12 60:1 84:20
already 18:18 27:4
  59:1 71:3 78:23 80:6
  80:22 86:6 89:3

101:18 104:20 106:3
  112:11 145:21 149:9
amended 46:13 130:12
among 110:8 152:10
amount 34:3 147:10
amplifiers 46:3
amps 140:23
anguish 149:6,19
another 7:4 37:15 40:7
  51:22 60:3 66:7 76:1
  76:9,16 78:5 79:15
  82:3 111:1,9 115:22
  121:3 124:15
answer 7:8
answering 6:9
anxiety 149:7,22 150:1
  151:5 152:16
anybody 27:8 45:7
  73:11 91:19 124:13
  128:13,19 134:8
  137:2 142:20 143:1
  151:19,21 152:6,9
anymore 131:22
anyone 7:22 28:16
  128:8 134:11,12
  143:4 144:19,23
  145:5,10
anything 9:8 16:22
  23:22 24:19 25:2,5
  40:5 43:6,9 44:16
  45:22 46:2 49:17
  54:12,16,19 55:1,8,9
  55:14 56:21,22 60:12
  60:18 67:1,13 72:20
  72:23 74:15,19,21
  75:12 76:18 77:7
  78:18 80:15 87:12
  88:1,4 89:6,9,12
  90:13,14,16,18 92:7
  92:9,14,21 97:11
  99:12 106:11,14
  108:11 109:15 110:6
  111:4,22 115:18
  117:18 119:12,14,16
  121:10 122:1,2,11
  137:17 141:2,6
  149:15 151:9
anyway 46:2
anywhere 27:3,11
  48:16 73:19
apologize 60:17
Appear 107:18,20
APPEARANCES 2:1
appeared 54:22 116:21
  118:9
apply 147:17
approach 112:9
approached 89:2,18
  92:20 112:10,11

approaching 90:12
approximate 68:15
approximately 1:21
  20:20 25:18 31:9,16
  32:21 38:16,19 39:14
  44:6 48:16,20 53:7
  59:13 60:3 61:6,19
  63:22 64:8 65:21
  66:7 67:18 69:11
  70:10 73:18 76:6,7
  78:17 98:4,6 103:22
  117:4,17 119:23
  121:3 127:8 133:1
  144:11 154:7
April 17:10 20:15
area 36:23 75:3,6,8,14
  76:11 77:22 78:22
  114:7 122:13,19,22
  128:14 132:17 144:6
areas 135:22
arm 102:22,23
Army 116:22
around 11:12 12:12
  53:7,14,21 61:19
  67:7,12 75:6 76:11
  76:18 77:17 79:23
  83:17 88:22 94:21
  98:21,22 104:18
  110:8 118:7 125:20
  126:4 143:15,19
  152:13,18
arranged 129:15
arrest 2:21 18:13 19:6
  20:15 21:17 22:14
arrested 17:9 19:5
  22:16 115:1,5 135:6
arrests 17:10,15 18:6
  20:13
arrive 109:21
arrived 110:1 115:23
  117:3,5 126:5
ashtray 31:21 32:3,8
asked 17:8 49:19 50:9
  50:9,15 53:10 60:16
  108:14 114:13
  123:14 128:5 131:16
  135:10 139:11
  141:11,12,19 142:2
asking 6:8 7:5 57:3,20
  86:10 96:1 101:20
  112:2 128:8 149:13
  149:14 151:16
aspirin 133:14
attack 150:1
attacks 149:7,22 151:5
  152:16
attend 14:14 16:18
attended 14:8
attention 23:10 40:6

88:18 92:16 119:15
  127:3,7 128:9
attorneys 2:4,9 9:8,9
  28:6
August 11:12,13,22
  46:20 129:12 137:21
aunt 130:13,15 132:18
  133:8,10,12 134:15
  135:2
aunt's 23:23 24:12
  25:12 27:11 36:10
  39:5
average 101:8
aware 57:10 64:14
  88:21 104:21,22
  145:6
away 151:12
a.m 1:21 126:8

**B**

B 82:5
back 9:18 13:8 30:1,23
  31:6 32:11,23 36:11
  38:12 44:4,16 46:12
  49:15 51:5 55:20
  60:2,5,13,15 62:11
  63:21,23 66:6,9 68:4
  68:23 69:2,4,9,10,11
  73:14 77:2,3,15
  79:23 80:18 85:14
  90:8,10,16,19 93:10
  94:1 95:21,21,22
  96:12 97:4 99:15,21
  101:1,18,23 102:2,7
  102:11,13,19,23
  104:2,4,9,17,18
  106:8,9,12,22 107:9
  109:23 112:13
  116:23 117:7 118:7
  118:20 120:5 121:6
  122:8,23 125:17
  132:16 134:18
  135:22 136:10 139:8
  140:5,8 141:11 142:7
  143:20,21 146:1
  152:12,15,21 153:8,9
backing 111:13
bad 35:20
badge 59:16,17 87:18
  89:15,16 96:2
badges 66:17 89:14
baggy 101:6 119:17,19
bail 129:14 135:13
Bailey 21:13,19
balance 145:23
Baptist 16:19
barber 13:19 14:11
barbering 14:9
barrel 62:7,9

Deposition of Richard Marshall

Page 2

**based** 45:19
**basically** 5:23 9:4
  75:10 85:11
**bath** 26:8
**beat** 100:11,21
**became** 88:21 104:21
**before** 1:16 4:6 6:1
  11:23 17:9 20:20
  26:6 31:2,3,6,7 40:1
  42:4,8 46:15,17
  53:10 58:8 59:2,18
  60:17 67:17 68:11
  70:16 89:1 100:12,22
  104:8 109:10 111:1,3
  112:8,10,11 115:1,5
  115:14 118:14
  133:21 139:16
**began** 27:13 126:5
**begun** 65:6
**behind** 43:20 48:22
  49:13 52:18 57:13
  60:2,6 63:21 90:10
  118:12 124:8,16
  149:11
**being** 24:14 35:14 60:1
  79:3 91:22 98:17
  103:4 110:20 111:5
  124:21 126:22
  127:11 129:10
  144:20 147:18 149:8
  150:2,3,4 152:19
**believe** 32:12 45:4
**belongings** 124:10
**belongs** 30:16
**belt** 18:7 28:22 71:12
  92:9,14 97:19 101:9
  101:10
**belts** 28:20 61:23 62:1
**Bend** 144:6
**bent** 139:23 140:2
**beside** 44:8 48:11 53:1
  55:20 60:16 63:20
  107:8 116:3 119:18
  125:5 143:12,19
  154:3
**besides** 17:16 28:12
  45:7 55:1 74:10
  89:10 111:5 124:14
  128:9 134:8 145:5,10
  149:15
**best** 37:20
**between** 4:3,17 5:1
  21:1 26:5 27:11 60:5
  61:17,18 62:8 68:18
  70:12 72:18 74:7
  91:14 111:8 119:8
  121:21 125:21 126:6
**big** 12:19,21 13:3,14
  56:12 76:12,13,14

82:10 99:18 105:6
**bill** 123:13
**bills** 33:17,18 108:6
**Biloxi** 34:5,7,16
**Bip** 136:20,21
**birth** 9:11
**bit** 38:20 53:16 84:18
**black** 44:9,9 56:10,11
  59:19,19,22 62:3
  92:11
**blame** 142:1
**blamed** 141:22
**blasting** 46:4
**blew** 131:15
**blocks** 135:23
**blue** 27:17 41:20,23
  49:8,9 59:14 66:15
**bluff** 70:19,20 72:2,2
**body** 102:21 149:4,14
**bogus** 20:23
**bond** 129:4,12,13 130:5
  130:10,14 131:17
  132:13,18 133:16
  135:14 136:14
  137:23 147:22 148:4
  148:13
**bondsman** 129:14
**book** 133:15 148:12
**booking** 122:10,13,19
  122:21 123:11 124:8
  124:15,17,22 125:20
  135:20,20 152:23
**books** 31:1
**booth** 128:1,1,10
**born** 9:16,20
**both** 58:23 82:23 83:18
  91:6 109:20 110:5
**box** 2:10 15:16,18 32:4
  32:6,16
**boxer** 154:1
**boxers** 101:11 143:13
**boys** 15:22
**Braggs** 38:15 77:2,3
**brake** 52:6
**brakes** 39:18 40:21
  41:9 43:5,15 44:3
**brand** 56:7
**break** 7:13,16 65:2
  73:14 109:10 151:1
**breath** 103:17
**breathe** 102:1,18
  103:12
**BRich1** 82:15
**BRich2** 82:15
**BRich3** 81:18
**Brick** 131:8
**bridge** 76:9,17
**bridges** 75:16
**brief** 18:1 46:10 52:6

58:7 65:4 66:2,22
  151:2
**Briefly** 14:9
**bring** 106:11
**broad** 113:18
**broke** 65:5 101:14
  140:15
**Brooks** 47:21
**brother** 136:16
**brought** 122:8,9
  134:20 152:23
**Brown** 116:12
**build** 116:22
**building** 126:2
**buildings** 75:5
**built** 75:4
**Bullard** 129:6
**bullet** 32:13 113:23
  114:3
**bullets** 32:1,3,4,7,16,23
  62:21
**bumped** 69:12,20
  127:9
**bumper** 49:7 53:15,15
  54:1,3 64:13,14,23
  65:17 67:23 68:8,18
  68:21 69:5,9,21
  70:18 139:23 140:2
**bunch** 39:20 108:3
**burglarized** 140:12
**business** 13:16,21
**bust** 101:15
**busted** 99:22
**Butler** 17:11 22:14,15
  22:16
**butt** 74:18,20,22
**button** 99:23 101:15
  127:14

---

**C**

**caliber** 107:3
**call** 9:18 19:8 73:11
  74:1,3,5 110:11
  132:21 134:22 135:1
  135:16 136:6,8,19
  137:5,5 140:20
**called** 33:4 75:13
  109:22 110:4,5,6,20
  111:5 136:12,13
  137:3 139:1,2 150:9
**calling** 72:19 82:9
  110:9
**calls** 134:14,17 136:2
**came** 8:2 19:12 21:5
  30:22 37:2 43:23
  52:11 54:6,8,9 68:11
  70:5,23 72:7 73:15
  79:1,2,23 80:15
  88:13,17,22 89:3,17

92:4,23 94:21 96:20
  104:17,18 106:9,11
  107:1 111:2,3 118:7
  120:5 122:7 125:2
  132:15 133:7,8 134:4
  134:12 138:23 139:7
  143:6,8,19 146:21
**capacity** 1:9,9 155:16
  155:17
**car** 24:10,12,13 27:8,22
  28:1,8,9,12,20 29:3
  29:10,14 30:12,19,21
  31:5 32:17 39:16,22
  40:1,20,21 41:1
  43:12 44:3 45:7,10
  45:12 47:4 48:9
  49:11 55:19 56:1
  63:14 64:2,7,9,11,12
  65:8,10 66:2 67:1,14
  69:19 70:12,16,22
  71:2,21 72:2,11
  78:18 79:1,2,12,15
  80:15,20 81:6,15
  83:7,10,14 84:15,19
  85:16 86:4,8,19,21
  88:17,23 90:20,21
  91:1 94:4,16,19,22
  95:4,9,21 96:6,11
  97:21,23 98:22 99:8
  99:14,16,20 100:3,8
  100:10,15,18,19,21
  101:18,22,23 102:3,6
  102:7,8,12,16,20
  103:7,12,13,23 104:2
  104:5,8,9,14 105:19
  106:2,17,20,22 107:9
  108:8,9 110:17
  112:14 113:3,22
  116:16,23 117:8,9,10
  117:11,16 118:3,5,11
  118:11 120:1,6,15,16
  120:21,22 121:7
  122:9,12,18 140:6,19
  140:21 141:13
  142:20 143:18
  145:19 146:1,9
**Carmichael** 8:3,10,15
  24:5 27:10
**carpet** 107:19,21,23
**carrying** 36:3 138:12
**cars** 43:20 55:23 56:1
  81:10 100:6
**case** 4:18,20 5:18,19
  7:14 8:7,11 9:2 39:13
  141:6 142:17
**casino** 34:4,5,7 35:9
**casinos** 34:2
**catch** 47:12

**caught** 12:12
**cause** 156:7
**caution** 51:15 52:6
  76:12 77:1,19,20,23
  78:5 144:12,13
**CDs** 140:23
**cell** 73:7,20 110:11
  135:23 153:4,6,11,12
**cement** 13:9
**center** 64:17,20 65:17
  68:1
**centered** 36:23
**Central** 14:5
**certain** 33:7 42:3 62:9
  127:20
**CERTIFICATE** 155:1
**Certified** 1:17 4:7
  155:4 156:13
**certify** 155:6 156:6
**cetera** 123:5 141:1
**chance** 18:2,5,15 28:7
  52:21 58:11 60:7
  111:18 127:17 146:3
**changed** 15:15 120:15
  120:19
**changing** 121:17
**charge** 18:23 20:21
  21:6 141:8
**charges** 19:1 20:22,23
  138:9,10,20
**Charles** 24:8 26:22
**Charlotte** 137:6
**Charlotte's** 137:6
**chase** 142:21
**cheap** 105:7
**check** 34:9 109:19
**Cherry** 137:10
**Cherrywood** 130:5
**Chevrolet** 27:20
**child** 35:14
**childhood** 136:23
**children** 15:19,21
  21:12
**choke** 102:14
**choked** 101:19 102:1,4
  103:5
**chokehold** 103:2
**choking** 103:6,8,9
**Chris** 1:8 5:20 42:4,12
  42:13,16 45:5,21
  54:16 59:5 83:20,23
  84:9,12,14 85:8,11
  85:15,19 86:1,3
  87:19 88:4 89:1,5,8
  89:15,17 92:3,18
  95:20 98:18,22 99:4
  99:10 105:12 106:20
  106:23 107:6 111:13
  117:22 118:8 120:5

120:11,16 121:17
122:7,23 123:7,11,16
124:8,14 125:2,3,10
139:1,5 140:20
143:16 147:13
150:14,16 152:23
155:15
church 16:15,17,17
75:17,19,22
churches 75:12 76:18
cigarette 74:18,20,22
city 20:2,3,4 22:9,16,19
Civil 1:7 4:5 155:22
claim 147:20
claimed 143:2 144:23
claiming 147:12
claims 142:21
clarify 35:21
clear 36:19
clearing 72:5
clearly 91:4 92:2
Clements 2:3
close 16:4 61:12 68:21
90:5
closed 99:15
collect 136:6
collected 145:21
college 14:8,16
color 20:6
come 33:20 37:13 49:1
65:7 67:13 81:3 82:7
94:19 96:22 100:19
119:15 122:6 132:16
134:8 135:7,12,12
136:14 139:12
141:10 144:19
coming 36:10 37:8,22
41:5 43:20 47:6
51:18 53:3 55:23
56:1 75:13 90:17
100:6 102:12 112:9
124:7 154:2
command 86:4 113:9
commanded 86:7
commanding 89:4
91:18
commands 83:15 91:19
91:22 112:18,21
113:7 114:10
commencing 1:21
comment 105:5
comments 105:3
commission 4:9
commissioner 1:18 4:7
132:5 155:5 156:14
Community 77:4
complaint 46:13
130:13
complete 52:11 106:1

completely 6:17 112:14
complied 113:10
complies 38:5,9,22
39:2
comply 112:21,23
114:10
complying 113:8
compromised 152:19
computer-printed
156:1
concealed 33:8,10
106:5
concluded 154:6
concrete 13:10
condition 149:13,15
conditioning 45:12,14
conditions 149:3
conduct 147:14
confrontation 91:14
confused 84:18
contact 10:19 65:8,14
67:13 68:11 80:11,12
129:23 131:21
contacted 131:12
contain 156:2
contained 29:18
continued 2:23 67:3
Continuing 109:9
contract 12:13 13:19
Contract's 12:6
control 64:7,10,23
65:11 66:2,23 68:22
68:23 69:22 71:20
controlled 138:13,14
138:16
conversation 6:22
42:21 107:5 112:3
121:4,22 122:15
convicted 48:1
cop 20:2
cope 152:20
copy 38:21
corner 139:2,6
correct 19:18 22:23
28:14,15 30:8 50:21
67:20 81:15 119:7
126:13 156:2
corrective 70:12
correctly 34:22
Cottrell 125:19
counsel 4:3,17 156:3,7
count 123:16
counter 123:2,9,12,20
125:6
counting 125:9
Country 120:9
county 5:21 9:17 15:1,8
16:3 17:11 19:23
20:3,4,9 22:11,14,15

22:20,23 26:15,16,18
36:9,13,15,23 37:3,5
37:9,10,13,14,21,21
37:23 38:3,4 39:7,9,9
39:15 40:9,13 41:14
48:10 53:12,22 73:14
74:11,13,23 75:9,14
75:16,23 76:5 78:7
78:11 116:12,13
117:7,20 118:10,14
118:14,22 119:4,4,8
119:10 121:20 132:4
142:22 144:14 150:5
155:3
couple 6:12 13:23
77:16,18,21 79:7
88:5 98:11,11 119:10
124:7 136:12 142:10
142:11
course 142:19
court 1:1,17 6:4,11,23
66:19 139:17 142:4
150:17 155:19
156:13
courteous 50:5
cousin 8:16,17 88:12
145:18
cousins 24:4,7
cousin's 24:13
cover 6:3
Cowans 136:19
crawled 102:19
crossing 119:1
crotch 101:17
Crown 116:12
cuffed 90:10 92:21
93:4,12 95:18
cuffs 88:23 93:2 95:23
101:19 105:1,13,14
123:3 124:10,11
127:11 154:4
currently 21:8
Curtis 12:16
cut 14:10 82:19 103:6
103:17 116:22
cutting 13:20
Cuz 57:3

### D

DA 47:20
damage 139:18 147:21
damages 147:12
148:15
dark 31:2
dark-colored 20:8,8
39:15,22 40:10 41:15
Darrell 24:8 26:22
Daryl 2:8 5:15
date 9:11 156:13

Daugherty 1:17 4:6
155:4 156:12
daughter 137:3,8,9
David 11:21
day 18:20 23:11,15,21
25:8,19,23 26:2 27:6
28:22 29:14,19 30:12
30:20 33:13 36:7
42:5,8 58:17 73:7
77:8 101:5 108:2,8
128:17 132:16,22
134:22 139:13
141:13,23 144:17
145:12,15 146:5
150:10,15 156:9
dayroom 128:14
135:22
days 18:14,22 31:9
32:20
daze 71:2 80:17 83:13
90:22
dead 146:1
deal 151:11 152:8,10
December 12:8,9,17
156:9
decent 34:1
deep 70:20
defend 73:5
defendant 2:7,20 17:4
defendants 1:10 5:17
5:19 27:13 39:13
155:18
Defendant's 17:18,21
28:3,6,10 29:5,8,10
30:7 31:17,20 32:11
36:17,20 58:1,4,5
61:3,5 78:23 79:5,9
79:16 81:4,14 86:21
91:5 93:11,14 94:5
94:11 95:12 104:1,4
107:11,14,17 108:12
108:16,18,21 113:16
118:21 133:17,20,21
demanded 47:2
denomination 33:17
department 19:20
22:17 89:12
depict 29:13 79:2
DEPONENT 154:11
Deposit 140:17
deposition 1:15 4:4,6
4:13,18 5:2 6:1 7:23
8:20,23 9:1 154:6
155:7
deputy 109:23 117:21
118:3 120:11,17
121:18,23 122:6,8,16
122:20 123:1,15
124:12,14 125:8

describe 27:15 44:1,20
56:5,6 62:7 63:17
78:9 90:1 95:1 102:4
103:3 116:20 125:14
149:19 150:1
described 60:6 81:7
124:21 151:23
describing 76:4 79:17
140:7
desk 124:9,16 125:2,3
135:17
detail 37:7
detention 121:20,21
122:5 134:20 135:21
137:18
deteriorating 32:6
different 77:23
difficult 6:15
dire 151:8
direction 37:23 41:18
41:19 72:9,13 77:5,8
79:21 93:17,18 94:7
111:15 113:15,21
114:2 115:13
dirt 77:13 115:17,21
dirty 88:6
disclosure 9:4
disclosures 58:14
discuss 111:22
discussion 124:22
dismissed 18:23 20:22
47:23
dispatch 110:13,15
distant 143:13
distinguishing 40:3
district 1:1,2 16:9
132:5 155:19,20
ditch 70:3
dive 40:22
DIVISION 1:3 155:21
divorce 10:12,16
dizzy 86:8
docket 139:1
doctor 127:11,21
document 58:8,12
documents 8:19 9:3,9
doing 6:5 44:13,17
49:11 54:17 57:2
60:13,14 66:6,12,14
73:2 87:15 88:11,16
88:19,21 92:2 96:7
100:1,7,7,16 101:20
102:5,10 106:7,8,21
110:14 114:14
143:16,16
dollar 133:13
done 26:23 99:10,11
120:3 151:4
door 15:4,13 71:2 80:6

Deposition of Richard Marshall

November 14, 2007

Page 4

80:22 83:12 84:4,5
84:17 86:9 87:8 90:3
91:2,3,7,8,12 93:20
93:22,22,23 95:5,7,7
95:21,21,23 99:14,14
115:14
**doorway** 80:7 91:16
113:2,3,17,19,20
**dot** 37:19
**down** 6:6,16 7:1 21:2
36:13 39:7,18 45:10
45:11 48:10 50:2
52:22 61:17,18 62:7
63:4 64:7 67:4,5,6
78:3,4,5 79:21 80:2,7
80:19 81:5,12 84:16
89:10 90:7,15 92:4
97:15 98:16 104:23
105:12 111:14 112:8
113:17,21 114:2
118:9 119:3 139:20
143:14,18,20 144:6,8
144:13 147:18
**draw** 23:10 37:18 38:2
**drawed** 88:17 111:14
**drawing** 33:21
**drawn** 71:4 80:8,20
81:8 82:23 83:1
84:11 90:4 91:18
92:1
**dressed** 25:21 153:10
**drew** 81:12 92:3 112:8
**drink** 7:14 25:5 29:23
30:1,3 120:13
**drive** 1:20 2:10 67:3,16
117:11 140:5
**driven** 117:16,20
**driver** 39:17 40:18,19
41:8 44:18 45:21
61:12
**driver's** 64:22 69:21
84:5 85:17 91:7,8
115:14 140:10
**driveway** 31:4
**driving** 39:19 41:3 44:5
45:5 46:4 48:14
53:21 54:11,23 55:5
55:21 56:23 57:8
61:1 74:6 84:9,10,12
85:12,13
**drop** 141:8
**dropped** 20:21 21:5
**drove** 66:6 117:10
**drug** 23:6 43:2 150:9
**drugs** 25:8,10,11
**drunk** 40:18,19 41:8
**drunken** 39:17
**DTF** 20:1 89:11
**duly** 5:6 155:9

**during** 33:23 34:2 46:4
63:1,10 104:13 111:4
111:6 117:18 146:21
**Dutch** 144:6
**duty** 127:23
**D.C** 30:16,17

---

**E**

**E** 120:23
**each** 6:14 35:3 41:18
41:19 51:23 52:2
64:1 65:14
**earlier** 31:9 84:8 93:3
112:22 120:21
152:21
**Early** 23:23
**eased** 88:8 90:4
**eat** 24:19 25:2 109:7
**effect** 73:3 87:16 92:13
112:20 131:18
**eight** 24:18
**either** 4:14,20 17:3
22:1 50:14 51:20
59:17 105:7
**Eley** 1:19 2:9
**Elks** 16:21
**Ellen** 47:20
**embankment** 78:20
**employed** 11:12 23:18
148:22
**employment** 147:16,20
**emptied** 30:4
**encounter** 27:12
**encountered** 41:14
**end** 7:18 12:12 13:15
35:11 63:23 115:15
136:7
**ended** 35:14 72:5
**enforcement** 42:18
**engine** 26:23 145:18,19
145:20 146:2,2,19,22
**enough** 37:7 47:21 90:5
103:17
**entire** 73:22 74:7
**entitled** 147:12
**equipment** 92:9 140:13
**equipped** 28:20
**Ernestine** 129:18,19
134:10
**escorted** 122:18
**established** 118:2
**estimate** 68:3,7 73:18
**estimating** 137:12
**et** 123:5 141:1
**even** 31:2 33:3 40:6
48:9 96:9 100:10,22
107:23 127:19
131:21 141:5 142:18
152:10

**evening** 125:22,23
126:3
**ever** 6:1 8:10 10:3
13:16 14:8 17:2,9
23:5,8 33:10 40:1
42:4,7 47:12,19
57:17 58:8 73:4
90:19 119:19 126:15
126:19,21 127:1
132:12 133:20 136:2
138:19 139:9,10
140:18 141:10 142:6
146:3
**every** 147:17 150:4,10
**Everybody** 152:13
**everything** 6:6 63:16
98:7 116:1 146:17
**evidence** 4:13 47:21
**exact** 147:10
**exactly** 7:4 20:4 33:15
34:13 49:23 103:4
114:5 132:8 147:8
**examination** 2:14 5:9
153:20 156:3
**excluding** 145:3
**excuse** 5:18 122:5
**Exhaust** 139:22,22
**Exhibit** 2:19 17:18,21
28:3,6,10 29:5,8,10
30:7 31:17,20 36:17
36:21 58:1,4,6 79:1
81:14 93:11 107:11
107:14,17 108:12,16
113:16 118:21
133:17,20,21
**Exhibits** 79:5 108:18
**exit** 38:16,18
**expecting** 7:8
**expenses** 148:19
**Expiration** 156:13
**explain** 35:5 146:18
**extent** 47:18
**eye** 71:9
**eyes** 55:20 80:18
150:11

---

**F**

**face** 90:7 149:11
**facility** 121:20,22
122:5,10 125:22
134:21 135:22
137:18
**facing** 72:6 94:1
**fair** 61:11 153:15
**fairly** 16:4 29:13 34:1
61:12 70:5 152:19
**fall** 69:2
**fallen** 69:10
**false** 21:2

**far** 25:17 31:15 69:2,3
77:15 78:15 92:8
98:14 121:10 141:13
141:20 144:11
145:13 149:3,18
**Farmersville** 5:21 9:17
14:20 16:19 25:13
37:9,12,20 39:4
**fast** 48:14 53:6,18 64:4
65:19 68:3,6,14,15
70:16
**faster** 68:7
**father** 136:16
**father's** 136:16
**features** 40:3
**Federal** 4:5
**feel** 87:10 152:13
**feeling** 154:1
**feet** 90:6,6 114:19
119:11
**fell** 68:23 69:11
**felt** 65:23 69:1
**few** 6:3 151:3 153:12
**field** 147:17
**figure** 118:20
**figured** 117:6
**file** 10:16 126:19
**filed** 35:10,13 126:21
**filing** 4:18,22
**fill** 127:15,18
**finalized** 10:12,21
**finally** 125:21 126:1,5
**find** 104:19 119:12,14
**finished** 26:5
**finisher** 13:9
**fire** 111:14 115:4
**fired** 112:8,12 113:5,19
114:2,18,22
**first** 5:6 6:13 16:19
17:6 19:7,9 20:15
36:5,8 39:12,16
40:12 44:10 49:16,18
50:3 65:9,15,20,22
67:1 68:4,19,20
69:12,14 72:18 74:8
97:20 104:21 112:7
117:12,22,23 118:1
121:18 127:6 130:17
131:13 152:22
**fit** 32:10 101:8,8
**five** 73:19,22 103:20,22
106:19 108:3 117:17
117:18 123:13,21,22
**fixing** 123:10
**flag** 44:10,12
**flashing** 100:12,22
**flask** 29:16
**flat** 41:3 120:14,14,16
120:19

**flip** 64:9
**focused** 88:10
**focusing** 88:3,16 91:23
92:16 99:3
**folded** 36:4
**followed** 52:19
**following** 18:16 69:20
**follows** 5:8
**foot** 90:7,9
**foot-swept** 92:20 93:1
93:15
**force** 43:3 150:10
**forced** 101:17
**Ford** 116:12
**foregoing** 156:1
**forgot** 18:7 111:12,16
**Forklift** 13:4,5
**form** 4:10
**formality** 4:9
**forth** 97:4
**found** 14:10 105:16
106:19 119:16
**four** 31:9,16 32:19
100:11
**four-lane** 52:1
**Fred** 2:3
**friend** 15:6,9 30:18
**from** 9:4 14:2,4 19:21
25:17 31:15 32:5
33:20,22 35:9 36:10
37:8,19,22 38:17
39:9 42:19 43:13,14
47:20 66:3 71:10,15
72:8 73:13,19 75:10
76:14 77:1,20 78:4
78:12,13,13,14,15
82:7 92:3,18,23,23
93:8,20,23 95:15
113:20 119:4 122:11
122:18 125:10,22
127:10 131:10
135:11 136:16,22,23
140:22 142:21
143:14 144:8,11
145:17 146:6,10,11
146:15,16 148:10
**front** 29:9,14 40:4
65:16 79:22 91:7,12
93:22 94:8,13 96:12
96:14 102:22 103:5
106:4 113:22 114:3
115:10,14 117:8
153:4
**Ft** 140:17
**fuck** 50:1
**full** 47:18 102:14 103:2
**further** 4:16,23 78:3
154:11 156:6

| G | | hair 13:20 14:11 | hear 46:1 50:6 55:9 | hit 39:18 64:15,22 |
|---|---|---|---|---|
| Gained 82:8 | 64:4,5 65:2,19,21 | Halcyon 1:19 2:10 | 59:7 86:14,15,18 | 65:15,20 67:1,22 |
| gambler 35:6 | 66:5 68:4,6,14,15 | half 60:3 130:7,8 148:5 | 98:13 110:18 114:6 | 68:5,6 69:23 70:4,9 |
| gambling 34:1 146:11 | 70:8,15 72:15 77:2,3 | halfway 118:4 119:7 | 122:2 | 70:13,13,17,19 71:6 |
| 146:15 | 77:8 79:7,9 86:10,16 | Hall 34:5,14,18 | heard 42:12,13,19,20 | 71:15,16,18 72:18,19 |
| Gaming 34:5 | 86:17 87:7,15 91:5,9 | hand 44:14,17,22 45:3 | 42:23,23 72:21 91:20 | 74:8 78:18,21 80:16 |
| Gary 2:8 5:14 | 91:15 96:7 98:12,13 | 45:23 46:6 54:10,13 | 98:14 107:5 110:9 | 82:18 99:21 113:23 |
| gas 76:22 77:6,11 | 98:16 100:3,4 102:11 | 55:2,4,6,7 56:17 | 113:23,23 114:7 | 114:1,6 115:8,12,15 |
| 120:10,10,18,22 | 102:16,17 104:15 | 74:17 97:9 102:13 | 115:15 | 115:20,21 140:8 |
| 121:1,12,16,21 | 107:13 108:20 117:6 | 123:17 | heart 21:22 22:1 | 149:17 |
| gate 122:7 | 127:4 131:2,17,19 | handcuffed 90:8 | held 11:6 | hitting 63:23,23 64:17 |
| gave 9:6 17:10 58:16 | 133:10 135:11 138:9 | handcuffs 95:10 99:18 | help 74:3,6 151:10 | 64:20 71:5 |
| 102:18 103:10 | 144:14 | 124:2,6 | helper 13:9 | hold 103:14,16 |
| 145:22 146:22 | good 6:15 9:14 12:4 | handling 10:18 | her 6:15 10:13,19 | holding 153:4,6,12 |
| general 94:7 113:15 | 35:20 36:11 38:6 | hands 54:19 86:9 87:8 | 21:23 22:2 125:1,14 | hole 123:18,19 125:11 |
| generally 115:9 | 59:4 73:13 80:9 92:5 | 90:3,23 91:3,17 | 125:15,15,16,18 | 153:1,3 |
| gesture 56:17 | gotten 83:8,9 | 96:19 97:18 101:16 | 131:2,7,10,13,16,17 | hollow 62:23 |
| gesturing 55:4 56:19 | grabbed 90:5 95:3 96:5 | 114:12 115:2 | 131:18,21 132:2,4,6 | home 9:20 26:8,9 27:4 |
| 84:21 | 99:19 102:13 | Hang 66:8 | 132:20 135:6,7,11 | 27:6,9 31:1 38:23 |
| getting 49:2 74:5 87:10 | graduate 14:2,4,6 | hanging 83:16 139:20 | 137:3,5,8 139:12 | 77:9 78:4,13,14,15 |
| 125:4 137:4 150:5 | grandmother 15:4 | happen 90:2 110:6 | 143:22,23 | 119:8 131:8 132:8 |
| girlfriend 129:16,17 | grandmother's 15:12 | 111:4 117:18 121:10 | hereto 4:21 5:1 | 139:4 |
| 134:10 148:3 | grass 110:7 115:17 | 122:11 132:16 | Herman 146:8,8,10,21 | hope 151:12 |
| give 6:18 7:8 16:8 | Greenville 130:3 | 137:17 | he'll 16:7 132:21 | Hospital 9:19 |
| 17:21 30:20 31:1,8 | grievance 126:19 | happened 46:10,23 | high 13:23 14:2,4,5 | hot 25:23 26:1 |
| 37:17 58:4 75:6 | gripped 101:17 | 47:16 54:7 65:14 | highway 15:8 26:13,17 | hotel 47:1,6 |
| 91:19 112:18 131:14 | ground 6:3 86:12,12,13 | 67:17 69:16 80:10 | 26:19 31:12 33:6 | hour 11:19 46:5 48:12 |
| 132:20 | 87:2,3,5,11 88:5,6,7 | 89:21 95:19 109:15 | 36:13,15 37:1,16 | 53:13,14 64:8 65:3 |
| given 6:1 91:22 113:9 | 88:7,9 89:5,9,23 90:2 | 111:7,8,11,12 112:6 | 38:15 48:23 49:2 | 65:22 67:8,16 70:8 |
| 146:13 | 90:7 92:19 93:1,2,12 | 116:1,4 120:3 121:16 | 50:21,23 51:11,13,18 | hours 153:13 |
| giving 45:3,23 113:7 | 93:16 95:20 99:22 | 122:4,21 131:9 | 51:22 52:3,14,19,23 | house 15:13 24:1 25:12 |
| glance 44:11 46:11 | 100:1 104:23 112:19 | 135:10 138:7,22 | 53:8 54:6 55:21 64:3 | 25:17 27:1,12 31:15 |
| 49:6,12,13,18 54:22 | 113:23 114:1,3,6,11 | 140:19 141:4,12,19 | 70:1,2,23 72:5 73:16 | 36:10,14 38:11 39:5 |
| 54:23 55:19 66:11 | 114:15,16 115:1,9,15 | 141:23 142:2 145:6 | 74:23 75:2 76:20 | 51:3,13 75:23 76:1,7 |
| 69:7 | guess 37:20 47:17 51:5 | 147:19 149:4 | 77:12 79:13 94:2,4 | 76:14 77:12 133:11 |
| glanced 50:17 54:10 | 68:12 70:15 85:13 | happening 44:6 87:7 | 100:6 118:16,17,19 | 144:14 |
| 55:20 56:14 | 131:23 135:19 | 121:11 | 119:9,22 130:22 | houses 75:11,15,16 |
| glancing 60:23 | gun 29:17 30:7,10,15 | happy 7:3 | 142:23 | 76:8,15 77:17,18 |
| glass 140:15 | 30:23 31:5 32:16,23 | harass 150:11 | hill 76:14 95:11 107:7 | Housewife 9:19 |
| go 6:17 13:8 16:15 | 47:2 56:8,9,9,12,12 | hard 6:23 39:18 69:14 | 109:12 111:1,7 | Howard 24:8,8 26:21 |
| 24:16 26:8,22 27:3 | 56:19 61:3,14,16 | harder 31:3 | him 19:7,10 30:21 31:1 | Howards 26:22 |
| 30:23 35:21 38:3,6 | 62:12,17,19 63:2,10 | hardly 102:9 | 33:3,4,4 42:8 43:1 | Howard's 120:9 |
| 51:12 52:7 68:4 | 73:4 85:21 86:20 | having 5:6 30:21 33:23 | 47:17 54:18 55:9 | huh 12:4 |
| 85:14 93:10 97:14 | 90:4 92:1,17 96:4 | 152:16 | 56:21 57:5 60:21,23 | huh-uh 6:20 |
| 118:20 120:6 121:19 | 104:19,20,22 105:1,3 | Hayneville 14:5 109:23 | 84:1 85:3,5 88:22,23 | Humiliated 154:2 |
| 127:17 133:15 137:6 | 105:5,6,7,8,9,9,17,18 | head 6:20 8:18 21:20 | 90:14,16 92:5,7 93:5 | hundred 77:16 119:11 |
| 137:12 138:19 139:4 | 105:20,20 106:23 | 25:1,16 39:11 60:11 | 94:17,22 95:1,3,4,8,9 | hurt 54:5 |
| 142:3 143:17 152:21 | 107:3 141:4,11,16,20 | 63:14 69:23 70:19,23 | 95:10,10,12 96:9,21 | Hutson 1:9 19:8,12 |
| goes 37:21 149:4 | 141:22 142:12 | 71:5,6,16 80:5,16 | 97:1,6,8,10,13 98:15 | 42:7,11 45:4 83:22 |
| 151:12 | 149:10 | 82:18 86:8 87:1 94:1 | 100:16,17,19 103:11 | 84:3,13,16,21 88:3 |
| going 6:8,9 15:14 17:20 | gunfire 114:6 | 94:3 102:15 121:15 | 106:11,16 114:13 | 88:22 93:5 94:17 |
| 26:7,9 27:6 29:7 | guns 71:4 80:8 81:7 | 127:9 129:9 130:9 | 116:20 117:11 | 105:6 117:10 118:1,6 |
| 36:13,19,20 38:13 | 82:23 83:1,3,11 | 131:1 149:2,16 | 123:14,17,18 125:5 | 120:6,10,12,20 |
| 45:18 48:10,12 50:5 | 84:11 | headache 127:9 | 125:10,10,11 131:17 | 124:19,20 150:9 |
| 50:11 51:1,3 52:14 | gunshot 114:1 | headed 93:17 | 131:19 132:17 | 155:16 |
| 52:22 53:6,12 55:11 | guy 47:2,12 76:13 | heading 51:13 | 136:20,22 141:13,17 | |
| 56:17 57:1,6,11,22 | 82:10 85:4 99:18 | headlights 42:2 | 141:20 142:3,9 | |
| 59:3,5 61:2 62:13 | 116:21 117:7 | head-on 65:16 | 145:18,20 146:2,6 | I |
| goes | | health 151:7,20 152:1 | 150:18,22 153:1 | idea 68:5,14 75:6 115:8 |
| H | | | | identification 17:19 |

Deposition of Richard Marshall

November 14, 2007

Page 6

28:4 29:6 31:18 36:18 58:2 79:6 107:12 108:19 133:18
identify 89:11,13
illness 23:8
immediate 99:9
immediately 36:9 40:20 69:16,18,19 75:22 76:5 123:14 125:6
impact 65:23 66:1 68:16,19,20 69:13,14 69:17,18
impound 140:16,17
impounded 139:14
incarcerated 18:12
incident 18:16 23:11 55:18 74:13,19 100:14 107:6 125:23 126:5 138:11 139:15 141:18 142:11 147:16,19 150:7
income 35:2,11,12
Index 2:14,19,23
indicating 44:14 91:3 102:15 110:13 113:15 115:19
individual 1:8,9 155:15 155:17
information 9:6 16:7 58:13 110:4 111:5
initial 58:14 72:13 91:14
initially 45:22 64:5 89:5 92:18 111:13 130:11 134:20
inmate 3:11 128:20
inmates 128:11,23
Inn 47:1
inquisition 7:12
inside 83:7 90:20 96:11 99:19 100:19 101:16 104:10 120:12 140:22
intercom 127:21
interested 156:8
Internet 36:22
interrogatories 17:8 20:13
interrogatory 151:15
interrupted 110:3 148:13
intersection 26:18 52:4 75:3,20,21
intersects 38:2 78:7
Interview 3:5
introduced 4:19
involved 21:16 145:4

J
jail 18:13,22 20:16,19 22:4,9,11,15,18,23 23:2 122:4 126:17 127:4 129:10 133:5 138:3,7 147:23 148:16 150:7
jailer 127:23
January 11:8,9,14 12:3 12:4 139:15 150:17
Jay 2:3,4 16:5
jerked 66:1 67:12 70:16
jerking 63:14
Jerome 47:15
jewelry 123:4,8,8 133:8 133:15 134:1 135:12 148:10
Jim 132:8
jimmied 140:15
job 11:6,23 12:11 33:22 147:18
jobs 12:5
John 136:19,19
Joshua 129:6
judge 18:15,23
July 28:2
jump 114:23
jumped 31:4 70:1,22 80:20 83:10
June 18:8,9,10 19:6 23:13,18 29:10 31:7 38:12 42:14,17 79:13 100:23 108:22 129:11 134:19 138:11 149:5
junkyard 76:13
just 6:3 9:4 10:20 16:6 17:22 20:2 22:7 24:22 27:6 36:4,12 36:19,21 37:1,18,20 38:2,3,7,10,23 40:7 42:21,23,23 44:14,20 45:18 46:10 47:4 49:12,15 50:17 54:18 55:2,4,5,16,22 56:23 57:10,21 58:5 59:7 59:21 60:23 61:14 63:4 66:8,11 68:16 69:4 70:16 71:20,21 72:7 76:8 77:16 78:9 80:22 82:1,2,8,20 86:11,23 87:10 88:4 88:8 90:15 91:23 97:13 98:8 99:3 101:8 104:11,12 105:21 110:7 111:21 112:3,7 114:14,18

115:19 116:10 117:20 118:20 121:14 126:10 127:23 128:6,14 131:15 135:18 136:23 137:12 139:10 140:5 142:1 147:3,11 148:16,17 149:6,6,7,14,17,21 149:21,22 150:2,12 151:3,10,16 152:8,13
J.P 14:9,14

K
keep 6:12 60:23 86:3
kept 39:19 41:3 44:5 54:11,23 55:5,21
Kevin 24:4,5 27:10 29:1 57:2 58:16 59:8 72:20 73:20 88:13,21 91:19,22 93:4 94:16 95:18 98:13 99:8 107:8 109:13,16 116:3,6 117:8 118:11 120:1 124:15 137:13 137:13 142:19 145:3 145:13,14 146:19,23
Kevin's 108:10
keys 28:14 104:13,15
kick 89:22 90:1 115:17
kicked 93:15
kids 21:1,7
kill 57:23 73:2
kin 156:6
kind 6:23 36:23 37:1 37:13,18 41:20 44:20 44:22 51:10 52:9 62:19,21 63:4 70:11 94:10,11 102:14 107:21 113:9 116:11 116:21 119:6 135:15 139:21 151:7 152:19
knew 30:12 51:9 54:2 84:14 87:21 129:7
knife 56:8
knocked 139:19 144:20
knocking 64:2
knot 71:10 82:20 149:1 149:15,17
know 7:2,4,15 12:5 15:17 16:21 20:4,22 21:14,21,23 22:1,19 25:15 31:13 33:18 38:8 39:19 42:10,11 44:6 45:19 47:18,22 51:8 56:6,7,13 57:5 60:14 62:14,21 68:16 69:4 70:22 75:15,23

83:19 85:3,5 87:6,9 88:19 96:8 97:2,3 98:14 99:8 100:13 102:8 103:3,4,21 104:10 108:1,5,15 114:19 115:13 116:15,18 125:15,20 127:20,22 128:3,13 128:15,16 129:2,6,7 131:5 132:6,8,19 136:22 137:12 138:15 139:7 141:5,5 141:6,14,20 142:4,5 142:6,16,18,20 143:1 143:2,5 144:7,23 145:4,13,14 146:16 146:17 147:8 151:12 152:12,14,19
knowing 70:20 146:19
knowledge 48:2 119:13 143:4 147:8
known 139:10
knows 141:23 147:3,10 147:11

L
L 2:3,8
lacerations 127:10
lady 21:7 124:15,17,21
lady's 21:10 125:12
laid 11:7 12:1 33:22
landed 70:2 72:12 80:3
lane 41:17,18,19 44:8 51:23 52:2 53:4 71:23 130:5
Large 1:18 4:8 155:6 156:14
larger 38:20
LaShun 1:9 42:7 155:16
last 10:22 11:6,7,8,23 12:17 22:2,3 142:9 142:11
later 21:4 36:7 39:12 44:7 45:2 91:10 109:22 119:16 153:10
law 1:19 2:4,4,9 42:18
lawsuit 17:1,3 23:12
lawyer 7:13 8:21 137:5 138:8,23 139:2
lawyers 7:21 79:10 111:19
lay 150:10
laying 61:4,20 86:22 93:13,16
Layoff 12:6
leads 37:9
leaned 80:18 84:14

learn 45:2 139:9
learned 39:13
leave 105:21 111:12 117:22,22
left 30:20 31:5 32:4,16 32:19 34:21,21 39:4 71:8 72:8,11 75:18 76:1,8,16 77:1 105:23 117:12 118:1 118:3 120:20 121:18 128:7 146:10,16 148:11 149:17
left-hand 51:7 53:2 61:8 94:11
leg 99:22
legs 102:20
less 88:12 98:21 99:1
let 6:3 7:2,15 13:7 17:20,21 23:10 28:5 29:7,8 30:1 31:6,19 37:4,17 43:13 44:16 46:12 49:15 58:3,4 60:15 61:7 79:10 80:10 85:14 97:5 131:17,19 132:18 133:19 148:2
letter 47:20
letting 87:9
let's 6:13 36:11 63:17 65:1 68:4 71:5 75:9 93:10 104:1 109:6 112:13 116:8 118:20 134:18 150:23
level 44:23
Lewis 2:3,4,17 16:10 111:20,22 153:21 154:5
license 14:10 18:17 40:4 81:17 82:1
life 5:23 15:1,4,5
light 49:8,9 51:15 59:14,15 66:15 76:12 77:1,19,20,23 78:5 100:9,9,10,11,12,13 100:15,17,20 140:3 143:17 144:12,13
lights 41:20,22,23,23
like 13:13,15 16:21,22 29:9 31:20 32:4 40:4 44:4 46:7 48:19 50:14 53:21 54:4 56:17 57:5,21 61:14 61:23 63:20 64:1 66:2 68:21 70:14,16 71:19 75:4,7,12 76:11,18 77:7 80:16 80:17 83:12 86:6,23 87:10 89:12 91:3,12 91:21 92:9,12 93:17

| | | | | |
|---|---|---|---|---|
| 96:4,21 97:18,19,20<br>102:15 107:19 108:2<br>108:3 114:22 115:18<br>115:19 119:6 140:5,7<br>145:22 148:8,15<br>150:6,11 152:14<br>**limit** 48:15 53:8<br>**Lincoln** 39:16,22 40:11<br>41:15 43:21 52:17<br>65:7 73:14 74:10<br>78:19 79:16,19 80:11<br>80:18 81:1,2 82:21<br>85:9 94:6,7,8,14<br>98:21 100:8 106:22<br>116:6 117:9 118:11<br>120:2,5 121:18<br>**line** 37:19 38:3 78:7,11<br>**lips** 55:14,17<br>**list** 16:8<br>**little** 36:22 37:19 38:11<br>38:20 53:16,19 56:12<br>62:3 68:23 69:19<br>82:8 105:2 106:4,9<br>107:2 139:7 152:11<br>152:22<br>**live** 5:20 14:19 31:11<br>33:5 77:20 130:2,21<br>144:4<br>**lived** 5:22 10:22 11:1<br>14:23,23 15:2<br>**lives** 21:14 144:13<br>**living** 15:7<br>**loaded** 62:17<br>**loaned** 28:16<br>**lock** 54:18 55:16 56:13<br>140:14<br>**log** 123:10<br>**Logging** 11:7<br>**long** 5:22 10:11 11:11<br>12:7 14:22 15:2<br>20:19 26:3 28:1 31:6<br>31:7 32:21 48:18<br>59:11 66:10 67:16<br>98:2 103:16,17<br>106:16 117:15<br>119:21 121:1 129:10<br>**look** 17:22 18:2 22:12<br>28:7 29:9 31:20<br>32:11 41:11 46:7<br>49:4 50:14 54:21<br>58:5 60:7,9,10 66:10<br>69:4 79:10 91:5 92:5<br>104:1 118:21,23<br>**looked** 40:23 44:4<br>46:11 57:21 66:3,8<br>96:20<br>**looking** 56:1 94:5<br>113:16 118:6,9<br>**looks** 57:5 61:23 75:7 | 107:19 108:3 119:6<br>140:7 150:6<br>**lose** 65:11<br>**losing** 64:7 141:22<br>**loss** 147:22<br>**lost** 66:2 68:22 147:21<br>147:22 148:15<br>**lot** 16:2,4 75:5 149:6,7<br>149:21,22<br>**Lots** 12:19,21 13:3,14<br>**loud** 91:23 110:21<br>**low** 101:7<br>**lower** 93:21<br>**Lowndes** 5:21 9:17<br>15:1,8 16:2 19:23<br>22:22 121:20 150:5<br>**Lowndes/Wilcox** 78:7<br>**lunch** 109:8<br>**lunchtime** 111:19<br>112:4<br>**lying** 32:13<br>**Lyn** 1:16 4:6 155:4<br>156:12<br><br>**___ M ___**<br><br>**M** 11:7,7<br>**mad** 99:19<br>**made** 4:11 40:18 41:7<br>47:10 65:10,14 80:11<br>80:12 101:22 105:5<br>106:23 126:11 129:4<br>129:12<br>**mailbox** 78:21,22<br>**make** 9:13 21:2 37:10<br>37:14,15,23 38:3<br>39:3 43:13 60:21<br>66:13 67:9 74:1 80:9<br>81:1 83:6 90:19<br>110:19 126:15<br>129:13 134:13,17,21<br>135:15 136:2<br>**makes** 6:15<br>**making** 11:19 13:13<br>60:22 105:2 107:2<br>113:18 126:10<br>**males** 44:9<br>**Mallory** 10:18<br>**man** 96:3,6 99:16 100:1<br>101:20 105:9 114:18<br>114:19 125:7<br>**manner** 4:20 156:8<br>**many** 10:5 15:21 46:17<br>65:7 103:21 114:8<br>116:8,15 141:15<br>**map** 3:4 36:22 37:6<br>51:5<br>**MapQuest** 3:4<br>**MAR** 2:20<br>**March** 34:15 | **Margaret** 144:1,1,2<br>145:5<br>**mark** 17:20 28:5 29:7<br>31:19 36:20 58:3<br>79:9 107:13<br>**marked** 17:18 28:3<br>29:5 31:17 36:17<br>58:1 79:6 107:11<br>108:19 133:17<br>**married** 10:1,3,5,7,9<br>10:11,13 21:8<br>**Marshall** 1:5,15 2:15<br>4:4 5:5,13,14 12:16<br>15:19 17:23 58:9<br>65:5 107:16 108:20<br>109:9 133:12,22<br>134:4,8 135:2,3<br>137:10 151:3 155:8<br>155:12<br>**Marzett** 130:16 136:12<br>**mashed** 127:20<br>**Masters** 2:8 5:15<br>**math** 9:14<br>**matter** 155:11<br>**Matthews** 11:21<br>**max** 117:5<br>**may** 4:6,11,13,19 6:19<br>7:15 10:10 20:9 33:2<br>49:19 65:21 86:7<br>108:9 113:13 146:14<br>**maybe** 41:2 48:16<br>129:2<br>**McDonough** 2:5<br>**McWilliams** 30:16,17<br>31:8,11 33:5 141:10<br>**mean** 6:19 20:4 45:15<br>61:18 63:18 81:23<br>85:11 109:18 141:23<br>148:17<br>**meant** 153:5<br>**mediation** 139:7<br>**medical** 127:3,6 128:9<br>128:18 148:19<br>**meet** 74:11<br>**meeting** 40:20 74:12<br>**member** 16:13,20<br>**mental** 23:8 149:6,13<br>149:19 151:7,20<br>152:1<br>**mention** 111:16<br>**met** 36:16 39:15<br>**middle** 1:2 16:9 94:12<br>155:20<br>**midwife** 9:21,22<br>**might** 18:6 19:21 37:6<br>42:22 54:16 60:16<br>111:23<br>**mile** 25:18 38:17 39:14<br>60:3 63:22 66:7 76:6 | 77:1 78:12,17<br>**miles** 31:16 38:17 46:5<br>48:12 53:13,14 64:8<br>65:22 67:7,16 70:8<br>**mind** 6:13 40:5,7<br>**mind-set** 152:12<br>**mine** 13:20 30:18 108:5<br>108:10 148:6<br>**minute** 17:22 36:12<br>44:7 58:5<br>**minutes** 73:19 98:4,5<br>98:11,11 103:18,19<br>106:19 109:22 111:1<br>117:4,5,17,19 119:23<br>120:20 121:3 124:7<br>**mirror** 40:23 44:4 49:5<br>49:6,11 52:22 60:8,9<br>66:4,9 69:8<br>**miss** 18:16 138:2,5<br>**missed** 33:3<br>**Mississippi** 34:6,12<br>**misunderstanding** 21:1<br>**Mixed** 13:9<br>**model** 76:15 107:3<br>**mom** 21:2,7<br>**moment** 66:2<br>**money** 33:12,20,23<br>34:3,6,11,12,14,20<br>35:17,18 47:3,7,8<br>96:9,22 97:7,9<br>107:18 108:2,4,7,10<br>108:13,15 123:12,15<br>123:16 124:22 125:6<br>125:7,8 126:12,16,22<br>130:6 134:1 135:11<br>135:12 140:18 146:5<br>146:14 147:22 148:4<br>148:11,14<br>**Montgomery** 1:20 2:5<br>2:11 12:20 14:12<br>46:22 155:3<br>**month** 2:2,4 22:3<br>34:13,14<br>**months** 142:10,11<br>**more** 24:4 69:19 77:21<br>79:7 83:20 88:12<br>98:21 99:1 108:21<br>140:6 147:1,3,11<br>151:3 152:22<br>**morning** 8:2 23:23<br>127:8<br>**mortar** 13:10<br>**Mosses** 130:22 131:6<br>132:7<br>**most** 15:3,5 106:6<br>**mostly** 137:4<br>**mother** 21:12 27:2<br>**mother's** 15:3<br>**motion** 54:10,13 64:3 | 102:5 113:18<br>**motions** 60:21,22<br>**motor** 24:1,9,17,23<br>25:6,19 26:4 145:16<br>**move** 37:4 63:10 90:19<br>105:20<br>**moved** 15:5 136:23<br>**moves** 67:9<br>**moving** 55:15,17 62:10<br>62:15 63:15 106:7<br>**much** 11:18 15:1 33:12<br>34:16,18 68:7,10<br>73:16 95:14 100:23<br>106:5 117:3 123:20<br>130:10 147:9 148:7<br>153:18<br>**mumbling** 73:1<br>**music** 46:3 55:10,11<br>59:3,5,9 86:16 91:23<br>140:13<br>**myself** 54:5 73:1<br>152:10<br>**M-A-R-Z-E-T-T**<br>130:18<br><br>**___ N ___**<br><br>**name** 5:11,14 19:9<br>21:10 42:12,13 45:19<br>47:14 109:17,17,18<br>110:20 116:18<br>125:12 130:17<br>136:18 139:1 143:23<br>146:7,8<br>**names** 109:20 128:12<br>128:23<br>**nearby** 99:6<br>**neck** 66:1 67:12 83:17<br>90:9 102:14,22,23<br>**need** 4:11 6:12 7:12,13<br>39:21 127:11 152:21<br>**needed** 135:7 152:7<br>**neither** 156:6<br>**nelson** 102:14 103:2<br>**never** 11:1,2 13:18,20<br>42:11 52:11 73:23<br>74:3 84:12 127:4,16<br>132:15 134:12<br>138:17<br>**New** 136:16,23<br>**next** 2:23 15:4,13 29:17<br>43:11,16 88:20<br>109:12 127:8 139:13<br>**nice** 49:20,21,22<br>**nickname** 82:1,5,8<br>**night** 149:8 152:17<br>153:10<br>**nightmares** 150:2<br>**nights** 149:8,21 152:17<br>**Nobody** 121:8 |

Deposition of Richard Marshall                                                              November 14, 2007

Page 8

nods 8:18 25:1 39:11
  87:1 121:15 130:9
None 9:10
noon 26:6 126:3,4
normal 6:21
NORTHERN 1:3
  155:21
nose 40:21
nothing 5:7 62:16
  89:13 96:3 111:7,8
  111:11 137:19
  155:10
noticed 8:2 49:7
Nova 27:17 31:21 82:4
  107:22,23
November 1:20 13:1,2
  155:23
nowhere 98:16
number 21:23 67:20
  73:9 109:20 110:20
  144:7

O

obey 102:10
Object 111:20
objections 4:9,10
occasions 141:17
occupants 49:10
occur 117:2
occurred 23:12 70:9
  124:23
off 11:8 12:1 13:15
  14:1 15:8 21:20
  25:15 26:11,13,16,16
  31:12 33:5,22 36:12
  36:15,22 37:3 38:15
  41:1,9 43:6,15 44:5
  44:23 47:7 53:23
  57:4,22 59:1,6 64:3
  64:18 67:10 71:19
  72:2,8 75:10 77:13
  77:13,15 79:22 80:5
  94:10 95:20 99:22
  101:15 103:6,17
  105:10 114:4 117:10
  117:11,16,20 119:4
  119:10 120:7 123:3,4
  123:4,7,8 124:4,10
  129:8 131:1,15
  133:15 144:20 150:3
offered 4:13
offhand 31:14 34:8
office 135:19 137:6
officer 19:7,9,21 20:7
  42:18 114:20 116:17
  116:18
officers 36:6,16 82:23
  91:15 116:16
Offices 1:19 2:4

oh 19:12,23 98:9
  104:20 105:6,6
  149:17
okay 6:7 7:6,11,17 9:23
  35:10 39:20 43:23
  64:16 65:5 70:4
  84:18 98:2 103:11
  114:18 126:10 133:4
  154:5
old 9:13 15:18 135:18
  137:11,13,14
older 15:23 76:15
oldest 137:14
once 7:18 10:6 35:13
  46:18 80:14 93:11
  95:8,18 99:10,10
  103:7 133:8
oncoming 53:3 71:22
one 5:18 6:5,22 17:6,10
  17:11,12,13,14,14
  19:17,21 20:5,11,17
  20:19 21:11,16 22:18
  22:20 28:13 29:18
  30:20 33:22 34:10
  41:17,18,19 42:23
  50:14 51:23 52:2
  64:18 65:13,13 77:17
  78:1 84:16 102:13,22
  102:23 114:9 116:10
  116:17 125:19 129:2
  132:16 143:11
  145:13,17 146:9
  147:15 153:22
ones 108:3
only 12:10 22:18,20
  28:14 41:7 42:18
  48:3 55:6,7 56:2 63:8
  74:17 85:8,10 92:10
  95:3 110:19 111:11
  116:4 118:4 123:13
  128:5 150:18
onto 36:15 37:3,14
  52:14 54:6 75:18
  76:5
open 42:21 61:14 91:8
  91:9,12 95:5,7,22
  96:10
opened 71:2 80:18,22
  83:12 104:14
opening 97:23
Operate 11:17
operator 13:4,5
opportunity 80:21
  83:11
opposite 70:2 71:1 72:6
ordeal 149:23
ordinary 122:11
organizations 16:21
originally 19:17,22

other 4:10,14,20 6:14
  7:21 9:5,10 14:16
  17:1,3,15 18:6 20:11
  20:13 23:2 24:7 27:6
  43:5 64:18 77:17
  78:19 82:2 84:4,17
  89:4,14 94:14 97:5
  97:16,17 107:5
  109:21 115:9 116:4,8
  134:17 136:7 142:19
  144:16,18 146:10
  149:2
out 13:23 14:10 15:5
  18:18 24:2,9 25:19
  26:4 27:2 31:4 33:2
  35:3,3,8 37:4 40:5
  47:6 48:22 52:19
  61:14 64:9,21,23
  69:22 70:5,18 71:3
  71:19 72:1 74:9,15
  74:23 78:16,19 79:3
  79:20 80:13,20,21
  81:7,11 82:22,23
  83:5,8,9,10,12,13,20
  84:11 85:17 86:4,7,8
  86:19 88:17,23 93:5
  93:16,19,20,23 94:3
  94:16,17,19,22 95:1
  95:4,9 96:8,9,10,20
  96:22 97:7,8,10,11
  97:14 98:21 99:8
  100:17,20 102:20
  104:13 107:9 110:19
  111:12 112:14
  113:13,20 114:23
  115:10 116:1 117:6
  118:5,8,20 120:22
  122:8,11,12 123:17
  124:2,6,9,11 127:15
  127:18 135:8 138:7
  139:3,5,9,11,19
  140:5,14,15,18,21,23
  144:14 145:16,19
  146:2 152:12,14
  153:10 156:4
outright 132:10
over 6:14 10:20 19:18
  19:19,22 24:22 25:2
  44:10,15 46:11 51:7
  56:18 57:17,19,23
  58:13,19,21,22 74:14
  82:9 84:22 98:15
  99:1 107:1 109:11,16
  110:11,13,16,21
  114:12 123:2 132:5
  146:11,16 148:11
  149:10,12 150:20
  151:12
overnight 22:6,7

owed 145:23
own 13:16,21 86:5
  132:10 151:22 152:8
  152:8
owned 13:16,21 76:14
  146:9
o'clock 24:18 126:7

_____

P

page 2:23
pages 156:1
paid 11:18 13:11 24:14
panic 74:4
pants 92:12 96:5,18
  97:17,20 99:20,21,23
  101:17
paper 22:13 125:4
  127:15,18
paragraph 46:13
  130:13
part 12:13 64:11 71:6
  93:21 97:16,19
  104:10 106:4
parties 4:3,17 5:1
  156:4,7
party 4:14,20 9:5 17:2
pass 144:16
passed 40:9,13 73:17
  74:7 117:3
passenger 44:18,19
  45:2,20 54:13 60:18
  83:19,23 84:13 99:14
passenger's 83:21 85:1
  85:16,20 94:20,21
  115:11
passing 44:8 143:3,9
past 113:17,20 141:18
  144:13
patrol 100:3 121:6
pause 18:1 58:7 66:22
pawn 135:13
pawning 148:10
pay 13:14,15 40:6
paying 92:15
payment 145:17,21
Peddler's 47:1
pen 37:17
people 82:9 128:14
  152:13,18 154:3
per 46:5
period 73:23
permanent 149:2
permission 139:12
permit 33:8,10 138:12
person 92:8 97:16 98:3
  98:8,10 99:4 128:19
personalized 81:19
personally 121:11
  132:12

persons 36:9
phone 21:23 73:7,9,20
  74:1 110:11 131:11
  134:21 135:17,18,19
  135:20 136:2,8
phones 135:21 136:3,9
Photograph 3:1,2,3,6,7
  3:8,9,10
physical 137:19
pick 63:2 73:4 139:13
  142:3
picked 73:23 119:17
  134:5
picture 30:8 93:21
  94:14
pictures 79:8,11,11
  96:16 103:23 108:21
  108:22 109:4 140:1
pipe 139:22
pipes 139:19,21
Pistol 138:12
pistols 80:20
place 121:5
placed 98:15 110:1
  116:3,5,23 117:7,8
  129:11 153:6
plaintiff 1:6 2:2 17:3
  155:13
plans 27:5,7
plate 40:4 81:17,19
please 5:11 7:2
plus 18:19
pocket 36:1 97:9 147:1
  147:1
pockets 96:8,19 97:12
  97:17
point 35:20 48:8 57:2
  57:12 64:4,21 73:13
  80:9 82:14 87:18
  89:8 92:3 94:6
  104:19 105:11
  109:11 115:22
  119:15 123:9 124:1
  153:8
Pointe 1:19 2:10
pointed 56:15,16
  112:15
pointing 61:22 62:10
  78:6,10 94:10 119:6
  142:1
points 62:23
police 22:16 47:9 57:13
  58:17,18,23 87:21
  109:21 110:15 111:3
  111:9 114:20 115:6
  115:23 126:22
  141:14,21 150:3,5
ponds 76:13,15
popped 101:15

posing 87:9 115:3
position 81:3 84:7
positive 30:9 39:8
    51:17 62:5 82:6 84:6
    85:7 92:6 107:15
    113:4 117:12,14
    123:23 124:18
    129:20 150:19
possession 138:13,16
possessions 123:10
    147:22
possible 59:7,10
post 136:13
pound 140:5,13
poured 13:10
Powell 129:18,21,23
power 11:17 12:1,7
    13:7,12
prepare 7:23 8:23 9:1
preparing 8:19
Prescription 25:10
present 98:17 100:14
    124:13,19 128:17
press 127:14
pretty 15:1 25:23 26:1
    59:3 92:5 95:14
    113:18
previous 12:8 74:18
previously 33:21 48:4
    146:13
prior 11:22 12:17 30:3
    30:4 32:23 40:10
    42:13,16 49:2
probably 7:18 15:14,14
    24:18 30:3 32:8 33:3
    62:14 63:6,8,9 64:5
    67:7 68:22 73:1 75:2
    76:15,23 78:20 101:1
    106:18 109:22
    119:10 120:13
    125:15,17 142:11
Procedure 4:5
proceeded 52:7 121:19
process 95:2
professional 151:10
property 3:11 130:14
    131:2,5 132:6 134:5
prosecuted 47:17
prosecutor 142:16
provided 4:14,21 9:8,9
pull 19:19 24:16 44:10
    44:15 47:2 56:18
    57:17,19,23 58:19,20
    58:22 67:9 81:5
    82:21 84:21
pulled 19:10,10,17,22
    24:1 31:3 44:7 48:11
    49:18 53:1 54:20
    55:19 60:5 63:20

79:21,22 80:2,7
    84:19 93:5 94:17
    95:4,8 97:20 116:5
    120:7,10 150:20
pulling 24:9 80:19
    145:16,19 146:1
purchase 146:22
purchased 21:3 28:2
    82:3 132:9
purpose 4:14
pursuant 1:16 4:4
pursuit 62:13 63:1,11
pushed 140:9
pushing 44:22
put 7:3 18:13 32:7 38:7
    38:11,20 55:20 88:23
    89:8 90:7 95:10,20
    96:19 97:8 100:2,9
    100:15,18 104:8
    105:1,13,14 107:7
    109:11,16 116:2,6
    120:10 123:8,11,18
    123:19,20 125:5,11
    130:6 131:3 133:10
    143:17 145:20 146:3
    148:3,5,7,8,12
    149:11 152:15 153:1
    153:3,8
P.C 2:9
p.m 126:8,9 154:7
P.O 2:10

**Q**

quarter 39:14 66:7
    76:6,23 77:19
question 4:11 6:17 7:1
    7:7,9 35:20 50:15
    85:14 153:22
questioning 47:10
questions 4:10 6:8,10
    151:3
quick 46:10 49:12
    50:18 65:1 115:19
    148:2
quickly 70:5
quite 53:9 63:13,15
    65:9 69:5 73:8 87:13

**R**

radio 105:10,12 110:11
    110:16 122:2 140:14
radioed 122:6
rain 30:22 32:5
raining 31:2
ram 60:4 67:20 69:1
    70:6
rammed 63:18 65:9
    66:11 67:18 70:14
    99:20 140:3

ramming 60:6 63:6,7
    63:12,14,17 64:6,14
    64:16 65:6,9,22 66:3
ran 19:9 36:6 109:17
    109:18,20 150:2
Randy's 140:17
range 48:17
rapidly 147:20
rate 13:14
rattling 139:22
raving 96:23
reach 62:15 100:19
    110:17
reached 100:8 104:12
    105:19 123:15 125:9
    125:22 126:1 146:23
reaching 104:11
reading 156:4
real 50:17 148:2
realized 58:23 59:2
really 10:18,19 13:19
    46:1,5 51:10 52:11
    53:17 69:3 83:22
    86:1 88:15,18 91:21
    127:20 128:13 129:8
    140:4 142:1,18 152:9
rear 40:23 49:4,6,11
    52:21 60:8 66:9 69:8
    81:14 91:7,8 99:14
    139:22
reason 115:4
recall 23:15 72:23
    74:12 89:9 91:21
    92:15 125:13 127:19
    128:4,12 129:8
receipts 34:9
recently 28:16
recess 65:4 109:8 151:2
recognize 92:10 107:16
    108:11,16,17 143:10
    144:18
recognized 143:11
    144:16
recollect 46:9 59:21
    89:7 99:7
recollection 18:5
recommend 152:6
recommended 151:19
record 5:12 44:21 78:9
recovered 148:10
redress 140:19
refer 37:2
referencing 93:13
referred 151:21
referring 45:18
refresh 18:5
regained 65:11 68:23
regardless 4:21
registering 40:7

regroup 31:7 36:11
    70:17 112:14
regular 20:2 92:12
    135:18
related 8:15
relative 143:13,14
relatives 16:2,4,8
release 3:11 133:23
released 18:21 103:14
    133:13 137:23
remember 12:2 19:5,20
    20:6 36:5 42:19
    60:22,23 72:4 73:9
    73:10 90:14 125:12
reminded 112:4,5
rephrase 7:3
reply 128:6
report 2:21 35:1,8,12
    47:9 126:21
reported 155:6
reporter 1:17 4:7 6:4
    6:11,23 66:19 155:5
    156:13
REPORTER'S 155:1
representing 4:3,17
    5:16
request 127:16,21
    132:15
requested 9:10 128:17
    132:14
reserved 4:12
residence 11:3 26:11
    33:3 38:13 51:2 52:8
    131:7 144:8
residences 77:21
residing 26:12 144:9
resisting 103:11
respect 151:4
responded 50:15
response 6:18 30:9
    39:8 51:17 62:5 82:6
    84:6 85:7 92:6
    107:15 113:4 117:12
    117:14 123:23
    124:18 127:12,15
    129:20 150:19
responses 151:15
rest 26:8 27:5 33:18
    52:12 53:11 79:2,3
    80:15 95:14 108:6
    123:14 125:8 148:5
    148:12
resting 94:14
result 18:12 138:10
    147:13 149:4
results 156:8
retrieve 133:8
review 8:19 9:3
Rich 82:5,10,11

Richard 1:5,15 2:15
    4:4 5:5,13 82:12
    155:8,12
ride 8:4,7 30:21 31:1,8
riding 49:7 68:8,21
right 7:5,15,16,20 10:14
    11:4 12:11 14:12,20
    15:17 20:11 22:22
    23:10 25:15 26:16
    27:20 30:5,13 31:2
    31:12,14 32:1,12
    34:8 35:10,21 37:10
    37:12,14,15,23 38:10
    39:3,9 40:17 41:5
    42:1,2 43:8,9,14
    44:22 45:5 48:3,8,11
    48:13 50:7,18,20
    51:1,3,6,11,12 52:7
    52:14,23 53:4,20
    55:2,4 58:14 59:11
    65:17 66:23 68:11
    69:7,13,14 70:6,20
    71:8,9,13,23 72:3,9
    72:16 73:22 75:17
    76:10,20,20 77:4,13
    77:13,18 78:4,5,6
    80:1,4,19 81:2,4,12
    81:19 82:5,21 84:19
    84:22 85:1,2,9,23
    86:14 87:19,22 89:17
    89:19 90:3 91:10,17
    92:5 93:4 94:12
    95:18 97:5 99:3,10
    99:13 101:12 103:1
    103:14 104:1,11
    105:18,21,23 106:1,2
    107:19 109:4,13
    111:10 112:16,22
    113:8,13,17,20 114:7
    115:13,22 116:15
    117:2 118:13,16,17
    119:2,3,10 120:8
    123:2 124:2 125:1,5
    126:11 129:8 131:1
    135:17 137:21 138:3
    140:2,10 144:6,8
    148:20 149:14
    150:21 151:8 152:15
    153:9
right-hand 36:1 61:22
    62:3
road 14:19 26:10,15,16
    26:18 36:9,13,15
    37:1,3,5,8,10,11,13
    37:15,21,21,23 38:3
    38:4 39:7,9,10,15
    40:9,13,15 41:2,4,9
    41:14,16,17 43:6,16,
    48:10 52:6 53:12,17

Deposition of Richard Marshall

November 14, 2007

Page 10

53:22 54:4 56:3 57:4
57:22 59:1 67:10
71:1 72:3,6 73:15
74:10,11,13,23 75:10
75:14,17,23 76:5
77:13 79:22 116:2
118:14,14,16,22
119:4,5,8,10,18
120:8 142:22 143:12
143:14,19,20,22
144:6,8,21 145:8
150:3 153:23 154:3
**rob** 50:4 57:6 97:3
**robbed** 46:14,17 48:4,6
74:5 149:9
**robbery** 151:23
**rolling** 52:9,10 83:10
**room** 5:16 6:7 47:6,6
124:13
**roughly** 65:16
**round** 114:18 115:8
**Route** 15:16,18
**rules** 4:5 6:3
**ruling** 4:12
**run** 57:4,22 76:6
114:23
**running** 110:21 146:1
**rural** 41:17

**S**

**SAITH** 154:11
**same** 4:22 54:9 67:23
68:17 82:1 105:16
107:21 133:10
137:15 140:6
**sat** 18:18 110:23
121:14
**save** 16:11
**saved** 33:22 146:14
**saw** 8:3 11:17 40:12
41:1 43:15,21 44:5,9
54:9 55:4,7 56:5,6,14
56:20 58:18 73:14
81:1,2,5 82:21 83:3
83:19 84:1 85:22
86:1 87:20 97:13
104:20 105:1,18
110:17 134:12
143:18 150:18
**saying** 6:7,20 19:12
34:20 47:21 50:6
55:17 59:8 70:4
72:23 88:5 90:14
96:5 110:18 114:15
126:3
**says** 22:15 58:17 134:6
**scared** 57:7
**scene** 95:16 117:13,15
**school** 13:23 14:2,4,16

**search** 97:16 98:2
106:1,16,18 119:21
**searched** 96:18 98:18
104:7,10 106:4
**searching** 97:21 98:23
98:23 99:4,11 106:7
106:20 120:4
**seat** 18:7 28:20,22 29:9
29:14,17 32:9,13
57:3 61:4,17,18,23
61:23 62:11 63:5,16
71:12,19 96:11,12,12
96:13,14 99:16
101:23 102:3,7,11,19
104:2,5,9 105:3
117:9 121:6 122:9
**seats** 62:8
**second** 17:11,13 44:21
49:15 54:22 59:12
60:15,19 63:21 66:8
68:13,19 69:13,16,18
70:6,13,14 71:15
131:14
**seconds** 44:7 48:20,21
59:13,23 66:20 67:18
103:18,19,19,20,20
103:21,22
**security** 109:19 110:20
**see** 6:4 22:13 31:23
37:5 39:12 41:4,20
43:17 46:2,6 49:8,10
49:13 51:19 54:16
55:1,14 58:11 59:14
59:15,16,17 60:12
61:8 66:4,5,12,15,17
79:15 80:10,14 81:3
82:22 83:22 84:7
85:15,19 86:2 91:4,6
92:2,8,14 93:6 94:3,4
95:3,12 96:2,2,9,15
96:17,21 97:6,8,10
98:13 99:16 100:2
102:20 103:23
105:22 115:3 119:13
119:19 123:13
125:15,18 127:11
132:21 135:7 138:8
140:2 143:22 146:23
**seeing** 19:7 36:6 40:10
44:3 154:3
**seeked** 151:9
**seem** 147:15
**seen** 36:8 40:1 42:4,7
44:14 55:2 56:17
58:8 59:21 83:16
87:18 96:1,3 125:16
129:3 131:16 133:21
141:17 150:14,16,22
**select** 81:21

**self-employed** 13:18
**Selma** 9:19 136:17
**sent** 71:16
**September** 12:22
**service** 10:17 11:2
**set** 28:14 95:10 152:15
156:4
**shakes** 60:11
**Shaking** 6:20
**shared** 11:2
**Shavonne** 21:13
**Shawn** 19:8,12 42:11
45:4,20,21 54:14,19
84:12,16,20 85:8,17
85:22 88:3,10,22
89:5 93:5 94:17,21
98:15,17 99:1,5
105:6 106:21,22
107:1 117:9 118:1,6
120:6,9,12,20 124:19
124:20 150:9
**sheet** 3:5
**sheriff** 116:12 117:8,21
118:3,10 120:6,17
121:19 127:1 131:12
132:1,3,21,14
**sheriff's** 89:12 109:23
116:13 120:15
**shield** 83:16 85:22 86:1
86:3 92:11
**Shiny** 56:10
**Shirley** 133:12 135:2,3
137:3
**Shirley's** 137:8
**shoes** 92:13
**shoot** 113:12 114:8
**shooting** 112:6 114:13
**shop** 14:11
**short** 36:1 82:11 92:12
150:23
**Shorthand** 4:7 155:4
**shorts** 25:22 101:5,14
154:1
**shot** 114:9,11 115:16
149:9 150:2
**shoulder** 44:23
**shoved** 96:6 97:20
**show** 17:20 28:5 29:7
31:19 36:19 58:3
61:7 79:7,8,12 93:12
107:13 108:20 115:2
133:19 140:1
**showed** 78:23 111:9
116:9,16
**shows** 108:16
**shutdown** 12:5
**side** 41:2 44:23 51:7
53:2 61:8,22 62:4
64:18,23 69:21 70:2

71:1 72:6 83:21,23
84:4,13,15 85:1,16
85:18,20 91:7,8
94:11,18,20,22
109:12 110:23 114:4
115:11 116:2 119:22
140:10,15 145:7
153:23
**sight** 97:13
**sighted** 150:4
**sign** 35:7 51:14,15,16
52:7 131:17 132:18
133:23
**signal** 44:14,17 45:3,23
46:6
**signature** 5:2 134:2
**signing** 156:4
**since** 35:13 48:6 125:16
128:20 129:3 133:19
139:14 141:18
147:16,18 150:14,16
150:20
**sir** 5:12 6:2 8:1,6,9,12
8:14 9:11 10:2,4 11:4
11:5,10,15 13:17
14:3,18,21 16:1,14
16:23 17:5,17 19:14
21:9,18 23:1,4,7,9,20
24:6,21 25:4,7,9,20
26:14 27:14,19 28:17
28:19,21,23 29:4,15
30:11,14 32:2,18
33:9,11,16 38:14
39:6,23 40:2,12,14
40:16 41:6,10,13
42:6,9,15,21 43:4,19
43:22 45:1,9,13
46:16 48:5,7 49:3,12
50:8,10,13,16,19,22
51:4,19,21 52:13,16
52:20 53:5 55:2,12
56:4 57:16 60:20
61:10,13 62:18 63:3
65:18 66:16,18 67:21
68:2 69:15 70:7,10
71:14 72:14,22 73:6
73:12,21 74:2 77:10
79:4,14,18 81:9,13
81:16,20,22 82:20
83:2,4 85:10 86:22
87:4 89:20 90:11
91:11,16 94:23 95:17
98:19 101:13 104:3,6
106:13,15 107:6,10
112:17 117:1 119:20
120:19 121:9,13,15
122:3 124:3,5 126:14
126:18,20,23 127:2
129:22 130:20 131:4

132:11 134:3,7,16
135:4 136:1,4,11
137:22 138:1,18,21
142:15 144:3,22
145:2,9 147:5 148:21
148:23 151:18 152:3
152:5 153:2,7,14,16
**sit** 128:22 131:19
**sitting** 57:3 98:15
110:7 111:6 148:16
**situation** 74:4
**size** 56:14
**skid** 70:22
**skinnier** 85:4
**skinny** 82:10
**slam** 43:15 44:3
**slammed** 40:21 41:8
88:8 89:22 90:1,6
102:5 104:17,23
**slamming** 43:5
**sleep** 149:8,22 152:17
**sliding** 61:20
**slip** 3:11
**slow** 67:4,6
**slowed** 39:17 64:7 67:5
143:18
**slung** 101:7
**small** 41:17 102:8
107:2 145:17
**smart** 105:2
**smoking** 74:18
**snatched** 69:23 70:21
71:20 72:4 99:21
123:17 125:10
**snug** 101:8
**social** 16:20 109:19
110:19
**sold** 145:18,20 146:2
**some** 6:8 16:12 26:8
30:2 31:23 32:8 34:6
47:8 57:12 82:14
102:14 103:2 104:19
107:18,19 109:11
113:9 119:15 124:1
131:14 132:9 134:13
135:13 143:8 151:20
152:16,17,18 153:8
**somebody** 50:4 57:5
97:3 129:7 136:6
**somehow** 61:16 151:12
**something** 7:14 13:13
34:9 39:17 41:3 46:8
46:12 47:22 67:17
73:3 87:16 92:13
109:6 112:19 118:6
118:10 119:18
120:13 121:11
127:16 131:18
147:23 148:17 153:1

sometime 26:5,6
somewhere 11:13
    12:12 13:2 38:18
    53:7 61:6,19 114:1
    115:10,14 119:3
    126:4,6 152:18
soon 75:18
sorry 17:12 28:18 37:4
    55:3 110:3 142:14
    148:13
sort 65:11 68:22
South 2:5
southwest 51:10
space 99:9,17
speak 5:7 132:12
    139:12 155:9
speaker 110:22
speakers 140:22
specifically 115:12
sped 53:16
speed 48:15 53:8,19
    67:4
spell 130:17
spend 20:16,19 22:4
spent 18:22
spinned 64:21,23 69:22
    70:18 72:1
spinning 80:14
spinout 70:3,9,13 71:15
    71:18 72:19
spoken 7:22 127:22
    128:19
spun 59:1 70:5 74:9
    78:16,18 79:3,20
    80:13 85:17
stand 122:23
standing 80:7 89:18
    90:21 91:2,16 96:23
    98:20 99:5,13 103:10
    104:11,12,16 113:1
    113:19 123:1 125:1,5
    143:12 153:22
start 12:21 13:15 45:18
    75:9 125:9
started 12:8 24:22 31:2
    60:4,7 63:12,22 64:6
    82:9 83:14 96:1,7
    97:21,23 100:6,12,22
    104:15 118:5 125:3
    125:23 138:8 143:9
starting 30:22
state 1:18 4:8 5:11
    26:17 52:2 155:2,5
    156:14
statement 47:11 58:16
    106:23 126:11,12,16
statements 21:3
STATES 1:1 155:19
station 77:11 120:18

121:2,12,16,21
stations 76:22 77:7
Statute 4:15,21
stay 10:11 48:18 53:12
    59:11 63:11 68:18
    95:14 117:15 143:14
stayed 15:4 38:16
    153:12
staying 147:2
stays 136:17
steering 61:9 69:23
    70:19,21 71:6,7,16
    80:6,16 82:18 149:18
Stephanie 10:8
stereo 50:2,11 72:15
    140:22
still 10:13 15:8 22:21
    33:5 49:13 50:11
    52:18 55:11 56:2,22
    59:3,13 66:5 69:9
    70:8 71:10 72:15
    83:7 86:16,17 87:8
    89:18 91:23 94:8,15
    96:22 99:14 102:6,20
    103:9 113:1 114:12
    114:14,20 117:13
    120:16 129:23
    145:23 149:1 152:16
    152:17
stipulated 4:2,16,23
stipulation 1:16 16:6
STIPULATIONS 4:1
stocky 116:22
stolen 140:14
stood 40:5 86:9
stop 19:15 27:11 51:14
    52:4,9,10 57:6 66:19
    73:16 88:13,17 97:5
    103:7 118:13,22
    143:7,8 148:2 150:8
stopped 97:1 100:7
    102:18 103:9 118:5,8
    118:17 119:11 120:7
    141:5 143:11,16
    145:7 150:6
store 76:23 77:4,11
    120:8,9,12
stores 76:22 77:6
straight 14:11 24:22
    86:3
straits 151:8
strange 40:22 150:6
streak 34:1
Street 2:5
stress 151:11
stretch 76:9,17,17
strike 114:3
striking 64:11
struck 114:5

stuck 100:20 101:16
stuff 37:4 106:7 124:4
    150:11
subdued 89:3 102:2
substance 112:2 138:13
    138:14,16
substantial 34:3
sued 5:17,19
suffering 147:23 149:7
summer 26:1
supervisor 11:20 12:14
support 35:14
supposed 10:18 123:11
    150:8
supposedly 132:1
    145:11
sure 15:15,17,17 16:10
    22:12 34:8,13 35:15
    39:3 43:13 53:9
    63:13,15 65:9 66:21
    69:5 73:8 81:2 83:6
    87:13 91:8 113:14
    125:18 126:10 143:3
suspect 150:4
suspended 18:17
swamp 75:14
swampy 75:14
swept 90:6
swerved 66:3
swerving 41:4 69:4,6
sworn 5:6 155:9

——————————
          T
——————————

taillight 140:11
take 7:15 17:22 18:2
    25:8 26:3,8 65:1,12
    70:11 79:10 95:1
    96:9 97:7,8,10,11,13
    98:3 100:17 105:20
    106:16 119:21 121:1
    123:3,4,7 124:1,4,9
    124:10 150:23
taken 1:15 4:4,6 9:20
    18:14 35:8 65:4
    95:15 108:22 109:8
    109:11 124:2,6
    126:22 140:21 151:2
takes 51:5
taking 6:6
talk 6:14 7:13 8:7
    18:15 63:17 71:5
    107:2 111:18 116:8
    127:1 132:14 134:18
    135:5
talked 8:10 22:2 23:3
    92:22 112:1 121:8
    128:10 131:10
    141:15 142:9
talking 35:19,22 38:8

65:6 98:8 110:8
    132:20 133:19
    134:15 143:6 149:20
tall 101:3
tank 120:10
task 43:2 150:10
tax 35:2,3,5,11
taxes 35:7
tearing 32:6 97:23
Tech 14:9,14
technically 10:13
telephone 134:13,17
    135:15
tell 14:22 36:21 37:17
    49:23 55:13 57:4,12
    57:14,15,17,19 58:20
    58:22 65:13 75:9
    88:15 104:21 106:14
    128:22 134:18 140:4
    148:3
telling 19:3 39:4 43:18
    78:1 86:11 120:8
    134:14 147:6 151:6
temp 12:10
temple 71:8
tend 6:21
tennis 92:12
testified 5:8 109:10
testify 47:19 145:11
testimony 43:14 45:20
    58:20 108:7 146:12
Thank 153:17
Thanks 153:19
their 27:1 48:9 64:11
    64:13 71:3 81:7
    83:17 84:11 86:4
    120:1 128:12
themselves 89:11 110:9
thereof 156:8
thing 6:13 41:7 43:11
    54:10 74:17 92:10
    95:3 111:11 112:7
    116:4
things 6:5,12,22 39:20
    62:3 151:5 152:10
think 10:10 11:7,12
    12:20 13:1 14:15
    18:8 23:17 26:5 28:2
    32:12 35:14 37:9
    40:18 41:7 45:6 50:2
    51:6 68:20 73:4 74:4
    84:8 93:3 104:7
    122:23 131:20
    147:10 153:10,17
third 17:14 82:2
    131:15
though 49:20 69:8
    150:12
thought 39:16 40:17,22

41:2 74:3 97:2
    131:14
threat 87:9 115:3
three 17:10 18:14
    20:12,20 21:4 31:9
    31:16 32:19 38:17
    64:1 65:10 100:11,21
    118:18 131:11 137:1
    141:17
three-way 137:4
threw 71:19
through 8:21 9:17
    12:13 75:13 95:5,5
    97:14 98:6 104:15
    122:6 132:15 136:14
throughout 100:14
throw 74:15,22 96:10
    97:14
throwing 139:3,5,11
thrown 74:20 139:9
ticket 18:18,19,20
ties 146:19
tight 99:17 101:6
    127:11
time 4:11,12 8:13 10:22
    11:2 12:6,18 16:12
    19:7 20:16 22:2,4
    24:16 26:12 29:18
    33:1,23 34:2 35:4
    36:5,8 40:23 43:13
    43:14 46:4 48:3 49:8
    49:17 50:12 53:6,11
    54:18,20 55:16 57:18
    58:23 59:4,12,14
    60:5,15,19 62:12
    63:1,9,10,21 64:1
    65:14,15,19 66:4
    67:15,22 68:5,9,13
    70:13,14 71:2,13
    72:16,17,18 73:12,13
    73:15,16 74:5,7,8,16
    80:5 81:11 83:3,15
    83:21 85:6 86:20
    87:11,21 88:20 89:7
    89:19 90:19 92:18,19
    92:23 95:15,22 99:3
    100:5 102:13 104:13
    105:16 109:2 111:4,6
    111:8,9 117:3 121:5
    121:7 122:12 126:15
    127:23 128:2,5,16
    131:16 138:4 142:9
    144:9 146:21 147:2
    147:17,22 148:22
    150:4,10,18 151:13
    152:11
times 10:5 23:2 46:17
    64:1 65:7,10 100:11
    100:21 114:8 131:11

136:12 141:15
**tire** 121:17
**Titus** 47:15,16
**today** 6:7 7:22,23 8:5
  8:20,21 17:2,15 58:9
  128:22 152:1
**together** 5:15 8:4,4
  10:23 11:1 21:4 36:4
**told** 20:12 42:22,23
  59:18 83:6 84:8 87:2
  93:3 97:1 103:11
  104:7 105:8 112:22
  115:6,23 122:23
  123:2,4,6,7,17 124:9
  125:10 127:8 131:11
  131:12,18 132:2,3,4
  132:20,22 133:2
  135:6,11 138:15,17
  139:3,11,12 140:20
  141:12,20 142:3
  149:1 151:15 152:21
**top** 6:14 21:20 25:15
  87:8 90:23 91:1,2,17
  100:9,20 129:8 131:1
  143:17
**topper** 11:17
**tossed** 142:5
**touch** 62:12
**touched** 62:14 63:9
**toward** 51:1 52:7 62:10
  70:19 72:2 93:16,17
  106:22 123:1 133:16
  145:22 146:22
**towards** 41:5 51:3,13
  76:3 77:2,3 94:1
  113:22 144:14
**Town** 39:16,22 98:22
  100:8 106:22 116:7
  117:9 118:11
**trade** 13:20 14:16
  16:13
**traffic** 51:18,19 53:3
  55:18,22 74:11,12
  102:12 150:8 154:2
**trailed** 48:22 50:20
  60:2
**trailer** 76:7
**trailing** 54:3
**transcript** 156:2
**transcription** 6:16
**transmission** 24:2
**travel** 53:18 72:9,13
**traveled** 39:7 77:6,8
**traveling** 76:3
**treated** 23:5,8
**treatment** 127:13
  128:18 151:7,20
  152:2
**trial** 4:19 47:19 138:19

138:22,23
**tried** 32:22 123:16
  130:14 136:13 142:6
  151:6,14,17
**trouble** 30:21
**true** 156:2
**trunk** 46:3 97:22 98:7
  98:23 104:14,16,17
  106:3,6 140:23
**truth** 5:7,7,8 155:9,10
  155:10
**try** 6:13 7:3 49:1 73:11
  131:22 135:13
  151:19 152:4,9
**trying** 44:10,12 46:7
  50:4 53:23 54:2
  55:13 57:4,6,20 73:2
  78:9 97:3 118:20
  138:8 151:11
**tucked** 61:15 63:4
**Tuesday** 23:17
**turn** 36:12 50:2 75:18
  77:13 119:4
**turned** 36:15 51:1,1,3
  51:11,12 54:6 58:13
  59:5 75:10 76:10
  79:23 105:10,12
  118:6 143:15,19
  147:18
**turning** 39:14 52:23
  75:22 76:5 118:17
**Tuscaloosa** 17:13
  21:15,17 22:5,9
**twenties** 33:19 108:6
  123:13,21,22
**twice** 7:19 22:23 65:10
  84:20
**two** 15:6,22 18:22
  20:20 21:4 24:4,7
  26:21 33:18 36:6,8
  38:17 44:9 45:8
  49:10 56:2 60:4 64:1
  65:10 66:20 67:20
  72:3 75:16 76:1,8,12
  76:15 81:10 82:2
  85:8,10 108:6,20
  125:21,21 126:1,6,7
  129:2 133:14 141:17
  141:18
**two-lane** 41:15 51:23
  52:2
**two-month** 12:10
**type** 103:2
**T-shirt** 25:22 92:11
**T-shirts** 44:9 59:19,20
  59:22

─────── U ───────
**uh-huh** 6:21 30:9 39:8

51:17 62:5 82:6 84:6
  85:7 92:6 107:15
  113:4 117:12,14
  123:23 124:18
  129:20 150:19
**uncle** 12:14,15 136:13
  136:13,15
**under** 22:19 37:19 38:7
  38:23 61:15
**underneath** 93:22
  101:11 140:10
**understand** 7:2 39:3
  57:8 85:5 94:18
  108:14 118:19
  150:13
**understanding** 7:10
  34:22 50:3 131:10
**understood** 7:9 83:6
  85:3
**underwear** 154:4
**unemployment** 33:21
**unfair** 148:18
**uniform** 2:21 20:6
**uniforms** 20:9
**union** 16:13
**unit** 111:9
**UNITED** 1:1 155:19
**units** 109:21
**unknown** 36:8
**until** 11:14 12:23 15:5
  43:16 59:5 63:6,11
  64:6,15,20 68:23
  73:15 74:8,13 80:15
  89:7 90:5 92:4,19
  95:15 102:1 115:22
  116:3 137:20
**unusual** 43:7
**upside** 43:11 95:21
**use** 135:15,19
**used** 4:13,20 15:16
  16:16 76:13 82:10
**using** 44:21
**usually** 147:19

─────── V ───────
**value** 132:6
**variably** 68:16
**Vaughner** 131:12
  132:1,4,13,14
**veer** 43:15 44:5
**veered** 41:9 48:22 60:2
  63:21 69:19
**veering** 41:1 43:6
**vehicle** 20:10 21:3 24:2
  27:15 40:8,12 41:12
  41:21 53:1,3 57:9
  60:4 63:8 64:1 67:9
  70:1 71:3 80:12 82:3
  94:13 98:22 99:2,5

110:1,10 111:2,3
  114:12 115:23 116:5
  116:6,13 118:7
  120:11 139:13,18
  143:11 144:18,20
  147:21 148:15
**vehicles** 40:9 56:2 74:9
  82:2,15 116:8 118:18
  143:2,9,10 144:16
**venire** 16:7
**verbal** 6:18 126:12
  127:14
**verbally** 97:19 101:23
  132:17
**very** 9:14 147:20
  153:17
**VFW** 16:21
**Vic** 116:12
**view** 40:23 49:4,6,11
  52:22 55:6 60:8 66:9
  69:8
**visit** 133:7 134:9
**visitation** 133:4
**visual** 66:13
**visually** 106:4
**Vodka** 29:22
**vs** 1:7 155:14

─────── W ───────
**Wait** 6:16
**waited** 121:14
**waived** 4:19 5:3 156:5
**waiver** 35:3,3,5
**waiving** 4:22
**walked** 90:15
**walking** 8:3 47:5 110:8
  114:17 118:8
**wall** 123:1
**wallet** 36:2 96:8,10,15
  96:20 97:6,13,14
**Walter** 132:8
**want** 13:1 18:9 20:8
  34:9 47:15 49:20
  50:1 53:17 54:5 64:9
  65:12,12 67:7 79:8
  81:1 83:5 136:19
  139:16
**wanted** 30:23 99:15
**warehousing** 147:17
**warm** 26:2
**Warrant** 109:19
**wasn't** 19:17 40:6
  47:21 48:1,14 54:2
  57:10 64:14 69:5
  70:15 87:9 88:3,10
  91:9 92:15 95:22
  98:16 99:9 103:19
  108:8,9 112:5 115:2
  124:20 138:4 140:6

**watch** 55:18
**watched** 100:17,19
  117:11
**watching** 55:18,22 57:9
  57:10 88:12 100:16
**waved** 120:5
**waving** 143:20
**wavy** 53:17 54:4
**way** 7:4 37:5 49:20,21
  49:22 50:20 51:20,23
  52:2 67:23 71:22
  72:7 79:12 94:3
  144:10
**weapon** 33:8,10 54:22
  55:1 56:5,7,14
  111:14 112:8,12,15
**wearing** 28:22 29:1
  59:19 71:12 101:5,7
  101:11 109:2
**Webb** 1:19 2:9
**Wednesday** 1:20
  131:16 155:23
**week** 23:15 30:3,4
  133:1
**weeks** 20:20 21:4
**weigh** 100:23
**weighing** 101:1
**weight** 82:8
**well** 5:18 7:19 9:17
  10:12,17 12:5 13:19
  22:18 26:21 29:20
  30:20 34:16 37:8
  38:15 46:7 52:23
  53:19,21,23 57:8,17
  66:1 75:13 83:19
  86:6 88:20 89:15
  93:15 112:6 115:5
  117:4 123:3 141:22
  147:15 151:8
**went** 14:11 16:17 21:2
  23:23 24:22 27:9
  41:12,21 47:10 71:21
  71:21,22 72:1,2,8,11
  80:14 93:5 97:22
  98:6 100:7 104:14
  106:3,5 118:4 120:12
  120:21 139:16 142:4
  143:21 150:7,16
**were** 9:16 10:7,9 13:11
  15:7 18:12 20:22
  22:14,15 23:19 24:7
  24:9,14 25:2,6,21
  26:7 27:4,16 28:22
  32:3 33:17,18 36:2
  43:16,20 44:12,21
  47:4,4,5 48:4 49:11
  49:16 50:6 52:22
  53:6,11,15,23 57:8
  57:13 59:18 60:12,16

| | | | | |
|---|---|---|---|---|
| 62:21 64:4,17,17,20 65:5,19 66:12,13 68:4,8 70:8,11 72:18 74:8,8,9 78:10,15,16 79:20 81:11 83:7 85:8,16 86:11 87:21 89:18 90:23 91:1 93:2,6,8,10,11,13 98:12,17 101:3,5,5,6 101:11 103:16 106:12 107:2 108:19 108:21 109:2,11,15 110:18 112:3 113:1 115:5 116:2,23 117:13 121:12 124:6 126:16 128:23 129:10 133:5 134:13 134:14,19,21 137:17 137:20,23 138:2 140:7 145:7 151:5 152:22 153:3,6,8 154:1 **weren't** 23:18 71:12 148:22 **west** 1:8 2:7 5:20 42:4 42:16 45:5 51:6,7,8 59:5 83:20,23 84:14 85:19 88:4 89:1,8 95:20 98:18 105:12 107:6 111:13 118:8 120:5,11,17 121:17 122:7,23 123:7,11,16 139:2,5 140:20 150:14,16 152:23 155:15 **West's** 42:12,13 147:13 **wet** 32:5 **we'll** 7:18 28:5 31:19 37:1 38:7 51:12 58:3 107:13 151:4 **we're** 5:16 6:6 17:1,12 17:14 18:16 29:7 35:19 36:20 38:8 72:19 79:9 91:5 113:16 133:19 **we've** 6:4,11 65:2 84:18 **wheel** 61:9 69:23 70:20 70:21 71:6,17,20 80:6,17 82:19 149:18 **wheels** 52:11 72:3 **When's** 142:9 **while** 16:16 18:18 22:13 25:2,6 30:2 57:1 61:2 62:12 69:5 71:7 91:9,14,17 98:12,17 99:4 101:18 103:9 104:16 106:9 106:20 120:16 121:11 125:16 | 126:16 129:2 131:19 133:4 137:17 138:2 140:12 149:10,12 **white** 20:9 34:5,14,18 116:21 **whole** 5:7 15:10 39:20 50:11 68:9 72:15,17 74:19 100:14 102:21 106:18 121:7 149:23 155:10 **wiggling** 64:2 **Wilcox** 78:11 144:14 **Wilford** 2:8,16 5:10,14 16:5,11 65:1 66:21 109:6,9 150:23 **win** 34:11,16 **wind** 45:15 **window** 45:10 74:15 95:6 **winnings** 34:21 35:1,8 146:11 **witness** 5:1,2,6 8:18 25:1 38:5,9,22 39:2 39:11 60:1 87:1 121:15 130:9 156:3 **witnessed** 128:8 142:21 143:3 144:20 145:1,6 **woke** 24:19 **won** 34:2,6,12,14 **wooded** 75:5 76:9 **woods** 75:16 **woofers** 140:23 **words** 88:6 **wore** 20:7 **work** 11:4,11,22 12:7 45:12 100:10 136:5 138:2,5 **worked** 11:14 12:13,18 12:23 19:21 43:2 **working** 12:21 24:23 25:6 138:4 **worry** 123:18 125:11 **wouldn't** 61:20 62:10 100:10 101:21 102:6 102:10 131:22 132:18 **wound** 78:13 79:12,19 85:15,17 142:22 **Wright** 130:16 134:15 136:12 144:1,2 145:5 **wrists** 127:10 **write** 38:23 **writing** 59:20 **written** 126:15 **wrong** 34:10 119:7 **wrote** 18:20 **W-R-I-G-H-T** 130:19 **W-2s** 35:8 | **X** X 38:11,20 **Y** **yards** 69:12 77:16,20 **yeah** 9:7,22 13:6 14:13 15:11,11 18:4,7,11 18:14 19:4 20:18,23 22:8,10 24:11 26:1 26:20 30:6 32:15 34:23 37:14 41:19 43:11 45:16,17 47:10 48:11,14 49:18,22 52:10 56:9 58:15 62:2 63:6 67:5 71:10 72:1 75:21 76:23 77:3,18 78:2,4,8 81:5 82:13,17 84:2,23 85:13,13 86:15,19 87:20 93:9,23 95:13 96:19 98:10 105:15 105:18 110:17 111:17 113:2,6,9 115:7 116:3,14 118:2 120:23 131:8 132:3 134:23 136:22 139:19 140:9 142:13 143:8 144:15 147:17 **year** 11:8 12:8 14:6 15:10 18:10 35:11 **years** 10:20 13:23 82:9 132:9 137:1 141:18 **yelled** 92:18 **yelling** 83:15 **Yep** 19:16 **yield** 51:15,16 52:7 **York** 136:17,23 **Youngblood** 14:19 26:10 **younger** 116:21 **y'all** 8:4,7 9:10 10:9,11 10:16,22 25:2,6 26:3 26:23 50:1 56:2 87:15 88:13 135:5 141:15 143:6 **Z** **zipper** 99:23 101:14,15 **zoomed** 37:6 **$** **$1,000** 146:15 **$10** 11:19 13:15 **$100** 33:18 108:6 123:13,21 133:9 **$450** 146:10 148:9 **$50** 145:22 146:5,10,13 146:15,18,22 147:1,3 **$500** | 35:19,22 108:4 145:11,14 146:20 **$99** 133:13,15 **$99.50** 134:5 **#** **#66** 1:17 156:12 **0** 03 12:9,9,17 46:20 04 12:1 28:2 34:12 05 11:12,13,22 23:18 34:15 35:13 38:12 42:14,17 100:23 06 11:9,14 150:17 07 19:6 **1** 1 2:21 17:18,21 **1:55** 154:7 10 3:9 48:20,21 59:13 59:23 67:18 73:19 98:4,5 103:20,22 106:19 108:18,21 117:4 120:20 **10,000** 130:11,11 **10-minute** 73:23 **10:00** 1:21 107 3:8 108 3:9,10 11 3:10 108:18,21 **11:30** 26:6 12 3:11 125:22 126:3,4 133:17,20,21 **13th** 156:9 133 3:11 14 1:21 155:23 140 15:16,18 15 117:4 119:23 **15.50** 13:13 153 2:17 155 156:1 16 36:15 37:3,5,10,13 37:21 38:7 39:7,10 40:13 46:13 75:11,14 75:20 1600 34:17 17 2:21 19 15:23 1971 27:17 **2** 2 3:1 15:16,18 28:3,6 28:10 45:14 77:19 79:1 91:5 93:11,14 94:5,11 113:16 2/24/74 9:12 2:06-cv-701-ID.CSC 1:7 155:22 | **2:30** 125:21 126:1 20 69:11 121:3 **20-something** 137:15 2000 13:2 2005 15:7 23:13 29:10 31:7 79:13 108:23 2007 1:21 155:23 156:9 21 15:8 26:11,13,17,19 31:12 33:6 36:13 37:1,16 38:15 48:23 49:2 50:21,23 51:11 51:13,14,18,22 52:5 52:15,19,22,23 53:8 54:6,21 70:1,23 73:16 74:13 75:1,2,4 75:11 76:3,10,20 77:6,12,14,15 78:6 79:13 94:2,4 100:6 118:4,9,16,17,19,22 119:5,9,22 120:21 142:23 143:7 22 130:5 240909 2:10 25 17:11 25th 17:10 263 38:16,17 119:1 275 101:1 28 3:1 42:17 28th 23:13,18 29:10 31:7 42:14 79:13 108:22 129:11 134:19 138:11 149:5 280 101:1 29 3:2 **3** 3 3:2 29:5,8,11 30:7 32:11 61:3,5 86:21 30 44:6 67:7 69:11 109:22 111:1 300 77:20 31 3:3 33 9:15 35 46:5 48:12 53:12,14 53:21 64:8 67:7,16 70:8 357 62:20,23 36 3:4 3600 34:19 36104 2:5 36124 2:11 39 130:13 **4** 4 3:3 31:17,20 4th 139:15 40 46:5 48:12 53:12,14 64:8 45 48:16 53:20,22 |

Deposition of Richard Marshall

Page 14

| | | | | |
|---|---|---|---|---|
| 65:21 109:22 111:1 450 148:8 | | | | |
| **5** | | | | |
| **5** 2:16 3:4 36:17,21 118:21 132:5<br>**5th** 129:12 137:20 139:15<br>**5-9** 101:4<br>**50** 48:16<br>**500** 33:14,15<br>**55** 45:14 53:7,9 64:5 65:22<br>**58** 3:5 | | | | |
| **6** | | | | |
| **6** 3:5 58:1,4,6<br>**6th** 139:16<br>**64** 14:19 26:10 | | | | |
| **7** | | | | |
| **7** 3:6 26:15,16,19 36:9 36:13,16 37:1,11,15 37:21 38:1,3,4 39:9 39:15 40:10 41:14 48:10 51:14 52:4 53:12,22 73:15 74:11 74:23 75:4,10,17,20 75:23 76:5 79:5,9,16 81:4,10,14 82:22 95:12 104:1 118:14 118:15 119:5,8,10 142:22<br>**7.50** 13:15<br>**7/21** 78:1<br>**71** 27:18<br>**7475** 1:19 2:10<br>**79** 3:6,7 | | | | |
| **8** | | | | |
| **8** 3:7 79:5,9,16 81:4,10 82:22 95:12 104:4<br>**847** 2:5 | | | | |
| **9** | | | | |
| **9** 3:8 107:11,14,17 108:12,16<br>**9-30-2008** 156:13<br>**92** 14:7<br>**93** 13:23 14:15<br>**97** 10:10 17:11 20:15 20:18<br>**98** 17:13 21:17<br>**99** 12:22 | | | | |

# DEPOSITION OF CHRISTOPHER WEST

## January 21, 2008

## Pages 1 through 64

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

2

Deposition of Christopher West                    Marshall vs. West; Hutson                    January 21, 2008

---

**Page 1**

1
2          IN THE UNITED STATES DISTRICT COURT
3           FOR THE MIDDLE DISTRICT OF ALABAMA
4                    NORTHERN DIVISION
5
6    RICHARD MARSHALL,
7          Plaintiff,
8    vs.            CIVIL ACTION NO.
                    2:06-cv-701-ID.CSC
9
     CHRIS WEST, in his individual
10   capacity, LASHUN HUTSON, in his
     individual capacity,
11
     Defendants.
12
13          * * * * * * * * * * * *
14
15          DEPOSITION OF CHRISTOPHER WEST, taken
16   pursuant to stipulation and agreement before Tracye
17   Sadler Blackwell, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on January 21, 2008,
21   commencing at approximately 9:10 a.m.
22
23          * * * * * * * * * * * *

---

**Page 2**

1             APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4    Mr. Jay Lewis
     Law Offices of Jay Lewis
5    Attorney at Law
     847 South McDonough Street
6    Montgomery, Alabama
7
8    ON BEHALF OF THE DEFENDANTS:
9    Mr. Daryl L. Masters
     WEBB & ELEY, P.C.
10   Attorneys at Law
     7475 Halcyon Pointe Drive
11   Montgomery, AL 36117
12   Mr. Rick A. Howard
     NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16
     ALSO PRESENT:
17
     Mr. Lashun Hutson
18
19
20          * * * * * * * * * * * *
21
22
23

---

**Page 3**

1             EXAMINATION INDEX
2
     BY MR. LEWIS . . . . . . . . . .   5
3
4           PLAINTIFF'S EXHIBITS
5
     1   Evidence Submission/Analysis Forms        42
6
     2   Courtesy Warning                  46
7
     3   Deposition                   47
8
     4   Complaint and Warrant           51
9
     5   Alabama Uniform Incident/Offense Report   52
10
     6   6-28-05 Statement Form of Christopher    55
11   West
12
13          * * * * * * * * * * * *
14
15            STIPULATIONS
16     It is hereby stipulated and agreed by and
17   between counsel representing the parties that the
18   deposition of CHRISTOPHER WEST is taken pursuant to
19   the Federal Rules of Civil Procedure and that said
20   deposition may be taken before Tracye Sadler
21   Blackwell, Certified Court Reporter and
22   Commissioner for the State of Alabama at Large,
23   without the formality of a commission, that

---

**Page 4**

1    objections to questions other than objections as to
2    the form of the question need not be made at this
3    time but may be reserved for a ruling at such time
4    as the said deposition may be offered in evidence
5    or used for any other purpose by either party
6    provided for by the Statute.
7       It is further stipulated and agreed by and
8    between counsel representing the parties in this
9    case that the filing of said deposition is hereby
10   waived and may be introduced at the trial of this
11   case or used in any other manner by either party
12   hereto provided for by the Statute regardless of
13   the waiving of the filing of the same.
14      It is further stipulated and agreed by and
15   between the parties hereto and the witness that the
16   signature of the witness to this deposition is
17   hereby waived.
18
19
20          * * * * * * * * * * * *
21
22
23

---

Page 5

1    THE COURT REPORTER:  Usual
2        stipulations?
3    MR. MASTERS:  Yes.
4    MR. LEWIS:  Yes.
5
6        CHRISTOPHER WEST
7    The witness, after having first been duly sworn
8    to speak the truth, the whole truth, and nothing
9    but the truth, testified as follows:
10            EXAMINATION
11   BY MR. LEWIS:
12   Q.   Tell us your name, please.
13   A.   Christopher Stewart West.
14   Q.   And how are you employed, Mr. West?
15   A.   By the Lowndes County Sheriff's Department.
16   Q.   And how long have you been employed by the
17       Lowndes County Sheriff's Department?
18   A.   About 11, 12 years, I think.
19   Q.   And what's your position with Lowndes
20       County Sheriff's Department?
21   A.   I'm a deputy sheriff.
22   Q.   Do you hold any particular rank as a deputy
23       sheriff?

Page 6

1    A.   I'm a lieutenant.
2    Q.   How many people are employed in the Lowndes
3        County Sheriff's Office?  And by that I
4        mean people who are in law enforcement as
5        opposed to jail work.
6    A.   Between 10 and 12 deputies, I think.
7    Q.   And what is your particular job as
8        lieutenant?  Do you have any particular
9        responsibility in that position?
10   A.   Yes, sir.  I'm drug task force commander.
11   Q.   And help me understand the drug task force
12       because there's always some confusion about
13       whether it's a legal entity, whether it has
14       its own personnel practices, whether it has
15       its own policies.  Tell me, if you will,
16       what the 2nd Judicial Drug Task Force is.
17            MR. MASTERS:  Object to the form.
18            Go ahead and answer as best as
19            you can, Chris.
20   A.   The drug task force is a task force that's
21       made up of several agencies.  We're funded
22       by the Department of Justice through the
23       Alabama Department of Economic and

Page 7

1    Community Affairs through a grant.  There
2    are several law enforcement agencies,
3    including district attorney's office,
4    within our three-county circuit.
5        Each year an agency -- all the agencies
6    are allowed to place an agent or an officer
7    on the drug task force.  Some agencies
8    choose to participate.  Most don't because
9    of funding issues.  Currently there's the
10   Lowndes County Sheriff's Office, the
11   Hayneville Police Department, and the
12   district attorney's office that are
13   participating on the drug task force as
14   part of the grant.
15   Q.   Okay.  So those three agencies make up the
16       drug task force?
17   A.   Yes, sir.
18   Q.   Are there federal agents assigned to that?
19   A.   No, sir.
20   Q.   But your salary continues to come from the
21       Lowndes County Sheriff's Office?
22   A.   That's correct.
23   Q.   And the Lowndes County Sheriff's Office in

Page 8

1    turn receives a grant to cover your
2    activity with the drug task force?
3    A.   The Lowndes County Commission does, not the
4        sheriff's office.
5    Q.   Does the Lowndes County -- does the drug
6        task force have a separate policies and
7        procedures manual for you to follow?
8    A.   Yes, sir, we do.
9    Q.   And are the policies and procedures in that
10       promulgated by the Department of Justice or
11       by some individual agency or the task force
12       as a group?
13   A.   A board of directors that form up the drug
14       task force.  We have a board of directors
15       that meet periodically, and if new rules or
16       guidelines need to be established, then the
17       board members will collectively make a
18       decision on how to establish that.
19   Q.   Okay.  And do those guidelines include
20       tactical operations, the way you perform
21       your duties, the day-to-day activities in
22       which you're involved?
23   A.   Yes, sir.

Page 9

1   Q.   Does the Lowndes County Sheriff's Office
2        have its own set of rules and regulations
3        for you to go by?
4   A.   Yes.
5   Q.   And who puts those out?
6   A.   The sheriff.
7   Q.   Have you discovered any conflicts between
8        the sheriff's guidelines and policies and
9        those of the drug task force?
10  A.   No, sir.
11  Q.   So they're pretty much consistent?
12  A.   Yes, sir.
13  Q.   Let me get a little personal information on
14       you. What's your address?
15  A.   Physical or mailing?
16  Q.   Physical.
17  A.   235 -- no. 214 Norman Drive, Fort Deposit.
18  Q.   Okay. 214 Norman Drive?
19  A.   Yes.
20  Q.   And what's your educational background?
21  A.   I graduated high school, currently in
22       college.
23  Q.   And where are you in college?

Page 10

1   A.   Herzing in Birmingham.
2   Q.   Where?
3   A.   Herzing. Herzing College in Birmingham.
4   Q.   Herzing?
5   A.   Yes, sir.
6   Q.   What sort of school is that?
7   A.   It's a private school.
8   Q.   And you're looking for a four-year degree
9        from there?
10  A.   Yes, sir.
11  Q.   What year are you at Herzing?
12  A.   My final year.
13  Q.   And what's your major?
14  A.   Homeland security and public safety.
15  Q.   When did you graduate from high school?
16  A.   In '86.
17  Q.   Have you had any additional training since
18       1986 other than what you're getting at
19       Herzing College?
20  A.   In regards to ...
21  Q.   Your position, your job --
22  A.   Yes, sir.
23  Q.   -- criminal justice, that sort of thing.

Page 11

1   A.   Yes, sir.
2   Q.   Tell me about those.
3   A.   It's just a --
4   Q.   And I don't want the two-day seminars and
5        stuff like that.
6   A.   Yeah. There's just numerous ...
7   Q.   Okay. Have you been to the FBI Academy?
8   A.   Yes, sir.
9   Q.   How long a course was that?
10  A.   Ten weeks.
11       MR. HOWARD: Can we take a second?
12       MR. LEWIS: Sure.
13       (A brief recess was taken.)
14  Q.   (Mr. Lewis continuing:) Have you had any
15       other training courses that have been six
16       weeks or longer?
17  A.   No, sir, I don't believe so.
18  Q.   Have you been to any law enforcement
19       advanced driving academies?
20  A.   No, sir.
21  Q.   Let me call your attention to June 28th,
22       2005. And I'll represent to you that's the
23       date that everybody agrees that the

Page 12

1        incident with Mr. Marshall about which
2        we're here today occurred. What had you
3        been doing that entire day?
4   A.   At my office. Got up out of bed that
5        morning and went to work.
6   Q.   Okay. What projects were you working on
7        that day?
8   A.   I don't remember.
9   Q.   Okay. Do you remember when you left your
10       office?
11  A.   No, sir, not exactly.
12  Q.   Okay. At some point that day did you hook
13       up with Mr. Hutson?
14  A.   Yes, sir.
15  Q.   At what point did you do that?
16  A.   I don't really remember. He may have -- we
17       may have been in the office together that
18       morning and discussed Mr. Marshall, or I
19       may have picked him up at another
20       location. I just don't remember.
21  Q.   When you say you might have picked him up,
22       do you recall who was driving?
23  A.   I was driving.

Deposition of Christopher West                  Marshall vs. West; Hutson                  January 21, 2008

Page 13

1   Q.  Do you recall what you were driving?
2   A.  Yes, sir.
3   Q.  What were you driving?
4   A.  A Lincoln.
5   Q.  What model?
6   A.  Town Car.
7   Q.  What year?  Do you remember?
8   A.  No, sir, I don't remember.
9   Q.  And why were you driving a Lincoln Town
10      Car?
11  A.  I don't remember exactly why we were
12      driving the Lincoln that day.
13  Q.  Was that Lincoln a vehicle that had been
14      confiscated?
15  A.  Yes, sir.
16  Q.  And had there been a condemnation
17      proceeding as to that Lincoln?
18  A.  Yes, sir.
19  Q.  And it had been condemned and your office
20      had it?
21  A.  Yes, sir.
22  Q.  Why were you discussing Mr. Marshall that
23      day?

Page 14

1   A.  I had received information that
2       Mr. Marshall was selling dope at his
3       residence, selling illegal drugs at his
4       residence.
5   Q.  Where did you get that information?
6   A.  I don't remember.
7   Q.  Did you make any notes of where you got
8       that information from?
9   A.  I may have.
10  Q.  Would you have preserved those notes?
11  A.  No, sir.
12  Q.  Did your information indicate what sort of
13      drugs he was supposed to be selling?
14  A.  Crack cocaine and marijuana.
15  Q.  And based on that information what, if
16      anything, did you do?
17  A.  We drove out to Mr. Marshall's residence to
18      do a knock-and-talk and to just discuss
19      with him the information that we had
20      received.
21  Q.  And where was Mr. Marshall's residence?
22  A.  Just off Highway 21 on a little dirt road.
23      I don't recall the name of the dirt road.

Page 15

1       And it wasn't -- I don't know if you really
2       could consider it a dirt road.  It's more
3       like a -- more like a big driveway that
4       kind of went up a hill and then it took a
5       right right in front of the mobile home
6       where he was living at at the time.  And as
7       it went on past his house, I guess maybe
8       less than a hundred yards or so it kind of
9       turned into a little more narrow trail so
10      to speak.  So I don't even know if it's
11      considered -- if it has a name.  It could
12      be a private drive.
13  Q.  All right.  Did you know Mr. Marshall prior
14      to this time?
15  A.  No, sir.
16  Q.  Had you had any law enforcement contact
17      with Mr. Marshall prior to this time?
18  A.  Never met him.  Never seen him before.
19  Q.  Had you received any prior information
20      about Mr. Marshall prior to that time?
21  A.  Yes, sir.
22  Q.  And what information had you received?
23  A.  The same information in reference to drug

Page 16

1       activity.
2   Q.  When you got to his house, what, if
3       anything, did you do?
4   A.  I believe that we knocked on the door and
5       no one came to the door.  We got back in
6       our vehicles and -- or got back in our
7       vehicle and left the residence.  Agent
8       Hutson had some information about another
9       place that was, I think -- I think it's
10      referred to as the Casey community.  It's
11      kind of in that area.  It's not in the
12      exact same area, but it's in that part of
13      the county.  And when we were leaving
14      Mr. Marshall's residence, we were going to
15      go to this home down in the Casey
16      community.
17  Q.  And what information did you have about the
18      Casey community that led you to go down
19      there?
20  A.  Agent Hutson had that.  I'm not exactly --
21      I'm not exactly sure.
22  Q.  So you were looking for Mr. Marshall?
23  A.  Yes, sir.

4 (Pages 13 to 16)

Page 17

1   Q.  Did you know what kind of car Mr. Marshall
2       was likely to be driving?
3   A.  Yes, sir.
4   Q.  And what were you on the lookout for?
5   A.  A blue Chevy Nova, older -- older -- older
6       type vehicle.
7   Q.  And just so I'm clear, you did not -- you
8       do not recall today how you received the
9       information about Mr. Marshall allegedly
10      selling drugs?
11   A.  No, sir. It could have been someone we
12      interviewed and I just made a note on
13      some -- a small Post-it, or it could have
14      been a phone call. I know we received it
15      on more than one occasion.
16   Q.  And when you received that information, do
17      you have a present sense of whether or not
18      you believed that information to be
19      reliable?
20   A.  If -- if it was a source that was a
21      reliable source and the time frame allowed,
22      I would have obtained a search warrant for
23      his residence. But we're doing a

Page 18

1      knock-and-talk, so maybe -- it could have
2      been a reliable informant that just knew
3      that activity was going on and just
4      referred it to me and we went out to do the
5      knock-and-talk. If it was reliable, we
6      would obtain -- I mean, if it was reliable
7      and within the time frame allowed, we would
8      have gotten a search warrant.
9   Q.  Okay. So the fact that you didn't get a
10      search warrant would seem to indicate that
11      it was not the sort of information that you
12      would have taken to a judge at that time;
13      correct?
14   A.  That's correct. Not at that time.
15   Q.  All right. So you're on your way to the
16      Casey community. How do you get to the
17      Casey community from where Mr. Marshall's
18      residence is?
19   A.  You know, I'm not exactly sure because I
20      don't think I've ever been there before.
21      But, now, Agent Hutson is familiar with it.
22   Q.  Okay.
23   A.  But I know it's -- you got to -- in the

Page 19

1      direction we were coming from, you have to
2      go down County Road 7. Because we were on
3      21. I mean, he -- where he lives is just
4      off 21.
5   Q.  Right.
6   A.  So if you're coming back toward Hayneville
7      from Mr. Marshall's residence, you take a
8      left on County Road 7.
9   Q.  And prior to your encountering Mr. Marshall
10      had you taken that left?
11   A.  Yes, sir.
12   Q.  So you were on County Road 7 at that time?
13   A.  That's right.
14   Q.  What, if anything, happened then?
15   A.  We met Mr. Marshall's vehicle, and I -- I
16      said, well, that's his vehicle right
17      there. We turned around and got behind his
18      vehicle.
19   Q.  Okay. And what then?
20   A.  Mr. Marshall didn't have on a seatbelt. I
21      observed that he didn't have on a
22      seatbelt. And we've got a blue-and-white
23      warning light that is powered -- it's a

Page 20

1      12-volt power that you plug into the
2      cigarette lighter. And I placed it on the
3      dash of the vehicle and activated that
4      light behind his vehicle.
5   Q.  What did Mr. Marshall do in response to
6      that?
7   A.  Kept driving.
8   Q.  How fast were you going at the time you
9      first activated this light?
10   A.  I don't -- I don't recall.
11   Q.  Well, would you consider it an excessive
12      rate of -- without regard to miles per
13      hour, an excessive rate of speed, an
14      ordinary rate of speed, a slow rate of
15      speed?
16   A.  An ordinary rate. It wasn't exceeding the
17      speed limit.
18   Q.  And your position is that Mr. Marshall --
19      that you activated this light?
20   A.  That's correct.
21   Q.  And the light was working at the time?
22   A.  Yes, sir.
23   Q.  And there were blue-and-white strobes or

Page 21

1     flashes coming off the light?
2  A.  That's correct.
3  Q.  All right. So Mr. Marshall kept on
4     driving?
5  A.  That's right.
6  Q.  What did you do then?
7  A.  Blew the horn, flashed the headlights, and
8     even at one point pulled alongside his
9     vehicle.
10  Q.  What color was this Lincoln Town Car you
11     were in?
12  A.  It's kind of a bluish/aquamarine type
13     color.
14  Q.  Doesn't look much like a police car though?
15  A.  No.
16  Q.  So you blew the horn, and Mr. Marshall just
17     continued to keep driving; right?
18  A.  Yes, sir.
19  Q.  You say you pulled up alongside him. Tell
20     me about that.
21  A.  We pulled alongside the vehicle. And, like
22     I said, it -- he's got an older car. It
23     doesn't run that fast. Pulled alongside

Page 22

1     the vehicle. Our windows are down. I
2     think Agent Hutson holds up his badge. And
3     it's a pretty good -- it's a pretty good
4     size badge. It's round and it has a
5     leather cover around it. It's a gold badge
6     with a black background. And he holds it
7     up. I mean, we're probably as close from
8     me to you. And he holds up the badge and
9     says pull over. And Mr. Marshall is
10     yelling and cussing, and he's very -- has a
11     very defensive appearance about himself.
12     And so Agent Hutson is holding up the
13     badge. And then at one point we even
14     removed the light from the dash and we've
15     got the badge in one hand and the light in
16     the other saying pull over. And he's
17     looking, I mean, directly at us. And he
18     says, you know, fuck y'all or something to
19     that nature, you know, I'm not pulling
20     over, you know. And so he keeps on going.
21     And so we pull -- you know, we back off and
22     pull back in behind the vehicle just
23     following behind him.

Page 23

1  Q.  At some point you're -- setting the scene
2     here, you have turned onto Highway 7. You
3     meet him. He's coming toward you?
4  A.  That's correct.
5  Q.  You turn around and you're going back,
6     what, south on Highway 7 approximately?
7  A.  Yeah.
8  Q.  Back toward Highway 21?
9  A.  That's correct.
10  Q.  And when I say Highway 7, I mean County
11     Road 7.
12  A.  That's right.
13  Q.  Heading back toward Highway 21?
14  A.  Uh-huh (positive response).
15  Q.  What, if anything, happened when you hit
16     Highway 21?
17  A.  He speeds up a little bit. It's a little
18     wider highway than the county road.
19  Q.  Did he turn onto Highway 21?
20  A.  Yes, he did.
21  Q.  Which direction did he turn?
22  A.  Going toward his residence, away from
23     Hayneville toward Wilcox County.

Page 24

1     And less than maybe 50 to 75 yards he
2     throws something out the window that
3     actually hits us in the windshield, a
4     plastic baggy. I seen enough of those in
5     my years. I know what a plastic baggy
6     looks like. It hits us and just kind of
7     flies off to the side. So I'm making
8     mental notes to try to remember where this
9     evidence or whatever came out of the
10     window.
11     And he continues to go in the direction
12     of Wilcox County. So we pull up beside him
13     again, you know, hey, pull over. We got
14     the badge just like this right here and the
15     light, you know, pull over. And he's just
16     yelling and cussing, you know, fuck you
17     all, I'm not doing it, I'm not pulling
18     over, you know.
19     And so we back off. And I tell Shun, I
20     says, hold on. Because he's moving around
21     in his seat. There's -- you know, he's
22     like looking down. He's -- there's a lot
23     of movement going on in the seat with him.

Page 25

1   And I tell Shun, I says, you know, you hold
2   on because something is going on here.
3        And so I bump his vehicle a couple of
4   times thinking that that will, you know,
5   make him pull over, but he still -- you
6   know, he's yelling and he's -- and he sees
7   us. I mean, he's looking in the mirror.
8   He sees us back -- he sees the blue light.
9        And so he ducked, and then I just kind
10  of, you know, pushed his bumper a little
11  bit. And his vehicle swerves and comes up
12  on this side of the road. Never harm
13  anything. I don't even think it hurt the
14  grass. And he came to rest in the
15  vehicle. The vehicle came to rest up on
16  the embankment. And I believe I backed up
17  because I took a position -- a defensive
18  position -- his vehicle -- if my wrist is
19  the front of his vehicle, then the nose of
20  my vehicle took a position like -- at an
21  angle like this.
22       And we opened our doors with our
23  weapons drawn behind our -- behind the

Page 26

1   doors. And I said to him -- I said, get
2   out of your vehicle and get on the ground.
3   And he just sat there cussing and just
4   sweating, and his eyes were red. It was a
5   bad situation.
6   Q.  Let's go back just a little bit. Earlier
7       you had said that when you pulled up next
8       to him you were as close as you were to
9       me --
10  A.  Yeah.
11  Q.  -- right now. And I estimate that distance
12      to be about four to five feet. Would that
13      be accurate?
14  A.  Or maybe further. Something like that. I
15      mean, I could see his face and I'm
16      driving. And Shun is even closer than I
17      am. But I'm driving. There's nothing else
18      on the road. And I'm looking him in his
19      face and he's looking at us. And he sees
20      the light and the badge is just like this.
21      And, like I say, it's a gold badge with a
22      black background and a blue-and-white
23      strobe just flashing.

Page 27

1   Q.  I understand --
2        MR. MASTERS:  Object to the form
3        of the previous question.
4        Just listen to his questions
5        and answer his questions.
6        THE WITNESS:  Okay. I'm sorry.
7   Q.  The question -- the cars would have been
8       approximately four to five feet apart?
9   A.  Yes, sir.
10  Q.  And when you say you pulled alongside him,
11      I'm assuming that you mean that your car's
12      passenger's side was next to his car's
13      driver's side?
14  A.  Yes, sir.
15  Q.  And to clarify what you said about how you
16      stopped --
17       MR. MASTERS:  Excuse me. Object
18       to the form of the previous
19       question.
20        Did you hear the
21        question, Chris? Which side
22        was closest to which?
23       THE WITNESS:  Shun's side was

Page 28

1        closest to his driver's side.
2        MR. MASTERS:  So your car's
3        passenger's side was close to
4        his car's driver's side?
5        THE WITNESS:  That's right.
6        MR. MASTERS:  I think you said the
7        opposite, Jay. I may be
8        mistaken.
9        MR. LEWIS:  Well, I'll -- we'll go
10       with the fact that his car --
11       that Mr. West's car's
12       passenger's side was next to
13       Mr. Marshall's driver's side.
14       MR. MASTERS:  I may be mistaken,
15       but I thought you said the
16       opposite.
17       MR. LEWIS:  That's fine.
18  Q.  But to clarify, you didn't pull over to the
19      right to get up next to his car. You
20      pulled to the left?
21  A.  Yeah. I pulled as if I was passing his
22      car.
23  Q.  Right. Okay. And this is a two-lane

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 29

1     highway?
2     A.  Yes, sir.
3     Q.  Are you familiar with what a PIT is?
4     A.  Yes, sir.
5     Q.  What is a PIT?
6     A.  It's a -- what's referred to as PIT
7         maneuver.
8     Q.  And that's a precision intervention
9         technique or precision interdiction
10        technique?
11    A.  Yes, sir.
12    Q.  And is that what you performed on
13        Mr. Marshall's car?
14    A.  Yes, sir.
15    Q.  And to clarify -- correct me if I'm
16        wrong -- that's a procedure by which you
17        pull up next to the car with your front
18        fender next to his rear fender and then
19        slow down and simultaneously turn into his
20        car bumping it into a turn; correct?
21    A.  Something of that nature.
22    Q.  And that's pretty much what you did on that
23        occasion?

Page 30

1     A.  Yes, sir.
2     Q.  And his car came to rest off the road;
3         correct?
4     A.  Yes, sir.
5     Q.  Based on what you said.
6             And did it come to rest facing back in
7         the direction from what you had come?
8     A.  Yes, sir.
9     Q.  So instead of going toward Wilcox County,
10        it is now headed away from Wilcox County in
11        the grass?
12    A.  That's correct.
13    Q.  On the opposite side of the road?
14    A.  Yes, sir.
15    Q.  You then backed up and angled your car
16        toward his car just off the road?
17    A.  That's correct.
18    Q.  Okay.  I think we've got the scene set.
19            And you indicated that you jumped out
20        of the car and Mr. Hutson jumped out of the
21        car, weapons drawn, and yelled at
22        Mr. Marshall to get out of the car?
23    A.  That's correct.

Page 31

1     Q.  And what, if anything, was Mr. Marshall
2         saying to you at the time?
3     A.  Cursing.
4     Q.  Okay.  Have any recollection of the
5         specific language he was using?
6     A.  Fuck y'all, why y'all fucking with me,
7         things of that nature.
8     Q.  Going back to when you say he threw a baggy
9         out of the car and hit your car.  In what
10        way did he -- I mean, tell me what you saw
11        as that baggy came out of the car.
12    A.  I saw his arm go up and the bag come out.
13        Like I said, we could see him moving around
14        in the car.
15    Q.  And you made note of where that baggy had
16        gone off the road?
17    A.  Yes, sir.
18    Q.  You've got him in the car.  Did he have a
19        passenger with him?
20    A.  Yes, sir.
21    Q.  And what did the passenger do, if
22        anything?
23    A.  Nothing really.

Page 32

1     Q.  Just sat there?
2     A.  Yes, sir.
3     Q.  Did you hear the passenger cursing?
4     A.  No, sir.
5     Q.  And Mr. Marshall's window, was it up or
6         down?
7     A.  Down.
8     Q.  What's the next thing that happened?
9             I know I sound like a prosecutor, but
10        what happened then?
11    A.  Mr. Marshall -- he got out of his car.  He
12        was standing -- he had the door open and
13        was standing between the car and the door.
14        And he's yelling and cussing.  And I tell
15        him several times to get on the ground.  He
16        will not comply.  And several more times I
17        say get on the ground, get on the ground
18        now.  He won't comply.  And I fired my
19        weapon in the ground, I guess, some
20        seven -- six to eight feet out from him
21        into the ground.
22            At that point he was shocked that that
23        even happened.  I could see the appearance

8 (Pages 29 to 32)

Marshall vs. West; Hutson

Page 33

1  on his face.  That's when I left from
2  behind my door, my weapon still pointed at
3  him -- or my weapon pointed at him, and as
4  I approached him, I grabbed him.  I don't
5  remember where I grabbed him, but I know I
6  grabbed him and I put him on the ground.
7  And he -- he was very resistant.
8      But he was cussing and just combative.
9  Not very combative, but just not wanting to
10  comply at all.  But I was able to get my
11  handcuffs out and put the handcuffs on
12  him.  And I think Agent Hutson got the
13  passenger out and placed the handcuffs on
14  him.
15      I left him there on the ground after I
16  got him handcuffed and looked into the
17  vehicle.  On the driver's seat right there
18  in the middle was a .357 Magnum.  And in
19  the ashtray was .357 rounds.  There was
20  some rounds in the floorboard and might
21  have been some loose rounds in the seat.
22  But I know the gun was loaded.  And there
23  was a -- like a liquor flask there in the

Page 34

1  seat and, I think, a pack of Swisher Sweet
2  cigars, a partial pack or something.
3      I get him -- after I see this stuff
4  right here, I'm -- I pat him down.  And I
5  think -- when I -- when I'm trying to get
6  him -- when I get him to the ground, he's
7  got these big -- real big shorts on that
8  are the bagging shorts.  So they basically
9  come off of him.  He doesn't have on a belt
10  or anything.  And so cars are coming by and
11  he's there in his underwear.  So I'm trying
12  to get him to get into the back seat of the
13  car, basically trying to save him from some
14  humiliation because he's standing there in
15  his boxers, so -- but he won't comply.  He
16  just won't do nothing I'm asking him.  So
17  eventually I get him pushed into the back
18  seat because, like I say, traffic is coming
19  by.
20      And the other guy, I think Agent Hutson
21  sits him over on the embankment.  He's
22  cool.  He's not saying anything.  He's not
23  resisting in any manner.  I call a marked

Page 35

1  unit.  The marked unit comes out and
2  transports them.  I take some photos.  And
3  that's pretty much the gist of it.
4  Q.  Going back to when you had him on the
5      ground and were doing the search of the
6      vehicle.  Did you also do a search of him,
7      did you say?
8  A.  I patted him, patted his pockets to see if
9      he had any weapons or anything in his
10      pockets.
11  Q.  Did you remove a wallet?
12  A.  I may have.  I don't remember.
13  Q.  Did you remove any money from him?
14  A.  I may have.
15  Q.  If you removed any money from him, did you
16      turn in all of the money you removed from
17      him?
18  A.  Yes, sir.
19  Q.  Turned it in to whom?
20  A.  The jail.
21  Q.  Okay.  Anything else you turned in to the
22      jail other than possibly money?
23  A.  No, sir.

Page 36

1  Q.  Okay.
2  A.  If he didn't have any weapons --
3          MR. MASTERS:  Chris, just answer
4      his question.
5          THE WITNESS:  Okay.
6  Q.  Well, what would have been your normal
7      procedure for dealing with confiscated
8      property?
9  A.  If he didn't have any weapons, normally I
10      would leave it in his pockets because the
11      jail is going to pick that stuff up when he
12      gets there anyway.
13  Q.  Do you recall whether you did that in this
14      case or not?
15  A.  No, sir.
16  Q.  What did you do then after he was trans --
17      let me go back.
18      You said that you called for a marked
19      unit?
20  A.  Yes, sir.
21  Q.  And did a marked unit arrive?
22  A.  Yes, sir.
23  Q.  From what jurisdiction was that marked

Page 37

1    unit?
2    A.  Lowndes County.
3    Q.  And do you recall who was in that marked
4        unit?
5    A.  Yes, sir.
6    Q.  Who was that?
7    A.  Deputy Phil Harding.
8    Q.  And what did Deputy Phil Harding do when he
9        got on the scene?
10   A.  Took Mr. Marshall and put him in the back
11       seat of his vehicle.
12   Q.  By that time had Mr. Marshall calmed down?
13   A.  No, sir.
14   Q.  Still combative?
15   A.  No, sir, not combative. Just still ...
16   Q.  Hostile?
17   A.  Yes, sir.
18   Q.  But you didn't have to -- nobody had to
19       fight him to get him in the patrol car?
20   A.  I don't recall, no, sir.
21   Q.  And did the patrol car then leave with
22       Mr. Marshall?
23   A.  Yes, sir.

Page 38

1    Q.  What happened to the passenger?
2    A.  He rode with me.
3    Q.  And did you have any trouble out of him at
4        all?
5    A.  No, sir.
6    Q.  Do you recall who he was?
7    A.  What's that boy's last name?
8        I know, but I can't remember right now.
9    Q.  Had you had any contact with him before?
10   A.  No, sir.
11   Q.  Didn't know him?
12   A.  No, sir.
13   Q.  When's the next time you saw Mr. Marshall?
14   A.  I went to interview him a few days later.
15   Q.  At that time had he been charged with
16       anything?
17   A.  Yes, sir.
18   Q.  And do you recall how long he was held
19       before he was charged?
20   A.  He was charged the day that I arrested him.
21   Q.  And you signed a warrant on him?
22   A.  Yes, sir.
23   Q.  Do you recall whether it was you or

Page 39

1    Mr. Hutson who did the paperwork and the
2    deposition and got the charge --
3    A.  I think it was me.  I think.
4    Q.  And the only reason I ask that is I
5        couldn't read the signatures.
6    A.  Okay.
7    Q.  And tell me about the interview you had
8        with Mr. Marshall.
9    A.  He was calm.  We talked just like you and I
10       are talking now.  And I asked him for a
11       statement, and he says, I -- he didn't want
12       to give me a statement.  And so I told him
13       I understood, and that was the end of it.
14   Q.  Any sense of how long that interview took?
15   A.  20, 30 minutes, something like that.
16   Q.  Going back to the time that Mr. Marshall
17       was transported in the deputy's patrol
18       car.  What did you do after that, after
19       Mr. Marshall had been taken away?
20   A.  We -- we actually all left together.  I
21       think Agent Hutson drove Mr. Marshall's car
22       because it was still fine.  And I drove the
23       Lincoln.  Phil Harding came on the marked

Page 40

1    unit.  He had Mr. Marshall.  His --
2    Mr. Marshall's cousin was with me.  And
3    Shun drove the Nova.
4        I think we may have stopped alongside
5    the road looking for the evidence or the
6    bag that was thrown out.  And I think Phil
7    pulled over too.  And I think when he
8    pulled over he caught a nail in his tire,
9    and so he had -- he sprung a leak in his
10   tire.  So we were maybe a mile -- less than
11   a mile from Howard Hooks' store.  So Phil
12   drove his car up to Howard Hooks' store.  I
13   went up with him while he changed the tire,
14   and Shun took the Nova on back to the jail.
15   Q.  When you pulled over to the side of the
16       road, did you retrieve anything?
17   A.  I don't remember whether we did at that
18       time or not.  I think we went back and
19       later retrieved it.  I don't remember.
20       Maybe we did.  I don't remember exactly.
21   Q.  What did you retrieve?
22   A.  A baggy containing residue.
23   Q.  And what did you do with that baggy?

Page 41

1  A.  I sent it to forensics.
2  Q.  Tell me about how you, quote, sent it to
3      forensics.
4  A.  I bagged it up in a brown paper bag because
5      we were seeking a fingerprint analysis.  I
6      labeled it to get -- for fingerprint
7      analysis.  The fingerprint analysts weren't
8      able to recover any fingerprints off of
9      it.  Once I received it from fingerprint
10     analysis, I sent it to forensics, to drug
11     analysis, and they weren't able to
12     determine because there was just not enough
13     residue in the bag.
14         So I got both of those back, and they
15     were just both -- both of the results.  And
16     there was --
17 Q.  There was sufficient residue for you to see
18     that there was residue?
19 A.  Yes, sir.
20 Q.  And yet it was not sufficient for forensics
21     to make a determination?
22 A.  That's correct.
23 Q.  And you received a report back from

Page 42

1      forensics?
2  A.  Yes, sir.
3  Q.  Let me show you what we will mark as
4      Plaintiff's Exhibit Number 1.
5          (Plaintiff's Exhibit 1 was marked
6           for identification.)
7  Q.  I'm showing you what we've marked as
8      Plaintiff's Exhibit Number 1 and ask you if
9      you recognize that.
10 A.  Yes, sir.
11 Q.  And what is that, please?
12 A.  It's an evidence submission form.
13 Q.  And that's page 1?
14 A.  That's the submission form.
15 Q.  Okay.  Let's go to page 2.  What is that?
16 A.  That's the receipt of submission from
17     forensic sciences.
18 Q.  And that's done in order to preserve what
19     we call the chain of custody?
20 A.  Yes, sir.
21 Q.  What is the next page?
22 A.  This is the certificate of analysis from
23     forensic sciences.

Page 43

1  Q.  And the following page?
2  A.  It's the evidence submission form for
3      latent prints.
4  Q.  And the following page?
5  A.  It's the -- it's just a copy of the same
6      form.
7  Q.  And down at the bottom it would indicate --
8      it would seem to indicate that the chain of
9      custody as to the page we're on was not as
10     complete as the previous page?
11 A.  Say what, now?
12 Q.  The previous page of the fingerprint
13     examination request seems to show a full
14     chain of custody down at the bottom.  In
15     other words, it shows it was received by,
16     returned to, and then returned by.
17 A.  Oh, okay.
18 Q.  And there's three signatures.  And the next
19     page seems to just be the original
20     submission.
21 A.  You mean the final page?
22 Q.  No, no.
23 A.  Oh, okay.

Page 44

1  Q.  Okay.
2  A.  So are you saying that this guy, Shannon
3      Fitzgerald, received it from me and then on
4      this page right here is the one where the
5      actual examination took place?
6  Q.  Right.
7  A.  Okay.
8  Q.  Is that pretty much the way it looks to
9      you?
10 A.  That's the way it appears.
11 Q.  Okay.  And then let's go to the last page.
12     What is that?
13 A.  This is the -- I guess the findings from
14     the examination.
15 Q.  All right.  Let's go back to this third,
16     fourth -- yeah, the third page, the
17     certificate of analysis.
18 A.  Yeah.
19 Q.  What was the result of that analysis as far
20     as you can tell?
21 A.  That the analysis of the residue failed to
22     reveal the presence of any controlled
23     substances.

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 45

1  Q.  So they were able to perform an analysis?
2  A.  Yes, sir.
3  Q.  But simply couldn't find any controlled
4      substance?
5  A.  Couldn't find any controlled substance.
6  Q.  And the last page, which is the report of
7      the fingerprint analysis, what was the
8      finding there?
9  A.  No latent prints of value were found on the
10     evidence.
11 Q.  Okay.  But Mr. Marshall was in fact charged
12     with possession of controlled substance?
13 A.  That's correct.
14 Q.  Was he charged with anything else?
15 A.  I don't remember.  Pistol without a permit,
16     I think.
17 Q.  Had you seen that pistol in Mr. Marshall's
18     possession prior to the time you executed
19     the PIT maneuver?
20 A.  No, sir.
21         (Plaintiff's Exhibit 2 was marked
22          for identification.)
23 Q.  Let me show you what's marked as

Page 46

1      Plaintiff's Exhibit Number 2 and see if you
2      recognize that.  What is that, please?
3  A.  It's a warning citation.
4  Q.  And it was for attempting to elude and no
5      seatbelt; correct?
6  A.  That's correct.
7  Q.  With regard to that seatbelt violation, do
8      you have any idea whether 1971 Chevrolets
9      were even equipped with shoulder harnesses?
10 A.  No, sir.
11 Q.  Okay.  So it may well be that shoulder
12     harnesses were not even available as far as
13     you know in 1971?
14 A.  As far as I know.
15         MR. MASTERS:  Object to the form.
16 A.  That's correct.
17 Q.  And if he had had a seatbelt and not a
18     shoulder harness, would you have been able
19     to see that from your perspective while
20     following him?
21 A.  No, sir.
22         (Plaintiff's Exhibit 3 was marked
23          for identification.)

Page 47

1  Q.  Let me show you what I've marked as
2      Plaintiff's Exhibit Number 3 and see if you
3      recognize that.
4  A.  Yes, sir.
5  Q.  What is that?
6  A.  It's a deposition.
7  Q.  And what is a deposition used for in this
8      context?
9  A.  Probable cause for the clerk to issue a
10     warrant.
11 Q.  And this is the deposition relating to
12     possession of controlled substance and
13     pistol without a permit; correct?
14 A.  Yes, sir.
15 Q.  Who filled out this form?
16 A.  I did.
17 Q.  Okay.  Looking on the second page up at the
18     top where it says complainant, whose
19     signature is that?
20 A.  That's my signature.
21 Q.  And it says offender attempted to elude DTF
22     agents at the same time throwing drug
23     evidence out the window.

Page 48

1          Going back to what you had said a
2      little earlier.  You had said when
3      Mr. Marshall turned onto Highway 21 toward
4      Wilcox County --
5  A.  Yes, sir.
6  Q.  -- he sped up a little --
7  A.  Yes, sir.
8  Q.  -- but that his car really was not capable
9      of going very fast?
10 A.  No, sir.
11 Q.  How fast, if you have a judgment, was
12     Mr. Marshall going at the time that you
13     executed the PIT maneuver?
14 A.  I'm not sure.
15 Q.  But you weren't exceeding the speed limit?
16 A.  I don't remember.
17 Q.  But you don't have a sense that you were --
18     as of today -- and since you don't
19     remember, I'm just trying to clarify this.
20     Do you have a sense today that you were in
21     a high speed chase?
22 A.  I would say so, yes, sir.
23 Q.  Okay.  So how high do you think the speed

12 (Pages 45 to 48)

Deposition of Christopher West                Marshall vs. West; Hutson                    January 21, 2008

---

Page 49

1    was?
2    A.  I just -- I don't remember.
3    Q.  So it said attempted to elude DTF agents at
4        the same time.  Isn't is it true what you
5        meant by that was he simply failed to stop?
6            MR. MASTERS:  Object to the form.
7    A.  I don't know.  I mean, I guess that depends
8        on how you look at it.
9    Q.  I guess it does.  But he didn't attempt to
10       turn on to any other roads and lead you on
11       this path through the woods or anything
12       like that?
13   A.  No, sir.
14   Q.  Okay.  He simply turned back toward what
15       you knew to be his residence?
16   A.  Yes, sir.
17           MR. MASTERS:  Object to the form.
18   Q.  And it says moving drug evidence out of
19       the window.  But at this point you don't
20       have any evidence whatsoever that he
21       actually threw drug evidence out?
22   A.  No, sir.
23   Q.  Offender was forced from the roadway onto

---

Page 50

1    the opposite side of the roadway where his
2    vehicle came to rest.  Offender was not
3    wearing seatbelt and was highly
4    belligerent, cursing, very combative, and
5    obviously highly agitated.  Have you told
6    me everything about that that you can
7    recall when you described it earlier?
8    A.  His demeanor?
9    Q.  Yeah.
10   A.  Yeah, I guess.  I mean, if I could think of
11       a few more words to use, I'd use them.
12   Q.  Okay.  There also was a passenger in the
13       vehicle.  Both individuals were detained
14       and transported to the Lowndes County
15       Detention Facility.  And have you told me
16       everything you can recall about their
17       arrest and transportation?
18   A.  Yes, sir.
19           (Plaintiff's Exhibit 4 was marked
20            for identification.)
21   Q.  Okay.  Let me show you what's marked as
22       Plaintiff's Exhibit Number 4.  And this is
23       simply a two-page document.  Tell me what

---

Page 51

1    this is, please.
2    A.  It's the complaint and the warrant.
3    Q.  Okay.  And this also bears your signature?
4    A.  Yes, sir.
5    Q.  On the first page?
6    A.  Yes, sir.
7    Q.  And on the second page down at the bottom
8        where it says sheriff, by, is that also
9        your signature?
10   A.  Yes, sir.
11   Q.  And that's simply the document that makes
12       the charge against Mr. Marshall --
13   A.  That's right.
14   Q.  -- on the first page, and on the second
15       page it's a warrant to arrest him?
16   A.  That's correct.
17           (Plaintiff's Exhibit 5 was marked
18            for identification.)
19   Q.  Okay.  And I think the last thing is
20       Plaintiff's Exhibit Number 5.  Tell me what
21       that is, please.
22   A.  It's an incident/offense report.
23   Q.  Okay.  We've gone through several pieces of

---

Page 52

1    paper that you have either authored or had
2    something to do with.  Tell me all of the
3    paperwork that you have to fill out in
4    making an arrest such as you made on
5    Mr. Marshall.
6    A.  You mean for a case file or --
7    Q.  Yeah.  Yeah.  Have we in front of us all of
8        the paperwork that you have executed on
9        Mr. Marshall?
10   A.  You don't -- my statement form is not here.
11   Q.  Right.  But other than that.
12   A.  There's an arrest report that's not here.
13   Q.  Okay.  Look on the third page of the
14       exhibit I've just handed you.
15   A.  Okay.
16   Q.  Is that the arrest report?
17   A.  This is the arrest report right here.
18   Q.  Is what you have in these exhibits that
19       I've given you all of the paperwork you
20       would have completed on Mr. Marshall?
21   A.  Yes, sir, I believe so.
22   Q.  All right.  Let's go to Plaintiff's Exhibit
23       Number 5.  That's a uniform

---

Page 53

1  incident/offense report?
2  A.  That's right.
3  Q.  And tell me what that's for.  What's the
4      purpose of that?
5  A.  It just lists myself as whoever is making
6      out the report, the agency, the charges or
7      the incident, the place of occurrence, the
8      date and time.  And there's an area in here
9      where you will list items that will be
10     recovered or whatever.  And then down at
11     the bottom -- underneath that it will list
12     the dollar amount for the items recovered,
13     vehicle information.
14         On the back page is the information for
15     the offender or whoever, suspect, and then
16     an area for the witnesses, a narrative, and
17     then an area for the signature of the
18     officer or whoever the complainant is and
19     case disposition area.
20 Q.  And did you fill out these first two
21     pages?
22 A.  Yes, sir.
23 Q.  And that's your signature at the bottom of

Page 54

1  the second page?
2  A.  Yes, sir.
3  Q.  And then tell me about this third page,
4      which is the Alabama Uniform Arrest Report.
5  A.  Basically the jail does this.  They do this
6      in booking.  And it has the -- you see the
7      defendant's name up at the top, his height,
8      weight, color, all of his information, the
9      place -- the occurrence of the arrest and
10     the charges and then the officer that did
11     the booking.
12 Q.  And that would be Marilyn Mealing?
13 A.  That's correct.
14 Q.  Do you know her?
15 A.  Yes, sir.
16 Q.  And is that her signature?
17 A.  I guess it is.
18 Q.  Have you seen her signature before?
19 A.  No.
20 Q.  Okay.  Did you retain a copy of this
21     Alabama Uniform Arrest Report?
22 A.  Yes.
23 Q.  And is this a true and correct copy of that

Page 55

1  arrest report?
2  A.  Yes.
3  Q.  And you normally maintain those in your
4      case file --
5  A.  That's correct.
6  Q.  -- in the normal course of business?
7  A.  That's correct.
8  Q.  All right.  Now, you had mentioned that you
9      had a statement also that you wrote out.
10     I'm going to show you Plaintiff's Exhibit
11     Number 6 and ask you if that's a copy of
12     your statement.
13         (Plaintiff's Exhibit 6 was marked
14         for identification.)
15 A.  Yes, sir.
16 Q.  Okay.  Let's go through this for just a
17     second if we could.
18 A.  Okay.
19 Q.  And I think this will be close to the last
20     thing that we're going to do today.
21         This was June 28th, 2005.  Is that the
22     date that all this happened?
23 A.  Yes, sir.

Page 56

1  Q.  And the time, 7:32 p.m., is that the time
2      that you wrote the statement?
3  A.  Yes, sir.
4  Q.  This indicates that the incident happened
5      sometime at about one o'clock this
6      afternoon --
7  A.  That's right.
8  Q.  -- that afternoon.
9  A.  Uh-huh (positive response).
10 Q.  And you say that you were traveling with
11     Mr. Hutson north on Lowndes County Road 7
12     and met Mr. Marshall's blue Chevrolet Nova.
13 A.  Yes, sir.
14 Q.  You turned around in an attempt to catch up
15     with the vehicle.
16 A.  That's correct.
17 Q.  As we caught up with the vehicle, I
18     observed that neither the driver nor the
19     passenger were wearing seat belts.  Why was
20     that important to you?  Why did you put
21     that in there?
22 A.  Probable cause for the stop.
23 Q.  But what you really wanted to talk to him

Page 57

1     about was drugs?
2   A.   That's correct.
3   Q.   And you placed your blue light on the dash
4        to gain the attention of the driver. And
5        you pulled beside his vehicle, showed
6        badges. It says here we showed the driver
7        our badges. Earlier you mentioned that
8        Mr. Hutson showed the driver his badge.
9        Did you show the driver your badge as well?
10  A.   If that's what the state -- but it also
11       says that the driver looked out the window
12       and screamed that he wasn't going to pull
13       the vehicle over.
14  Q.   No. The question was, did you show him
15       your badge as well?
16  A.   If that's what the statement says, then I
17       did it.
18  Q.   Do you have any independent recollection of
19       showing him your badge?
20  A.   It's been two years, almost three years. I
21       don't -- I can't remember whether I did or
22       not.
23  Q.   Fair enough. And it says that he threw

Page 58

1        drug evidence out the window at about the
2        102 mile marker. And if I'm correct, based
3        on the analysis and your recollection of
4        that analysis, there was nothing to
5        indicate it was drug evidence, correct, in
6        the final analysis?
7   A.   That's correct.
8   Q.   But at that time you thought it was drug
9        residue?
10  A.   I still believe that.
11  Q.   Okay. Did you do any field tests on that
12       residue?
13  A.   No, sir.
14  Q.   Have you got the equipment to do field
15       tests?
16  A.   Yes, sir.
17  Q.   You don't have gas chromatography?
18  A.   No, sir.
19  Q.   Pursued Mr. Marshall for 2.4 miles.
20       Marshall was still responding violently.
21       Did he ever make a violent move toward you?
22  A.   Where are you at?
23  Q.   I'm down here at the -- close to the bottom

Page 59

1        of the page. I instructed Mr. Marshall to
2        exit his vehicle and get on the ground.
3   A.   Okay.
4   Q.   You see that?
5   A.   Yes.
6   Q.   Did he ever make a violent move toward you?
7   A.   No. We had weapons drawn.
8   Q.   Okay. Never attempted to hit you or
9        anything else?
10  A.   No. He's at his vehicle. We're at ours.
11  Q.   Never attempted to run away?
12  A.   No, sir.
13  Q.   Fired my service weapon into the ground. I
14       meant to ask you about that. Does the
15       Lowndes County Sheriff's Office have a use
16       of force policy?
17  A.   Yes, sir.
18  Q.   And what does that use of force policy say
19       about discharging a firearm?
20  A.   I'm not exactly sure.
21  Q.   Okay. On the second page it says, again,
22       that you located and recovered an empty
23       torn baggy that at one time had contained

Page 60

1        cocaine. And you've signed that?
2   A.   Yes, sir.
3   Q.   Okay. Are you sure that at one time that
4        it contained cocaine?
5            MR. MASTERS: Object to the form.
6   A.   Yes, sir.
7   Q.   And that is your statement that you wrote
8        in connection with this case?
9   A.   Yes, sir.
10  Q.   How were you dressed that day?
11  A.   I don't remember.
12  Q.   Middle of June -- end of June. Pretty
13       hot. Were you probably -- were you
14       wearing -- do you recall whether or not you
15       would have been wearing short-sleeve shirts
16       at that time?
17  A.   Probably.
18  Q.   Okay. And the drug task force operates in
19       some cases undercover; correct?
20  A.   That's correct.
21  Q.   You operate in plain clothes?
22  A.   That's correct.
23            MR. LEWIS: Let me have about five

Page 61

1          minutes, Daryl.
2          MR. MASTERS.  That's fine.  Take
3     whatever time you need.
4          (A brief recess was taken.)
5     Q.  (Mr. Lewis continuing:)  I have just a
6     couple more questions.
7          Did you fill out a use of force report
8     form following the discharge of your
9     weapon?
10    A.  At that time I don't believe our department
11    had one.  And I still don't believe we had
12    one, but what I did do was I did a
13    statement and gave it to the sheriff.
14    Q.  Is that this statement that we've just
15    seen?
16    A.  I think it's the same statement.
17    Q.  Were you reprimanded in any way for doing
18    that?
19    A.  No, sir.
20    Q.  Have you ever been reprimanded during your
21    period with the Lowndes County Sheriff's
22    Office?
23    A.  Not one time.

Page 62

1     Q.  Are you aware of any citizen complaints
2     against you that were investigated?
3     A.  I'm sure citizens have complained.
4          MR. LEWIS:  I believe that's all I
5     have.  Thank you.
6
7          (Deposition concluded at
8     approximately 10:35 a.m.)
9
10
11          * * * * * * * * * *
12    FURTHER DEPONENT SAITH NOT
13          * * * * * * * * * *
14
15    REPORTER'S CERTIFICATE
16
17    STATE OF ALABAMA:
18    MONTGOMERY COUNTY:
19
20          I, Tracye Sadler Blackwell, Certified
21    Court Reporter and Commissioner for the State of
22    Alabama at Large, do hereby certify that I reported
23    the deposition of:

Page 63

1          CHRISTOPHER WEST
2     who was duly sworn by me to speak the truth, the
3     whole truth and nothing but the truth, in the
4     matter of:
5          RICHARD MARSHALL,
6          Plaintiff,
7          vs.
8     CHRIS WEST, in his individual
9     Capacity, LASHUN HUTSON, in his
10    Individual capacity,
11    Defendants.
12    IN THE UNITED STATES DISTRICT COURT
13    FOR THE MIDDLE DISTRICT OF ALABAMA
14    NORTHERN DIVISION
15    Case Number 2:06-cv-701-ID.CSC
16    on January 21, 2008.
17          The foregoing 62 computer-printed pages
18    contain a true and correct transcript of the
19    examination of said witness by counsel for the
20    parties set out herein.  The reading and signing of
21    same is hereby waived.
22          I further certify that I am neither of
23    kin nor of counsel to the parties to said cause nor

Page 64

1     in any manner interested in the results thereof.
2          This 6th day of February 2008.
3
4
5          _____
6          Tracye Sadler Blackwell
          ACCR No. 294
7          Expiration date: 9-30-2008
          Certified Court Reporter
8          and Commissioner for the State
          of Alabama at Large
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Deposition of Christopher West       Marshall vs. West; Hutson       January 21, 2008

Page 1

## A

able 33:10 41:8,11 45:1 46:18
about 5:18 6:12 11:2 12:1 15:20 16:8,17 17:9 21:20 22:11 26:12 27:15 39:7 41:2 50:6,16 54:3 56:5 57:1 58:1 59:14 59:19 60:23
academies 11:19
Academy 11:7
ACCR 64:6
accurate 26:13
ACTION 1:8
activated 20:3,9,19
activities 8:21
activity 8:2 16:1 18:3
actual 44:5
actually 24:3 39:20 49:21
additional 10:17
address 9:14
advanced 11:19
Affairs 7:1
after 5:7 33:15 34:3 36:16 39:18,18
afternoon 56:6,8
again 24:13 59:21
against 51:12 62:2
agencies 6:21 7:2,5,7 7:15
agency 7:5 8:11 53:6
agent 7:6 16:7,20 18:21 22:2,12 33:12 34:20 39:21
agents 7:18 47:22 49:3
agitated 50:5
agreed 3:16 4:7,14
agreement 1:16
agrees 11:23
ahead 6:18
AL 2:11,14
Alabama 1:3,18,20 2:6 3:9,22 6:23 54:4,21 62:17,22 63:13 64:8
allegedly 17:9
allowed 7:6 17:21 18:7
almost 57:20
alongside 21:8,19,21 21:23 27:10 40:4
always 6:12
amount 53:12
analysis 41:5,7,10,11 42:22 44:17,19,21 45:1,7 58:3,4,6
analysts 41:7
angle 25:21

## B

angled 30:15
another 12:19 16:8
answer 6:18 27:5 36:3
anything 14:16 16:3 19:14 23:15 25:13 31:1,22 34:10,22 35:9,21 38:16 40:16 45:14 49:11 59:9
anyway 36:12
apart 27:8
appearance 22:11 32:23
APPEARANCES 2:1
appears 44:10
approached 33:4
approximately 1:21 23:6 27:8 62:8
area 16:11,12 53:8,16 53:17,19
arm 31:12
around 19:17 22:5 23:5 24:20 31:13 56:14
arrest 50:17 51:15 52:4 52:12,16,17 54:4,9 54:21 55:1
arrested 38:20
arrive 36:21
ashtray 33:19
asked 39:10
asking 34:16
assigned 7:18
assuming 27:11
attempt 49:9 56:14
attempted 47:21 49:3 59:8,11
attempting 46:4
attention 11:21 57:4
Attorney 2:5
Attorneys 2:10,13
attorney's 7:3,12
authored 52:1
available 46:12
aware 62:1
away 23:22 30:10 39:19 59:11
a.m 1:21 62:8

back 16:5,6 19:6 22:21 22:22 23:5,8,13 24:19 25:8 26:6 30:6 31:8 34:12,17 35:4 36:17 37:10 39:16 40:14,18 41:14,23 44:15 48:1 49:14 53:14
backed 25:16 30:15
background 9:20 22:6 26:22

## C

bad 26:5
badge 22:2,4,5,8,13,15 24:14 26:20,21 57:8 57:9,15,19
badges 57:6,7
bag 31:12 40:6 41:4,13
bagged 41:4
bagging 34:8
baggy 24:4,5 31:8,11 31:15 40:22,23 59:23
based 14:15 30:5 58:2
basically 34:8,13 54:5
bears 51:3
bed 12:4
before 1:16 3:20 15:18 18:20 38:9,19 54:18
BEHALF 2:3,8
behind 19:17 20:4 22:22,23 25:23,23 33:2
believe 11:17 16:4 25:16 52:21 58:10 61:10,11 62:4
believed 17:18
belligerent 50:4
belt 34:9
belts 56:19
beside 24:12 57:5
best 6:18
between 3:17 4:8,15 6:6 9:7 32:13
big 15:3 34:7,7
Birmingham 10:1,3
bit 23:17 25:11 26:6 62:20 64:5
black 22:6 26:22
Blackwell 1:17 3:21 62:20 64:5
blew 21:7,16
blue 17:5 25:8 56:12 57:3
blue-and-white 19:22 20:23 26:22
bluish/aquamarine 21:12
board 8:13,14,17
booking 54:6,11
both 41:14,15,15 50:13
bottom 43:7,14 51:7 53:11,23 58:23
boxers 34:15
boy's 38:7
brief 11:13 61:4
brown 41:4
bump 25:3
bumper 25:10
bumping 29:20
business 55:6

## C

call 11:21 17:14 34:23 42:19
called 36:18
calm 39:9
calmed 37:12
came 16:5 24:9 25:14 25:15 30:2 31:11 39:23 50:2
capable 48:8
capacity 1:10,10 63:9 63:10
car 13:6,10 17:1 21:10 21:14,22 28:10,19,22 29:13,17,20 30:2,15 30:16,20,21,22 31:9 31:9,11,14,18 32:11 32:13 34:13 37:19,21 39:18,21 40:12 48:8
Carmichael 2:14
cars 27:7 34:10
car's 27:11,12 28:2,4 28:11
case 4:9,11 36:14 52:6 53:19 55:4 60:8 63:15
cases 60:19
Casey 16:10,15,18 18:16,17
catch 56:14
caught 40:8 56:17
cause 47:9 56:22 63:23
certificate 42:22 44:17 62:15
Certified 1:17 3:21 62:20 64:7
certify 62:22 63:22
chain 42:19 43:8,14
changed 40:13
charge 39:2 51:12
charged 38:15,19,20 45:11,14
charges 53:6 54:10
chase 48:21
Chevrolet 56:12
Chevrolets 46:8
Chevy 17:5
choose 7:8
Chris 1:9 6:19 27:21 36:3 63:8
Christopher 1:15 3:10 3:18 5:6,13 63:1
chromatography 58:17
cigarette 20:2
cigars 34:2
circuit 7:4
citation 46:3
citizen 62:1
citizens 62:3
Civil 1:8 3:19

clarify 27:15 28:18 29:15 48:19
clear 17:7
clerk 47:9
close 22:7 26:8 28:3 55:19 58:23
closer 26:16
closest 27:22 28:1
clothes 60:21
cocaine 14:14 60:1,4
collectively 8:17
college 9:22,23 10:3,19
color 21:10,13 54:8
combative 33:8,9 37:14 37:15 50:4
come 7:20 30:6,7 31:12 34:9
comes 25:11 35:1
coming 19:1,6 21:1 23:3 34:10,18
commander 6:10
commencing 1:21
commission 3:23 8:3
Commissioner 1:18 3:22 62:21 64:7
community 7:1 16:10 16:16,18 18:16,17
complainant 47:18 53:18
complained 62:3
complaint 3:8 51:2
complaints 62:1
complete 43:10
completed 52:20
comply 32:16,18 33:10 34:15
computer-printed 63:17
concluded 62:7
condemnation 13:16
condemned 13:19
confiscated 13:14 36:7
conflicts 9:7
confusion 6:12
connection 60:8
consider 15:2 20:11
considered 15:11
consistent 9:11
contact 15:16 38:9
contain 63:18
contained 59:23 60:4
containing 40:22
context 47:8
continued 21:17
continues 7:20 24:11
continuing 1:14 61:5
controlled 44:22 45:3,5 45:12 47:12
cool 34:22

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 2

copy 43:5 54:20,23 55:11
correct 7:22 18:13,14 20:20 21:2 23:4,9 29:15,20 30:3,12,17 30:23 41:22 45:13 46:5,6,16 47:13 51:16 54:13,23 55:5 55:7 56:16 57:2 58:2 58:5,7 60:19,20,22 63:18
counsel 3:17 4:8 63:19 63:23
county 5:15,17,20 6:3 7:10,21,23 8:3,5 9:1 16:13 19:2,8,12 23:10,18,23 24:12 30:9,10 37:2 48:4 50:14 56:11 59:15 61:21 62:18
couple 25:3 61:6
course 11:9 55:6
courses 11:15
Court 1:2,17 3:21 5:1 62:21 63:12 64:7
Courtesy 3:6
cousin 40:2
cover 8:1 22:5
Crack 14:14
criminal 10:23
currently 7:9 9:21
cursing 31:3 32:3 50:4
cussing 22:10 24:16 26:3 32:14 33:8
custody 42:19 43:9,14

**D**

Daryl 2:9 61:1
dash 20:3 22:14 57:3
date 11:23 53:8 55:22 64:6
day 12:3,7,12 13:12,23 38:20 60:10 64:2
days 38:14
day-to-day 8:21
dealing 36:7
decision 8:18
Defendants 1:11 2:8 63:11
defendant's 54:7
defensive 22:11 25:17
degree 10:8
demeanor 50:8
department 5:15,17,20 6:22,23 7:11 8:10 61:10
depends 49:7
DEPONENT 62:12
Deposit 9:17

deposition 1:15 3:7,18 3:20 4:4,9,16 39:2 47:6,7,11 62:7,23
deputies 6:6
deputy 5:21,22 37:7,8
deputy's 39:17
described 50:7
detained 50:13
Detention 50:15
determination 41:21
determine 41:12
direction 19:1 23:21 24:11 30:7
directly 22:17
directors 8:13,14
dirt 14:22,23 15:2
discharge 61:8
discharging 59:19
discovered 9:7
discuss 14:18
discussed 12:18
discussing 13:22
disposition 53:19
distance 26:11
district 1:2,3 7:3,12 63:12,13
DIVISION 1:4 63:14
document 50:23 51:11
doing 12:3 17:23 24:17 35:5 61:17
dollar 53:12
done 42:18
door 16:4,5 32:12,13 33:2
doors 25:22 26:1
dope 14:2
down 16:15,18 19:2 22:1 24:22 29:19 32:6,7 34:4 37:12 43:7,14 51:7 53:10 58:23
drawn 25:23 30:21 59:7
dressed 60:10
drive 1:20 2:10 9:17,18 15:12
driver 56:18 57:4,6,8,9 57:11
driver's 27:13 28:1,4 28:13 33:17
driveway 15:3
driving 11:19 12:22,23 13:1,3,9,12 17:2 20:7 21:4,17 26:16,17
drove 14:17 39:21,22 40:3,12
drug 6:10,11,16,20 7:7 7:13,16 8:2,5,13 9:9 15:23 41:10 47:22

49:18,21 58:1,5,8 60:18
drugs 14:3,13 17:10 57:1
DTF 47:21 49:3
ducked 25:9
duly 5:7 63:2
during 61:20
duties 8:21

**E**

Each 7:5
earlier 26:6 48:2 50:7 57:7
Economic 6:23
educational 9:20
eight 32:20
either 4:5,11 52:1
Eley 1:19 2:9
elude 46:4 47:21 49:3
embankment 25:16 34:21
employed 5:14,16 6:2
empty 59:22
encountering 19:9
end 39:13 60:12
enforcement 6:4 7:2 11:18 15:16
enough 24:4 41:12 57:23
entire 12:3
entity 6:13
equipment 58:14
equipped 46:9
establish 8:18
established 8:16
estimate 26:11
even 15:10 21:8 22:13 25:13 26:16 32:23 46:9,12
eventually 34:17
ever 18:20 58:21 59:6 61:20
everybody 11:23
everything 50:6,16
evidence 3:5 4:4 24:9 40:5 42:12 43:2 45:10 47:23 49:18,20 49:21 58:1,5
exact 16:12
exactly 12:11 13:11 16:20,21 18:19 40:20 59:20
examination 3:1 5:10 43:13 44:5,14 63:19
exceeding 20:16 48:15
excessive 20:11,13
Excuse 27:17
executed 45:18 48:13

52:8
exhibit 42:4,5,8 45:21 46:1,22 47:2 50:19 50:22 51:17,20 52:14 52:22 55:10,13
exhibits 3:4 52:18
exit 59:2
Expiration 64:6
eyes 26:4

**F**

face 26:15,19 33:1
Facility 50:15
facing 30:6
fact 18:9 28:10 45:11
failed 44:21 49:5
Fair 57:23
familiar 18:21 29:3
far 44:19 46:12,14
fast 20:8 21:23 48:9,11
FBI 11:7
February 64:2
federal 3:19 7:18
feet 26:12 27:8 32:20
fender 29:18,18
few 38:14 50:11
field 58:11,14
fight 37:19
file 52:6 55:4
filing 4:9,13
fill 52:3 53:20 61:7
filled 47:15
final 10:12 43:21 58:6
find 45:3,5
finding 45:8
findings 44:13
fine 28:17 39:22 61:2
fingerprint 41:5,6,7,9 43:12 45:7
fingerprints 41:8
firearm 59:19
fired 32:18 59:13
first 5:7 20:9 51:5,14 53:20
Fitzgerald 44:3
five 26:12 27:8 60:23
flashed 21:7
flashes 21:1
flashing 26:23
flask 33:23
flies 24:7
floorboard 33:20
follow 8:7
following 22:23 43:1,4 46:20 61:8
follows 5:9
force 6:10,11,16,20,20 7:7,13,16 8:2,6,11,14 9:9 59:16,18 60:18

61:7
forced 49:23
foregoing 63:17
forensic 42:17,23
forensics 41:1,3,10,20 42:1
form 3:10 4:2 6:17 8:13 27:2,18 42:12,14 43:2,6 46:15 47:15 49:6,17 52:10 60:5 61:8
formality 3:23
Forms 3:5
Fort 9:17
found 45:9
four 26:12 27:8
fourth 44:16
four-year 10:8
frame 17:21 18:7
from 7:20 10:9,15 14:8 18:17 19:1,7 22:7,14 23:22 30:7,10 32:20 33:1 34:13 35:13,15 35:16 36:23 40:11 41:9,23 42:16,22 44:3,13 46:19 49:23
front 15:5 25:19 29:17 52:7
fuck 22:18 24:16 31:6
fucking 31:6
full 43:13
funded 6:21
funding 7:9
further 4:7,14 26:14 62:12 63:22

**G**

gain 57:4
gas 58:17
gave 61:13
gets 36:12
getting 10:18
GILLILAND 2:12
gist 35:3
give 39:12
given 52:19
go 6:18 9:3 16:15,18 19:2 24:11 26:6 28:9 31:12 36:17 42:15 44:11,15 52:22 55:16
going 16:14 18:3 20:8 22:20 23:5,22 24:23 25:2 30:9 31:8 35:4 36:11 39:16 48:1,9 48:12 55:10,20 57:12
gold 22:5 26:21
gone 31:16 51:23
good 22:3,3
gotten 18:8

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008

grabbed 33:4,5,6
graduate 10:15
graduated 9:21
grant 7:1,14 8:1
grass 25:14 30:11
ground 26:2 32:15,17
    32:17,19,21 33:6,15
    34:6 35:5 59:2,13
group 8:12
guess 15:7 32:19 44:13
    49:7,9 50:10 54:17
guidelines 8:16,19 9:8
gun 33:22
guy 34:20 44:2

—————————————
H
Halcyon 1:19 2:10
hand 22:15
handcuffed 33:16
handcuffs 33:11,11,13
handed 52:14
happened 19:14 23:15
    32:8,10,23 38:1
    55:22 56:4
Harding 37:7,8 39:23
harm 25:12
harness 46:18
harnesses 46:9,12
having 5:7
Hayneville 7:11 19:6
    23:23
headed 30:10
Heading 23:13
headlights 21:7
hear 27:20 32:3
height 54:7
held 38:18
help 6:11
her 54:14,16,18
hereto 4:12,15
Herzing 10:1,3,3,4,11
    10:19
hey 24:13
HIGGINS 2:12
high 9:21 10:15 48:21
    48:23
highly 50:3,5
highway 14:22 23:2,6,8
    23:10,13,16,18,19
    29:1 48:3
hill 15:4
him 12:19,21 14:19
    15:18,18 21:19 22:23
    23:3 24:12,23 25:5
    26:1,8,18 27:10
    31:13,18,19 32:15,20
    33:3,3,4,4,5,6,6,12
    33:14,15,16 34:3,4,6
    34:6,9,12,13,16,17

34:21 35:4,6,8,13,15
    35:17 37:10,19,19
    38:3,9,11,14,20,21
    39:10,12 40:13 46:20
    51:15 56:23 57:14,19
himself 22:11
hit 23:15 31:9 59:8
hits 24:3,6
HITSON 2:12
hold 5:22 24:20 25:1
holding 22:12
holds 22:2,6,8
HOLTSFORD 2:12
home 15:5 16:15
Homeland 10:14
hook 12:12
Hooks 40:11,12
horn 21:7,16
Hostile 37:16
hot 60:13
hour 20:13
house 15:7 16:2
Howard 2:12 11:11
    40:11,12
humiliation 34:14
hundred 15:8
hurt 25:13
Hutson 1:10 2:17 12:13
    16:8,20 18:21 22:2
    22:12 30:20 33:12
    34:20 39:1,21 56:11
    57:8 63:9

—————————————
I
idea 46:8
identification 42:6
    45:22 46:23 50:20
    51:18 55:14
illegal 14:3
important 56:20
incident 12:1 53:7 56:4
incident/offense 3:9
    51:22 53:1
include 8:19
including 7:3
independent 57:18
INDEX 3:1
indicate 14:12 18:10
    43:7,8 58:5
indicated 30:19
indicates 56:4
individual 1:9,10 8:11
    63:8,10
individuals 50:13
informant 18:2
information 3:9 14:1
    14:5,8,12,15,19
    15:19,22,23 16:8,17
    17:9,16,18 18:11

53:13,14 54:8
instead 30:9
instructed 59:1
interdiction 29:9
interested 64:1
intervention 29:8
interview 38:14 39:7
    39:14
interviewed 17:12
introduced 4:10
investigated 62:2
involved 8:22
issue 47:9
issues 7:9
items 53:9,12

—————————————
J
jail 6:5 35:20,22 36:11
    40:14 54:5
January 1:20 63:16
Jay 2:4,4 28:7
job 6:7 10:21
judge 18:12
judgment 48:11
Judicial 6:16
jumped 30:19,20
June 11:21 55:21 60:12
    60:12
jurisdiction 36:23
just 11:3,6 12:20 14:18
    14:22 17:7,12 18:2,3
    19:3 21:16 22:22
    24:6,14,15 25:9 26:3
    26:3,6,20,23 27:4
    30:16 32:1 33:8,9
    34:16 36:3 37:15
    39:9 41:12,15 43:5
    43:19 48:19 49:2
    52:14 53:5 55:16
    61:5,14
justice 6:22 8:10 10:23

—————————————
K
keep 21:17
keeps 22:20
kept 20:7 21:3
kin 63:23
kind 15:4,8 16:11 17:1
    21:12 24:6 25:9
knew 18:2 49:15
knocked 16:4
knock-and-talk 14:18
    18:1,5
know 15:1,10,13 17:1
    17:14 18:19,23 22:18
    22:19,20,21 24:5,13
    24:15,16,18,21 25:1
    25:4,6,10 32:9 33:5
    33:22 38:8,11 46:13

46:14 49:7 54:14

—————————————
L
L 2:9
labeled 41:6
language 31:5
Large 1:18 3:22 62:22
    64:8
Lashun 1:10 2:17 63:9
last 38:7 44:11 45:6
    51:19 55:19
latent 43:3 45:9
later 38:14 40:19
law 1:19 2:4,5,10,13
    6:4 7:2 11:18 15:16
lead 49:10
leak 40:9
leather 22:5
leave 36:10 37:21
leaving 16:13
led 16:18
left 12:9 16:7 19:8,10
    28:20 33:1,15 39:20
    legal 6:13
less 15:8 24:1 40:10
let 9:13 11:21 36:17
    42:3 45:23 47:1
    50:21 60:23
let's 26:6 42:15 44:11
    44:15 52:22 55:16
Lewis 2:4,4 3:2 5:4,11
    11:12,14 28:9,17
    60:23 61:5 62:4
lieutenant 6:1,8
light 19:23 20:4,9,19
    20:21 21:1 22:14,15
    24:15 25:8 26:20
    57:3
lighter 20:2
like 11:5 15:3,3 21:14
    21:21 24:6,14,22
    25:20,21 26:14,20,21
    31:13 32:9 33:23
    34:18 39:9,15 49:12
likely 17:2
limit 20:17 48:15
Lincoln 13:4,9,12,13
    13:17 21:10 39:23
liquor 33:23
list 53:9,11
listen 27:4
lists 53:5
little 9:13 14:22 15:9
    23:17,17 25:10 26:6
    48:2,6
lives 19:3
living 15:6
loaded 33:22
located 59:22

location 12:20
long 5:16 11:9 38:18
    39:14
longer 11:16
look 21:14 49:8 52:13
looked 33:16 57:11
looking 10:8 16:22
    22:17 24:22 25:7
    26:18,19 40:5 47:17
lookout 17:4
looks 24:6 44:8
loose 33:21
Lowndes 5:15,17,19
    6:2 7:10,21,23 8:3,5
    9:1 37:2 50:14 56:11
    59:15 61:21

—————————————
M
made 4:2 6:21 17:12
    31:15 52:4
Magnum 33:18
mailing 9:15
maintain 55:3
major 10:13
make 7:15 8:17 14:7
    25:5 41:21 58:21
    59:6
makes 51:11
making 24:7 52:4 53:5
maneuver 29:7 45:19
    48:13
manner 4:11 34:23
    64:1
manual 8:7
many 6:2
marijuana 14:14
Marilyn 54:12
mark 42:3
marked 34:23 35:1
    36:18,21,23 37:3
    39:23 42:5,7 45:21
    45:23 46:22 47:1
    50:19,21 51:17 55:13
marker 58:2
Marshall 1:6 12:1,18
    13:22 14:2 15:13,17
    15:20 16:22 17:1,9
    19:9,20 20:5,18 21:3
    21:16 22:9 30:22
    31:1 32:11 37:10,12
    37:22 38:13 39:8,16
    39:19 40:1 45:11
    48:3,12 51:12 52:5,9
    52:20 58:19,20 59:1
    63:5
Marshall's 14:17,21
    16:14 18:17 19:7,15
    28:13 29:13 32:5

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 4

| | | | | |
|---|---|---|---|---|
| 39:21 40:2 45:17 56:12 | neither 56:18 63:22 | 44:7,11 45:11 46:11 47:17 48:23 49:14 | participate 7:8 | policy 59:16,18 |
| Masters 2:9 5:3 6:17 27:2,17 28:2,6,14 36:3 46:15 49:6,17 60:5 61:2 | Never 15:18,18 25:12 59:8,11 | 50:12,21 51:3,19,23 52:13,15 54:20 55:16 55:18 58:11 59:3,8 | participating 7:13 | position 5:19 6:9 10:21 20:18 25:17,18,20 |
| | new 8:15 | | particular 5:22 6:7,8 | positive 23:14 56:9 |
| | next 26:7 27:12 28:12 28:19 29:17,18 32:8 38:13 42:21 43:18 | | parties 3:17 4:8,15 63:20,23 | possession 45:12,18 47:12 |
| matter 63:4 | | 59:21 60:3,18 | party 4:5,11 | possibly 35:22 |
| may 3:20 4:3,4,10 12:16,17,19 14:9 28:7,14 35:12,14 40:4 46:11 | NIX 2:12 | older 17:5,5,5 21:22 | passenger 31:19,21 32:3 33:13 38:1 50:12 56:19 | Post-it 17:13 |
| | nobody 37:18 | Once 41:9 | | power 20:1 |
| | normal 36:6 55:6 | one 16:5 17:15 21:8 22:13,15 44:4 56:5 59:23 60:3 61:11,12 61:23 | | powered 19:23 |
| | normally 36:9 55:3 | | passenger's 27:12 28:3 28:12 | practices 6:14 |
| maybe 15:7 18:1 24:1 26:14 40:10,20 | Norman 9:17,18 | | | precision 29:8,9 |
| | north 56:11 | only 39:4 | passing 28:21 | presence 44:22 |
| McDonough 2:5 | NORTHERN 1:4 63:14 | onto 23:2,19 48:3 49:23 | past 15:7 | present 2:16 17:17 |
| Mealing 54:12 | | open 32:12 | pat 34:4 | preserve 42:18 |
| mean 6:4 18:6 19:3 22:7,17 23:10 25:7 26:15 27:11 31:10 43:21 49:7 50:10 52:6 | nose 25:19 | opened 25:22 | path 49:11 | preserved 14:10 |
| | note 17:12 31:15 | operate 60:21 | patrol 37:19,21 39:17 | pretty 9:11 22:3,3 29:22 35:3 44:8 60:12 |
| | notes 14:7,10 24:8 | operates 60:18 | patted 35:8,8 | |
| | nothing 5:8 26:17 31:23 34:16 58:4 63:3 | operations 8:20 | people 6:2,4 | |
| | | opposed 6:5 | per 20:12 | previous 27:3,18 43:10 43:12 |
| meant 49:5 59:14 | | opposite 28:7,16 30:13 50:1 | perform 8:20 45:1 | |
| meet 8:15 23:3 | Nova 17:5 40:3,14 56:12 | | performed 29:12 | prints 43:3 45:9 |
| members 8:17 | | order 42:18 | period 61:21 | prior 15:13,17,19,20 19:9 45:18 |
| mental 24:8 | Number 42:4,8 46:1 47:2 50:22 51:20 52:23 55:11 63:15 | ordinary 20:14,16 | periodically 8:15 | |
| mentioned 55:8 57:7 | | original 43:19 | permit 45:15 47:13 | private 10:7 15:12 |
| met 15:18 19:15 56:12 | | other 4:1,5,11 10:18 11:15 22:16 34:20 35:22 43:15 49:10 52:11 | personal 9:13 | Probable 47:9 56:22 |
| middle 1:3 33:18 60:12 63:13 | numerous 11:6 | | personnel 6:14 | probably 22:7 60:13,17 |
| | | | perspective 46:19 | procedure 3:19 29:16 36:7 |
| might 12:21 33:20 | **O** | | Phil 37:7,8 39:23 40:6 40:11 | |
| mile 40:10,11 58:2 | Object 6:17 27:2,17 46:15 49:6,17 60:5 | out 9:5 12:4 14:17 18:4 24:2,9 26:2 30:19,20 30:22 31:9,11,12 32:11,20 33:11,13 35:1 38:3 40:6 47:15 47:23 49:18,21 52:3 53:6,20 55:9 57:11 58:1 61:7 63:20 | | procedures 8:7,9 |
| miles 20:12 58:19 | | | phone 17:14 | proceeding 13:17 |
| minutes 39:15 61:1 | objections 4:1,1 | | photos 35:2 | projects 12:6 |
| mirror 25:7 | observed 19:21 56:18 | | Physical 9:15,16 | promulgated 8:10 |
| mistaken 28:8,14 | obtain 18:6 | | pick 36:11 | property 36:8 |
| mobile 15:5 | obtained 17:22 | | picked 12:19,21 | prosecutor 32:9 |
| model 13:5 | obviously 50:5 | | pieces 51:23 | provided 4:6,12 |
| money 35:13,15,16,22 | occasion 17:15 29:23 | | pistol 45:15,17 47:13 | public 10:14 |
| Montgomery 1:20 2:6 2:11,14 62:18 | occurred 12:2 | over 22:9,16,20 24:13 24:15,18 25:5 28:18 34:21 40:7,8,15 57:13 | PIT 29:3,5,6 45:19 48:13 | pull 22:9,16,21,22 24:12,13,15 25:5 28:18 29:17 57:12 |
| | occurrence 53:7 54:9 | | | |
| more 15:2,3,9 17:15 32:16 50:11 61:6 | off 14:22 19:4 21:1 22:21 24:7,19 30:2 30:16 31:16 34:9 41:8 | | place 7:6 16:9 44:5 53:7 54:9 | pulled 21:8,19,21,23 26:7 27:10 28:20,21 40:7,8,15 57:5 |
| morning 12:5,18 | | own 6:14,15 9:2 | placed 20:2 33:13 57:3 | |
| Most 7:8 | | o'clock 56:5 | plain 60:21 | pulling 22:19 24:17 |
| move 58:21 59:6 | offender 47:21 49:23 50:2 53:15 | | Plaintiff 1:7 2:3 63:6 | purpose 4:5 53:4 |
| movement 24:23 | | **P** | Plaintiff's 3:4 42:4,5,8 45:21 46:1,22 47:2 50:19,22 51:17,20 52:22 55:10,13 | pursuant 1:16 3:18 |
| moving 24:20 31:13 | offered 4:4 | pack 34:1,2 | | Pursued 58:19 |
| much 9:11 21:14 29:22 35:3 44:8 | office 6:3 7:3,10,12,21 7:23 8:4 9:1 12:4,10 12:17 13:19 59:15 61:22 | page 42:13,15,21 43:1 43:4,9,10,12,19,21 44:4,11,16 45:6 47:17 51:5,7,14,15 52:13 53:14 54:1,3 59:1,21 | | pushed 25:10 34:17 |
| | | | plastic 24:4,5 | put 33:6,11 37:10 56:20 |
| myself 53:5 | | | please 5:12 42:11 46:2 51:1,21 | puts 9:5 |
| | | | plug 20:1 | P.C 2:9 |
| **N** | officer 7:6 53:18 54:10 | | pockets 35:8,10 36:10 | p.m 56:1 |
| nail 40:8 | Offices 1:19 2:4 | pages 53:21 63:17 | point 12:12,15 21:8 22:13 23:1 32:22 49:19 | |
| name 5:12 14:23 15:11 38:7 54:7 | Oh 43:17,23 | paper 41:4 52:1 | | **Q** |
| narrative 53:16 | okay 7:15 8:19 9:18 11:7 12:6,9,12 18:9 18:22 19:19 27:6 28:23 30:18 31:4 35:21 36:1,5 39:6 42:15 43:17,23 44:1 | paperwork 39:1 52:3,8 52:19 | Pointe 1:19 2:10 | question 4:2 27:3,7,19 27:21 36:4 57:14 |
| narrow 15:9 | | part 7:14 16:12 | pointed 33:2,2 | questions 4:1 27:4,5 61:6 |
| nature 22:19 29:21 31:7 | | partial 34:2 | police 7:11 21:14 | |
| need 4:2 8:16 61:3 | | | policies 6:15 8:6,9 9:8 | |

Deposition of Christopher West                    Marshall vs. West; Hutson                    January 21, 2008

quote 41:2

**R**

rank 5:22
rate 20:12,13,14,14,16
read 39:5
reading 63:20
real 34:7
really 12:16 15:1 31:23
    48:8 56:23
rear 29:18
reason 39:4
recall 12:22 13:1 14:23
    17:8 20:10 36:13
    37:3,20 38:6,18,23
    50:7,16 60:14
receipt 42:16
received 14:1,20 15:19
    15:22 17:8,14,16
    41:9,23 43:15 44:3
receives 8:1
recess 11:13 61:4
recognize 42:9 46:2
    47:3
recollection 31:4 57:18
    58:3
recover 41:8
recovered 53:10,12
    59:22
red 26:4
reference 15:23
referred 16:10 18:4
    29:6
regard 20:12 46:7
regardless 4:12
regards 10:20
regulations 9:2
relating 47:11
reliable 17:19,21 18:2
    18:5,6
remember 12:8,9,16,20
    13:7,8,11 14:6 24:8
    33:5 35:12 38:8
    40:17,19,20 45:15
    48:16,19 49:2 57:21
    60:11
remove 35:11,13
removed 22:14 35:15
    35:16
report 3:9 41:23 45:6
    51:22 52:12,16,17
    53:1,6 54:4,21 55:1
    61:7
reported 62:22
Reporter 1:17 3:21 5:1
    62:21 64:7
REPORTER'S 62:15
represent 11:22
representing 3:17 4:8

reprimanded 61:17,20
request 43:13
reserved 4:3
residence 14:3,4,17,21
    16:7,14 17:23 18:18
    19:7 23:22 49:15
residue 40:22 41:13,17
    41:18 44:21 58:9,12
resistant 33:7
resisting 34:3
responding 58:20
response 20:5 23:14
    56:9
responsibility 6:9
rest 25:14,15 30:2,6
    50:2
result 44:19
results 41:15 64:1
retain 54:20
retrieve 40:16,21
retrieved 40:19
returned 43:16,16
reveal 44:22
RICHARD 1:6 63:5
Rick 2:12
right 15:5,5,13 18:15
    19:5,13,16 21:3,5,17
    23:12 24:14 26:11
    28:5,19,23 33:17
    34:4 38:8 44:4,6,15
    51:13 52:11,17,22
    53:2 55:8 56:7
road 2:14 14:22,23
    15:2 19:2,8,12 23:11
    23:18 25:12 26:18
    30:2,13,16 31:16
    40:5,16 56:11
roads 49:10
roadway 49:23 50:1
rode 38:2
round 22:4
rounds 33:19,20,21
rules 3:19 8:15 9:2
ruling 4:3
run 21:23 59:11

**S**

Sadler 1:17 3:20 62:20
    64:5
safety 10:14
SAITH 62:12
salary 7:20
same 4:13 15:23 16:12
    43:5 47:22 49:4
    61:16 63:21
sat 26:3 32:1
save 34:13
saw 31:10,12 38:13
saying 22:16 31:2

    34:22 44:2
says 22:9,18 24:20 25:1
    39:11 47:18,21 49:18
    51:8 57:6,11,16,23
    59:21
scene 23:1 30:18 37:9
school 9:21 10:6,7,15
sciences 42:17,23
screamed 57:12
search 17:22 18:8,10
    35:5,6
seat 24:21,23 33:17,21
    34:1,12,18 37:11
    56:19
seatbelt 19:20,22 46:5
    46:7,17 50:3
second 11:11 47:17
    51:7,14 54:1 55:17
    59:21
security 10:14
see 26:15 31:13 32:23
    34:3 35:8 41:17 46:1
    46:19 47:2 54:6 59:4
seeking 41:5
seem 18:10 43:8
seems 43:13,19
seen 15:18 24:4 45:17
    54:18 61:15
sees 25:6,8,8 26:19
selling 14:2,3,13 17:10
seminars 11:4
sense 17:17 39:14
    48:17,20
sent 41:1,2,10
separate 8:6
service 59:13
set 9:2 30:18 63:20
setting 23:1
seven 32:20
several 6:21 7:2 32:15
    32:16 51:23
Shannon 44:2
sheriff 5:21,23 9:6 51:8
    61:13
sheriff's 5:15,17,20 6:3
    7:10,21,23 8:4 9:1,8
    59:15 61:21
shirts 60:15
shocked 32:22
shorts 34:7,8
short-sleeve 60:15
shoulder 46:9,11,18
show 42:3 43:13 45:23
    47:1 50:21 55:10
    57:9,14
showed 57:5,6,8
showing 42:7 57:19
shows 43:15
Shun 24:19 25:1 26:16

    40:3,14
Shun's 27:23
side 24:7 25:12 27:12
    27:13,21,23 28:1,3,4
    28:12,13 30:13 40:15
    50:1
signature 4:16 47:19
    47:20 51:3,9 53:17
    53:23 54:16,18
signatures 39:5 43:18
signed 38:21 60:1
signing 63:20
simply 45:3 49:5,14
    50:23 51:11
simultaneously 29:19
since 10:17 48:18
sir 6:10 7:17,19 8:8,23
    9:10,12 10:5,10,22
    11:1,8,17,20 12:11
    12:14 13:2,8,15,18
    13:21 14:11 15:15,21
    16:23 17:3,11 19:11
    20:22 21:18 27:9,14
    29:2,4,11,14 30:1,4,8
    30:14 31:17,20 32:2
    32:4 35:18,23 36:15
    36:20,22 37:5,13,15
    37:17,20,23 38:5,10
    38:12,17,22 41:19
    42:2,10,20 45:2,20
    46:10,21 47:4,14
    48:5,7,10,22 49:13
    49:16,22 50:18 51:4
    51:6,10 52:21 53:22
    54:2,15 55:15,23
    56:3,13 58:13,16,18
    59:12,17 60:2,6,9
    61:19
sits 34:21
situation 26:5
six 11:15 32:20
size 22:4
slow 20:14 29:19
small 17:13
some 6:12 7:7 8:11
    12:12 16:8 17:13
    23:1 32:19 33:20,21
    34:13 35:2 60:19
someone 17:11
something 22:18 24:2
    25:2 26:14 29:21
    34:2 39:15 52:2
sometime 56:5
sorry 27:6
sort 10:6,23 14:12
    18:11
sound 32:9
source 17:20,21
south 2:5 23:6

speak 5:8 15:10 63:2
specific 31:5
sped 48:6
speed 20:13,14,15,17
    48:15,21,23
speeds 23:17
sprung 40:9
standing 32:12,13
    34:14
state 1:18 3:22 57:10
    62:17,21 64:7
statement 3:10 39:11
    39:12 52:10 55:9,12
    56:2 57:16 60:7
    61:13,14,16
STATES 1:2 63:12
Statute 4:6,12
Stewart 5:13
still 25:5 33:2 37:14,15
    39:22 58:10,20 61:11
stipulated 3:16 4:7,14
stipulation 1:16
stipulations 3:15 5:2
stop 49:5 56:22
stopped 27:16 40:4
store 40:11,12
Street 2:5
strobe 26:23
strobes 20:23
stuff 11:5 34:3 36:11
submission 42:12,14,16
    43:2,20
Submission/Analysis
    3:5
substance 45:4,5,12
    47:12
substances 44:23
sufficient 41:17,20
Suite 2:13
supposed 14:13
sure 11:12 16:21 18:19
    48:14 59:20 60:3
    62:3
suspect 53:15
sweating 26:4
Sweet 34:1
swerves 25:11
Swisher 34:1
sworn 5:7 63:2

**T**

tactical 8:20
take 11:11 19:7 35:2
    61:2
taken 1:15 3:18,20
    11:13 18:12 19:10
    39:19 61:4
talk 56:23
talked 39:9

Deposition of Christopher West                    Marshall vs. West; Hutson                    January 21, 2008

Page 6

| | | | | |
|---|---|---|---|---|
| talking 39:10 | 59:6 | vehicles 16:6 | whole 5:8 63:3 | 28th 11:21 55:21 |
| task 6:10,11,16,20,20 | Town 13:6,9 21:10 | very 22:10,11 33:7,9 | wider 23:18 | 294 64:6 |
| 7:7,13,16 8:2,6,11,14 | Tracye 1:16 3:20 62:20 | 48:9 50:4 | Wilcox 23:23 24:12 | |
| 9:9 60:18 | 64:5 | violation 46:7 | 30:9,10 48:4 | _____ |
| technique 29:9,10 | traffic 34:18 | violent 58:21 59:6 | window 24:2,10 32:5 | 3 |
| tell 5:12 6:15 11:2 | trail 15:9 | violently 58:20 | 47:23 49:19 57:11 | 3 3:7 46:22 47:2 |
| 21:19 24:19 25:1 | training 10:17 11:15 | vs 1:8 63:7 | 58:1 | 30 39:15 |
| 31:10 32:14 39:7 | trans 36:16 | | windows 22:1 | 300 2:13 |
| 41:2 44:20 50:23 | transcript 63:18 | _____ | windshield 24:3 | 357 33:18,19 |
| 51:20 52:2 53:3 54:3 | transportation 50:17 | W | witness 4:15,16 5:7 | 36106 2:14 |
| Ten 11:10 | transported 39:17 | waived 4:10,17 63:21 | 27:6,23 28:5 36:5 | 36117 2:11 |
| testified 5:9 | 50:14 | waiving 4:13 | 63:19 | |
| tests 58:11,15 | transports 35:2 | wallet 35:11 | witnesses 53:16 | _____ |
| Thank 62:5 | traveling 56:10 | want 11:4 39:11 | woods 49:11 | 4 |
| their 50:16 | trial 4:10 | wanted 56:23 | words 43:15 50:11 | 4 3:8 50:19,22 |
| thereof 64:1 | trouble 38:3 | wanting 33:9 | work 6:5 12:5 | 4001 2:14 |
| thing 10:23 32:8 51:19 | true 49:4 54:23 63:18 | warning 3:6 19:23 46:3 | working 12:6 20:21 | 42 3:5 |
| 55:20 | truth 5:8,8,9 63:2,2,3 | warrant 3:8 17:22 18:8 | wrist 25:18 | 46 3:6 |
| things 31:7 | try 24:8 | 18:10 38:21 47:10 | wrong 29:16 | 47 3:7 |
| think 5:18 6:6 16:9,9 | trying 34:5,11,13 48:19 | 51:2,15 | wrote 55:9 56:2 60:7 | |
| 18:20 22:2 25:13 | turn 8:1 23:5,19,21 | wasn't 15:1 20:16 | | _____ |
| 28:6 30:18 33:12 | 29:19,20 35:16 49:10 | 57:12 | _____ | 5 |
| 34:1,5,20 39:3,3,21 | turned 15:9 19:17 23:2 | way 8:20 18:15 31:10 | Y | 5 3:2,9 51:17,20 52:23 |
| 40:4,6,7,18 45:16 | 35:19,21 48:3 49:14 | 44:8,10 61:17 | yards 15:8 24:1 | 50 24:1 |
| 48:23 50:10 51:19 | 56:14 | weapon 32:19 33:2,3 | yeah 11:6 23:7 26:10 | 51 3:8 |
| 55:19 61:16 | two 53:20 57:20 | 59:13 61:9 | 28:21 44:16,18 50:9 | 52 3:9 |
| thinking 25:4 | two-day 11:4 | weapons 25:23 30:21 | 50:10 52:7,7 | 55 3:10 |
| third 44:15,16 52:13 | two-lane 28:23 | 35:9 36:2,9 59:7 | year 7:5 10:11,12 13:7 | |
| 54:3 | two-page 50:23 | wearing 50:3 56:19 | years 5:18 24:5 57:20 | _____ |
| though 21:14 | type 17:6 21:12 | 60:14,15 | 57:20 | 6 |
| thought 28:15 58:8 | | Webb 1:19 2:9 | yelled 30:21 | 6 3:10 55:11,13 |
| three 7:15 43:18 57:20 | _____ | weeks 11:10,16 | yelling 22:10 24:16 | 6th 64:2 |
| three-county 7:4 | U | weight 54:8 | 25:6 32:14 | 6-28-05 3:10 |
| threw 31:8 49:21 57:23 | Uh-huh 23:14 56:9 | well 19:16 20:11 28:9 | y'all 22:18 31:6,6 | 62 63:17 |
| through 6:22 7:1 49:11 | undercover 60:19 | 36:6 46:11 57:9,15 | | |
| 51:23 55:16 | underneath 53:11 | went 12:5 15:4,7 18:4 | _____ | _____ |
| throwing 47:22 49:18 | understand 6:11 27:1 | 38:14 40:13,18 | 1 | 7 |
| thrown 40:6 | understood 39:13 | were 12:6 13:1,3,9,11 | 1 3:5 42:4,5,8,13 | 7 19:2,8,12 23:2,6,10 |
| throws 24:2 | underwear 34:11 | 13:22 16:13,14,22 | 10 6:6 | 23:11 56:11 |
| time 4:3,3 15:6,14,17 | uniform 3:9 52:23 54:4 | 17:4 19:1,2,12 20:8 | 10:35 62:8 | 7:32 56:1 |
| 15:20 17:21 18:7,12 | 54:21 | 20:23 21:11 26:4,8,8 | 102 58:2 | 7475 1:19 2:10 |
| 18:14 19:12 20:8,21 | unit 35:1,1 36:19,21 | 35:5 40:10 41:5,15 | 11 5:18 | 75 24:1 |
| 31:2 37:12 38:13,15 | 37:1,4 40:1 | 45:1,9 46:9,12 48:17 | 12 5:18 6:6 | |
| 39:16 40:18 45:18 | UNITED 1:2 63:12 | 48:20 50:13 56:10,19 | 12-volt 20:1 | _____ |
| 47:22 48:12 49:4 | use 50:11,11 59:15,18 | 60:10,13,13 61:17 | 1971 46:8,13 | 8 |
| 53:8 56:1,1 58:8 | 61:7 | 62:2 | 1986 10:18 | 847 2:5 |
| 59:23 60:3,16 61:3 | used 4:5,11 47:7 | weren't 41:7,11 48:15 | | 86 10:16 |
| 61:10,23 | using 31:5 | West 1:9,15 3:11,18 | _____ | |
| times 25:4 32:15,16 | Usual 5:1 | 5:6,13,14 63:1,8 | 2 | _____ |
| tire 40:8,10,13 | | West's 28:11 | 2 3:6 42:15 45:21 46:1 | 9 |
| today 12:2 17:8 48:18 | _____ | we'll 28:9 | 2nd 6:16 | 9-30-2008 64:6 |
| 48:20 55:20 | V | we're 6:21 12:2 17:23 | 2.4 58:19 | 9:10 1:21 |
| together 12:17 39:20 | value 45:9 | 22:7 43:9 55:20 | 2:06-cv-701-ID.CSC | |
| told 39:12 50:5,15 | vehicle 13:13 16:7 17:6 | 59:10 | 1:8 63:15 | |
| top 47:18 54:7 | 19:15,16,18 20:3,4 | we've 19:22 22:14 | 20 39:15 | |
| torn 59:23 | 21:9,21 22:1,22 25:3 | 30:18 42:7 51:23 | 2005 11:22 55:21 | |
| toward 19:6 23:3,8,13 | 25:11,15,15,18,19,20 | 61:14 | 2008 1:20 63:16 64:2 | |
| 23:22,23 30:9,16 | 26:2 33:17 35:6 | whatsoever 49:20 | 21 1:20 14:22 19:3,4 | |
| 48:3 49:14 58:21 | 37:11 50:2,13 53:13 | When's 38:13 | 23:8,13,16,19 48:3 | |
| | 56:15,17 57:5,13 | while 40:13 46:19 | 63:16 | |
| | 59:2,10 | | 214 9:17,18 | |
| | | | 235 9:17 | |

# DEPOSITION OF G. LASHUN HUTSON

## January 21, 2008

## Pages 1 through 38

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

3

Case 2:06-cv-00701-ID-CSC    Document 30-4    Filed 02/12/2008    Page 3 of 16

Deposition of G. Lashun Hutson                Marshall vs. West; Hutson                January 21, 2008



**Page 1**

1
2          IN THE UNITED STATES DISTRICT COURT
3          FOR THE MIDDLE DISTRICT OF ALABAMA
4                    NORTHERN DIVISION
5
6    RICHARD MARSHALL,
7          Plaintiff,
8    vs.              CIVIL ACTION NO.
                  2:06-cv-701-ID.CSC
9
     CHRIS WEST, in his individual
10   capacity, LASHUN HUTSON, in his
     individual capacity,
11
12         Defendants.
13         * * * * * * * * * * * *
14
15         DEPOSITION OF G. LASHUN HUTSON, taken
16   pursuant to stipulation and agreement before Tracye
17   Sadler Blackwell, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on January 21, 2008,
21   commencing at approximately 10:40 a.m.
22
23         * * * * * * * * * * * *

**Page 2**

1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4    Mr. Jay Lewis
     Law Offices of Jay Lewis
5    Attorney at Law
     847 South McDonough Street
6    Montgomery, Alabama
7
8    ON BEHALF OF THE DEFENDANTS:
9    Mr. Daryl L. Masters
     WEBB & ELEY, P.C.
10   Attorneys at Law
     7475 Halcyon Pointe Drive
11   Montgomery, AL 36117
12   Mr. Rick A. Howard
     NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16
     ALSO PRESENT:
17
     Mr. Christopher West
18
19
20
21         * * * * * * * * * * * *
22
23

**Page 3**

1                  EXAMINATION INDEX
2
3    BY MR. LEWIS . . . . . . . . . .   5
4
5
6                 PLAINTIFF'S EXHIBIT
7    7   6-28-05 Statement Form of Lashun Hutson      34
8
9
10         * * * * * * * * * * * *
11
12
13                    STIPULATIONS
14       It is hereby stipulated and agreed by and
15   between counsel representing the parties that the
16   deposition of G. LASHUN HUTSON is taken pursuant to
17   the Federal Rules of Civil Procedure and that said
18   deposition may be taken before Tracye Sadler
19   Blackwell, Certified Court Reporter and
20   Commissioner for the State of Alabama at Large,
21   without the formality of a commission, that
22   objections to questions other than objections as to
23   the form of the question need not be made at this

**Page 4**

1    as the said deposition may be offered in evidence
2    or used for any other purpose by either party
3    provided for by the Statute.
4        It is further stipulated and agreed by and
5    between counsel representing the parties in this
6    case that the filing of said deposition is hereby
7    waived and may be introduced at the trial of this
8    case or used in any other manner by either party
9    hereto provided for by the Statute regardless of
10   the waiving of the filing of the same.
11       It is further stipulated and agreed by and
12   between the parties hereto and the witness that the
13   signature of the witness to this deposition is
14   hereby waived.
15
16         * * * * * * * * * * * *
17
18         THE COURT REPORTER:  Usual
19            stipulations?
20         MR. HOWARD:  Sure.
21         MR. MASTERS:  Sure.
22
23

Page 5

1          G. LASHUN HUTSON
2      The witness, after having first been duly sworn
3   to speak the truth, the whole truth, and nothing
4   but the truth, testified as follows:
5          EXAMINATION
6   BY MR. LEWIS:
7   Q.  Tell us your name, please.
8   A.  G. Lashun Hutson.
9   Q.  Mr. Hutson, how are you employed?
10  A.  Lowndes County Sheriff's Department.
11  Q.  And what's your position there?
12  A.  Sheriff's deputy.
13  Q.  Do you have any particular rank?
14  A.  No.
15  Q.  On June 28th, 2005, where were you
16      employed?
17  A.  2nd Judicial Drug Task Force.
18  Q.  Were you employed with any city police
19      agency?
20  A.  Hayneville Police, yes, sir.
21  Q.  But now you're with the Lowndes County
22      Sheriff's Office?
23  A.  Uh-huh (positive response).

Page 6

1   Q.  You're going to have to say yes or no.
2   A.  Yes.
3   Q.  Okay.  Tell me about your educational
4       background.
5   A.  My educational background?
6   Q.  Yeah.
7   A.  High school graduate.  I've got some
8       college.  Marine Corps.  I've got a lot of
9       training from there.
10  Q.  How much college?
11  A.  Couple of semesters.
12  Q.  When did you graduate from high school?
13  A.  '77.
14  Q.  All right.  Have you been to any advanced
15      law enforcement training?
16  A.  I've been to a few.
17  Q.  All right.  Have you been to the FBI
18      Academy at Quantico?
19  A.  No.
20  Q.  Any law enforcement experience outside of
21      the academy that's required for POST
22      certification, any long-term -- by that I
23      mean over six weeks -- courses in law

Page 7

1       enforcement?
2   A.  Not over six weeks.  Some two-week
3       courses.  No six-week courses.
4   Q.  Do you have any particular certifications
5       in any special branch of law enforcement?
6   A.  Drug enforcement.
7   Q.  How did you get your training for drug
8       enforcement?
9   A.  The academy in Mississippi.
10  Q.  How long a course was that?
11  A.  I think that course is three weeks, two
12      weeks.
13  Q.  When did you go to that?
14  A.  About three and a half years ago.
15  Q.  Okay.  And what's your address?
16  A.  My work address or --
17  Q.  Physical, home address.
18  A.  It's going to be 3716 Fieldcrest Drive.
19  Q.  3716 --
20  A.  16.
21  Q.  -- Fieldcrest?
22  A.  Uh-huh (positive response).
23  Q.  And what city is that?

Page 8

1   A.  Montgomery.
2   Q.  Is that in the Fieldcrest Apartments?
3   A.  No.  Those are houses.
4   Q.  Houses.  Okay.  What's your date of birth?
5   A.  9-21-58.
6   Q.  And did you tell me when you graduated from
7       high school?
8   A.  1977.
9   Q.  And what college have you attended?
10  A.  Albany State.
11  Q.  Where?
12  A.  Albany State in Georgia.
13  Q.  Albany State.  Okay.  And when did you join
14      the -- well, tell me about your law
15      enforcement employment experience.  When
16      did you first get into law enforcement?
17  A.  First got into law enforcement in 1995
18      after I got out of the Marine Corps with
19      the Dougherty County Sheriff's Department.
20      I worked corrections with them from '95
21      until '98 when I came to Lowndes County.
22  Q.  And in 1998 what agency did you work for?
23  A.  Sheriff's department.  Lowndes County

Page 9

1     Sheriff's Department.
2     Q.  How long did you stay with Lowndes County
3          Sheriff's Office?
4     A.  About two years, three years.  I can't
5          remember.
6     Q.  Where did you go from there?
7     A.  Hayneville Police Department.
8     Q.  And did you remain at the Hayneville Police
9          Department from the time you left the
10         sheriff's office until the time you
11         returned to the sheriff's office?
12    A.  Right.
13    Q.  So that would have -- when did you return
14         to the sheriff's office?
15    A.  I can't give you the -- I don't -- I don't
16         know.
17    Q.  But during 2005 you were still with
18         Hayneville Police Department?
19    A.  Right.
20    Q.  All right.  Are you familiar with the use
21         of force policy of the Lowndes County
22         Sheriff's Office?
23    A.  I'm not familiar with it, but I think they

Page 10

1     have one.
2     Q.  All right.  Have you ever filled out a use
3          of force report?
4     A.  No.
5     Q.  Tell me what you were doing on June 28th,
6          2005, which we all agree is the date of the
7          incident involving Mr. Marshall.
8     A.  What I was doing at what time?
9     Q.  Well, starting early in that day what were
10         you -- when you got to work, what were you
11         doing?
12    A.  It's hard to say exactly what I was doing.
13    Q.  At what time did you -- if you did, did you
14         leave the sheriff's office?
15    A.  You mean the DTF office?
16    Q.  I'm sorry.  The DTF office.
17    A.  It's hard to say exactly what time I left.
18    Q.  And the DTF office is a separate facility;
19         correct?
20    A.  Correct.
21    Q.  And where is the DTF office?
22    A.  It's down the street from the sheriff's
23         office.

Page 11

1     Q.  In Hayneville?
2     A.  In Hayneville.
3     Q.  Do you recall who else was on duty that day
4          with the DTF?
5              By DTF, I mean drug task force.
6     A.  I can't tell you exactly who was on and who
7          was off.  That would be up to Lieutenant
8          West.  But I was on and Lieutenant West was
9          on.
10    Q.  Do you recall why you left the DTF office?
11    A.  I probably left more than one time.  But
12         the last time I left it was with Lieutenant
13         West.
14    Q.  All right.  What did you leave in?
15    A.  We left in a blue Lincoln.
16    Q.  What was the purpose of leaving with
17         Mr. West?
18    A.  We were going to a gentleman's house by the
19         name of -- I know him as "Blood."  You guys
20         keep calling him Mr. Marshall -- that lives
21         up in the -- south of Hayneville.
22    Q.  Did you know Mr. Marshall?
23    A.  I had heard his name, "Blood."

Page 12

1     Q.  Had you met him?
2     A.  Not yet.
3     Q.  Okay.  So prior to the time that you went
4          out with Mr. West you had not had any law
5          enforcement contact with Mr. Marshall?
6     A.  No, I hadn't.
7     Q.  Do you know why you were going out looking
8          for Mr. Marshall?
9     A.  I was going with Lieutenant West.  He
10         needed to talk to him.
11    Q.  You didn't have any independent knowledge
12         of why you were out there?
13    A.  No.  I had an inkling why we were out
14         there, but as far as specifics, no.
15    Q.  All right.  What was that inkling?
16    A.  Dope.
17    Q.  Had you personally received any information
18         about Mr. Marshall and any dope?
19    A.  I had heard his name.
20    Q.  In connection with what?
21    A.  In connection with the sale of drugs.
22    Q.  From whom did you hear his name?
23    A.  People.

Deposition of G. Lashun Hutson            Marshall vs. West; Hutson            January 21, 2008

---

Page 13

1  Q.  You want to elaborate on that?
2  A.  No.
3  Q.  Do you recall what people you heard talking
4      about Mr. Marshall with drugs?
5  A.  People in that line of business.
6  Q.  And what people are you talking about?
7  A.  People I may have arrested that wanted to
8      help themselves out.
9  Q.  Do you have any specific names of people?
10 A.  No.
11 Q.  All right.  So you leave with
12     Mr. Marshall.  Tell me what happens then.
13 A.  Lieutenant and I, we go to Mr. Marshall's
14     house.  He wasn't there.  We did knock.
15     Nobody came to the door.  We left and we
16     was having a conversation on the way back
17     about a little community I was familiar
18     with called Casey.
19 Q.  Is that C-A-S-E-Y?
20 A.  Correct.
21 Q.  And what did you tell Mr. Marshall about --
22     I mean, Mr. West about the Casey community?
23 A.  He asked me -- he said, where is it?  I

Page 14

1      said, it's right down on County Road 7.  I
2      said, he might be down there.  And so we
3      were going to head down there.  I was
4      looking for another individual.  And as we
5      were going down County Road 7, Lieutenant
6      perks up and said, there he goes right
7      there.  And I'm looking and I see the blue
8      Nova coming at us.
9  Q.  Who is driving the car?
10 A.  Which car?
11 Q.  Your car.
12 A.  Lieutenant West.
13 Q.  All right.  What reason did you have to
14     believe that Mr. Marshall might be at the
15     Casey community?
16 A.  I've heard his name in the community of the
17     drug community that he's a drug dealer and
18     he, you know, frequents different
19     communities and Casey was one of them.
20 Q.  Other than this incident on June 28th,
21     2005, have you ever arrested Mr. Marshall?
22 A.  No.
23 Q.  Since this incident have you had occasion

Page 15

1      to arrest Mr. Marshall?
2  A.  No.
3  Q.  Since this incident have you had occasion
4      to know whether Mr. Marshall has been
5      arrested by anybody else?
6  A.  No.
7  Q.  So you see a blue Chevrolet Nova after
8      Mr. West says there's his car or there he
9      is?
10 A.  Uh-huh (positive response).
11 Q.  Okay.  What happens then?
12 A.  Lieutenant goes down.  We pass each other.
13     Lieutenant turns around and we come back up
14     behind him to make a stop.
15 Q.  And what was your purpose for making a
16     stop?
17 A.  I -- I don't know.  Whatever Lieutenant
18     West told you his probable cause was for
19     stopping him.
20 Q.  Did you see any probable cause for making a
21     stop?
22 A.  I wasn't driving.
23 Q.  No.  That wasn't the question.  Did you see

Page 16

1      any probable cause for making a stop?
2  A.  I wasn't driving.
3  Q.  Let me rephrase the question.
4  A.  Okay.
5  Q.  Did you see any probable cause for making a
6      stop?
7  A.  Let me see if I can -- I wasn't driving.
8          MR. HOWARD:  If you saw it, yes.
9          If you didn't see it, no, or
10         were you looking?  Just answer
11         his question.
12 A.  No.  I just looked -- when he said there he
13     is, I looked and I identified the subject.
14     I wasn't looking for a probable cause.
15 Q.  So you didn't see any probable cause
16     because you weren't looking for any?
17 A.  Right.
18 Q.  Okay.  So if there was probable cause
19     determined, it was Mr. West who determined
20     it?
21 A.  Correct.
22 Q.  Okay.  You said that you looked and you saw
23     that it was Mr. Marshall?

---

4 (Pages 13 to 16)

Deposition of G. Lashun Hutson      Marshall vs. West; Hutson      January 21, 2008

Page 17

1  A.  I looked and saw an individual driving the
2      car.  There was two individuals in it, and
3      I looked and saw the individual driving the
4      car.
5  Q.  You didn't know him as Mr. Marshall?
6  A.  No.
7  Q.  Because you had never met Mr. Marshall?
8  A.  No.
9  Q.  All right.  So Lieutenant West turns his
10     car around and pulls in behind
11     Mr. Marshall's car or the car that you've
12     identified as being the blue Nova you were
13     looking for?
14  A.  Right.
15  Q.  How fast was that Nova going?
16  A.  I would have guessed the speed limit.
17  Q.  Did he speed up after you pulled in behind
18     it?
19  A.  Once we got on 21 he did.
20  Q.  But he didn't until you got to 21?
21  A.  No.
22  Q.  All right.  What happened after you pulled
23     in behind him?

Page 18

1  A.  I looked -- just looked in the car just to
2      see -- nobody was moving and Lieutenant
3      said, go ahead and light them up.
4  Q.  And what did you take that to mean?
5  A.  Turn the blue light on.
6  Q.  Did you do that?
7  A.  Yes.
8  Q.  That car doesn't have built-in blue lights?
9  A.  No.
10  Q.  You had a portable blue light?
11  A.  Had a portable blue light.
12  Q.  Like anybody could buy?
13  A.  Any law enforcement agency could buy.
14  Q.  All right.  And where did you put that blue
15     light?
16  A.  I put it on the dash initially.
17  Q.  Okay.  And what happened then?
18  A.  Mr. Marshall looked in his rear-view
19     mirror, he looked down in his side mirror,
20     and he just kept driving.
21  Q.  At some point did your car pull up next to
22     his car while you were still on County
23     Road 7?

Page 19

1  A.  Yes.  We had came out of the curve.  When
2      we got on the straightaway, Lieutenant got
3      to the side of them.
4  Q.  What, if anything, did you do at that time?
5  A.  At that time I rolled my window down, I
6      pulled my badge, and I said, pull over.
7      And he looked, and he said, what y'all
8      want, man?  And I said, pull over.  And he
9      kept driving.
10  Q.  What happened then?
11  A.  After he got back behind him -- I can't
12     remember if it's because of oncoming
13     traffic or for whatever reason he got back
14     behind him.  And the blue light was still
15     going.  And then we had came to the
16     intersection of 21.
17  Q.  All right.  Which way did Mr. Marshall
18     turn?
19  A.  He turned right.
20  Q.  And that's headed toward Wilcox County?
21  A.  South on 21, yes.
22  Q.  So you got onto Highway 21, which is a
23     larger highway?

Page 20

1  A.  You could say larger.
2  Q.  Still two-lane?
3  A.  Correct.
4  Q.  Okay.  What happened then?
5  A.  We continued behind him.  LT found a spot.
6      He got beside him again.  And I reached up.
7      I got the light off of the dash.  It's
8      still blinking blue.  And I got my badge
9      and I held it up.  I said, pull over.  And
10     he said, mother fuck y'all, I ain't
11     stopping.  And about that time LT yells in
12     my ear and says, pull over, and he -- he's
13     got his badge up.  And we're both yelling,
14     windows down -- you can imagine how close
15     we were -- to pull over, but he still
16     refused.
17  Q.  What were you wearing?
18  A.  I can't tell you exactly what I was
19     wearing.
20  Q.  Civilian clothes?
21  A.  Probably.
22  Q.  Was that just a blue light or was it a
23     blue-and-white light?

Page 21

1   A.  It's a blue light.
2   Q.  Blue light. All right. So after he did
3      not pull over, what did you do then?
4   A.  I told LT I don't think he's going to
5      stop. And I put the light back on the dash
6      and I sat back. LT dropped back behind
7      him.
8   Q.  At any point did you display a weapon --
9   A.  No.
10  Q.  -- at the time you were driving?
11  A.  No.
12  Q.  All right. So Lieutenant West -- and when
13     you say LT, you're talking about Lieutenant
14     West?
15  A.  I'm talking about Lieutenant West.
16  Q.  Okay. Lieutenant West pulls back behind
17     him; correct?
18  A.  Correct.
19  Q.  What's the next thing that happens?
20  A.  We come up on a cattle truck. There's a
21     cattle truck. It slows us down. And LT
22     went to the side, and he "pitted" him.
23  Q.  Okay. When you say he "pitted" him, you're

Page 22

1     talking about executing a precision
2     intervention technique?
3   A.  If that's what you're calling it now.
4   Q.  Well, what do you call it?
5   A.  I don't call it anything.
6   Q.  Okay. You just "pitted" him?
7   A.  Right.
8   Q.  And basically that's hitting the driver's
9     side fender of his car with the front
10     passenger's side bumper or fender of your
11     car?
12  A.  You can do it that way or vice versa.
13  Q.  Well, which way was it done this time?
14  A.  The way you just stated.
15  Q.  Okay. And it spun his car out?
16  A.  Correct.
17  Q.  He ended up going the opposite direction on
18     the other side of the road?
19  A.  On the shoulder, yes.
20  Q.  Did you observe anything else while you
21     were driving down the road behind
22     Mr. Marshall?
23  A.  I observed his hand when it came out of the

Page 23

1     window and when he tossed something. It
2     hit our windshield to be exact.
3   Q.  And did you identify what it was at that
4     time?
5   A.  Not at that time, no.
6   Q.  You said you came up behind a cattle truck
7     and slowed down. How slow were you going?
8   A.  We were going less than the speed limit at
9     that time.
10  Q.  Had you been going at any time prior to
11     that faster than the speed limit?
12  A.  Yes.
13  Q.  How fast would you say is the fastest you
14     were going?
15  A.  If I had to guess -- and it's purely a
16     guess -- I would say about 70.
17  Q.  Okay. And the speed limit on that road
18     is --
19  A.  55.
20  Q.  55. Okay.
21      All right. So setting the scene, we've
22     now got Mr. Marshall's car on the shoulder
23     of the road facing back toward Hayneville,

Page 24

1     and Lieutenant West pulls his car so it's
2     angled toward Mr. Marshall's car?
3   A.  Correct.
4   Q.  What did you do then?
5   A.  We both exited the vehicles, but we stayed
6     behind the doors for protection.
7   Q.  What did you say, if anything?
8   A.  Lieutenant was yelling to the driver. I
9     just yelled to the passenger, passenger,
10     don't move.
11  Q.  And did the passenger move?
12  A.  No. He sat there like a statue.
13  Q.  And did the driver move?
14  A.  Yes.
15  Q.  And what was Mr. West yelling to the
16     driver?
17  A.  He told him to exit the vehicle and get on
18     the ground.
19  Q.  All right. What, if anything, did Mr. West
20     do -- or did Mr. Marshall do in response to
21     that?
22  A.  He opened the door. He got out, but he
23     stayed between the door and his vehicle.

Page 25

1    Q.  So he obeyed the command to get out of the
2        car?
3    A.  Yes.
4    Q.  Was he saying anything at that time?
5    A.  He was cursing, being very belligerent.
6    Q.  What, if anything, did Mr. West do?
7    A.  He kept yelling the order for him to get on
8        the ground.
9    Q.  All right.  Did he take any other action?
10   A.  Did who take any action?
11   Q.  Mr. West.
12   A.  He kept yelling for Mr. Marshall to get on
13       the ground.
14   Q.  All right.  Did he fire his weapon?
15   A.  Yes.
16   Q.  In what direction did he fire his weapon?
17   A.  In Mr. Marshall's direction but into the
18       ground.
19   Q.  And at that time were you looking at the
20       passenger or were you looking at
21       Mr. Marshall?  Where were you looking?
22   A.  My angle, I could see them both.  I could
23       look at Mr. Marshall and right past him I

Page 26

1        could see the passenger.
2    Q.  All right.  And after Mr. West fired the
3        shot, what, if anything, did Mr. Marshall
4        do?
5    A.  It froze him.  Because Mr. Marshall was
6        reaching back into his vehicle, and I
7        believe that's the reason Lieutenant fired
8        his weapon.  When he fired the weapon, it
9        froze Mr. Marshall, and he came out.
10       Because I don't think he expected that to
11       happen, so it froze him.
12   Q.  So you're holding your hands up.  He came
13       out with his hands up?
14   A.  Yeah, one on the window of the car and he
15       had the other one like stunned.
16   Q.  Up in the air?
17   A.  (Witness nods head.)
18   Q.  Yes?
19   A.  Yes.
20   Q.  Did he get on the ground then?
21   A.  No.
22   Q.  What happened?
23   A.  Lieutenant approached him, and once he got

Page 27

1        close enough to him where he could put his
2        hands on him, he put him on the ground.
3    Q.  At some point did his pants come off?  Did
4        Mr. Marshall's pants come off?
5    A.  During the tussle with the lieutenant they
6        did.
7    Q.  Did you see Mr. Marshall ever take a swing
8        at the lieutenant, ever try to run away,
9        anything like that?
10   A.  Nothing like that, no.
11   Q.  So Mr. Marshall ends up on the ground with
12       his hands behind him cuffed?
13   A.  After Lieutenant put his hands behind him
14       cuffed.
15   Q.  Right.  And what's happening with the
16       passenger all this time?
17   A.  I've still got my weapon on him and he's
18       still sitting there like a statue.
19   Q.  At any time did you feel the need to go to
20       the aid of the lieutenant?
21   A.  No.  He was doing pretty good.
22   Q.  All right.  At what point did the passenger
23       emerge from the vehicle?

Page 28

1    A.  Once Lieutenant got the cuffs on
2        Mr. Marshall, then I proceeded around to
3        the passenger.
4    Q.  And did the passenger cooperate with you?
5    A.  Yes, sir.
6    Q.  And you cuffed him and put him on the
7        ground?
8    A.  Got him out and then I sat him on the bank
9        there.
10   Q.  Tell me what happened then.
11   A.  I walked back to the vehicle where
12       Lieutenant was with Mr. Marshall.  When I
13       looked inside, I saw the .357 on the seat.
14   Q.  And that was a .357 Magnum revolver?
15   A.  Yes.
16   Q.  Did you search the vehicle?
17   A.  I can't remember if we searched it right
18       then or if we searched it later.  But we
19       looked in it enough to see that there was a
20       .357 on the seat, bullets on the floorboard
21       and in the ashtray.
22   Q.  Do you recall whether or not, whether you
23       searched it at the scene or you searched it

Deposition of G. Lashun Hutson                Marshall vs. West; Hutson                January 21, 2008

---

Page 29

1    later, you found anything else of
2    contraband nature?
3    A.  Nothing that I can think of, no, sir.
4    Q.  Just kind of cutting to the chase, did you
5        see Mr. West serve Mr. Marshall?
6    A.  I saw him pat him down.
7    Q.  Did you see him remove anything from his
8        pants?
9    A.  No.
10   Q.  Did you see him remove any money?
11   A.  No.
12   Q.  Were you watching him enough to know
13       whether or not he removed any money?
14   A.  I watched him enough to know that he had
15       him secured so I could go secure the
16       passenger.
17   Q.  So there was a period of time that you just
18       lost sight of what Mr. West and
19       Mr. Marshall were doing?
20   A.  Yes.
21   Q.  Because you were concentrating on the
22       passenger?
23   A.  Correct.

---

Page 30

1    Q.  I think we've already heard that at that
2        point Mr. West called for a transportation
3        unit, a marked unit, and that another
4        deputy came, took Mr. Marshall away, and
5        the passenger rode with you; is that
6        correct?
7    A.  No.
8    Q.  Okay.  Tell me what happened.
9    A.  The passenger rode with the lieutenant.  I
10       drove the Nova.
11   Q.  Okay.  All right.  Following the incident
12       at which Mr. Marshall was handcuffed, did
13       you see Mr. Marshall become violent in any
14       way?
15   A.  While the lieutenant was in the car, he had
16       gotten back up off the ground.  And I told
17       him -- I said, get back on the ground.  And
18       I had to go over and put him back on the
19       ground.
20   Q.  But he didn't attempt to run away?
21   A.  I don't know if he was attempting to run
22       away or not, but he got up.
23   Q.  But you walked over to him and put him back

---

Page 31

1    on the ground?
2    A.  Right.
3    Q.  And could that have been while the
4        lieutenant was searching the vehicle?
5    A.  The lieutenant was leaned over in the
6        vehicle, yes.
7    Q.  On the way back to the sheriff's office
8        what, if anything, happened?
9    A.  Happened with me?
10   Q.  Yeah.
11   A.  Nothing happened with me.
12   Q.  You didn't stop at the side of the road?
13   A.  We stopped when the marked unit got -- tire
14       started to go down.  And I don't remember
15       that whole incident fully because I wasn't
16       concentrating on that.
17   Q.  Did you assist in the roadside search for
18       any contraband?
19   A.  Yes.
20   Q.  And was any contraband located?
21   A.  We located a corner-torn baggy.
22   Q.  And describe that baggy for me.
23   A.  A sandwich bag where you would take the

---

Page 32

1    corner end and tear it off and tie a knot
2    in it.  That's what it looked like.
3    Q.  And who took custody of that?
4    A.  The lieutenant did.
5    Q.  During that period of time was the
6        passenger in Mr. Marshall's vehicle still
7        in the lieutenant's vehicle?
8    A.  I can't recall.
9    Q.  Did you have any role in booking
10       Mr. Marshall or the passenger?
11   A.  No.
12   Q.  You delivered the passenger where?
13   A.  I didn't deliver the passenger.
14   Q.  Oh, that's right.  Mr. West did, didn't he?
15   A.  Uh-huh (positive response).
16   Q.  What did you do with the vehicle?
17   A.  I parked it in front of the jail.
18   Q.  Do you know whether or not that vehicle was
19       moved during the period of time that
20       Mr. Marshall was in jail?
21   A.  Lieutenant came out from where I had parked
22       it.  He told me to put it inside.  They had
23       a secure gate there that locks, and he told

---

8 (Pages 29 to 32)

Page 33

1    me to move it and put it inside. That's
2    the only other incident of it being moved
3    from where I originally parked it.
4    Q.  Do you know whether that car was driven
5    during any time other than that while
6    Mr. Marshall was incarcerated?
7    A.  No.
8    Q.  Did that Chevrolet Nova have shoulder
9    harnesses?
10   A.  I can't recall. I wish I could.
11   Q.  All right. I have shown you what's marked
12   as Plaintiff's --
13       (Brief interruption.)
14       (Plaintiff's Exhibit 7 was marked
15       for identification.)
16   Q.  I'll show you this one instead of that
17   one. Do you recognize what I've marked as
18   Plaintiff's Exhibit Number 7?
19   A.  Uh-huh (positive response). Yes.
20   Q.  Turn to the second page of that. Whose
21   signature is that?
22   A.  That's mine.
23   Q.  And did you write this yourself?

Page 34

1    A.  Yes.
2    Q.  All right. And I just want to take a look
3    at it for just a second.
4        About two-thirds down the front page it
5    indicates that Mr. Marshall accelerated at
6    one point throwing something from the
7    driver's side window that was later found
8    to be drug evidence between the 102 and 104
9    mile marker.
10   A.  Uh-huh (positive response).
11   Q.  Did you later discover that there was no
12   drug residue found in that baggy?
13   A.  Yes. Later, after Lieutenant had got the
14   analysis back from forensics, he told me
15   that it turned out to be no evidence in it.
16   Q.  Okay. I may have asked you this, and if I
17   did, I apologize. Did you fill out a use
18   of force form with regard to any activity
19   in which you engaged on June 28th, 2005?
20   A.  No.
21   Q.  Is there a policy of the drug task force
22   that such reports be filled out?
23   A.  If use of force was used -- I'm not sure of

Page 35

1    a policy -- we would put it in our
2    statement.
3    Q.  So this Plaintiff's Exhibit Number 7 would
4    constitute any report that you would be
5    required to file?
6    A.  If I had used force.
7    Q.  Were you reprimanded for anything that
8    happened on that date?
9    A.  No.
10   Q.  Have you ever been reprimanded by the
11   Lowndes County Sheriff's Office?
12   A.  Yes.
13   Q.  For what?
14   A.  Oh, I can't remember. It was during
15   Sheriff Varner's time.
16   Q.  You can't recall anything that you were
17   reprimanded for?
18   A.  Once about a radio. That's -- not
19   answering the radio or the radio not being
20   loud -- I can't remember. It was a radio
21   though.
22   Q.  Anything having to do with citizen
23   complaints?

Page 36

1    A.  I'm pretty sure some citizens have
2    complained.
3    Q.  But were you ever disciplined in connection
4    with citizen complaints?
5    A.  No. No.
6    Q.  Has your POST certification ever been
7    suspended?
8    A.  No.
9        MR. LEWIS: Give us a minute.
10       (A brief recess was taken.)
11   Q.  (Mr. Lewis continuing:) Did you have
12   any -- and I may have asked this already.
13       Did you have any part to play other
14   than writing that statement that's been
15   marked as Plaintiff's Exhibit Number 7 in
16   the booking or prosecution of Mr. Marshall?
17   A.  No, sir.
18   Q.  Did you appear at court in connection with
19   a case against Mr. Marshall?
20   A.  No.
21       MR. LEWIS: That's all I have.
22       (Deposition concluded at
23       approximately 11:15 a.m.)

Deposition of G. Lashun Hutson                Marshall vs. West; Hutson                January 21, 2008

Page 37

1           * * * * * * * * * *
2           FURTHER DEPONENT SAITH NOT
3           * * * * * * * * * *
4           REPORTER'S CERTIFICATE
5     STATE OF ALABAMA:
6     MONTGOMERY COUNTY:
7           I, Tracye Sadler Blackwell, Certified
8     Court Reporter and Commissioner for the State of
9     Alabama at Large, do hereby certify that I reported
10    the deposition of:
11          G. LASHUN HUTSON
12    who was duly sworn by me to speak the truth, the
13    whole truth and nothing but the truth, in the
14    matter of:
15          RICHARD MARSHALL,
16          Plaintiff,
17          vs.
18          CHRIS WEST, in his individual
19          Capacity, LASHUN HUTSON, in his
20          Individual capacity,
21          Defendants.
22          IN THE UNITED STATES DISTRICT COURT
23          FOR THE MIDDLE DISTRICT OF ALABAMA

Page 38

1           NORTHERN DIVISION
2           Case Number 2:06-cv-701-ID.CSC
3     on January 21, 2008.
4           The foregoing 37 computer-printed pages
5     contain a true and correct transcript of the
6     examination of said witness by counsel for the
7     parties set out herein.  The reading and signing of
8     same is hereby waived.
9           I further certify that I am neither of
10    kin nor of counsel to the parties to said cause nor
11    in any manner interested in the results thereof.
12          This 6th day of February 2008.
13
14
15          _____
            Tracye Sadler Blackwell
16          ACCR No. 294
            Expiration date:  9-30-2008
17          Certified Court Reporter
            and Commissioner for the State
18          of Alabama at Large
19
            20
21
22
23

10 (Pages 37 to 38)

Case 2:06-cv-00701-ID-CSC    Document 30-4    Filed 02/12/2008    Page 13 of 16

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson                    January 21, 2008

Page 1

**A**

about 6:3 7:14 8:14 9:4 12:18 13:4,6,17,21 13:22 20:11 21:13,15 22:1 23:16 34:4 35:18
academy 6:18,21 7:9
accelerated 34:5
ACCR 38:16
action 1:8 25:9,10
activity 34:18
address 7:15,16,17
advanced 6:14
after 5:2 8:18 15:7 17:17,22 19:11 21:2 26:2 27:13 34:13
again 20:6
against 36:19
agency 5:19 8:22 18:13
ago 7:14
agree 10:6
agreed 3:13 4:4,11
agreement 1:16
ahead 18:3
aid 27:20
ain't 20:10
air 26:16
AL 2:11,14
Alabama 1:3,18,20 2:6 3:19 37:5,9,23 38:18
Albany 8:10,12,13
already 30:1 36:12
analysis 34:14
angle 25:22
angled 24:2
another 14:4 30:3
answer 16:10
answering 35:19
anybody 15:5 18:12
anything 19:4 22:5,20 24:7,19 25:4,6 26:3 27:9 29:1,7 31:8 35:7 35:16,22
Apartments 8:2
apologize 34:17
appear 36:18
APPEARANCES 2:1
approached 26:23
approximately 1:21 36:23
around 15:13 17:10 28:2
arrest 15:1
arrested 13:7 14:21 15:5
ashtray 28:21
asked 13:23 34:16 36:12

**B**

assist 31:17
attempt 30:20
attempting 30:21
attended 8:9
Attorney 2:5
Attorneys 2:10,13
away 27:8 30:4,20,22
a.m 1:21 36:23

back 13:16 15:13 19:11 19:13 21:5,6,6,16 23:23 26:6 28:11 30:16,17,18,23 31:7 34:14
background 6:4,5
badge 19:6 20:8,13
bag 31:23
baggy 31:21,22 34:12
bank 28:8
basically 22:8
become 30:13
before 1:16 3:17
BEHALF 2:3,8
behind 15:14 17:10,17 17:23 19:11,14 20:5 21:6,16 22:21 23:6 24:6 27:12,13
being 17:12 25:5 33:2 35:19
believe 14:14 26:7
belligerent 25:5
beside 20:6
between 3:14 4:5,12 24:23 34:8
birth 8:4
Blackwell 1:17 3:18 37:7 38:15
blinking 20:8
Blood 11:19,23
blue 11:15 14:7 15:7 17:12 18:5,8,10,11 18:14 19:14 20:8,22 21:1,2
blue-and-white 20:23
booking 32:9 36:16
both 20:13 24:5 25:22
branch 7:5
brief 33:13 36:10
built-in 18:8
bullets 28:20
bumper 22:10
business 13:5
buy 18:12,13

**C**

call 22:4,5
called 13:18 30:2
calling 11:20 22:3

came 8:21 13:15 19:1 19:15 22:23 23:6 26:9,12 30:4 32:21
capacity 1:10,10 37:19 37:20
car 14:9,10,11 15:8 17:2,4,10,11,11 18:1 18:8,21,22 22:9,11 22:15 23:22 24:1,2 25:2 26:14 30:15 33:4
Carmichael 2:14
case 4:6,8 36:19 38:2
Casey 13:18,22 14:15 14:19
cattle 21:20,21 23:6
cause 15:18,20 16:1,5 16:14,15,18 38:10
CERTIFICATE 37:4
certification 6:22 36:6
certifications 7:4
Certified 1:17 3:18 37:7 38:17
certify 37:9 38:9
chase 29:4
Chevrolet 15:7 33:8
CHRIS 1:9 37:18
Christopher 2:17
citizen 35:22 36:4
citizens 36:1
city 5:18 7:23
Civil 1:8 3:16
Civilian 20:20
close 20:14 27:1
clothes 20:20
college 6:8,10 8:9
come 15:13 21:20 27:3 27:4
coming 14:8
command 25:1
commencing 1:21
commission 3:20
Commissioner 1:18 3:19 37:8 38:17
communities 14:19
community 13:17,22 14:15,16,17
complained 36:2
complaints 35:23 36:4
computer-printed 38:4
concentrating 29:21 31:16
concluded 36:22
connection 12:20,21 36:3,18
constitute 35:4
contact 12:5
contain 38:5
continued 20:5

continuing 36:11
contraband 29:2 31:18 31:20
conversation 13:16
cooperate 28:4
corner 32:1
corner-torn 31:21
Corps 6:8 8:18
correct 10:19,20 13:20 16:21 20:3 21:17,18 22:16 24:3 29:23 30:6 38:5
corrections 8:20
counsel 3:14 4:5 38:6 38:10
County 5:10,21 8:19,21 8:23 9:2,21 14:1,5 18:22 19:20 35:11 37:6
Couple 6:11
course 7:10,11
courses 6:23 7:3,3
court 1:2,17 3:18 4:18 36:18 37:8,22 38:17
cuffed 27:12,14 28:6
cuffs 28:1
cursing 25:5
curve 19:1
custody 32:3
cutting 29:4
C-A-S-E-Y 13:19

**D**

Daryl 2:9
dash 18:16 20:7 21:5
date 8:4 10:6 35:8 38:16
day 10:9 11:3 38:12
dealer 14:17
Defendants 1:11 2:8 37:21
deliver 32:13
delivered 32:12
department 5:10 8:19 8:23 9:1,7,9,18
DEPONENT 37:2
deposition 1:15 3:15,17 4:1,6,13 36:22 37:10
deputy 5:12 30:4
describe 31:22
determined 16:19,19
different 14:18
direction 22:17 25:16 25:17
disciplined 36:3
discover 34:11
display 21:8
DISTRICT 1:2,3 37:22 37:23

DIVISION 1:4 38:1
doing 10:5,8,11,12 27:21 29:19
done 22:13
door 13:15 24:22,23
doors 24:6
dope 12:16,18
Dougherty 8:19
down 10:22 14:1,2,3,5 15:12 18:19 19:5 20:14 21:21 22:21 23:7 29:6 31:14 34:4
Drive 1:20 2:10 7:18
driven 33:4
driver 24:8,13,16
driver's 22:8 34:7
driving 14:9 15:22 16:2 16:7 17:1,3 18:20 19:9 21:10 22:21
dropped 21:6
drove 30:10
drug 5:17 7:6,7 11:5 14:17,17 34:8,12,21
drugs 12:21 13:4
DTF 10:15,16,18,21 11:4,5,10
duly 5:2 37:12
during 9:17 27:5 32:5 32:19 33:5 35:14
duty 11:3

**E**

each 15:12
ear 20:12
early 10:9
educational 6:3,5
either 4:2,8
elaborate 13:1
Eley 1:19 2:9
emerge 27:23
employed 5:9,16,18
employment 8:15
end 32:1
ended 22:17
ends 27:11
enforcement 6:15,20 7:1,5,6,8 8:15,16,17 12:5 18:13
engaged 34:19
enough 27:1 28:19 29:12,14
ever 10:2 14:21 27:7,8 35:10 36:3,6
evidence 4:1 34:8,15
exact 23:2
exactly 10:12,17 11:6 20:18
examination 3:1 5:5 38:6

Case 2:06-cv-00701-ID-CSC    Document 30-4    Filed 02/12/2008    Page 14 of 16

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson                    January 21, 2008

Page 2

executing 22:1
Exhibit 3:5 33:14,18
  35:3 36:15
exit 24:17
exited 24:5
expected 26:10
experience 6:20 8:15
Expiration 38:16

_____ F _____
facility 10:18
facing 23:23
familiar 9:20,23 13:17
far 12:14
fast 17:15 23:13
faster 23:11
fastest 23:13
FBI 6:17
February 38:12
Federal 3:16
feel 27:19
fender 22:9,10
few 6:16
Fieldcrest 7:18,21 8:2
file 35:5
filing 4:6,10
fill 34:17
filled 10:2 34:22
fire 25:14,16
fired 26:2,7,8
first 5:2 8:16,17
floorboard 28:20
Following 30:11
follows 5:4
force 5:17 9:21 10:3
  11:5 34:18,21,23
  35:6
foregoing 38:4
forensics 34:14
form 3:7,22 34:18
formality 3:20
found 20:5 29:1 34:7
  34:12
frequents 14:18
from 6:9,12 8:6,20 9:6
  9:9 10:22 12:22
  27:23 29:7 32:21
  33:3 34:6,14
front 22:9 32:17 34:4
froze 26:5,9,11
fuck 20:10
fully 31:15
further 4:4,11 37:2
  38:9

_____ G _____
G 1:15 3:15 5:1,8 37:11
gate 32:23
gentleman's 11:18

Georgia 8:12
GILLILAND 2:12
give 9:15 36:9
go 7:13 9:6 13:13 18:3
  27:19 29:15 30:18
  31:14
goes 14:6 15:12
going 6:1 7:18 11:18
  12:7,9 14:3,5 17:15
  19:15 21:4 22:17
  23:7,8,10,14
good 27:21
gotten 30:16
graduate 6:7,12
graduated 8:6
ground 24:18 25:8,13
  25:18 26:20 27:2,11
  28:7 30:16,17,19
  31:1
guess 23:15,16
guessed 17:16
guys 11:19

_____ H _____
Halcyon 1:19 2:10
half 7:14
hand 22:23
handcuffed 30:12
hands 26:12,13 27:2,12
  27:13
happen 26:11
happened 17:22 18:17
  19:10 20:4 26:22
  28:10 30:8 31:8,9,11
  35:8
happening 27:15
happens 13:12 15:11
  21:19
hard 10:12,17
harnesses 33:9
having 5:2 13:16 35:22
Hayneville 5:20 9:7,8
  9:18 11:1,2,21 23:23
head 14:3 26:17
headed 19:20
hear 12:22
heard 11:23 12:19 13:3
  14:16 30:1
held 20:9
help 13:8
hereto 4:9,12
HIGGINS 2:12
high 6:7,12 8:7
highway 19:22,23
him 11:19,20 12:1,10
  15:14,19 17:5,23
  19:11,14 20:5,6 21:7
  21:17,22,23 22:6
  24:17 25:7,23 26:5

26:11,23 27:1,2,2,12
27:13,17 28:6,6,8,8
29:6,6,7,10,12,14,15
30:17,18,23,23
hit 23:2
HITSON 2:12
hitting 22:8
holding 26:12
HOLTSFORD 2:12
home 7:17
house 11:18 13:14
houses 8:3,4
Howard 2:12 4:20 16:8
Hutson 1:10,15 3:7,15
  5:1,8,9 37:11,19

_____ I _____
identification 33:15
identified 16:13 17:12
identify 23:3
imagine 20:14
incarcerated 33:6
incident 10:7 14:20,23
  15:3 30:11 31:15
  33:2
independent 12:11
INDEX 3:1
indicates 34:5
individual 1:9,10 14:4
  17:1,3 37:18,20
individuals 17:2
information 12:17
initially 18:16
inkling 12:13,15
inside 28:13 32:22 33:1
instead 33:16
interested 38:11
interruption 33:13
intersection 19:16
intervention 22:2
introduced 4:7
involving 10:7

_____ J _____
jail 32:17,20
January 1:20 38:3
Jay 2:4,4
join 8:13
Judicial 5:17
June 5:15 10:5 14:20
  34:19
just 16:10,12 18:1,1,20
  20:22 22:6,14 24:9
  29:4,17 34:2,3

_____ K _____
keep 11:20
kept 18:20 19:9 25:7,12
kin 38:10

kind 29:4
knock 13:14
knot 32:1
know 9:16 11:19,22
  12:7 14:18 15:4,17
  17:5 29:12,14 30:21
  32:18 33:4
knowledge 12:11

_____ L _____
L 2:9
Large 1:18 3:19 37:9
  38:18
larger 19:23 20:1
Lashun 1:10,15 3:7,15
  5:1,8 37:11,19
last 11:12
later 28:18 29:1 34:7
  34:11,13
law 1:19 2:4,5,10,13
  6:15,20,23 7:5 8:14
  8:16,17 12:4 18:13
leaned 31:5
leave 10:14 11:14
  13:11
leaving 11:16
left 9:10 10:17 11:10,11
  11:12,15 13:15
less 23:8
Let 16:3,7
Lewis 2:4,4 3:3 5:6
  36:9,11,21
lieutenant 11:7,8,12
  12:9 13:13 14:5,12
  15:12,13,17 17:9
  18:2 19:2 21:12,13
  21:15,16 24:1,8 26:7
  26:23 27:5,8,13,20
  28:1,12 30:9,15 31:4
  31:5 32:4,21 34:13
lieutenant's 32:7
light 18:3,5,10,11,15
  19:14 20:7,22,23
  21:1,2,5
lights 18:8
like 18:12 24:12 26:15
  27:9,10,18 32:2
limit 17:16 23:8,11,17
Lincoln 11:15
line 13:5
little 13:17
lives 11:20
located 31:20,21
locks 32:23
long 7:10 9:2
long-term 6:22
look 25:23 34:2
looked 16:12,13,22
  17:1,3 18:1,1,18,19

19:7 28:13,19 32:2
looking 12:7 14:4,7
  16:10,14,16 17:13
  25:19,20,21
lost 29:18
lot 6:8
loud 35:20
Lowndes 5:10,21 8:21
  8:23 9:2,21 35:11
LT 20:5,11 21:4,6,13
  21:21

_____ M _____
made 3:22
Magnum 28:14
make 15:14
making 15:15,20 16:1
  16:5
man 19:8
manner 4:8 38:11
Marine 6:8 8:18
marked 30:3 31:13
  33:11,14,17 36:15
marker 34:9
Marshall 1:6 10:7
  11:20,22 12:5,8,18
  13:4,12,21 14:14,21
  15:1,4 16:23 17:5,7
  18:18 19:17 22:22
  24:20 25:12,21,23
  26:3,5,9 27:7,11 28:2
  28:12 29:5,19 30:4
  30:12,13 32:10,20
  33:6 34:5 36:16,19
  37:15
Marshall's 13:13 17:11
  23:22 24:2 25:17
  27:4 32:6
Masters 2:9 4:21
matter 37:14
may 3:17 4:1,7 13:7
  34:16 36:12
McDonough 2:5
mean 6:23 10:15 11:5
  13:22 18:4
met 12:1 17:7
MIDDLE 1:3 37:23
might 14:2,14
mile 34:9
mine 33:22
minute 36:9
mirror 18:19,19
Mississippi 7:9
money 29:10,13
Montgomery 1:20 2:6
  2:11,14 8:1 37:6
more 11:11
mother 20:10
move 24:10,11,13 33:1

Case 2:06-cv-00701-ID-CSC     Document 30-4     Filed 02/12/2008     Page 15 of 16

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson          January 21, 2008

Page 3

moved 32:19 33:2
moving 18:2
much 6:10

**N**

name 5:7 11:19,23
  12:19,22 14:16
names 13:9
nature 29:2
need 3:22 27:19
needed 12:10
neither 38:9
never 17:7
next 18:21 21:19
NIX 2:12
nobody 13:15 18:2
nods 26:17
NORTHERN 1:4 38:1
nothing 5:3 27:10 29:3
  31:11 37:13
Nova 14:8 15:7 17:12
  17:15 30:10 33:8
Number 33:18 35:3
  36:15 38:2

**O**

obeyed 25:1
objections 3:21,21
observe 22:20
observed 22:23
occasion 14:23 15:3
off 11:7 20:7 27:3,4
  30:16 32:1
offered 4:1
office 5:22 9:3,10,11,14
  9:22 10:14,15,16,18
  10:21,23 11:10 31:7
  35:11
Offices 1:19 2:4
Oh 32:14 35:14
Okay 6:3 7:15 8:4,13
  12:3 15:11 16:4,18
  16:22 18:17 20:4
  21:16,23 22:6,15
  23:17,20 30:8,11
  34:16
once 17:19 26:23 28:1
  35:18
oncoming 19:12
one 10:1 11:11 14:19
  26:14,15 33:16,17
  34:6
only 33:2
onto 19:22
opened 24:22
opposite 22:17
order 25:7
originally 33:3
other 3:21 4:2,8 14:20

15:12 22:18 25:9
  26:15 33:2,5 36:13
out 8:18 10:2 12:4,7,12
  12:13 13:8 19:1
  22:15,23 24:22 25:1
  26:9,13 28:8 32:21
  34:15,17,22 38:7
outside 6:20
over 6:23 7:2 19:6,8
  20:9,12,15 21:3
  30:18,23 31:5

**P**

page 33:20 34:4
pages 38:4
pants 27:3,4 29:8
parked 32:17,21 33:3
part 36:13
particular 5:13 7:4
parties 3:14 4:5,12
  38:7,10
party 4:2,8
pass 15:12
passenger 24:9,9,11
  25:20 26:1 27:16,22
  28:3,4 29:16,22 30:5
  30:9 32:6,10,12,13
passenger's 22:10
past 25:23
pat 29:6
people 12:23 13:3,5,6,7
  13:9
period 29:17 32:5,19
perks 14:6
personally 12:17
Physical 7:17
pitted 21:22,23 22:6
Plaintiff 1:7 2:3 37:16
Plaintiff's 3:5 33:12,14
  33:18 35:3 36:15
play 36:13
please 5:7
point 18:21 21:8 27:3
  27:22 30:2 34:6
Pointe 1:19 2:10
police 5:18,20 9:7,8,18
policy 9:21 34:21 35:1
portable 18:10,11
position 5:11
positive 5:23 7:22
  15:10 32:15 33:19
  34:10
POST 6:21 36:6
precision 22:1
PRESENT 2:16
pretty 27:21 36:1
prior 12:3 23:10
probable 15:18,20 16:1
  16:5,14,15,18

probably 11:11 20:21
Procedure 3:16
proceeded 28:2
prosecution 36:16
protection 24:6
provided 4:3,9
pull 18:21 19:6,8 20:9
  20:12,15 21:3
pulled 17:17,22 19:6
pulls 17:10 21:16 24:1
purely 23:15
purpose 4:2 11:16
  15:15
pursuant 1:16 3:15
put 18:14,16 21:5 27:1
  27:2,13 28:6 30:18
  30:23 32:22 33:1
  35:1
P.C 2:9

**Q**

Quantico 6:18
question 3:22 15:23
  16:3,11
questions 3:21

**R**

radio 35:18,19,19,20
rank 5:13
reached 20:6
reaching 26:6
reading 38:7
rear-view 18:18
reason 14:13 19:13
  26:7
recall 11:3,10 13:3
  28:22 32:8 33:10
  35:16
received 12:17
recess 36:10
recognize 33:17
refused 20:16
regard 34:18
regardless 4:9
remain 9:8
remember 9:5 19:12
  28:17 31:14 35:14,20
remove 29:7,10
removed 29:13
rephrase 16:3
report 10:3 35:4
reported 37:9
Reporter 1:17 3:18
  4:18 37:8 38:17
REPORTER'S 37:4
reports 34:22
representing 3:14 4:5
reprimanded 35:7,10
  35:17

required 6:21 35:5
residue 34:12
response 5:23 7:22
  15:10 24:20 32:15
  33:19 34:10
results 38:11
return 9:13
returned 9:11
revolver 28:14
RICHARD 1:6 37:15
Rick 2:12
right 6:14,17 9:12,19
  9:20 10:2 11:14
  12:15 13:11 14:1,6
  14:13 16:17 17:9,14
  17:22 18:14 19:17,19
  21:2,12 22:7 23:21
  24:19 25:9,14,23
  26:2 27:15,22 28:17
  30:11 31:2 32:14
  33:11 34:2
road 2:14 14:1,5 18:23
  22:18,21 23:17,23
  31:12
roadside 31:17
rode 30:5,9
role 32:9
rolled 19:5
Rules 3:16
run 27:8 30:20,21

**S**

Sadler 1:17 3:17 37:7
  38:15
SAITH 37:2
sale 12:21
same 4:10 38:8
sandwich 31:23
sat 21:6 24:12 28:8
saw 16:8,22 17:1,3
  28:13 29:6
saying 25:4
says 15:8 20:12
scene 23:21 28:23
school 6:7,12 8:7
search 28:16 31:17
searched 28:17,18,23
  28:23
searching 31:4
seat 28:13,20
second 33:20 34:3
secure 29:15 32:23
secured 29:15
see 14:7 15:7,20,23
  16:5,7,9,15 18:2
  25:22 26:1 27:7
  28:19 29:5,7,10
  30:13
semesters 6:11

separate 10:18
serve 29:5
set 38:7
setting 23:21
Sheriff 35:15
sheriff's 5:10,12,22
  8:19,23 9:1,3,10,11
  9:14,22 10:14,22
  31:7 35:11
shot 26:3
shoulder 22:19 23:22
  33:8
show 33:16
shown 33:11
side 18:19 19:3 21:22
  22:9,10,18 31:12
  34:7
sight 29:18
signature 4:13 33:21
signing 38:7
Since 14:23 15:3
sir 5:20 28:5 29:3 36:17
sitting 27:18
six 6:23 7:2
six-week 7:3
slow 23:7
slowed 23:7
slows 21:21
some 6:7 7:2 18:21
  27:3 36:1
something 23:1 34:6
sorry 10:16
south 2:5 11:21 19:21
speak 5:3 37:12
special 7:5
specific 13:9
specifics 12:14
speed 17:16,17 23:8,11
  23:17
spot 20:5
spun 22:15
started 31:14
starting 10:9
State 1:18 3:19 8:10,12
  8:13 37:5,8 38:17
stated 22:14
statement 3:7 35:2
  36:14
STATES 1:2 37:22
statue 24:12 27:18
Statute 4:3,9
stay 9:2
stayed 24:5,23
still 9:17 18:22 19:14
  20:2,8,15 27:17,18
  32:6
stipulated 3:13 4:4,11
stipulation 1:16
stipulations 3:12 4:19

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson                    January 21, 2008

Page 4

stop 15:14,16,21 16:1,6
    21:5 31:12
stopped 31:13
stopping 15:19 20:11
straightaway 19:2
street 2:5 10:22
stunned 26:15
subject 16:13
Suite 2:13
sure 4:20,21 34:23 36:1
suspended 36:7
swing 27:7
sworn 5:2 37:12

_____ T _____
take 18:4 25:9,10 27:7
    31:23 34:2
taken 1:15 3:15,17
    36:10
talk 12:10
talking 13:3,6 21:13,15
    22:1
task 5:17 11:5 34:21
tear 32:1
technique 22:2
tell 5:7 6:3 8:6,14 10:5
    11:6 13:12,21 20:18
    28:10 30:8
testified 5:4
themselves 13:8
thereof 38:11
thing 21:19
think 7:11 9:23 21:4
    26:10 29:3 30:1
though 35:21
three 7:11,14 9:4
throwing 34:6
tie 32:1
time 9:9,10 10:8,13,17
    11:11,12 12:3 19:4,5
    20:11 21:10 22:13
    23:4,5,9,10 25:4,19
    27:16,19 29:17 32:5
    32:19 33:5 35:15
tire 31:13
told 15:18 21:4 24:17
    30:16 32:22,23 34:14
tossed 23:1
toward 19:20 23:23
    24:2
Tracye 1:16 3:17 37:7
    38:15
traffic 19:13
training 6:9,15 7:7
transcript 38:5
transportation 30:2
trial 4:7
truck 21:20,21 23:6
true 38:5

truth 5:3,3,4 37:12,13
    37:13
try 27:8
turn 18:5 19:18 33:20
turned 19:19 34:15
turns 15:13 17:9
tussle 27:5
two 7:11 9:4 17:2
two-lane 20:2
two-thirds 34:4
two-week 7:2

_____ U _____
Uh-huh 5:23 7:22
    15:10 32:15 33:19
    34:10
unit 30:3,3 31:13
UNITED 1:2 37:22
until 8:21 9:10 17:20
use 9:20 10:2 34:17,23
used 4:2,8 34:23 35:6
Usual 4:18

_____ V _____
Varner's 35:15
vehicle 24:17,23 26:6
    27:23 28:11,16 31:4
    31:6 32:6,7,16,18
vehicles 24:5
versa 22:12
very 25:5
vice 22:12
violent 30:13
vs 1:8 37:17

_____ W _____
waived 4:7,14 38:8
waiving 4:10
walked 28:11 30:23
want 13:1 19:8 34:2
wanted 13:7
wasn't 13:14 15:22,23
    16:2,7,14 31:15
watched 29:14
watching 29:12
way 13:16 19:17 22:12
    22:13,14 30:14 31:7
weapon 21:8 25:14,16
    26:8,8 27:17
wearing 20:17,19
Webb 1:19 2:9
weeks 6:23 7:2,11,12
well 8:14 10:9 22:4,13
went 12:3 21:22
were 5:15,18 9:17 10:5
    10:9,10 11:18 12:7
    12:12,13 14:3,5
    16:10 17:12 18:22
    20:15,17 21:10 22:21

23:7,8,14 25:19,20
    25:21 29:12,19,21
    35:7,16 36:3
weren't 16:16
West 1:9 2:17 11:8,8
    11:13,17 12:4,9
    13:22 14:12 15:8,18
    16:19 17:9 21:12,14
    21:15,16 24:1,15,19
    25:6,11 26:2 29:5,18
    30:2 32:14 37:18
we're 20:13
we've 23:21 30:1
while 18:22 22:20
    30:15 31:3 33:5
whole 5:3 31:15 37:13
Wilcox 19:20
window 19:5 23:1
    26:14 34:7
windows 20:14
windshield 23:2
wish 33:10
witness 4:12,13 5:2
    26:17 38:6
work 7:16 8:22 10:10
worked 8:20
write 33:23
writing 36:14

_____ Y _____
Yeah 6:6 26:14 31:10
years 7:14 9:4,4
yelled 24:9
yelling 20:13 24:8,15
    25:7,12
yells 20:11
y'all 19:7 20:10

_____ 1 _____
10:40 1:21
102 34:8
104 34:8
11:15 36:23
16 7:20
1977 8:8
1995 8:17
1998 8:22

_____ 2 _____
2nd 5:17
2:06-cv-701-ID.CSC
    1:8 38:2
20 38:19
2005 5:15 9:17 10:6
    14:21 34:19
2008 1:20 38:3,12
21 1:20 17:19,20 19:16
    19:21,22 38:3
28th 5:15 10:5 14:20

34:19
294 38:16

_____ 3 _____
300 2:13
34 3:7
357 28:13,14,20
36106 2:14
36117 2:11
37 38:4
3716 7:18,19

_____ 4 _____
4001 2:14

_____ 5 _____
5 3:3
55 23:19,20

_____ 6 _____
6th 38:12
6-28-05 3:7

_____ 7 _____
7 3:7 14:1,5 18:23
    33:14,18 35:3 36:15
70 23:16
7475 1:19 2:10
77 6:13

_____ 8 _____
847 2:5

_____ 9 _____
9-21-58 8:5
9-30-2008 38:16
95 8:20
98 8:21

# DEPOSITION OF KELVIN CARMICHAEL

## November 14, 2007

## Pages 1 through 89

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT
4

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5   RICHARD MARSHALL,
 6          Plaintiff,
 7   vs.                    CIVIL ACTION NO.
                            2:06-cv-701-ID.CSC
 8
     CHRIS WEST, in his individual
 9   capacity, LASHUN HUTSON, in his
     individual capacity,
10
          Defendants.
11
12
13          * * * * * * * * * * * * *
14
15        DEPOSITION OF KELVIN CARMICHAEL, taken
16   pursuant to stipulation and agreement before Lyn
17   Daugherty, ACCR #66, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on Wednesday, November
21   14, 2007, commencing at approximately 1:55 p.m.
22
            * * * * * * * * * * * * *
23
```

**Page 2**

```
 1                  APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Jay Lewis
     Mr. Fred L. Clements
 4   LAW OFFICES OF JAY LEWIS
     Attorneys at Law
 5   847 South McDonough Street
     Montgomery, Alabama 36104
 6
 7   FOR THE DEFENDANT WEST:
 8   Mr. Gary Wilford
     Mr. Daryl L. Masters
 9   WEBB & ELEY, P.C.
     Attorneys at Law
10   7475 Halcyon Pointe Drive
     P.O. Box 240909
11   Montgomery, Alabama 36124
12
     ALSO PRESENT: Mr. Richard Marshall
13
14          * * * * * * * * * * * * *
15        EXAMINATION INDEX
16
     KELVIN CARMICHAEL
17
       BY MR. WILFORD . . . . . . . . . . 4
18
19
            EXHIBIT INDEX
20
                    MAR
21   Defendant
22   13  Photograph              73
23
```

**Page 3**

```
 1                  STIPULATIONS
 2      It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of KELVIN CARMICHAEL is taken pursuant
 5   to the Federal Rules of Civil Procedure and that
 6   said deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16      It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23      It is further stipulated and agreed by and
```

**Page 4**

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby waived.
 4          * * * * * * * * * * * * *
 5              KELVIN CARMICHAEL
 6      The witness, after having first been duly sworn
 7   to speak the truth, the whole truth and nothing but
 8   the truth testified as follows:
 9                EXAMINATION
10   BY MR. WILFORD:
11   Q.  Would you please state your name for the
12       record, sir.
13   A.  Kelvin Carmichael.
14   Q.  Could you spell your first name for me,
15       please.
16   A.  K-E-L-V-I-N.
17   Q.  Is it pronounced Kevin or Kelvin?
18   A.  Kelvin.
19   Q.  Mr. Carmichael, have you ever given a
20       deposition before?
21   A.  No.
22   Q.  What we've got here is we've got a court
23       reporter who is going to be taking down
```

Page 5

1  every word you and I say and anybody else
2  says here in the courtroom today -- I'm
3  sorry -- this conference room today. And
4  so it's going to be important that we stick
5  to certain rules as we're going through
6  this thing. And one of those is that I
7  need you to wait until I finish asking you
8  a question before you answer it; all right?
9  A. (Witness nods head).
10 Q. And one of the things that I need you to do
11 when you answer it, unlike what you did
12 right there, is answer out loud for me
13 either yes, no, or whatever the explanation
14 might be, because it's very difficult for
15 her to get down head shakes and noddings of
16 the head like you just did there; all
17 right?
18 A. All right.
19 Q. And as we kind of go through this, if you
20 do that, hopefully I'll catch it and remind
21 you of it. If I ask you a question and you
22 don't understand the question, let me know
23 and I'll be happy to rephrase it for you.

Page 6

1  A. All right.
2  Q. Because what I'm going to do is if I ask
3  you a question and you answer me, I'm going
4  to assume you understood my question. Is
5  that fair?
6  A. Yes.
7  Q. If for whatever reason you need a break,
8  let me know. We can go ahead and take a
9  break. I think you noticed during
10 Mr. Marshall's deposition we took a couple
11 of breaks. And all you've got to do is
12 just let me know and we can do that; all
13 right?
14 A. All right.
15 Q. Okay. In preparing for your deposition
16 today, did you speak with anyone?
17 A. No.
18 Q. You didn't speak with Mr. Marshall?
19 A. He called me and told me that we had to
20 come here.
21 Q. Is that all he told you?
22 A. Yes.
23 Q. When did he call you?

Page 7

1  A. The day before we had to go meet at his
2  office.
3  Q. Who is his office?
4  A. We went to talk to him because they wanted
5  to see me.
6  Q. You're saying him. I don't know who him
7  is.
8  A. I don't know his --
9  Q. This gentleman sitting next to you right
10 here?
11 A. Yes.
12 Q. From Mr. Lewis's office?
13 A. Yes.
14 Q. And y'all spoke about this deposition here
15 today?
16 A. They just told us that we had to come here
17 and how to get here and all that.
18 Q. Did you talk about your testimony with him?
19 A. No.
20 Q. Did they ask you about the facts of the
21 case?
22 A. No.
23 Q. Did you look at any documents?

Page 8

1  A. No.
2  Q. What's your date of birth?
3  A. September 25th, 1980.
4  Q. That makes you 27; is that right?
5  A. Yes.
6  Q. Where were you born?
7  A. Montgomery.
8  Q. Do you work right now?
9  A. Yes.
10 Q. Where do you work?
11 A. At Quincy's Triple Seven in Shorter.
12 Q. How long have you been at Quincy's Triple
13 Seven?
14 A. Almost three weeks.
15 Q. And what do you do for them?
16 A. Housekeeping.
17 Q. Did you work before Quincy's Triple Seven?
18 A. Yes.
19 Q. Who did you work for?
20 A. I worked for Big Lots.
21 Q. When did you work for Big Lots?
22 A. About four years. But up until then I've
23 been working with my uncle painting. Up

Deposition of Kelvin Carmichael                                                                                          November 14, 2007

---

Page 9

1    until now --
2    Q.  So you were working -- I'm sorry.
3    A.  Up until now when I stopped working at Big
4        Lots.  I think it was in '05, '06,
5        something like that.
6    Q.  That's when you started or when you
7        stopped?
8    A.  When I stopped.
9    Q.  When did you start with them?
10   A.  I think it was in '01, '02.
11   Q.  And you said after you left Big Lots you
12       worked with your uncle?
13   A.  Painting.
14   Q.  Did you work at Big Lots the same time
15       Mr. Marshall did?
16   A.  Huh-uh (negative response).
17   Q.  Is that a no?
18   A.  No.
19   Q.  What about before Big Lots, who did you
20       work for, if anybody, then?
21   A.  Long John Silver.
22   Q.  Where at?
23   A.  On Norman Bridge Road.

---

Page 10

1    Q.  How long did you work for them?
2    A.  I worked for them when I was in school
3        since about '98.
4    Q.  Why did you leave Long John Silver's?
5    A.  Because I started working at Big Lots.
6    Q.  And then why did you leave Big Lots?
7    A.  I got terminated.
8    Q.  And why did you get terminated?
9    A.  Missing too many days.
10   Q.  Have you ever been married?
11   A.  No.
12   Q.  Where do you live?
13   A.  Norman Bridge Road.
14   Q.  What's the address there?
15   A.  3468 Apartment A.
16   Q.  Did you graduate from high school?
17   A.  Yes.
18   Q.  What high school did you graduate from?
19   A.  Sidney Lanier.
20   Q.  And when did you graduate?
21   A.  '99.
22   Q.  Have you ever been to college?
23   A.  No.

---

Page 11

1    Q.  Ever been to trade school?
2    A.  No.
3    Q.  How long have you lived on Norman Bridge
4        Road?
5    A.  About three months.
6    Q.  Where did you live before that?
7    A.  Davenport Drive.
8    Q.  Is that in Montgomery?
9    A.  Yes.
10   Q.  What's the street number there?
11   A.  I'm not really sure of that.  I just know
12       it's Davenport because I was staying there
13       with a girl.  But it wasn't nothing but
14       like a year.
15   Q.  How long did you live on Davenport Drive?
16   A.  About a year.
17   Q.  So that would have been about '06; is that
18       right?
19   A.  Yes.
20   Q.  And where did you live before that?
21   A.  In Stone Crossing.
22   Q.  Where is that?
23   A.  On Woodley Road.

---

Page 12

1    Q.  How long did you live in Stone Crossing?
2    A.  About six months.
3    Q.  Were you living in Stone Crossing at the
4        time of the traffic stop that led to this
5        lawsuit?
6    A.  No.
7    Q.  Where were you -- Then let's keep going
8        back.  Where did you live before Stone
9        Crossing?
10   A.  I had my own apartment in the Colonies.
11       But it's Cypress Court now.  They changed
12       the name of it.  It's on -- what street --
13       Troy Highway, right off Troy Highway.
14   Q.  Is that where you were living at the time
15       of the traffic stop?
16   A.  No.  I think I had got put out my apartment
17       and I had went to stay with my grandmother
18       for a minute.
19   Q.  So you were living with your grandmother at
20       that time?
21   A.  I was just staying with her for a minute.
22   Q.  Well, you have to explain to me what you
23       mean for a minute.  How long a time are we

---

Page 13

1    talking about?
2    A.  It was probably about two, three months,
3        something like that.
4    Q.  Was there anyplace that you lived at
5        between your grandmother's house and
6        Cypress Court?
7    A.  No.
8    Q.  Where is your grandmother's house at?
9    A.  In Farmersville.
10   Q.  What's the address there?
11   A.  I don't know.  I just know it's on
12       Youngblood Road.  I don't know the address.
13   Q.  So that's not too far from where
14       Mr. Marshall was living at the time?
15   A.  Not that far.
16   Q.  About how far would you say?
17   A.  Maybe five, 10 miles, I guess.
18   Q.  Are you and Mr. Marshall related?
19   A.  Yes.
20   Q.  How are you related?
21   A.  My cousin.
22   Q.  Do you have any children?
23   A.  Yes.

Page 14

1    Q.  How many?
2    A.  One.
3    Q.  How old is the child?
4    A.  She's five, fixing to be six.
5            MR. WILFORD:  Can we get the same
6            stipulation with this witness,
7            Jay, on the relatives?
8            MR. LEWIS:  Right.
9    Q.  Do you go to church?
10   A.  No.
11   Q.  Have you ever gone to church?
12   A.  Yes.
13   Q.  Last time you went to church where did you
14       go?
15   A.  Morning Pilgrim.
16   Q.  Where is that at?
17   A.  On Rosa Parks.
18   Q.  In Montgomery?
19   A.  Yes.
20   Q.  Have you ever been a member of a union?
21   A.  No.
22   Q.  Any kind of social organization?
23   A.  No.

Page 15

1    Q.  Have you ever been a party to a lawsuit?
2    A.  No.
3    Q.  Never been sued?
4    A.  No.
5    Q.  Never sued anybody?
6    A.  No.
7    Q.  Have you ever been arrested before?
8    A.  Yes.
9    Q.  How many times have you been arrested?
10   A.  Maybe five times, I guess.  Just tickets.
11   Q.  Okay.  I'm not talking about -- What kind
12       of tickets are you talking about?
13   A.  Like tickets that I got I didn't pay and
14       they stopped me.
15   Q.  So you've been arrested five times for not
16       paying tickets?
17   A.  Yes.
18   Q.  Is that what you're telling me?
19            When was the first time you were
20       arrested?
21   A.  That's kind of hard to say.  I don't
22       remember how long that's been.  Maybe 2000.
23   Q.  Where were you arrested in 2000?

Page 16

1    A.  Montgomery.
2    Q.  Who was it that arrested you?  City
3        police?  County police?
4    A.  City.
5    Q.  And what specifically did they arrest you
6        for?
7    A.  Warrants for not -- unpaid ticket.
8    Q.  What was the unpaid ticket?
9    A.  I think it was a noise ordinance ticket.
10   Q.  Anything else besides the noise ordinance
11       ticket?
12   A.  At that time?
13   Q.  Yes, sir.
14   A.  Just speeding tickets.  I got arrested
15       like --
16   Q.  I'm just asking you about the 2000 arrest
17       right now.  We're going to go through each
18       of them.
19   A.  Not that I remember.
20   Q.  What happened with that arrest?  Were you
21       put in jail?
22   A.  Yes.
23   Q.  How long did you stay in jail?

Page 17

| | |
|---|---|
| 1 | A.  A few hours. |
| 2 | Q.  Did you pay the tickets? |
| 3 | A.  Yes. |
| 4 | Q.  Is that how you got out? |
| 5 | A.  Yes. |
| 6 | Q.  What about your second arrest, when was |
| 7 | that? |
| 8 | A.  I think it was an unpaid speeding ticket. |
| 9 | Q.  Do you remember when that was? |
| 10 | A.  No. |
| 11 | Q.  How long after the 2000 arrest was it? |
| 12 | A.  Maybe a year, year later. |
| 13 | Q.  So maybe sometime in '03? |
| 14 | A.  Yeah.  Yes. |
| 15 | Q.  And where were you arrested then? |
| 16 | A.  Montgomery. |
| 17 | Q.  By the Montgomery Police Department? |
| 18 | A.  Yes. |
| 19 | Q.  Spend time in jail on that one? |
| 20 | A.  Couple of hours. |
| 21 | Q.  Did you pay the tickets? |
| 22 | A.  Yes. |
| 23 | Q.  How about arrest number three, when did |

Page 18

| | |
|---|---|
| 1 | that take place? |
| 2 | A.  Probably was another year later. |
| 3 | Q.  So sometime in '04? |
| 4 | A.  Yes. |
| 5 | Q.  And who arrested you that time? |
| 6 | A.  Montgomery city. |
| 7 | Q.  And what was that arrest for? |
| 8 | A.  I think it was -- I had a driving while |
| 9 | suspended I didn't pay. |
| 10 | Q.  What was your driver's license suspended |
| 11 | for? |
| 12 | A.  A speeding ticket. |
| 13 | Q.  A speeding ticket? |
| 14 | A.  Yes. |
| 15 | Q.  How did you get your license suspended for |
| 16 | a speeding ticket? |
| 17 | A.  Not paying the ticket. |
| 18 | Q.  All right.  What happened as a result of |
| 19 | the '04 arrest? |
| 20 | A.  What happened? |
| 21 | Q.  Yes, sir.  Were you put in jail again? |
| 22 | A.  Yes. |
| 23 | Q.  How long were you in jail that time? |

Page 19

| | |
|---|---|
| 1 | A.  Couple hours. |
| 2 | Q.  Was it the Montgomery City Jail? |
| 3 | A.  Yes. |
| 4 | Q.  And what happened with the driving while |
| 5 | suspended charge? |
| 6 | A.  I had to pay a fine. |
| 7 | Q.  Did you ever get your license back? |
| 8 | A.  No. |
| 9 | Q.  So sitting here today you don't have a |
| 10 | driver's license? |
| 11 | A.  No. |
| 12 | Q.  The fourth arrest, when did that take |
| 13 | place? |
| 14 | A.  I was arrested about -- I think it was |
| 15 | about two, three months ago. |
| 16 | Q.  Sometime in '07? |
| 17 | A.  Yes. |
| 18 | Q.  What was that arrest for? |
| 19 | A.  Smoking in a nightclub. |
| 20 | Q.  Smoking in a nightclub? |
| 21 | A.  (Witness nods head). |
| 22 | Q.  Where was that at? |
| 23 | A.  The name of the club?  The Martini Bar. |

Page 20

| | |
|---|---|
| 1 | Q.  Is that in Montgomery? |
| 2 | A.  Yes. |
| 3 | Q.  Who arrested you? |
| 4 | A.  I have no idea, because it wasn't the city |
| 5 | and it wasn't the county.  But they took me |
| 6 | to the county, though. |
| 7 | Q.  The Montgomery County Jail? |
| 8 | A.  Yes. |
| 9 | Q.  What happened when you got to the |
| 10 | Montgomery County Jail? |
| 11 | A.  I stayed there a couple hours and got out. |
| 12 | Q.  Was that on bond? |
| 13 | A.  Uh-huh (positive response). |
| 14 | Q.  What's the bond for smoking in a bar? |
| 15 | A.  I think it was about, yeah, 150. |
| 16 | Q.  I take it those charges are still |
| 17 | pending -- |
| 18 | A.  Uh-huh (positive response). |
| 19 | Q.  -- or that charge is still pending? |
| 20 | A.  I already went to court for it. |
| 21 | Q.  What happened? |
| 22 | A.  They put me in a class. |
| 23 | Q.  Did you have to pay a fine? |

Page 21

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. How much? |
| 3 | A. I think it was like about $400 and I've got |
| 4 | to pay for the class. |
| 5 | Q. What is the class on? Do you know? |
| 6 | A. Put me in a class with alcoholics and |
| 7 | stuff. |
| 8 | Q. Okay. The fifth arrest, what was that? |
| 9 | A. I haven't been arrested since that. |
| 10 | Q. So really it was four times and not five |
| 11 | times you've been arrested? |
| 12 | A. Yeah. It ain't been nothing but just |
| 13 | tickets. |
| 14 | MR. WILFORD: Off the record. |
| 15 | (Off-the-record discussion.) |
| 16 | Q. Other than this class that you're going to |
| 17 | have to attend for smoking in a bar, have |
| 18 | you ever been treated for alcohol or drug |
| 19 | addiction? |
| 20 | A. No. |
| 21 | Q. Have you ever been treated for mental |
| 22 | illness? |
| 23 | A. No. |

Page 22

| | |
|---|---|
| 1 | Q. You know the event that we're here on |
| 2 | today; right? |
| 3 | A. Yes. |
| 4 | Q. Something happened out on Highway 21 in |
| 5 | Lowndes County? |
| 6 | A. Yes. |
| 7 | Q. Would you agree with me that that happened |
| 8 | on June 28th of 2005? |
| 9 | A. I'm not sure of the date. |
| 10 | Q. You don't have an independent recollection |
| 11 | of the date? |
| 12 | A. No. |
| 13 | Q. Would you have any reason to disagree that |
| 14 | June 28th, 2005 was the date this occurred? |
| 15 | A. I'm just not sure of the date. |
| 16 | Q. That's fine. Do you remember what you were |
| 17 | doing the day that this occurred? |
| 18 | A. Before or after? |
| 19 | Q. Before. |
| 20 | A. Yes. |
| 21 | Q. What were y'all doing? What were you |
| 22 | doing? Excuse me. |
| 23 | A. Watching them take a motor out of the car. |

Page 23

| | |
|---|---|
| 1 | Q. Watching who take a motor out of the car? |
| 2 | A. Two of my cousins. |
| 3 | Q. And who were the two cousins? |
| 4 | A. His name is -- because we call him by his |
| 5 | nickname. His name is Herman, though. |
| 6 | Q. And who else? |
| 7 | A. And my other cousin Steven. |
| 8 | Q. Steven? |
| 9 | A. Yes. |
| 10 | Q. Do you know what Herman and Steven's last |
| 11 | names are? |
| 12 | A. I know Steven's last name is Howard. I'm |
| 13 | not sure what Herman's last name is. |
| 14 | Q. Was there anybody else present that day? |
| 15 | A. Yes. |
| 16 | Q. Who? |
| 17 | A. Richard Marshall. |
| 18 | Q. Anybody else? |
| 19 | A. No. |
| 20 | Q. All right. Where were you taking this -- |
| 21 | or where were they taking this motor out |
| 22 | at? |
| 23 | A. At my aunt's house. |

Page 24

| | |
|---|---|
| 1 | Q. What's your aunt's name? |
| 2 | A. Gwendolyn Howard. |
| 3 | Q. Where does she live? Where did she live at |
| 4 | the time? Excuse me. |
| 5 | A. Probably about a mile or two from my |
| 6 | grandma's house. |
| 7 | Q. That's in Farmersville? |
| 8 | A. Yes. |
| 9 | Q. When did you first get to your aunt's house |
| 10 | that morning? |
| 11 | A. I'm really not sure what time it was. I |
| 12 | know it was like -- kind of like in the |
| 13 | morning. Maybe ten, nine, something like |
| 14 | that. |
| 15 | Q. How did you get there? |
| 16 | A. In the car with Richard. |
| 17 | Q. How did you come to be in the car with |
| 18 | Richard? |
| 19 | A. Because I spent the night at his house that |
| 20 | night. |
| 21 | Q. The night before? |
| 22 | A. Yes. |
| 23 | Q. What did y'all do the night before? |

|  | Page 25 |  | Page 27 |
|---|---|---|---|

**Page 25**

1   A.  Nothing. Just at his house.
2   Q.  And y'all didn't go anywhere?
3   A.  No.
4   Q.  Did y'all have anything to drink that
5      night?
6   A.  No.
7   Q.  Do any drugs that night?
8   A.  No.
9   Q.  What time did y'all get up on the morning
10     of the 28th? And I understand that you
11     don't have an independent recollection it
12     was the 28th. I'm just going to use that
13     as a form of shorthand for right now.
14  A.  Maybe eight, something like that.
15  Q.  Did you go straight to your aunt's house
16     from there?
17  A.  Yes.
18  Q.  Did y'all have any breakfast that morning?
19  A.  No.
20  Q.  How long did it take to take that motor out
21     of the car?
22  A.  Maybe an hour. Probably less than that.
23  Q.  Were they doing anything else while they

**Page 26**

1     were taking the motor out?
2   A.  Nothing but talking and laughing.
3   Q.  Anybody have a beer?
4   A.  No.
5   Q.  Nothing to drink at all?
6   A.  No.
7   Q.  All right. What happened after the motor
8     was out of the car?
9   A.  Me and my cousin got in the car and we was
10     on our way back to his house.
11  Q.  In Richard's car?
12  A.  Yes.
13  Q.  What kind of car did Richard have?
14  A.  Blue Nova.
15  Q.  I'm going to show you what was previously
16     marked as Defendant's Exhibit 2 to Richard
17     Marshall's deposition. Is that Richard's
18     car?
19  A.  Yes.
20  Q.  What were you going to do when you got back
21     to Richard's house?
22  A.  Nothing. Watch TV.
23  Q.  Do you remember what day of the week it

**Page 27**

1     was?
2   A.  No.
3   Q.  Were y'all meeting anybody at Richard's
4     house?
5   A.  No.
6   Q.  Between your aunt's house and the time that
7     you first encountered my client in his car,
8     did y'all stop anywhere?
9   A.  No.
10  Q.  Who was driving the car?
11  A.  Richard.
12  Q.  Where were you at in the car?
13  A.  In the passenger's side.
14  Q.  Are there any seat belts in that car?
15  A.  Yes.
16  Q.  Were you wearing yours?
17  A.  Yes.
18  Q.  Was Richard wearing his?
19  A.  Yes.
20  Q.  So if Richard says he wasn't, he was
21     mistaken?
22  A.  He be telling me to put mine on, so I'm
23     pretty sure he had his on.

**Page 28**

1   Q.  Do you actually remember him having his
2     seat belt on, or you're just pretty sure?
3   A.  I'm sure, because he told me to put mine
4     on. That's how he drive with his seat belt
5     on.
6   Q.  Was there any alcohol in that car?
7   A.  No.
8   Q.  Let me show you what was previously marked
9     as Defendant's Exhibit 3. What was in that
10     flask?
11  A.  Nothing.
12  Q.  Do you know what had been in that flask?
13  A.  No. But I know nothing was in it, though.
14  Q.  That flask was in the car that day, though;
15     right?
16  A.  Yeah.
17  Q.  Whose Swishers were those?
18  A.  I don't know.
19  Q.  Were they yours?
20  A.  No.
21  Q.  That was Richard's car; right?
22  A.  Huh?
23  Q.  That was Richard's car; right?

Page 29

1   A. Yes.
2   Q. Do you see anything in Defendant's Exhibit
3      3 that belonged to you?
4   A. No.
5   Q. You see that gun in Defendant's Exhibit 3;
6      right?
7   A. Yes.
8   Q. Whose gun was that?
9   A. I don't know.
10  Q. Was it in the car when you got in the car
11     that morning?
12  A. Yes.
13  Q. Where was it when you got in the car that
14     morning?
15  A. On the seat.
16  Q. About where it is in Defendant's Exhibit 3?
17  A. Yes.
18  Q. Is that the front seat of Richard's car in
19     Defendant's Exhibit 3?
20  A. Yes.
21  Q. Is that gun loaded?
22  A. I don't know.
23  Q. Did you ever pick that gun up?

Page 30

1   A. I just seen it and I ain't asked nothing
2      about it because it wasn't my business,
3      so ...
4   Q. The gun looks to me like it's pointing
5      toward the passenger's side of the car.
6      Does that look like it's pointing that way
7      to you?
8   A. Yes.
9   Q. Make you nervous having a gun pointed at
10     you?
11  A. No.
12  Q. So you didn't pay it no mind?
13  A. No.
14  Q. All right. Did you ever see Richard with
15     that gun before?
16  A. No.
17  Q. That's the first time you saw it was that
18     day?
19  A. Yes. That's why I didn't ask him nothing
20     about it.
21  Q. Did Richard usually have a gun?
22  A. No.
23  Q. Was that the first time you had ever seen

Page 31

1     Richard with a gun?
2   A. Yes.
3   Q. So that's the first time you've ever seen
4     him with a gun and you didn't ask him
5     anything about it?
6   A. No.
7   Q. Do you know if Richard had any money on him
8     that day?
9   A. I know he had just sold my cousin a motor,
10     but I don't know what he sold it for,
11     though.
12  Q. Did you see any money change hands?
13  A. Not really. But he told me that my cousin
14     was fixing to buy it. That's why we went
15     over there to watch him take it out.
16  Q. But you didn't see him give him any money;
17     right?
18  A. Not at the time.
19  Q. Did you ever see him give him any money
20     later?
21  A. No. I know my cousin told me he bought the
22     motor from him.
23  Q. Which cousin was that?

Page 32

1   A. Herman.
2   Q. Did you ever actually see Richard with any
3     money that day?
4   A. Yes.
5   Q. When did you see him with money?
6   A. That morning before we left.
7   Q. How much did he have on him? Were you able
8     to see how much?
9   A. No.
10  Q. Were you able to see any particular bill?
11  A. No.
12  Q. How was he carrying the money?
13  A. In his pocket.
14  Q. Did he just take it out and show it to you?
15  A. No. We were fixing to go to the store and
16     get some gas, but he just said we're going
17     to go ahead on down there because they were
18     waiting on us.
19  Q. Okay. So how did you seeing his money come
20     into play there?
21  A. Because he was counting it because he said
22     he was fixing to go get gas, but he was
23     going to go ahead on and go to my auntee's

Deposition of Kelvin Carmichael

November 14, 2007

Page 33

1    house first and he would just get it when
2    we left there.
3    Q.  All right.  When was the first time you
4       noticed the car that my client was in?
5    A.  When they pulled up on the side with a
6       pistol.
7    Q.  Where was that at?
8    A.  The same road that you turn off to go to my
9       grandmother's house.  It wasn't 21.  I'm
10      not for sure what the name of the road
11      was.  But I remember them pulling up on the
12      side of us with a gun.
13   Q.  That's the first time you saw them?
14   A.  Yeah.
15   Q.  You didn't see them at any point before
16      that?
17   A.  No.
18   Q.  What happened when they pulled up alongside
19      of you?
20   A.  He was pointing the gun and pointing at the
21      side of the road and telling us to pull
22      over.
23   Q.  Who was he?

Page 34

1    A.  The guy on the passenger's side.
2    Q.  Do you know who was on the passenger's
3       side?
4    A.  No.  I never saw them before.  They had on
5       regular clothes.
6    Q.  Have you learned since then who was on the
7       passenger's side?
8    A.  I know now he was the police, but I don't
9       know his name.
10   Q.  That's what I'm asking you.  Have you found
11      out what his name was?
12   A.  No.
13   Q.  Can you describe him for me?
14   A.  I know he was like -- he wasn't that tall.
15      Had a low haircut all over.  Kind of slim
16      guy.  He wasn't that big, not like the
17      driver.
18   Q.  Black guy?  White guy?
19   A.  Who?  The passenger?
20   Q.  Yes, sir.
21   A.  Black guy.
22   Q.  Did he have any facial hair?
23   A.  Yes.  I think he had a mustache.

Page 35

1    Q.  Just a mustache?
2    A.  I think he did.  He might have had a
3       full -- I know he just had a little beard
4       or something, I guess.  I wasn't really
5       looking at him like that.
6    Q.  You got a chance to look at him later,
7       though; right?
8    A.  Uh-huh (positive response).
9    Q.  Were you able to see the driver?
10   A.  Yes.
11   Q.  Did you know who the driver was prior to
12      that time?
13   A.  No.
14   Q.  Have you since learned who the driver was?
15   A.  Yes.
16   Q.  Who was the driver?
17   A.  Guy named Chris West.
18   Q.  And you didn't know Chris prior to this?
19   A.  No.  I never saw neither one of them.
20   Q.  Did you know of either one of them prior to
21      this?
22   A.  No.
23   Q.  All right.  So the car pulls up next to you

Page 36

1    and you said he had a gun?
2    A.  Yeah.
3    Q.  What kind of gun are we talking about?
4    A.  I just know it was black.  Because when I
5       seen him, I asked my cousin who is it, and
6       he say he don't know, might be somebody
7       trying to rob him or something.  So -- I
8       don't know.
9    Q.  Were you able to hear your cousin say that?
10   A.  Huh?
11   Q.  You were able to hear Richard say that?
12   A.  When I asked him who is it, I heard him say
13      he didn't know.
14   Q.  What hand did the person with the gun have
15      the gun in?
16   A.  I think it was his right because he was
17      pointing with his -- this arm right here
18      (indicating).  He was telling us to pull
19      over.
20   Q.  How was he holding the gun?
21   A.  Pointing it at us through his window.
22   Q.  You say he was pointing it at you and using
23      his other hand to point to the side of the

Deposition of Kelvin Carmichael

November 14, 2007

---

Page 37

1    road?
2    A.  Yes.
3    Q.  What did Richard do, if anything, when he
4        did that?
5    A.  We speeded up because we didn't know who
6        they was.  They was in regular clothes in a
7        regular car, so we speeded up.
8    Q.  What happened after you sped up?  Let me
9        back up.  I'm sorry.  Did Richard say
10       anything to them?
11   A.  No, not that I remember.
12   Q.  Was there anything going on that would
13       prevent you from hearing what Richard might
14       have said to them?
15   A.  He had the radio on, but I would have heard
16       if he said anything.  I mean, he didn't say
17       nothing to them because they had their
18       windows up and his window was down -- well,
19       our window was down.
20   Q.  Richard's window was down, but their window
21       was up?
22   A.  (Witness nods head).
23   Q.  So he's pointing through the glass with the

---

Page 38

1        gun?  Is that what you're telling me?
2    A.  Yes.
3    Q.  What kind of car did they have?
4    A.  It was a Lincoln.
5    Q.  Do you remember anything else about the
6        car?
7    A.  I think it was like a dark gray.
8    Q.  Was it a newer one or an older one?
9    A.  It was a newer one, but not that new.  I
10       think it was like about '98, '99.  It
11       wasn't no old model.
12   Q.  Did you see anything that stood out on the
13       car; antennas, license plates, anything
14       like that?
15   A.  No.  It was just regular car.
16   Q.  Did you see any blue lights on the vehicle?
17   A.  No.
18   Q.  The road that you were on when the car came
19       up alongside of you, is that a two-lane or
20       four-lane or some other lane?
21   A.  Two.
22   Q.  All right.  So you said Richard sped up.
23       What happened after he sped up?

---

Page 39

1    A.  They got behind us.
2    Q.  Did you watch them?
3    A.  I was looking in the rear view mirror, like
4        the little mirror on the side.  But I was
5        just looking at the car.  I wasn't watching
6        them.
7    Q.  You didn't turn around and look at them?
8    A.  Huh-uh (negative response).  I was trying
9        to tell him to go because I thought it was
10       somebody trying to rob us, too, or rob him
11       and they had a gun.  I ain't trying to get
12       shot.
13   Q.  Have you ever heard of any problems like
14       that happening in that part of the county
15       before?
16   A.  What?  People getting robbed?
17   Q.  Well, people coming up alongside in cars
18       and trying to rob people in a car.
19   A.  No.  But I'm from Montgomery.  I know it
20       happens.
21   Q.  Okay.  So you're watching in the side view
22       mirror.  What happens next?
23   A.  We turned on the road to go home.

---

Page 40

1    Q.  And what road is that that you turned on to
2        go home?
3    A.  I think that's -- I think it's 21.
4    Q.  Which way did you turn?
5    A.  Right.
6    Q.  Is that an intersection there that you
7        turned at?
8    A.  Yes.
9    Q.  Is there a stop sign, traffic light,
10       something there?
11   A.  A yellow flashing light.
12   Q.  Did Richard stop at that light?
13   A.  He yield.  He slowed down.  But then we
14       took off again because we didn't know who
15       they was.
16   Q.  Did he ever actually stop, though, at the
17       intersection?
18   A.  No.  Because there's a yield sign.
19   Q.  Was there any traffic around?
20   A.  No.  Not at that time.
21   Q.  Had you seen any other cars besides yours
22       and the Lincoln --
23   A.  No.

---

Page 41

1   Q.  -- up to that point?
2   A.  No.
3   Q.  What happened when you made the right onto
4      Highway 21?
5   A.  We took off again.
6   Q.  After the Lincoln fell in behind you before
7      the turn, did y'all -- you and Richard talk
8      about anything up until you turned right on
9      21?
10  A.  No.  Because I was really scared.  I was
11     wondering myself who they was.
12  Q.  You did say you were urging him to go on;
13     right?
14  A.  Because I didn't know who it was, yes.
15  Q.  What did you tell him?
16  A.  I just kept asking him who that is, and he
17     just kept shrugging his shoulders he didn't
18     know.  And I didn't know, so I just told
19     him, man, don't let them catch us because
20     we don't know who they is -- well, I don't
21     know who they is and then they're pointing
22     a gun too.
23  Q.  Did Richard appear to be mad?

Page 42

1   A.  No.
2   Q.  He didn't yell at anybody up to that point?
3   A.  No.
4   Q.  All right.  You make the right-hand turn
5      onto Highway 21.  What happens next?
6   A.  We rode down a little while and they were
7     still behind us.  And they ran to the back
8     of the car.
9   Q.  So they followed behind you and then just
10     ran into the back of the car?
11  A.  Yes.
12  Q.  How long from the time you turned right
13     onto 21 until they ran into the back of the
14     car?
15  A.  Maybe it was about a mile.
16  Q.  How fast was Richard going at that point?
17  A.  I don't know.
18  Q.  Did he go faster than he had been before he
19     turned off, about the same speed or slower?
20  A.  It was about the same speed.
21  Q.  Did you turn around at any point while you
22     were on Highway 21 to look at the car
23     behind you?

Page 43

1   A.  After they hit us the second time that's
2     when I looked back.
3   Q.  After they hit you the second time?
4   A.  (Witness nods head.)
5   Q.  Prior to them hitting you, did you turn
6     around and look back at them?
7   A.  No.
8   Q.  What happened when, as you said, they ran
9     into you the first time?
10  A.  I just was like, they done hit us.  Because
11     by the time I was fixing to turn around
12     again and they hit us again.  That's when I
13     turned around and looked.
14  Q.  Let's just keep talking about the first
15     time for right now; okay?
16  A.  Uh-huh (positive response).
17  Q.  How hard a hit was it?
18  A.  Enough to turn the back of the car a little
19     bit.
20  Q.  Turn it how?
21  A.  Like the back end swerved a little, like
22     swerved to the right like they were trying
23     to knock us off the road.

Page 44

1   Q.  Did you actually see the Lincoln hit you?
2   A.  I know it was them because they were right
3     behind us.
4   Q.  I understand that.  What I'm asking you is,
5     were you able to see them actually hit
6     you?  Were you looking at them when they
7     hit you?
8   A.  Not the first time.
9   Q.  So you said it knocked -- it swerved the
10     back end a little bit?
11  A.  (Witness nods head.)
12  Q.  Did it do anything else to the car?
13  A.  No.
14  Q.  They hit you a second time; is that right?
15  A.  Yes.
16  Q.  How much time passed between the first time
17     they hit you and the second time they hit
18     you?
19  A.  Maybe a couple of seconds.
20  Q.  And did you tell me that you were able to
21     turn around then and look at the car?
22  A.  After they hit us the second time?
23  Q.  No.  Between the first time and the second

Page 45

1    time.
2    A.  I was fixing to look when they hit us the
3        first time.  But by the time I looked, they
4        hit us again.  And I turned back around to
5        make sure we wasn't fixing to go off the
6        road.  Then I turned back and looked again.
7    Q.  After the second time?
8    A.  Yes.
9    Q.  Tell me about the second hit.  How hard was
10       it?
11   A.  Probably about the same as the first.
12   Q.  Did the speed of Richard's car change
13       between the first time and the second time?
14   A.  A little, because when they hit us, it was
15       like it knocked us forward a little bit.
16   Q.  So up until the second time they hit you,
17       you still hadn't had a chance to turn
18       around and look back; right?
19   A.  Huh-uh (negative response).  I almost did
20       after the first one.  But when they hit us
21       I turned back around to make sure we wasn't
22       going off the road.
23   Q.  After they hit you the second time, what

Page 46

1    happened?
2    A.  That's when I turned around and looked.
3        And it looked like he was on the radio or
4        something.  So I said --
5    Q.  What made you think he was on the radio?
6    A.  Because I saw him with something in his
7        hand talking in it.
8    Q.  Can you describe for me what it was in his
9        hand that he was talking into?
10   A.  Looked like a CB.
11   Q.  Did you see anything else besides the CB --
12       what you described as looking like a CB?
13   A.  No.
14   Q.  How long were you able to look back?
15   A.  Maybe a couple seconds, because that's when
16       he hit us again and he went off the road
17       that time.
18   Q.  Who was it that was talking on the CB?  Was
19       it the driver or the passenger?
20   A.  The passenger.
21   Q.  Did you see any blue lights at that time?
22   A.  No.  I didn't see any lights until after
23       people was pulling over and they were

Page 47

1    grabbing him around his neck and people
2    were stopping.  Then he grabbed something
3    and put it on top of the car.
4    Q.  All right.  At what point did you tell
5        Richard that it was the police behind you?
6    A.  I said, I think it's the police, and then
7        he started talking in the thing.  But by
8        then he had hit us again and knocked us off
9        the road.
10   Q.  Did you start to say that before that third
11       hit or after the third hit?
12   A.  It was like time I was saying it he was
13       running into us again.  And that time he
14       knocked us off the road.
15   Q.  So you did recognize then that it was the
16       police that was behind you?
17   A.  I ain't -- I wasn't sure it was the
18       police.  I said I think it's the police
19       because I saw him talking in a CB.  And I'm
20       pretty sure if somebody robbing you they
21       probably wouldn't have no CB.
22   Q.  Had Richard ever said anything to you
23       before about being robbed?

Page 48

1    A.  No.
2    Q.  So you didn't know before that day that
3        he'd said he had been robbed before?
4    A.  No.
5    Q.  From the time you turned onto Highway 21
6        until they hit you that third time, did you
7        see any other cars on the road?
8    A.  No.
9    Q.  Did you see Richard throw something out the
10       window?
11   A.  No.
12   Q.  You did see his arm out the window, though;
13       right?
14   A.  He rides with his arm on his mirror.
15   Q.  Well, was he riding with his arm on the
16       mirror at the time?
17   A.  Talking about at the time when they was
18       riding behind us like that?
19   Q.  Right.
20   A.  I wasn't really paying attention to his
21       hand then, not to be riding with it on the
22       mirror, because I was scared.
23   Q.  Afterwards you made a statement, didn't

12 (Pages 45 to 48)

Page 49

1    you?
2    A.  Yes.
3    Q.  And you told the police at that time that
4        you had put your -- or that he -- sorry.
5        Told the police at that time that you saw
6        that he put his arm out the window?
7    A.  Put his arm out the window?
8    Q.  Actually what you said was I saw that he
9        put his arm out the window.
10   A.  Probably on his mirror, because he usually
11       drive holding his mirror while he drives.
12   Q.  You didn't tell the police he was holding
13       his mirror, though, did you?  Let me show
14       you Defendant's Exhibit 6.  See if you can
15       show for me there where you said he had his
16       hand on the mirror.
17   A.  No.
18   Q.  It doesn't say that, does it?
19   A.  No.
20   Q.  Just says he had his arm out the window;
21       right?
22   A.  I'm looking for where it says that at.
23   Q.  Starting right here.

Page 50

1    A.  Uh-huh (positive response).
2    Q.  That is your statement that you made to the
3        police, right, Defendant's Exhibit 6?
4    A.  Yes.
5    Q.  Did you have a cell phone that day?
6    A.  No.
7    Q.  Did Richard?
8    A.  No.
9    Q.  What happened to that gun that was on the
10       seat there while all this bumping was going
11       on?
12   A.  What happened to it?
13   Q.  Uh-huh (positive response).  If anything.
14   A.  Nothing.
15   Q.  Where was it while all of this bumping was
16       going on?
17   A.  Up on the seat.
18   Q.  Still right there on the seat?
19   A.  Yes.
20   Q.  Wasn't moving around at all?
21   A.  No.
22   Q.  Still pointing at you?
23   A.  I guess.  I wasn't really paying attention

Page 51

1    if he was pointing at me.
2    Q.  Did you ever ask Richard to stop and let
3        you out of the car?
4    A.  No.
5    Q.  Okay.  What happened after that third hit?
6    A.  He went off the road.
7    Q.  How did you go off the road?  Describe that
8        for me.
9    A.  The car spun around, almost turned over,
10       but it didn't.
11   Q.  Which way did it go off the road?
12   A.  To the left.
13   Q.  Did it cross over the center line?
14   A.  Yes.
15   Q.  You said it almost turned over.  How did it
16       almost turn over?
17   A.  Because it's like they hit the edge of his
18       bumper and it spun us around.  And the car
19       felt like it was fixing to turn over, but
20       it didn't once we went off in the grass.
21   Q.  On the opposite side of the road?
22   A.  Yeah.
23   Q.  Let me show you what we marked as

Page 52

1    Defendant's Exhibit 8.  Is that where
2    the -- where Richard's car wound up?
3    A.  Yes.
4    Q.  While it was spinning, what happened inside
5        of the car?
6    A.  Nothing happened.  When it stopped, he was
7        fixing to get out.  That's when they shot
8        right there at the ground.
9    Q.  We're not quite to that point yet.  We'll
10       get to that in a minute.  Did anything fly
11       around inside the car?  You know, did you
12       hit anything inside the car?  Did anything
13       hit you?
14   A.  Huh-uh (negative response).
15   Q.  Nothing happened inside the car while it
16       was spinning?
17   A.  No.
18   Q.  Did either you or Richard say anything
19       while the car was spinning?
20   A.  No.  I was trying to hold on because I
21       thought the car was fixing to turn over.
22   Q.  Did you see when the Lincoln hit your car
23       that third time?

13 (Pages 49 to 52)

Page 53

1   A.   Uh-huh (positive response).
2   Q.   How did it hit you the third time?
3   A.   Just like he put the edge of his bumper
4        on -- on the corner of my cousin's bumper.
5   Q.   The edge of his front bumper?
6   A.   Yeah. Like the driver's side, he pushed it
7        with the passenger's side of my cousin's
8        car.
9   Q.   And you were looking at him when that
10       happened?
11  A.   (Witness nods head).
12  Q.   Did Richard's car hit anything between the
13       time that it was hit the third time and the
14       time that it came to rest?
15  A.   Huh-uh (negative response).
16  Q.   Is that a no?
17  A.   No.
18  Q.   Did you suffer any injuries at all in -- or
19       as a result of the car being forced off the
20       road?
21  A.   No.
22  Q.   Was Richard hurt?
23  A.   No.

Page 54

1   Q.   Okay. What happened with the Lincoln after
2        y'all were spun out?
3   A.   They pulled up right in like on the side of
4        the car.
5   Q.   About like what you see there in
6        Defendant's 8?
7   A.   About like that. Like they were back a
8        little bit.
9   Q.   Okay. Is that the Lincoln in Defendant's
10       Exhibit 8 that we can just barely see there?
11  A.   Yes.
12  Q.   What happened once everybody came to a rest
13       or a stop?
14  A.   They got out the car. And when my cousin
15       was getting out, they shot like right at
16       the door.
17  Q.   Let's take this kind of slow and walk
18       through this whole thing. They got out of
19       the car; is that right?
20  A.   Yes.
21  Q.   Did you get out of the car?
22  A.   I was fixing to get out.
23  Q.   Did you actually get out?

Page 55

1   A.   No. I was fixing to, though, until they
2        shot.
3   Q.   Did Richard get out?
4   A.   He was fixing to.
5   Q.   When they got out of the car -- the two
6        officers I'm talking about -- did they say
7        anything?
8   A.   They got out and pointed the guns.
9   Q.   Did they say anything?
10  A.   Not that I recall.
11  Q.   Were you able to see any badges on them at
12       that point?
13  A.   Yeah. After they pulled them out of their
14       shirts.
15  Q.   When did they pull them out of their
16       shirts?
17  A.   When they jumped out of the car and they
18       pointed their guns.
19  Q.   So they jumped out of the car pointing
20       their guns, pull their badges out of their
21       shirts?
22  A.   Because they was on a chain.
23  Q.   Around their necks?

Page 56

1   A.   (Witness nods head).
2   Q.   Did they give any commands to get on the
3        ground?
4   A.   Not when they first -- at first they
5        didn't.
6   Q.   So at some point they did?
7   A.   They told him to get out the car.
8   Q.   Told him to get out of the car first?
9   A.   Uh-huh (positive response).
10  Q.   Did he do that?
11  A.   Yes.
12  Q.   How far did he get out of the car?
13  A.   Just standing up in the doorway.
14  Q.   Where were his hands?
15  A.   On his side until they told him to put them
16       up.
17  Q.   Until they told him to put his hands up?
18  A.   Yes.
19  Q.   Did he put his hands up?
20  A.   Yes.
21  Q.   Where were your hands while all this was
22       going on?
23  A.   In my lap. I was still in the car.

14 (Pages 53 to 56)

Page 57

1    Q.  Were you watching what was going on?
2    A.  Yeah.
3    Q.  Were any of the guns pointed at you?
4    A.  When he walked on my side.
5    Q.  I'm talking about that point right there in
6        time when Richard is out of the car with
7        his hands up.  Is anybody pointing their
8        guns at you?
9    A.  He was like standing right in front of me,
10       so it was like they were pointing them at
11       me.
12   Q.  So Richard was between you and them; is
13       that right?
14   A.  Yes.
15   Q.  All right.  Richard puts his hands up.
16       What happens next?
17   A.  They put the handcuffs on him and started
18       snatching him around.
19   Q.  Hang on just a second because we're
20       skipping something here obviously.  Because
21       you told me there was a shot fired
22       somewhere in here and there was some
23       commands to get on the ground.  So let's go

Page 58

1        back.  After Richard puts his hands up,
2        what's the next thing that happens?
3    A.  They shot before they told me to get out.
4        At the time the car stopped, he opened the
5        door.  That's when they shot.
6    Q.  He was still in the car?
7    A.  Uh-huh (positive response).
8    Q.  How much time passed between the time that
9        they told him to get out of the car and
10       there was a shot fired?
11   A.  Maybe 30 seconds.
12   Q.  Where was the shot fired?
13   A.  Like right at the ground with -- if he
14       would have stepped out where his foot would
15       have been like right at the door.
16   Q.  Explain to me how you were able to see that
17       if he wasn't out of the car yet.
18   A.  Because I can see the dirt jumping off the
19       ground.
20   Q.  Was the car door open?
21   A.  Yes.
22   Q.  But Richard was still in the car?
23   A.  Yeah.  He was fixing to get out, but they

Page 59

1        shot.
2    Q.  So you were able to see past Richard to
3        where this round hit?
4    A.  How the car was it was like my side was up
5        on the hill, so I look at the ground
6        from -- with his door open.
7    Q.  Okay.  Fair enough.  How far from the car
8        did the round hit?
9    A.  It was like right by if he would have
10       stepped out.
11   Q.  Let's look at Defendant's Exhibit 2.  Show
12       for me on Defendant's Exhibit 2 where that
13       round hit.
14   A.  Maybe right there somewhere.
15   Q.  All right.  So you were showing -- Please
16       put your finger back there.  I need to
17       describe it for the record.  You've got
18       your finger it looks like right in between
19       the front door and the back door; is that
20       right?
21   A.  Uh-huh (positive response).
22   Q.  And at least the way the picture is kind of
23       at the bottom -- even with the bottom of

Page 60

1        the front door --
2    A.  Uh-huh (positive response).
3    Q.  -- where it's open?
4            MR. MASTERS:  Is that yes or no?
5    A.  Yes.
6    Q.  About how far in feet would you say that
7        was from the car?
8    A.  Maybe one.
9    Q.  Other than the badges and the guns, did you
10       see any other kind of equipment on the two
11       officers?
12   A.  I think they had handcuffs.
13   Q.  Anything else?
14   A.  No.
15   Q.  Do you know what a Taser is?
16   A.  Yes.
17   Q.  You've seen one before?
18   A.  Yes.
19   Q.  Did they have a Taser?
20   A.  No.
21   Q.  Do you know what pepper spray is?
22   A.  Yes.
23   Q.  Did they have pepper spray?

Page 61

1   A.  No.
2   Q.  Other than telling Richard to get out of
3       the car, did they say anything else before
4       firing a shot?
5   A.  No.
6   Q.  Did they identify themselves as police?
7   A.  Yeah.  After they shot.
8   Q.  After they shot.  How long after they shot?
9   A.  Probably a couple of seconds.
10  Q.  What did they say to identify themselves as
11      police?
12  A.  They pulled their badges out of their
13      shirts and said that was the police.
14  Q.  Okay.  You told me just a minute ago they
15      pulled their badges out of their shirt as
16      they were getting out of the car.
17  A.  I'm saying when they first got out of the
18      car they shot.  Then he pulled the badge
19      out of his shirt.
20  Q.  Did they tell him to get out of the car
21      before or after they pulled the badges out?
22  A.  After.
23  Q.  How many times did they shoot?

Page 62

1   A.  One.
2   Q.  Who was it that shot?
3   A.  I'm not sure which one of them shot.
4   Q.  When they got out of the car, how far out
5       of the car did they go?
6   A.  Like behind the door.
7   Q.  So the one who got out of the passenger's
8       side, where did he go?
9   A.  He was behind his door.
10  Q.  And the driver?
11  A.  Behind his door.
12  Q.  Where was the gun in your car while all
13      this was going on?
14  A.  On the seat.
15  Q.  Where were Richard's hands?
16  A.  When?
17  Q.  Before he got out of the car.
18  A.  He took his seat belt off.
19  Q.  So he had to reach down to his side to do
20      that; right?
21  A.  Uh-huh (positive response).
22  Q.  Onto his right side?
23  A.  Yeah.

Page 63

1   Q.  And that's where that gun was, wasn't it?
2   A.  It was like in the middle of the seat.
3   Q.  But it was to his right side; correct?
4   A.  Uh-huh (positive response).
5   Q.  Is that a yes?
6   A.  Yes.
7   Q.  Okay.  Let's move forward in time.  Richard
8       has gotten out of the car.  He's got his
9       hands up?
10  A.  Uh-huh (positive response).
11  Q.  Now what happens?
12  A.  They put the handcuffs on him.
13  Q.  Was he ordered to get to the ground?
14  A.  Yes.
15  Q.  Did he go to the ground?
16  A.  Yes.
17  Q.  By himself?
18  A.  Halfway by himself until they started
19      grabbing him.
20  Q.  So he tried to go to the ground before they
21      grabbed him?  Is that what you're telling
22      me?
23  A.  Yeah.  He was going to the ground getting

Page 64

1       on his knees and they just forced him on
2       down.
3   Q.  You're saying they.  Did both officers come
4       over to the car?
5   A.  Yes.
6   Q.  Describe for me how that happened.
7   A.  How it happened?
8   Q.  Yes, sir.
9   A.  The passenger came from behind his door and
10      then the driver came from behind his door.
11      And when they got him on the ground, that's
12      when the passenger's side -- I mean, the
13      officer on the passenger's side came to my
14      side.
15  Q.  Did Richard already start going towards the
16      ground before they left out from behind
17      their doors?
18  A.  He was getting on his knees.
19  Q.  Was he on his knees before they left their
20      doors?
21  A.  Yes.  He was getting on his knees when they
22      told him to get down.
23  Q.  How long did it take them to get from where

Page 65

| 1 | they started outside of their doors to |
| 2 | Richard? |
| 3 | A. Maybe two seconds, because they were right |
| 4 | in front of us. |
| 5 | Q. When they got to Richard, what did they do? |
| 6 | A. The one on the driver's side pushed him on |
| 7 | the ground. |
| 8 | Q. How? |
| 9 | A. Like from his back. He just pushed him on |
| 10 | the ground. |
| 11 | Q. One hand? Two hands? |
| 12 | A. One, because he had a gun in his other |
| 13 | hand. |
| 14 | Q. Which hand did he use to push him on the |
| 15 | ground with? |
| 16 | A. I guess his left. |
| 17 | Q. So the gun was in his right hand; is that |
| 18 | right? |
| 19 | A. If I'm not mistaken. |
| 20 | Q. What was the other one doing? |
| 21 | A. Like had his knees on the back of his neck |
| 22 | once he got on the ground. |
| 23 | Q. Before he got on the ground while the |

Page 66

| 1 | driver was pushing him down, what was the |
| 2 | one that came from the passenger's side |
| 3 | doing? |
| 4 | A. Looking at me telling me don't move. |
| 5 | Q. What was he doing with his weapon? |
| 6 | A. Pointing it at me. |
| 7 | Q. So Richard then goes to the ground? |
| 8 | A. Uh-huh (positive response). |
| 9 | Q. And after he gets to the ground what |
| 10 | happens? |
| 11 | A. That's when they put the handcuffs on him. |
| 12 | Q. Who put the handcuffs on him? |
| 13 | A. Chris West. |
| 14 | Q. How did they cuff him? How did Chris cuff |
| 15 | him? Excuse me. |
| 16 | A. With his hands behind his back. |
| 17 | Q. What did Chris do with his gun? |
| 18 | A. He put it in his holster after he put the |
| 19 | handcuffs on him. But the other one still |
| 20 | had his out. |
| 21 | Q. Where was that pointed? |
| 22 | A. At me. |
| 23 | Q. So he's still pointing at you? |

Page 67

| 1 | A. Uh-huh (positive response). |
| 2 | Q. With his knee on Richard's back? |
| 3 | A. Yeah. Because they was right in front of |
| 4 | the door and he had his knee on his back |
| 5 | and he was looking at me pointing the gun |
| 6 | at me telling me not to move. |
| 7 | Q. Once they got him cuffed, what did they do |
| 8 | next? |
| 9 | A. Snatched him up off the ground and started |
| 10 | grabbing on his neck and stuff. And his |
| 11 | pants and all that. |
| 12 | Q. Did he just forget about you? |
| 13 | A. No. The big one did once they got the |
| 14 | handcuffs on him. The other one that was |
| 15 | on the passenger's side walked on my side |
| 16 | and told me to get out of the car. |
| 17 | Q. How did he go? How did he get to your |
| 18 | side? |
| 19 | A. He walked around the front. |
| 20 | Q. What did he do once he got to your side? |
| 21 | A. Told me to get out the car. |
| 22 | Q. Were you paying attention to him at that |
| 23 | point in time? |

Page 68

| 1 | A. Which one? |
| 2 | Q. The one who was around on your side of the |
| 3 | car now. |
| 4 | A. Yes. |
| 5 | Q. And when he told you to get out of the car, |
| 6 | what did you do? |
| 7 | A. Get out. |
| 8 | Q. How did you get out? |
| 9 | A. Through the passenger's side. |
| 10 | Q. Did you open the door? Did you go out the |
| 11 | window? How did you get out? |
| 12 | A. Open the door. |
| 13 | Q. And he let you do that? |
| 14 | A. Uh-huh (positive response). |
| 15 | Q. Is that a yes? |
| 16 | A. Yes. |
| 17 | Q. Once you got out of the car, what happened |
| 18 | next? |
| 19 | A. They put the handcuffs on me. |
| 20 | Q. Who put the handcuffs on you? |
| 21 | A. The officer on the passenger side. |
| 22 | Q. Explain for me the handcuffing process for |
| 23 | you. How did he get cuffs on you? |

|  | Page 69 |
|---|---|

1   A.  He just told me to stand on the side of the
2       car and he grabbed one of my arms and put
3       it behind my back and grabbed the other
4       one.
5   Q.  Didn't put you on the ground?
6   A.  Huh-uh (negative response).
7   Q.  Is that a no?
8   A.  No.
9   Q.  Once he got the handcuffs on you, what
10      happened next?
11  A.  He made me sit in the grass.
12  Q.  Where we see you on Defendant's Exhibit 8?
13  A.  Yes.
14  Q.  Is that right?
15  A.  Yes.
16  Q.  So he took you over there?
17  A.  Yes.
18  Q.  Were you able to -- What, if anything, were
19      you able to see that was going on with
20      Richard while this was happening?
21  A.  I just saw the bigger one that was driving
22      the car just had his hand around his neck
23      telling him to shut up and don't move and

|  | Page 70 |
|---|---|

1       pulling all on his pants and stuff.
2   Q.  Was Richard resisting him in any way?
3   A.  No.
4   Q.  Was he telling him he wasn't going to go
5       anywhere?
6   A.  No.  He just kept asking him why did they
7       pull him over and knock him off the road.
8       Just told him to shut up.
9   Q.  Was your radio still on at this point?
10  A.  No.
11  Q.  What happened with Richard?  What did they
12      do with him?
13  A.  They put him -- I think they put him in
14      another car because I was in the Lincoln.
15  Q.  That's a little bit further down the road,
16      though, right, in time?
17  A.  What?
18  Q.  Because they put you over here sitting on
19      the side of the hill initially; right?
20  A.  Uh-huh (positive response).
21  Q.  While you were sitting over here on the
22      hill, what did they do with Richard?
23  A.  I think he was in the back seat of that car

|  | Page 71 |
|---|---|

1       and another car pulled up.  I know we
2       wasn't in the same car.
3   Q.  Back seat of what car?
4   A.  That Lincoln.  I think that's what he was
5       in.  Because after they sat me on the
6       ground it was like the car -- the Nova, it
7       was kind of like blocking because they had
8       him over there on the ground.
9   Q.  When you say blocking, does that mean you
10      couldn't see what was going on?
11  A.  After they sat me in the grass.
12  Q.  Did you see anything else happen before --
13      Let me back up.  Another police car came at
14      some point?
15  A.  Yes.  Because I remember he was in -- when
16      they stopped at the store, he was in
17      another car.  He wasn't in the car with me.
18  Q.  What happened between the time that you
19      were sat there on the hill and that other
20      police car came?
21  A.  They was looking through his car.
22  Q.  Who was looking through his car?
23  A.  Chris West.

|  | Page 72 |
|---|---|

1   Q.  Just Chris?
2   A.  And the other guy was, too, but he wasn't
3       looking in it like the other guy was.
4   Q.  Did they take anything out of the car?
5   A.  Their gun.
6   Q.  What did they do with the gun?
7   A.  I think they sat it on the hood of their
8       car.
9   Q.  How soon after you guys came to a rest
10      after being knocked off the road did they
11      get the gun?
12  A.  Probably after they sat me in the grass.
13      Probably about maybe two, three minutes
14      later, because time they looked in there
15      that's when they seen it.
16  Q.  When did they first -- When did you first
17      know that they knew that there was a gun in
18      the car?
19  A.  Because I heard one of the officers said
20      something about we pointing our guns at
21      them and he got a gun in here bigger than
22      ours.
23  Q.  First of all, who made that comment?

| | Page 73 |
|---|---|
| 1 | A.   The guy that was on the passenger side. |
| 2 | Q.   And when did he make that comment? |
| 3 | A.   Once they looked in the car. |
| 4 | Q.   Was that before or after they cuffed |
| 5 | Richard? |
| 6 | A.   After. |
| 7 | Q.   How long after they cuffed Richard? |
| 8 | A.   Probably about three, four minutes. It |
| 9 | wasn't that long. |
| 10 | Q.   Did they take some pictures that day? |
| 11 | A.   They took a picture of me. |
| 12 | (Defendant's Exhibit 13 was marked |
| 13 | for identification.) |
| 14 | Q.   Let me show you Defendant's Exhibit 13.  Is |
| 15 | that the picture they took of you? |
| 16 | A.   Yes. |
| 17 | Q.   Did you see them taking these other |
| 18 | pictures that we've been talking about |
| 19 | today? |
| 20 | A.   Not really.  I remember they took this |
| 21 | picture right here.  Not this one, but the |
| 22 | one where I was sitting in the grass. |
| 23 | Q.   Defendant's 8? |

| | Page 74 |
|---|---|
| 1 | A.   Uh-huh (positive response). |
| 2 | Q.   Is that a yes? |
| 3 | A.   Yes. |
| 4 | Q.   Well, everything that we've showed you so |
| 5 | far, that is the way it was on that day; |
| 6 | correct? |
| 7 | A.   Yes. |
| 8 | Q.   They took a picture of Richard too; right? |
| 9 | A.   Yes. |
| 10 | Q.   Let me show you Defendant's 11.  Is that |
| 11 | how he looked that day? |
| 12 | A.   Yes. |
| 13 | Q.   Let me show you Defendant's 9.  What is |
| 14 | that? |
| 15 | A.   Looks like about $15. |
| 16 | Q.   Can you tell where that's at? |
| 17 | A.   Looks like under a bed. |
| 18 | Q.   That's not in Richard's car? |
| 19 | A.   No.  He don't have carpet. |
| 20 | Q.   Let me show you Defendant's 4.  Is that a |
| 21 | picture of the inside of Richard's car that |
| 22 | day? |
| 23 | A.   Yes. |

| | Page 75 |
|---|---|
| 1 | Q.   Is that his ashtray? |
| 2 | A.   Yes. |
| 3 | Q.   And those bullets were in the ashtray that |
| 4 | day? |
| 5 | A.   I guess.  I didn't look in the ashtray. |
| 6 | Q.   But you do recognize that as his ashtray; |
| 7 | correct? |
| 8 | A.   Yeah.  That's the inside of his car. |
| 9 | Q.   At any point after Richard got out of the |
| 10 | car but before he was placed in handcuffs |
| 11 | did he try to get back in the car? |
| 12 | A.   No.  Because as soon as he opened the door, |
| 13 | they shot and he didn't ever move until |
| 14 | they told him to get out. |
| 15 | Q.   Did he ever try to reach back into the car? |
| 16 | A.   No. |
| 17 | Q.   Other than the gun, did they take anything |
| 18 | else out of the car during the search? |
| 19 | A.   No. |
| 20 | Q.   Did anybody search you? |
| 21 | A.   Yes. |
| 22 | Q.   Who searched you? |
| 23 | A.   Officer on the passenger side. |

| | Page 76 |
|---|---|
| 1 | Q.   Did they take anything from you? |
| 2 | A.   No. |
| 3 | Q.   Did you see anybody search Richard? |
| 4 | A.   Yes. |
| 5 | Q.   Who searched Richard? |
| 6 | A.   Chris West. |
| 7 | Q.   Did you see them take anything from |
| 8 | Richard? |
| 9 | A.   I seen them snatching all on his pants. |
| 10 | That's when they made me sit down in the |
| 11 | grass. |
| 12 | Q.   Did you see them take anything from him, |
| 13 | though? |
| 14 | A.   No. |
| 15 | Q.   How long were you sitting there in the |
| 16 | grass before that police car showed up? |
| 17 | A.   Maybe about 30, 45 minutes. |
| 18 | Q.   And you said they put you in what car? |
| 19 | A.   That Lincoln. |
| 20 | Q.   Did they put you in the car after that |
| 21 | other police car showed up? |
| 22 | A.   After they put him in the car, yes. |
| 23 | Q.   After they put who in the car? |

Page 77

1   A.  Richard.
2   Q.  And they put him in which car?
3   A.  The police car.
4   Q.  Then they came and got you and put you in
5       the Lincoln; is that right?
6   A.  Yes.
7   Q.  What happened after y'all got put in the
8       cars?
9   A.  The other officer got in Richard's car.
10  Q.  Which other officer?
11  A.  The one that was on the passenger's side.
12  Q.  What happened then?
13  A.  We drove up the road about a little less
14      than a mile. That's when Chris West pulled
15      over on the side of the road and picked up
16      something.
17  Q.  Did you see what it was he picked up?
18  A.  No. He put it in a bag.
19  Q.  Did you ever come to learn what it was that
20      he picked up?
21  A.  No. I just know what he said when he got
22      back in the car.
23  Q.  What did he say?

Page 78

1   A.  We got your cousin's ass now.
2   Q.  Did he say anything else besides that?
3   A.  No.
4   Q.  Did you know what he meant by that?
5   A.  No.
6   Q.  How did he know at that point that you were
7       cousins?
8   A.  Because they -- he asked me.
9   Q.  When did he ask you that?
10  A.  While I was sitting on the ground, they
11      asked me how did I know him.
12  Q.  All right. Once Chris gets back in the
13      car, what happens after that?
14  A.  They go on down the road to the store.
15  Q.  What store did they go to?
16  A.  Howard, Howard Hooks.
17  Q.  Where is that at?
18  A.  Probably about a mile from where we was at.
19  Q.  Towards Hayneville? Towards Wilcox County?
20  A.  Towards Hayneville.
21  Q.  And what happened when you got to the
22      store?
23  A.  The police car pulled up and they pulled up

Page 79

1       in his car and was putting gas in it. And
2       the police car had a flat and we had to sit
3       there until they fixed the flat.
4   Q.  How long did that take?
5   A.  Probably about 30 minutes.
6   Q.  Anything else happen there at the gas
7       station besides putting gas in Richard's
8       car and fixing the flat?
9   A.  No. The other officer left in the car
10      after that, after he put the gas in.
11  Q.  Left in Richard's car?
12  A.  Yeah.
13  Q.  Was the passenger still driving Richard's
14      car?
15  A.  Yes.
16  Q.  He left before you did?
17  A.  Yes. After he put the gas in, he left and
18      got out and was fixing his tire and Chris
19      West stayed there until he got through.
20  Q.  After the tire was fixed, then what
21      happened?
22  A.  They took us to the Hayneville jail.
23  Q.  How long did it take you to get to the

Page 80

1       Hayneville jail?
2   A.  Maybe five minutes. Five, 10 minutes.
3   Q.  Other than the comment that Chris made to
4       you when he found whatever it was he found
5       on the side of the road, did y'all have any
6       other conversation at any time before you
7       got to the jail?
8   A.  No. He had the radio up.
9   Q.  Did he talk on that CB radio as you
10      described it while y'all were going to the
11      jail?
12  A.  No.
13  Q.  How long does it take to get from that
14      store to the jail?
15  A.  Maybe five, 10 minutes.
16  Q.  What happened once you got to the jail?
17  A.  They started dressing my cousin out. Well,
18      made him change clothes.
19  Q.  What happened with you once you got to the
20      jail?
21  A.  Nothing.
22  Q.  Nothing?
23  A.  No.

Deposition of Kelvin Carmichael                                          November 14, 2007

Page 81

1   Q.  Okay. You arrive in the Lincoln. You're
2      still in handcuffs; right?
3   A.  Yes.
4   Q.  Car stops?
5   A.  Yes.
6   Q.  What happens after the car stops?
7   A.  They just take me on the inside where they
8      book you at, where they put you in there
9      at.
10  Q.  Were you booked?
11  A.  No.
12  Q.  What did they do with you?
13  A.  He just took me in a room and started
14     asking me questions. Then he told me to
15     call me a ride because I ain't who they
16     want.
17  Q.  How long were you in the booking area
18     before being taken to that room?
19  A.  Maybe 30, 45 minutes.
20  Q.  Were you able to see Richard get booked?
21  A.  Yes.
22  Q.  What happened with Richard's booking?
23  A.  They took him in the back and made him

Page 82

1     change clothes back there with Chris West.
2     And when they came back to the front, they
3     put his stuff on the counter and they got
4     into it about that wasn't the money that he
5     had.
6   Q.  Who is they that got into it?
7   A.  He told Chris West that that wasn't the
8     money that he had in his pocket, that some
9     of it was missing.
10  Q.  What did Chris say?
11  A.  Told him to shut up and told the people to
12     put him in a -- like a little cell right
13     beside.
14  Q.  Did they do that?
15  A.  Yes.
16  Q.  How many people besides you, Chris West,
17     and Richard were there in the booking area?
18  A.  It was a lady at the desk and another guy.
19  Q.  Was the deputy who transported Richard, was
20     he there?
21  A.  Not that I remember.
22  Q.  Who was the other guy?
23  A.  Someone up behind the desk with the girl.

Page 83

1   Q.  Was he wearing a uniform?
2   A.  Yes.
3   Q.  Was it a jail uniform?
4   A.  It was like he worked there.
5   Q.  What about the girl as you described her,
6     was she somebody who worked there too?
7   A.  Yes.
8   Q.  Do you know who she was?
9   A.  No.
10  Q.  Haven't seen them since?
11  A.  No.
12  Q.  Who took you back into that room that you
13     were telling me about?
14  A.  Chris West.
15  Q.  And how long were you back there with him?
16  A.  Maybe 20 minutes.
17  Q.  What did y'all talk about?
18  A.  He just was asking me questions. Then
19     another guy came in.
20  Q.  Who was the other guy?
21  A.  I don't know. He had on like a suit.
22  Q.  White guy or black guy?
23  A.  Black guy.

Page 84

1   Q.  Did he have a badge?
2   A.  Yes.
3   Q.  And a gun?
4   A.  Yes.
5   Q.  Did he ask you questions?
6   A.  Yes.
7   Q.  Did you make this statement that's
8     Defendant's Exhibit 6 while you were back
9     there in that room?
10  A.  I think that's the paper. I know they had
11     me write something.
12  Q.  I'll let you look at it again and you tell
13     me if that's what you did that day.
14  A.  Yes.
15  Q.  Anybody else besides Chris and the guy in
16     the suit come back there and talk to you?
17  A.  No.
18  Q.  And what happened after you made the
19     statement?
20  A.  He told me he would call me a ride.
21  Q.  And did you do that?
22  A.  Yes.
23  Q.  Who did you call?

21 (Pages 81 to 84)

Deposition of Kelvin Carmichael                    November 14, 2007

Page 85

1  A.  My aunt.  But --
2  Q.  Which aunt?
3  A.  Shirley Marshall.  But she wasn't there, so
4      they told one of the police guys to take me
5      home.
6  Q.  After you were taken back to that room
7      where you made the statement, did you see
8      Richard again that day?
9  A.  No.
10  Q.  Were there ever any charges pressed against
11      you?
12  A.  No.
13  Q.  Other than you and Richard, do you know of
14      anybody else who claims that they witnessed
15      the chase?
16  A.  No.
17  Q.  Do you know of anybody who claims to have
18      witnessed them ramming you off the road?
19  A.  No.
20  Q.  Do you know of anybody who claims to have
21      gone by and saw y'all on the side of the
22      road?
23  A.  I seen cars stopping, but I ain't know who

Page 87

1  Q.  When you see him every now and then, do
2      y'all do the same things you used to do?
3  A.  Like when he come up here, we'll probably
4      go to the mall or something.  But that's
5      been probably a year ago.
6  Q.  That's just because y'all are separated by
7      distance now; right?
8  A.  Yes.
9  Q.  Have you noticed any changes in his
10      behavior?
11  A.  No.
12          MR. WILFORD:  I think that's all I
13      have.
14          MR. LEWIS:  That's it.
15      (Deposition was concluded at
16      approximately 3:25 p.m.)
17
18      * * * * * * * * * * * * * *
19      FURTHER DEPONENT SAITH NOT
20      * * * * * * * * * * * * * *
21
22
23

Page 86

1      they was.
2  Q.  You didn't recognize anybody?
3  A.  No.
4  Q.  Do you know what happened to that gun?
5  A.  No.
6          MR. WILFORD:  Let's take a break.
7      (Brief recess was taken.)
8  Q.  Mr. Carmichael, what kind of stuff did you
9      and your cousin Richard do before this
10      incident?
11  A.  At his house?
12  Q.  Just in general.  What kind of stuff did
13      y'all do?
14  A.  Just sit around, watch TV, and used to go
15      to the casino.
16  Q.  Which casino?
17  A.  In White Hall.
18  Q.  Anything else?
19  A.  Just around my cousin's house.
20  Q.  Do y'all still do those same things now?
21  A.  I'm back up in Montgomery.
22  Q.  You don't hang around with him anymore?
23  A.  I see him every now and then.

Page 88

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Lyn Daugherty, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8          KELVIN CARMICHAEL
9  who was duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the
11  matter of:
12      RICHARD MARSHALL,
13      Plaintiff,
14      vs.
15      CHRIS WEST, in his individual
16      capacity, LASHUN HUTSON, in his
17      individual capacity,
18      Defendants.
19      IN THE UNITED STATES DISTRICT COURT
20      FOR THE MIDDLE DISTRICT OF ALABAMA
21      NORTHERN DIVISION
22      Civil Action No. 2:06-cv-701-ID.CSC
23  on Wednesday, November 14, 2007.

22 (Pages 85 to 88)

Page 89

```
1        The foregoing 87 computer-printed pages
2   contain a true and correct transcript of the
3   examination of said witness by counsel for the
4   parties set out herein.  The reading and signing is
5   hereby waived.
6        I further certify that I am neither of kin
7   nor of counsel to the parties to said cause nor in
8   any manner interested in the results thereof.
9        This 13th day of December 2007.
10
11
12
             _____
13           Lyn Daugherty, ACCR #66
             Expiration Date:  9-30-2008
             Certified Court Reporter
14           And Commissioner for the
             State of Alabama at Large
15
16
17
18
19
20
21
22
23
```

Deposition of Kelvin Carmichael

## A

**able** 32:7,10 35:9 36:9 36:11 44:5,20 46:14 55:11 58:16 59:2 69:18,19 81:20
**about** 7:14,18,20 8:22 9:19 10:3 11:5,16,17 12:2 13:1,2,16 15:11 15:12 16:16 17:6,23 19:14,15 20:15 21:3 24:5 29:16 30:2,20 31:5 36:3 38:5,10 41:8 42:15,19,20 43:14 45:9,11 47:23 48:17 54:5,7 55:6 57:5 60:6 67:12 72:13,20 73:8,18 74:15 76:17 77:13 78:18 79:5 82:4 83:5 83:13,17
**ACCR** 1:17 89:12
**Action** 1:7 88:22
**actually** 28:1 32:2 40:16 44:1,5 49:8 54:23
**addiction** 21:19
**address** 10:14 13:10,12
**after** 4:6 9:11 17:11 22:18 26:7 37:8 38:23 41:6 43:1,3 44:22 45:7,20,23 46:22 47:11 51:5 54:1 55:13 58:1 61:7 61:8,8,21,22 66:9,18 71:5,11 72:9,10,12 73:4,6,7 75:9 76:20 76:22,23 77:7 78:13 79:10,10,17,20 81:6 84:18 85:6
**Afterwards** 48:23
**again** 18:21 40:14 41:5 43:12,12 45:4,6 46:16 47:8,13 84:12 85:8
**against** 85:10
**ago** 19:15 61:14 87:5
**agree** 22:7
**agreed** 3:2,16,23
**agreement** 1:16
**ahead** 6:8 32:17,23
**ain't** 21:12 30:1 39:11 47:17 81:15 85:23
**Alabama** 1:2,18,20 2:5 2:11 3:8 88:2,5,20 89:14
**alcohol** 21:18 28:6
**alcoholics** 21:6
**almost** 8:14 45:19 51:9

51:15,16
**alongside** 33:18 38:19 39:17
**already** 20:20 64:15
**another** 18:2 70:14 71:1,13,17 82:18 83:19
**answer** 5:8,11,12 6:3
**antennas** 38:13
**anybody** 5:1 9:20 15:5 23:14,18 26:3 27:3 42:2 57:7 75:20 76:3 84:15 85:14,17,20 86:2
**anymore** 86:22
**anyone** 6:16
**anyplace** 13:4
**anything** 16:10 25:4,23 29:2 31:5 37:3,10,12 37:16 38:5,12,13 41:8 44:12 46:11 47:22 50:13 52:10,12 52:12,18 53:12 55:7 55:9 60:13 61:3 69:18 71:12 72:4 75:17 76:1,7,12 78:2 79:6 86:18
**anywhere** 25:2 27:8 70:5
**apartment** 10:15 12:10 12:16
**appear** 41:23
**APPEARANCES** 2:1
**approximately** 1:21 87:16
**area** 81:17 82:17
**arm** 36:17 48:12,14,15 49:6,7,9,20
**arms** 69:2
**around** 39:7 40:19 42:21 43:6,11,13 44:21 45:4,18,21 46:2 47:1 50:20 51:9 51:18 52:11 55:23 57:18 67:19 68:2 69:22 86:14,19,22
**arrest** 16:5,16,20 17:6 17:11,23 18:7,19 19:12,18 21:8
**arrested** 15:7,9,15,20 15:23 16:2,14 17:15 18:5 19:14 20:3 21:9 21:11
**arrive** 81:1
**ashtray** 75:1,3,5,6
**asked** 30:1 36:5,12 78:8,11
**asking** 5:7 16:16 34:10 41:16 44:4 70:6

81:14 83:18
**ass** 78:1
**assume** 6:4
**attend** 21:17
**attention** 48:20 50:23 67:22
**Attorneys** 2:4,9
**aunt** 85:1,2
**auntee's** 32:23
**aunt's** 23:23 24:1,9 25:15 27:6

## B

**back** 12:8 19:7 26:10 26:20 37:9 42:7,10 42:13 43:2,6,18,21 44:10 45:4,6,18,21 46:14 54:7 58:1 59:16,19 65:9,21 66:16 67:2,4 69:3 70:23 71:3,13 75:11 75:15 77:22 78:12 81:23 82:1,2 83:12 83:15 84:8,16 85:6 86:21
**badge** 61:18 84:1
**badges** 55:11,20 60:9 61:12,15,21
**bag** 77:18
**bar** 19:23 20:14 21:17
**barely** 54:10
**beard** 35:3
**bed** 74:17
**beer** 26:3
**before** 1:16 3:6 4:20 5:8 7:1 8:17 9:19 11:6,20 12:8 15:7 22:18,19 24:21,23 30:15 32:6 33:15 34:4 39:15 41:6 42:18 47:10,23 48:2 48:3 58:3 60:17 61:3 61:21 62:17 63:20 64:16,19 65:23 71:12 73:4 75:10 76:16 79:16 80:6 81:18 86:9
**behavior** 87:10
**behind** 39:1 41:6 42:7 42:9,23 44:3 47:5,16 48:18 62:6,9,11 64:9 64:10,16 66:16 69:3 82:23
**being** 47:23 53:19 72:10 81:18
**belonged** 29:3
**belt** 28:2,4 62:18
**belts** 27:14
**beside** 82:13

**besides** 16:10 40:21 46:11 78:2 79:7 82:16 84:15
**between** 3:3,17 4:1 13:5 27:6 44:16,23 45:13 53:12 57:12 58:8 59:18 71:18
**big** 8:20,21 9:3,11,14 9:19 10:5,6 34:16 67:13
**bigger** 69:21 72:21
**bill** 32:10
**birth** 8:2
**bit** 43:19 44:10 45:15 54:8 70:15
**black** 34:18,21 36:4 83:22,23
**blocking** 71:7,9
**blue** 26:14 38:16 46:21
**bond** 20:12,14
**book** 81:8
**booked** 81:10,20
**booking** 81:17,22 82:17
**born** 8:6
**both** 64:3
**bottom** 59:23,23
**bought** 31:21
**Box** 2:10
**break** 6:7,9 86:6
**breakfast** 25:18
**breaks** 6:11
**Bridge** 9:23 10:13 11:3
**Brief** 86:7
**bullets** 75:3
**bumper** 51:18 53:3,4,5
**bumping** 50:10,15
**business** 30:2
**buy** 31:14

## C

**call** 6:23 23:4 81:15 84:20,23
**called** 6:19
**came** 38:18 53:14 54:12 64:9,10,13 66:2 71:13,20 72:9 77:4 82:2 83:19
**capacity** 1:9,9 88:16,17
**car** 22:23 23:1 24:16 24:17 25:21 26:8,9 26:11,13,18 27:7,10 27:12,14 28:6,14,21 28:23 29:10,10,13,18 30:5 33:4 35:23 37:7 38:3,6,13,15,18 39:5 39:18 42:8,10,14,22 43:18 44:12,21 45:12 47:3 51:3,9,18 52:2,5

52:11,12,15,19,21,22 53:8,12,19 54:4,14 54:19,21 55:5,17,19 56:7,8,12,23 57:6 58:4,6,9,17,20,22 59:4,7 60:7 61:3,16 61:18,20 62:4,5,12 62:17 63:8 64:4 67:16,21 68:3,5,17 69:2,22 70:14,23 71:1,2,3,6,13,17,17 71:20,21,22 72:4,8 72:18 73:3 74:18,21 75:8,10,11,15,18 76:16,18,20,21,22,23 77:2,3,9,22 78:13,23 79:1,2,8,9,11,14 81:4 81:6
**Carmichael** 1:15 2:16 3:4 4:5,13,19 86:8 88:8
**carpet** 74:19
**carrying** 32:12
**cars** 39:17 40:21 48:7 77:8 85:23
**case** 3:18,20 7:17
**casino** 86:15,16
**catch** 5:20 41:19
**cause** 89:7
**CB** 46:10,11,12,18 47:19,21 80:9
**cell** 50:5 81:12
**center** 51:13
**certain** 5:5
**CERTIFICATE** 88:1
**Certified** 1:17 3:7 88:4 89:13
**certify** 88:6 89:6
**chain** 55:22
**chance** 35:6 45:17
**change** 31:12 45:12 80:18 82:1
**changed** 12:11
**changes** 87:9
**charge** 19:5 20:19
**charges** 20:16 85:10
**chase** 85:15
**child** 14:3
**children** 13:22
**Chris** 1:8 35:17,18 66:13,14,17 71:23 72:1 76:6 77:14 78:12 79:18 80:3 82:1,7,10,16 83:14 84:15 88:15
**church** 14:9,11,13
**city** 16:2,4 18:6 19:2 20:4
**Civil** 1:7 3:5 88:22

Deposition of Kelvin Carmichael                                      November 14, 2007

Page 2

claims 85:14,17,20
class 20:22 21:4,5,6,16
Clements 2:3
client 27:7 33:4
clothes 34:5 37:6 80:18
    82:1
club 19:23
college 10:22
Colonies 12:10
come 6:20 7:16 24:17
    32:19 64:3 77:19
    84:16 87:3
coming 39:17
commands 56:2 57:23
commencing 1:21
comment 72:23 73:2
    80:3
commission 3:9
Commissioner 1:18 3:7
    88:5 89:14
computer-printed 89:1
concluded 87:15
conference 5:3
contain 89:2
conversation 80:6
corner 53:4
correct 63:3 74:6 75:7
    89:2
counsel 3:3,17 89:3,7
counter 82:3
counting 32:21
county 16:3 20:5,6,7,10
    22:5 39:14 78:19
    88:3
couple 6:10 17:20 19:1
    20:11 44:19 46:15
    61:9
court 1:1,17 4:22 12:11
    13:6 20:20 88:19
    89:13
courtroom 5:2
cousin 13:21 23:7 26:9
    31:9,13,21,23 36:5,9
    54:14 80:17 86:9
cousins 23:2,3 78:7
cousin's 53:4,7 78:1
    86:19
cross 51:13
Crossing 11:21 12:1,3
    12:9
cuff 66:14,14
cuffed 67:7 73:4,7
cuffs 68:23
Cypress 12:11 13:6

___ D ___
dark 38:7
Daryl 2:8
date 8:2 22:9,11,14,15

89:13
Daugherty 1:17 3:6
    88:4 89:12
Davenport 11:7,12,15
day 7:1 22:17 23:14
    26:23 28:14 30:18
    31:8 32:3 48:2 50:5
    73:10 74:5,11,22
    75:4 84:13 85:8 89:9
days 10:9
December 89:9
Defendant 2:7,21
Defendants 1:10 88:18
Defendant's 26:16 28:9
    29:2,5,16,19 49:14
    50:3 52:1 54:6,9
    59:11,12 69:12 73:12
    73:14,23 74:10,13,20
    84:8
Department 17:17
DEPONENT 87:19
deposition 1:15 3:4,6
    3:13,18 4:2,20 6:10
    6:15 7:14 26:17
    87:15 88:7
deputy 82:19
describe 34:13 46:8
    51:7 59:17 64:6
described 46:12 80:10
    83:5
desk 82:18,23
difficult 5:14
dirt 58:18
disagree 22:13
discussion 21:15
distance 87:7
DISTRICT 1:1,2 88:19
    88:20
DIVISION 1:3 88:21
documents 7:23
doing 22:17,21,22
    25:23 65:20 66:3,5
done 43:10
door 54:16 58:5,15,20
    59:6,19,19 60:1 62:6
    62:9,11 64:9,10 67:4
    68:10,12 75:12
doors 64:17,20 65:1
doorway 56:13
down 4:23 5:15 32:17
    37:18,19,20 40:13
    42:6 62:19 64:2,22
    66:1 70:15 76:10
    78:14
dressing 80:17
drink 25:4 26:5
drive 1:20 2:10 11:7,15
    28:4 49:11
driver 34:17 35:9,11,14

35:16 46:19 62:10
    64:10 66:1
driver's 18:10 19:10
    53:6 65:6
drives 49:11
driving 18:8 19:4 27:10
    69:21 79:13
drove 77:13
drug 21:18
drugs 25:7
duly 4:6 88:9
during 6:9 75:18

___ E ___
each 16:17
edge 51:17 53:3,5
eight 25:14
either 3:14,20 5:13
    35:20 52:18
Eley 1:19 2:9
encountered 27:7
end 43:21 44:10
enough 43:18 59:7
equipment 60:10
even 59:23
event 22:1
ever 4:19 10:10,22 11:1
    14:11,20 15:1,7 19:7
    21:18,21 29:23 30:14
    30:23 31:3,19 32:2
    39:13 40:16 47:22
    51:2 75:13,15 77:19
    85:10
every 5:1 86:23 87:1
everybody 54:12
everything 74:4
evidence 3:13
examination 2:15 4:9
    89:3
Excuse 22:22 24:4
    66:15
Exhibit 2:19 26:16
    28:9 29:2,5,16,19
    49:14 50:3 52:1
    54:10 59:11,12 69:12
    73:12,14 84:8
Expiration 89:13
explain 12:22 58:16
    68:22
explanation 5:13

___ F ___
facial 34:22
facts 7:20
fair 6:5 59:7
far 13:13,15,16 56:12
    59:7 60:6 62:4 74:5
Farmersville 13:9 24:7
fast 42:16

faster 42:18
Federal 3:15
feet 60:6
fell 41:6
felt 51:19
few 17:1
fifth 21:8
filing 3:18,22
fine 19:6 20:23 22:16
finger 59:16,18
finish 5:7
fired 57:21 58:10,12
firing 61:4
first 4:6,14 15:19 24:9
    27:7 30:17,23 31:3
    33:1,3,13 43:9,14
    44:8,16,23 45:3,11
    45:13,20 56:4,4,8
    61:17 72:16,16,23
five 13:17 14:4 15:10
    15:15 21:10 80:2,2
    80:15
fixed 79:3,20
fixing 14:4 31:14 32:15
    32:22 43:11 45:2,5
    51:19 52:7,21 54:22
    55:1,4 58:23 79:8,18
flashing 40:11
flask 28:10,12,14
flat 79:2,3,8
fly 52:10
followed 42:9
follows 4:8
foot 58:14
forced 53:19 64:1
foregoing 89:1
forget 67:12
form 3:10
formality 3:9
forward 45:15 63:7
found 34:10 80:4,4
four 8:22 21:10 73:8
fourth 19:12
four-lane 38:20
Fred 2:3
from 7:12 10:16,18
    13:13 24:5 25:16
    31:22 37:13 39:19
    42:12 48:5 59:6,7
    60:7 64:9,10,16,23
    65:9 66:2 76:1,7,12
    78:18 80:13
front 29:18 53:5 57:9
    59:19 60:1 65:4 67:3
    67:19 82:2
full 35:3
further 3:16,23 70:15
    87:19 89:6

___ G ___
Gary 2:8
gas 32:16,22 79:1,6,7
    79:10,17
general 86:12
gentleman 7:9
gets 66:9 78:12
getting 39:16 54:15
    61:16 63:23 64:18,21
girl 11:13 82:23 83:5
give 31:16,19 56:2
given 4:19
glass 37:23
go 5:19 6:8 7:1 14:9,14
    16:17 25:2,15 32:15
    32:17,22,23,23 33:8
    39:9,23 40:2 41:12
    42:18 45:5 51:7,11
    57:23 62:5,8 63:15
    63:20 67:17 68:10
    70:4 78:14,15 86:14
    87:4
goes 66:7
going 4:23 5:4,5 6:2,3
    12:7 16:17 21:16
    25:12 26:15,20 32:16
    32:23 37:12 42:16
    45:22 50:10,16 56:22
    57:1 62:13 63:23
    64:15 69:19 70:4
    71:10 80:10
gone 14:11 85:21
gotten 63:8
grabbed 47:2 63:21
    69:2,3
grabbing 47:1 63:19
    67:10
graduate 10:16,18,20
grandma's 24:6
grandmother 12:17,19
grandmother's 13:5,8
    33:9
grass 51:20 69:11
    71:11 72:12 73:22
    76:11,16
gray 38:7
ground 52:8 56:3 57:23
    58:13,19 59:5 63:13
    63:15,20,23 64:11,16
    65:7,10,15,22,23
    66:7,9 67:9 69:5 71:6
    71:8 78:10
guess 13:17 15:10 35:4
    50:23 65:16 75:5
gun 29:5,8,21,23 30:4,9
    30:15,21 31:1,4
    33:12,20 36;1,3,14
    36:15,20 38:1 39:11

Deposition of Kelvin Carmichael

41:22 50:9 62:12
63:1 65:12,17 66:17
67:5 72:5,6,11,17,21
75:17 84:3 86:4
**guns** 55:8,18,20 57:3,8
60:9 72:20
**guy** 34:1,16,18,18,21
35:17 72:2,3 73:1
82:18,22 83:19,20,22
83:22,23 84:15
**guys** 72:9 85:4
**Gwendolyn** 24:2

**H**

**hair** 34:22
**haircut** 34:15
**Halcyon** 1:19 2:10
**Halfway** 63:18
**Hall** 86:17
**hand** 36:14,23 46:7,9
48:21 49:16 65:11,13
65:14,17 69:22
**handcuffing** 68:22
**handcuffs** 57:17 60:12
63:12 66:11,12,19
67:14 68:19,20 69:9
75:10 81:2
**hands** 31:12 56:14,17
56:19,21 57:7,15
58:1 62:15 63:9
65:11 66:16
**hang** 57:19 86:22
**happen** 71:12 79:6
**happened** 16:20 18:18
18:20 19:4 20:9,21
22:4,7 26:7 33:18
37:8 38:23 41:3 43:8
46:1 50:9,12 51:5
52:4,6,15 53:10 54:1
54:12 64:6,7 68:17
69:10 70:11 71:18
77:7,12 78:21 79:21
80:16,19 81:22 84:18
86:4
**happening** 39:14 69:20
**happens** 39:20,22 42:5
57:16 58:2 63:11
66:10 78:13 81:6
**happy** 5:23
**hard** 15:21 43:17 45:9
**having** 4:6 28:1 30:9
**Hayneville** 78:19,20
79:22 80:1
**head** 5:9,15,16 19:21
37:22 43:4 44:11
53:11 56:1
**hear** 36:9,11
**heard** 36:12 37:15
39:13 72:19

**hearing** 37:13
**her** 5:15 12:21 83:5
**hereto** 3:21 4:1
**Herman** 23:5,10 32:1
**Herman's** 23:13
**high** 10:16,18
**Highway** 12:13,13 22:4
41:4 42:5,22 48:5
**hill** 59:5 70:19,22 71:19
**him** 7:4,6,6,18 23:4
28:1 30:19 31:4,4,7
31:15,16,16,19,19,22
32:5,7 34:13 35:5,6
36:5,7,12,12 39:9,10
41:12,15,16,19 46:6
47:1,19 53:9 56:7,8
56:15,17 57:17,18
58:9 61:20 63:12,19
63:21 64:1,11,22
65:6,9,14 66:1,11,12
66:14,15,19 67:7,9
67:14,22 69:23 70:2
70:4,6,7,7,8,12,13,13
71:8 75:14 76:12,22
77:2 78:11 80:18
81:23,23 82:11,12
83:15 86:22,23 87:1
**himself** 63:17,18
**hit** 43:1,3,10,12,17
44:1,5,7,14,17,17,22
45:2,4,9,14,16,20,23
46:16 47:8,11,11
48:6 51:5,17 52:12
52:13,22 53:2,12,13
59:3,8,13
**hitting** 43:5
**hold** 52:20
**holding** 36:20 49:11,12
**holster** 66:18
**home** 39:23 40:2 85:5
**hood** 72:7
**Hooks** 78:16
**hopefully** 5:20
**hour** 25:22
**hours** 17:1,20 19:1
20:11
**house** 13:5,8 23:23
24:6,9,19 25:1,15
26:10,21 27:4,6 33:1
33:9 86:11,19
**Housekeeping** 8:16
**Howard** 23:12 24:2
78:16,16
**Huh** 28:22 36:10
**Huh-uh** 9:16 39:8
45:19 52:14 53:15
69:6
**hurt** 53:22
**HUTSON** 1:9 88:16

**I**

**idea** 20:4
**identification** 73:13
**identify** 61:6,10
**illness** 21:22
**important** 5:4
**incident** 86:10
**independent** 22:10
25:11
**INDEX** 2:15,19
**indicating** 36:18
**individual** 1:8,9 88:15
88:17
**initially** 70:19
**injuries** 53:18
**inside** 52:4,11,12,15
74:21 75:8 81:7
**interested** 89:8
**intersection** 40:6,17
**introduced** 3:19

**J**

**jail** 16:21,23 17:19
18:21,23 19:2 20:7
20:10 79:22 80:1,7
80:11,14,16,20 83:3
**Jay** 2:3,4 14:7
**John** 9:21 10:4
**jumped** 55:17,19
**jumping** 58:18
**June** 22:8,14
**just** 5:16 6:12 7:16
11:11 12:21 13:11
15:10 16:14,16 21:12
22:15 25:1,12 28:2
30:1 31:9 32:14,16
33:1 35:1,3 36:4
38:15 39:5 41:16,17
41:18 42:9 43:10,14
49:20 53:3 54:10
56:13 57:19 61:14
64:1 65:9 67:12 69:1
69:21,22 70:6,8 72:1
77:21 81:7,13 83:18
86:12,14,19 87:6

**K**

**keep** 12:7 43:14
**Kelvin** 1:15 2:16 3:4
4:5,13,17,18 88:8
**kept** 41:16,17 70:6
**Kevin** 4:17
**kin** 89:6
**kind** 5:19 14:22 15:11
15:21 24:12 25:13
26:13 34:15 36:3
38:3 54:17 59:22
60:10 71:7 86:8,12

**knee** 67:2,4
**knees** 64:1,18,19,21
65:21
**knew** 72:17
**knock** 43:23 70:7
**knocked** 44:9 45:15
47:8,14 72:10
**know** 5:22 6:8,12 7:6,8
11:11 13:11,11,12
21:5 22:1 23:10,12
24:12 28:12,13,18
29:9,22 31:7,9,10,21
34:2,8,9,14 35:3,11
35:18,20 36:4,6,8,13
37:5 39:19 40:14
41:14,18,18,20,21
42:17 44:2 48:2
52:11 60:15,21 71:1
72:17 77:21 78:4,6
78:11 83:8,21 84:10
85:13,17,20,23 86:4
**K-E-L-V-I-N** 4:16

**L**

**L** 2:3,8
**lady** 82:18
**lane** 38:20
**Lanier** 10:19
**lap** 56:23
**Large** 1:18 3:8 88:6
89:14
**LASHUN** 1:9 88:16
**last** 14:13 23:10,12,13
**later** 17:12 18:2 31:20
35:6 72:14
**laughing** 26:2
**Law** 1:19 2:4,4,9
**lawsuit** 12:5 15:1
**learn** 77:19
**learned** 34:6 35:14
**least** 59:22
**leave** 10:4,6
**led** 12:4
**left** 9:11 32:6 33:2
51:12 64:16,19 65:16
79:9,11,16,17
**less** 25:22 77:13
**let** 5:22 6:8,12 28:8
37:8 41:19 49:13
51:2,23 68:13 71:13
73:14 74:10,13,20
84:12
**let's** 12:7 43:14 54:17
57:23 59:11 63:7
86:6
**Lewis** 2:3,4 14:8 87:14
**Lewis's** 7:12
**license** 18:10,15 19:7
19:10 38:13

**light** 40:9,11,12
**lights** 38:16 46:21,22
**like** 5:16 9:5 11:14 13:3
15:13 16:15 21:3
24:12,12,13 25:14
30:4,6 34:14,16 35:5
38:7,10,14 39:3,13
43:10,21,21,22 45:15
46:3,10,12 47:12
48:18 51:17,19 53:3
53:6 54:3,5,7,7,15
57:9,10 58:13,15
59:4,9,18 62:6 63:2
65:9,21 71:6,7 72:3
74:15,17 82:12 83:4
83:21 87:3
**Lincoln** 38:4 40:22
41:6 44:1 52:22 54:1
54:9 70:14 71:4
76:19 77:5 81:1
**line** 51:13
**little** 35:3 39:4 42:6
43:18,21 44:10 45:14
45:15 54:8 70:15
77:13 82:12
**live** 10:12 11:6,15,20
12:1,8 24:3,3
**lived** 11:3 13:4
**living** 12:3,14,19 13:14
**loaded** 29:21
**long** 8:12 9:21 10:1,4
11:3,15 12:1,23
15:22 16:23 17:11
18:23 25:20 42:12
46:14 61:6 64:23
73:7,9 76:15 79:4,23
80:13 81:17 83:15
**look** 7:23 30:6 35:6
39:7 42:22 43:6
44:21 45:2,18 46:14
59:5,11 75:5 84:12
**looked** 43:12,13 45:3,6
46:2,3,10 72:14 73:3
74:11
**looking** 35:5 39:3,5
44:6 46:12 49:22
53:9 66:4 67:5 71:21
71:22 72:3
**looks** 30:4 59:18 74:15
74:17
**Lots** 8:20,21 9:4,11,14
9:19 10:5,6
**loud** 5:12
**low** 34:15
**Lowndes** 22:5
**Lyn** 1:16 3:6 88:4
89:12

**M**

Deposition of Kelvin Carmichael                                   November 14, 2007

Page 4

**mad** 41:23
**made** 3:11 41:3 46:5
    48:23 50:2 69:11
    72:23 76:10 80:3,18
    81:23 84:18 85:7
**make** 30:9 42:4 45:5,21
    73:2 84:7
**makes** 8:4
**mall** 87:4
**man** 41:19
**manner** 3:20 89:8
**many** 10:9 14:1 15:9
    61:23 82:16
**MAR** 2:20
**marked** 26:16 28:8
    51:23 73:12
**married** 10:10
**Marshall** 1:5 2:12 6:18
    9:15 13:14,18 23:17
    85:3 88:12
**Marshall's** 6:10 26:17
**Martini** 19:23
**Masters** 2:8 60:4
**matter** 88:11
**may** 3:6,11,13,19
**maybe** 13:17 15:10,22
    17:12,13 24:13 25:14
    25:22 42:15 44:19
    46:15 58:11 59:14
    60:8 65:3 72:13
    76:17 80:2,15 81:19
    83:16
**McDonough** 2:5
**mean** 12:23 37:16
    64:12 71:9
**meant** 78:4
**meet** 7:1
**meeting** 27:3
**member** 14:20
**mental** 21:21
**middle** 1:2 63:2 88:20
**might** 5:14 35:2 36:6
    37:13
**mile** 24:5 42:15 77:14
    78:18
**miles** 13:17
**mind** 30:12
**mine** 27:22 28:3
**minute** 12:18,21,23
    52:10 61:14
**minutes** 72:13 73:8
    76:17 79:5 80:2,2,15
    81:19 83:16
**mirror** 39:3,4,22 48:14
    48:16,22 49:10,11,13
    49:16
**missing** 10:9 82:9
**mistaken** 27:21 65:19
**model** 38:11

**money** 31:7,12,16,19
    32:3,5,12,19 82:4,8
**Montgomery** 1:20 2:5
    2:11 8:7 11:8 14:18
    16:1 17:16,17 18:6
    19:2 20:1,7,10 39:19
    86:21 88:3
**months** 11:5 12:2 13:2
    19:15
**morning** 14:15 24:10
    24:13 25:9,18 29:11
    29:14 32:6
**motor** 22:23 23:1,21
    25:20 26:1,7 31:9,22
**move** 63:7 66:4 67:6
    69:23 75:13
**moving** 50:20
**much** 21:2 32:7,8 44:16
    58:8
**mustache** 34:23 35:1
**myself** 41:11

**N**
**name** 4:11,14 12:12
    19:23 23:4,5,12,13
    24:1 33:10 34:9,11
**named** 35:17
**names** 23:11
**neck** 47:1 65:21 67:10
    69:22
**necks** 55:23
**need** 3:11 5:7,10 6:7
    59:16
**negative** 9:16 39:8
    45:19 52:14 53:15
    69:6
**neither** 35:19 89:6
**nervous** 30:9
**never** 15:3,5 34:4 35:19
**new** 38:9
**newer** 38:8,9
**next** 7:9 35:23 39:22
    42:5 57:16 58:2 67:8
    68:18 69:10
**nickname** 23:5
**night** 24:19,20,21,23
    25:5,7
**nightclub** 19:19,20
**nine** 24:13
**noddings** 5:15
**nods** 5:9 19:21 37:22
    43:4 44:11 53:11
    56:1
**noise** 16:9,10
**Norman** 9:23 10:13
    11:3
**NORTHERN** 1:3
    88:21
**nothing** 4:7 11:13

    21:12 25:1 26:2,5,22
    28:11,13 30:1,19
    37:17 50:14 52:6,15
    80:21,22 88:10
**noticed** 6:9 33:4 87:9
**Nova** 26:14 71:6
**November** 1:20 88:23
**number** 11:10 17:23

**O**
**objections** 3:9,10
**obviously** 57:20
**occurred** 22:14,17
**off** 12:13 21:14 33:8
    40:14 41:5 42:19
    43:23 45:5,22 46:16
    47:8,14 51:6,7,11,20
    53:19 58:18 62:18
    67:9 70:7 72:10
    85:18
**offered** 3:13
**office** 7:2,3,12
**officer** 64:13 68:21
    75:23 77:9,10 79:9
**officers** 55:6 60:11
    64:3 72:19
**Offices** 1:19 2:4
**Off-the-record** 21:15
**okay** 6:15 15:11 21:8
    32:19 39:21 43:15
    51:5 54:1,9 59:7
    61:14 63:7 81:1
**old** 14:3 38:11
**older** 38:8
**once** 51:20 54:12 65:22
    67:7,13,20 68:17
    69:9 73:3 78:12
    80:16,19
**one** 5:6,10 14:2 17:19
    35:19,20 38:8,8,9
    45:20 60:8,17 62:1,3
    62:7 65:6,11,12,20
    66:2,19 67:13,14
    68:1,2 69:2,4,21
    72:19 73:21,22 77:11
    85:4
**onto** 41:3 42:5,13 48:5
    62:22
**open** 58:20 59:6 60:3
    68:10,12
**opened** 58:4 75:12
**opposite** 51:21
**ordered** 63:13
**ordinance** 16:9,10
**organization** 14:22
**other** 3:10,14,20 21:16
    23:7 36:23 38:20
    40:21 48:7 60:9,10
    61:2 65:12,20 66:19

    67:14 69:3 71:19
    72:2,3 73:17 75:17
    76:21 77:9,10 79:9
    80:3,6 82:22 83:20
    85:13
**out** 5:12 12:16 17:4
    20:11 22:4,23 23:1
    23:21 25:20 26:1,8
    31:15 32:14 34:11
    38:12 48:9,12 49:6,7
    49:9,20 51:3 52:7
    54:2,14,15,18,21,22
    54:23 55:3,5,8,13,15
    55:17,19,20 56:7,8
    56:12 57:6 58:3,9,14
    58:17,23 59:10 61:2
    61:12,15,16,17,19,20
    61:21 62:4,4,7,17
    63:8 64:16 66:20
    67:16,21 68:5,7,8,10
    68:11,17 72:4 75:9
    75:14,18 79:18 80:17
    89:4
**outside** 65:1
**over** 31:15 33:22 34:15
    36:19 46:23 51:9,13
    51:15,16,19 52:21
    64:4 69:16 70:7,18
    70:21 71:8 77:15
**own** 12:10

**P**
**pages** 89:1
**painting** 8:23 9:13
**pants** 67:11 70:1 76:9
**paper** 84:10
**Parks** 14:17
**part** 39:14
**particular** 32:10
**parties** 3:3,17 4:1 89:4
    89:7
**party** 3:14,20 15:1
**passed** 44:16 58:8
**passenger** 34:19 46:19
    46:20 64:9 68:21
    73:1 75:23 79:13
**passenger's** 27:13 30:5
    34:1,2,7 53:7 62:7
    64:12,13 66:2 67:15
    68:9 77:11
**past** 59:2
**pay** 15:13 17:2,21 18:9
    19:6 20:23 21:4
    30:12
**paying** 15:16 18:17
    48:20 50:23 67:22
**pending** 20:17,19
**people** 39:16,17,18
    46:23 47:1 82:11,16

**pepper** 60:21,23
**person** 36:14
**phone** 50:5
**Photograph** 2:22
**pick** 29:23
**picked** 77:15,17,20
**picture** 59:22 73:11,15
    73:21 74:8,21
**pictures** 73:10,18
**Pilgrim** 14:15
**pistol** 33:6
**place** 18:1 19:13
**placed** 75:10
**Plaintiff** 1:6 2:2 88:13
**plates** 38:13
**play** 32:20
**please** 4:11,15 59:15
**pocket** 32:13 82:8
**point** 33:15 36:23 41:1
    42:2,16,21 47:4 52:9
    55:12 56:6 57:5
    67:23 70:9 71:14
    75:9 78:6
**Pointe** 1:19 2:10
**pointed** 30:9 55:8,18
    57:3 66:21
**pointing** 30:4,6 33:20
    33:20 36:17,21,22
    37:23 41:21 50:22
    51:1 55:19 57:7,10
    66:6,23 67:5 72:20
**police** 16:3,3 17:17
    34:8 47:5,6,16,18,18
    49:3,5,12 50:3 61:6
    61:11,13 71:13,20
    76:16,21 77:3 78:23
    79:2 85:4
**positive** 20:13,18 35:8
    43:16 50:1,13 53:1
    56:9 58:7 59:21 60:2
    62:21 63:4,10 66:8
    67:1 68:14 70:20
    74:1
**preparing** 6:15
**present** 2:12 23:14
**pressed** 85:10
**pretty** 27:23 28:2 47:20
    47:23
**prevent** 37:13
**previously** 26:15 28:8
**prior** 35:11,18,20 43:5
**probably** 13:2 18:2
    24:5 25:22 45:11
    47:21 49:10 61:9
    72:12,13 73:8 78:18
    79:5 87:3,5
**problems** 39:13
**Procedure** 3:5
**process** 68:22
**pronounced** 4:17

Deposition of Kelvin Carmichael

provided 3:14,21
pull 33:21 36:18 55:15
 55:20 70:7
pulled 33:5,18 54:3
 55:13 61:12,15,18,21
 71:1 77:14 78:23,23
pulling 33:11 46:23
 70:1
pulls 35:23
purpose 3:14
pursuant 1:16 3:4
push 65:14
pushed 53:6 65:6,9
pushing 66:1
put 12:16 16:21 18:21
 20:22 21:6 27:22
 28:3 47:3 49:4,6,7,9
 53:3 56:15,17,19
 57:17 59:16 63:12
 66:11,12,18,18 68:19
 68:20 69:2,5 70:13
 70:13,18 76:18,20,22
 76:23 77:2,4,7,18
 79:10,17 81:8 82:3
 82:12
puts 57:15 58:1
putting 79:1,7
P.C 2:9
p.m 1:21 87:16
P.O 2:10

**Q**

question 3:11 5:8,21,22
 6:3,4
questions 3:10 81:14
 83:18 84:5
Quincy's 8:11,12,17
quite 52:9

**R**

radio 37:15 46:3,5 70:9
 80:8,9
ramming 85:18
ran 42:7,10,13 43:8
reach 62:19 75:15
reading 89:4
really 11:11 21:10
 24:11 31:13 35:4
 41:10 48:20 50:23
 73:20
rear 39:3
reason 6:7 22:13
recall 55:10
recess 86:7
recognize 47:15 75:6
 86:2
recollection 22:10
 25:11
record 4:12 21:14

59:17
regardless 3:21
regular 34:5 37:6,7
 38:15
related 13:18,20
relatives 14:7
remember 15:22 16:19
 17:9 22:16 26:23
 28:1 33:11 37:11
 38:5 71:15 73:20
 82:21
remind 5:20
rephrase 5:23
reported 88:6
reporter 1:17 3:7 4:23
 88:5 89:13
REPORTER'S 88:1
representing 3:3,17
reserved 3:12
resisting 70:2
response 9:16 20:13,18
 35:8 39:8 43:16
 45:19 50:1,13 52:14
 53:1,15 56:9 58:7
 59:21 60:2 62:21
 63:4,10 66:8 67:1
 68:14 69:6 70:20
 74:1
rest 53:14 54:12 72:9
result 18:18 53:19
results 89:8
Richard 1:5 2:12 23:17
 24:16,18 26:13,16
 27:11,18,20 30:14,21
 31:1,7 32:2 36:11
 37:3,9,13 38:22
 40:12 41:7,23 42:16
 47:5,22 48:9 50:7
 51:2 52:18 53:22
 55:3 57:6,12,15 58:1
 58:22 59:2 61:2 63:7
 64:15 65:2,5 66:7
 69:20 70:2,11,22
 73:5,7 74:8 75:9 76:3
 76:5,8 77:1 81:20
 82:17,19 85:8,13
 86:9 88:12
Richard's 26:11,17,21
 27:3 28:21,23 29:18
 37:20 45:12 52:2
 53:12 62:15 67:2
 74:18,21 77:9 79:7
 79:11,13 81:22
ride 81:15 84:20
rides 48:14
riding 48:15,18,21
right 5:8,12,17,18 6:1
 6:13,14 7:9 8:4,8
 11:18 12:13 14:8

16:17 18:18 22:2
 23:20 25:13 26:7
 28:15,21,23 29:6
 30:14 31:17 33:3
 35:7,23 36:16,17
 38:22 40:5 41:3,8,13
 42:4,12 43:15,22
 44:2,14 45:18 47:4
 48:13,19 49:21,23
 50:3,18 52:8 54:3,15
 54:19 57:5,9,13,15
 58:13,15 59:9,14,15
 59:18,20 62:20,22
 63:3 65:3,17,18 67:3
 69:14 70:16,19 73:21
 74:8 77:5 78:12 81:2
 82:12 87:7
right-hand 42:4
road 9:23 10:13 11:4
 11:23 13:12 33:8,10
 33:21 37:1 38:18
 39:23 40:1 43:23
 45:6,22 46:16 47:9
 47:14 48:7 51:6,7,11
 51:21 53:20 70:7,15
 72:10 77:13,15 78:14
 80:5 85:18,22
rob 36:7 39:10,10,18
robbed 39:16 47:23
 48:3
robbing 47:20
rode 42:6
room 5:3 81:13,18
 83:12 84:9 85:6
Rosa 14:17
round 59:3,8,13
rules 3:5 5:5
ruling 3:12
running 47:13

**S**

SAITH 87:19
same 3:22 9:14 14:5
 33:8 42:19,20 45:11
 71:2 86:20 87:2
sat 71:5,11,19 72:7,12
saw 30:17 33:13 34:4
 35:19 46:6 47:19
 49:5,8 69:21 85:21
saying 7:6 47:12 61:17
 64:3
says 5:2 27:20 49:20,22
scared 41:10 48:22
school 10:2,16,18 11:1
search 75:18,20 76:3
searched 75:22 76:5
seat 27:14 28:2,4 29:15
 29:18 50:10,17,18
 62:14,18 63:2 70:23

71:3
second 17:6 43:1,3
 44:14,17,22,23 45:7
 45:9,13,16,23 57:19
seconds 44:19 46:15
 58:11 61:9 65:3
see 7:5 29:2,5 30:14
 31:12,16,19 32:2,5,8
 32:10 33:15 35:9
 38:12,16 44:1,5
 46:11,21,22 48:7,9
 48:12 49:14 52:22
 54:5,10 55:11 58:16
 58:18 59:2 60:10
 69:12,19 71:10,12
 73:17 76:3,7,12
 77:17 81:20 85:7
 86:23 87:1
seeing 32:19
seen 30:1,23 31:3 36:5
 40:21 60:17 72:15
 76:9 83:10 85:23
separated 87:6
September 8:3
set 89:4
Seven 8:11,13,17
shakes 5:15
Shirley 85:3
shirt 61:15,19
shirts 55:14,16,21
 61:13
shoot 61:23
Shorter 8:11
shorthand 3:7 25:13
 88:4
shot 39:12 52:7 54:15
 55:2 57:21 58:3,5,10
 58:12 59:1 61:4,7,8,8
 61:18 62:2,3 75:13
shoulders 41:17
show 26:15 28:8 32:14
 49:13,15 51:23 59:11
 73:14 74:10,13,20
showed 74:4 76:16,21
showing 59:15
shrugging 41:17
shut 69:23 70:8 82:11
side 27:13 30:5 33:5,12
 33:21 34:1,3,7 36:23
 39:4,21 51:21 53:6,7
 54:3 56:15 57:4 59:4
 62:8,19,22 63:3
 64:12,13,14 65:6
 66:2 67:15,15,18,20
 68:2,9,21 69:1 70:19
 73:1 75:23 77:11,15
 80:5 85:21
Sidney 10:19
sign 40:9,18

signature 4:2
signing 89:4
Silver 9:21
Silver's 10:4
since 10:3 21:9 34:6
 35:14 83:10
sir 4:12 16:13 18:21
 34:20 64:8
sit 69:11 76:10 79:2
 86:14
sitting 7:9 19:9 70:18
 70:21 73:22 76:15
 78:10
six 12:2 14:4
skipping 57:20
slim 34:15
slow 54:17
slowed 40:13
slower 42:19
smoking 19:19,20
 20:14 21:17
Snatched 67:9
snatching 57:18 76:9
social 14:22
sold 31:9,10
some 32:16 38:20 56:6
 57:22 71:14 73:10
 82:8
somebody 36:6 39:10
 47:20 83:6
Someone 82:23
something 9:5 13:3
 22:4 24:13 25:14
 35:4 36:7 40:10 46:4
 46:6 47:2 48:9 57:20
 72:20 77:16 84:11
 87:4
sometime 17:13 18:3
 19:16
somewhere 57:22
 59:14
soon 72:9 75:12
sorry 5:3 9:2 37:9 49:4
South 2:5
speak 4:7 6:16,18 88:9
specifically 16:5
sped 37:8 38:22,23
speed 42:19,20 45:12
speeded 37:5,7
speeding 16:14 17:8
 18:12,13,16
spell 4:14
Spend 17:19
spent 24:19
spinning 52:4,16,19
spoke 7:14
spray 60:21,23
spun 51:9,18 54:2
stand 69:1

Deposition of Kelvin Carmichael

November 14, 2007

Page 6

standing 56:13 57:9
start 9:9 47:10 64:15
started 9:6 10:5 47:7
  57:17 63:18 65:1
  67:9 80:17 81:13
Starting 49:23
state 1:18 3:8 4:11 88:2
  88:5 89:14
statement 48:23 50:2
  84:7,19 85:7
STATES 1:1 88:19
station 79:7
Statute 3:15,21
stay 12:17 16:23
stayed 20:11 79:19
staying 11:12 12:21
stepped 58:14 59:10
Steven 23:7,8
Steven's 23:10,12
stick 5:4
still 20:16,19 42:7
  45:17 50:18,22 56:23
  58:6,22 66:19,23
  70:9 79:13 81:2
  86:20
stipulated 3:2,16,23
stipulation 1:16 14:6
STIPULATIONS 3:1
Stone 11:21 12:1,3,8
stood 38:12
stop 12:4,15 27:8 40:9
  40:12,16 51:2 54:13
stopped 9:3,7,8 15:14
  52:6 58:4 71:16
stopping 47:2 85:23
stops 81:4,6
store 32:15 71:16 78:14
  78:15,22 80:14
straight 25:15
street 2:5 11:10 12:12
stuff 21:7 67:10 70:1
  82:3 86:8,12
sued 15:3,5
suffer 53:18
suit 83:21 84:16
sure 11:11 22:9,15
  23:13 24:11 27:23
  28:2,3 33:10 45:5,21
  47:17,20 62:3
suspended 18:9,10,15
  19:5
swerved 43:21,22 44:9
Swishers 28:17
sworn 4:6 88:9

_____ T _____

take 6:8 18:1 19:12
  20:16 22:23 23:1
  25:20,20 31:15 32:14

54:17 64:23 72:4
  73:10 75:17 76:1,7
  76:12 79:4,23 80:13
  81:7 85:4 86:6
taken 1:15 3:4,6 81:18
  85:6 86:7
taking 4:23 23:20,21
  26:1 73:17
talk 7:4,18 41:7 80:9
  83:17 84:16
talking 13:1 15:11,12
  26:2 36:3 43:14 46:7
  46:9,18 47:7,19
  48:17 55:6 57:5
  73:18
tall 34:14
Taser 60:15,19
tell 39:9 41:15 44:20
  45:9 47:4 49:12
  61:20 74:16 84:12
telling 15:18 27:22
  33:21 36:18 38:1
  61:2 63:21 66:4 67:6
  69:23 70:4 83:13
ten 24:13
terminated 10:7,8
testified 4:8
testimony 7:18
their 37:17,20 55:13,15
  55:18,20,20,20,23
  57:7 61:12,12,15,15
  64:17,19 65:1 72:5,7
themselves 61:6,10
thereof 89:8
thing 5:6 47:7 54:18
  58:2
things 5:10 86:20 87:2
think 6:9 9:4,10 12:16
  16:9 17:8 18:8 19:14
  20:15 21:3 34:23
  35:2 36:16 38:7,10
  40:3,3 46:5 47:6,18
  60:12 70:13,23 71:4
  72:7 84:10 87:12
third 47:10,11 48:6
  51:5 52:23 53:2,13
though 20:6 23:5 28:13
  28:14 31:11 35:7
  40:16 48:12 49:13
  55:11 70:16 76:13
thought 39:9 52:21
three 8:14 11:5 13:2
  17:23 19:15 72:13
  73:8
through 5:5,19 16:17
  36:21 37:23 54:18
  68:9 71:21,22 79:19
throw 48:9
ticket 16:7,8,9,11 17:8

18:12,13,16,17
tickets 15:10,12,13,16
  16:14 17:2,21 21:13
time 3:11,12 9:14 12:4
  12:14,20,23 13:14
  14:13 15:19 16:12
  17:19 18:5,23 24:4
  24:11 25:9 27:6
  30:17,23 31:3,18
  33:3,13 35:12 40:20
  42:12 43:1,3,9,11,15
  44:8,14,16,16,17,22
  44:23 45:1,3,3,7,13
  45:13,16,23 46:17,21
  47:12,13 48:5,6,16
  48:17 49:3,5 52:23
  53:2,13,13,14 57:6
  58:4,8,8 63:7 67:23
  70:16 71:18 72:14
  80:6
times 15:9,10,15 21:10
  21:11 61:23
tire 79:18,20
today 5:2,3 6:16 7:15
  19:9 22:2 73:19
told 6:19,21 7:16 28:3
  31:13,21 41:18 49:3
  49:5 56:7,8,15,17
  57:21 58:3,9 61:14
  64:22 67:16,21 68:5
  69:1 70:8 75:14
  81:14 82:7,11,11
  84:20 85:4
top 47:3
toward 30:5
towards 64:15 78:19
  78:19,20
trade 11:1
traffic 5:14,15 40:9,19
transcript 89:2
transported 82:19
treated 21:18,21
trial 3:19
tried 63:20
Triple 8:11,12,17
Troy 12:13,13
true 89:2
truth 4:7,7,8 88:9,10
  88:10
try 75:11,15
trying 36:7 39:8,10,11
  39:18 43:22 52:20
turn 33:8 39:7 40:4
  41:7 42:4,21 43:5,11
  43:18,20 44:21 45:17
  51:16,19 52:21
turned 39:23 40:1,7
  41:8 42:12,19 43:13
  45:4,6,21 46:2 48:5

51:9,15
TV 26:22 86:14
two 13:2 19:15 23:2,3
  24:5 38:21 55:5
  60:10 65:3,11 72:13
two-lane 38:19

_____ U _____

Uh-huh 20:13,18 35:8
  43:16 50:1,13 53:1
  56:9 58:7 59:21 60:2
  62:21 63:4,10 66:8
  67:1 68:14 70:20
  74:1
uncle 8:23 9:12
under 74:17
understand 5:22 25:10
  44:4
understood 6:4
uniform 83:1,3
union 14:20
UNITED 1:1 88:19
unlike 5:11
unpaid 16:7,8 17:8
until 5:7 8:22 9:1,3
  41:8 42:13 45:16
  46:22 48:6 55:1
  56:15,17 63:18 75:13
  79:3,19
urging 41:12
use 25:12 65:14
used 3:13,20 86:14
  87:2
using 36:22
usually 30:21 49:10

_____ V _____

vehicle 38:16
very 5:14
view 39:3,21
vs 1:7 88:14

_____ W _____

wait 5:7
waiting 32:18
waived 3:19 4:3 89:5
waiving 3:22
walk 54:17
walked 57:4 67:15,19
want 81:16
wanted 7:4
Warrants 16:7
wasn't 11:13 20:4,5
  27:20 30:2 33:9
  34:14,16 35:4 38:11
  39:5 45:5,21 47:17
  48:20 50:20,23 58:17
  63:1 70:4 71:2,17
  72:2 73:9 82:4,7 85:3

watch 26:22 31:15 39:2
  86:14
watching 22:23 23:1
  39:5,21 57:1
way 26:10 30:6 40:4
  51:11 59:22 70:2
  74:5
weapon 66:5
wearing 27:16,18 83:1
Webb 1:19 2:9
Wednesday 1:20 88:23
week 26:23
weeks 8:14
well 12:22 37:18 39:17
  41:20 48:15 74:4
  80:17
went 7:4 12:17 14:13
  20:20 31:14 46:16
  51:6,20
were 8:6 9:2 12:3,7,14
  12:19 15:19,23 16:20
  17:15 18:21,23 22:16
  22:21,21 23:3,20,21
  25:23 26:1,20 27:3
  27:12,16 28:17,19
  32:7,10,15,17 35:9
  36:9,11 38:18 41:12
  42:6,22 43:22 44:2,5
  44:6,20 46:14,23
  47:2 53:9 54:2,7
  55:11 56:14,21 57:1
  57:3,10 58:16 59:2
  59:15 61:16 62:15
  65:3 67:22 69:18,18
  70:21 71:19 75:3
  76:15 78:6 80:10
  81:10,17,20 82:17
  83:13,15 84:8 85:6
  85:10
West 1:8 2:7 35:17
  66:13 71:23 76:6
  77:14 79:19 82:1,7
  82:16 83:14 88:15
we'll 52:9 87:3
we're 5:5 16:17 22:1
  32:16 52:9 57:19
we've 4:22,22 73:18
  74:4
while 18:8 19:4 25:23
  42:6,21 49:11 50:10
  50:15 52:4,15,19
  56:21 62:12 65:23
  69:20 70:21 78:10
  80:10 84:8
White 34:18 83:22
  86:17
whole 4:7 54:18 88:10
Wilcox 78:19
Wilford 2:8,17 4:10

Deposition of Kelvin Carmichael

14:5 21:14 86:6
  87:12
**window** 36:21 37:18,19
  37:20,20 48:10,12
  49:6,7,9,20 68:11
**windows** 37:18
**witness** 4:1,2,6 5:9 14:6
  19:21 37:22 43:4
  44:11 53:11 56:1
  89:3
**witnessed** 85:14,18
**wondering** 41:11
**Woodley** 11:23
**word** 5:1
**work** 8:8,10,17,19,21
  9:14,20 10:1
**worked** 8:20 9:12 10:2
  83:4,6
**working** 8:23 9:2,3
  10:5
**wouldn't** 47:21
**wound** 52:2
**write** 84:11

---

**Y**

**yeah** 17:14 20:15 21:12
  28:16 33:14 36:2
  51:22 53:6 55:13
  57:2 58:23 61:7
  62:23 63:23 67:3
  75:8 79:12
**year** 11:14,16 17:12,12
  18:2 87:5
**years** 8:22
**yell** 42:2
**yellow** 40:11
**yield** 40:13,18
**Youngblood** 13:12
**y'all** 7:14 22:21 24:23
  25:2,4,9,18 27:3,8
  41:7 54:2 77:7 80:5
  80:10 83:17 85:21
  86:13,20 87:2,6

---

**$**

**$15** 74:15
**$400** 21:3

---

**#**

**#66** 1:17 89:12

---

**0**

**01** 9:10
**02** 9:10
**03** 17:13
**04** 18:3,19
**05** 9:4
**06** 9:4 11:17
**07** 19:16

---

**1**

**1:55** 1:21
**10** 13:17 80:2,15
**11** 74:10
**13** 2:22 73:12,14
**13th** 89:9
**14** 1:21 88:23
**150** 20:15
**1980** 8:3

---

**2**

**2** 26:16 59:11,12
**2:06-cv-701-ID.CSC**
  1:7 88:22
**20** 83:16
**2000** 15:22,23 16:16
  17:11
**2005** 22:8,14
**2007** 1:21 88:23 89:9
**21** 22:4 33:9 40:3 41:4
  41:9 42:5,13,22 48:5
**240909** 2:10
**25th** 8:3
**27** 8:4
**28th** 22:8,14 25:10,12

---

**3**

**3** 28:9 29:3,5,16,19
**3:25** 87:16
**30** 58:11 76:17 79:5
  81:19
**3468** 10:15
**36104** 2:5
**36124** 2:11

---

**4**

**4** 2:17 74:20
**45** 76:17 81:19

---

**6**

**6** 49:14 50:3 84:8

---

**7**

**73** 2:22
**7475** 1:19 2:10

---

**8**

**8** 52:1 54:6,10 69:12
  73:23
**847** 2:5
**87** 89:1

---

**9**

**9** 74:13
**9-30-2008** 89:13
**98** 10:3 38:10
**99** 10:21 38:10



EXHIBIT

5





















# 2nd Judicial Circuit Drug Task Force Inter-Agency Agreement

This agreement is made and executed on this the _15th_ day of _October_, 2004 between the following parties:

2nd Judicial District Attorneys Office
Greenville Police Department
Luverne Police Department
Hayneville Police Department
Lowndes County Sheriffs Department

## PURPOSE
The purpose of this document is to describe and define the agreement among the above listed agencies concerning the establishment and operation of the 2nd Judicial Drug Task Force.

The agencies above realize the advantages to be obtained by combating illegal drug distribution and usage through a unified cooperative effort Drug Task Force. The concept is intended to coordinate a program designed to enhance the efforts of all of the participating agencies to decrease the amount of illegal drug activity and possibly alleviate the presence of associated violent crime.

## AGREEMENT
The above listed law enforcement agencies have united in their battle against illegal drug distribution and usage and the resulting violent crimes that have become a result of such within the 2nd Judicial Circuit consisting of Butler, Crenshaw and Lowndes Counties. Therefore, they have come together to form the 2nd Judicial Drug Task Force. The Drug Task Force shall work in conjunction with all agencies within this circuit to ensure a consistent network of information is shared between itself and those agencies.

## DRUG TASK FORCE MEMBERS
Drug Task Force Members are those Agents and support staff that conduct day to day operations of the Drug Task Force. Each participating agency is responsible for twenty-five percent (25%) of their personnel's salary and fringe benefits. Also each participating agency will be responsible for twenty-five percent (25%) of the operating expenses, travel and equipment if equipment is purchased. Each agency is required to maintain insurance on their Agents work vehicle.

## DISTRIBUTION OF ASSETS
Assets received through seizure and forfeiture shall be reported as project income and be used for the advancement of the Drug Task Force. Any assets condemned to the Drug Task Force shall be divided as follows:

**EXHIBIT**
tabbies
**6**

1. In condemnations involving assets of four thousand dollars ($4,000.00) or less shall go into a fund for the Drug Task Force. There will be two funds established. A State fund for State cases and a Federal fund for Federal cases. The State account will be used to purchase evidence, pay informants and purchase equipment with the approval of the Board of Directors.

2. In condemnations involving five thousand dollars ($5,000.00) or more the asset will be divided evenly among all participating agencies with the exception of the District Attorneys Office unless otherwise decided by the Board of Directors.

3. In the condemnation of vehicles, land, homes and other articles, unless otherwise requested the item at question will be condemned in the name of the 2nd Judicial Drug Task Force. At the Drug Task Force Commanders discretion these items shall be used by the Drug Task Force, or allowed for temporary use to a participating agency. To transfer a vehicle to a participating agency will require the approval of the Board of Directors.

## DISSOLUTION OF DRUG TASK FORCE

Should the Drug Task Force be dissolved the Drug Task Force Commander shall provide to the Board of Directors a list of all articles to be disposed of and their value, the source of the article and the Agent involved if it's a seizure. If the item is equipment purchased through the grant, a list of amounts contributed by each participating agency will be provided to the Board of Directors also. The Board of Directors will decide on how each item shall be divided.

## WITHDRAWL FROM DRUG TASK FORCE

Any agency may withdraw from participation with the Drug Task Force at anytime. Should any agency withdraw from the Drug Task Force, the agency shall not be entitled to any condemned funds, vehicles, equipment or article of property seized or purchased by the Drug Task Force. Should an agency become involuntarily removed from participation that agency shall not be entitled to any condemned funds, vehicles, equipment or article of property seized or purchased by the Drug Task Force. However, the Chief Law Enforcement Officer of the withdrawing agency may specifically request in writing to the Board of Directors for any articles or vehicles seized by his or her agency. This decision will be made by the Board of Directors.

District Attorney John Andrews                          Chief Lorizo Ingram

Chief Bob Davis                                         Chief Kelvin B. Mitchell

Sheriff Willie Vaughner

# ADECA   2005-2006 Annual Report

 

## Help for Today ... Hope for Tomorrow







*Alabama Department of Economic and Community Affairs*

EXHIBIT
7



**401 Adams Avenue**
**P.O. Box 5690**
**Montgomery, Alabama 36103-5690**
**(334) 242-5100**
www.adeca.alabama.gov

Help for Today ··· Hope for Tomorrow

# Table of Contents

A Message from Governor Bob Riley . . . . . . . . . . . . . ii

ADECA Provides Help for Today . . . . . . . . . . . . . iii

ADECA Organizational Chart . . . . . . . . . . . . . . . iv

ADECA Legislative Oversight Committee . . . . . . . . . . vi

Community and Economic Development Program . . . . . . . 1

Office of Workforce Development . . . . . . . . . . . . . 3

Office of Water Resources . . . . . . . . . . . . . . . . 5

Energy, Weatherization and Technology . . . . . . . . . . 7

Surplus Property . . . . . . . . . . . . . . . . . . . . 9

ADECA Staff Photo . . . . . . . . . . . . . . . . . 10/11

Program Integrity . . . . . . . . . . . . . . . . . . . 12

Audit . . . . . . . . . . . . . . . . . . . . . . . . . 12

Law Enforcement and Traffic Safety . . . . . . . . . . . 13

Appalachian Regional Commission . . . . . . . . . . . . 15

Governor's Resource and Economic . . . . . . . . . . . . 16

Recreational Programs . . . . . . . . . . . . . . . . . 18

Legal Section . . . . . . . . . . . . . . . . . . . . . 19

Human Resources . . . . . . . . . . . . . . . . . . . . 19

Information Services . . . . . . . . . . . . . . . . . . 20

Financial Services . . . . . . . . . . . . . . . . . . . 21

Communications and Information . . . . . . . . . . . . . 22

Federal Funding Sources . . . . . . . . . . . . . . . . 23

Total Receipts and Disbursements . . . . . . . . . . 24/25

Get Connected to ADECA Services . . . . . . . . . . . . 26

OFFICE OF THE GOVERNOR

**Bob Riley**
GOVERNOR



**State of Alabama**



Bob Riley
Governor

## A Message from Governor Bob Riley

Alabama has come a long way over the past four years, and the Alabama Department of Economic and Community Affairs has played a major role.

Unemployment has fallen to historic low levels because of our success in attracting new businesses and helping existing industries to thrive and expand. ADECA economic development grants helped many small communities provide the infrastructure necessary to support this business growth.

Well-trained employees are critical to business success. With vital support from ADECA, our Office of Workforce Development became the top-rated program in the nation. ADECA also helped create a distance learning network that is giving Alabama children and adults unprecedented access to educational opportunities.

Alabama has become a safer place, thanks in part to ADECA programs that support multi-jurisdictional drug task forces and other law enforcement initiatives.

In the future, I expect ADECA to play an even greater role in moving Alabama forward in the areas of economic growth, public safety and quality of life.

ADECA's traffic safety programs will be a cornerstone of the Safe Roads Initiative, part of our Plan 2010 vision for Alabama. Other law enforcement programs administered by the department will support our plans to reform the state's corrections system.

The last few years have underscored the importance of disaster preparedness and ADECA will assist with the disaster recovery steps outlined in Plan 2010.

ADECA also will continue to make major contributions to the quality of life in Alabama: by helping communities build and expand parks, trails and other recreational facilities; by safeguarding our water resources; and by supporting the development and distribution of alternative fuels that will reduce our dependence on foreign energy supplies.

With its wide range of indispensable programs, ADECA will continue to give Alabamians help for today and hope for tomorrow.

Sincerely,

Bob Riley
Governor

OFFICE OF THE GOVERNOR

**BOB RILEY**
GOVERNOR



**STATE OF ALABAMA**

ALABAMA DEPARTMENT OF ECONOMIC
AND COMMUNITY AFFAIRS



**Bill JOHNSON**
DIRECTOR

## ADECA Provides Help for Today, Hope for Tomorrow

State government exists to serve the people. As part of our mission to build stronger and better Alabama communities, the staff of the Alabama Department of Economic and Community Affairs provides services and administers hundreds of grants that help Alabamians improve their lives.

This annual report focuses on a small sample of ADECA programs that assisted people throughout the state in fiscal year 2006. In the report, you will find the stories of real citizens who have directly benefited from ADECA programs and services, people who have found new careers or regained hope for brighter futures as a result of assistance from one of ADECA's divisions.

Whether through funding a community's first public park, helping the poor pay heating bills, providing Community Development Block Grants to help communities rebuild from Hurricane Katrina, supporting an emergency shelter for domestic violence victims or providing other assistance, ADECA programs and services significantly improve the quality of life for Alabama residents.



ADECA's professional staff is dedicated to administering our programs efficiently and distributing resources around the state where they will do the most good. I am grateful to the entire staff for their hard work and especially to Assistant Director Doni Ingram who guided ADECA as its acting director for four months during my leave of absence.

*ADECA*
*Assistant Director*
*Doni M. Ingram*

Finally, I would like to thank Governor Riley not only for his leadership of our state, but also for entrusting me with the responsibility of directing an agency that does so much to improve the quality of life for all Alabamians. During the coming year I look forward to working with ADECA staff and community leaders to continue giving Alabamians help for today and hope for tomorrow.

Sincerely,

Bill John

401 ADAMS AVENUE • SUITE 580 • P.O. BOX 5690 • MONTGOMERY, ALABAMA 36103-5690 • (334) 242-5100



**ADECA**
Director

## Energy, Weatherization and Technology
Terri Adams, Division Director

- Telecommunications Technology assistance Program
- Weatherization Assistance Program (WAP)
- Energy Emergency and Assurance Program
- State Building Energy Efficiency Program
- Local Government Energy Loan Program
- Agriculture Energy Efficiency Program
- Alternative Transportation Fuels Program
- State Energy Program
- Energy-Efficient Homes Program
- ENERGY STAR® Program
- Recycling Program
- Building Energy Codes Program
- Biomass Energy Program
- Energy Education Program
- Low Income Home Energy Assistance Program (LIHEAP)

## Law Enforcement and Traffic Safety
Robert H. Pruit, Division Director

- Family Violence and Victims' Programs
- Law Enforcement Programs
- Safe and Drug-Free Schools and Communities
- Highway Traffic Safety
- Juvenile Justice
- Corrections

## Community and Economic Development Programs
Shabbir Olia, Programs Manager

- Economic Development
- Competitive Grants
- Special Projects
- Community Enhancement
- Community Service Block Grants
- Community Action Agencies
- Emergency Shelter Grants
- Community Food and Nutrition
- Planning Grants

## Office of Workforce Development
Tim Alford, Director

- Workforce Investment Act
- Career Readiness Certificate Initiative
- Alabama's Career Center System
- Alabama Customized Employment Program
- Focused Industry Training
- Incumbent Worker Training
- Rapid Response
- Workforce Innovation in Regional Economic Development

☐ Granting Entities     ☐ Support Entities     ▨ Other Entities

Organizational Chart as of
September 30, 2006



## Governor's Resources and Economic Assistance Programs

Bea Forniss, Programs Manager

- Renewal Communities
- Enterprise Communities
- Delta Regional Authority
- Gulf Opportunity Zone Credit Program
- Minority Business Enterprises
- Community and Economic Development Technical Assistance
- Alabama Enterprise Zones

## Recreational Programs

Jon Strickland, Programs Manager

- Land & Water Conservation Fund
- Recreational Trail Program

## Appalachian Regional Commission

Bonnie Durham, Program Manager

- Appalachian Regional Development
- Appalachian Research, Technical Assistance and Demonstration Projects
- Appalachian Area Development

## Office of Water Resources

Eddie Davis, Acting Director

- Floodplain Management
- Geographic Information System Program
- Interstate Support Program
- Alabama Water Resources Commission
- Water Management Program

## Human Resources

Ramona Carroll
Manager

## Program Integrity

Paula Murphy
Manager

## Legal

Eddie Davis
Legal Counsel

## Audit

Wendy Spivey
Audit Manager

## Communications and Information

Larry Childers, Division Director

- Public Information
- Graphic Arts
- Census Bureau Liaison
- Legislation
- Charitable Campaigns

## Financial Services

Tammy Rolling, Accounting Director

- Fiscal Section
- Property Management
- Payroll

## Information Services

Scott Randolph, Manager

- PC Support
- Telecommunications
- Operations
- Programming

## Surplus Property

Shane Bailey, Division Director

- State and Federal Property Collection
- Transfers to Governments, Non-profits
- Public Auctions



# Legislative Oversight Commission 2005-2006

The Legislative Oversight Commission was a part of the 1983 Act which created the Alabama Department of Economic and Community Affairs—Act 83-194. The commission is composed of the Chairman and Deputy Chairman of the Senate Committee on Finance and Taxation, three members of the Senate appointed by the Lieutenant Governor, the Chairman and Vice Chairman of the House Ways and Means Committee and three members of the House of Representatives appointed by the Speaker of the House.

## House                                   ## Senate



Chairperson
Neal Morrison



Hank Sanders

                        

John Knight              Tommy Carter

                        

Roger Bedford              Phil Poole

                        

Thad McClammy              Jack Page

                        

Bobby Denton              Zeb Little

# Community and Economic Development Programs

## MISSION

To distribute block grant funds through an effective and efficient means to promote the development of economically viable communities and a suitable living environment by creating sound and adequate public facilities, utilities, infrastructure, housing and job opportunities.

### Programs Administered

* Economic Development Grants
* Competitive Grants
* Planning Grants
* Community Enhancement Grants
* Community Service Block Grants
* Community Action Agencies
* Emergency Shelter Grants
* Community Food and Nutrition

## Seniors Benefit from Talladega Springs Grant to Revive Former Masonic Lodge Building

The purported healing waters brought in flocks of people and commerce to the town of Talladega Springs in the early 1900s, but the sulfur springs could provide no remedy to revive the town which began to decline after a disease epidemic in the early 1930s.

Town officials, determined not to go down without a fight, are making efforts to rejuvenate the community. Recently they applied for a Community Development Block Grant to resurrect a former Masonic lodge into an activity center for senior citizens. Asking for the $57,456 grant was a bold step because it required the town to dig deep into its shallow pockets for $6,340 in local funding. To raise money, the 124 residents of Talladega Springs held special fundraisers and volunteers agreed to provide some of the labor and materials for the renovation.

"I was skeptical about it," said former Councilwoman Ann Shaw. "I never thought it would go over (because so few people live in the community)."

But when the center opened in March 2005, Shaw saw the beginning of something she never expected.

"It has grown by leaps and bounds, and it's not just people in the community who are coming," said Shaw. "We reach out a good 10 miles to other areas. It has really helped blend the communities."

Faye Butler said the center, which provides meals, fellowship and activities for seniors, has "been a blessing" for her and others who regularly attend center activities. Butler, a recent transplant to the area, said the center has served to introduce her to people in the community.

"The community has just come closer together because of this," she said. "We just get together, enjoy the company and cheer each other up. It's been wonderful."



*Director Nancy Mitchell said the senior center started off slowly, but that is quickly changing.*



Before the center was started, senior citizens had to go to Sylacauga or Childersburg to receive services, including nutritional weekday lunches.

Director Nancy Mitchell said the senior center started off slowly, but that is quickly changing.

"We have more and more people join us each month," said Mitchell.

A van donated by the Talladega County Commission has enabled the center to conduct regular field trips, said Mitchell's husband, Frank Mitchell, who is also the town's mayor.

Frank Mitchell said the grant enabled the town to install a kitchen, windows and a porch on the 2,700-square-foot building.

"There's no doubt, it is one of our more successful projects," said Ellen Austin, director of the East Alabama Planning and Development Commission, which submitted the grant application for the town. "We are just so glad we were able to help with the project."

The town once boasted several stores, a bank, a hotel and four trains a day when people throughout the South visited the area for its water and its offerings as a resort.

---

## Residents Get Safe, Reliable Water Thanks to Community Development Block Grant

It took a while for Cecil Kimbrell to acquire a taste for water treated with chlorine, but he is not complaining. It beats the alternative of having little or no water. Better yet, Kimbrell no longer has to be concerned that the water he or his family drinks will make them sick.

A Community Development Block Grant provided Kimbrell and about 100 other people



Community Development Block Grants have helped supply many areas in Alabama with plentiful and safe water.

in the Fayette County community of Concord with a plentiful and safe supply of water by connecting them to a public water service.

Providing public water to rural communities is just one of the benefits stemming from the block grant program. Grants also have been awarded by Governor Riley to provide or improve sewer and drainage, build community and senior centers, provide infrastructure improvements to aid in the recruitment or expansion of businesses, resurface roads and build recreational facilities. The grants, designed to mainly benefit low- and moderate-income families and individuals, typically help fund large projects that counties, cities and towns could not undertake without reducing or cutting other vital services.

Public water for the Concord community was not just a desire, it was a necessity. Many residents depended on shallow wells or even above-ground springs as their main water supply. During dry summers they could never be certain if water coming from the spigots would be gushes or drips, pure or tinted or tainted with the harmful E. coli bacteria.

"My main problem was when the electricity went off you didn't have any water. It goes off approximately once a month and during the winter it's been off two to three weeks at a time," Kimbrell said. "But I guess I was lucky. I had good water most of the time, but some people around here never knew when they were going to run out of water whether it was the pump or something else."

2

# Office of Workforce Development

## MISSION

To provide a market-driven system that delivers services to employers, employees and jobseekers using an innovative and comprehensive approach, which will provide employers with a prepared workforce to enhance the state's economic development and quality of life.

### Programs Administered

- Workforce Investment Act
- Alabama's Career Center System
- Alabama Customized Employment Program
- Workforce Innovation in Regional Economic Development
- Rapid Response
- Focused Industry Training
- Career Readiness Certificate Initiative
- Incumbent Worker Training

## OWD Program Prepares Workers for New Careers

When James Flowers hurt his leg, he knew his career as a carpenter was over. A father of three, and still in his prime at age 33, retirement was not an option. He had to take care of a family.

"I was at a crossroads in my life," Flowers said.

For 14 years the Valley resident earned his living as a carpenter, and his education had ended with the 10th grade. He not only needed to find a new career, he also needed the skills to get in the door. The Office of Workforce Development was there to help.

OWD created a new program in 2006 aimed at matching jobseekers with potential employers by certifying that workers posses the necessary skills for particular jobs. The Career Readiness Certificate benefits both workers and employers by increasing the chances that the right worker gets the right job.

"The certificate verifies that an individual can handle tasks needed by employers," said Sarah Horton, OWD's career readiness certification coordinator.

The certificate is awarded on three levels (gold, silver and bronze) based on scores achieved by workers who take a series of tests called Alabama WorkKeys. After completing requirements for his GED at Southern Union State Community College, Flowers



*Governor Riley presents James Flowers with Alabama's first Career Readiness Certificate.*

earned the state's first Career Readiness Certificate by passing the WorkKeys assessments on the gold level.

WorkKeys tests jobseekers' abilities in math, reading and locating information. Test results alert employers to workers who are qualified for openings and point out to workers what skills they may be lacking. For Flowers, the program has enabled him to start a whole new life, professionally speaking. He now works at a distribution center for a major retail company and has taken classes in business management.

"I chose to further my education and it has paid off," said Flowers.

Governor Riley presented Flowers with his certificate saying that the program would take workforce development to a different level. "This initiative will help us maintain our status as the best workforce development state in the United States," Riley said.

The Office of Workforce Development was created in 2003 to consolidate the state's workforce programs. OWD strives to improve employment opportunities for Alabama residents through One-Stop Career Centers, job training and other programs. It is an independent office whose administrative duties are handled by ADECA.



*Dr. Tim Alford, director of the Office of Workforce Development, signs Flowers' certificate.*



# OWD Named Top
# Workforce Development Agency in Nation

OWD is committed to providing streamlined services and supporting programs to help Alabama workers and jobseekers obtain the job training and assistance they need. Those efforts to help Alabama workers have made the agency a model for workforce development programs nationwide.

Worldwide Interactive Network, a national publisher of workforce training materials, named OWD the top workforce development agency in the United States for 2006. OWD Director Dr. Tim Alford accepted the organization's Crystal Globe Award for outstanding state workforce development at the group's annual WorkKeys conference in May.

WIN President Teresa Chasteen cited OWD's improved coordination of all the state agencies involved in developing Alabama's workforce as well as its success in streamlining services and helping individuals with training and career choices as the main reasons why the agency received the honor.

"Dr. Alford and the state of Alabama have gotten the job done on all fronts, and every state should be looking at the workforce development model in Alabama," she said.

The award came with a $1 million grant for a state-of-the-art interactive job training center. The center's focus will be on providing training in Alabama's high-growth advanced manufacturing industries.

Once open, the training center will be just the latest in a broad array of services offered by OWD to help Alabama workers. The state's Career Center system offers a one-stop place for jobseekers to get employment and job training information. Through Workforce Investment Act youth programs, troubled young adults can get their lives back on track by obtaining their GED and receiving training for a job in one of Alabama's high growth, high demand industries. The Rapid Response Team meets with recently laid-off workers to give them information about available state assistance and job training opportunities. Incumbent Worker Training grants help workers boost their earning potential and value to their company by providing training in the latest techniques in manufacturing and management.



*Worldwide Interactive Network recognized OWD's efforts to strengthen Alabama's workforce by naming it the best state workforce development agency in the nation for 2006.*

Dr. Alford said the partnership forged between state agencies has helped Alabama develop a stronger workforce.

"I'm proud of what we have accomplished," he said. "For the first time, we have a workforce system in the true meaning of the word, with all of our partner agencies working together to help Alabamians obtain the skills needed for employment."

4

# Office of Water Resources

## MISSION

To plan, coordinate, develop and manage Alabama's ground and surface water resources in a manner that is in the best interest of the state by recommending policies and legislation, conducting technical studies, implementing programs and projects and actively representing Alabama's intra- and interstate water resource interests.

### Programs Administered

- Floodplain Management Program
- Geographic Information System Program
- Water Management Program
- Interstate Support Program

## Groundwork by OWR Helps Residents Reduce Flood Damage

Alabamians tend to be drawn toward water. It's no wonder with so many lakes, rivers, streams, creeks and even a coastal area in the state. Growing up and living in Alabama, it would be hard not to appreciate and be captivated by the state's water resources.

Water has played a large role in the state's history, serving as the major mode of transportation for centuries. Water has been harnessed to produce energy, provide drinking water and offer recreational opportunities.

While water can be beckoning and inviting, it also possesses a power that must be respected and feared. Heavy rains can turn peaceful creeks and rivers into a destructive rage that damages property, causes injuries and takes lives.

Many programs managed by the Office of Water Resources Division ensure that Alabamians enjoy the water, but at least one program tries to safeguard residents against its destructive force.

In 2002 OWR assumed state management of the National Flood Insurance Program from the Alabama Emergency Management Agency.



*Water at times can be a destructive force and a threat to humans and property.*

The program offers insurance at reasonable rates to homeowners and landowners provided they follow guidelines intended to reduce the risk of property damage.

As part of the program, OWR is charged with developing and updating maps depicting flood-zone areas. The maps play a big role in the flood insurance program by pinpointing areas most likely to flood during heavy rains and storms.

"The mapping is an ongoing process," said OWR's Ken Meredith, who serves as the state coordinator for the National Flood Insurance Program. "As we continue to develop areas of the state, we have to redefine the flood areas. Even if there was no development, acts of nature by themselves are changing the landscape and the flood zones."

In Alabama, 361 counties, cities and towns have signed on to participate in the flood insurance program. The program has picked up 31 new communities since 2005.

Part of the participation agreement requires local governments to ensure that landowners build structures above flood levels. That may require that structures be built on poles or stilts or on a manmade earthen pad at least a foot above the flood zone. Residents who live in areas where governments do not participate in the flood program are not eligible to purchase flood insurance.

"The regulations adopted at the local level are a community's tool to manage any development in a flood hazard zone," Meredith said.

Charles R. Bazzell, flood plain administrator in Montgomery County, said the program typically



generates protests until that first disaster. Nearly a third of the county is positioned in some type of flood-plain area.

"I've even had people call me up after floods and say, 'Thank you,' for the flood insurance program," Bazzell said. "The program is sometimes hard for people to digest, but in the long run its

keeps the cost of insurance down."

OWR is scheduled to complete it statewide mapping process by 2010. The maps will be amended as land areas change, Meredith said.

"The goal of this program is simple: Save lives and property," Meredith said.

## GIS Program Helps Alabama Map Out Its Future

In law enforcement, they call it a composite drawing. Victims provide an artist with details of facial features. In time, the artist is able to complete an often accurate drawing of a suspect that many times results in a capture of a criminal.

They don't hunt criminals in OWR's

Geographic Information System, but they do use technical data and geological features that when combined can add up to jobs, safer communities and strategic plans to make Alabama communities stronger.

"GIS is taking computer graphics and attaching data to it to come up with a lot of questions to help you in coming up with solutions," said Philip Henderson, GIS program manager.

When Kia announced they were building an automobile plant just across the Alabama state line, GIS immediately detailing a map with concentric circles detailing likely areas for tier one, two and three suppliers for the plants and listing available industrial parks, major roads and employment figures. The map helped arm city, county and state with the necessary information to sway suppliers to build plants in Alabama.

The GIS program has provided data to a number of state agencies outside ADECA and has also assisted the federal government, particularly the Federal Emegency Management Agency, in identifying flood areas and providing physical data on updated flood zones.

GIS data has also helped public safety offices and highway planners determine congested traffic routes, especially during special events like football games and other high-traffic events, and map out solutions.

Mapped data of the same area can also show some startling contrasts over a period of time. Using color-coded maps, analyzers were able to situate two maps side by side and see a remarkable drop in unemployment rates in the state within a six-year period.

"You make it as simple or complicated as you want it to be," said Henderson. "The maps give a face to the data."

### 2000 Census Unemployment Rates by Block Groups



2000 Census Unemployment Rates

- 0.00 - 3.00
- 3.01 - 5.99
- 6.00 - 10.00
- 10.01 - 20.00
- 20.01 - 40.00
- 40.01 - 53.00

ADECA

# Energy, Weatherization and Technology

## MISSION

To increase energy efficiency, reduce energy consumption, encourage and promote market acceptance of energy efficiency and renewable energy technologies, help limited income households better manage energy bills through education and assistance and encourage access to advanced telecommunication services in rural areas.

### Programs Administered

- Telecommunications Technology assistance Program
- Weatherization Assistance Program (WAP)
- Energy Emergency and Assurance Program
- State Building Energy Efficiency Program
- Local Government Energy Loan Program
- Agriculture Energy Efficiency Program
- Alternative Transportation Fuels Program
- Recycling Program
- Biomass Energy Program
- ENERGY STAR® Program
- State Energy Program
- Building Energy Codes Program
- Energy-Efficient Homes Program
- Energy Education Program
- Low Income Home Energy Assistance Program (LIHEAP)

## Weatherization Program Gives Residents Long-Term Relief from Energy Bills

Melva Johnson was forced into early retirement when she began experiencing health problems. The $400-$600 heating bills for her Birmingham home made it tough to obtain the medication she needed.

"It's hard when you have to choose between medication and heating your home," Johnson said.

Fortunately, Johnson no longer has to make that choice thanks to assistance she received from the Energy, Weatherization and Technology Division's Weatherization Program. The program, funded through a U.S. Department of Energy grant, lowers energy bills by making houses more energy efficient. Weatherization assistance may include installing insulation, repairing or replacing faulty windows and doors, sealing air leaks and patching small areas of the roof, with an average of $2,826 spent on each house.

To help Johnson, the Jefferson County Committee for Economic Opportunity, a local Community Action Agency, sent weatherization experts to assess Johnson's home for changes that would increase energy efficiency and make long-term improvements that would save her money on utility bills. The experts plugged air leaks by placing sealant around windows, caulking around doorframes and placing corkboard around the ceiling throughout the house.

As a result of the improvements, Johnson has saved hundreds of dollars on her energy bills. She uses the savings to pay for her medication and other needs.

"My highest bill has been $253, and I've been



ADECA's *Weatherization Program helps low-income residents save money on heating and cooling bills by making changes to improve energy efficiency. After a home is weatherized, families experience an average energy use reduction of 20 percent or more, which means hundreds of dollars in savings.*



able to pay that without getting assistance," she said.

For low-income residents, high energy bills during hot summers and cold winters can be an almost impossible financial burden. This burden gets even heavier when energy prices soar, forcing families to cut back on necessities such as food and medicine to pay their energy bills. The changes made by weatherization experts lead to long-term relief from high energy costs. After a home is weatherized, families experience an average energy use reduction of 20 percent or more, which means hundreds of dollars that would have been used on energy bills can be used on other needs.

ADECA distributes the funds to 16 Community Action Agencies and one county commission to deliver the assistance to those who need it most in the state's 67 counties. From October 2005 to September 2006, the state provided weatherization assistance to 787 households with $2.8 million. Johnson's home was one of those.

Weatherization assistance is available to households with income of less than 150 percent of the federal poverty guidelines. Priority is given to older residents, people with disabilities and families with young children.

## 'Aquaculture' Gets Boost Through EWT Program

"We are on the cutting edge, and so far it's been successful."

Lee Jackson is in the shrimp business, but he



*ADECA grants have enabled Lee Jackson to keep a watchful eye on the oxygen levels in his shrimp pond.*

doesn't drop his net in the Gulf. He drops it in a pond in Lowndes County.

The Mosses native began farming shrimp in 2001. Jackson's father, who helped develop the area's first water system, discovered an abundance of salt water which Jackson has tapped to harvest thousands of pounds of shrimp over the last five years.

In October 2005, Tuskegee University was awarded an ADECA grant of $49,666, administered through EWT's Agriculture Energy Efficiency Program, to continue a project that has been largely responsible for Jackson's success. In 2003, the university installed energy-efficient, solar-powered aerators that supply oxygen to the pond. Aeration is critical to the size, quality and health of shrimp and the new aerators generated significant savings

for Jackson's business while ensuring the growth of the best shrimp possible.

The project also included computerized pond monitoring systems that keep oxygen at an optimal level. "It's enabled us to keep shrimp alive and monitor water quality," Jackson said.

Jackson believes this new type of agriculture, or aquaculture, can benefit the entire Black Belt region. He is looking to generate jobs through expansion of his business by adding new ponds and constructing a processing plant. "That means it could have an economic impact," he said. There is also growing interest from struggling catfish farmers to start harvesting shrimp.

Without ADECA's help, Jackson said he would probably still be in business, "but the results would be a lot worse." Instead, Jackson's harvests increase every year, and he can hope for greater economic development for the Black Belt.



*An aeration system along with natural inland salt water reservoirs help make it possible to raise shrimp in places in Alabama other than the Gulf Coast.*

8

# Surplus Property

## MISSION

To acquire property declared surplus by state agencies and the United States government and redistribute it fairly and equitably for use by local governments and eligible Alabama organizations.

### Programs Administered

- State and Federal Property Collection
- Public Auctions
- Transfers to Governments, Non-profits

## Communities Count on Surplus Property When Times get Tough

Throughout the year, Surplus Property acquires property no longer needed by state agencies and the United States government. The property is transferred to Alabama local governments and eligible non-profit organizations.

As part of its mission to redistribute property equitably, the division has helped local governments and agencies in south Alabama acquire equipment to replace items damaged or destroyed by Hurricane Katrina.

"During the past year we have concentrated on Hurricane Katrina relief efforts in Bayou La Batre and other Alabama coastal areas," said Shane Bailey, Surplus Property director. "The total for just the relief efforts has been close to $6 million. With the assistance from numerous Department of Defense agencies, we transferred cranes, bulldozers, dump trucks, generators, scoop loaders and many other items to local governments across south Alabama so they can continue providing vital services and begin repairs to boost the quality of life in their communities."

Through Surplus Property, Bayou La Batre obtained equipment to help the city and its residents recover as they picked up the pieces in Katrina's aftermath. The equipment was desperately needed by the city after most of their equipment was destroyed during the storm.

"Our equipment was under water, and we had no money to buy new equipment for the city," Bayou La Batre Mayor Stan Wright said. "We are still using the police cars, bulldozers and front-end loaders we got from Surplus. We have really been blessed and are very appreciative."

To continue providing the best service to its customers and keep updated on sales and innovative ways to save taxpayer dollars through the purchase of state and federal unneeded equipment, Surplus Property employees have attended numerous conventions and training seminars not only in Alabama but also across the United States.

During the past fiscal year, the division also has taken steps to inform eligible organizations of the advantages of purchasing surplus property.

"We continue to promote Surplus Property programs throughout Alabama," Bailey said, "to make sure that those who might need our assistance know how to take advantage of what we have to offer."



*In 2006, Surplus Property helped communities in south Alabama obtain much-needed equipment, including this 60-ton crane, to help recover and rebuild after Hurricane Katrina.*

9



Alabama Department of Economic

10



and Community Affairs Staff



# Program Integrity

> ## MISSION
>
> To safeguard public funds administered by the Alabama Department of Economic and Community Affairs through technical assistance, on-site compliance reviews and project inspections to ensure that all intended services are delivered.

## Program Integrity Helps Non-profit Gain Better Financial Footing

ADECA awards grant funds to various organizations with an expectation that they will improve the lives of Alabamians by providing services in the manner described in their grant applications. The Program Integrity Unit helps ensure that grantees are following state and federal laws, rules and regulations and looks into complaints that grantees are not following rules and regulations in their grant contracts.

Recently, the unit worked with ADECA's Audit Section to train the financial staff of a non-profit organization that had problems with their financial management.

"They wanted to resolve their problems, and they sent a letter to the ADECA director requesting our help," said Paula Murphy, Program Integrity manager.

The training focused on proper procurement procedures so the staff could learn how to make the most of their grant funds by getting the best price for needed goods and services. As a result, the non-profit now is able to provide more cost-effective services to its clients.

Program Integrity also has hired an engineer to review cost estimates, construction plans and specifications for local governments who were awarded grants for community improvements. The engineer will help governments make the most of their grant funds by preventing overpricing and making sure they get a fair deal.

# Audit

> ## MISSION
>
> To provide financial monitoring through reviews or special audits of ADECA grant recipients, provide technical assistance and training to ADECA program managers and grantees and conduct internal reviews of operations, processes and systems to enhance efficiency and effectiveness and verify compliance.

## Audit Section Helps Cast Net of Hope for Shrimpers

Shrimping is a family business, passed down from generation to generation, and for many in the family it is all they know. So when disasters like Hurricanes Ivan and Katrina strike, the results can be devastating.

"Storms and other issues had put a lot of them out of business," said Wendy Spivey, ADECA's audit manager.

To help Gulf Coast shrimpers stay in operation, ADECA is administering $825,780 in disaster-relief funds. Spivey has been involved since day one to ensure things are done right and delivery of funds is not delayed.

Shrimpers, processors and boat owners formed the Eat Alabama Wild Shrimp Committee which is using the grant funds to keep shrimpers afloat through financial assistance and a marketing campaign aimed at convincing consumers to eat more Alabama shrimp. To keep the money coming, the committee must follow the rules.

"They had to operate differently than they were operating as a for-profit entity" because of federal regulations, Spivey said.

With Audit's help, the committee is going strong and was a sponsor of the National Shrimp Festival in October 2006.

In addition to training and monitoring grantees, the audit staff also reviews internal ADECA operations to boost efficiency and effectiveness.

# Law Enforcement and Traffic Safety

## MISSION

To increase safety and quality of life by encouraging professional planning and innovative programs for Alabama's criminal justice system, addressing traffic safety problems, assisting child and domestic abuse victims, supporting drug/violent crime prevention programs and programs to prevent juvenile crime.

### Programs Administered

- Family Violence and Victims' Programs
- Corrections
- Highway Traffic Safety
- Safe and Drug-Free Schools and Communities
- Juvenile Justice
- Law Enforcement Programs

## StrongGirls

## Sets Juvenile Offender on Path to Brighter Future

Youth who commit violent, criminal offenses and find themselves in juvenile court face an important choice: continue destructive behaviors that lead to unproductive lives of crime, or avoid drugs and violence and set goals for a brighter future.

Through Juvenile Justice Formula grants, ADECA's Law Enforcement and Traffic Safety Division supports community-based programs that help juveniles make the right choice.

One juvenile who was able to improve her life with the assistance of an ADECA-funded program is Tameka from Jefferson County.

Tameka's grades were better than average, but her chances of finishing high school were slim since she had just been suspended for fighting for the third time.

Tameka's mom was stressed and tired after work and school. It didn't take much to set her off, and the call from Tameka's school about the suspension was the final straw. Tameka had barely walked in the door when she felt the sting of her mom's hand across her face. Being the kind of girl who "didn't take anything from anybody," Tameka slapped her mother back. Tameka's grandmother witnessed the scene and called the police.

Juvenile court mandated that Tameka attend StrongGirls, a 16-session program for girls age 14-17 in Jefferson County who have displayed problem behaviors. Meeting twice a week, the girls learn trust, self-respect and accountability through games, group therapy and creative arts. Poetry, visual art, drum circles and dance lessons are some of the arts used to help participants build confidence, self-esteem and find enjoyable positive activities. Parents attend eight separate sessions where they learn skills to improve their parenting, including communication and setting limits.

"The girls' world tends to be narrow. The only thing they know is the neighborhood and school," program director Eve Laxer said. "We try to show them that there is much more than that out there."



*A participant in the StrongGirls program paints a canvas during a session.*

Tameka's mother expressed disgust about having to attend parent sessions and Tameka modeled her mom's attitude at first. Then something changed: Tameka discovered she was looking forward to the sessions.

Tameka liked the art projects and absorbed every drop of praise for her artwork and willingness to try new things. She also caught on quickly to the dance steps practiced at each session.

Still, Tameka was quiet during group therapy. She did not put her trust in other girls, so it was new to her to hear girls with some of the same problems share their struggles. When Tameka began to talk it was clear that her tough-girl anger was a cover for a young girl longing for someone who really cared.

"The girls are very defensive at first, and pretty separated," Laxer said. "But about halfway through in therapy they open up and learn to trust the other girls."

To address Tameka's mother's resistance to the program, staff members asked a parent of a girl who



had gone through StrongGirls to speak with her about the program's benefits. The dialog proved to be a turning point in the mother-daughter relationship.

Although her mother arrived late for the StrongGirls dance performance and graduation, Tameka caught a glimpse of tears in her eyes when Tameka received her graduation certificate. This was the first time in many years that Tameka had finished something successfully. Soon after, she was accepted into a local dance troupe. Her mother takes her to dance practice two nights a week and stays to watch. Tameka returned to school and has had no additional suspensions.

"We want to leave participants feeling better about themselves (when they finish the program)," Laxer said. "We also try to hook them up with positive extracurricular activities like dance or the school band."

The program benefits everyone in the community by helping juveniles become productive citizens.

"Hopefully, after they leave us, the participants are graduating high school and becoming productive adults," Laxer said.

StrongGirls received a grant of $40,057 from LETS in fiscal year 2006 to pay part of staff salaries and purchase art supplies and equipment.

"The grant funds are crucial to our program" Laxer said. "We are so grateful because it allows us to continue functioning."

---

## Thousands of Miles Away from Home, Domestic Violence Victim Reaches a 'Turning Point'

Rana was a long way from her home country, abused and alone.

She met her husband James in Qatar, where both worked on a U.S. military base. Because Rana's family would not approve, she began seeing him secretly and within a month, James proposed to marry and bring her to the United States. Rana's family threatened violence making it impossible for her to return to Qatar. After the wedding she moved to Tuscaloosa to live with James and his mother.

After about a month, James began to change, first becoming verbally and mentally abusive to Rana, then physically and sexually abusive. James threatened her with deportation if she didn't follow his rules, demanded she stay in the house while he was at work and had his mother report Rana's actions to him. She soon discovered that her husband also was unfaithful. Unfamiliar with U.S. laws that offered protections to domestic violence victims, she was afraid to call the police.

James decided to take a job in Iraq, telling Rana she must find a place to live and take care of herself while he was away. After he left, Rana reported his abuse. The police recommended that she contact Turning Point, a Tuscaloosa-based program that assists victims of domestic violence in six west Alabama counties and sexual assault victims in nine counties.

Turning Point provides a 24-hour crisis hotline, a six-bedroom emergency shelter, counseling programs,

support groups and advocates to help victims understand their rights and provide legal assistance.

This assistance was a literal turning point in Rana's life. Court advocate Michele Snyder and legal services attorney Aimee Pittman told Rana about Violence Against Women Act protections that allow immigrant wives of U.S. citizens to petition for a special visa if they are domestic violence victims.

"Michele and Aimee worked with Rana on a self-petition that would offer her an opportunity to stay in the United States and be able to pursue a divorce from her abusive husband," said Paige Miller, Turning Point's executive director.



Attorney Aimee Pittman, left, and victim's advocate Michele Snyder helped a domestic violence victim through Turning Point.

Rana received the free, professional assistance she needed to end her abusive marriage and give her hope for a brighter future in the United States. She is now working, "living on her own and free from violence," Miller said.

In fiscal year 2006, the organization received $143,431 from the Law Enforcement and Traffic Safety Division to support its free services to domestic violence victims. A grant awarded by ADECA helped fund the salaries of both Snyder and Pittman.

Through the Victims of Crime Assistance and STOP Violence Against Women grant programs, LETS supports organizations throughout the state that help thousands of abuse victims per year. The grants help fund important free services that otherwise would not be accessible to most victims.

# Appalachian Regional Commission

## MISSION

To create opportunities for self-sustaining economic development and improved quality of life in Appalachia by increasing job opportunities and per capita income, strengthening the capacity of the people of Appalachia to compete in the global economy, improving Appalachia's infrastructure and building the Appalachian Development Highway System to reduce Appalachia's isolation.

### Programs Administered

- Appalachian Regional Development
- Appalachian Area Development
- Appalachian Research, Technical Assistance and Demonstration Projects

## ARC Helps 'WRATT' Out Energy Waste

When the city of Lanett was searching for ways to reduce its energy costs, it turned to the Waste Reduction and Technology Transfer Foundation and the Appalachian Regional Commission.

WRATT is a non-profit group of retired scientists, engineers and professionals committed to helping public and private organizations conserve energy, reduce waste and protect the environment. WRATT was granted $50,000 in ARC funds in fiscal year 2006 to send out its volunteers to provide free technical consultation services and conduct seminars and educational programs for 26 municipal governments. The city of Lanett was one of them.

"They pointed out some things we saw but had taken for granted," said Jerry Thrower, Lanett's city inspector.

Thrower said the city was already making plans to upgrade some of their systems when WRATT came in and spotlighted some areas that were overlooked. He said the city has implemented 65 to 75 percent of WRATT's recommendations and there is already a noticeable difference.

"Our HVAC (air conditioning unit) is operating more efficiently and we are not having near the problems we had with it," Thrower said.

He said the city has installed new energy-saving computers, replaced inefficient lighting and cut down on water usage by fixing leaky faucets.

Thanks to ARC, 25 other Alabama cities and towns were afforded the opportunity to save energy and reduce their utility bills.

Since 1990, with funding support from ARC and other sources, WRATT has conducted more than 1,300 energy assessments, nearly half of which were for schools. Their recommendations have resulted in savings of more than $10 million annually on energy bills for taxpayers and businesses.

Created by Congress in 1965, the Appalachian Regional Commission is a partnership of federal, state and local governments dedicated to promoting economic growth and improving the quality of life in a 13-state region along the Appalachian Mountains. In Alabama, ARC grants coordinated by ADECA help raise the standard of living in 37 counties.



*WRATT engineers inspect air conditioning units at a municipal city hall.*

# Governor's Resources and Economic Assistance Programs

### MISSION

To enhance local economic and community development activities by promoting economic development incentives with an emphasis on small and minority-owned businesses and providing resources for effective planning and implementation.

Programs Administered

- Renewal Communities
- Gulf Opportunity Zone Credit Program
- Community and Economic Development Technical Assistance

- Alabama Enterprise Zones
- Delta Regional Authority
- Minority Business Enterprises
- Enterprise Communities

## Grant Helps Historic Quilting Bee Get Back in Business After Hurricane

The Freedom Quilting Bee has a lot of history. Formed near Gee's Bend in Wilcox County, the bee has employed women to make colorful quilts and other handmade items from Alabama's rural Black Belt to sell throughout the United States since 1966.

The bee began during the civil rights movement when several women came together to earn supplemental income by creating quilts using patterns passed down to them from their mothers and grandmothers. The quilts were sold at stores in the eastern United States and displayed at the Smithsonian Institution, gaining national acclaim for their creative and colorful designs. In 1977, the Legislature designated the bee's Pine Burr Quilt as Alabama's state quilt.

The historic bee almost became history in the early 2000s. The number of quilters declined as the original members of the bee got older and became unable to continue quilting and fewer younger women developed an interest in quilt making. The final straw almost came in 2004 when Hurricane Ivan severely damaged the roof of the building in Alberta that the bee had used since its start to make their handmade items.

"We were using the building before the hurricane but struggling," said Rennie Miller, president



*Quilters from the Freedom Quilting Bee work on a quilt during demonstration at the Folk Life Festival in October 2006. The festival was held at the Black Belt Treasures store in Camden.*

of the bee. "After the damage we stopped the work."

Miller said that although the work stopped because the quilters no longer had a building in which to make their creations, she believed the bee would find a way to continue.

"We closed down to reassess our situation," she said. "We never gave up hope."

Their hope for a better future became a reality with a $50,000 Delta Regional Authority grant awarded in January 2006. The DRA program in Alabama is overseen by ADECA's newly formed Governor's Resources and Economic Assistance Programs office. REAP helps local officials find state and federal resources and assistance for economic and community development in their communities. The grant is funding construction on a new roof for the quilting bee facility.

"This grant means everything," Miller said. "Without that grant we could not continue. Now, we know something will be done, and we'll get our building back in shape."

Once the building is repaired in early 2007, Miller said the bee will employ six women to make quilts and other handmade items, preserving a piece of Alabama history while creating jobs for



*Hurricane Ivan severely damaged the Freedom Quilting Bee's building in 2004, but a grant from the Delta Regional Authority awarded in 2006 is funding repairs so the quilters can get back to work.*

the women to support their families. The quilts will be sold through mail order and Black Belt Treasures, a store in Camden that sells items made by artists in Alabama's Black Belt counties.

The bee will hold demonstrations and instructional sessions in the building to draw visitors interested in learning more about the art of quilting. Miller said the resumed operation of the Gee's Bend ferry will help lure tourists to the building.

"Tourists can see the quilts being made and someone will explain how to make them," Miller said.

To spur interest in quilt making among the younger generation, the bee will offer an after-school program at the facility. Participants will learn all aspects of the art so they can continue the long tradition of quilt making in Wilcox County.

Once the bee is up and running in the repaired building, Miller anticipates that increased interest and demand for the handmade items will allow the bee to employ more quilters.

By funding the roof repairs, the DRA is helping economic development in Wilcox County by creating new jobs and providing a destination to draw tourists interested in the art of quilt making and the history of the bee to the area.

The DRA was created by Congress in 2000 to promote economic development, improve education



Governor's Resources and Economic Assistance Programs Areas



*Freedom Quilting Bee president Rennie Miller said the bee plans to employ six women to make handmade items once building repairs are finished.*

and enhance the quality of life in eight states. The Authority serves 20 Alabama counties, including Wilcox County, classified as "distressed" because of a number of factors including unemployment rates higher than the national average, a significant population loss or the closing of a major business or industry.

# Recreational Programs

## MISSION

To generate outdoor recreation opportunities, to strengthen the health and vitality of Alabama's population, and foster sound planning and investment strategies to protect, expand and ensure the quality of outdoor recreation.

Programs Administered
. Land & Water Conservation Fund          • Recreational Trail Program

## Recreational Trail, Land and Water Conservation Funds Enhance Outdoor Activities Throughout Alabama

For years ADECA has been encouraging Alabamians to enjoy the outdoors through its Recreational Trails and Land and Water Conservation Fund grants.

In addition to promoting healthy lifestyles, projects funded by the grants serve to enhance communities, attract tourists and encourage family, community and area activities. Trail and park grants benefit urban and rural communities throughout Alabama.

A $44,584 Recreational Trail grant for the Dothan Area Botanical Gardens opened a new world for many people.

The grant not only was used to renovate a nearly mile-long trail through the gardens and to control erosion, it also resulted in making the gardens accessible for people using walkers and wheelchairs.

Evelyn Isbell, one of the pioneers of the garden, said lack of a handicapped-accessible trail prevented many people from observing all of the gardens.

"It is such a wonderful place, but if you are in a wheelchair or on a walker like me you couldn't see the entire gardens," Isbell said.



*A Recreational Trail grant has helped the Dothan Botanical Gardens to become more accessible.*

Paul Angeloff, director of the gardens, said the improvements in the 50-acre gardens have had positive effects, including increasing attendance.

"Everybody has just marveled at the results," said Angeloff. "We have never had the traffic like we have had this year."

The gardens were established in the 1990s and rely heavily on volunteers and contributions from individuals and businesses. The gardens attract people throughout southeast Alabama, southwest Georgia and the Florida Panhandle. In addition to flower enthusiasts, visitors include school and scouting groups.

In the Cullman County town of Colony, a $60,765 LWCF grant has had some similar benefits. While some of the grant was used to upgrade existing playground equipment, much of the funding was spent to build a water feature or "sprayground."

The sprayground shoots water in a variety of methods and allows children to get wet. It is cheaper to maintain than a swimming pool.

"It has been really a big thing for us. People are just amazed by it," Mayor Earlene Johnson said of the attraction. "It is ideal for a rural community like Colony. It is a wonderful water feature that doesn't bring with it the liability of a swimming pool."

Mayor Johnson said the water feature which is at Vivian Allen Park is one of the few recreational opportunities offered to children in the community. In addition to attracting locals, it has also brought in people from nearby towns, Mayor Johnson said.

The sprayground is open from May until September and on special occasions when weather permits.

# Legal Section

## MISSION

To provide advice, risk management, litigation and other legal services to the Alabama Department of Economic and Community Affairs.

### Programs Administered
• Legal     • General Services

## Legal Section Ensures Accountability in ADECA Matters

Nearly every formal document that is released through ADECA makes its way through the Legal Section.

Eddie Davis, who heads the section, said staff attorneys review all contracts and grants issued by the department to ensure legal accountability.

Staff members also closely follow proposed legislative bills and possible effects on ADECA divisions and employees. The section also ensures that ADECA divisions are familiar with new or amended laws.

Attorneys work individually with divisions to provide legal guidance in a variety of matters ranging from formulating documents to interpreting technical issues.

The Legal Section represents ADECA in litigation and court-related matters.

The staff also works with the personnel section to ensure that matters involving ADECA employees are conducted according to policies and procedures.

"The greatest compliment to our office would be that no one knew that we existed," said Davis. "That would mean we are quietly going about our duties and all is well with our department."

General Services, which falls under the Legal Section, handles the department's mail and parcels, interoffice correspondence and oversees distribution of office supplies for ADECA.

# Human Resources

## MISSION

To effectively administer ADECA's personnel needs and use all available resources to provide current and potential employees with the highest quality of personnel-related services.

## Human Resources Helps ADECA Hire Qualified Workforce

With a staff of more than 200, ADECA administers dozens of programs and support services that help improve the lives of individuals throughout the state. The Human Resources section helps the department maintain the competent, well-qualified staff needed to manage the programs effectively.

To assist ADECA's divisions in the hiring process, Human Resources obtains registers of qualified applicants for specific positions from the state Personnel Department. The section maintains contact with applicants throughout the hiring process and extends the job offer once a director or manager has chosen the applicant best capable of performing the job.

"We help move the process along," said Ramona Carroll, personnel manager.

As ADECA's responsibilities change or expand it is sometimes necessary to establish new positions. In 2006, when the Office of Water Resources needed to hire two new employees, Human Resources worked with OWR to determine the duties as well as the skills and experience needed to be successful in the new positions. HR determined that the Geological Information Systems Specialist classification in the state merit system closely matched the new duties, and the section began working with the state Personnel Department to establish and fill the positions. By carefully matching duties with a classification, the Human Resources section ensures that the most-qualified applicants available will be considered for new jobs.

# Information Services

<table>
<tr><td>
### MISSION

To provide information technology and telecommunications services and support to ADECA and its stakeholders.

Programs Administered

- PC Support
- Operations
- Telecommunications
- Programming
</td></tr>
</table>

## Information Services Pitches In to Help Displaced Workers Return to the Workforce

If an ADECA employee runs into technology problems, Information Services is there to help. IS provides equipment and know-how to support and link ADECA's wide-ranging programs, projects and services. But it's not just ADECA employees that benefit from the expertise of the IS staff.

In May 2006, Avondale Mills announced it would shut down operations, leaving more than 1,000 workers in Talladega and St. Clair counties without jobs. In the city of Talladega, displaced workers could go to the One-Stop Career Center to get help finding a new job, but in Sylacauga no such help was available.

To save workers a trip and get them back working as soon as possible, the Talladega center opened a satellite office in Sylacauga. That's when IS was called in.

"They were thankful they didn't have to make the commute to Talladega," said David Waters who, with other IS technicians, spent three days in Sylacauga setting up 22 computers for job seekers and six more for career center staff. The computers are invaluable tools that help workers create a resume, search for job openings, apply for jobs and receive e-mails that notify them of openings that match their skills.

Waters said the services provided at the career center actually have far-reaching effects. "You give (workers) the chance to upgrade their skills," he said.



Roy Jones, left, and David Waters of ADECA's Information Services staff install computers in Sylacauga.

"That's a big victory for the entire state."

Gwen Taylor of the Career Center agreed. "Some of the workers don't have computers at home," she said. "The computers installed by ADECA have been very helpful."

Taylor said more than 1,000 job seekers took advantage of the center's services in its first two months of operation. One of those was Carl Hathcock.

Hathcock worked for Avondale for 29 years. When the news came that the company was shutting down, he was stunned.

"It's the only place I have ever worked," Hathcock said.

Not only was Hathcock suddenly forced to look for a new job, he quickly realized he would need a new set of skills to find something as soon as possible. The biggest obstacle to developing those new skills was the burden of having to travel to Talladega to get help. The opening of the Sylacauga career center was a relief.

"With gas prices the way they are and not working, that made a difference to me," said Hathcock. "It's been a big help."

Thanks to the computers that were installed by ADECA's Information Services staff, Hathcock was able to study for, take and pass the exam for his commercial driver's license. With his new skills, he is ready to re-enter the workforce and start the next phase of his career.

# Financial Services

MISSION

To provide administrative support functions including financial management, purchasing, payroll and property management in an accountable and timely manner to meet the needs of ADECA and the citizens of Alabama.

Programs Administered
• Fiscal Section          • Payroll
• Property Management

## Training Presentation Helps Grantees Avoid Funding Delays

When residents served by ADECA grantees ask for help, chances are they need it right away. Financial Services works with grantees to make sure ADECA funds are used properly so the vital help they provide to Alabamians can be delivered in a timely manner.

An ADECA grant doesn't mean a blank check for the organizations awarded the funds. When applying for grants, organizations must submit budgets detailing how the funds will be used. A mistake or request for something not included in the budget leads to a delay in funds while the request is sent back to the grantee for correction.

To help grantees avoid these mistakes so they can concentrate on providing services that help Alabamians, Financial Services participates in periodic training sessions hosted by ADECA's divisions.



*Attendees listen to a speaker from ADECA during an informational session for grantees at the Alabama Center for Commerce. A Financial Services representative often presents information in training sessions to help grantees maintain compliance and avoid funding delays.*

"These training sessions help grantees head off problems," said lead accountant William Waldroff, who participates in sessions for recipients of grants from the Law Enforcement and Traffic Safety Division.

The presentation includes an overview of the financial side of a grant and the procedures ADECA follows to ensure compliance with state and federal regulations. Grantees are shown how to prepare complete, accurate budgets and requests for reimbursement from grant funds. Waldroff also answers questions about grantees' specific situations.

"The presentation helps them understand how to comply and what to submit to ADECA," Waldroff said.

After a training session, Waldroff offers follow-up assistance to any organization needing help. On request, he also sends electronic files of frequently used forms, such as budget revisions, to grantees for their convenience. The forms are standardized and based in Microsoft Excel to reduce the chance of an error that could lead to a delay while the grantee corrects it.

The information presented and follow-up assistance offered by Financial Services has helped several LETS grantees.

"Some of the non-profit programs don't have a lot of reserve funds, so any delay in grant funds can affect them," Waldroff said. "I've had numerous organizations tell me they really have benefited from the information and improved their financial compliance."

Such improvements mean that organizations will receive funding more quickly for the wide range of vital services they provide for Alabamians every day.



# Communications and Information

## MISSION

To foster ADECA's mission of Building Better Alabama Communities by informing and educating the public, providing support to all of ADECA's divisions and encouraging participation in community service projects.

### Programs Administered

- Public Information
- Census Bureau Liaison
- Charitable Campaigns
- Graphic Arts
- Legislation

## CID Announces ADECA's Helpful Grants and Programs

ADECA's grants are important news for citizens and communities across the state because they enrich lives through infrastructure improvement and expansion, economic development, job creation and career advancement, traffic safety, energy conservation and dozens of other ways. Making sure that residents are informed about grants and programs that impact their area is the objective of the Communications and Information Division.

Through print, broadcast and online media, CID works to inform Alabamians of services from which they may benefit. One of those programs is weatherization.

In September 2006, ADECA awarded $40,413 to make improvements to homes in Montgomery County. Improvements include adding insulation, replacing or repairing windows and doors, sealing air leaks and patching holes in roofs. With winter fast approaching, the Central Alabama Regional Planning and Development Commission needed to get the word out that this service was available to residents whose homes were not ready for the cold.

Donny Barber, the commission's weatherization coordinator, enlisted CID's help to publicize a demonstration of the benefits of weatherization in hopes that residents would send in more applications for the service. An eligible Montgomery resident volunteered her home for inspection and improvement, and local officials were on hand to witness the effectiveness of the program.

The efforts of CID staff assured the presence of local media representatives at the event and the next day Barber got the response he was looking for.

"We were flooded with calls from the time we stepped in the office," Barber said.

## Education is also a CID Goal

CID doesn't just announce grants; the division conducts public education efforts as well.

Rising energy costs are a concern for everyone. Increasing gas prices and utility bills take money out of people's pockets and inefficient homes and appliances contribute to environmental problems.

ADECA's Energy, Weatherization and Technology Division wanted Alabamians to know that they can save money and help protect the environment by using energy-efficient building practices and by looking for the ENERGY STAR® label on lighting and appliances. They approached CID with the challenge.

"CID's job was to find an affordable way to get the word out," said CID Director Larry Childers.

Working with EWT and a local newspaper, CID arranged for a comprehensive four-page tabloid to be printed that focused on the ENERGY STAR® program and ways home builders and buyers can save energy and money.

"We needed to convey more information than could be included in a typical newspaper ad or broadcast commercial," said Childers. A newspaper insert proved to be the most effective way to get the word out and stay within the U.S. Department of Energy funds budgeted for the project.

The tabloid was distributed to more than 200,000 households in Birmingham, Mobile and Montgomery informing a large segment of homeowners about the benefits of ENERGY STAR® materials and appliances.

Alabama Department of Economic and Community Affairs
Federal Funding Sources
FY 2006



# Alabama Department of Economic and Community Affairs
# 2005-2006 Federal Receipts and Disbursements

| Federal Grantor / Program Title | Receipts | Disbursements |
|---|---|---|
| **DEPARTMENT OF COMMERCE** | | |
| **Economic Development Administration** | | |
| Economic Development - Support for Planning Organizations ( New Program) | 114,000.00 | 159,321.63 |
| Economic Adjustment Assistance (New Program) | 340,000.00 | 0.00 |
| | | |
| **National Oceanic and Atmospheric Agency, National Marine Fisheries Service** | | |
| Unallied Industry Projects | 563,698.34 | 563,489.34 |
| | | |
| **DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | | |
| **Community Planning and Development** | | |
| Community Development Block Grants/State's Program | 32,806,817.85 | 32,800,590.35 |
| Emergency Shelter Grants Program | 1,650,199.03 | 1,650,132.50 |
| Housing Opportunities for Persons With AIDS | 1,383,752.92 | 1,377,594.27 |
| | | |
| **DEPARTMENT OF THE INTERIOR** | | |
| **National Park Service** | | |
| Outdoor Recreation - Acquisition, Development  and Planning | 2,190,406.40 | 2,157,809.88 |
| | | |
| **DEPARTMENT OF JUSTICE** | | |
| **Office Of Justice Programs (OJP), Bureau of Justice Assistance** | | |
| Prisoner Reentry Initiative Demonstration (Offender Reentry) | 256,823.62 | 256,842.10 |
| Edward Byrne Memorial Formula Grant Program | 2,012,123.31 | 2,009,272.58 |
| Violent Offender Incarceration and Truth in Sentencing Incentive Grants | 2,703,726.52 | 2,703,600.56 |
| Local Law Enforcement Block Grants Program | (142.10) | 14,999.98 |
| Edward Byrne Memorial Justice Assistance Grant Program | 11,932,695.11 | 3,395,416.34 |
| | | |
| **OJP, Office of Juvenile Justice and Delinquency Prevention (OJJDP)** | | |
| Juvenile Accountability Incentive Block Grants | 30,615.46 | 1,633,237.42 |
| Juvenile Justice and Delinquency Prenvention - Allocation to the States | 1,278,490.97 | 1,277,141.55 |
| Title V - Delinquency Prevention Program | 156,019.35 | 155,339.85 |
| Part E - State Challenge Activities | 9,527.41 | 9,527.41 |
| Enforcing Underage Drinking Laws Program | 416,768.92 | 416,467.85 |
| | | |
| **OJP, National Institute of Justice** | | |
| National Institute of Justice Research, Evaluation, & Dev Project Grants | 177,395.43 | 177,395.26 |
| | | |
| **OJP, Office for Victims of Crime** | | |
| Crime Victim Assistance | 5,588,337.90 | 5,584,713.81 |
| | | |
| **Office on Violence Against Women** | | |
| Violence Against Women  Formula Grants | 1,888,726.27 | 1,879,918.15 |
| Rural Domestic Violence and Child Victimization Enforcement Grant Program | 441,335.00 | 441,335.00 |
| Grants to Encourage Arrest Policies and Enforcement of Protection Orders | 439,035.59 | 439,035.59 |
| | | |
| **OJP, Corrections Program Office** | | |
| Residential Substance Abuse Treatment for State Prisoners | 1,225,168.14 | 1,224,875.44 |
| | | |
| **DEPARTMENT OF LABOR** | | |
| **Employment and Training Administration** | | |
| Workforce Investment Act | | |
| Adult Program | 12,161,702.49 | 12,327,921.69 |
| Youth Activities | 12,346,917.58 | 12,167,369.17 |
| Dislocated Workers | 20,124,317.83 | 19,732,620.41 |
| Pilots, Demonstrations, and Research Projects (New Program) | 2,104,835.11 | 2,104,071.93 |
| Work Incentives Grant | 389,026.59 | 388,671.69 |
| Incentive Grants - WIA Section 503 | 876,590.64 | 559,894.83 |

24

| Federal Grantor / Program Title | Receipts | Disbursements |
|---|---|---|
| **DEPARTMENT OF TRANSPORTATION** | | |
| **Federal Highway Administration** | | |
| Recreational Trails Program | 832,598.98 | 865,026.65 |
| | | |
| **National Highway Traffic Safety Administration** | | |
| State and Community Highway Safety | 2,342,576.38 | 2,533,335.83 |
| Occupant Protection | 944,231.98 | 944,231.98 |
| Federal Highway Safety Data Improvements Incentive Grants | 548,372.06 | 545,886.90 |
| Safety Incentive Grants for Use of Seatbelts | 275,046.27 | 275,154.01 |
| Safety Incentives to Prevent Operation of Motor Vehicles by Intoxicated Persons | 926,846.57 | 562,198.90 |
| Transportation Demo Grant and Section 2003b Safety Belts | 39,753.72 | 40,803.15 |
| | | |
| **APPALACHIAN REGIONAL COMMISSION** | | |
| Appalachian Regional Development | 1,805.44 | 0.00 |
| Appalachian Area Development | 822,645.60 | 822,645.60 |
| Appalachian Research, Technical Assistance and Demonstration Projects | 109,380.46 | 121,488.70 |
| | | |
| **GENERAL SERVICES ADMINISTRATION** | | |
| Donation of Federal Surplus Personal Property   (NOTE 1) | 19,637,607.00 | 16,041,356.00 |
| | | |
| **DEPARTMENT OF ENERGY** | | |
| **Office of Energy Efficiency and Renewable Energy** | | |
| State Energy Program | 553,116.74 | 547,091.96 |
| Weatherization Assistance for Low-Income Persons | 2,704,153.55 | 2,713,278.93 |
| Regional Biomass Energy Programs (New Program) | 1,235.49 | 1,259.61 |
| Energy Efficiency and Renewable Energy Information | | |
| Dissemination, Outreach, Training and Technical Analysis/Assistance | 34,503.89 | 42,696.84 |
| State Energy Program Special Projects | 44,859.07 | 44,401.31 |
| | | |
| **Other Federal Assistance** | | |
| Citronelle | 49,196.62 | 22,009.59 |
| Crude Oil Refund | 170,875.13 | 0.00 |
| Exxon | (33,076.35) | 109,024.79 |
| Second Stage | 67,355.06 | 58,352.66 |
| Strip Oil | 214,908.13 | 172,616.62 |
| Texaco | 189,174.75 | 115,387.79 |
| | | |
| **DEPARTMENT OF EDUCATION** | | |
| **Office of Safe and Drug-Free Schools** | | |
| Safe and Drug-Free Schools and Communities - State Grants | 1,489,692.33 | 1,429,862.52 |
| | | |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| **Substance Abuse and Mental Health Services Administration** | | |
| Substance Abuse and Mental Health Services Projects | 1,310,605.21 | 1,304,724.75 |
| | | |
| **Administration for Children and Families** | | |
| Low-Income Home Energy Assistance | 30,057,751.93 | 30,015,156.33 |
| Community Services Block Grant | 11,145,930.39 | 11,078,683.28 |
| Community Services Block Grant Formula and Discretionary | | |
| Awards - Community Food and Nutrition Programs | 73,229.03 | 73,229.03 |
| Social Services in Empowerment Zones and Enterprise Communities | 335,348.61 | 341,406.37 |
| Family Violence Prevention and Services/Grants for Battered Women's Shelters | 1,449,186.85 | 1,447,985.04 |
| | | |
| **DEPARTMENT OF HOMELAND SECURITY** | | |
| Community Assistance Program State Support Services Element (CAP-SSEE) | 121,283.45 | 130,690.26 |
| Cooperating Technical Partners | 379,553.21 | 379,582.21 |
| Map Modernization Management Support | 172,304.53 | 176,448.93 |
| | | |
| **TOTAL FEDERAL ASSISTANCE** | 193,049,080.17 | 180,990,010.07 |

Get Connected to ADECA Services

ADECA · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 334-242-5100

Appalachian Regional Commission (ARC) · · · · · · · · · · · · · 256-845-3472

Audit · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 334-242-5470

Communications & Information (CID) · · · · · · · · · · · · · · 334-242-5525

Community Development Block Grant (CDBG) · · · · · · · · · · · 334-242-0492

Community Services Block Grant (CSBG) · · · · · · · · · · · · · 334-353-4023

Energy, Weatherization & Technology (EWT) · · · · · · · · · · · 334-242-5290

Financial Services (FS) · · · · · · · · · · · · · · · · · · · · · · 334-242-5729

Gov.'s Resources & Economic Assistance Programs (REAP) · · · 334-242-5370

Human Resources · · · · · · · · · · · · · · · · · · · · · · · · 334-242-5251

Information Services (IS) · · · · · · · · · · · · · · · · · · · · · 334-242-5529

Law Enforcement & Traffic Safety (LETS) · · · · · · · · · · · · 334-242-5897

Legal Services · · · · · · · · · · · · · · · · · · · · · · · · · · 334-242-5255

Office of Workforce Development (OWD) · · · · · · · · · · · · · 334-242-5300

Office of Water Resources (OWR) · · · · · · · · · · · · · · · · 334-242-4991

Program Integrity · · · · · · · · · · · · · · · · · · · · · · · · 334-242-5470

Surplus Property · · · · · · · · · · · · · · · · · · · · · · · · · 334-277-5866

26



Alabama Department of Economic and Community Affairs

Bob Riley, Governor