**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD MARSHALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:06-cv-701-ID-CSC** |
| | ) | |
| **CHRIS WEST, in his individual capacity,** | ) | |
| **LASHUN HUTSON, in his individual** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT'S EVIDENTIARY SUBMISSIONS IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Lowndes County, Alabama, Deputy Sheriff Chris West, a Defendant in the above-styled cause, and submits the following Evidentiary Materials in support of his contemporaneously filed Motion for Summary Judgment:

| Exhibit | Description |
|---|---|
| A | Deposition of Chris West |
| B | Declaration of Chris West |
| C | Deposition of Lashun Hutson |
| D | Plaintiff's Responses to Defendants' Requests for Admission |
| E | Deposition of Richard Marshall |
| F | Drug Task Force Case File for Case No: 05-06-011, "Case File", Alabama Uniform Incident/Offense Report |
| G | Case File, 2nd Judicial Drug Task Force Drug Agent Statement Form of Lt. West |
| H | Case File, 2nd Judicial Drug Task Force Drug Agent Statement Form of Agent Hutson |

| Exhibit | Description |
| --- | --- |
| I | Case File, Interview Sheet of Kelvin Carmichael |
| J | Case File, Warrant Deposition |
| K | Case File, Documents submitted to and received from BATFE |
| L | The remainder of the case file not identified as a separate exhibit |
| M | Case File, Courtesy Warning |

Respectfully submitted this the 12th day of February, 2008.

**s/Gary L. Willford, Jr.**
DARYL L. MASTERS Bar No.  MAS018
GARY L. WILLFORD, JR. – Bar No. WIL198
Attorneys for Defendant Chris West
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
P.O. Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  gwillford@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on **February 12, 2008**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  **Jay Lewis, Esq., Rick Howard, Esq.**

**s/Gary L. Willford, Jr.**
OF COUNSEL

# EXHIBIT A

**Deposition of Chris West**

# DEPOSITION OF CHRISTOPHER WEST

## January 21, 2008

## Pages 1 through 64

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Case 2:06-cv-00701-ID-CSC   Document 33-2   Filed 02/12/2008   Page 4 of 19

Deposition of Christopher West          Marshall vs. West; Hutson          January 21, 2008



Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3        FOR THE MIDDLE DISTRICT OF ALABAMA
 4                  NORTHERN DIVISION
 5
 6   RICHARD MARSHALL,
 7        Plaintiff,
 8   vs.            CIVIL ACTION NO.
                    2:06-cv-701-ID.CSC
 9
     CHRIS WEST, in his individual
10   capacity, LASHUN HUTSON, in his
     individual capacity,
11
     Defendants.
12
13        * * * * * * * * * * * *
14
15        DEPOSITION OF CHRISTOPHER WEST, taken
16   pursuant to stipulation and agreement before Tracye
17   Sadler Blackwell, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on January 21, 2008,
21   commencing at approximately 9:10 a.m.
22
23        * * * * * * * * * * * *
```

Page 2

```
 1             APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4   Mr. Jay Lewis
     Law Offices of Jay Lewis
 5   Attorney at Law
     847 South McDonough Street
 6   Montgomery, Alabama
 7
 8   ON BEHALF OF THE DEFENDANTS:
 9   Mr. Daryl L. Masters
     WEBB & ELEY, P.C.
10   Attorneys at Law
     7475 Halcyon Pointe Drive
11   Montgomery, AL 36117
12   Mr. Rick A. Howard
     NIX, HOLTSFORD, GILLILAND, HIGGINS & HUTSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16
     ALSO PRESENT:
17
     Mr. Lashun Hutson
18
19
20        * * * * * * * * * * * *
21
22
23
```

Page 3

```
 1             EXAMINATION INDEX
 2
     BY MR. LEWIS . . . . . . . . . .  5
 3
 4        PLAINTIFF'S EXHIBITS
 5
 1   Evidence Submission/Analysis Forms        42
 6
 2   Courtesy Warning                 46
 7
 3   Deposition                      47
 8
 4   Complaint and Warrant           51
 9
 5   Alabama Uniform Incident/Offense Report   52
10
 6   6-28-05 Statement Form of Christopher     55
11   West
12
13        * * * * * * * * * * * *
14
15             STIPULATIONS
16   It is hereby stipulated and agreed by and
17   between counsel representing the parties that the
18   deposition of CHRISTOPHER WEST is taken pursuant to
19   the Federal Rules of Civil Procedure and that said
20   deposition may be taken before Tracye Sadler
21   Blackwell, Certified Court Reporter and
22   Commissioner for the State of Alabama at Large,
23   without the formality of a commission, that
```

Page 4

```
 1   objections to questions other than objections as to
 2   the form of the question need not be made at this
 3   time but may be reserved for a ruling at such time
 4   as the said deposition may be offered in evidence
 5   or used for any other purpose by either party
 6   provided for by the Statute.
 7        It is further stipulated and agreed by and
 8   between counsel representing the parties in this
 9   case that the filing of said deposition is hereby
10   waived and may be introduced at the trial of this
11   case or used in any other manner by either party
12   hereto provided for by the Statute regardless of
13   the waiving of the filing of the same.
14        It is further stipulated and agreed by and
15   between the parties hereto and the witness that the
16   signature of the witness to this deposition is
17   hereby waived.
18
19
20        * * * * * * * * * * * *
21
22
23
```

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 5 of 19

on of Christopher West                    Marshall vs. West; Hutson                    January 21, 2008

Page 5

THE COURT REPORTER:  Usual
stipulations?
MR. MASTERS:  Yes.
MR. LEWIS:  Yes.

CHRISTOPHER WEST
The witness, after having first been duly sworn
) speak the truth, the whole truth, and nothing
ut the truth, testified as follows:
EXAMINATION
Y MR. LEWIS:
). Tell us your name, please.
\. Christopher Stewart West.
\. And how are you employed, Mr. West?
\. By the Lowndes County Sheriff's Department.
). And how long have you been employed by the
Lowndes County Sheriff's Department?
\. About 11, 12 years, I think.
). And what's your position with Lowndes
County Sheriff's Department?
\. I'm a deputy sheriff.
). Do you hold any particular rank as a deputy
sheriff?

Page 6

\. I'm a lieutenant.
). How many people are employed in the Lowndes
County Sheriff's Office?  And by that I
mean people who are in law enforcement as
opposed to jail work.
\. Between 10 and 12 deputies, I think.
). And what is your particular job as
lieutenant?  Do you have any particular
responsibility in that position?
\. Yes, sir.  I'm drug task force commander.
). And help me understand the drug task force
because there's always some confusion about
whether it's a legal entity, whether it has
its own personnel practices, whether it has
its own policies.  Tell me, if you will,
what the 2nd Judicial Drug Task Force is.
MR. MASTERS:  Object to the form.
Go ahead and answer as best as
you can, Chris.
.. The drug task force is a task force that's
made up of several agencies.  We're funded
by the Department of Justice through the
Alabama Department of Economic and

Page 7

1   Community Affairs through a grant.  There
2   are several law enforcement agencies,
3   including district attorney's office,
4   within our three-county circuit.
5       Each year an agency -- all the agencies
6   are allowed to place an agent or an officer
7   on the drug task force.  Some agencies
8   choose to participate.  Most don't because
9   of funding issues.  Currently there's the
10  Lowndes County Sheriff's Office, the
11  Hayneville Police Department, and the
12  district attorney's office that are
13  participating on the drug task force as
14  part of that grant.
15  Q.  Okay.  So those three agencies make up the
16  drug task force?
17  A.  Yes, sir.
18  Q.  Are there federal agents assigned to that?
19  A.  No, sir.
20  Q.  But your salary continues to come from the
21  Lowndes County Sheriff's Office?
22  A.  That's correct.
23  Q.  And the Lowndes County Sheriff's Office in

Page 8

1   turn receives a grant to cover your
2   activity with the drug task force?
3   A.  The Lowndes County Commission does, not the
4   sheriff's office.
5   Q.  Does the Lowndes County -- does the drug
6   task force have a separate policies and
7   procedures manual for you to follow?
8   A.  Yes, sir, we do.
9   Q.  And are the policies and procedures in that
10  promulgated by the Department of Justice or
11  by some individual agency or the task force
12  as a group?
13  A.  A board of directors that form up the drug
14  task force.  We have a board of directors
15  that meet periodically, and if new rules or
16  guidelines need to be established, then the
17  board members will collectively make a
18  decision on how to establish that.
19  Q.  Okay.  And do those guidelines include
20  tactical operations, the way you perform
21  your duties, the day-to-day activities in
22  which you're involved?
23  A.  Yes, sir.

Page 9

1  Q. Does the Lowndes County Sheriff's Office
2     have its own set of rules and regulations
3     for you to go by?
4  A. Yes.
5  Q. And who puts those out?
6  A. The sheriff.
7  Q. Have you discovered any conflicts between
8     the sheriff's guidelines and policies and
9     those of the drug task force?
10 A. No, sir.
11 Q. So they're pretty much consistent?
12 A. Yes, sir.
13 Q. Let me get a little personal information on
14    you. What's your address?
15 A. Physical or mailing?
16 Q. Physical.
17 A. 235 -- no. 214 Norman Drive, Fort Deposit.
18 Q. Okay. 214 Norman Drive?
19 A. Yes.
20 Q. And what's your educational background?
21 A. I graduated high school, currently in
22    college.
23 Q. And where are you in college?

Page 10

1  A. Herzing in Birmingham.
2  Q. Where?
3  A. Herzing. Herzing College in Birmingham.
4  Q. Herzing?
5  A. Yes, sir.
6  Q. What sort of school is that?
7  A. It's a private school.
8  Q. And you're looking for a four-year degree
9     from there?
10 A. Yes, sir.
11 Q. What year are you at Herzing?
12 A. My final year.
13 Q. And what's your major?
14 A. Homeland security and public safety.
15 Q. When did you graduate from high school?
16 A. In '86.
17 Q. Have you had any additional training since
18    1986 other than what you're getting at
19    Herzing College?
20 A. In regards to ...
21 Q. Your position, your job --
22 A. Yes, sir.
23 Q. -- criminal justice, that sort of thing.

Page 11

1  A. Yes, sir.
2  Q. Tell me about those.
3  A. It's just a --
4  Q. And I don't want the two-day seminars and
5     stuff like that.
6  A. Yeah. There's just numerous ...
7  Q. Okay. Have you been to the FBI Academy?
8  A. Yes, sir.
9  Q. How long a course was that?
10 A. Ten weeks.
11         MR. HOWARD: Can we take a second?
12         MR. LEWIS: Sure.
13         (A brief recess was taken.)
14 Q. (Mr. Lewis continuing:) Have you had any
15    other training courses that have been six
16    weeks or longer?
17 A. No, sir, I don't believe so.
18 Q. Have you been to any law enforcement
19    advanced driving academies?
20 A. No, sir.
21 Q. Let me call your attention to June 28th,
22    2005. And I'll represent to you that's the
23    date that everybody agrees that the

Page 12

1     incident with Mr. Marshall about which
2     we're here today occurred. What had you
3     been doing that entire day?
4  A. At my office. Got up out of bed that
5     morning and went to work.
6  Q. Okay. What projects were you working on
7     that day?
8  A. I don't remember.
9  Q. Okay. Do you remember when you left your
10    office?
11 A. No, sir, not exactly.
12 Q. Okay. At some point that day did you hook
13    up with Mr. Hutson?
14 A. Yes, sir.
15 Q. At what point did you do that?
16 A. I don't really remember. He may have -- we
17    may have been in the office together that
18    morning and discussed Mr. Marshall, or I
19    may have picked him up at another
20    location. I just don't remember.
21 Q. When you say you might have picked him up,
22    do you recall who was driving?
23 A. I was driving.

Deposition of Christopher West     Marshall vs. West; Hutson     January 21, 2008

Page 13

1    Q.  Do you recall what you were driving?
2    A.  Yes, sir.
3    Q.  What were you driving?
4    A.  A Lincoln.
5    Q.  What model?
6    A.  Town Car.
7    Q.  What year?  Do you remember?
8    A.  No, sir, I don't remember.
9    Q.  And why were you driving a Lincoln Town
10       Car?
11   A.  I don't remember exactly why we were
12       driving the Lincoln that day.
13   Q.  Was that Lincoln a vehicle that had been
14       confiscated?
15   A.  Yes, sir.
16   Q.  And had there been a condemnation
17       proceeding as to that Lincoln?
18   A.  Yes, sir.
19   Q.  And it had been condemned and your office
20       had it?
21   A.  Yes, sir.
22   Q.  Why were you discussing Mr. Marshall that
23       day?

Page 14

1    A.  I had received information that
2        Mr. Marshall was selling dope at his
3        residence, selling illegal drugs at his
4        residence.
5    Q.  Where did you get that information?
6    A.  I don't remember.
7    Q.  Did you make any notes of where you got
8        that information from?
9    A.  I may have.
10   Q.  Would you have preserved those notes?
11   A.  No, sir.
12   Q.  Did your information indicate what sort of
13       drugs he was supposed to be selling?
14   A.  Crack cocaine and marijuana.
15   Q.  And based on that information what, if
16       anything, did you do?
17   A.  We drove out to Mr. Marshall's residence to
18       do a knock-and-talk and to just discuss
19       with him the information that we had
20       received.
21   Q.  And where was Mr. Marshall's residence?
22   A.  Just off Highway 21 on a little dirt road.
23       I don't recall the name of the dirt road.

Page 15

1        And it wasn't -- I don't know if you really
2        could consider it a dirt road.  It's more
3        like a -- more like a big driveway that
4        kind of went up a hill and then it took a
5        right right in front of the mobile home
6        where he was living at at the time.  And as
7        it went on past his house, I guess maybe
8        less than a hundred yards or so it kind of
9        turned into a little more narrow trail so
10       to speak.  So I don't even know if it's
11       considered -- if it has a name.  It could
12       be a private drive.
13   Q.  All right.  Did you know Mr. Marshall prior
14       to this time?
15   A.  No, sir.
16   Q.  Had you had any law enforcement contact
17       with Mr. Marshall prior to this time?
18   A.  Never met him.  Never seen him before.
19   Q.  Had you received any prior information
20       about Mr. Marshall prior to that time?
21   A.  Yes, sir.
22   Q.  And what information had you received?
23   A.  The same information in reference to drug

Page 16

1        activity.
2    Q.  When you got to his house, what, if
3        anything, did you do?
4    A.  I believe that we knocked on the door and
5        no one came to the door.  We got back in
6        our vehicles and -- or got back in our
7        vehicle and left the residence.  Agent
8        Hutson had some information about another
9        place that was, I think -- I think it's
10       referred to as the Casey community.  It's
11       kind of in that area.  It's not in the
12       exact same area, but it's in that part of
13       the county.  And when we were leaving
14       Mr. Marshall's residence, we were going to
15       go to this home down in the Casey
16       community.
17   Q.  And what information did you have about the
18       Casey community that led you to go down
19       there?
20   A.  Agent Hutson had that.  I'm not exactly --
21       I'm not exactly sure.
22   Q.  So you were looking for Mr. Marshall?
23   A.  Yes, sir.

Page 17

1  Q.  Did you know what kind of car Mr. Marshall
2      was likely to be driving?
3  A.  Yes, sir.
4  Q.  And what were you on the lookout for?
5  A.  A blue Chevy Nova, older -- older -- older
6      type vehicle.
7  Q.  And just so I'm clear, you did not -- you
8      do not recall today how you received the
9      information about Mr. Marshall allegedly
10     selling drugs?
11 A.  No, sir.  It could have been someone we
12     interviewed and I just made a note on
13     some -- a small Post-it, or it could have
14     been a phone call.  I know we received it
15     on more than one occasion.
16 Q.  And when you received that information, do
17     you have a present sense of whether or not
18     you believed that information to be
19     reliable?
20 A.  If -- if it was a source that was a
21     reliable source and the time frame allowed,
22     I would have obtained a search warrant for
23     his residence.  But we're doing a

Page 18

1      knock-and-talk, so maybe -- it could have
2      been a reliable informant that just knew
3      that activity was going on and just
4      referred it to me and we went out to do the
5      knock-and-talk.  If it was reliable, we
6      would obtain -- I mean, if it was reliable
7      and within the time frame allowed, we would
8      have gotten a search warrant.
9  Q.  Okay.  So the fact that you didn't get a
10     search warrant would seem to indicate that
11     it was not the sort of information that you
12     would have taken to a judge at that time;
13     correct?
14 A.  That's correct.  Not at that time.
15 Q.  All right.  So you're on your way to the
16     Casey community.  How do you get to the
17     Casey community from where Mr. Marshall's
18     residence is?
19 A.  You know, I'm not exactly sure because I
20     don't think I've ever been there before.
21     But, now, Agent Hutson is familiar with it.
22 Q.  Okay.
23 A.  But I know it's -- you got to -- in the

Page 19

1      direction we were coming from, you have to
2      go down County Road 7.  Because we were on
3      21.  I mean, he -- where he lives is just
4      off 21.
5  Q.  Right.
6  A.  So if you're coming back toward Hayneville
7      from Mr. Marshall's residence, you take a
8      left on County Road 7.
9  Q.  And prior to your encountering Mr. Marshall
10     had you taken that left?
11 A.  Yes, sir.
12 Q.  So you were on County Road 7 at that time?
13 A.  That's right.
14 Q.  What, if anything, happened then?
15 A.  We met Mr. Marshall's vehicle, and I -- I
16     said, well, that's his vehicle right
17     there.  We turned around and got behind his
18     vehicle.
19 Q.  Okay.  And what then?
20 A.  Mr. Marshall didn't have on a seatbelt.  I
21     observed that he didn't have on a
22     seatbelt.  And we've got a blue-and-white
23     warning light that is powered -- it's a

Page 20

1      12-volt power that you plug into the
2      cigarette lighter.  And I placed it on the
3      dash of the vehicle and activated that
4      light behind his vehicle.
5  Q.  What did Mr. Marshall do in response to
6      that?
7  A.  Kept driving.
8  Q.  How fast were you going at the time you
9      first activated this light?
10 A.  I don't -- I don't recall.
11 Q.  Well, would you consider it an excessive
12     rate of -- without regard to miles per
13     hour, an excessive rate of speed, an
14     ordinary rate of speed, a slow rate of
15     speed?
16 A.  An ordinary rate.  It wasn't exceeding the
17     speed limit.
18 Q.  And your position is that Mr. Marshall --
19     that you activated this light?
20 A.  That's correct.
21 Q.  And the light was working at the time?
22 A.  Yes, sir.
23 Q.  And there were blue-and-white strobes or

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 9 of 19

m of Christopher West                Marshall vs. West; Hutson                        January 21, 2008

Page 21

flashes coming off the light?

A. That's correct.

Q. All right. So Mr. Marshall kept on driving?

A. That's right.

Q. What did you do then?

A. Blew the horn, flashed the headlights, and even at one point pulled alongside his vehicle.

Q. What color was this Lincoln Town Car you were in?

A. It's kind of a bluish/aquamarine type color.

Q. Doesn't look much like a police car though?

A. No.

Q. So you blew the horn, and Mr. Marshall just continued to keep driving; right?

A. Yes, sir.

Q. You say you pulled up alongside him. Tell me about that.

A. We pulled alongside the vehicle. And, like I said, it -- he's got an older car. It doesn't run that fast. Pulled alongside

Page 22

the vehicle. Our windows are down. I think Agent Hutson holds up his badge. And it's a pretty good -- it's a pretty good size badge. It's round and it has a leather cover around it. It's a gold badge with a black background. And he holds it up. I mean, we're probably as close from me to you. And he holds up the badge and says pull over. And Mr. Marshall is yelling and cussing, and he's very -- has a very defensive appearance about himself.

And so Agent Hutson is holding up the badge. And then at one point we even removed the light from the dash and we've got the badge in one hand and the light in the other saying pull over. And he's looking, I mean, directly at us. And he says, you know, fuck y'all or something to that nature, you know, I'm not pulling over, you know. And so he keeps on going. And so we pull -- you know, we back off and pull back in behind the vehicle just following behind him.

Page 23

1  Q. At some point you're -- setting the scene
2     here, you have turned onto Highway 7. You
3     meet him. He's coming toward you?
4  A. That's correct.
5  Q. You turn around and you're going back,
6     what, south on Highway 7 approximately?
7  A. Yeah.
8  Q. Back toward Highway 21?
9  A. That's correct.
10 Q. And when I say Highway 7, I mean County
11     Road 7.
12 A. That's right.
13 Q. Heading back toward Highway 21?
14 A. Uh-huh (positive response).
15 Q. What, if anything, happened when you hit
16     Highway 21?
17 A. He speeds up a little bit. It's a little
18     wider highway than the county road.
19 Q. Did he turn onto Highway 21?
20 A. Yes, he did.
21 Q. Which direction did he turn?
22 A. Going toward his residence, away from
23     Hayneville toward Wilcox County.

Page 24

1      And less than maybe 50 to 75 yards he
2  throws something out the window that
3  actually hits us in the windshield, a
4  plastic baggy. I seen enough of those in
5  my years. I know what a plastic baggy
6  looks like. It hits us and just kind of
7  flies off to the side. So I'm making
8  mental notes to try to remember where this
9  evidence or whatever came out of the
10  window.
11     And he continues to go in the direction
12  of Wilcox County. So we pull up beside him
13  again, you know, hey, pull over. We got
14  the badge just like this right here and the
15  light, you know, pull over. And he's just
16  yelling and cussing, you know, fuck you
17  all, I'm not doing it, I'm not pulling
18  over, you know.
19     And so we back off. And I tell Shun, I
20  says, hold on. Because he's moving around
21  in his seat. There's -- this guy, he's
22  like looking down. He's -- there's a lot
23  of movement going on in the seat with him.

Page 25

1  And I tell Shun, I says, you know, you hold
2  on because something is going on here.
3      And so I bump his vehicle a couple of
4  times thinking that that will, you know,
5  make him pull over, but he still -- you
6  know, he's yelling and he's -- and he sees
7  us. I mean, he's looking in the mirror.
8  He sees us back -- he sees the blue light.
9      And so he ducked, and then I just kind
10 of, you know, pushed his bumper a little
11 bit. And his vehicle swerves and comes up
12 on this side of the road. Never harm
13 anything. I don't even think it hurt the
14 grass. And he came to rest in the
15 vehicle. The vehicle came to rest up on
16 the embankment. And I believe I backed up
17 because I took a position -- a defensive
18 position -- his vehicle -- if my wrist is
19 the front of his vehicle, then the nose of
20 my vehicle took a position like -- at an
21 angle like this.
22      And we opened our doors with our
23 weapons drawn behind our -- behind the

Page 26

1  doors. And I said to him -- I said, get
2  out of your vehicle and get on the ground.
3  And he just sat there cussing and just
4  sweating, and his eyes were red. It was a
5  bad situation.
6  Q.  Let's go back just a little bit. Earlier
7  you had said that when you pulled up next
8  to him you were as close as you were to
9  me --
10 A.  Yeah.
11 Q.  -- right now. And I estimate that distance
12 to be about four to five feet. Would that
13 be accurate?
14 A.  Or maybe further. Something like that. I
15 mean, I could see his face and I'm
16 driving. And Shun is even closer than I
17 am. But I'm driving. There's nothing else
18 on the road. And I'm looking him in his
19 face and he's looking at us. And he sees
20 the light and the badge is just like this.
21 And, like I say, it's a gold badge with a
22 black background and a blue-and-white
23 strobe just flashing.

Page 27

1  Q.  I understand --
2      MR. MASTERS:  Object to the form
3      of the previous question.
4      Just listen to his questions
5      and answer his questions.
6      THE WITNESS:  Okay. I'm sorry.
7  Q.  The question -- the cars would have been
8  approximately four to five feet apart?
9  A.  Yes, sir.
10 Q.  And when you say you pulled alongside him,
11 I'm assuming that you mean that your car's
12 passenger's side was next to his car's
13 driver's side?
14 A.  Yes, sir.
15 Q.  And to clarify what you said about how you
16 stopped --
17     MR. MASTERS:  Excuse me. Object
18     to the form of the previous
19     question.
20     Did you hear the
21     question, Chris? Which side
22     was closest to which?
23     THE WITNESS:  Shun's side was

Page 28

1  closest to his driver's side.
2      MR. MASTERS:  So your car's
3      passenger's side was close to
4      his car's driver's side?
5      THE WITNESS:  That's right.
6      MR. MASTERS:  I think you said the
7      opposite, Jay. I may be
8      mistaken.
9      MR. LEWIS:  Well, I'll -- we'll go
10     with the fact that his car --
11     that Mr. West's car's
12     passenger's side was next to
13     Mr. Marshall's driver's side.
14     MR. MASTERS:  I may be mistaken,
15     but I thought you said the
16     opposite.
17     MR. LEWIS:  That's fine.
18 Q.  But to clarify, you didn't pull over to the
19 right to get up next to his car. You
20 pulled to the left?
21 A.  Yeah. I pulled as if I was passing his
22 car.
23 Q.  Right. Okay. And this is a two-lane

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 11 of 19

on of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 29

highway?
A.   Yes, sir.
Q.   Are you familiar with what a PIT is?
A.   Yes, sir.
Q.   What is a PIT?
A.   It's a -- what's referred to as PIT maneuver.
Q.   And that's a precision intervention technique or precision interdiction technique?
A.   Yes, sir.
Q.   And is that what you performed on Mr. Marshall's car?
A.   Yes, sir.
Q.   And to clarify -- correct me if I'm wrong -- that's a procedure by which you pull up next to the car with your front fender next to his rear fender and then slow down and simultaneously turn into his car bumping it into a turn; correct?
A.   Something of that nature.
Q.   And that's pretty much what you did on that occasion?

Page 30

A.   Yes, sir.
Q.   And his car came to rest off the road; correct?
A.   Yes, sir.
Q.   Based on what you said.
        And did it come to rest facing back in the direction from what you had come?
A.   Yes, sir.
Q.   So instead of going toward Wilcox County, it is now headed away from Wilcox County in the grass?
A.   That's correct.
Q.   On the opposite side of the road?
A.   Yes, sir.
Q.   You then backed up and angled your car toward his car just off the road?
A.   That's correct.
Q.   Okay.  I think we've got the scene set.
        And you indicated that you jumped out of the car and Mr. Hutson jumped out of the car, weapons drawn, and yelled at Mr. Marshall to get out of the car?
A.   That's correct.

Page 31

1   Q.   And what, if anything, was Mr. Marshall
2       saying to you at the time?
3   A.   Cursing.
4   Q.   Okay.  Have any recollection of the
5       specific language he was using?
6   A.   Fuck y'all, why y'all fucking with me,
7       things of that nature.
8   Q.   Going back to when you say he threw a baggy
9       out of the car and hit your car.  In what
10      way did he -- I mean, tell me what you saw
11      as that baggy came out of the car.
12  A.   I saw his arm go up and the bag come out.
13      Like I said, we could see him moving around
14      in the car.
15  Q.   And you made note of where that baggy had
16      gone off the road?
17  A.   Yes, sir.
18  Q.   You've got him in the car.  Did he have a
19      passenger with him?
20  A.   Yes, sir.
21  Q.   And what did the passenger do, if
22      anything?
23  A.   Nothing really.

Page 32

1   Q.   Just sat there?
2   A.   Yes, sir.
3   Q.   Did you hear the passenger cursing?
4   A.   No, sir.
5   Q.   And Mr. Marshall's window, was it up or
6       down?
7   A.   Down.
8   Q.   What's the next thing that happened?
9       I know I sound like a prosecutor, but
10      what happened then?
11  A.   Mr. Marshall -- he got out of his car.  He
12      was standing -- he had the door open and
13      was standing between the car and the door.
14      And he's yelling and cussing.  And I tell
15      him several times to get on the ground.  He
16      will not comply.  And several more times I
17      say get on the ground, get on the ground
18      now.  He won't comply.  And I fired my
19      weapon in the ground, I guess, some
20      seven -- six to eight feet out from him
21      into the ground.
22      At that point he was shocked that that
23      even happened.  I could see the appearance

Page 33

1  on his face. That's when I left from
2  behind my door, my weapon still pointed at
3  him -- or my weapon pointed at him, and as
4  I approached him, I grabbed him. I don't
5  remember where I grabbed him, but I know I
6  grabbed him and I put him on the ground.
7  And he -- he was very resistant.
8      But he was cussing and just combative.
9  Not very combative, but just not wanting to
10  comply at all. But I was able to get my
11  handcuffs out and put the handcuffs on
12  him. And I think Agent Hutson got the
13  passenger out and placed the handcuffs on
14  him.
15      I left him there on the ground after I
16  got him handcuffed and looked into the
17  vehicle. On the driver's seat right there
18  in the middle was a .357 Magnum. And in
19  the ashtray was .357 rounds. There was
20  some rounds in the floorboard and might
21  have been some loose rounds in the seat.
22  But I know the gun was loaded. And there
23  was a -- like a liquor flask there in the

Page 34

1  seat and, I think, a pack of Swisher Sweet
2  cigars, a partial pack or something.
3      I get him -- after I see this stuff
4  right here, I'm -- I pat him down. And I
5  think -- when I -- when I'm trying to get
6  him -- when I get him to the ground, he's
7  got these big -- real big shorts on that
8  are the bagging shorts. So they basically
9  come off of him. He doesn't have on a belt
10  or anything. And so cars are coming by and
11  he's there in his underwear. So I'm trying
12  to get him to get into the back seat of the
13  car, basically trying to save him from some
14  humiliation because he's standing there in
15  his boxers, so -- but he won't comply. He
16  just won't do nothing I'm asking him. So
17  eventually I get him pushed into the back
18  seat because, like I say, traffic is coming
19  by.
20      And the other guy, I think Agent Hutson
21  sits him over on the embankment. He's
22  cool. He's not saying anything. He's not
23  resisting in any manner. I call a marked

Page 35

1  unit. The marked unit comes out and
2  transports them. I take some photos. And
3  that's pretty much the gist of it.
4  Q. Going back to when you had him on the
5     ground and were doing the search of the
6     vehicle. Did you also do a search of him,
7     did you say?
8  A. I patted him, patted his pockets to see if
9     he had any weapons or anything in his
10     pockets.
11  Q. Did you remove a wallet?
12  A. I may have. I don't remember.
13  Q. Did you remove any money from him?
14  A. I may have.
15  Q. If you removed any money from him, did you
16     turn in all of the money you removed from
17     him?
18  A. Yes, sir.
19  Q. Turned it in to whom?
20  A. The jail.
21  Q. Okay. Anything else you turned in to the
22     jail other than possibly money?
23  A. No, sir.

Page 36

1  Q. Okay.
2  A. If he didn't have any weapons --
3      MR. MASTERS: Chris, just answer
4      his question.
5      THE WITNESS: Okay.
6  Q. Well, what would have been your normal
7     procedure for dealing with confiscated
8     property?
9  A. If he didn't have any weapons, normally I
10     would leave it in his pockets because the
11     jail is going to pick that stuff up when he
12     gets there anyway.
13  Q. Do you recall whether you did that in this
14     case or not?
15  A. No, sir.
16  Q. What did you do then after he was trans --
17     let me go back.
18      You said that you called for a marked
19     unit?
20  A. Yes, sir.
21  Q. And did a marked unit arrive?
22  A. Yes, sir.
23  Q. From what jurisdiction was that marked

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 13 of 19

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 37

1    unit?
2    A.   Lowndes County.
3    Q.   And do you recall who was in that marked
4         unit?
5    A.   Yes, sir.
6    Q.   Who was that?
7    A.   Deputy Phil Harding.
8    Q.   And what did Deputy Phil Harding do when he
9         got on the scene?
10   A.   Took Mr. Marshall and put him in the back
11        seat of his vehicle.
12   Q.   By that time had Mr. Marshall calmed down?
13   A.   No, sir.
14   Q.   Still combative?
15   A.   No, sir, not combative. Just still ...
16   Q.   Hostile?
17   A.   Yes, sir.
18   Q.   But you didn't have to -- nobody had to
19        fight him to get him in the patrol car?
20   A.   I don't recall, no, sir.
21   Q.   And did the patrol car then leave with
22        Mr. Marshall?
23   A.   Yes, sir.

Page 38

1    Q.   What happened to the passenger?
2    A.   He rode with me.
3    Q.   And did you have any trouble out of him at
4         all?
5    A.   No, sir.
6    Q.   Do you recall who he was?
7    A.   What's that boy's last name?
8         I know, but I can't remember right now.
9    Q.   Had you had any contact with him before?
10   A.   No, sir.
11   Q.   Didn't know him?
12   A.   No, sir.
13   Q.   When's the next time you saw Mr. Marshall?
14   A.   I went to interview him a few days later.
15   Q.   At that time had he been charged with
16        anything?
17   A.   Yes, sir.
18   Q.   And do you recall how long he was held
19        before he was charged?
20   A.   He was charged the day that I arrested him.
21   Q.   And you signed a warrant on him?
22   A.   Yes, sir.
23   Q.   Do you recall whether it was you or

Page 39

1         Mr. Hutson who did the paperwork and the
2         deposition and got the charge --
3    A.   I think it was me. I think.
4    Q.   And the only reason I ask that is I
5         couldn't read the signatures.
6    A.   Okay.
7    Q.   And tell me about the interview you had
8         with Mr. Marshall.
9    A.   He was calm. We talked just like you and I
10        are talking now. And I asked him for a
11        statement, and he says, I -- he didn't want
12        to give me a statement. And so I told him
13        I understood, and that was the end of it.
14   Q.   Any sense of how long that interview took?
15   A.   20, 30 minutes, something like that.
16   Q.   Going back to the time that Mr. Marshall
17        was transported in the deputy's patrol
18        car. What did you do after that, after
19        Mr. Marshall had been taken away?
20   A.   We -- we actually all left together. I
21        think Agent Hutson drove Mr. Marshall's car
22        because it was still fine. And I drove the
23        Lincoln. Phil Harding came on the marked

Page 40

1    unit. He had Mr. Marshall. His --
2    Mr. Marshall's cousin was with me. And
3    Shun drove the Nova.
4         I think we may have stopped alongside
5    the road looking for the evidence or the
6    bag that was thrown out. And I think Phil
7    pulled over too. And I think when he
8    pulled over he caught a nail in his tire,
9    and so he had -- he sprung a leak in his
10   tire. So we were maybe a mile -- less than
11   a mile from Howard Hooks' store. So Phil
12   drove his car up to Howard Hooks' store. I
13   went up with him while he changed the tire,
14   and Shun took the Nova on back to the jail.
15   Q.   When you pulled over to the side of the
16        road, did you retrieve anything?
17   A.   I don't remember whether we did at that
18        time or not. I think we went back and
19        later retrieved it. I don't remember.
20        Maybe we did. I don't remember exactly.
21   Q.   What did you retrieve?
22   A.   A baggy containing residue.
23   Q.   And what did you do with that baggy?

Page 41

1  A.  I sent it to forensics.
2  Q.  Tell me about how you, quote, sent it to
3      forensics.
4  A.  I bagged it up in a brown paper bag because
5      we were seeking a fingerprint analysis.  I
6      labeled it to get -- for fingerprint
7      analysis.  The fingerprint analysts weren't
8      able to recover any fingerprints off of
9      it.  Once I received it from fingerprint
10     analysis, I sent it to forensics, to drug
11     analysis, and they weren't able to
12     determine because there was just not enough
13     residue in the bag.
14         So I got both of those back, and they
15     were just both -- both of the results.  And
16     there was --
17 Q.  There was sufficient residue for you to see
18     that there was residue?
19 A.  Yes, sir.
20 Q.  And yet it was not sufficient for forensics
21     to make a determination?
22 A.  That's correct.
23 Q.  And you received a report back from

Page 42

1      forensics?
2  A.  Yes, sir.
3  Q.  Let me show you what we will mark as
4      Plaintiff's Exhibit Number 1.
5          (Plaintiff's Exhibit 1 was marked
6          for identification.)
7  Q.  I'm showing you what we've marked as
8      Plaintiff's Exhibit Number 1 and ask you if
9      you recognize that.
10 A.  Yes, sir.
11 Q.  And what is that, please?
12 A.  It's an evidence submission form.
13 Q.  And that's page 1?
14 A.  That's the submission form.
15 Q.  Okay.  Let's go to page 2.  What is that?
16 A.  That's the receipt of submission from
17     forensic sciences.
18 Q.  And that's done in order to preserve what
19     we call the chain of custody?
20 A.  Yes, sir.
21 Q.  What is the next page?
22 A.  This is the certificate of analysis from
23     forensic sciences.

Page 43

1  Q.  And the following page?
2  A.  It's the evidence submission form for
3      latent prints.
4  Q.  And the following page?
5  A.  It's the -- it's just a copy of the same
6      form.
7  Q.  And down at the bottom it would indicate --
8      it would seem to indicate that the chain of
9      custody as to the page we're on was not as
10     complete as the previous page?
11 A.  Say what, now?
12 Q.  The previous page of the fingerprint
13     examination request seems to show a full
14     chain of custody down at the bottom.  In
15     other words, it shows it was received by,
16     returned to, and then returned by.
17 A.  Oh, okay.
18 Q.  And there's three signatures.  And the next
19     page seems to just be the original
20     submission.
21 A.  You mean the final page?
22 Q.  No, no.
23 A.  Oh, okay.

Page 44

1  Q.  Okay.
2  A.  So are you saying that this guy, Shannon
3      Fitzgerald, received it from me and then on
4      this page right here is the one where the
5      actual examination took place?
6  Q.  Right.
7  A.  Okay.
8  Q.  Is that pretty much the way it looks to
9      you?
10 A.  That's the way it appears.
11 Q.  Okay.  And then let's go to the last page.
12     What is that?
13 A.  This is the -- I guess the findings from
14     the examination --
15 Q.  All right.  Let's go back to this third,
16     fourth -- yeah, the third page, the
17     certificate of analysis.
18 A.  Yeah.
19 Q.  What was the result of that analysis as far
20     as you can tell?
21 A.  That the analysis of the residue failed to
22     reveal the presence of any controlled
23     substances.

Page 45

1  Q.  So they were able to perform an analysis?
2  A.  Yes, sir.
3  Q.  But simply couldn't find any controlled
4      substance?
5  A.  Couldn't find any controlled substance.
6  Q.  And the last page, which is the report of
7      the fingerprint analysis, what was the
8      finding there?
9  A.  No latent prints of value were found on the
10     evidence.
11  Q.  Okay.  But Mr. Marshall was in fact charged
12     with possession of controlled substance?
13  A.  That's correct.
14  Q.  Was he charged with anything else?
15  A.  I don't remember.  Pistol without a permit,
16     I think.
17  Q.  Had you seen that pistol in Mr. Marshall's
18     possession prior to the time you executed
19     the PIT maneuver?
20  A.  No, sir.
21       (Plaintiff's Exhibit 2 was marked
22      for identification.)
23  Q.  Let me show you what's marked as

Page 46

1     Plaintiff's Exhibit Number 2 and see if you
2     recognize that.  What is that, please?
3  A.  It's a warning citation.
4  Q.  And it was for attempting to elude and no
5     seatbelt; correct?
6  A.  That's correct.
7  Q.  With regard to that seatbelt violation, do
8     you have any idea whether 1971 Chevrolets
9     were even equipped with shoulder harnesses?
10  A.  No, sir.
11  Q.  Okay.  So it may well be that shoulder
12     harnesses were not even available as far as
13     you know in 1971?
14  A.  As far as I know.
15       MR. MASTERS:  Object to the form.
16  A.  That's correct.
17  Q.  And if he had had a seatbelt and not a
18     shoulder harness, would you have been able
19     to see that from your perspective while
20     following him?
21  A.  No, sir.
22       (Plaintiff's Exhibit 3 was marked
23      for identification.)

Page 47

1  Q.  Let me show you what I've marked as
2     Plaintiff's Exhibit Number 3 and see if you
3     recognize that.
4  A.  Yes, sir.
5  Q.  What is that?
6  A.  It's a deposition.
7  Q.  And what is a deposition used for in this
8     context?
9  A.  Probable cause for the clerk to issue a
10     warrant.
11  Q.  And this is the deposition relating to
12     possession of controlled substance and
13     pistol without a permit; correct?
14  A.  Yes, sir.
15  Q.  Who filled out this form?
16  A.  I did.
17  Q.  Okay.  Looking on the second page up at the
18     top where it says complainant, whose
19     signature is that?
20  A.  That's my signature.
21  Q.  And it says offender attempted to elude DTF
22     agents at the same time throwing drug
23     evidence out the window.

Page 48

1     Going back to what you had said a
2     little earlier.  You had said when
3     Mr. Marshall turned onto Highway 21 toward
4     Wilcox County --
5  A.  Yes, sir.
6  Q.  -- he sped up a little --
7  A.  Yes, sir.
8  Q.  -- but that his car really was not capable
9     of going very fast?
10  A.  No, sir.
11  Q.  How fast, if you have a judgment, was
12     Mr. Marshall going at the time that you
13     executed the PIT maneuver?
14  A.  I'm not sure.
15  Q.  But you weren't exceeding the speed limit?
16  A.  I don't remember.
17  Q.  But you don't have a sense that you were --
18     as of today -- and since you don't
19     remember, I'm just trying to clarify this.
20     Do you have a sense today that you were in
21     a high speed chase?
22  A.  I would say so, yes, sir.
23  Q.  Okay.  So how high do you think the speed

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 16 of 19

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 49

1    was?
2    A.  I just -- I don't remember.
3    Q.  So it said attempted to elude DTF agents at
4         the same time.  Isn't is it true what you
5         meant by that was he simply failed to stop?
6         MR. MASTERS:  Object to the form.
7    A.  I don't know.  I mean, I guess that depends
8         on how you look at it.
9    Q.  I guess it does.  But he didn't attempt to
10        turn on to any other roads and lead you on
11        this path through the woods or anything
12        like that?
13   A.  No, sir.
14   Q.  Okay.  He simply turned back toward what
15        you knew to be his residence?
16   A.  Yes, sir.
17        MR. MASTERS:  Object to the form.
18   Q.  And it says throwing drug evidence out of
19        the window.  But at this point you don't
20        have any evidence whatsoever that he
21        actually threw drug evidence out?
22   A.  No, sir.
23   Q.  Offender was forced from the roadway onto

Page 50

1    the opposite side of the roadway where his
2    vehicle came to rest.  Offender was not
3    wearing seatbelt and was highly
4    belligerent, cursing, very combative, and
5    obviously highly agitated.  Have you told
6    me everything about that that you can
7    recall when you described it earlier?
8    A.  His demeanor?
9    Q.  Yeah.
10   A.  Yeah, I guess.  I mean, if I could think of
11        a few more words to use, I'd use them.
12   Q.  Okay.  There also was a passenger in the
13        vehicle.  Both individuals were detained
14        and transported to the Lowndes County
15        Detention Facility.  And have you told me
16        everything you can recall about their
17        arrest and transportation?
18   A.  Yes, sir.
19        (Plaintiff's Exhibit 4 was marked
20         for identification.)
21   Q.  Okay.  Let me show you what's marked as
22        Plaintiff's Exhibit Number 4.  And this is
23        simply a two-page document.  Tell me what

Page 51

1    this is, please.
2    A.  It's the complaint and the warrant.
3    Q.  Okay.  And this also bears your signature?
4    A.  Yes, sir.
5    Q.  On the first page?
6    A.  Yes, sir.
7    Q.  And on the second page down at the bottom
8         where it says sheriff, by, is that also
9         your signature?
10   A.  Yes, sir.
11   Q.  And that's simply the document that makes
12        the charge against Mr. Marshall --
13   A.  That's right.
14   Q.  -- on the first page, and on the second
15        page it's a warrant to arrest him?
16   A.  That's correct.
17        (Plaintiff's Exhibit 5 was marked
18         for identification.)
19   Q.  Okay.  And I think the last thing is
20        Plaintiff's Exhibit Number 5.  Tell me what
21        that is, please.
22   A.  It's an incident/offense report.
23   Q.  Okay.  We've gone through several pieces of

Page 52

1    paper that you have either authored or had
2    something to do with.  Tell me all of the
3    paperwork that you have to fill out in
4    making an arrest such as you made on
5    Mr. Marshall.
6    A.  You mean for a case file or --
7    Q.  Yeah.  Yeah.  Have we in front of us all of
8         the paperwork that you have executed on
9         Mr. Marshall?
10   A.  You don't -- my statement form is not here.
11   Q.  Right.  But other than that.
12   A.  There's an arrest report that's not here.
13   Q.  Okay.  Look on the third page of the
14        exhibit I've just handed you.
15   A.  Okay.
16   Q.  Is that the arrest report?
17   A.  This is the arrest report right here.
18   Q.  Is what you have in these exhibits that
19        I've given you all of the paperwork you
20        would have completed on Mr. Marshall?
21   A.  Yes, sir, I believe so.
22   Q.  All right.  Let's go to Plaintiff's Exhibit
23        Number 5.  That's a uniform

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 17 of 19

on of Christopher West                 Marshall vs. West; Hutson                 January 21, 2008

Page 53

incident/offense report?

A.   That's right.

Q.   And tell me what that's for.  What's the purpose of that?

A.   It just lists myself as whoever is making out the report, the agency, the charges or the incident, the place of occurrence, the date and time.  And there's an area in here where you will list items that will be recovered or whatever.  And then down at the bottom -- underneath that it will list the dollar amount for the items recovered, vehicle information.

     On the back page is the information for the offender or whoever, suspect, and then an area for the witnesses, a narrative, and then an area for the signature of the officer or whoever the complainant is and case disposition area.

Q.   And did you fill out these first two pages?

A.   Yes, sir.

Q.   And that's your signature at the bottom of

Page 54

the second page?

A.   Yes, sir.

Q.   And then tell me about this third page, which is the Alabama Uniform Arrest Report.

A.   Basically the jail does this.  They do this in booking.  And it has the -- you see the defendant's name up at the top, his height, weight, color, all of his information, the place -- the occurrence of the arrest and the charges and then the officer that did the booking.

Q.   And that would be Marilyn Mealing?

A.   That's correct.

Q.   Do you know her?

A.   Yes, sir.

Q.   And is that her signature?

A.   I guess it is.

Q.   Have you seen her signature before?

A.   No.

Q.   Okay.  Did you retain a copy of this Alabama Uniform Arrest Report?

A.   Yes.

Q.   And is this a true and correct copy of that

Page 55

1    arrest report?

2    A.   Yes.

3    Q.   And you normally maintain those in your

4         case file --

5    A.   That's correct.

6    Q.   -- in the normal course of business?

7    A.   That's correct.

8    Q.   All right.  Now, you had mentioned that you

9         had a statement also that you wrote out.

10        I'm going to show you Plaintiff's Exhibit

11        Number 6 and ask you if that's a copy of

12        your statement.

13             (Plaintiff's Exhibit 6 was marked

14             for identification.)

15   A.   Yes, sir.

16   Q.   Okay.  Let's go through this for just a

17        second if we could.

18   A.   Okay.

19   Q.   And I think this will be close to the last

20        thing that we're going to do today.

21             This was June 28th, 2005.  Is that the

22        date that all this happened?

23   A.   Yes, sir.

Page 56

1    Q.   And the time, 7:32 p.m., is that the time

2         that you wrote the statement?

3    A.   Yes, sir.

4    Q.   This indicates that the incident happened

5         sometime at about one o'clock this

6         afternoon --

7    A.   That's right.

8    Q.   -- that afternoon.

9    A.   Uh-huh (positive response).

10   Q.   And you say that you were traveling with

11        Mr. Hutson north on Lowndes County Road 7

12        and met Mr. Marshall's blue Chevrolet Nova.

13   A.   Yes, sir.

14   Q.   You turned around in an attempt to catch up

15        with the vehicle.

16   A.   That's correct.

17   Q.   As we caught up with the vehicle, I

18        observed that neither the driver nor the

19        passenger were wearing seat belts.  Why was

20        that important to you?  Why did you put

21        that in there?

22   A.   Probable cause for the stop.

23   Q.   But what you really wanted to talk to him

Page 57

1    about was drugs?
2  A.  That's correct.
3  Q.  And you placed your blue light on the dash
4      to gain the attention of the driver.  And
5      you pulled beside his vehicle, showed
6      badges.  It says here we showed the driver
7      our badges.  Earlier you mentioned that
8      Mr. Hutson showed the driver his badge.
9      Did you show the driver your badge as well?
10 A.  If that's what the state -- but it also
11     says that the driver looked out the window
12     and screamed that he wasn't going to pull
13     the vehicle over.
14 Q.  No.  The question was, did you show him
15     your badge as well?
16 A.  If that's what the statement says, then I
17     did it.
18 Q.  Do you have any independent recollection of
19     showing him your badge?
20 A.  It's been two years, almost three years.  I
21     don't -- I can't remember whether I did or
22     not.
23 Q.  Fair enough.  And it says that he threw

Page 58

1      drug evidence out the window at about the
2      102 mile marker.  And if I'm correct, based
3      on the analysis and your recollection of
4      that analysis, there was nothing to
5      indicate it was drug evidence, correct, in
6      the final analysis?
7  A.  That's correct.
8  Q.  But at that time you thought it was drug
9      residue?
10 A.  I still believe that.
11 Q.  Okay.  Did you do any field tests on that
12     residue?
13 A.  No, sir.
14 Q.  Have you got the equipment to do field
15     tests?
16 A.  Yes, sir.
17 Q.  You don't have gas chromatography?
18 A.  No, sir.
19 Q.  Pursued Mr. Marshall for 2.4 miles.
20     Marshall was still responding violently.
21     Did he ever make a violent move toward you?
22 A.  Where are you at?
23 Q.  I'm down here at the -- close to the bottom

Page 59

1      of the page.  I instructed Mr. Marshall to
2      exit his vehicle and get on the ground.
3  A.  Okay.
4  Q.  You see that?
5  A.  Yes.
6  Q.  Did he ever make a violent move toward you?
7  A.  No.  We had weapons drawn.
8  Q.  Okay.  Never attempted to hit you or
9      anything else?
10 A.  No.  He's at his vehicle.  We're at ours.
11 Q.  Never attempted to run away?
12 A.  No, sir.
13 Q.  Fired my service weapon into the ground.  I
14     meant to ask you about that.  Does the
15     Lowndes County Sheriff's Office have a use
16     of force policy?
17 A.  Yes, sir.
18 Q.  And what does that use of force policy say
19     about discharging a firearm?
20 A.  I'm not exactly sure.
21 Q.  Okay.  On the second page it says, again,
22     that you located and recovered an empty
23     torn baggy that at one time had contained

Page 60

1      cocaine.  And you've signed that?
2  A.  Yes, sir.
3  Q.  Okay.  Are you sure that at one time that
4      it contained cocaine?
5        MR. MASTERS:  Object to the form.
6  A.  Yes, sir.
7  Q.  And that is your statement that you wrote
8      in connection with this case?
9  A.  Yes, sir.
10 Q.  How were you dressed that day?
11 A.  I don't remember.
12 Q.  Middle of June -- or end of June.  Pretty
13     hot.  Were you probably -- were you
14     wearing -- do you recall whether or not you
15     would have been wearing short-sleeve shirts
16     at that time?
17 A.  Probably.
18 Q.  Okay.  And the drug task force operates in
19     some cases undercover; correct?
20 A.  That's correct.
21 Q.  You operate in plain clothes?
22 A.  That's correct.
23        MR. LEWIS:  Let me have about five

Case 2:06-cv-00701-ID-CSC    Document 33-2    Filed 02/12/2008    Page 19 of 19

on of Christopher West                 Marshall vs. West; Hutson                 January 21, 2008

Page 61

minutes, Daryl.

MR. MASTERS. That's fine. Take whatever time you need.

(A brief recess was taken.)

). (Mr. Lewis continuing:) I have just a couple more questions.

Did you fill out a use of force report form following the discharge of your weapon?

A. At that time I don't believe our department had one. And I still don't believe we had one, but what I did do was I did a statement and gave it to the sheriff.

). Is that this statement that we've just seen?

A. I think it's the same statement.

). Were you reprimanded in any way for doing that?

A. No, sir.

). Have you ever been reprimanded during your period with the Lowndes County Sheriff's Office?

A. Not one time.

Page 62

). Are you aware of any citizen complaints against you that were investigated?

A. I'm sure citizens have complained.

MR. LEWIS: I believe that's all I have. Thank you.

(Deposition concluded at approximately 10:35 a.m.)

* * * * * * * * * *

FURTHER DEPONENT SAITH NOT

* * * * * * * * * *

REPORTER'S CERTIFICATE

TATE OF ALABAMA:

ONTGOMERY COUNTY:

I, Tracye Sadler Blackwell, Certified urt Reporter and Commissioner for the State of abama at Large, do hereby certify that I reported e deposition of:

Page 63

1    CHRISTOPHER WEST
2  who was duly sworn by me to speak the truth, the
3  whole truth and nothing but the truth, in the
4  matter of:
5        RICHARD MARSHALL,
6        Plaintiff,
7        vs.
8        CHRIS WEST, in his individual
9        Capacity, LASHUN HUTSON, in his
10       Individual capacity,
11       Defendants.
12    IN THE UNITED STATES DISTRICT COURT
13    FOR THE MIDDLE DISTRICT OF ALABAMA
14    NORTHERN DIVISION
15       Case Number 2:06-cv-701-ID.CSC
16  on January 21, 2008.
17       The foregoing 62 computer-printed pages
18  contain a true and correct transcript of the
19  examination of said witness by counsel for the
20  parties set out herein. The reading and signing of
21  same is hereby waived.
22       I further certify that I am neither of
23  kin nor of counsel to the parties to said cause nor

Page 64

1  in any manner interested in the results thereof.
2       This 6th day of February 2008.
3
4
5
6    Tracye Sadler Blackwell
     ACCR No. 294
     Expiration date:  9-30-2008
7    Certified Court Reporter
     and Commissioner for the State
8    of Alabama at Large
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# EXHIBIT 1

06MC00466
SubH 1 Received (11/28/2005)
2nd Judicial Drug Task Force
Case# 05-06-011

Evidence Submis

Date: 11-28-05                              County: Lowndes

Suspect(s): Richard J. Marshall          Race: B   Sex: M   DOB: Adult
Suspect(s):                              Race:     Sex:     DOB:

Subject(s):                              Race:     Sex:     DOB:
Subject(s):                              Race:     Sex:     DOB:

Requesting Agent: C.S. West         Title: Commander

Office No. (334) 335-3340    Fax No. (334) 335-6401    Normal Duty Hours: 9am-5pm

Agency:  2d Judicial Circuit Drug Task Force

Mailing Address: PO Box 795 North Tuskeena Street Hayneville, Alabama 36040

Law Enforcement Case No: 05-06-011        Property No.: 01

Type Case (CHARGE): Possession

Brief History of Case: Offender found to be in possession while attempting to elude

*Evidence Submitted: residue

Examination Requested: Drug Analysis

**\*NOTES THAT EVIDENCE IS IN A CLEAR SEALED PLASTIC BAG**



PLAINTIFF'S EXHIBIT



## ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

### EVIDENCE RECEIPT

CASE NUMBER: 06MG00466    ID: 1    TYPE: Controlled Substances    REFERENCES:    LAB: MG

AGENCY NUMBER: 05-06-011    ORI NUMBER: AL045TASK DATE: 11/28/05    TIME: 1:22 pm

| CASE NAMES | TYPE | RACE | SEX | DOB | AGE | STATUS |
|---|---|---|---|---|---|---|
| Richard J Marshall | S | B | M | | | |

| CHAIN OF CUSTODY | DATE | TIME |
|---|---|---|
| Secured at Montgomery Regional Laboratory Evidence Intake Area | 11/28/05 | 1:22 pm |

DESCRIPTION OF EVIDENCE:    SERVICE REQUESTED:

1  One brown paper bag identified to contain drug evidence    DRUG CHEMISTRY

*ALL ITEMS LISTED ABOVE ARE AS DESCRIBED BY THE SUBMITTING AGENCY AND ARE SUBJECT TO VERIFICATION UPON INSPECTION BY THE ANALYST*

REPORT TO:    SUBMITTED BY:

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

G. Lashun Hutson



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |

### CERTIFICATE OF ANALYSIS

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

CASE NUMBER:    06MG00466          SUBMITTING AGENCY CASE NUMBER:    05-06-011

|  |  | Race | Sex | Date of Birth | Status |
|---|---|---|---|---|---|
| SUSPECT(S): | Richard J Marshall | B | M |  | Adult |

SERVICE REQUESTED:  Drug Analysis

CHAIN OF CUSTODY:

|  | DATE | TIME |
|---|---|---|
| G. Lashun Hutson from 2nd Judicial Drug Task Force | 11/28/2005 | 13:22 |
| Michael L. Hitchcock | 12/01/2005 | 14:35 |
| Robert Agee | 01/13/2006 | 08:59 |

DESCRIPTION OF EVIDENCE:

1.          One brown paper bag containing residue

RESULTS OF ANALYSES:               DATE(S) OF ANALYSES:    01/26/2006

1.   Laboratory analyses of the residue failed to reveal the presence of any controlled substances.

Sworn to and subscribed to me this the _2nd_ Day of _Feb_ . 20_06_ as true and correct



*An ASCLD/LAB Accredited Laboratory since October 2003*

Alabama Department of
**Public Safety**

BUREAU OF INVESTIGATION

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

RETURN TO: LATENT PRINT UNIT
P.O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: *2nd Judicial Drug Task Force* | 6. CONTRIBUTOR CASE NO: *05-06-011* |
| 2. NAME *Christopher S. Dent* | 7. TYPE OF CRIME: *Drug* |
| 3. AGENCY: *Selma* | 8. DATE OF CRIME: *6-28-05* |
| ADDRESS *136 E. 9th Street*    P.O. BOX | 9. VICTIM OF CRIME: |
| CITY *Laverne*    STATE *Al*    ZIP *36049* | 10. DPS LATENT CASE NO: *09-1108-35-05* |
| 4. PHONE NO: *334-235-3390* | 11. NEW CASE: ✓   12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: *Selma* | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY: *Christopher S. Dent*   PRINT NAME | 15. SIGNATURE | 16. AGENCY *2nd JDTF* | 17. DATE/TIME *7-12-05/1:05* |
|---|---|---|---|

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

*1) Brown Paper Bag Containing clear*

*plastic baggie.*

19. FOR DPS USE ONLY

| | | |
|---|---|---|
| RECEIVED BY:    PRINT NAME    SIGNATURE | HOW RECEIVED *Personally* | DATE/TIME *7-13-05  1:49* |
| EVIDENCE RETURNED TO:    PRINT NAME    SIGNATURE | AGENCY *3rd JDTF* | DATE/TIME |
| EVIDENCE RETURNED BY:    PRINT NAME    SIGNATURE | HOW RETURNED | DATE/TIME |

| LOG NO: *099* | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of
# Public Safety

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

## BUREAU OF INVESTIGATION

10 7 7049

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| 1. CONTRIBUTOR TITLE: 2ᵈ Judicial Drug Task Force | 6. CONTRIBUTOR CASE NO: 05-06-011 |
|---|---|
| 2. NAME  Christopher S. West | 7. TYPE OF CRIME: Drug |
| 3. AGENCY:  Same | 8. DATE OF CRIME: 6-28-05 |
| ADDRESS  196 E. 4ᵗʰ Street    P. O. BOX | 9. VICTIM OF CRIME: |
| CITY  Luverne    STATE  AL.    ZIP 36049 | 10. DPS LATENT CASE NO: 09-1108-35-05 |
| 4. PHONE NO:  334-335-3390 | 11. NEW CASE: ✓    12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO:  Same | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY:   PRINT NAME  Christopher S. West | 15. SIGNATURE | 16. AGENCY  2ᵈ JDTF | 17. DATE/TIME  7-13-05 1:09 |
|---|---|---|---|

**18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY**

① Brown Paper Bag Containing clear
plastic baggie.

## 19. FOR DPS USE ONLY

| RECEIVED BY:   PRINT NAME  SF Shannon Fitzgerald | SIGNATURE | HOW RECEIVED  Personally | DATE/TIME  7-13-05 1:09 pm |
|---|---|---|---|
| EVIDENCE RETURNED TO:   PRINT NAME | SIGNATURE | AGENCY | DATE/TIME |
| EVIDENCE RETURNED BY:   PRINT NAME | SIGNATURE | HOW RETURNED | DATE/TIME |

| LOG NO:  049 | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of

# Public Safety

REPLY MAY BE MADE TO:

Shannon Fitzgerald
ABI Headquarters

Date: _B-25-05_

Dear Contributor:

The enclosed case file is being returned to your department for the following reason:

_____Statute of Limitations Has Expired

__X__ No latent prints of value were found on the evidence which:

    __X__ is enclosed

    _____ is being forwarded to the Department of Forensic Sciences.

    _____ is being retained for pick up by your department.

Retention of this file is recommended until such time your department determine it
Has no evidentiary value.

This file is the original and no copy will be retained by this department.

If this department can be of further assistance to you, please do not hesitate to
Contact me at (334) 395-4320.

Sincerely,

Shannon Fitzgerald
Certified Latent Print Examiner
Alabama Bureau of Investigation

SF/ss

Headquarters
Post Office Box 1511
Montgomery, Alabama 36102 - 1511

Driver License
Post Office Box 1471
Montgomery, Alabama 36102 - 1471

# EXHIBIT 2

SECOND JUDICIAL DRUG TASK FORCE

SERVING BUTLER, CRENSHAW AND LOWNDES COUNTIES
146 EAST FOURTH STREET
LUVERNE, ALABAMA 36049
334-335-3340

COURTESY WARNING                    DATE _6-30-05_ TIME _2:00 p~_
                                    _For:6-2t-00_

SPEEDING _____ MPH _____ MPH ZONE

IMPROPER LANE USAGE                 FAILURE TO YIELD

IMPROPER TAG                        FAILURE TO SIGNAL

RED LIGHT                           FOLLOWING TO CLOSE

STOP SIGN                           IMPROPER TURN

DEFECTIVE EQUIPMENT _____

OTHER/REMARKS _Attempted to Elode, No Seat Belt_

MAKE OF VEHICLE _Chevrolet_ YEAR _1971_ COLOR _Blue_

VEHICLE TAG # _____ STATE _AL._

LOCATION _Hwy 21 S. Lowndes County_

THIS IS A COURTESY WARNING ONLY AND WILL NOT REFLECT ON YOUR
OPERATORS LICENSE

_[signature]_                _6018769_____ STATE _AL._
VIOLATOR                     DRIVERS LICENSE #

_[signature]_____ ID _DE-1_
AGENT

THE LIFE YOU SAVE MAY BE YOUR OWN

PLAINTIFF'S
EXHIBIT
2

# EXHIBIT 3

State of Alabama
Unified Judicial System

Form CR-57 (front)    Rev. 8/98

# DEPOSITION

Warrant/Summons Number
WR05-425.036

Case Number

IN THE _District_ COURT OF _Lowndes County_ , ALABAMA
        (Circuit, District or Municipal)              (Name of Municipality or County)

☐ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. _____

                                                    Defendant

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

Name of Accused (or Alias) _Richard D. Marshall_          Telephone Number

Social Security Number _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_    Driver's License Number    Date of Birth _2-24-74_    Age _31_    Race _31_    Sex _M_

Height _5-9_    Weight _160_    Hair _Blk_    Eyes _Bro_    Complexion _Dark_

Address of Accused (or Alias) _100 S. Burbank Dr._    City _Montgomery_    State _AL_    Zip Code

Name of Employer                                        Employer's Telephone Number

Address of Employer                    City                State    Zip Code

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense: _Poss. of Controlled Sub. / Pistol w/o Permit_

Date and Time of Offense: _6-28-05_

Place of Occurrence: _Hwy 21 South Hayneville Al._

Person Attacked or Property Damaged? _Front End of Undercover Police Vehicle_

How Attacked: _____

Was accused under the influence of alcohol or a controlled substance? ☐ Yes ☐ No

Any law enforcement agency contacted? ☐ Yes ☐ No

If yes, which one? _____

Did Accused Possess or Use a Weapon? ☒ Yes ☐ No    Type: _Rossi 357 Magnum_

Did you go to the hospital? ☐ Yes ☒ No

Damage Done or Injuries Received: _____

Value of Property: _Unknown_

Details of Offense: _Offender attempted to elude DTF Agents at the same time throwing drug evidence out of the window. Offender was forced from the roadway onto the [ ] of the roadway where his vehicle came to rest. Offender was not wearing a seat belt and was highly belligerent, cursing, very combative and obviously highly agitated. There also was a passenger in the vehicle. Both individuals were detained and transported to the Lowndes County Detention Facility._

☐ Check if additional pages are necessary.

PLAINTIFF'S
EXHIBIT
2

Form CR-57 (back)    Rev. 8/98

# DEPOSITION

Any Law Enforcement Agency Contacted ?  ☐ Yes    ☐ No
If yes, which one? _____

I make this statement for the purpose of securing a WARRANT/SUMMONS against the named of accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this

_____30st_____ day of

_June_____ 19 05

_____
Judge/Clerk/Magistrate

_____
Complainant

Social Security Number
_____DTF_____

Address

Phone Number: _____

# WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
| P. West | DTF | |
| L. Hutson | DTF | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# MAGISTRATE NOTES

Warrant or Summons issued? ☐ Yes    ☐ No        Warrant Number: _____

# EXHIBIT 4

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF LOWNDES COUNTY * * *

AGENCY NUMBER:                          WARRANT NUMBER: WR 2005 000435.00
                                        OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
LOWNDES COUNTY, ALABAMA, PERSONALLY APPEARED   COMMANDER CHRISTOPHE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    RICHARD J MARSHALL            DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

DID ON OR ABOUT JUNE 28, 2005, WHILE IN LOWNDES COUNTY,
ALABAMA:
(XX) UNLAWFULLY POSSESS A CONTROLLED SUBSTANCE, TO-WIT:COCAINE,
IN VIOLATION OF 13A-012-212                      OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

                          _____
                          COMPLAINANT'S SIGNATURE



SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 30 DAY OF JUNE, 2005.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

CHARGES: POSS/REC CONTR. SUBS  13A-012-212          F  FELONY
_____

WITNESS FOR THE STATE

COMMANDER CHRISTOPHE/146 E 4TH STREET/LUVERNE/36049

_____
_____
_____
_____

OPERATOR: CAM    DATE: 06/30/2005


PLAINTIFF'S
EXHIBIT
4

STATE OF ALABAMA                LOWNDES COUNTY                DISTRICT COURT

W A R R A N T

AGENCY NUMBER:
WARRANT NUMBER: WR 2005 000435.00
OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST      RICHARD J MARSHALL      AND BRING
HIM/HER BEFORE THE DISTRICT COURT OF LOWNDES COUNTY TO ANSWER THE STATE
ON A CHARGE(S) OF:
POSS/REC CONTR. SUBS   CLASS: C   TYPE: F   COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN THEREON.
YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ OR UNTIL LEGALLY DISCHARGED.
DATED THIS 30 DAY OF JUNE, 2005.

BOND SET AT:    (1)   $10,000.00   BOND TYPE: PROPERTY BOND
                (2) _____
                (3)

JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: POSS/REC CONTR. SUBS   13A-012-212   F FELONY

NAME: RICHARD J MARSHALL
ALIAS:
ADDRESS: 101 S BURBANK DRIVE
ADDRESS:
CITY: MONTGOMERY          STATE: AL      ZIP: 36116 0000
PHONE: 334 000 0000 EXT: 000
EMPLOYMENT:
DOB: 02/24/1974   RACE: B   SEX: M   HAIR: BLK
EYE: BRO   HEIGHT: 5'09"   WEIGHT: 160
SID: 000000000  SSN: 000000000  DL NUM: 4249426500

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ ) PLACING DEFENDANT IN THE LOWNDES COUNTY JAIL

(  ) RELEASING DEFENDANT ON APPEARANCE BOND

THIS _____ DAY OF _____ 200_

SHERIFF

BY

COMPLAINANT: COMMANDER CHRISTIOPHE
149 E 4TH STREET
LUVERNE AL 36049

OPERATOR: CAM                    DATE: 06/30/2005

# EXHIBIT 5

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| VICTIM SSN | COMPLAINANT SSN | ☐ 1 INCIDENT ☐ 3 SUPPLEMENT ☒ 2 OFFENSE | 2 CASE # 0 5 - 0 6 - 0 1 1 | 3 SFX |
|---|---|---|---|---|

| 4 ORI | 5 DATE AND TIME OF THIS REPORT | 6 AGENCY NAME |
|---|---|---|
| 0 4 5 0 7 0 0 | 0 6 2 8 0 5    8 : 21 ☐AM ☒PM ☐MIL | 2nd Judicial Circuit Drug Task Force |

| 8 REPORTED BY | ☐ VICTIM OR ☐ 9 ADDRESS ( STREET, CITY, STATE, ZIP) | 10 PHONE |
|---|---|---|
| Commander Christopher S. West | 146 East 4th Street Luverne, Alabama 36049 | ( 334 ) 335-3340 |

| | 12 VICTIM (LAST, FIRST, MIDDLE NAME) ☐1P ☒2B ☐3S | 13 ADDRESS ( STREET, CITY, STATE, ZIP) | 14 PHONE |
|---|---|---|---|
| M U L T I V I C T I M | 15 EMPLOYER/SCHOOL | 16 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 18 PHONE |

| | ☐ RESIDENT ☐ NON-RESIDENT | 20 INJURY ☐ Y ☐ N | 21 RACE ☐ W ☐ B ☐ A ☐ I | 22 SEX ☐ MALE ☐ FEMALE | 23 HGT | 24 WGT | 25 DOB M D Y | 26 AGE | 27 WAS OFFENDER KNOWN TO VICTIM ? ☐ Y ☐ N | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) | 29 CODE |

| 30 TYPE INCIDENT OR OFFENSE ☒ FEL. ☐ MISD | 31 DEGREE (CIRCLE) | 32 UCR CODE | 33 STATE CODE/LOCAL ORDINANCE |
|---|---|---|---|
| Unlawful possession of Controlled Substance | 1  2  3 | 3 5 3 2 | 13A-12-212 |

| 34 TYPE INCIDENT OR OFFENSE ☐ FEL. ☒ MISD | | 35 UCR CODE | 37 STATE CODE/LOCAL ORDINANCE |
|---|---|---|---|
| Pistol w/o Permit | 1  2  3 | | 13A-11-073 |

| 38 PLACE OF OCCURRENCE | 39 SECTOR |
|---|---|
| Highway 21 South, Dutch Bend Community, Lowndes County | |

<table>
<tr><td>40 POINT OF ENTRY ☐ DOOR ☐ WINDOW ☐ ROOF ☐ OTHER</td><td>41 METHOD OF ENTRY ☐ FORCIBLE ☐ NO FORCE ☐ ATT. FORCIBLE</td><td>42 ASSAULT ☐ SIMPLE ☐ AGGR.</td><td>43 TREATMENT FOR ASSAULT INJURY ☐ Y ☐ N</td></tr>
</table>

| E V E N T | 44 OCCURRED ON OR BETWEEN 0 6 2 8 0 5  1 : 00 ☐AM ☒PM ☐MIL 0 6 2 8 0 5  2 : 30 ☐AM ☒PM ☐MIL | 45 TIME | 46 ☐ S ☒ M ☐ T ☐ W ☐ T ☐ F ☐ S | 47 LIGHTING 1- NATURAL 2- MOON 3- ART. EXT. 4- ART. INT. 5- UNK. | 48 WEATHER ☒ 1 - CLEAR ☐ 2 - CLOUDY ☐ 3 - RAIN ☐ 4 - FOG ☐ 5 - SNOW ☐ 6 - HAIL ☐ 7 - UNK. | 49 PREMISE ☒ A–HWY.-ST.-ALLEY ☐ B - RAILROAD ☐ C - RESIDENCE ☐ D - CHURCH ☐ E - SCHOOL ☐ F - CONVENIENCE ☐ G - INDUSTRIAL ☐ H - SERVICE STA. | ☐ J- BANK ☐ J - DRUG STORE ☐ K - ART/TWN. HSE. ☐ L - SHOPPING CENTER ☐ M - PARKING LOT ☐ N - OTHER COMMER. ☐ O - OTHER | 50 CODE |
|---|---|---|---|---|---|---|---|---|

| 54 VERIFY FOR RAPE EXAM ☐ Y ☐ N | 55 TREAT. FOR RAPE INJURY ☐ Y ☐ N | 56 CIRCUMSTANCES HOMICIDE & ASSAULT | CODE | LOCATION: RAPE |
|---|---|---|---|---|

| 58 WEAPON USED ☐ FIREARM ☐ KNIFE ☐ HANDS, FISTS, VOICE, ETC. ☐ OTHER DANGEROUS | 59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE DESCRIBE ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN |
|---|---|

| D E S C R I P T I O N | 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|---|
| | | | STOLEN | DAMAGED | DATE | VALUE |
| | 1 | Rossi 357 Magnum s#F161600 & 357 Magnum Rounds | | | 6-28 | $450 |
| | 1 | Plastic Baggie containg residue | | | 6-28 | $5 |
| | 1 | 1976 Chevrolet Nova | | | 6-28 | $3000 |

☐ CONTINUED IN NARRATIVE

| P R O P E R T Y V A L U E | 64 MOTOR VEHICLE $3,000 S R D C | 65 CURRENCY, NOTES S R D C | 66 JEWELRY S R D C | 67 CLOTHING/ FURS S R D C | 68 FIREARMS $450 S R D C | 69 OFFICE EQUIPMENT S R D C |
|---|---|---|---|---|---|---|
| | 70 ELECTRONICS S R D C | 71 HOUSEHOLD S R D C | 72 CONSUMABLE $5 S R D C | 73 LIVESTOCK S R D C | 74 MISCELLANEOUS S R D C | |

| 75 CHECK CATEGORIES ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED |
|---|

| V E H I C L E S | 76 STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR Blue | 81 VIN |
|---|---|---|---|---|---|---|
| | 82 VYR 76 | 83 VMA Chev | 84 VMO Nova | 85 VST Al | 86 VCO | TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION |
| | STOLEN MTR. VEH ONLY ☐ BUS. ☐ RES. ☐ RUR. | 88 AREA STOLEN | | 89 OWNERSHIP/ VERIFIED BY: ☐ TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | 90 WARRANT SIGNED YES ☐ NO ☐ # |
| | 21 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | | 92 PHONE ( ) |
| | MOTOR VEH.RECOVERY ONLY REQUIRED FOR 24V UCR CODE | 93 STOLEN IN YOUR JURISDICTION? YES ☐ NO ☐ WHERE? | 94 RECOVERED IN YOUR JURISDICTION? YES ☐ NO ☐ WHERE? |

TYPE OR PRINT IN BLACK INK

ACJIC—32 REV. 6-94

PLAINTIFF'S EXHIBIT 5

OFFICER WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 0 7 6 2 8 0 5   8 : 21 | AM ☐ FM ☒ | 96 CASE # 0 5 - 0 6 - 0 1 1 | 97 SFX | 98 | ☒ OFFENDER ☐ SUSPECT ☐ MISSING PERSON | ☐ CHECK IF MULTIPLE |

| 99 NAME (LAST, FIRST, MIDDLE) Marshall,   Richard J. | 100 NICKNAME/ALIAS "Blood" | 101 RACE ☐ W ☒ A ☒ B ☐ H | 102 SEX ☒ M ☐ F | 103 DOB 0 2 2 4 7 4 | 104 AGE 31 |

| 105 ADDRESS (STREET, CITY, STATE, ZIP) 101 S. Burbank Drive Montgomery, Alabama | 106 HGT 59 | 107 WGT 160 | 108 EYE Bro | 109 HAIR Blk | 110 COMPLEXION Dark |

| 111 PROBABLE DESTINATION | 112 ARMED? ☒ Y ☐ N ☐ UNK | 113 WEAPON Rossi 357 Magnum |

| 114 CLOTHING | ☐ SCARS · ☐ MARKS · ☐ TATTOOS | 115 ☐ ARRESTED ☐ WANTED |

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE ☐ W ☐ A ☐ B ☐ H | 119 SEX ☐ M ☐ F | 120 DOB M   D   Y | 121 AGE |

| 122 ADDRESS (STREET, CITY, STATE, ZIP) | 123 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |

| 128 PROBABLE DESTINATION | 129 ARMED? ☐ Y ☐ N ☐ UNK | 130 WEAPON |

| 131 CLOTHING | ☐ SCARS ☐ MARKS ☐ TATTOOS | 132 ☐ ARRESTED ☐ WANTED |

WITNESSES

| | 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|
| #1 | Hutson, L    SEX ☐ M ☐ F  RACE ☐ W ☐ A ☐ B ☐ H | DTF | (   ) | (   ) |
| #2 | SEX ☐ M ☐ F  RACE ☐ W ☐ A ☐ B ☐ H | | (   ) | (   ) |
| #3 | SEX ☐ M ☐ F  RACE ☐ W ☐ A ☐ B ☐ H | | (   ) | (   ) |
| #4 | SEX ☐ M ☐ F  RACE ☐ W ☐ A ☐ B ☐ H | | (   ) | (   ) |

WITNESS #1 SSN | | | WITNESS #2 SSN | | | WITNESS #3 SSN | | | WITNESS #4 SSN

NARRATIVE

137  Offender failed to stop for Agents after being blue lighted throwing drug evidence out of the drivers side window as the chase progressed.  Offender was forced off the road and had to be forced to the ground and forced to comply.  Subject conducted himself in an extremely violent manner as if maybe under the influence of a controlled substance.  Subject was arrested and transported to the Lowndes County Detention Facility.

| CONTINUED ON SUPPLEMENT   Y ☐   N ☒ | ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge.  I will assume full responsibility for notifying the agency if any stolen property or missing person hereby reported is returned

SIGNATURE

| 138 LOCAL USE | T A S K |
| 139 STATE USE |

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | ADDITIONAL CASES CLOSED NARRATIVE |

ADMIN

| 147 CASE STATUS ☐ 1 - PENDING ☐ 2 - INACTIVE ☒ 3 - CLOSED   ENTERED ☐ Y ACIC/NCIC ☐ N DATE | 148 CASE DISPOSITION ☐ 1 - CLEARED BY ARREST (JUV) ☒ 2 - CLEARED BY ARREST (ADULT) ☐ 3 - UNFOUNDED ☐ 5 - ADMINISTRATIVELY CLEARED | ☐ 4 - EXCEPTIONAL CLEARANCE ☐ A - SUSPECT/OFFENDER DEAD ☐ B - OTHER PROSECUTION ☐ C - EXTRADITION DENIED ☐ D - LACK OF PROSECUTION ☐ E - JUVENILE, NO REFERRAL ☐ F - DEATH OF VICTIM | 149 REPORTING OFFICER Cmdr. Christopher S. West | ID # DE-1 |
| | | | 150 ASSISTING OFFICER | ID # |
| | | | 151 SUPERVISOR APPROVAL   ID # | 142 WATCH CMDR   ID # |

# A' ABAMA UNIFORM ARREST REPORT

| Fingerprinted | RS4 Completed |
|---|---|
| ☐ Yes | ☐ Yes |
| ☐ No | ☐ No |

OFFICER'S WORK PRODUCT MAY NOT BE *PUBLIC INFORMATION*

## IDENTIFICATION

| 1 ORI# | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 0,4,5,0,0,7,0,0 | *2d Judicial Drug Task Force* LOWNDES COUNTY DETENTION FACILITY | 0 5 0 6 8 8 8 4 2 | |

| 5 LAST, FIRST, MIDDLE NAME | 6 ALIAS AKA |
|---|---|
| MARSHALL, RICHARD JAMES | |

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | 14 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ M ☐ F | ☒ W ☐ A ☐ B ☐ I | 509 | 160 | BRO | BLK | DRK | ☐ SCARS | ☐ MARKS | ☐ TATTOOS | ☐ AMPUTATIONS | |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|
| ALABAMA | 4 2 4 - 9 4 - 2 6 6 0 | 0 2 2 4 7 4 | 31 | |

| 20 SID # | 21 FINGERPRINT CLASS KEY | 22 DL # | 23 ST |
|---|---|---|---|
| | MAJOR  PRIMARY  SCDV  SUB-SECONDARY  FINAL | 6018769 | AL |

| 24 FBI # | HENRY CLASS | 25 IDENTIFICATION COMMENTS |
|---|---|---|
| | NCIC CLASS | |

| 26 ☒ RESIDENT ☐ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|
| | 101 S BURBANK DR APT.D-10 MONTGOMERY, AL 36117 | ( ) | UNEMPLOYED |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE |
|---|---|---|
| N/A | | ( ) |

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO |
|---|---|---|
| 21 SOUTH HAYNEVILLE ALABAMA | | ☒ IN STATE ☐ OUT STATE ☐ AGENCY |

| 36 CONDITION OF ARRESTEE: | 37 RESIST ARREST? | 38 INJURIES? | 39 ARMED? | 40 DESCRIPTION OF WEAPON |
|---|---|---|---|---|
| ☐ DRUNK ☒ SOBER ☐ DRINKING ☐ DRUGS | ☐ YES ☒ NO ☐ OFFICER ☐ ARRESTEE | ☒ NONE ☐ ARRESTEE | ☐ YES ☐ NO ☐ UNKNOWN | ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN  ☐ OTHER FIREARM ☐ OTHER WEAPON |

| 41 DATE OF ARREST | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED BEFORE? |
|---|---|---|---|---|
| 0 6 2 8 0 5 | 04:00 ☐ 1. AM ☒ 2. PM ☐ MIL. | S M T W ☒ F S | ☒ ON VIEW ☐ CALL ☐ WARRANT | ☒ YES ☐ NO |

| 46 CHARGE-1 ☒ FEL ☐ MISD | | 48 CHARGE-2 ☐ FEL ☒ MISD | |
|---|---|---|---|
| POSS OF CONTROLLED SUB | | PISTOL W/O PERMIT | |

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED |
|---|---|---|---|---|---|

| 56 CHARGE-3 ☐ FEL ☐ MISD | | 58 CHARGE-4 ☐ FEL ☐ MISD | |
|---|---|---|---|

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED |
|---|---|---|---|---|---|

| 66 ARREST DISPOSITION | 67 IF OUT ON RELEASE WHAT TYPE ? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| ☒ HELD ☐ TOT-LE ☐ BAIL ☐ OTHER ☐ RELEASED | | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP / BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN | 79 IMPOUNDED? ☐ YES ☐ NO | 80 STORAGE LOCATION / IMPOUND # |
|---|---|---|

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | ☐ CONTINUED IN NARRATIVE |
|---|---|

## JUVENILE

| 82 JUVENILE DISPOSITION: | ☐ HANDLED AND RELEASED ☐ REF. TO JUVENILE COURT | ☐ REF. TO WELFARE AGENCY ☐ REF. TO OTHER POLICE AGENCY | ☐ REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE ( ) |
|---|---|---|

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE ( ) |
|---|---|---|---|

## RELEASE

| 91 DATE AND TIME OF RELEASE | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|
| M D Y : ☐ 1. AM ☐ 2. PM ☐ MIL. | | | |

| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐ YES ☐ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY ? |
|---|---|---|

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) |
|---|

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER |
|---|---|
| *Marilyn Hearling* | |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE# | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) | 112 ID # | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR ID # | 116 WATCH CMDR. ID # |
|---|---|---|---|---|---|
| WEST, CHRIS | DE1 | | | | |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC-34 REV. 10-90

**EXHIBIT 6**

2nd Judicial Drug Task Force
Drug Agent
Statement Form

Date: June 28, 2005

Time: 7:32pm

Today at about 1:00 pm I along with Agent Lashun Hutson were traveling North on Lowndes County Road 7 when we met Mr. Richard Marshall's blue Chevrolet Nova. I immediately turned around in an attempt to catch up with the vehicle. As we caught up with the vehicle I observed that neither the driver or the passenger were wearing seatbelts, we placed our blue light on the dash of our vehicle to gain the attention of the driver to pull the vehicle over. The driver looked out the window and screamed that he wasn't going to pull the vehicle over. I then pulled beside his vehicle and we showed the driver Mr. Marshall our badges identifying ourselves as law enforcement officers. He still insisted that he would not pull his vehicle over responding in a very violent manner. This incident occurred approximately 2 miles from the Lowndes County Road 7 and Alabama Highway 21 intersection. As we got to the intersection Mr. Marshall turned right onto highway 21 picking up speed and throwing drug evidence out of the driver's window at about the 102 mile marker. We also observed Mr. Marshall moving around in the seat and with his right hand constantly doing something down in the seat. We pursued Mr. Marshall for another 2.4 miles before forcing his vehicle from the roadway. The vehicle came to rest on the embankment on the opposite side of the highway. Once off the highway Agent Hutson and I took cover behind the doors of our vehicle (weapons drawn). I instructed Mr. Marshall to exit his vehicle and get on the ground. He got out of the vehicle but stood in the door still responding violently and not complying with us, at that time I fired my service weapon into the ground in an attempt to quicken Mr. Marshall into compliance but still he did not comply. Next I approached Mr. Marshall and forced him to the ground experiencing some resistance yet having to force his hands behind his back so as to handcuff him. Agent Hutson approached the passenger's side of the vehicle and removed the passenger after I secured Mr. Marshall. After securing Mr. Marshall I noticed a revolver style handgun on the seat of the vehicle and bullets lying on the seat and in the floor. Mr. Marshall was arrested and transported to the Lowndes County Detention

PLAINTIFF'S
EXHIBIT
6

Facility. I later returned to the area of highway 21 where I observed Mr. Marshall throwing out the evidence. While walking the roadway I located and recovered an empty torn baggie that at one time had contained cocaine.

Signature _____

# EXHIBIT B

**Declaration of Chris West**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

RICHARD MARSHALL,                          )
                                           )
    Plaintiff,                        )
                                           )
v.                                         )  CIVIL ACTION NO. 2:06-cv-701-ID-CSC
                                           )
CHRIS WEST, in his individual capacity,    )
LASHUN HUTSON, in his individual           )
capacity,                                  )
                                           )
    Defendants.                       )

### DECLARATION OF CHRIS WEST
### PURSUANT TO 28 U.S.C. § 1746

1.    My name is Chris West. I am over the age of nineteen and competent to make this declaration.

2.    I am a deputy with the Lowndes County Sheriff's Department with the rank of Lieutenant. I am also the Commander of the 2nd Judicial Drug Task Force ("DTF").

3.    I am a Defendant in the above-entitled action.

4.    This affidavit is to clarify and expand upon my deposition testimony.

5.    I have been in narcotics investigations for seventeen years. I have been the Commander of the DTF for the last seven years. In that time, I have been involved in hundreds of drug cases. My experience has taught me the various methods by which drug dealers store and transport controlled substances.

6.    One such method for transporting a number of substances including marijuana and cocaine is to keep them in a plastic baggie. This enables the drug dealer/user to keep the drugs dry and hidden in a variety of places on their person, vehicle, and home.

7.    I have also been involved in numerous situations in which drug dealers/users will run from law enforcement and attempt to throw away their drugs.

8.    My training and experience taught me that when the baggie containing a white powdery substance hit the windshield of my car during my pursuit of the Plaintiff, it was highly likely that the white powdery substance was cocaine.

9.    That belief was further strengthened by the information that I had previously received that the Plaintiff was selling cocaine.

10.    When I obtained the certificate of analysis on the baggie indicating that there was no controlled substance, I informed the prosecutor and the drug charge was dismissed against the Plaintiff.

11.    When I encountered the Plaintiff on June 28, 2005, neither I nor Agent Hutson had any less than lethal or non-lethal weapons on our persons. As a plain clothes narcotics officer, I did not, and as a general rule, do not carry weapons such as pepper spray, TASERs, or batons.

12.    Unfortunately, when I was facing non-compliance from the Plaintiff on the side of Highway 21, the only non-lethal option I had was to fire a warning shot.

13.    As I testified in my deposition, firing a warning shot had the desired effect because the Plaintiff froze long enough for me to close on him and secure him.

14.    The weapons charge was dismissed against the Plaintiff in order to allow him to be prosecuted by the United States Attorney for a federal firearms offense. I learned shortly after the Plaintiff's arrest that he had a domestic violence conviction in Tuscaloosa County and should not have been in possession of a firearm under federal law. I turned the case over to the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Included in my case file is a true and correct

copy of the acknowledgement letter I received from BATFE as well as copies of the Plaintiff's domestic violence conviction.

15.    It is my understanding that the United States Attorney is planning on presenting the case to a federal grand jury.

16.    However, once I turned the matter over to BATFE and the United States Attorney, I have had no further involvement in any decision to prosecute the Plaintiff on the federal weapons charge.

17.    As a matter of policy, whenever a vehicle is impounded by the DTF an inventory of the vehicle's contents is conducted.

18.    The Plaintiff's vehicle was impounded and inventoried in accordance with our policy.

19.    The documents attached to my Summary Judgment Evidentiary submissions identified as being from my case file are true and correct copies and were made and kept in the regular course of businesses of the DTF.

20.    I declare under penalty of perjury that the foregoing is true and correct. I further declare that I am competent to make this declaration, and that the above statements were made by drawing from my personal knowledge and information regarding this case, as well as my professional training, education, and experience.

Chris West

# EXHIBIT C

**Deposition of Lashun Hutson**

# DEPOSITION OF G. LASHUN HUTSON

## January 21, 2008

## Pages 1 through 38

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



**Page 1**

1
2    IN THE UNITED STATES DISTRICT COURT
3    FOR THE MIDDLE DISTRICT OF ALABAMA
4    NORTHERN DIVISION
5
6  RICHARD MARSHALL,
7    Plaintiff,
8  vs.    CIVIL ACTION NO.
    2:06-cv-701-ID.CSC
9
10  CHRIS WEST, in his individual
  capacity, LASHUN HUTSON, in his
11  individual capacity,

12  Defendants.

13  * * * * * * * * * * * *
14
15    DEPOSITION OF G. LASHUN HUTSON, taken
16  pursuant to stipulation and agreement before Tracye
17  Sadler Blackwell, Certified Court Reporter and
18  Commissioner for the State of Alabama at Large, in
19  the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20  Drive, Montgomery, Alabama, on January 21, 2008,
21  commencing at approximately 10:40 a.m.
22
23  * * * * * * * * * * * *

**Page 2**

1    APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFF:
4  Mr. Jay Lewis
  Law Offices of Jay Lewis
5  Attorney at Law
  847 South McDonough Street
6  Montgomery, Alabama
7
8  ON BEHALF OF THE DEFENDANTS:
9  Mr. Daryl L. Masters
  WEBB & ELEY, P.C.
10  Attorneys at Law
  7475 Halcyon Pointe Drive
11  Montgomery, AL 36117
12  Mr. Rick A. Howard
  NIX, HOLTSFORD, GILLILAND, HIGGINS & HUTSON
13  Attorneys at Law
  Suite 300
14  4001 Carmichael Road
  Montgomery, AL 36106
15
16
17  ALSO PRESENT:

  Mr. Christopher West
18
19
20
21  * * * * * * * * * * * *
22
23

**Page 3**

1    EXAMINATION INDEX
2
3  BY MR. LEWIS . . . . . . . . . .  5
4
5
6    PLAINTIFF'S EXHIBIT
7  7  6-28-05 Statement Form of Lashun Hutson  34
8
9
10  * * * * * * * * * * * *
11
12
13    STIPULATIONS
14  It is hereby stipulated and agreed by and
15  between counsel representing the parties that the
16  deposition of G. LASHUN HUTSON is taken pursuant to
17  the Federal Rules of Civil Procedure and that said
18  deposition may be taken before Tracye Sadler
19  Blackwell, Certified Court Reporter and
20  Commissioner for the State of Alabama at Large,
21  without the formality of a commission, that
22  objections to questions other than objections as to
23  the form of the question need not be made at this

**Page 4**

1  as the said deposition may be offered in evidence
2  or used for any other purpose by either party
3  provided for by the Statute.
4    It is further stipulated and agreed by and
5  between counsel representing the parties in this
6  case that the filing of said deposition is hereby
7  waived and may be introduced at the trial of this
8  case or used in any other manner by either party
9  hereto provided for by the Statute regardless of
10  the waiving of the filing of the same.
11    It is further stipulated and agreed by and
12  between the parties hereto and the witness that the
13  signature of the witness to this deposition is
14  hereby waived.
15
16  * * * * * * * * * * * *
17
18  THE COURT REPORTER:  Usual
19  stipulations?
20  MR. HOWARD:  Sure.
21  MR. MASTERS:  Sure.
22
23

Page 5

1         G. LASHUN HUTSON
2    The witness, after having first been duly sworn
3  to speak the truth, the whole truth, and nothing
4  but the truth, testified as follows:
5        EXAMINATION
6  BY MR. LEWIS:
7    Q.  Tell us your name, please.
8    A.  G. Lashun Hutson.
9    Q.  Mr. Hutson, how are you employed?
10   A.  Lowndes County Sheriff's Department.
11   Q.  And what's your position there?
12   A.  Sheriff's deputy.
13   Q.  Do you have any particular rank?
14   A.  No.
15   Q.  On June 28th, 2005, where were you
16   employed?
17   A.  2nd Judicial Drug Task Force.
18   Q.  Were you employed with any city police
19   agency?
20   A.  Hayneville Police, yes, sir.
21   Q.  But now you're with the Lowndes County
22   Sheriff's Office?
23   A.  Uh-huh (positive response).

Page 6

1    Q.  You're going to have to say yes or no.
2    A.  Yes.
3    Q.  Okay.  Tell me about your educational
4    background.
5    A.  My educational background?
6    Q.  Yeah.
7    A.  High school graduate.  I've got some
8    college.  Marine Corps.  I've got a lot of
9    training from there.
10   Q.  How much college?
11   A.  Couple of semesters.
12   Q.  When did you graduate from high school?
13   A.  '77.
14   Q.  All right.  Have you been to any advanced
15   law enforcement training?
16   A.  I've been to a few.
17   Q.  All right.  Have you been to the FBI
18   Academy at Quantico?
19   A.  No.
20   Q.  Any law enforcement experience outside of
21   the academy that's required for POST
22   certification, any long-term -- by that I
23   mean over six weeks -- courses in law

Page 7

1    enforcement?
2    A.  Not over six weeks.  Some two-week
3    courses.  No six-week courses.
4    Q.  Do you have any particular certifications
5    in any special branch of law enforcement?
6    A.  Drug enforcement.
7    Q.  How did you get your training for drug
8    enforcement?
9    A.  The academy in Mississippi.
10   Q.  How long a course was that?
11   A.  I think that course is three weeks, two
12   weeks.
13   Q.  When did you go to that?
14   A.  About three and a half years ago.
15   Q.  Okay.  And what's your address?
16   A.  My work address or --
17   Q.  Physical, home address.
18   A.  It's going to be 3716 Fieldcrest Drive.
19   Q.  3716 --
20   A.  16.
21   Q.  -- Fieldcrest?
22   A.  Uh-huh (positive response).
23   Q.  And what city is that?

Page 8

1    A.  Montgomery.
2    Q.  Is that in the Fieldcrest Apartments?
3    A.  No.  Those are houses.
4    Q.  Houses.  Okay.  What's your date of birth?
5    A.  9-21-58.
6    Q.  And did you tell me when you graduated from
7    high school?
8    A.  1977.
9    Q.  And what college have you attended?
10   A.  Albany State.
11   Q.  Where?
12   A.  Albany State in Georgia.
13   Q.  Albany State.  Okay.  And when did you join
14   the -- well, tell me about your law
15   enforcement employment experience.  When
16   did you first get into law enforcement?
17   A.  First got into law enforcement in 1995
18   after I got out of the Marine Corps with
19   the Dougherty County Sheriff's Department.
20   I worked corrections with them from '95
21   until '98 when I came to Lowndes County.
22   Q.  And in 1998 what agency did you work for?
23   A.  Sheriff's department.  Lowndes County

Page 9

1    Sheriff's Department.
2    Q.  How long did you stay with Lowndes County
3        Sheriff's Office?
4    A.  About two years, three years.  I can't
5        remember.
6    Q.  Where did you go from there?
7    A.  Hayneville Police Department.
8    Q.  And did you remain at the Hayneville Police
9        Department from the time you left the
10       sheriff's office until the time you
11       returned to the sheriff's office?
12   A.  Right.
13   Q.  So that would have -- when did you return
14       to the sheriff's office?
15   A.  I can't give you the -- I don't -- I don't
16       know.
17   Q.  But during 2005 you were still with
18       Hayneville Police Department?
19   A.  Right.
20   Q.  All right.  Are you familiar with the use
21       of force policy of the Lowndes County
22       Sheriff's Office?
23   A.  I'm not familiar with it, but I think they

Page 10

1        have one.
2    Q.  All right.  Have you ever filled out a use
3        of force report?
4    A.  No.
5    Q.  Tell me what you were doing on June 28th,
6        2005, which we all agree is the date of the
7        incident involving Mr. Marshall.
8    A.  What I was doing at what time?
9    Q.  Well, starting early in that day what were
10       you -- when you got to work, what were you
11       doing?
12   A.  It's hard to say exactly what I was doing.
13   Q.  At what time did you -- if you did, did you
14       leave the sheriff's office?
15   A.  You mean the DTF office?
16   Q.  I'm sorry.  The DTF office.
17   A.  It's hard to say exactly what time I left.
18   Q.  And the DTF office is a separate facility;
19       correct?
20   A.  Correct.
21   Q.  And where is the DTF office?
22   A.  It's down the street from the sheriff's
23       office.

Page 11

1    Q.  In Hayneville?
2    A.  In Hayneville.
3    Q.  Do you recall who else was on duty that day
4        with the DTF?
5            By DTF, I mean drug task force.
6    A.  I can't tell you exactly who was on and who
7        was off.  That would be up to Lieutenant
8        West.  But I was on and Lieutenant West was
9        on.
10   Q.  Do you recall why you left the DTF office?
11   A.  I probably left more than one time.  But
12       the last time I left it was with Lieutenant
13       West.
14   Q.  All right.  What did you leave in?
15   A.  We left in a blue Lincoln.
16   Q.  What was the purpose of leaving with
17       Mr. West?
18   A.  We were going to a gentleman's house by the
19       name of -- I know him as "Blood."  You guys
20       keep calling him Mr. Marshall -- that lives
21       up in the -- south of Hayneville.
22   Q.  Did you know Mr. Marshall?
23   A.  I had heard his name, "Blood."

Page 12

1    Q.  Had you met him?
2    A.  Not yet.
3    Q.  Okay.  So prior to the time that you went
4        out with Mr. West you had not had any law
5        enforcement contact with Mr. Marshall?
6    A.  No, I hadn't.
7    Q.  Do you know why you were going out looking
8        for Mr. Marshall?
9    A.  I was going with Lieutenant West.  He
10       needed to talk to him.
11   Q.  You didn't have any independent knowledge
12       of why you were out there?
13   A.  No.  I had an inkling why we were out
14       there, but as far as specifics, no.
15   Q.  All right.  What was that inkling?
16   A.  Dope.
17   Q.  Had you personally received any information
18       about Mr. Marshall and any dope?
19   A.  I had heard his name.
20   Q.  In connection with what?
21   A.  In connection with the sale of drugs.
22   Q.  From whom did you hear his name?
23   A.  People.

Page 13

1　Q.　You want to elaborate on that?
2　A.　No.
3　Q.　Do you recall what people you heard talking
4　　　about Mr. Marshall with drugs?
5　A.　People in that line of business.
6　Q.　And what people are you talking about?
7　A.　People I may have arrested that wanted to
8　　　help themselves out.
9　Q.　Do you have any specific names of people?
10　A.　No.
11　Q.　All right.  So you leave with
12　　　Mr. Marshall.  Tell me what happens then.
13　A.　Lieutenant and I, we go to Mr. Marshall's
14　　　house.  He wasn't there.  We did knock.
15　　　Nobody came to the door.  We left and we
16　　　was having a conversation on the way back
17　　　about a little community I was familiar
18　　　with called Casey.
19　Q.　Is that C-A-S-E-Y?
20　A.　Correct.
21　Q.　And what did you tell Mr. Marshall about --
22　　　I mean, Mr. West about the Casey community?
23　A.　He asked me -- he said, where is it?  I

Page 14

1　　　said, it's right down on County Road 7.  I
2　　　said, he might be down there.  And so we
3　　　were going to head down there.  I was
4　　　looking for another individual.  And as we
5　　　were going down County Road 7, Lieutenant
6　　　perks up and said, there he goes right
7　　　there.  And I'm looking and I see the blue
8　　　Nova coming at us.
9　Q.　Who is driving the car?
10　A.　Which car?
11　Q.　Your car.
12　A.　Lieutenant West.
13　Q.　All right.  What reason did you have to
14　　　believe that Mr. Marshall might be at the
15　　　Casey community?
16　A.　I've heard his name in the community of the
17　　　drug community that he's a drug dealer and
18　　　he, you know, frequents different
19　　　communities and Casey was one of them.
20　Q.　Other than this incident on June 28th,
21　　　2005, have you ever arrested Mr. Marshall?
22　A.　No.
23　Q.　Since this incident have you had occasion

Page 15

1　　　to arrest Mr. Marshall?
2　A.　No.
3　Q.　Since this incident have you had occasion
4　　　to know whether Mr. Marshall has been
5　　　arrested by anybody else?
6　A.　No.
7　Q.　So you see a blue Chevrolet Nova after
8　　　Mr. West says there's his car or there he
9　　　is?
10　A.　Uh-huh (positive response).
11　Q.　Okay.  What happens then?
12　A.　Lieutenant goes down.  We pass each other.
13　　　Lieutenant turns around and we come back up
14　　　behind him to make a stop.
15　Q.　And what was your purpose for making a
16　　　stop?
17　A.　I -- I don't know.  Whatever Lieutenant
18　　　West told you his probable cause was for
19　　　stopping him.
20　Q.　Did you see any probable cause for making a
21　　　stop?
22　A.　I wasn't driving.
23　Q.　No.  That wasn't the question.  Did you see

Page 16

1　　　any probable cause for making a stop?
2　A.　I wasn't driving.
3　Q.　Let me rephrase the question.
4　A.　Okay.
5　Q.　Did you see any probable cause for making a
6　　　stop?
7　A.　Let me see if I can -- I wasn't driving.
8　　　　　MR. HOWARD:  If you saw it, yes.
9　　　　　　If you didn't see it, no, or
10　　　　　　were you looking?  Just answer
11　　　　　　his question.
12　A.　No.  I just looked -- when he said there he
13　　　is, I looked and I identified the subject.
14　　　I wasn't looking for a probable cause.
15　Q.　So you didn't see any probable cause
16　　　because you weren't looking for any?
17　A.　Right.
18　Q.　Okay.  So if there was probable cause
19　　　determined, it was Mr. West who determined
20　　　it?
21　A.　Correct.
22　Q.　Okay.  You said that you looked and you saw
23　　　that it was Mr. Marshall?

Case 2:06-cv-00701-ID-CSC    Document 33-5    Filed 02/12/2008    Page 8 of 13

Deposition of G. Lashun Hutson    Marshall vs. West; Hutson    January 21, 2008

Page 17

1   A.  I looked and saw an individual driving the
2       car.  There was two individuals in it, and
3       I looked and saw the individual driving the
4       car.
5   Q.  You didn't know him as Mr. Marshall?
6   A.  No.
7   Q.  Because you had never met Mr. Marshall?
8   A.  No.
9   Q.  All right.  So Lieutenant West turns his
10      car around and pulls in behind
11      Mr. Marshall's car or the car that you've
12      identified as being the blue Nova you were
13      looking for?
14  A.  Right.
15  Q.  How fast was that Nova going?
16  A.  I would have guessed the speed limit.
17  Q.  Did he speed up after you pulled in behind
18      it?
19  A.  Once we got on 21 he did.
20  Q.  But he didn't until you got to 21?
21  A.  No.
22  Q.  All right.  What happened after you pulled
23      in behind him?

Page 18

1   A.  I looked -- just looked in the car just to
2       see -- nobody was moving and Lieutenant
3       said, go ahead and light them up.
4   Q.  And what did you take that to mean?
5   A.  Turn the blue light on.
6   Q.  Did you do that?
7   A.  Yes.
8   Q.  That car doesn't have built-in blue lights?
9   A.  No.
10  Q.  You had a portable blue light?
11  A.  Had a portable blue light.
12  Q.  Like anybody could buy?
13  A.  Any law enforcement agency could buy.
14  Q.  All right.  And where did you put that blue
15      light?
16  A.  I put it on the dash initially.
17  Q.  Okay.  And what happened then?
18  A.  Mr. Marshall looked in his rear-view
19      mirror, he looked down in his side mirror,
20      and he just kept driving.
21  Q.  At some point did your car pull up next to
22      his car while you were still on County
23      Road 7?

Page 19

1   A.  Yes.  We had came out of the curve.  When
2       we got on the straightaway, Lieutenant got
3       to the side of them.
4   Q.  What, if anything, did you do at that time?
5   A.  At that time I rolled my window down, I
6       pulled my badge, and I said, pull over.
7       And he looked, and he said, what y'all
8       want, man?  And I said, pull over.  And he
9       kept driving.
10  Q.  What happened then?
11  A.  After he got back behind him -- I can't
12      remember if it's because of oncoming
13      traffic or for whatever reason he got back
14      behind him.  And the blue light was still
15      going.  And then we had came to the
16      intersection of 21.
17  Q.  All right.  Which way did Mr. Marshall
18      turn?
19  A.  He turned right.
20  Q.  And that's headed toward Wilcox County?
21  A.  South on 21, yes.
22  Q.  So you got onto Highway 21, which is a
23      larger highway?

Page 20

1   A.  You could say larger.
2   Q.  Still two-lane?
3   A.  Correct.
4   Q.  Okay.  What happened then?
5   A.  We continued behind him.  LT found a spot.
6       He got beside him again.  And I reached up.
7       I got the light off of the dash.  It's
8       still blinking blue.  And I got my badge
9       and I held it up.  I said, pull over.  And
10      he said, mother fuck y'all, I ain't
11      stopping.  And about that time LT yells in
12      my ear and says, pull over, and he -- he's
13      got his badge up.  And we're both yelling,
14      windows down -- you can imagine how close
15      we were -- to pull over, but he still
16      refused.
17  Q.  What were you wearing?
18  A.  I can't tell you exactly what I was
19      wearing.
20  Q.  Civilian clothes?
21  A.  Probably.
22  Q.  Was that just a blue light or was it a
23      blue-and-white light?

Page 21

1   A.   It's a blue light.
2   Q.   Blue light. All right. So after he did
3        not pull over, what did you do then?
4   A.   I told LT I don't think he's going to
5        stop. And I put the light back on the dash
6        and I sat back. LT dropped back behind
7        him.
8   Q.   At any point did you display a weapon --
9   A.   No.
10  Q.   -- at the time you were driving?
11  A.   No.
12  Q.   All right. So Lieutenant West -- and when
13       you say LT, you're talking about Lieutenant
14       West?
15  A.   I'm talking about Lieutenant West.
16  Q.   Okay. Lieutenant West pulls back behind
17       him; correct?
18  A.   Correct.
19  Q.   What's the next thing that happens?
20  A.   We come up on a cattle truck. There's a
21       cattle truck. It slows us down. And LT
22       went to the side, and he "pitted" him.
23  Q.   Okay. When you say he "pitted" him, you're

Page 22

1        talking about executing a precision
2        intervention technique?
3   A.   If that's what you're calling it now.
4   Q.   Well, what do you call it?
5   A.   I don't call it anything.
6   Q.   Okay. You just "pitted" him?
7   A.   Right.
8   Q.   And basically that's hitting the driver's
9        side fender of his car with the front
10       passenger's side bumper or fender of your
11       car?
12  A.   You can do it that way or vice versa.
13  Q.   Well, which way was it done this time?
14  A.   The way you just stated.
15  Q.   Okay. And it spun his car out?
16  A.   Correct.
17  Q.   He ended up going the opposite direction on
18       the other side of the road?
19  A.   On the shoulder, yes.
20  Q.   Did you observe anything else while you
21       were driving down the road behind
22       Mr. Marshall?
23  A.   I observed his hand when it came out of the

Page 23

1        window and when he tossed something. It
2        hit our windshield to be exact.
3   Q.   And did you identify what it was at that
4        time?
5   A.   Not at that time, no.
6   Q.   You said you came up behind a cattle truck
7        and slowed down. How slow were you going?
8   A.   We were going less than the speed limit at
9        that time.
10  Q.   Had you been going at any time prior to
11       that faster than the speed limit?
12  A.   Yes.
13  Q.   How fast would you say is the fastest you
14       were going?
15  A.   If I had to guess -- and it's purely a
16       guess -- I would say about 70.
17  Q.   Okay. And the speed limit on that road
18       is --
19  A.   55.
20  Q.   55. Okay.
21       All right. So setting the scene, we've
22       now got Mr. Marshall's car on the shoulder
23       of the road facing back toward Hayneville,

Page 24

1        and Lieutenant West pulls his car so it's
2        angled toward Mr. Marshall's car?
3   A.   Correct.
4   Q.   What did you do then?
5   A.   We both exited the vehicles, but we stayed
6        behind the doors for protection.
7   Q.   What did you say, if anything?
8   A.   Lieutenant was yelling to the driver. I
9        just yelled to the passenger, passenger,
10       don't move.
11  Q.   And did the passenger move?
12  A.   No. He sat there like a statue.
13  Q.   And did the driver move?
14  A.   Yes.
15  Q.   And what was Mr. West yelling to the
16       driver?
17  A.   He told him to exit the vehicle and get on
18       the ground.
19  Q.   All right. What, if anything, did Mr. West
20       do -- or did Mr. Marshall do in response to
21       that?
22  A.   He opened the door. He got out, but he
23       stayed between the door and his vehicle.

Page 25

1  Q.  So he obeyed the command to get out of the
2      car?
3  A.  Yes.
4  Q.  Was he saying anything at that time?
5  A.  He was cursing, being very belligerent.
6  Q.  What, if anything, did Mr. West do?
7  A.  He kept yelling the order for him to get on
8      the ground.
9  Q.  All right.  Did he take any other action?
10 A.  Did who take any action?
11 Q.  Mr. West.
12 A.  He kept yelling for Mr. Marshall to get on
13     the ground.
14 Q.  All right.  Did he fire his weapon?
15 A.  Yes.
16 Q.  In what direction did he fire his weapon?
17 A.  In Mr. Marshall's direction but into the
18     ground.
19 Q.  And at that time were you looking at the
20     passenger or were you looking at
21     Mr. Marshall?  Where were you looking?
22 A.  My angle, I could see them both.  I could
23     look at Mr. Marshall and right past him I

Page 26

1      could see the passenger.
2  Q.  All right.  And after Mr. West fired the
3      shot, what, if anything, did Mr. Marshall
4      do?
5  A.  It froze him.  Because Mr. Marshall was
6      reaching back into his vehicle, and I
7      believe that's the reason Lieutenant fired
8      his weapon.  When he fired the weapon, it
9      froze Mr. Marshall, and he came out.
10     Because I don't think he expected that to
11     happen, so it froze him.
12 Q.  So you're holding your hands up.  He came
13     out with his hands up?
14 A.  Yeah, one on the window of the car and he
15     had the other one like stunned.
16 Q.  Up in the air?
17 A.  (Witness nods head.)
18 Q.  Yes?
19 A.  Yes.
20 Q.  Did he get on the ground then?
21 A.  No.
22 Q.  What happened?
23 A.  Lieutenant approached him, and once he got

Page 27

1      close enough to him where he could put his
2      hands on him, he put him on the ground.
3  Q.  At some point did his pants come off?  Did
4      Mr. Marshall's pants come off?
5  A.  During the tussle with the lieutenant they
6      did.
7  Q.  Did you see Mr. Marshall ever take a swing
8      at the lieutenant, ever try to run away,
9      anything like that?
10 A.  Nothing like that, no.
11 Q.  So Mr. Marshall ends up on the ground with
12     his hands behind him cuffed?
13 A.  After Lieutenant put his hands behind him
14     cuffed.
15 Q.  Right.  And what's happening with the
16     passenger all this time?
17 A.  I've still got my weapon on him and he's
18     still sitting there like a statue.
19 Q.  At any time did you feel the need to go to
20     the aid of the lieutenant?
21 A.  No.  He was doing pretty good.
22 Q.  All right.  At what point did the passenger
23     emerge from the vehicle?

Page 28

1  A.  Once Lieutenant got the cuffs on
2      Mr. Marshall, then I proceeded around to
3      the passenger.
4  Q.  And did the passenger cooperate with you?
5  A.  Yes, sir.
6  Q.  And you cuffed him and put him on the
7      ground?
8  A.  Got him out and then I sat him on the bank
9      there.
10 Q.  Tell me what happened then.
11 A.  I walked back to the vehicle where
12     Lieutenant was with Mr. Marshall.  When I
13     looked inside, I saw the .357 on the seat.
14 Q.  And that was a .357 Magnum revolver?
15 A.  Yes.
16 Q.  Did you search the vehicle?
17 A.  I can't remember if we searched it right
18     then or if we searched it later.  But we
19     looked in it enough to see that there was a
20     .357 on the seat, bullets on the floorboard
21     and in the ashtray.
22 Q.  Do you recall whether or not, whether you
23     searched it at the scene or you searched it

7 (Pages 25 to 28)

Page 29

1    later, you found anything else of
2    contraband nature?
3    A.   Nothing that I can think of, no, sir.
4    Q.   Just kind of cutting to the chase, did you
5         see Mr. West serve Mr. Marshall?
6    A.   I saw him pat him down.
7    Q.   Did you see him remove anything from his
8         pants?
9    A.   No.
10   Q.   Did you see him remove any money?
11   A.   No.
12   Q.   Were you watching him enough to know
13        whether or not he removed any money?
14   A.   I watched him enough to know that he had
15        him secured so I could go secure the
16        passenger.
17   Q.   So there was a period of time that you just
18        lost sight of what Mr. West and
19        Mr. Marshall were doing?
20   A.   Yes.
21   Q.   Because you were concentrating on the
22        passenger?
23   A.   Correct.

Page 30

1    Q.   I think we've already heard that at that
2         point Mr. West called for a transportation
3         unit, a marked unit, and that another
4         deputy came, took Mr. Marshall away, and
5         the passenger rode with you; is that
6         correct?
7    A.   No.
8    Q.   Okay.  Tell me what happened.
9    A.   The passenger rode with the lieutenant.  I
10        drove the Nova.
11   Q.   Okay.  All right.  Following the incident
12        at which Mr. Marshall was handcuffed, did
13        you see Mr. Marshall become violent in any
14        way?
15   A.   While the lieutenant was in the car, he had
16        gotten back up off the ground.  And I told
17        him -- I said, get back on the ground.  And
18        I had to go over and put him back on the
19        ground.
20   Q.   But he didn't attempt to run away?
21   A.   I don't know if he was attempting to run
22        away or not, but he got up.
23   Q.   But you walked over to him and put him back

Page 31

1    on the ground?
2    A.   Right.
3    Q.   And could that have been while the
4         lieutenant was searching the vehicle?
5    A.   The lieutenant was leaned over in the
6         vehicle, yes.
7    Q.   On the way back to the sheriff's office
8         what, if anything, happened?
9    A.   Happened with me?
10   Q.   Yeah.
11   A.   Nothing happened with me.
12   Q.   You didn't stop at the side of the road?
13   A.   We stopped when the marked unit got -- tire
14        started to go down.  And I don't remember
15        that whole incident fully because I wasn't
16        concentrating on that.
17   Q.   Did you assist in the roadside search for
18        any contraband?
19   A.   Yes.
20   Q.   And was any contraband located?
21   A.   We located a corner-torn baggy.
22   Q.   And describe that baggy for me.
23   A.   A sandwich bag where you would take the

Page 32

1    corner end and tear it off and tie a knot
2    in it.  That's what it looked like.
3    Q.   And who took custody of that?
4    A.   The lieutenant did.
5    Q.   During that period of time was the
6         passenger in Mr. Marshall's vehicle still
7         in the lieutenant's vehicle?
8    A.   I can't recall.
9    Q.   Did you have any role in booking
10        Mr. Marshall or the passenger?
11   A.   No.
12   Q.   You delivered the passenger where?
13   A.   I didn't deliver the passenger.
14   Q.   Oh, that's right.  Mr. West did, didn't he?
15   A.   Uh-huh (positive response).
16   Q.   What did you do with the vehicle?
17   A.   I parked it in front of the jail.
18   Q.   Do you know whether or not that vehicle was
19        moved during the period of time that
20        Mr. Marshall was in jail?
21   A.   Lieutenant came out from where I had parked
22        it.  He told me to put it inside.  They had
23        a secure gate there that locks, and he told

Page 33

1    me to move it and put it inside.  That's
2    the only other incident of it being moved
3    from where I originally parked it.
4    Q.  Do you know whether that car was driven
5    during any time other than that while
6    Mr. Marshall was incarcerated?
7    A.  No.
8    Q.  Did that Chevrolet Nova have shoulder
9    harnesses?
10   A.  I can't recall.  I wish I could.
11   Q.  All right.  I have shown you what's marked
12   as Plaintiff's --
13        (Brief interruption.)
14        (Plaintiff's Exhibit 7 was marked
15        for identification.)
16   Q.  I'll show you this one instead of that
17   one.  Do you recognize what I've marked as
18   Plaintiff's Exhibit Number 7?
19   A.  Uh-huh (positive response).  Yes.
20   Q.  Turn to the second page of that.  Whose
21   signature is that?
22   A.  That's mine.
23   Q.  And did you write this yourself?

Page 35

1    a policy -- we would put it in our
2    statement.
3    Q.  So this Plaintiff's Exhibit Number 7 would
4    constitute any report that you would be
5    required to file?
6    A.  If I had used force.
7    Q.  Were you reprimanded for anything that
8    happened on that date?
9    A.  No.
10   Q.  Have you ever been reprimanded by the
11   Lowndes County Sheriff's Office?
12   A.  Yes.
13   Q.  For what?
14   A.  Oh, I can't remember.  It was during
15   Sheriff Varner's time.
16   Q.  You can't recall anything that you were
17   reprimanded for?
18   A.  Once about a radio.  That's -- not
19   answering the radio or the radio not being
20   loud -- I can't remember.  It was a radio
21   though.
22   Q.  Anything having to do with citizen
23   complaints?

Page 34

1    A.  Yes.
2    Q.  All right.  And I just want to take a look
3    at it for just a second.
4        About two-thirds down the front page it
5    indicates that Mr. Marshall accelerated at
6    one point throwing something from the
7    driver's side window that was later found
8    to be drug evidence between the 102 and 104
9    mile marker.
10   A.  Uh-huh (positive response).
11   Q.  Did you later discover that there was no
12   drug residue found in that baggy?
13   A.  Yes.  Later, after Lieutenant had got the
14   analysis back from forensics, he told me
15   that it turned out to be no evidence in it.
16   Q.  Okay.  I may have asked you this, and if I
17   did, I apologize.  Did you fill out a use
18   of force form with regard to any activity
19   in which you engaged on June 28th, 2005?
20   A.  No.
21   Q.  Is there a policy of the drug task force
22   that such reports be filled out?
23   A.  If use of force was used -- I'm not sure of

Page 36

1    A.  I'm pretty sure some citizens have
2    complained.
3    Q.  But were you ever disciplined in connection
4    with citizen complaints?
5    A.  No.  No.
6    Q.  Has your POST certification ever been
7    suspended?
8    A.  No.
9        MR. LEWIS:  Give us a minute.
10       (A brief recess was taken.)
11   Q.  (Mr. Lewis continuing:)  Did you have
12   any -- and I may have asked this already.
13       Did you have any part to play other
14   than writing that statement that's been
15   marked as Plaintiff's Exhibit Number 7 in
16   the booking or prosecution of Mr. Marshall?
17   A.  No, sir.
18   Q.  Did you appear at court in connection with
19   a case against Mr. Marshall?
20   A.  No.
21       MR. LEWIS:  That's all I have.
22       (Deposition concluded at
23       approximately 11:15 a.m.)

Case 2:06-cv-00701-ID-CSC    Document 33-5    Filed 02/12/2008    Page 13 of 13

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson          January 21, 2008

Page 37

```
 1              * * * * * * * * * *
 2          FURTHER DEPONENT SAITH NOT
 3              * * * * * * * * * *
 4           REPORTER'S CERTIFICATE
 5    STATE OF ALABAMA:
 6    MONTGOMERY COUNTY:
 7           I, Tracye Sadler Blackwell, Certified
 8    Court Reporter and Commissioner for the State of
 9    Alabama at Large, do hereby certify that I reported
10    the deposition of:
11           G. LASHUN HUTSON
12    who was duly sworn by me to speak the truth, the
13    whole truth and nothing but the truth, in the
14    matter of:
15           RICHARD MARSHALL,
16           Plaintiff,
17           vs.
18           CHRIS WEST, in his individual
19           Capacity, LASHUN HUTSON, in his
20           Individual capacity,
21           Defendants.
22           IN THE UNITED STATES DISTRICT COURT
23           FOR THE MIDDLE DISTRICT OF ALABAMA
```

Page 38

```
 1           NORTHERN DIVISION
 2           Case Number 2:06-cv-701-ID.CSC
 3    on January 21, 2008.
 4           The foregoing 37 computer-printed pages
 5    contain a true and correct transcript of the
 6    examination of said witness by counsel for the
 7    parties set out herein.  The reading and signing of
 8    same is hereby waived.
 9           I further certify that I am neither of
10    kin nor of counsel to the parties to said cause nor
11    in any manner interested in the results thereof.
12           This 6th day of February 2008.
13
14
15           _____
              Tracye Sadler Blackwell
16            ACCR No. 294
              Expiration date:  9-30-2008
17            Certified Court Reporter
              and Commissioner for the State
18            of Alabama at Large
19
             20
21
22
23
```

# EXHIBIT 7

2nd Judicial Circuit
Drug Task Force
Statement Form

**Date:** June 28, 2005

**Time:** 18:20

**Name:** Agent G. LaShun Hutson


On above date at approximately 1:00 pm myself and Lt. C.S. West were traveling North on County Road 7 in Lowndes County when we met Mr. Richard Marshall traveling South in a early model blue Chevrolet Nova. Lt. West stated "That's the vehicle" and began to turn around in an attempt to catch up to the vehicle. Once behind the vehicle the blue light was placed on the dash of our vehicle to alert the driver that he was being stopped, the driver looked in his rear view mirror and left side mirror and continued to drive and began to move around in the seat and appeared to be reaching for something in the seat with his right hand, I stated to Lt. West " Lt. he's moving around a lot I don't think he's going to stop" at which time Lt. West stated "I don't either," at that point we were approximately 2 ½ miles from the intersection of County Road 7 and State Highway 21. Lt. West pulled our vehicle along side Mr. Marshall and I showed him my badge and the blue light and yelled for him to pull over at which time Mr. Marshall stated " Man what the fuck ya'll want" and continued to drive North on County Road 7. We reached State Highway 21 and Mr. Marshall turned south and accelerated at one point throwing something from the driver side window that we later found to be drug evidence between the 102 and 104 mile marker. Mr. Marshall continued South on State Highway 21, Lt. West came along side Mr. Marshall for a second time and I again yelled to Mr. Marshall to pull over at which time he stated "Motherfuck ya'll, I ain't stoppin" At that point Lt. West forced Mr. Marshall to the shoulder of the road and we exited our vehicle with our guns drawn and ordered Mr. Marshall to exit his vehicle with his hands where we could see them, Mr. Marshall exited his vehicle with a very belligerent attitude and cursing. Lt. West ordered Mr. Marshall to get on the ground and Mr. Marshall turned as if he was



PLAINTIFF'S
EXHIBIT
1

getting back into the vehicle and Lt. West fired his service weapon into the ground and stated "Don't get back in that vehicle, get on the ground" Mr. Marshall paused , still being belligerent and cursing at which time Lt. West approached him and put him on the ground by force and cuffed him during which time I had turned my attention to the passenger and approached his side of the vehicle and removed him without incident and cuffed. Once both parties were secure Lt. West and I looked into the vehicle and saw what later became known to us as a Rossi .357 Revolver fully loaded with 6 (six) Hollow Point bullets and an additional 34 (thirty-four) more bullets in the ash tray and on the floor, I asked Mr. Marshall was that his weapon on the seat and he stated "What ever you see is yours because you put it there, ya'll motherfuckers good for that shit." Mr. Marshall and his passenger were taken to the John Hullett Detention Facility to be processed by a Lowndes County Sheriff Deputy as Lt. West and I returned to the area where we saw Mr. Marshall throw something from the car and Lt. west recovered a empty torn baggie that at one time had contained a controlled substance.


Signature: _____

# EXHIBIT D

**Plaintiff's Responses to Defendants' Requests for Admission**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RICHARD MARSHALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:06-cv-701-ID-CSC |
| | ) |
| CHRIS WEST, in his individual capacity, | ) |
| LASHUN HUTSON, in his individual | ) |
| capacity | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT CHRIS WEST'S REQUESTS FOR ADMISSIONS

COMES NOW, Richard Marshal, Plaintiff, in the above-styled cause and pursuant to Rule 36 of the Federal Rules of Civil Procedure and in response to defendant's Request for Admissions, states as follows:

## REQUESTS FOR ADMISSION

1.    Admit or deny that, at the time of the incidents underlying your Amended Complaint, there was a .357 caliber revolver in the car you were driving.

**RESPONSE: Admit.**

2.    Admit or deny that, at the time of the incidents underlying your Amended Complaint, the above-referenced revolver was loaded with one or more bullets.

**RESPONSE: Admit.**

3.    Admit or deny that, at the time of the incidents underlying your Amended Complaint, the above-referenced revolver was lying on the front seat of the car you were driving.

**RESPONSE: Admit.**

4.     Admit or deny that you were the owner of the car you were driving at the time of the incidents alleged in your Amended Complaint.

**RESPONSE: Admit.**

5.     Admit or deny that, at the time of the incidents underlying your Complaint, the car driven by the Defendants had a single, rotating blue light.

**RESPONSE: Deny. Light was not activated until after I was in custody.**

6.     Admit or deny that, at the time of the incidents underlying your Amended Complaint, you saw the single, rotating blue light while it was activated.

**RESPONSE: Deny. See response to Request for Admissions number 5 herein.**

Admit or deny that, at the time you first observed the Defendants' car, you were not wearing your seatbelt.

**RESPONSE: Admit.**

7.     Admit or deny that, at the time of the incidents underlying your Amended Complaint, you refused the directives given to you by the Defendants to pull your car to the side of the road.

**RESPONSE: Admit.**

8.     Admit or deny that, after the Defendants forced your car to the side of the road, you refused to obey commands to get on the ground.

**RESPONSE: Admit.**

9.     Admit or deny that, after the Defendants forced your car to the side of the road, you reached into the car despite the Defendants' verbal commands to the contrary.

**RESPONSE: Cannot answer. Never reached into car. No command not to reach.**

Dated this 23ʳᵈ day of October, 2007.

Richard Marshall
Richard Marshall

SWORN TO and SUBSCRIBED before me this 23rd day of October, 2007.

_Paula M. Cocker_
NOTARY PUBLIC Alabama at Large

(SEAL)

My commission expires $07/09/2011$

Respectfully submitted this 23rd day of October, 2007.

JAY LEWIS (LEW031)
Attorney for Plaintiff

Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this ____30____ day of October, 2007 I have served an exact copy of the foregoing on counsel of record by placing same in the United States mail, first class postage prepaid and properly addressed:

Daryl L. Masters
Gary L. Willford, Jr.
Joseph L. Hubbard, Jr.
WEBB & ELEY, P.C.
P.O. Box 240909
Montgomery, AL 36124

JAY LEWIS

# EXHIBIT E

**Deposition of Richard Marshall**

# DEPOSITION OF RICHARD MARSHALL

## November 14, 2007

## Pages 1 through 156

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5   RICHARD MARSHALL,
6            Plaintiff,
7   vs.              CIVIL ACTION NO.
                     2:06-cv-701-ID-CSC
8
9   CHRIS WEST, in his individual
    capacity, LASHUN HUTSON, in his
    individual capacity,
10
11           Defendants.
12
13
       * * * * * * * * * * * * *
14
15
16   DEPOSITION OF RICHARD MARSHALL, taken
     pursuant to stipulation and agreement before Lyn
17
     Daugherty, ACCR #66, Certified Court Reporter and
18
     Commissioner for the State of Alabama at Large, in
19
     the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20
     Drive, Montgomery, Alabama, on Wednesday, November
21
     14, 2007, commencing at approximately 10:00 a.m.
22
23   * * * * * * * * * * * * *

Page 3

1    2    Photograph                         28
2    3    Photograph                         29
3    4    Photograph                         31
4    5    MapQuest map                          36
5    6    Interview sheet                    58
6    7    Photograph                         79
7    8    Photograph                         79
8    9    Photograph                        107
9    10   Photograph                        108
10   11   Photograph                        108
11   12   Inmate property release slip         133
12
13
14
15
16

          * * * * * * * * * * * *

17
18
19
20
21
22
23

Page 2

1              APPEARANCES
2   FOR THE PLAINTIFF:
3   Mr. Jay Lewis
    Mr. Fred L. Clements
4   LAW OFFICES OF JAY LEWIS
    Attorneys at Law
5   847 South McDonough Street
    Montgomery, Alabama 36104
6
7   FOR THE DEFENDANT WEST:
8   Mr. Gary Wilford
    Mr. Daryl L. Masters
9   WEBB & ELEY, P.C.
    Attorneys at Law
10  7475 Halcyon Pointe Drive
    P.O. Box 240909
11  Montgomery, Alabama 36124
12
13     * * * * * * * * * * * * *
14     EXAMINATION INDEX
15
    RICHARD MARSHALL
16
       BY MR. WILFORD . . . . . . . . . . 5
17
       BY MR. LEWIS . . . . . . . . . . . 153
18
19        EXHIBIT INDEX
20                         MAR
    Defendant
21
    1   Alabama uniform arrest report      17
22
       (Index continued on next page)
23

Page 4

1            STIPULATIONS
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of RICHARD MARSHALL is taken pursuant to
5   the Federal Rules of Civil Procedure and that said
6   deposition may be taken before Lyn Daugherty,
7   Certified Shorthand Reporter, and Commissioner for
8   the State of Alabama at Large, without the
9   formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and

Page 5

etween the parties hereto and the witness that the ignature of the witness to this deposition is ereby waived.

\* \* \* \* \* \* \* \* \* \* \*

RICHARD MARSHALL

The witness, after having first been duly sworn to speak the truth, the whole truth and nothing but he truth testified as follows:

EXAMINATION

BY MR. WILFORD:

Q. Would you please state your name for the record, sir.

A. Richard Marshall.

Q. Mr. Marshall, my name is Gary Wilford, and together with Daryl Masters, who is also here in the room, we're representing the defendants that you have sued in this case -- well, excuse me -- one of the defendants that you've sued in this case, Chris West. Where do you live?

A. Lowndes County, Farmersville.

Q. How long have you lived there?

A. Basically all my life.

Page 6

Q. Have you ever given a deposition before?

A. No, sir.

Q. Let me cover just a few ground rules here. As you can see, we've got a court reporter, and one of the things that she's doing is she's taking down everything that we're saying in the room here today; okay? And I'm going to be asking you some questions and you're going to be answering those questions for me. And when you do that, because we've got the court reporter here, there's a couple of things we need to keep in mind. The first thing is let's try not to talk over the top of each other because it makes it difficult for her to get a good transcription down. Wait for me to ask my question completely and then go ahead and give me a verbal response. And by that I mean a yes, no, or whatever it may be. Shaking your head and saying huh-uh and uh-huh as we tend to do in normal conversation as is, again, one of those things that's kind of hard for the court reporter

Page 7

1    to get down. If I ask a question that you
2    don't understand, please let me know and
3    I'll be happy to rephrase it, try to put it
4    another way so that you know exactly what
5    it is that I'm asking you; all right?
6  A. Okay.
7  Q. Because when I ask you a question and you
8    give me an answer, I'm expecting that you
9    understood my question. Can we have that
10   understanding?
11 A. Okay.
12 Q. This isn't an inquisition. If you need a
13   break, if you need to talk to your lawyer,
14   get something to drink, whatever the case
15   may be, let me know and we can take a
16   break; all right?
17 A. Okay.
18 Q. And we'll probably do it on our end once or
19   twice as well.
20 A. All right.
21 Q. Other than your lawyers, who are with you
22   here today, have you spoken with anyone to
23   prepare for your deposition today?

Page 8

1  A. No, sir.
2  Q. I noticed when you came in this morning I
3    saw you and Mr. Carmichael walking up
4    together. Did y'all ride in together
5    today?
6  A. Yes, sir.
7  Q. Did y'all talk about this case on the ride
8    up?
9  A. No, sir.
10 Q. Have you ever talked to Mr. Carmichael
11   about this case?
12 A. No, sir.
13 Q. At any time?
14 A. No, sir.
15 Q. Are you related to Mr. Carmichael?
16 A. Yes. My cousin.
17 Q. Cousin?
18 A. (Witness nods head).
19 Q. Did you review any documents in preparing
20   for your deposition today?
21 A. Not today, but I have -- through my lawyer
22   I have.
23 Q. To prepare for this deposition?

Page 9

1   A.  Not to prepare for the deposition, but for
2      the case.
3   Q.  What documents did you review?
4   A.  Just basically disclosure, whatever from
5      the other party.
6   Q.  The information that we gave you?
7   A.  Yeah.
8   Q.  Anything that you provided your attorneys,
9      any documents you provided your attorneys?
10  A.  None other than what y'all requested.
11  Q.  What's your date of birth, sir?
12  A.  2/24/74.
13  Q.  And how old does that make you?  I'm not
14     very good at math.
15  A.  33.
16  Q.  Where were you born?
17  A.  Lowndes County.  Well, Farmersville through
18     the -- what did they call it back then?
19     Housewife?  Selma Hospital is where I was
20     taken.  I was born at home.
21  Q.  With a midwife?
22  A.  Midwife, yeah.
23  Q.  Okay.  I got you.

Page 10

1      Are you married?
2   A.  No, sir.
3   Q.  Have you ever been married?
4   A.  Yes, sir.
5   Q.  How many times have you been married?
6   A.  Once.
7   Q.  And who were you married to?
8   A.  Stephanie Mallory.
9   Q.  When were y'all married?
10  A.  In '97.  May, I think.
11  Q.  How long did y'all stay married?
12  A.  Well, the divorce hasn't been finalized.
13  Q.  So technically you're still married to her;
14     is that right?
15  A.  Yes.
16  Q.  When did y'all file for divorce?
17  A.  Well, she was in the service.  She was
18     really supposed to be handling that.  And I
19     haven't really been in contact with her
20     over the years.  Just hasn't been
21     finalized.
22  Q.  When was the last time that y'all lived
23     together?

Page 11

1   A.  We never actually lived together.  She was
2     in the service at the time.  Never shared a
3     residence.
4   Q.  All right.  Do you work now, sir?
5   A.  No, sir.
6   Q.  What was the last job that you held?
7   A.  M & M Logging last -- I think I was laid
8     off January of last year.
9   Q.  January of '06?
10  A.  Yes, sir.
11  Q.  How long did you work for them?
12  A.  I think I was employed around August '05,
13     somewhere August '05.
14  Q.  And worked with them until January of '06?
15  A.  Yes, sir.
16  Q.  What did you do for them?
17  A.  I was a topper.  Operate power saw.
18  Q.  How much did you get paid there?
19  A.  I was making $10 an hour.
20  Q.  Who was your supervisor?
21  A.  David Matthews.
22  Q.  Did you work prior to August of '05?
23  A.  The last job before that was Alabama

Page 12

1     Power.  I got laid off in '04.
2   Q.  Do you remember about what month that was?
3   A.  January.
4   Q.  January is not a good month for you, huh?
5   A.  Well, you know, it was shutdown jobs.
6     Contract's up.  Layoff time.
7   Q.  How long did you work for Alabama Power?
8   A.  I started December the previous year.  That
9     would be '03, December '03.
10  Q.  So that would be only about a two-month temp
11     job?  Is that about right?
12  A.  Somewhere around there.  I caught the end
13     part of the contract.  I worked through my
14     uncle.  He was the supervisor.
15  Q.  Who was your uncle?
16  A.  Curtis Marshall.
17  Q.  Prior to December of '03, when was the last
18     time that you worked?
19  A.  I have to say it would have to be Big Lots
20     in Montgomery.  I think that's what ...
21  Q.  When did you start working for Big Lots?
22  A.  I would say September of '99.
23  Q.  And you worked for them until when?

Page 13

1   A.  I want to say November -- I think it was
2       November 2000, somewhere along in there.
3   Q.  What did you do for Big Lots?
4   A.  Forklift operator.
5   Q.  Forklift operator?
6   A.  Yeah.
7   Q.  And what did you do for Alabama Power?  Let
8       me go back to that.
9   A.  I was a cement finisher helper.  Mixed
10      mortar, poured concrete.
11  Q.  And what did you get paid when you were at
12      Alabama Power?
13  A.  I was making 15.50, something like that.
14  Q.  What was your rate of pay at Big Lots?
15  A.  Start pay was 7.50 and end off at like $10.
16  Q.  Have you ever owned your own business?
17  A.  No, sir.
18  Q.  Never been self-employed?
19  A.  Not really.  Well, I contract barber, a
20      trade of mine, hair cutting.  But I never
21      owned my own business.
22  Q.  When did you do that?
23  A.  '93 out of high school a couple of years

Page 14

1       off and on.
2   Q.  Did you graduate from high school?
3   A.  Yes, sir.
4   Q.  What high school did you graduate from?
5   A.  Central High, Hayneville.
6   Q.  What year did you graduate?
7   A.  '92.
8   Q.  Have you ever attended a college?
9   A.  Briefly J.P. Tech for barbering.  But I
10      found out I have to have a license to cut
11      hair.  Went straight to the barber shop.
12  Q.  And that was here in Montgomery; right?
13  A.  Yeah.
14  Q.  When did you attend J.P. Tech?
15  A.  I think it was '93.
16  Q.  Any other college or trade school that you
17      have?
18  A.  No, sir.
19  Q.  Now, you live at 64 Youngblood Road in
20      Farmersville; is that right?
21  A.  Yes, sir.
22  Q.  And how long did you tell me that you've
23      lived there?  You said you've lived in

Page 15

1       Lowndes County pretty much all your life.
2       How long have you lived at that address?
3   A.  That's my mother's address.  Most all my
4       life I stayed next door with my grandmother
5       most of my life until I moved out with a
6       friend or two.
7   Q.  Where were you living in 2005?
8   A.  Still Lowndes County off of Highway 21 with
9       a friend.
10  Q.  The whole year?
11  A.  Yeah.  Yeah.
12  Q.  What's the address at your grandmother's
13      house that you said is next door?
14  A.  It's probably going to be -- Probably --
15      I'm not sure.  The address has changed.  It
16      used to be Route 2, Box 140, but I'm not
17      sure.  I'm not sure right now.  I know
18      that's the old address, Route 2, Box 140.
19  Q.  Do you have any children, Mr. Marshall?
20  A.  Yes.
21  Q.  How many children do you have?
22  A.  Two boys.
23  Q.  Are any of them 19 or older?

Page 16

1   A.  No, sir.
2   Q.  Do you have a lot of relatives in Lowndes
3       County?
4   A.  Fairly, but not a lot.  Close relatives.
5           MR. WILFORD:  Jay, can we get a
6           stipulation, just for the
7           venire information, that he'll
8           give us a list of relatives in
9           the middle district?
10          MR. LEWIS:  Sure.
11          MR. WILFORD:  That will save us
12          some time.
13  Q.  Are you a member of a trade union?
14  A.  No, sir.
15  Q.  Do you go to church?
16  A.  I used to.  I haven't been in a while.
17  Q.  When you went to church, what church did
18      you attend?
19  A.  First Baptist in Farmersville.
20  Q.  Are you a member of any social
21      organizations like, you know, Elks, VFW,
22      anything like that?
23  A.  No, sir.

Page 17

1  Q.  Other than this lawsuit that we're here on
2      today, have you ever been a party in any
3      other lawsuit either as a plaintiff or a
4      defendant?
5  A.  No, sir.
6  Q.  So this is your first one?
7  A.  Yes.
8  Q.  We had asked you in the interrogatories if
9      you had ever been arrested before, and you
10     gave us three arrests; one in April 25th --
11     25 of '97 in Butler County, the second one
12     was the one that we're here -- I'm sorry --
13     the second one was in '98 in Tuscaloosa,
14     and the third one was the one that we're on
15     here today.  Do you have any other arrests
16     besides those?
17 A.  No, sir.
18       (Defendant's Exhibit 1 was marked
19         for identification.)
20 Q.  Let me show you what I'm going to mark as
21     Defendant's Exhibit 1.  Let me give you
22     just a minute to take a look at that,
23     Mr. Marshall.

Page 18

1        (Brief pause.)
2  Q.  Have you had a chance to take a look at
3      that?
4  A.  Yeah.
5  Q.  Does that refresh your recollection as to
6      any other arrests you might have had?
7  A.  Yeah.  I forgot about that.  Seat belt,
8      whatever it was.  I think it was June -- I
9      want to say June.
10 Q.  June of this year?
11 A.  Yeah.
12 Q.  Were you actually incarcerated as a result
13     of that arrest?  Put in jail?
14 A.  Yeah.  I was taken in for three days, but I
15     got a chance to talk to the judge.  It was
16     a miss -- following the incident we're here
17     now on.  They suspended my license for a
18     ticket that I already sat out while I was
19     in there.  She took the ticket up plus the
20     ticket that they wrote me that day and
21     released me.
22 Q.  So you spent two days in jail on this
23     charge and then the judge dismissed all the

Page 19

1      charges?
2  A.  Yes.
3  Q.  Is that what you're telling me?
4  A.  Yeah.
5  Q.  Do you remember who it was that arrested
6      you on this June of '07 arrest?
7  A.  The officer -- my first time seeing him.
8      But they did call Shawn Hutson up.  When
9      they ran my name, he was the first officer
10     pulled up.  So they pulled him up and they
11     took me in.
12 Q.  Oh, you're saying Shawn Hutson came to the
13     the --
14 A.  Yes, sir.
15 Q.  -- to the stop?
16 A.  Yep.
17 Q.  But he wasn't the one who originally pulled
18     you over; correct?
19 A.  He didn't pull me over.
20 Q.  Do you remember what department that
21     officer might have worked from, the one who
22     originally pulled you over?
23 A.  Oh, it was Lowndes County.

Page 20

1  Q.  Was it the DTF?
2  A.  Just a regular city cop, whatever.
3  Q.  City or county?
4  A.  County, city.  I mean, I don't exactly know
5      which one it was.
6  Q.  Do you remember what color uniform the
7      officer wore?
8  A.  I want to say dark-colored, dark-colored
9      uniforms.  May be county.  In a white
10     vehicle.
11 Q.  All right.  Other than this one and the
12     three that you told us about in the
13     interrogatories, any other arrests?
14 A.  No.
15 Q.  On the first arrest in April of '97, did
16     you have to spend any time in jail on that
17     one?
18 A.  '97, yeah.
19 Q.  How long did you spend in jail on that one?
20 A.  Approximately two or three weeks before the
21     charge was dropped.
22 Q.  Do you know why the charges were dismissed?
23 A.  Yeah.  It was bogus charges.  It was a

Page 21

1    misunderstanding between me and my kids'
2    mom.  She went down there to make false
3    statements about a vehicle we purchased
4    together, and two or three weeks later she
5    came to an agreement and dropped the
6    charge.
7    Q.  You say your kids' mom.  Is that the lady
8        that you're currently married to?
9    A.  No, sir.
10   Q.  What was that lady's name?
11   A.  Which one?
12   Q.  The mother of your children.
13   A.  Shavonne Bailey.
14   Q.  Do you know where she lives now?
15   A.  Tuscaloosa.
16   Q.  Was she the one that was involved in the
17       arrest in Tuscaloosa in '98?
18   A.  Yes, sir.
19   Q.  Do you have an address on Ms. Bailey?
20   A.  Not off the top of my head, but I have it.
21       I have an address, but I don't know it by
22       heart.
23   Q.  Do you know her phone number?

Page 22

1    A.  I don't know it by heart either.
2    Q.  When was the last time you talked to her?
3    A.  Last month.
4    Q.  Did you spend any time in jail in
5        Tuscaloosa?
6    A.  Overnight.
7    Q.  Just overnight?
8    A.  Yeah.
9    Q.  That was in Tuscaloosa City Jail?
10   A.  Yeah.
11   Q.  Or the county jail?
12   A.  I'm not sure.  I'd have to look at the
13       paper and see.  It's been a while.
14   Q.  The arrest in Butler County, were you in
15       the Butler County Jail?  It says you were
16       arrested by the Butler City Police
17       Department.
18   A.  Well, they only have one jail.  I don't
19       know whether it's under the city or the
20       county.  It's the only one they have --
21       still have.
22   Q.  All right.  And you've been in the Lowndes
23       County jail twice; is that correct?

Page 23

1    A.  Yes, sir.
2    Q.  Any other times that you've been in jail
3        that we haven't talked about?
4    A.  No, sir.
5    Q.  Have you ever been treated for alcohol or
6        drug addiction?
7    A.  No, sir.
8    Q.  Ever been treated for mental illness?
9    A.  No, sir.
10   Q.  All right.  Let me draw your attention to
11       the day that this incident that this
12       lawsuit is about occurred.  Would you agree
13       with me that that was June 28th of 2005?
14   A.  I would agree.
15   Q.  Do you recall what day of the week that
16       was?
17   A.  I think it was Tuesday.
18   Q.  You weren't employed on June 28th of '05,
19       were you?
20   A.  No, sir.
21   Q.  What did you have to do that day, if
22       anything?
23   A.  Early that morning I went to my aunt's

Page 24

1    house and we pulled the motor and
2    transmission out of a vehicle.
3    Q.  You said we.  Who is we?
4    A.  Me and Kevin and two more cousins.
5    Q.  Kevin Carmichael?
6    A.  Yes, sir.
7    Q.  Who were the other two cousins?
8    A.  Darrell Howard, Charles Howard.
9    Q.  And you said you were pulling a motor out
10       of a car?
11   A.  Yeah.
12   Q.  Was it your aunt's car?
13   A.  No.  It was my cousin's car.
14   Q.  Were you being paid to do that?
15   A.  No.
16   Q.  What time did you get up to go pull that
17       motor?
18   A.  Probably about eight o'clock.
19   Q.  Did you have anything to eat when you woke
20       up?
21   A.  No, sir.
22   Q.  Just went straight over there and started
23       working on a motor?

Deposition of Richard Marshall

November 14, 2007

Page 25

1  A.  (Witness nods head).
2  Q.  Did y'all eat anything while you were over
3      there?
4  A.  No, sir.
5  Q.  Did you have anything alcoholic to drink
6      while y'all were working on that motor?
7  A.  No, sir.
8  Q.  Take any drugs that day?
9  A.  No, sir.
10 Q.  Prescription drugs?
11 A.  No drugs.
12 Q.  Where is your aunt's house at?
13 A.  It's in Farmersville also.
14 Q.  What's the address there?
15 A.  I don't know the address right off the top
16     of my head.
17 Q.  How far is it from your house?
18 A.  Approximately a mile.
19 Q.  So did you get that motor out that day?
20 A.  Yes, sir.
21 Q.  How were you dressed?
22 A.  T-shirt and shorts.
23 Q.  Pretty hot that day?

Page 26

1  A.  Yeah.  It was a pretty hot summer.  It was
2      warm that day.
3  Q.  How long did it take y'all to get that
4      motor out?
5  A.  I think we finished up sometime between
6      11:30 -- sometime before noon.
7  Q.  What were you going to do after that?
8  A.  Go home and take a bath and get some rest.
9  Q.  And was that -- When you say going home,
10     was that the 64 Youngblood Road address?
11 A.  No.  That's the residence off of 21 where I
12     was residing at the time.
13 Q.  Off of Highway 21?
14 A.  Yes, sir.
15 Q.  Is that on County Road 7?
16 A.  Off of County Road 7, right off of the
17     State Highway 21.
18 Q.  Is that at the intersection of County Road
19     7 and Highway 21?
20 A.  Yeah.
21 Q.  Where did Mr. Howard -- well, the two
22     Mr. Howards, Darrell and Charles, go after
23     y'all got done with that engine?

Page 27

1  A.  They was at their house where we took it
2      out.  That's his mother.
3  Q.  So they didn't go anywhere?
4  A.  They were home already.
5  Q.  Did you have any plans for the rest of the
6      day other than just going home?
7  A.  No plans.
8  Q.  Was there anybody in the car with you when
9      you went home?
10 A.  Kevin Carmichael.
11 Q.  Did you stop anywhere between your aunt's
12     house and where your encounter with the
13     defendants began?
14 A.  No, sir.
15 Q.  Can you describe for me the vehicle that
16     you were in?
17 A.  1971 blue Nova.
18 Q.  '71?
19 A.  Yes, sir.
20 Q.  That's a Chevrolet; right?
21 A.  Yes.
22 Q.  Was that your car?
23 A.  Yes.

Page 28

1  Q.  How long had you had that car?
2  A.  I think I purchased it in July of '04.
3          (Defendant's Exhibit 2 was marked
4          for identification.)
5  Q.  Let me show you what we'll mark as
6      Defendant's Exhibit 2 after your attorneys
7      get a chance to look at it.  Is that your
8      car?
9  A.  That's my car.
10 Q.  That's in Defendant's Exhibit 2?
11 A.  That's it.
12 Q.  Who all besides you had access to that car?
13 A.  No one.
14 Q.  So you had the only set of keys; correct?
15 A.  That's correct.
16 Q.  Had you loaned it to anyone recently?
17 A.  No, sir.
18 Q.  I'm sorry?
19 A.  No, sir.
20 Q.  Was that car equipped with seat belts?
21 A.  Yes, sir.
22 Q.  Were you wearing your seat belt that day?
23 A.  No, sir.

Page 29

1   Q.  What about Kevin, was he wearing his?
2   A.  No.
3   Q.  Was there any alcohol in that car?
4   A.  No, sir.
5           (Defendant's Exhibit 3 was marked
6           for identification.)
7   Q.  Let me show you what we're going to mark as
8       Defendant's Exhibit 3.  Let me ask you,
9       does that look like the front seat of your
10      car on June 28th, 2005, Defendant's Exhibit
11      3?
12  A.  That's it.
13  Q.  Fairly and accurately depict what was on
14      the front seat of your car that day?
15  A.  Yes, sir.
16  Q.  What was in that flask that's there on the
17      seat next to the gun?
18  A.  At one time it had contained alcohol, but
19      it was no alcohol in it that day.
20  Q.  Well, what was in it when it was -- What
21      was the alcohol that was in there?
22  A.  Vodka.
23  Q.  When did you drink that -- or did you --

Page 30

1       let me back up.  Did you drink that?
2   A.  It's been in there for some while.
3       Probably a week prior when I had a drink.
4   Q.  So you had emptied it about a week prior;
5       is that right?
6   A.  Yeah.
7   Q.  Now, Defendant's Exhibit 3 also has a gun
8       in that picture; correct?
9   A.  Uh-huh (positive response).
10  Q.  Was that your gun?
11  A.  No, sir.
12  Q.  But you knew it was in the car that day;
13      right?
14  A.  Yes, sir.
15  Q.  Whose gun is it?
16  A.  It belongs to D.C. McWilliams.
17  Q.  Who is D.C. McWilliams?
18  A.  A friend of mine.
19  Q.  How did it get in the car?
20  A.  Well, he left it in there.  One day I give
21      him a ride when he was having car trouble.
22      It was starting to rain.  He came along and
23      said he wanted to go back and get his gun

Page 31

1       and his books.  And I give him a ride home
2       right before dark.  It started raining even
3       harder before we got there.  When I pulled
4       up in his driveway, he jumped out of the
5       car and left the gun.
6   Q.  How long ago before -- Let me back up and
7       regroup.  How long before June 28th, 2005
8       did you give Mr. McWilliams a ride?
9   A.  Approximately three or four days earlier
10      than that.
11  Q.  Where does Mr. McWilliams live?
12  A.  Right off of Highway 21.
13  Q.  Do you know the address?
14  A.  Not right offhand.
15  Q.  How far is it from your house?
16  A.  Approximately three or four miles.
17          (Defendant's Exhibit 4 was marked
18          for identification.)
19  Q.  Let me show you what we'll mark as
20      Defendant's Exhibit 4.  Does that look like
21      the ashtray that was in your Nova?
22  A.  It is.
23  Q.  And you can see in there there's some

Page 32

1       bullets in there; right?
2   A.  Yes, sir.
3   Q.  Why were those bullets in your ashtray?
4   A.  Like I said, he left the box of bullets in
5       there which had got wet from the rain.  The
6       box was deteriorating, therefore tearing
7       up.  So I took the bullets, put them in the
8       ashtray.  And there probably was some on
9       the seat also because all of them couldn't
10      fit in there.
11  Q.  If you look back at Defendant's 3,
12      I believe it is, I think you're right.
13      There is a bullet lying there on the seat,
14      isn't there?
15  A.  Yeah.
16  Q.  So he left the gun and a box of bullets in
17      your car?
18  A.  Yes, sir.
19  Q.  And he left it there for three to four
20      days?
21  A.  That's approximately how long it was.
22  Q.  Had he tried to get ahold of you to get his
23      gun and his bullets back prior to that

Page 33

1  time?
2  A.  He may have, but I was in and out of my
3     residence probably and missed him.  I even
4     called him, but I couldn't get up with him.
5  Q.  Does Mr. McWilliams still live there off
6     Highway 21?
7  A.  I'm certain he does.
8  Q.  Did you have a concealed weapon permit?
9  A.  No, sir.
10 Q.  Had you ever had a concealed weapon permit?
11 A.  No, sir.
12 Q.  How much money did you have on you that
13    day?
14 A.  500.
15 Q.  Exactly 500?
16 A.  Yes, sir.
17 Q.  In what denomination were the bills?
18 A.  I know two $100 bills and the rest were
19    twenties.
20 Q.  Where did that money come from?
21 A.  I previously was drawing unemployment when
22    I got laid off from one job and I saved
23    money.  And during that time I was having a

Page 34

1  fairly decent streak at the gambling
2  casinos.  During the time I won a
3  substantial amount of money.
4  Q.  Which casino?
5  A.  White Hall Gaming Casino.  Also Biloxi,
6     Mississippi I won some money.
7  Q.  Which casino in Biloxi?
8  A.  I'm not sure right offhand.  I'd have to
9     check receipts or something.  I don't want
10    to say the wrong one.
11 Q.  When did you win that money?
12 A.  I won the money in Mississippi in '04.  The
13    month I'm not exactly -- I'm not sure of
14    the month.  I won money in White Hall in
15    '05, March.
16 Q.  Well, how much did you win in Biloxi?
17 A.  About 1600.
18 Q.  And how much at White Hall?
19 A.  3600.
20 Q.  And you're saying that this money was
21    left -- what was left of your winnings?  Am
22    I understanding you correctly?
23 A.  Yeah.

Page 35

1  Q.  Did you report those winnings on your
2     income tax?
3  A.  I took a waiver out -- tax waiver out each
4     time.
5  Q.  Tax waiver.  You have to explain that to me
6     because I'm not a gambler.
7  A.  When you have to sign to have your taxes
8     taken out of winnings to report your W-2s
9     from the casino.
10 Q.  Right.  Okay.  But when you filed your
11    income tax at the end of the year, did you
12    report that income?
13 A.  I haven't filed but once since '05.  I
14    think child support ended up being on
15    that.  I'm not sure if I had it in there or
16    not.
17 Q.  Where was that money at?
18 A.  What money?
19 Q.  The $500 that we're talking about.  That's
20    a good point.  When I ask a bad question,
21    you go right ahead and ask me to clarify.
22    I'm talking about the $500 now.  Where did
23    you have that at?

Page 36

1  A.  In my short right-hand pocket.
2  Q.  Was it in a wallet, or how were you
3     carrying it?
4  A.  Just together folded.
5  Q.  When was the first time that you remember
6     seeing the two officers that you ran into
7     later that day?
8  A.  The first time that I seen two unknown
9     persons was on County Road 7 immediately
10    coming from my aunt's house.
11 Q.  That's good.  Let's back up and regroup on
12    that just a minute.  Did you turn off of
13    Highway 21 going down County Road 7 to your
14    house?
15 A.  I turned off of Highway 16 onto County Road
16    7 where I met the officers.
17        (Defendant's Exhibit 5 was marked
18         for identification.)
19 Q.  Just so I'm clear, I'm going to show you
20    what we're going to mark as Defendant's
21    Exhibit 5, which I'll tell you is just a
22    little map that I got off the Internet of
23    the area.  Kind of centered in it is County

Page 37

Road 7 and Highway 21 and we'll just kind of refer to that. Now, you said you came off -- was it County Road 16 and onto -- I'm sorry. Let me move all this stuff out of your way. I don't see County Road 16 on that map, and I might not have it zoomed in in enough detail.

A. Well, it's -- the road coming from Farmersville I think leads to be County Road 16 and then you make a right on County Road 7.

Q. There's Farmersville right there. So does County Road 16 kind of come --

A. Yeah. And you make a right onto County Road 7. Then you make another right on Highway 21.

Q. I tell you what. Let me give you my pen here and if you would just kind of draw a little line there from that dot under Farmersville. Just your best guess at how County Road 16 goes into County Road 7.

A. It would have to be coming from this direction and make a right on County Road

Page 38

7.

Q. Just draw that to where it intersects into County Road 7. Just make your line go into County Road 7.

A. (Witness complies).

Q. There we go. That's good. And if you would, just put a 16 under that so we'll know what we're talking about.

A. (Witness complies).

Q. All right. Now, if you would on here just put a little X about where your house was back in June of '05.

A. The residence where I was going to?

Q. Yes, sir.

A. Well, it's off of Highway 21. Braggs. This is 263 exit. I stayed approximately a mile or two, three miles from the 263 exit. So I would have to say somewhere in here approximately.

Q. Can you put a little bit larger X so when we copy that?

A. (Witness complies).

Q. And if you would, just write home under

Page 39

1   that.
2   A.  (Witness complies).
3   Q.  All right. So make sure I understand what
4       you're telling me. You left Farmersville
5       where your aunt's house was?
6   A.  Yes, sir.
7   Q.  Traveled down County Road 16?
8   A.  Uh-huh (positive response).
9   Q.  Took a right on County Road 7 from County
10      Road 16?
11  A.  (Witness nods head).
12  Q.  Where did you first see who you later
13      learned to be the defendants in this case?
14  A.  Approximately a quarter mile after turning
15      on County Road 7 I met a dark-colored
16      Lincoln Town Car, who I first thought was a
17      drunken driver or something that slowed
18      down, hit the brakes hard. And I didn't
19      know who it was, so I kept driving.
20  Q.  Okay. There's a whole bunch of things I
21      need to ask you about there. You said it
22      was a dark-colored Lincoln Town Car?
23  A.  Yes, sir.

Page 40

1   Q.  Had you ever seen that car before?
2   A.  No, sir.
3   Q.  Did it have any distinguishing features on
4       it, like a license plate on the front or
5       anything that stood out in your mind?
6   A.  Didn't even pay it no attention. Wasn't
7       registering in my mind. Just another
8       vehicle.
9   Q.  Had you passed any vehicles on County Road
10      7 prior to seeing that dark-colored
11      Lincoln?
12  A.  No, sir. That's the first vehicle I saw.
13  Q.  Had you passed any on County Road 16?
14  A.  No, sir.
15  Q.  So you're all alone on a road there?
16  A.  Yes, sir.
17  Q.  All right. You also said that you thought
18      it was a drunk driver. What made you think
19      it was a drunk driver?
20  A.  Because immediately upon meeting the car
21      the car slammed on brakes and took a nose
22      dive, and I thought that to be strange at
23      the time. Looked in my rear view mirror,

Page 41

1    saw that the car was veering off to the
2    side of the road. So I thought maybe they
3    had a flat or something, so I kept driving.
4    Q.  You didn't see it swerving in the road as
5    it was coming towards you; right?
6    A.  No, sir.
7    Q.  So the only thing that made you think it
8    was a drunk driver was it slammed on the
9    brakes and then veered off the road?
10   A.  Yes, sir.
11   Q.  Did you get a look at who was in the
12   vehicle as it went by you?
13   A.  No, sir.
14   Q.  County Road 7 where you encountered this
15   dark-colored Lincoln, is that a two-lane
16   road?
17   A.  It's a small rural road, one lane.
18   Q.  One lane in each direction?
19   A.  Yeah. One lane in each direction.
20   Q.  Did you see any kind of blue lights on the
21   vehicle when it went by you?
22   A.  There was no lights.
23   Q.  When you say no lights, no blue lights?

Page 42

1    A.  Right.
2    Q.  It had headlights; right?
3    A.  I'm certain it did.
4    Q.  Had you ever seen Chris West before that
5    day?
6    A.  No, sir.
7    Q.  How about LaShun Hutson, had you ever seen
8    him before that day?
9    A.  No, sir.
10   Q.  Did you know of them?
11   A.  I never know of Shawn Hutson, but I have
12   heard Chris West's name.
13   Q.  You'd heard Chris West's name prior to the
14   28th of June of '05?
15   A.  Yes, sir.
16   Q.  What did you know about Chris West prior to
17   June 28 of '05?
18   A.  Only that he was a law enforcement officer.
19   Q.  Do you remember who you heard that from or
20   how you heard it?
21   A.  No, sir. Just open conversation.
22   Q.  Do you know who might have told you that?
23   A.  No one told me. Just heard it. Just heard

Page 43

1    of him.
2    Q.  Did you know he worked with the drug task
3    force?
4    A.  No, sir.
5    Q.  Other than slamming on the brakes and
6    veering off the road, did they do anything
7    else unusual?
8    A.  That's all I know is right then.
9    Q.  You say right then. Did they do anything
10   else after that?
11   A.  Yeah. Next thing I know is they was upside
12   my car.
13   Q.  So from the time -- Let me make sure I got
14   your testimony right. From the time you
15   saw them slam on brakes and veer off the
16   road until they were next to you, you
17   didn't see them. Is that what you're
18   telling me?
19   A.  Yes, sir.
20   Q.  Were there any cars coming behind that
21   Lincoln that you saw?
22   A.  No, sir.
23   Q.  Okay. Now, you said they came alongside of

Page 44

1    you. How did they do that? Describe that
2    for me.
3    A.  After seeing the car slam on brakes and,
4    like I said, I looked in my back mirror and
5    saw them veer off. I kept driving. Didn't
6    know what was happening. Approximately 30
7    seconds to a minute later they had pulled
8    up beside me in the passing lane. All I
9    saw was two black males in black T-shirts
10   trying to flag me to pull over on first
11   glance.
12   Q.  You said trying to flag you. What were
13   they doing?
14   A.  I just seen the hand signal (indicating)
15   and pull over.
16   Q.  Was there anything -- Let me back up. Who
17   was doing the hand signal? Was it the
18   passenger or the driver?
19   A.  Passenger.
20   Q.  And just kind of describe what you did a
21   second ago. For the record you were using
22   your right hand and kind of pushing at
23   shoulder level off to the side?

Page 45

1  A.  Yes, sir.
2  Q.  Did you later learn who the passenger was
3       that was giving you the hand signal?
4  A.  I believe it was Shawn Hutson.
5  Q.  So Chris West was driving; is that right?
6  A.  I think he was.  Had to be.
7  Q.  Was there anybody else in the car besides
8       those two?
9  A.  No, sir.
10 Q.  Was your window up or down in your car?
11 A.  Down.
12 Q.  Does the air conditioning work in that car?
13 A.  No, sir.
14 Q.  So you had 2 by 55 air conditioning?
15 A.  I mean, wind?
16 Q.  Yeah.
17 A.  Yeah.  That's it.
18 Q.  And I'm just going to start referring to
19      them by name now.  We know that based on
20      your testimony Shawn was the passenger and
21      Chris was the driver.  Did Shawn say
22      anything to you when he was initially
23      giving you that hand signal?

Page 46

1  A.  I really couldn't hear if he had said
2       anything anyway.  As you can see in my
3       trunk, I had amplifiers and music that was
4       blasting during the time.  I was driving
5       35, 40 miles per hour.  All I could really
6       see was a hand signal.
7  Q.  Well, did it look like he was trying to say
8       something?
9  A.  I can't recollect.  I can't say that
10      because it happened so quick.  Just a brief
11      glance and that's all I looked over there.
12 Q.  Let me back up and ask you something here.
13      In paragraph 16 of your amended complaint
14      you alleged that you've been robbed
15      before.
16 A.  Yes, sir.
17 Q.  How many times had you been robbed before?
18 A.  Once.
19 Q.  When was that?
20 A.  August '03.
21 Q.  Where was it?
22 A.  In Montgomery.
23 Q.  What happened?

Page 47

1  A.  I was at the hotel, Peddler's Inn, and I
2       had a guy pull a gun on me and demanded
3       money.
4  Q.  Were you in a car or were you just
5       walking?  Where were you?
6  A.  Coming out my room -- hotel room.
7  Q.  Did he get any money off of you?
8  A.  He took some money.
9  Q.  Did you report it to the police?
10 A.  Yeah.  I went in for questioning and made a
11      statement.
12 Q.  Did they ever catch the guy who did it?
13 A.  Yes.
14 Q.  What was his name?
15 A.  I want to say Jerome Titus.
16 Q.  What happened with Mr. Titus?
17 A.  I guess they prosecuted him or whatever.  I
18      don't know the full extent.
19 Q.  Did you ever have to testify at trial?
20 A.  No.  I got a letter from the DA, Ellen
21      Brooks, saying it wasn't enough evidence or
22      something.  I don't know.  It was
23      dismissed.

Page 48

1  Q.  So he wasn't convicted?
2  A.  Not to my knowledge.
3  Q.  All right.  So that was the only time that
4       you were robbed previously?
5  A.  Yes, sir.
6  Q.  Have you been robbed since?
7  A.  No, sir.
8  Q.  All right.  So we got to the point where
9       their car -- are they about even with you
10      going down County Road 7?
11 A.  Yeah.  They pulled right up beside me.
12 Q.  Going about 35, 40 miles an hour; is that
13      right?
14 A.  Yeah.  I wasn't driving fast.
15 Q.  What's the speed limit there?
16 A.  Approximately 45, 50 maybe, anywhere in
17      that range.
18 Q.  About how long did they stay alongside of
19      you like that?
20 A.  Approximately 10 seconds.
21 Q.  What did they do after that 10 seconds?
22 A.  They veered behind me and trailed me out to
23      Highway 21.

| Page 49 |
|---|

1   Q.  Did they try to come up alongside of you
2       again prior to getting to Highway 21?
3   A.  No, sir.
4   Q.  Did you look at them in your rear view
5       mirror?
6   A.  I took a glance in my rear view mirror and
7       noticed that they was riding my bumper.
8   Q.  Did you see a blue light at that time?
9   A.  There was no blue light.
10  Q.  Could you see what the two occupants of the
11      car were doing in your rear view mirror?
12  A.  No, sir. I didn't glance. Just quick
13      glance to see that they was still behind
14      me.
15  Q.  Let me back up for just a second. When
16      they were alongside of you here this first
17      time, did you say anything to them?
18  A.  On first glance when they pulled up, yeah,
19      I may have said -- asked them what they
20      want, not in that nice a way, though.
21  Q.  Not in a nice way?
22  A.  Yeah. Not in a nice way.
23  Q.  Can you tell me exactly what you said?

| Page 50 |
|---|

1   A.  What the fuck y'all want.
2   Q.  Did you think to turn the stereo down?
3   A.  No. Because it was my first understanding
4      that it was somebody trying to rob me and
5      I'm not going to be courteous to them.
6   Q.  So you couldn't hear what they were saying
7      to you; right?
8   A.  No, sir.
9   Q.  And you asked them what you asked them?
10  A.  Yes, sir.
11  Q.  And the stereo is still going the whole
12      time?
13  A.  Yes, sir.
14  Q.  Did it look like either one of them
15      responded when you asked them that question?
16  A.  No, sir.
17  Q.  Because you just glanced at them real
18      quick; right?
19  A.  Yes, sir.
20  Q.  All right. They trailed you all the way up
21      to Highway 21; correct?
22  A.  Yes, sir.
23  Q.  What did you do when you got to Highway 21?

| Page 51 |
|---|

1   A.  I turned right. Turned going toward my
2      residence.
3   Q.  Turned right going towards your house?
4   A.  Yes, sir.
5   Q.  Which I guess on this map takes us back to
6      the west; is that right? I think this is
7      west over here on the left-hand side.
8   A.  I don't know if it's west or not. All I
9      knew --
10  Q.  Kind of southwest really?
11  A.  I turned right on Highway 21.
12  Q.  We'll go with that. You turned right on
13      Highway 21 heading towards your house. Is
14      there a stop sign there at 7 and 21?
15  A.  Caution light, yield sign.
16  Q.  A yield sign?
17  A.  Uh-huh (positive response).
18  Q.  Was there any traffic coming on Highway 21?
19  A.  No, sir. I didn't see any traffic.
20  Q.  Either way?
21  A.  No, sir.
22  Q.  What is Highway 21? Is it another
23      two-lane, one lane each way, or is it

| Page 52 |
|---|

1      four-lane?
2   A.  Two-lane, one lane each way. State
3      highway.
4   Q.  Did you stop at the intersection of 7 and
5      21?
6   A.  Brief caution, brake in the road at the
7      yield sign and proceeded to go right toward
8      my residence.
9   Q.  Kind of a rolling stop?
10  A.  Yeah. Rolling stop.
11  Q.  Wheels never really came to a complete
12      rest?
13  A.  No, sir.
14  Q.  And you took the right going onto Highway
15      21?
16  A.  Yes, sir.
17  Q.  What did the Lincoln do?
18  A.  Still behind me.
19  Q.  It followed you out on Highway 21?
20  A.  Yes, sir.
21  Q.  Did you get a chance to look in your rear
22      view mirror as you were going down 21?
23  A.  Well, right after turning on Highway 21 the

Page 53

1       vehicle pulled up beside me again.
2  Q.  So up again on the left-hand side of your
3       vehicle coming in the oncoming traffic
4       lane; is that right?
5  A.  Yes, sir.
6  Q.  How fast were you going at that time?
7  A.  Approximately 55, somewhere around there.
8  Q.  What's the speed limit on Highway 21?
9  A.  I'm quite sure it's 55.
10  Q.  And I should have asked you this before.
11       The rest of the time that you were on
12       County Road 7, did you stay going 35, 40
13       miles an hour?
14  A.  Around 35, 40 miles an hour. Because they
15       were bumper to bumper on me.
16  Q.  So you sped up a little bit?
17  A.  It was a wavy road, so I really didn't want
18       to travel fast.
19  Q.  Well, you did speed up a little if you got
20       up to 45; right?
21  A.  Well, like I said, I was driving around 35
22       to 45 on County Road 7.
23  Q.  Well, were you trying to get them off your

Page 54

1       bumper at all?
2  A.  I wasn't trying to because I knew I
3       couldn't. They was trailing my bumper.
4       And like I said, it was a wavy road. I
5       didn't want to hurt myself.
6  Q.  So you turned onto Highway 21 and they came
7       up alongside of you. What happened when
8       they came alongside of you?
9  A.  They came alongside me and I saw the same
10       thing, hand motion and I glanced and
11       kept driving.
12  Q.  Was there anything in -- And you said the
13       hand motion. Was that the passenger again,
14       Shawn?
15  A.  Yes.
16  Q.  Could you see anything that Chris might be
17       doing?
18  A.  I didn't have time to just lock in on him.
19  Q.  Did Shawn have anything in his hands this
20       time when they pulled up alongside of you
21       on 21?
22  A.  On second glance it appeared to be a weapon
23       at a glance and kept driving.

Page 55

1  Q.  Did you see anything besides the weapon?
2  A.  No, sir. I just seen the right hand.
3  Q.  I'm sorry?
4  A.  I just saw his right hand gesturing and I
5       just kept driving.
6  Q.  Is that the only hand he had in view?
7  A.  That's the only hand I saw.
8  Q.  Did he say anything to you?
9  A.  I didn't hear him say anything if he did
10       for the music.
11  Q.  You still had the music going?
12  A.  Yes, sir.
13  Q.  Could you tell that he was trying to say
14       anything to you? Could you see his lips
15       moving?
16  A.  I didn't have time to just lock on to what
17       he was saying, lips moving, because I'm
18       watching traffic and watch the incident.
19       All I did is glance. When the car pulled
20       up beside me, I glanced, put my eyes back
21       on the highway and kept driving.
22  Q.  You just said watching traffic. Are there
23       cars coming now?

Page 56

1  A.  No cars coming, but I'm looking for a car.
2  Q.  So still y'all are the only two vehicles on
3       the road?
4  A.  Yes, sir.
5  Q.  Describe that weapon that you saw for me.
6  A.  I can't describe it. All I know is I saw a
7       weapon. I don't know what brand --
8  Q.  Was it a knife? A gun?
9  A.  A gun, yeah. A gun.
10  Q.  Was it black? Shiny?
11  A.  It was black.
12  Q.  Big gun? Little gun?
13  A.  I don't know. I can't lock in on the
14       size. I glanced at the weapon I saw.
15  Q.  Was it pointed at you?
16  A.  I can't say that it was pointed at me. All
17       I seen was a hand gesture going like to
18       pull over or whatever.
19  Q.  He was gesturing with the gun?
20  A.  That's what I saw.
21  Q.  Did you say anything to him?
22  A.  I didn't say anything else. I was still
23       just driving.

Page 57

1   Q.   While all this was going on up to this
2        point, what's Kevin doing?
3   A.   Sitting in the seat asking me, Cuz, who is
4        this trying to run us off the road?  I tell
5        him I don't know; looks like somebody
6        trying to rob us; I'm not going to stop.
7        He was scared.
8   Q.   Well, I understand that you were driving
9        the vehicle.  Was he watching them?
10  A.   He wasn't watching them.  He was just aware
11       of what was going on.
12  Q.   Did he tell you at some point that the
13       police were behind you?
14  A.   He didn't tell me that.
15  Q.   He did not tell you that?
16  A.   No, sir.
17  Q.   Well, did he ever tell you to pull over at
18       any time?
19  A.   He didn't tell me to pull over.  He's
20       asking me who is this and what they trying
21       to do.  He just said, it looked like
22       they're going to run us off the road and
23       kill us if we don't pull over.

Page 58

1            (Defendant's Exhibit 6 was marked
2            for identification.)
3   Q.   Let me show you what we'll mark as
4        Defendant's Exhibit 6.  Let me give you
5        just a minute to look at Defendant's
6        Exhibit 6.
7            (Brief pause.)
8   Q.   Had you ever seen that document before
9        today, Mr. Marshall?
10  A.   I have.
11  Q.   When did you get a chance to see that
12       document?
13  A.   When we turned the information over.
14  Q.   Those initial disclosures; is that right?
15  A.   Yeah.
16  Q.   Now, this is a statement that Kevin gave to
17       the police that day.  And in it he says
18       that he saw that it was the police and he
19       advised you to pull over.  Is it your
20       testimony that he didn't tell you to pull
21       over?
22  A.   He didn't tell me to pull over, because by
23       the time we both realized it was the police

Page 59

1        we already had been spun off the road
2        before we realized who it was.
3   Q.   Now, you still had the music going pretty
4        good at that time?
5   A.   The music was going until Chris West turned
6        it off.
7   Q.   Is it possible that you just didn't hear
8        what Kevin was saying to you because of the
9        music?
10  A.   It's possible.
11  Q.   All right.  How long did they stay up
12       alongside of you the second time?
13  A.   Still approximately 10 seconds.
14  Q.   Did you see a blue light this time?
15  A.   I didn't see a light.
16  Q.   Did you see a badge?
17  A.   I didn't see a badge either.
18  Q.   And you told me before that they were
19       wearing black T-shirts.  Did those black
20       T-shirts have any writing on them?
21  A.   Not that I can recollect.  I just seen it
22       was black T-shirts.
23  Q.   What did they do after that 10 seconds of

Page 60

1        being alongside of you?
2   A.   Veered back behind me and trailed me
3        approximately another mile and a half or
4        two and they started to ram the vehicle.
5   Q.   Between the time that they pulled back
6        behind you and as you described the ramming
7        started, did you get a chance to look in
8        your rear view mirror at them?
9   A.   I didn't look in the mirror.
10  Q.   You didn't look again?
11  A.   (Witness shakes head).
12  Q.   So you couldn't see anything that they were
13       doing back there?
14  A.   I don't know what they was doing.
15  Q.   Let me back up again to the second time
16       they were beside you.  I might have asked
17       you this before.  If I did, I apologize.
18       Did you say anything to the passenger that
19       second time?
20  A.   No, sir.
21  Q.   Make any motions to him?
22  A.   I don't remember making any motions.  I
23       just remember glancing at him and keep

Page 61

1   driving.
2   Q.  While all this was going on, where was this
3       gun that's in Defendant's 3?
4   A.  Laying on the seat.
5   Q.  About where it is in Defendant's 3?
6   A.  Approximately somewhere.
7   Q.  Let me show it to you again.  And is
8       that -- you can see in the left-hand side,
9       is that the steering wheel?
10  A.  Yes, sir.
11  Q.  So it's -- is it fair to say that it's
12      fairly close to the driver?
13  A.  Yes, sir.
14  Q.  Was that gun just out in the open like
15      that, or was it tucked up under you
16      somehow?  How was that gun?
17  A.  It was down between the seat.
18  Q.  What do you mean down between the seat?
19  A.  Approximately somewhere around here where
20      it wouldn't be sliding.  It was laying
21      there.
22  Q.  You're pointing to the right-hand side what
23      looks like seat belts.  Are those seat

Page 62

1   belts there?
2   A.  Yeah.
3   Q.  Those little black things on the right-hand
4       side?
5   A.  Uh-huh (positive response).
6   Q.  So was it -- How was it in there?  You've
7       got it barrel down.  Describe for me how
8       it's in between the seats there.
9   A.  I'm certain the barrel was in there so it
10      wouldn't be moving pointing toward the --
11      back in the seat.
12  Q.  Did you touch the gun at any time while
13      this pursuit was going on?
14  A.  I don't know.  I probably touched it if it
15      was moving or whatever, but I didn't reach
16      for it or nothing.
17  Q.  Was the gun loaded?
18  A.  Yes, sir.
19  Q.  What kind of gun is that?
20  A.  .357.
21  Q.  Do you know what kind of bullets were in
22      it?
23  A.  .357 hollow points.

Page 63

1   Q.  At any time during this pursuit did you
2       pick that gun up?
3   A.  No, sir.
4   Q.  So it's just there kind of tucked down in
5       the seat?
6   A.  Yeah.  Until they was ramming.  It probably
7       was moving when they was ramming the
8       vehicle.  That's probably about the only
9       time I probably touched it.
10  Q.  Did the gun move at any time during the
11      pursuit?  Did it stay here until the
12      ramming started?
13  A.  I'm quite sure it did.  But when they was
14      ramming the car, my head was jerking.  I'm
15      quite sure it was moving along with
16      everything else on the seat.
17  Q.  Let's talk about the ramming.  Describe for
18      me what you mean when you say they rammed
19      you.
20  A.  Like I say, after they pulled beside me for
21      the second time, they veered back behind me
22      approximately a mile and they started
23      hitting -- hitting the back end of my

Page 64

1   vehicle like two or three times.  Each time
2   it was knocking the car in a wiggling
3   motion off the highway.
4   Q.  How fast were you going at that point?
5   A.  Initially I probably was going about 55
6       until they started ramming me and I was
7       losing control of the car and I slowed down
8       approximately about 35, 40 miles an hour
9       because I didn't want the car to flip out
10      of control.
11  Q.  What part of their car was striking your
12      car?
13  A.  I would have to say their bumper to
14      bumper.  I wasn't aware of the ramming
15      until I was hit.
16  Q.  Okay.  Was it -- And when you say ramming,
17      were they hitting you center on, or were
18      they off to one side or the other?  How was
19      that?
20  A.  They were hitting me center on up until the
21      point where they spinned me out.  And
22      that's when they hit me on the driver's
23      side bumper and spinned me out of control.



Page 65

1    MR. WILFORD:  Let's take a quick
2        break.  We've been going for
3        an hour.
4        (Brief recess was taken.)
5  Q.  Okay.  When we broke, Mr. Marshall, we were
6        talking about the ramming had begun.  About
7        how many times did the Lincoln come into
8        contact with your car?
9  A.  First ramming I'm quite sure he rammed me
10       twice -- two or three times.  Made the car
11       sort of lose control and then I regained.
12  Q.  That's what I want to do.  I want to take
13       them one by one so you can tell me what
14       happened each time he made contact with
15       you.  The first time that he hit you, was
16       that, again, head-on his front to roughly
17       the center of your bumper; is that right?
18  A.  Yes, sir.
19  Q.  And how fast were you going at the time
20       when he first hit you?
21  A.  I may have been going approximately 45 to
22       55 miles an hour at the first ramming.
23  Q.  What did you do when you felt the impact?

Page 66

1  A.  Well, on impact it jerked my neck and for a
2        brief moment I lost control of the car like
3        swerved from the ramming.  And I looked in
4        the mirror at this time to see what was
5        going on, but I still couldn't see what
6        they was doing back there.  I drove
7        approximately another quarter mile.
8  Q.  Hang on just a second.  You said you looked
9        back in the rear view mirror.  About how
10       long did you look?
11  A.  Just a glance up after they rammed.
12  Q.  Could you see what they were doing?
13  A.  No.  I couldn't make visual what they were
14       doing.
15  Q.  Did you see a blue light?
16  A.  No, sir.
17  Q.  Did you see any badges?
18  A.  No, sir.
19       COURT REPORTER:  Can I stop for
20       two seconds?
21       MR. WILFORD:  Sure.
22       (Brief pause.)
23  Q.  All right.  After you got control of the

Page 67

1        car after the first hit, what, if anything,
2        did you do?
3  A.  Continued to drive.
4  Q.  Did you slow down or speed up?
5  A.  Yeah.  I slowed down.
6  Q.  How slow did you get down to?
7  A.  Probably I want to say around 30, 35 miles
8        an hour.
9  Q.  Did you make any moves to pull the vehicle
10       off the road?
11  A.  No.
12  Q.  You said your neck got jerked around.  Did
13       you come in contact with anything in the
14       car?
15  A.  Not -- At that time I didn't.
16  Q.  How long did you drive at 35 miles an hour
17       before something else happened?
18  A.  Approximately 10 seconds and got rammed
19       again.
20  Q.  So this would be ram number two; correct?
21  A.  Yes, sir.
22  Q.  How did he hit you that time?
23  A.  Same way, bumper.

Page 68

1  Q.  Center on?
2  A.  Yes, sir.
3  Q.  Do you have any estimate of how fast they
4        were going?  Let's go back to the first
5        time he hit you.  Do you have any idea how
6        fast he was going when he hit you?
7  A.  I would estimate not too much faster than
8        me, because they were riding my bumper the
9        whole time.
10  Q.  So he couldn't have accelerated too much
11       before he came in contact; right?
12  A.  I guess not.
13  Q.  What about the second time, do you have any
14       idea how fast he was going?
15  A.  I can't approximate how fast he was going.
16       I just know the impact was variably the
17       same.
18  Q.  Did he stay on your bumper between the
19       first and the second impact?
20  A.  After the first impact I don't think he was
21       riding my bumper as close.  Because like I
22       say, I sort of lost control.  He probably
23       fell back a little until I regained control

Deposition of Richard Marshall

November 14, 2007

Page 69

1  and then I felt the ram again.
2  Q.  About how far did he fall back?
3  A.  I can't say how far because I really didn't
4     look back.  I just know I was swerving and
5     I'm quite sure he wasn't on my bumper while
6     I'm swerving.
7  Q.  Right.  When you did that glance into the
8     rear view mirror, though, about where was
9     he?  Was he still back on your bumper?  Had
10    he fallen back?
11 A.  No.  He had fell back approximately 20, 30
12    yards after he first bumped me.
13 Q.  All right.  So the second impact was about
14    as hard as the first impact; right?
15 A.  Yes, sir.
16 Q.  What happened immediately after the second
17    impact?
18 A.  Immediately after the second impact, the
19    car veered a little more, and immediately
20    following that that's when he bumped it
21    again on my driver's side bumper.  That's when my
22    spinned me out of control.  That's when my
23    head hit the steering wheel.  I snatched

Page 70

1  the vehicle.  It jumped Highway 21 and
2  landed on the opposite side of the highway
3  in a ditch on a spinout.
4  Q.  Okay.  So you're saying that the hit where
5     he spun you out came fairly quickly after
6     the second ram; is that right?
7  A.  Yes, sir.
8  Q.  Were you still going about 35 miles an hour
9     when the spinout hit occurred?
10 A.  Yes, sir.  Approximately.
11 Q.  Were you able to take any kind of
12    corrective action with the car between the
13    time of the second hit and the spinout hit?
14 A.  After he rammed me the second time, like I
15    say, I guess because I wasn't going as
16    fast, the car just like jerked.  And before
17    I can regroup, he had hit me again on the
18    bumper.  And that's when I spinned out
19    toward the bluff.  My head hit the steering
20    wheel.  Knowing it's a deep bluff right
21    here, I snatched the steering wheel, and
22    all I know the car jumped or skid across
23    Highway 21.  Because when my head came up,

Page 71

1  I was on the opposite side of the road in a
2  daze.  By the time I opened the car door
3  they was already out of their vehicle with
4  guns drawn.
5  Q.  Let's talk about your head hitting the
6     steering wheel.  What part of your head hit
7     the steering while?
8  A.  My right -- left temple.
9  Q.  Right above your eye there?
10 A.  Yeah.  I've still got a knot up there from
11    it.
12 Q.  And you weren't wearing your seat belt at
13    the time; right?
14 A.  No, sir.
15 Q.  Was that from the second hit or the spinout
16    hit that sent your head into the steering
17    wheel?
18 A.  Had to be the spinout, because when he hit
19    me, it like threw me off the seat out of
20    control and I just snatched the wheel and
21    the car just went where it went.
22 Q.  So it went all the way across the oncoming
23    lane; is that right?

Page 72

1  A.  Yeah.  It went -- When he spinned me out,
2     the car went off the bluff toward the bluff
3     to the right of the road on two wheels.  I
4     snatched it and all I can remember is it
5     clearing the highway or whatever.  I ended
6     on the opposite side of the road facing the
7     way we just came.
8  Q.  So you went off to the left from your
9     direction of travel; is that right?
10 A.  That's where --
11 Q.  Your car went to the left?
12 A.  That's where it landed.
13 Q.  Your initial direction of travel?
14 A.  Yes, sir.
15 Q.  And the stereo was still going the whole
16    time; right?
17 A.  Whole time.
18 Q.  Between the first time that you were hit
19    and what we're calling the spinout hit
20    here, did Kevin say anything to you that
21    you heard?
22 A.  No, sir.
23 Q.  Do you recall saying anything?

18 (Pages 69 to 72)

Page 73

1    A.  I was probably mumbling to myself, they're
2        trying to kill me, what they doing,
3        something to that effect.
4    Q.  Did you ever think to pick up that gun and
5        defend yourself with it?
6    A.  No, sir.
7    Q.  Did you have a cell phone with you that day?
8    A.  I'm quite sure I did.
9    Q.  Do you remember what the phone number was?
10   A.  I don't remember.
11   Q.  Did you try to call anybody?
12   A.  No, sir.  I didn't have time.
13   Q.  That's a good point.  From the time that
14       you saw that Lincoln break back on County
15       Road 7 until the time that you came to a
16       stop on Highway 21, how much time had
17       passed?
18   A.  If I had to estimate, I'd approximately say
19       anywhere from five to 10 minutes.
20   Q.  Did Kevin have a cell phone?
21   A.  No, sir.
22   Q.  All right.  So in that entire five- to
23       10-minute period, you never picked up the

Page 74

1        phone to make a call?
2    A.  No, sir.
3    Q.  Never thought to call for help?
4    A.  It's a panic situation.  You think you're
5        getting robbed.  You ain't got time to call
6        for no help when I'm driving.
7    Q.  The entire time that passed between the
8        first time that you were hit until you were
9        spun out, were there any vehicles on the
10       road besides yours and the Lincoln?
11   A.  I didn't meet any traffic on County Road 7,
12       and I don't recall meeting any traffic on
13       County Road 21 until after the incident was
14       over.
15   Q.  Did you throw anything out the window at
16       any time?
17   A.  The only thing I had in my hand was a
18       cigarette butt.  I was smoking previous to
19       the whole incident.  If anything was
20       thrown, it had to be a cigarette butt
21       because I didn't have anything else.
22   Q.  Where did you throw that cigarette butt
23       out?  Was it on County Road 7 or Highway

Page 75

1        21?
2    A.  Probably had to be on Highway 21.
3    Q.  What is this area here in this intersection
4        of 7 and 21 like?  Is it built up?  Are
5        there a lot of buildings?  Is it wooded?
6        Give me an idea of what the area around
7        there looks like.
8    A.  This area where --
9    Q.  I tell you what.  Let's start on County
10       Road 7 from basically where you turned off
11       on 16 up to 21.  Are there any houses or
12       churches or anything like that there?
13   A.  Well, after coming through what's called
14       the swamp on County Road 16, swampy area,
15       no houses.  I don't know what's in the
16       woods.  No houses.  Two bridges.  On County
17       Road 7 there's a church right to your
18       left.  As soon as you turn onto it there's
19       a church.
20   Q.  At the intersection of 16 and 7?
21   A.  Yeah.  That's the intersection.  It's a
22       church there.  And immediately turning on
23       County Road 7 I know there's a house and

Page 76

1        another house or two on your left.  And
2        after that --
3    Q.  Is this as you're traveling towards 21 that
4        you're describing for me?
5    A.  Immediately turning onto County Road 7
6        approximately a quarter mile you'll run up
7        on a house and a trailer and approximately
8        two houses on your left.  Then it's just
9        another wooded stretch and a bridge.
10   Q.  What about on 21 where you turned right
11       there, what's the area like around there?
12   A.  It's a caution light.  It's a big -- two
13       big ponds and used to be a junkyard.  Guy
14       owned a big house on the hill up from the
15       ponds and probably two older model houses
16       on your left.  Then you've got a another
17       stretch -- bridge and stretch or whatever.
18   Q.  Any churches or anything like that around
19       there?
20   A.  Not right there on Highway 21.  Not right
21       there.
22   Q.  Any gas stations or stores?
23   A.  Yeah.  There's a store probably a quarter

Page 77

mile to your left from the caution light.

Q. Going back towards Braggs?

A. Yeah. Going back towards Braggs. Community store right there.

Q. What about in the direction that you traveled on 21, are there any stores or gas stations or anything like that?

A. The direction I traveled that day going home?

Q. Yes, sir.

A. No gas station. No store.

Q. And your house is on Highway 21?

A. Right off the dirt road. Turn right off of 21.

Q. About how far back off of 21?

A. Just a couple hundred yards.

Q. Are there any other houses around that one?

A. Yeah. It's a couple houses right at the caution light about a quarter -- about 2, 300 yards from where I live, caution light, and there's a couple more residences in the area.

Q. Is that a different caution light than the

Page 78

one you've been telling me about on 7/21?

A. Yeah.

Q. So that's further on down?

A. Yeah. Right down from my home there's another caution light right down there.

Q. You're pointing right about where 21 intersects the Lowndes/Wilcox County line.

A. Yeah.

Q. I'm just trying to describe for the record where you were pointing.

A. Wilcox County line actually was about a mile from the --

Q. From your home or from where you wound up?

A. From my home.

Q. How far were you from your home when you were spun out?

A. Approximately a mile.

Q. Did your car hit anything when it was spun out other than the Lincoln?

A. Probably embankment is all I can say.

Q. Didn't hit a mailbox or --

A. No. It's no mailbox in the area.

Q. And we showed you already Defendant's

Page 79

1   Exhibit 2. Is that where your car came to
2   rest? Does that depict where your car came
3   to rest after being spun out?
4  A. Yes, sir.
5       (Defendant's Exhibits 7 and 8 was
6       marked for identification.)
7  Q. I'm going to show you a couple more
8   pictures here. I want to show you what
9   we're going to mark as Defendant's 7 and 8
10   and let you and your lawyers take a look at
11   those pictures. Now, do those pictures
12   also show the way your car wound up on
13   Highway 21 on June 28th, 2005?
14  A. Yes, sir.
15  Q. And we can also see another car in
16   Defendant's 7 and 8. Is that the Lincoln
17   that you've been describing?
18  A. Yes, sir.
19  Q. Is that how the Lincoln wound up after you
20   were spun out?
21  A. They pulled down in the direction. They
22   pulled off the road in front of me.
23  Q. And then they turned around and came back;

Page 80

1   is that right?
2  A. No. They pulled down after -- This is
3   where I landed.
4  Q. Right.
5  A. And by the time my head is up off the
6   steering wheel, my door -- they had already
7   pulled down and standing in the doorway
8   with guns drawn.
9  Q. That's -- Actually you make a good point
10   there. Let me -- Did you see what happened
11   to the Lincoln after it made contact --
12   made the contact with your vehicle that
13   spun you out?
14  A. No. Once I went spinning, I didn't see
15   anything else until the car came to rest.
16   And like I say, my head hit the steering
17   wheel. I had like a daze. And when I
18   leaned back and opened my eyes, the Lincoln
19   was pulling down right there and they
20   jumped out of the car with pistols drawn.
21   I didn't have an opportunity to get out. I
22   just opened the door and they was already
23   up.

Page 81

1  Q. So you saw the Lincoln -- I want to make
2     sure I got you right. You saw the Lincoln
3     come to that position that we see it in in
4     Defendant's 7 and 8; is that right?
5  A. Yeah. I saw it pull down.
6  Q. And is that where that car was when, as you
7     described, they got out with their guns
8     drawn?
9  A. Yes, sir.
10 Q. So the two cars in 7 and 8 are where they
11    were at that time that they got out and
12    drew down on you; is that right?
13 A. Yes, sir.
14 Q. Defendant's Exhibit 7, that's the rear of
15    your car; correct?
16 A. Yes, sir.
17 Q. What is that license plate?
18 A. BRich3.
19 Q. That's a personalized plate; is that right?
20 A. Yes, sir.
21 Q. Did you select that?
22 A. Yes, sir.
23 Q. What does that mean?

Page 82

1  A. Just a nickname. I had the same license on
2     two other vehicles. That's just the third
3     vehicle I had purchased. I had another
4     Nova.
5  Q. So your nickname is B Rich; is that right?
6  A. Uh-huh (positive response).
7  Q. Where does that come from?
8  A. Just a nickname. Gained a little weight
9     over the years. People started calling me
10    Big Rich. I used to be a skinny guy.
11 Q. I got you. So the Rich is short for
12    Richard?
13 A. Yeah.
14 Q. I got you. So you at some point had
15    vehicles that had BRich1 and BRich2 on
16    them?
17 A. Yeah.
18 Q. When you hit your head on the steering
19    wheel, did it get cut?
20 A. No, sir. Just a knot.
21 Q. All right. You saw the Lincoln pull up to
22    where we see it on 7 and 8 and they got out
23    with guns drawn. Did both officers get out

Page 83

1     with guns drawn?
2  A. Yes, sir.
3  Q. You saw the guns, then, at that time?
4  A. Yes, sir.
5  Q. Now, when they got out -- and I want to
6     make sure I understood what you told me --
7     were you still inside the car or had you
8     gotten out?
9  A. No. I hadn't gotten out. When they was
10    rolling up and jumped out of the car with
11    guns, I hadn't had an opportunity to get
12    out. I had opened the door, but like I
13    say, I was in a daze. And I got out of the
14    car after that and that's when they started
15    yelling commands. At that time is where I
16    seen a shield or whatever they had hanging
17    around their neck.
18 Q. Both of them?
19 A. Well, I know I saw the passenger because he
20    was more out, which was Chris West. He was
21    on the passenger's side at this time. I
22    really couldn't see what Mr. Hutson had on.
23 Q. Chris West was on the passenger side when

Page 84

1     you saw him?
2  A. Yeah.
3  Q. And where was Hutson?
4  A. On the other side of the door.
5  Q. On the driver's door?
6  A. Uh-huh (positive response).
7  Q. Did you see how they got to that position?
8     Because I think you told me earlier that
9     Chris was driving.
10 A. No. I didn't say he was driving. I said
11    that they got out with their guns drawn. I
12    never said Chris was driving because Shawn
13    Hutson was on the passenger side. But all
14    I knew is when I leaned up Chris West was
15    on this side of the car because he's the
16    one that took me down. Shawn Hutson was on
17    the other door.
18 Q. Okay. I'm a bit confused here, so we've
19    got to get this right. When the car pulled
20    up alongside of you twice, it was Shawn
21    Hutson who was gesturing at you to pull
22    over; right?
23 A. Yeah.

Page 85

1   Q.   And he was on the passenger's side; right?
2        Is that right?
3   A.   I understood it to be him.  I know it was a
4        skinnier guy.
5   Q.   I understand you didn't know him at the
6        time.
7   A.   Uh-huh (positive response).
8   Q.   And Chris and Shawn were the only two in
9        the Lincoln; right?
10  A.   Yes, sir.  The only two.
11  Q.   So doesn't that basically mean that Chris
12       had to have been driving?
13  A.   Yeah.  I guess he was driving, yeah.
14  Q.   So let me go back to my question.  Did you
15       see how it was that Chris wound up on the
16       passenger's side of the car after you were
17       spun out and Shawn wound up on the driver's
18       side?
19  A.   I didn't see that, but it was Chris West
20       that was on the passenger's side with the
21       gun on me.
22  Q.   And you said you saw the shield on Shawn;
23       is that right?

Page 86

1   A.   Saw the shield on Chris.  I really couldn't
2        see --
3   Q.   Keep me straight.  Shield on Chris.  Did
4        you get out of the car on their command or
5        on your own?
6   A.   Well, after -- Like I say, they was already
7        out.  They may have commanded me, but I was
8        dizzy in the head.  I got out of the car
9        and stood in the door with my hands up.
10       And I was asking them what's going on, and
11       they were just telling me, get on the
12       ground, get on the ground, get on the
13       ground.
14  Q.   So you could hear them now; right?
15  A.   Yeah.  I could hear them.
16  Q.   Music still going?
17  A.   Still going.
18  Q.   But now you can hear them?
19  A.   Yeah.  I'm out of the car.
20  Q.   At this time is the gun that was in your
21       car where it is in Defendant's 3?
22  A.   Yes, sir.  It was laying there.
23  Q.   Just like that?

Page 87

1   A.   (Witness nods head).
2   Q.   When they told you to get on the ground,
3        did you get on the ground?
4   A.   No, sir.
5   Q.   Why did you not get on the ground?
6   A.   Because I was agitated.  I didn't know what
7        was going on, why this was happening.  But
8        I still had my hands on top of the door
9        letting them know I wasn't posing a threat,
10       but I just didn't feel like getting on the
11       ground at the time.
12  Q.   Did you say anything to them?
13  A.   I'm quite sure I did.
14  Q.   What did you say?
15  A.   Why y'all doing this, what's going on,
16       something to that effect, what's this all
17       about.
18  Q.   At this point you'd seen the badge on
19       Chris; right?
20  A.   Yeah, I saw it.
21  Q.   So you knew they were police at this time;
22       right?
23  A.   I did.

Page 88

1   Q.   What did they say, if anything, when you
2        said what you said to them?
3   A.   Shawn Hutson, he wasn't focusing on me.  He
4        didn't say anything.  Chris West was just
5        saying get on the ground.  He said a couple
6        of dirty words, too; get on the ground, get
7        on the ground, get on the ground.  And he
8        just eased up on me and slammed me to the
9        ground.
10  Q.   You said Shawn wasn't focused on you.  What
11       was he doing?
12  A.   He was more or less watching my cousin.
13  Q.   After y'all came to a stop, what did Kevin
14       do?
15  A.   I really couldn't tell you what he was
16       doing.  I was focusing on them.  After the
17       car came to a stop and they drawed out, my
18       attention was on them.  So I really don't
19       know what he was doing.
20  Q.   Well, when was the next time that you
21       became aware of what Kevin was doing?
22  A.   When Shawn Hutson came around and got him
23       out of the car and put him in cuffs.

Page 89

1 Q. Was that before or after Chris West had
2 approached you?
3 A. He had already came along and subdued me.
4 Q. Other than commanding you to get on the
5 ground initially, did Chris or Shawn say
6 anything else?
7 A. At that time I can't recollect. Up until
8 the point where he -- Chris West put me on
9 the ground I can't recall anything they
10 said besides get down.
11 Q. Did they identify themselves, DTF or
12 sheriff's department or anything like that?
13 A. They didn't identify nothing.
14 Q. Other than the badges that they had on --
15 well, the badge that Chris had on?
16 A. The badge.
17 Q. All right. You said Chris came and
18 approached you and you were still standing
19 up at that time; right?
20 A. Yes, sir.
21 Q. What happened when he got to you?
22 A. He got to me, kick slammed me to the
23 ground.

Page 90

1 Q. Describe that for me. You say kick slammed
2 you to the ground. How did that happen?
3 A. I had my hands up right above my door. He
4 eased up on me with the gun drawn and he
5 got close enough until he grabbed me and
6 swept my feet with his feet and slammed me
7 face down on the ground. He put his foot
8 on my back and handcuffed me. Then he had
9 his foot on my neck.
10 Q. He cuffed you behind your back?
11 A. Yes, sir.
12 Q. As he was approaching you, did he say
13 anything to you?
14 A. I don't remember him saying anything but
15 just get down and he walked up on me.
16 Q. Did you say anything back to him as he was
17 coming up on you?
18 A. I didn't say anything then.
19 Q. Did you ever at any time make any move back
20 inside that car?
21 A. No, I didn't. I was standing in the car in
22 a daze and --
23 Q. You said your hands were up on top of the

Page 91

1 car. Were they on top of the --
2 A. Top of the door. I was standing in the
3 door with my hands like this (indicating)
4 so he can clearly see.
5 Q. We're going to look at Defendant's 2
6 again. You can see here you've got both
7 the driver's side front and rear door
8 open. I'm sure the driver's side rear door
9 wasn't open while all this was going on;
10 right? That was later?
11 A. Yes, sir.
12 Q. Was the front door open about like it is --
13 A. Yes.
14 Q. -- while this initial confrontation between
15 you and the officers was going on?
16 A. Yes, sir. I was standing in my doorway
17 with my hands up right here on top while
18 they was drawn and commanding me.
19 Q. Did anybody give any commands to Kevin that
20 you heard?
21 A. Like I say, I really can't recall any
22 commands being given to Kevin, because the
23 music is still loud and I'm just focusing

Page 92

1 on this gun is drawn on me and I can
2 clearly see what he's doing.
3 Q. Now, at the point from where Chris drew
4 down on you until he came up on you, you
5 got a pretty good look at him; right?
6 A. Uh-huh (positive response).
7 Q. What else did he have on him, if anything,
8 as far as on his person? Did you see any
9 equipment belt or anything like that?
10 A. Only thing I can recognize is he had on a
11 black T-shirt with the shield and he had on
12 regular short pants like I had on, tennis
13 shoes or something to that effect.
14 Q. Did you see anything on his belt?
15 A. I can't recall. I wasn't paying any
16 attention to that. All I was focusing on
17 was the gun on me.
18 Q. From the time Chris initially yelled at you
19 to get on the ground until the time that he
20 approached you and as you said foot-swept
21 you and cuffed you, did he do anything else
22 that we haven't talked about?
23 A. Not from the time he came from there and

Deposition of Richard Marshall                                              November 14, 2007

Page 93

1     foot-swept me on the ground he didn't.
2   Q.  After you were in cuffs and on the ground,
3     I think you told me earlier that's when
4     they cuffed Kevin; right?
5   A.  Yes.  Shawn Hutson went and pulled him out.
6   Q.  Were you able to see that --
7   A.  Yes.
8   Q.  -- from where you were?
9   A.  Yeah.
10  Q.  How were you -- Let's go back to
11    Defendant's Exhibit 2 again.  Once you were
12    cuffed and on the ground, can you show me
13    how you were laying by referencing
14    Defendant's 2?
15  A.  Well, when he foot-swept me and kicked me
16    on the ground, I was laying out toward --
17    like in this direction headed toward this
18    direction.
19  Q.  So you're out --
20  A.  Out from the door.
21  Q.  -- to the lower part of the picture
22    underneath the door -- the front door?
23  A.  Out from the door, yeah.

Page 94

1   Q.  Is that with your head facing back towards
2     Highway 21?
3   A.  My head is out this way where I can see
4     Highway 21 and I can see in my car.
5   Q.  Looking at Defendant's 2, where is the
6     Lincoln at?  Can you point for me the
7     general direction the Lincoln was in?
8   A.  The Lincoln was still up here at the front
9     where it was.
10  Q.  You're kind of pointing off to the
11    left-hand side of Defendant's 2 kind of in
12    the middle; is that right?
13  A.  Up in front of the vehicle where it was
14    resting on the other picture.  The Lincoln
15    was still there.
16  Q.  How did Kevin get out of the car?
17  A.  Shawn Hutson pulled him out of it.
18  Q.  I understand that.  But what side of the
19    car did he come out of?
20  A.  Passenger's side.
21  Q.  So Shawn came around to the passenger's
22    side of the car and took him out?
23  A.  Yes, sir.

Page 95

1   Q.  How did he take him out?  Describe that
2     process for me.
3   A.  Only thing I can see he grabbed him and
4     pulled him out of the car.
5   Q.  Was it through an open door or through the
6     window?
7   A.  The door.  The door was open.
8   Q.  And what did he do to him once he pulled
9     him out of the car?
10  A.  Put him in handcuffs and set him up there
11    on that hill.
12  Q.  Where we see him in Defendant's 7 and 8?
13  A.  Yeah.
14  Q.  Did he pretty much stay there for the rest
15    of the time until he was taken from the
16    scene?
17  A.  Yes, sir.
18  Q.  All right.  Once Kevin was cuffed, what
19    happened?
20  A.  Chris West got me up off the ground and put
21    me back upside my car door.  My back door
22    wasn't open at the time.  My back is
23    against my door and in cuffs, and he

Page 96

1     started asking me, you ain't seen the
2     badge, you ain't see this, you ain't see
3     that.  I said, man, I ain't seen nothing
4     but the gun.  He didn't like what I was
5     saying, so he grabbed my pants and he
6     shoved me against the car.  I said, man,
7     what you doing.  He started going in my
8     pockets.  I know he took my wallet out.  I
9     didn't even see him take the money out.  He
10    took my wallet out, open it up, throw it
11    inside my car on the seat.
12  Q.  Which seat?  The back seat or the front
13    seat?
14  A.  It was on the front seat.
15  Q.  Did we see your wallet in any of these
16    pictures?
17  A.  I didn't see it.
18  Q.  So he searched your pants?
19  A.  Yeah.  He put his hands in all my pockets
20    and he came out with the wallet and looked
21    in it.  And like I say, I didn't see him
22    come out with the money.  But I was still
23    standing there.  He was raving on about why

24 (Pages 93 to 96)

Page 97

1   I ain't stopped, this and that. I told him
2   I didn't know who he was; I thought you was
3   somebody trying to rob me. You know who I
4   was, this and that back and forth.
5   Q.  Let me stop you right there. Other than
6       your wallet -- You said you didn't see him
7       take the money out?
8   A.  I didn't see him take it out, but he put
9       his hand in the pocket where my money was.
10      I didn't see him take it out.
11  Q.  Did he take anything else out of your
12      pockets?
13  A.  Just my wallet in my sight. I saw him take
14      the wallet out and go through it and throw
15      it down.
16  Q.  Did he search any other part of your person
17      other than the pockets of your pants?
18  A.  He had -- Like I say, he had his hands
19      verbally in -- like in the belt part of my
20      pants and pulled them first like shoved me
21      against the car. Then he started searching
22      me. After that he went to the trunk of the
23      car and started tearing it up, opening it

Page 98

1   up.
2   Q.  Okay. About how long did his search of
3       your person take?
4   A.  I would approximately say 10 minutes.
5   Q.  10 minutes?
6   A.  Approximately. Because he went through the
7       trunk and everything.
8   Q.  I'm just talking about your person.
9   A.  Oh, me?
10  Q.  Yeah. Your person.
11  A.  Couple of minutes. Couple of minutes.
12  Q.  While this was going on, were you able to
13      see or hear what was going on with Kevin?
14  A.  No. I ain't heard -- As far as I know,
15      Shawn had placed him over there sitting
16      down. He wasn't going nowhere.
17  Q.  Was Shawn present while you were being
18      searched by Chris West?
19  A.  Yes, sir.
20  Q.  Was he standing there?
21  A.  He was more or less out around the Lincoln
22      Town Car around the vehicle. Chris was
23      searching me, searching the trunk or

Page 99

1   whatever. Shawn was more or less over by
2   the vehicle.
3   Q.  I'm just focusing on the time right now
4       while Chris was searching your person, not
5       the vehicle yet. Was Shawn standing
6       nearby?
7   A.  I can't recollect where he was then. I
8       know he had got Kevin out of the car and he
9       wasn't in our immediate space.
10  Q.  All right. Once he got done -- Once Chris
11      got done searching you, what did he do with
12      you, if anything?
13  A.  I was standing right there, as I say, in my
14      car door. The passenger rear door is still
15      closed. He wanted me to get in the back
16      seat of the car. I said, man, you see this
17      tight space; I can't get in there with my
18      handcuffs on; I'm a big guy; I can't get in
19      there. He got mad and grabbed me inside my
20      pants and rammed me against the car and he
21      snatched me back. That's when my pants hit
22      the ground off my leg because he busted the
23      zipper and the button. My pants was on the

Page 100

1   ground. I said, man, what you doing. I
2   said, you see I can't get in there; put me
3   in the patrol car or whatever you're going
4   to do. You're going to get in here; such
5   and such, such and such. So at this time
6   cars started coming up Highway 21. He
7   stopped doing what he's doing, went to the
8   Lincoln Town Car, reached in there, got a
9   light. He put the light on top of the
10  car. The light wouldn't even work. He
11  beat on the light three or four times
12  before the light started flashing. That's
13  how I was able to know there was no light
14  present throughout the whole incident. He
15  put the light on the car after he had did
16  all this and I'm watching him doing this.
17  Q.  You watched him take the light out of the
18      car and put it up on --
19  A.  I watched him reach inside the car and come
20      out with a light. He stuck it on top of
21      the car and he beat on it three times
22      before it even started flashing.
23  Q.  How much did you weigh in June of '05?

Page 101

1   A.   I was probably weighing about 275, 280 back
2        then.
3   Q.   How tall were you?
4   A.   5-9.
5   Q.   The shorts you were wearing that day, were
6        they tight on you?  Baggy?  Were you
7        wearing them low slung?
8   A.   Just snug fit, average fit.
9   Q.   Did you have a belt on?
10  A.   No belt.
11  Q.   You were wearing boxers underneath them; is
12       that right?
13  A.   Yes, sir.
14  Q.   You said the zipper broke on the shorts?
15  A.   The zipper bust and the button popped off,
16       because he stuck his hands in the inside of
17       my crotch and gripped the pants and forced
18       me back in the car while I'm already in
19       cuffs.  Then he choked me because I was
20       asking what he was doing.  I said, man,
21       what this all about.  When I wouldn't get
22       in the car -- That's what made me get in
23       the back seat of the car.  He verbally

Page 102

1        choked me until I couldn't breathe, and
2        that's when I subdued and got in the back
3        seat of the car.
4   Q.   Describe for me how he choked you.
5   A.   Doing the motion.  When he slammed me
6        against the car, I still wouldn't get in
7        the back seat of the car because I
8        couldn't -- it's a small car.  I know I
9        couldn't hardly get in there.  And I
10       wouldn't obey what he was doing.  He said,
11       you're going to get in the back seat of
12       this car because traffic coming at the
13       time.  He grabbed one hand on the back of
14       my neck some kind of full nelson choke and
15       my head was like this (indicating).  You're
16       going to get in the car.  That's what he
17       said.  You're going to get in there.  And
18       when I stopped -- couldn't breathe, I gave
19       up and crawled in the back seat of the
20       car.  You see my legs are still out.  I
21       couldn't get my whole body in there.
22  Q.   So he had one arm in the front of your neck
23       and one arm in the back of your neck; is

Page 103

1        that right?
2   A.   Full nelson, some type of chokehold.
3        That's all I know.  I can't describe
4        exactly how it was.  All I know I was being
5        choked.  He was in front of me and he was
6        choking me.  Cut my air off.
7   Q.   Once you got in the car, did he stop
8        choking you?
9   A.   He stopped choking me while I was still
10       standing there because I gave up
11       resisting.  I told him, okay, I'll get in
12       the car because I couldn't breathe.
13  Q.   So you agreed to get in the car and he
14       released his hold; is that right?
15  A.   Yes.
16  Q.   About how long were you in that hold?
17  A.   Long enough for my breath to get cut off.
18  Q.   Seconds?  Minutes?
19  A.   Seconds.  Wasn't no minutes.  Seconds.
20  Q.   10 seconds?  Five seconds?
21  A.   I don't know how many seconds.
22       Approximately five to 10 seconds.
23  Q.   We do see you in the car in these pictures;

Page 104

1        right?  Let's look at Defendant's 7.  Is
2        that you in the back seat of the car there?
3   A.   Yes, sir.
4   Q.   And Defendant's 8, is that you in the back
5        seat of the car?
6   A.   Yes, sir.
7   Q.   And I think you told me he searched your
8        car too.  Was that before or after he put
9        you in the back seat of your car?
10  A.   I know he searched it -- the inside part
11       with me standing right here just reaching
12       in.  I'm standing here.  He just reached in
13       and he got the keys out during that time
14       and he went to the trunk of the car, opened
15       it with the keys and started going through
16       the trunk while I was standing there.  And
17       he came back and slammed the trunk or
18       whatever and came back around.
19  Q.   At some point did he find the gun?
20  A.   Oh, he already saw the gun.
21  Q.   Tell me when you first became aware that he
22       was aware of the gun.
23  A.   After he had slammed me down on the ground

Deposition of Richard Marshall

November 14, 2007

Page 105

1    and put me in cuffs they saw the gun,
2    because they was making little smart
3    comments about the gun on the seat and this
4    and that.
5  Q.  Who made the comment about the gun?
6  A.  Shawn Hutson.  Oh, he got a big gun; oh, it
7    ain't no cheap gun either; all this and
8    that.  I told them it's not my gun.  That's
9    your gun?  I said, it ain't my gun, man.
10  Q.  Had the radio been turned off at this
11    point?
12  A.  Chris West turned the radio down after he
13    put me in cuffs.
14  Q.  After he put you in cuffs?
15  A.  Yeah.
16  Q.  Is that about the same time that he found
17    the gun?
18  A.  Yeah.  He saw the gun right after he
19    reached in the car or whatever.
20  Q.  Did he take the gun, did he move the gun,
21    or did he just leave it right there where
22    we see it?
23  A.  He left it right there.

Page 106

1  Q.  All right.  Then he did a complete search
2    of your car; is that right?
3  A.  He went to the trunk.  He already had
4    visually searched the little front part,
5    which is not too much concealed.  He went
6    to the trunk and that's where he did most
7    of the searching, moving stuff doing this
8    and that, whatever he was doing back
9    there.  He came back a little while where I
10    was.
11  Q.  Did he bring anything with him when he came
12    back up there where you were?
13  A.  No, sir.
14  Q.  Did he tell you that he had found anything?
15  A.  No, sir.
16  Q.  About how long did it take him to search
17    the car?
18  A.  I'd say the whole search probably I'd say
19    five to 10 minutes.
20  Q.  While Chris was searching the car, what was
21    Shawn doing?
22  A.  Shawn was back toward the Lincoln Town Car
23    and Chris made the statement about the gun

Page 107

1    or whatever.  Then Shawn came over where he
2    was and they were making little small talk
3    about the caliber and the model of the gun
4    or whatever, this and that.
5  Q.  Any other conversation that you heard?
6  A.  No, sir.  After that incident, Chris West
7    took me up there and put me on the hill
8    beside Kevin.
9  Q.  Took you back out of your car?
10  A.  Yes, sir.
11        (Defendant's Exhibit 9 was marked
12        for identification.)
13  Q.  I'm going to show you what we'll mark as
14    Defendant's Exhibit 9.
15  A.  Uh-huh (positive response).
16  Q.  Mr. Marshall, do you recognize what's in
17    Defendant's Exhibit 9?
18  A.  Appear to be some money.
19  Q.  Looks like it's on some carpet too; right?
20  A.  Appear to be.
21  Q.  Is that the same kind of carpet that you
22    have in your Nova?
23  A.  My Nova doesn't even have carpet in it, so

Page 108

1    I don't know what that is.
2  Q.  Did you have money like that that day, a
3    five and what looks like a bunch of ones?
4  A.  I had $500.  If that's the money, I don't
5    know whose it is.  It ain't mine.  I had
6    two $100 bills and the rest in twenties.
7  Q.  So it's your testimony that that money
8    wasn't in your car that day?
9  A.  I can't say it wasn't in my car.  It may
10    have been Kevin's money, but it's not mine.
11  Q.  So you don't recognize anything in
12    Defendant's Exhibit 9 at all?
13  A.  It's not my money.
14  Q.  That's not what I asked you.  I understand
15    that you know that it's money.  Do you
16    recognize what Defendant's Exhibit 9 shows?
17  A.  I don't recognize that.
18        (Defendant's Exhibits 10 and 11
19        were marked for identification.)
20  Q.  Mr. Marshall, I'm going to show you two
21    more pictures, Defendant's 10 and 11.  Were
22    those pictures taken of you on June 28th,
23    2005?

of Richard Marshall

<table>
</table>

**Page 109**

Yes.

Is that what you were wearing at the time?

Yes.

And that is you in those pictures; right?

Yes.

    MR. WILFORD: Let's get something to eat.

    (Whereupon lunch recess was taken.)

(Continuing by Mr. Wilford) Mr. Marshall, you testified before we took a break that at some point you were taken and put over on the side of the hill there next to Kevin; right?

Yes.

What, if anything, happened after you were put over there by Kevin?

They ran my name, his name in and --

What do you mean they ran his name in?

Warrant check or whatever, social security number. Ran both our names and --

Did any other police units arrive?

Probably 30 to 45 minutes later they called back to Hayneville for a sheriff's deputy

**Page 110**

vehicle. It arrived, which I was placed in.

I'm sorry I interrupted you. So they called his information in?

Called both of us in.

Anything happen after they called that in?

No. We just was sitting there on the grass and they was walking around talking among themselves. I heard them calling in for the vehicle.

Did they call over a radio or cell phone, or how did they do that?

Over the dispatch (indicating).

You're doing --

Police dispatch.

Over the radio?

I saw them reach in the car, yeah.

Could you hear what they were saying?

Only what I could make out of it my social security number and name being called and they was running or whatever over the loud speaker.

And so you sat there on the side of the

**Page 111**

1  hill for 30 to 45 minutes before another
2  vehicle came?
3  A.  Yes. Before the police vehicle came.
4  Q.  Anything else happen during that time
5  besides your information being called in?
6  A.  Not during that time I was sitting on the
7  hill. Nothing happened then.
8  Q.  So nothing happened between that time and
9  the time that another police unit showed
10  up; is that right?
11  A.  No. Nothing happened. The only thing that
12  I forgot to leave out that happened is
13  backing up to when Chris West initially
14  drawed down on me he did fire his weapon in
15  my direction.
16  Q.  You forgot to mention that?
17  A.  Yeah.
18  Q.  Was that after you had a chance to talk to
19  your lawyers at lunchtime?
20        MR. LEWIS: Object.
21  A.  I just --
22        MR. LEWIS: Don't discuss anything
23      that you and I might have

**Page 112**

1      talked about.
2  Q.  I'm not asking about the substance of the
3  conversation. I'm just -- Were you
4  reminded of it at lunchtime?
5  A.  No, I wasn't reminded of it.
6  Q.  Well, what happened with this shooting?
7  A.  It just -- That's the first thing -- After
8  he drew down, he fired the weapon before
9  coming to approach me.
10  Q.  Before who approached you?
11  A.  Before he approached me he had already
12  fired the weapon.
13  Q.  Let's back up, then, and as you say
14  completely regroup. He got out of the car
15  and he had his weapon pointed at you; is
16  that right?
17  A.  Yes, sir.
18  Q.  Did he give you commands?
19  A.  He said get on the ground or something to
20  that effect.
21  Q.  And you didn't comply with those commands.
22  You told me that earlier; right?
23  A.  No, I didn't comply.

Page 113

1  Q.  So you were still standing there?
2  A.  In the doorway, yeah.
3  Q.  In the doorway of the car?
4  A.  Uh-huh (positive response).
5  Q.  And he fired?
6  A.  Yeah.
7  Q.  This was after giving you commands and you
8     not complying; right?
9  A.  Yeah. He had given some kind of command.
10  Q.  And you hadn't complied?
11  A.  No.
12  Q.  Where did he shoot?
13  A.  Right out -- if I may.
14  Q.  Sure.
15  A.  In this general direction (indicating).
16  Q.  We're looking at Defendant's Exhibit 2.
17  A.  Right down past the doorway.
18  Q.  You're making a pretty broad motion there.
19  A.  I'm standing in the doorway, but he fired
20     right out from -- past the doorway in this
21     direction down --
22  Q.  Towards the front of your car or --
23  A.  I heard the bullet hit the ground. I heard

Page 114

1     the gunshot. It hit the ground somewhere
2     in this direction. He fired down there.
3  Q.  Did the bullet strike the ground in front
4     of you or off to the side of you?
5  A.  I can't say exactly where it struck,
6     gunfire. But I did hear it hit the ground
7     in this area right here. I heard it.
8  Q.  How many times did he shoot?
9  A.  One shot.
10  Q.  And did you comply with his commands after
11     he shot at the ground?
12  A.  I still had my hands up over the vehicle.
13     I asked him, why are you shooting at me,
14     what are you doing, and he was just still
15     saying, get on the ground, this or that,
16     get on the ground. That's when he was
17     walking up on me.
18  Q.  Okay. So this man just fired a round at
19     your feet? This man that you know to be a
20     police officer and you still didn't do what
21     he said?
22  A.  He fired at me, but I didn't -- like I
23     said, I didn't run out to jump on the

Page 115

1     ground. I've been arrested before. That's
2     why I had my hands up to show I wasn't
3     posing a threat. But I didn't see any
4     reason why he had to fire at me.
5  Q.  Well, when you were arrested before, did
6     you do what the police told you to do?
7  A.  Yeah.
8  Q.  And you have no idea where the round hit
9     the ground other than it was generally
10     somewhere out in front of your car on the
11     passenger's side?
12  A.  I can't specifically say where it hit, but
13     I know it was right in the direction of the
14     front driver's door somewhere before the
15     end of the car. I heard it hit the ground
16     when he shot.
17  Q.  Did it kick up any dirt or grass or
18     anything like that?
19  A.  Just like (indicating) quick.
20  Q.  Did any of it hit you?
21  A.  No. Didn't no dirt or -- it didn't hit me.
22  Q.  All right. Up until the point that another
23     police vehicle arrived, have you told me

Page 116

1     everything that happened out there after
2     you were put on the side of the road?
3  A.  Yeah. Up until he placed me beside Kevin.
4     The only other thing happened is the
5     vehicle pulled up and they placed me in
6     that vehicle and put Kevin in the Lincoln
7     Town Car.
8  Q.  Let's talk about -- How many other vehicles
9     showed up?
10  A.  Just one.
11  Q.  What kind of car was it?
12  A.  Brown Ford Crown Vic, county sheriff.
13  Q.  It was a county sheriff's vehicle?
14  A.  Yeah.
15  Q.  All right. Do you know -- How many
16     officers showed up in that car?
17  A.  One officer.
18  Q.  Do you know the name of that officer?
19  A.  No, I don't.
20  Q.  Can you describe him for me?
21  A.  Appeared to be a younger white guy, kind of
22     stocky build, Army cut.
23  Q.  And you were placed in the back of his car?

Deposition of Richard Marshall                                                                November 14, 2007

Page 117

| | |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  When did that occur?  Was it right after he |
| 3 | arrived, or how much time passed? |
| 4 | A.  Well, I'll say approximately 10 minutes, 15 |
| 5 | minutes max after he arrived after they |
| 6 | figured out who was going to get in what. |
| 7 | The guy placed me in the back of the county |
| 8 | sheriff car and placed Kevin in the front |
| 9 | seat of the Lincoln Town Car.  And Shawn |
| 10 | Hutson drove off in my car. |
| 11 | Q.  You watched him drive off in your car? |
| 12 | A.  Uh-huh (positive response).  He left first. |
| 13 | Q.  You were still there on the scene? |
| 14 | A.  Uh-huh (positive response). |
| 15 | Q.  How long did you stay there on the scene |
| 16 | after your car was driven off? |
| 17 | A.  Approximately five minutes. |
| 18 | Q.  Did anything happen during that five |
| 19 | minutes? |
| 20 | A.  No.  I just was driven off by the county |
| 21 | deputy sheriff. |
| 22 | Q.  Did you leave first, or did Chris leave |
| 23 | first? |

Page 119

| | |
|---|---|
| 1 | A.  This would be 263 crossing. |
| 2 | Q.  Right. |
| 3 | A.  I would say somewhere in here right down |
| 4 | from the turn on County Road -- off County |
| 5 | Road 7 on 21. |
| 6 | Q.  Looks like you're kind of pointing -- and |
| 7 | correct me if I'm wrong -- about halfway |
| 8 | between County Road 7 and your home on |
| 9 | Highway 21. |
| 10 | A.  Right off County Road 7 probably a couple |
| 11 | hundred feet.  That's where they stopped. |
| 12 | Q.  Did they find anything? |
| 13 | A.  Not to my knowledge.  I didn't see them |
| 14 | find anything. |
| 15 | Q.  Has it come to your attention at some point |
| 16 | later that they found anything? |
| 17 | A.  It was said that he picked a baggy up |
| 18 | beside the road or something. |
| 19 | Q.  Did you ever see the baggy? |
| 20 | A.  No, sir. |
| 21 | Q.  How long did it take them to search on the |
| 22 | side of Highway 21? |
| 23 | A.  I'll say approximately 15 minutes or so. |

Page 118

| | |
|---|---|
| 1 | A.  Shawn Hutson left first. |
| 2 | Q.  Yeah.  We established that. |
| 3 | A.  Then I left in the deputy sheriff car.  And |
| 4 | we only went halfway up 21 when they |
| 5 | stopped and got out of the car and started |
| 6 | looking for something.  Shawn Hutson turned |
| 7 | around in my vehicle and came back and |
| 8 | stopped and got out with Chris West walking |
| 9 | down 21 appeared to be looking for |
| 10 | something.  I was in the county sheriff |
| 11 | car.  Kevin was in the Lincoln Town Car |
| 12 | behind us. |
| 13 | Q.  All right.  Where did you stop?  Was it |
| 14 | before County Road 7 or after County Road |
| 15 | 7? |
| 16 | A.  On Highway 21 right up the road.  After |
| 17 | turning on Highway 21, they stopped right |
| 18 | there and -- all three vehicles. |
| 19 | Q.  I understand it was on Highway 21.  I'm |
| 20 | just trying to figure out.  Let's go back |
| 21 | and look at Defendant's Exhibit 5.  About |
| 22 | where on County Road 21 did they stop and |
| 23 | look? |

Page 120

| | |
|---|---|
| 1 | Q.  Was Kevin there, too, in their car? |
| 2 | A.  He was in the Lincoln. |
| 3 | Q.  What happened after they got done |
| 4 | searching? |
| 5 | A.  Chris West came back to the Lincoln, waved |
| 6 | Shawn Hutson to go on.  And the sheriff car |
| 7 | pulled off with me and then they stopped at |
| 8 | the store right up the road I was telling |
| 9 | you about, Howard's Country Store.  Shawn |
| 10 | Hutson pulled up on the gas tank, put gas |
| 11 | in my vehicle.  Chris West, the deputy, and |
| 12 | Shawn Hutson went inside the store. |
| 13 | Probably got something to drink or |
| 14 | whatever.  I had a flat -- They had a flat |
| 15 | on the sheriff's car.  They changed the |
| 16 | flat while I was still in the car, Chris |
| 17 | West and the deputy sheriff. |
| 18 | Q.  There at the gas station? |
| 19 | A.  Yes, sir.  They changed the flat.  And |
| 20 | Shawn Hutson, he left about 10 minutes |
| 21 | earlier and went up 21 in my car. |
| 22 | Q.  Was your car almost out of gas? |
| 23 | A.  Yeah.  It was on E. |

Page 121

1  Q.  How long did that take there at the gas
2      station for them to do all that?
3  A.  I'll say approximately another 20 minutes.
4  Q.  Was there any conversation with you that
5      took place at that time?
6  A.  No.  I was in the back seat of the patrol
7      car the whole time.
8  Q.  Nobody talked to you?
9  A.  No, sir.
10  Q.  Did anything else happen as far as
11      something happening to you personally while
12      you were there at the gas station?
13  A.  No, sir.
14  Q.  Just sat there and waited for them?
15  A.  (Witness nods head).  Yes, sir.
16  Q.  What happened after the gas station?
17  A.  After changing the tire, Chris West got in
18      the Lincoln.  He left first.  The deputy
19      sheriff got in and proceeded to go to the
20      Lowndes County Detention Facility.
21  Q.  Between the gas station and the detention
22      facility, did you have any conversation
23      with the deputy?

Page 122

1  A.  No.  He didn't say anything.
2  Q.  Did you hear anything on the radio?
3  A.  No, sir.
4  Q.  What happened when you got to the jail --
5      excuse me -- detention facility?
6  A.  The deputy radioed to come in through the
7      gate and Chris West came in also.  And he
8      brought -- Deputy got me out of the back
9      seat of the car and brought us into the
10      facility into booking.
11  Q.  Anything out of the ordinary happen from
12      the time you got out of the car and you got
13      to the booking area?
14  A.  No.
15  Q.  Did you have any conversation with the
16      deputy?
17  A.  No.
18  Q.  Who escorted you from the car to the
19      booking area?
20  A.  The deputy.
21  Q.  What happened when you got to the booking
22      area?
23  A.  I think Chris West told us to stand back

Page 123

1      toward the wall.  The deputy was standing
2      over to the right by the counter.  Told me
3      to take off -- Well, he took the cuffs
4      off.  He told me to take off jewelry,
5      et cetera.
6  Q.  Who told you to do that?
7  A.  Chris West.  Told me to take off the
8      jewelry.  So I took the jewelry off, put it
9      on the counter.  And at this point they was
10      fixing to log whatever possessions in the
11      booking.  Chris West put what was supposed
12      to have been my money on the counter, which
13      I see was only five twenties, $100 bill.  I
14      immediately asked him where is the rest of
15      my money.  The deputy reached to get the
16      money and tried to count it.  Chris West
17      snatched it out of his hand and told him
18      don't worry about it, put him in the hole.
19      They put me in the hole.
20  Q.  How much did he put on the counter?
21  A.  $100, five twenties.
22  Q.  Five twenties?
23  A.  Uh-huh (positive response).

Page 124

1  Q.  I take it at some point you had to have
2      been taken out of handcuffs, right --
3  A.  Yes, sir.
4  Q.  -- to take all your stuff off?
5  A.  Yes, sir.
6  Q.  When were you taken out of handcuffs?
7  A.  Not -- A couple of minutes after coming
8      into booking after Chris got behind the
9      desk and told them to take me out of the
10      cuffs so I can take my belongings off.
11  Q.  Who took you out of the cuffs?
12  A.  The deputy.
13  Q.  Was there anybody present in the room
14      besides you, the deputy, and Chris?
15  A.  Kevin.  And another lady in booking was
16      behind the desk.
17  Q.  There was a lady in booking?
18  A.  Uh-huh (positive response).
19  Q.  What about Shawn Hutson, was he present?
20  A.  Shawn Hutson wasn't in there.
21  Q.  Where was the lady that you described being
22      in booking when the discussion of the money
23      occurred?

Page 125

A. Standing right there. She was in her desk. But when Chris came in, she got up and Chris got in the desk and started getting the paper or whatever. She was standing right beside him when he put the money on the counter and I immediately said, man, that's not all my money, where is the rest of my money. And the deputy reached for it to start counting it and Chris snatched it from him and told him, don't worry about it, put him in the hole.

Q. Do you remember what this lady's name was?

A. I can't recall.

Q. Can you describe her for me?

A. I probably know her if I see her. It's been a while. I've seen her since I've been back up there. But I probably have to see her. I'm not sure if it's Ms. Cottrell. It's one of them. I don't know who is in booking. It was around two -- between two and 2:30 when we finally reached the facility that evening. From 12 that evening when the incident started, it

Page 126

was two to 2:30 when I finally reached the building.

Q. You're saying evening. 12 noon?

A. It was somewhere around 12 noon when the incident began. When I finally arrived there, it was somewhere between two -- after two o'clock.

Q. P.m. or a.m.?

A. P.m.

Q. Okay. I'm just making sure.
       All right. Now, you made a statement about your money there, a verbal statement; correct?

A. Yes, sir.

Q. At any time did you ever make a written statement about your money while you were in the jail?

A. No, sir.

Q. Did you ever file a grievance?

A. No, sir.

Q. Have you ever filed a report with any police agency about your money being taken?

A. No, sir.

Page 127

1  Q. Did you ever talk to the sheriff about it?
2  A. No, sir.
3  Q. Did you ask for any medical attention?
4  A. I did upon going to jail, but I never did
5     get any.
6  Q. When did you first ask for medical
7     attention?
8  A. Approximately the next morning I told them
9     I had a headache and I had bumped my head;
10    I had lacerations on my wrists from the
11    cuffs being tight; I need to see a doctor;
12    but no response.
13 Q. How did you ask to get treatment?
14 A. They have a -- press the button for verbal
15    response and you have to fill out a paper,
16    a request or something for it. But I never
17    did get a chance to go.
18 Q. Did you fill out the paper?
19 A. Actually, I don't even recall. I can't
20    really be certain. But I know I mashed the
21    intercom to request a doctor.
22 Q. Do you know who you would have spoken to?
23 A. At the time it was just the jailer on duty

Page 128

1     in the booth, whoever was in the booth at
2     that time.
3  Q. And you don't know who that is?
4  A. I can't recall.
5  Q. Was that the only time you asked?
6  A. Yes. After I didn't get no reply, I just
7     left it alone.
8  Q. Was there anyone who witnessed you asking
9     for medical attention besides the person
10    you talked to in the booth?
11 A. Inmates.
12 Q. Do you recall any of their names?
13 A. I don't really -- didn't know anybody in
14    there. Just dayroom area people. I don't
15    know any of them.
16 Q. You didn't know any of them at the time?
17 A. Not the present day when I requested
18    medical treatment.
19 Q. Have you spoken to anybody who was an
20    inmate in there with you since then?
21 A. No.
22 Q. As you sit here today, you can't tell me
23    any names of any of the inmates who were in

Page 129

1        there with you?
2    A.  Maybe one or two that I got to know while I
3        was in there, but I haven't seen them since
4        I made bond.
5    Q.  Who are they?
6    A.  I know Joshua Bullard.  He was in there.  I
7        know it was somebody else in there I knew.
8        I can't really recall right now off the top
9        of my head.
10   Q.  How long were you in the jail after being
11       placed in there on the 28th of June?
12   A.  I made bond August 5th.
13   Q.  How did you make bond?
14   A.  Bail bondsman.
15   Q.  Who arranged that?
16   A.  My girlfriend and me.
17   Q.  Who was your girlfriend?
18   A.  Ernestine Powell.
19   Q.  Ernestine?
20   A.  Uh-huh (positive response).
21   Q.  Powell?
22   A.  Yes, sir.
23   Q.  Are you still in contact with Ms. Powell?

Page 130

1    A.  Yes.
2    Q.  Where does she live?
3    A.  Greenville.
4    Q.  Have you got an address?
5    A.  22 Cherrywood Lane.  She was on my bond.
6    Q.  Did she put up the money?
7    A.  Half of it.
8    Q.  Half?
9    A.  (Witness nods head).
10   Q.  How much was your bond?
11   A.  Initially 10,000.  10,000.
12   Q.  There's an allegation in your amended
13       complaint at paragraph 39 that an aunt
14       tried to do a property bond for you.  Who
15       was that aunt?
16   A.  Marzett Wright.
17   Q.  Can you spell that first name for me?
18   A.  M-A-R-Z-E-T-T.
19   Q.  W-R-I-G-H-T?
20   A.  Yes, sir.
21   Q.  Where does she live?
22   A.  Mosses Highway.
23   Q.  Do you have an address for that?

Page 131

1    A.  Not right off the top of my head I don't.
2    Q.  Was it her property that she was going to
3        put up for you?
4    A.  Yes, sir.
5    Q.  Do you know where that property is?
6    A.  It's in Mosses.
7    Q.  Is it her residence?
8    A.  Yeah.  Brick home.
9    Q.  What happened with that?
10   A.  From my understanding I talked with her
11       three times on the phone.  She told me that
12       she contacted Sheriff Vaughner and he told
13       her that on first account that he would
14       give it some thought.  Second account he
15       said -- he just blew it off.  And the third
16       time he seen her that Wednesday and asked
17       him was he going to let her sign my bond.
18       He told her something to the effect I'm
19       going to let him sit there a while; I'll
20       have to think about it.  And after that I
21       didn't even get in contact with her
22       anymore.  She wouldn't try to do it, I
23       guess.

Page 132

1    Q.  That's what supposedly Sheriff Vaughner
2        told her?
3    A.  Yeah.  That's what she told me Sheriff
4        Vaughner told her.  She's the county
5        commissioner over District 5.
6    Q.  Do you know what the value of her property
7        is there in Mosses?
8    A.  Not exactly.  I know it's a Jim Walter Home
9        she had purchased some years ago.
10   Q.  Did she own it outright?
11   A.  Yes, sir.
12   Q.  Did you ever personally speak with Sheriff
13       Vaughner about your bond?
14   A.  I requested to talk to Sheriff Vaughner but
15       never came through with the request.  But
16       one day he did happen to come in the back
17       area where I did verbally ask him why
18       wouldn't he let my aunt sign my bond, and
19       he act as if he didn't know what I was
20       talking about.  He told me, you give her a
21       call and he'll see what he can do.  That's
22       what he told me that day.
23   Q.  When was that?

Page 133

A.   Approximately a week after I had been in there, after she told me she had did all of that.

Q.   Okay.  Did you have any visitation while you were in jail?

A.   Yes.

Q.   Who came to visit you?

A.   My aunt came once to retrieve my jewelry and the $100.

Q.   Is that the same aunt that was going to put up the house?

A.   Shirley Marshall.  It's my aunt.  It's who I released $99 to because I took a dollar for two aspirin I took in there.  She took my jewelry and $99 off the book to go toward my bond.

        (Defendant's Exhibit 12 was marked for identification.)

Q.   Since we're talking about that, let me show you Defendant's Exhibit 12.  Have you ever seen Defendant's Exhibit 12 before, Mr. Marshall?

A.   Yes.  I had to sign that to release my

Page 134

jewelry and the money.

Q.   That's your signature there?

A.   Yes, sir.

Q.   And that's where Ms. Marshall came and picked up your property and your $99.50 it says?

A.   Yes, sir.

Q.   Anybody else besides Ms. Marshall come and visit you?

A.   Girlfriend, Ernestine.

Q.   Anyone else?

A.   If anyone else came, I never saw them.

Q.   And you were able to make some telephone calls because you were telling me about talking to your Aunt Wright.

A.   Yes, sir.

Q.   Did you make any other telephone calls -- I tell you what.  Let's back up and talk about the 28th of June when you were initially brought to the detention facility.  Were you able to make a phone call that day?

A.   Yeah.

Page 135

1   Q.   Who did you call?
2   A.   My aunt, Shirley Marshall.
3   Q.   Shirley Marshall?
4   A.   Yes, sir.
5   Q.   And what did y'all talk about?
6   A.   I told her that I had been arrested and I
7        needed her to come up here and see could
8        she get me out.
9   Q.   And what did she say?
10  A.   Asked me what happened and where is she
11       going to get the money from.  I told her to
12       come get my money and come get my jewelry
13       and pawn it and try to get some bail when I
14       get -- when I get a bond.
15  Q.   What kind of telephone did you use to make
16       that call?
17  A.   Phone right there on the desk.
18  Q.   Just a regular old phone?
19  A.   I guess the office phone they use in
20       booking.  The phone in booking.
21  Q.   Do they have phones in the detention
22       facility back in the dayroom areas and the
23       cell blocks?

Page 136

1   A.   Yes, sir.
2   Q.   Did you ever make any phone calls on those
3        phones?
4   A.   Yes, sir.
5   Q.   How does that work?
6   A.   Got to call collect and get somebody on the
7        other end to accept.
8   Q.   And who did you call on that phone -- on
9        those phones?
10  A.   In the back?
11  Q.   Yes, sir.
12  A.   Called Marzett Wright a couple of times.  I
13       called my uncle.  Uncle tried to post
14       bond.  Didn't come through.
15  Q.   Which uncle was that?
16  A.   My father -- father's brother from New
17       York.  Now stays in Selma.
18  Q.   What's his name?
19  A.   John -- I want to say John Cowans.  Call
20       him Bip.
21  Q.   Bip?
22  A.   Yeah.  That's all I know him from my
23       childhood.  Just moved from New York about

| | Page 137 |
|---|---|
| 1 | three years ago. |
| 2 | Q.  Anybody else? |
| 3 | A.  I called Shirley and her daughter on |
| 4 | three-way.  That's mostly who I was getting |
| 5 | to call.  And I had her to call my lawyer, |
| 6 | Charlotte, and go to Charlotte's office for |
| 7 | me. |
| 8 | Q.  Who is Shirley's daughter?  You said her |
| 9 | daughter. |
| 10 | A.  Cherry Marshall. |
| 11 | Q.  How old is she? |
| 12 | A.  Just estimating.  I don't know.  She go |
| 13 | along with Kevin.  However old Kevin is. |
| 14 | I'm the oldest of all of them.  However old |
| 15 | he is.  20-something.  They're the same |
| 16 | age. |
| 17 | Q.  Did anything happen to you while you were |
| 18 | there at the detention facility? |
| 19 | A.  Nothing physical, no. |
| 20 | Q.  And you said you were there until the 5th |
| 21 | of August; is that right? |
| 22 | A.  Yes, sir. |
| 23 | Q.  And you were released on bond? |

| | Page 138 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  You didn't miss any work while you were in |
| 3 | the jail; right? |
| 4 | A.  I wasn't working at the time. |
| 5 | Q.  So you didn't miss any work? |
| 6 | A.  No. |
| 7 | Q.  What happened after you got out of jail? |
| 8 | A.  Started trying to get a lawyer to see what |
| 9 | was going on with the charges. |
| 10 | Q.  What charges did you have as a result of |
| 11 | the June 28th incident? |
| 12 | A.  Pistol carrying without a permit and |
| 13 | possession of a controlled substance. |
| 14 | Q.  What was the controlled substance? |
| 15 | A.  I don't know.  That's all they told me, |
| 16 | possession of a controlled substance. |
| 17 | Q.  They never told you what it was? |
| 18 | A.  No, sir. |
| 19 | Q.  Did you ever have to go to trial on those |
| 20 | charges? |
| 21 | A.  Yes, sir. |
| 22 | Q.  What happened at trial? |
| 23 | A.  I came to trial with my lawyer.  They |

| | Page 139 |
|---|---|
| 1 | called my name on the docket.  And Chris |
| 2 | West called my lawyer in the corner and she |
| 3 | told me that he was throwing it out and I |
| 4 | can go home. |
| 5 | Q.  That Chris West was throwing it out? |
| 6 | A.  That's who she was in the corner and, you |
| 7 | know, had a little mediation with and came |
| 8 | back to me. |
| 9 | Q.  Did you ever learn why it was thrown out? |
| 10 | A.  No.  I ain't ever known.  No.  She just |
| 11 | told me they was throwing it out.  He asked |
| 12 | her permission to come speak to me and told |
| 13 | me I can pick my vehicle up the next day, |
| 14 | which they had it impounded since that |
| 15 | incident.  This was January 4th or 5th I |
| 16 | want to say before the 6th when I went to |
| 17 | court. |
| 18 | Q.  Was there any damage to your vehicle? |
| 19 | A.  Yeah.  Knocked out of alignment.  Pipes was |
| 20 | hanging down. |
| 21 | Q.  What kind of pipes? |
| 22 | A.  Exhaust.  Exhaust pipe was rattling.  Rear |
| 23 | bumper bent. |

| | Page 140 |
|---|---|
| 1 | Q.  Can you show me where on the pictures? |
| 2 | A.  You can see right there the bumper is bent |
| 3 | up on the light where he rammed me at.  And |
| 4 | you can't really tell, but after I got it |
| 5 | back out of the pound, it just drive like |
| 6 | it wasn't the same car no more. |
| 7 | Q.  Looks like when you were describing where |
| 8 | he hit you it was the -- was it the back -- |
| 9 | A.  Yeah.  It was pushed up. |
| 10 | Q.  -- driver's side right underneath the |
| 11 | taillight there? |
| 12 | A.  And it have been also burglarized while it |
| 13 | was in the pound.  All the music equipment |
| 14 | was stolen out, radio.  The lock was |
| 15 | jimmied out and the side glass was broke. |
| 16 | Q.  Where was the impound at? |
| 17 | A.  Randy's Impound in Ft. Deposit. |
| 18 | Q.  Did you ever get any money out of them or |
| 19 | any redress for what happened to your car? |
| 20 | A.  They told me to call Chris West. |
| 21 | Q.  What all was taken out of the car? |
| 22 | A.  Stereo from the inside, all speakers, |
| 23 | woofers and amps out of the trunk, CDs, |

**Page 141**

et cetera.

Q. Anything else?

A. That's it.

Q. What happened to the gun?

A. I don't even know. All I know they stopped the case. I don't know anything else about it.

Q. Did they drop the charge on that too?

A. Yes.

Q. Has Mr. McWilliams ever come to you and asked for his gun back?

A. He asked me what happened to it. I told him it was in the car that day and as far as I know the police got it.

Q. How many times have y'all talked about that gun?

A. I've seen him on two or three occasions in the past two years since the incident and he asked me about whatever happened to his gun and I told him as far as I know the police got it.

Q. Well, has he blamed you for losing his gun?

A. I mean, he knows what happened that day.

**Page 142**

He ain't really pointing no blame. He just asked me was it -- what happened, can he go -- can he pick it up. I told him I don't know. I went to court and they tossed it is all I know.

Q. Do you know if he's ever tried to get it back?

A. I don't.

Q. When's the last time you talked to him?

A. I would have to say a couple months ago. Probably a couple months ago last incident.

Q. Did he ask you about the gun then?

A. Yeah.

Q. I'm sorry?

A. Yes, sir.

Q. Do you know who the prosecutor was in your case?

A. I really don't even know.

Q. Other than, of course, Kevin who was in the car with you, do you know of anybody else who claims to have witnessed the chase from County Road 7 up to where you wound up on Highway 21?

**Page 143**

1   A. No. I don't know anybody who have
2   claimed. All I know it was vehicles
3   passing along. I'm not sure who witnessed
4   it. But not anyone to my knowledge that I
5   know.
6   Q. You're talking about after y'all came to a
7   stop on 21?
8   A. Yeah. After we came to a stop it was some
9   vehicles started passing by.
10  Q. Did you recognize any of those vehicles?
11  A. I recognized one vehicle that stopped when
12  I was standing beside the road in my
13  boxers. It was relative -- a distant
14  relative that stay down the road from me.
15  And she turned around. Actually that's
16  when Chris stopped doing what he was doing
17  to go get the light and put on top of the
18  car because she slowed down when she saw me
19  beside the road and turned around and came
20  back down the road and they was waving them
21  on. And after that she went back up the
22  road. I ain't see her again.
23  Q. What's her name?

**Page 144**

1   A. Margaret, Margaret Wright.
2   Q. Margaret Wright?
3   A. Yes, sir.
4   Q. And where does she live at? Do you have an
5   address?
6   A. Right down the road. Dutch Bend area. I
7   don't know the number -- address. It's
8   right down the road from the residence
9   where I was residing at the time.
10  Q. Which way?
11  A. Approximately this far from where I'm at.
12  It's a caution light there.
13  Q. She lives down by the caution light past
14  your house going out towards Wilcox County?
15  A. Yeah.
16  Q. Any other vehicles that you recognized pass
17  by that day?
18  A. I didn't recognize any other vehicle.
19  Q. Has anyone come up to you and said they
20  witnessed your vehicle being knocked off
21  the road?
22  A. No, sir.
23  Q. Do you know of anyone who has claimed to

Page 145

1  have witnessed that?
2  A.  No, sir.
3  Q.  And, again, I'm excluding Kevin because I
4     know he was involved.
5        Anyone besides Margaret Wright that
6     you're aware of who witnessed what happened
7     after you were stopped there at the side of
8     the road?
9  A.  No, sir.
10  Q.  Is there anyone else besides you who can
11     testify about the $500 that you supposedly
12     had on you that day?
13  A.  As far as I know Kevin.  No one else.
14  Q.  How would Kevin know that you had $500 on
15     you that day?
16  A.  Because the motor we was pulling out for
17     one I had took small -- a payment on from
18     my cousin.  I had sold him the engine.  We
19     was pulling the engine out of his car to
20     put the engine that I sold him in.
21  Q.  You had already collected payment for that?
22  A.  He had gave me like $50 toward it.  But he
23     still owed me the balance after we get the

Page 146

1     car back running.  We was pulling the dead
2     engine out.  But I had sold him an engine,
3     but we hadn't ever got a chance to put it
4     in.
5  Q.  So that money that you had that day $50 of
6     it was from him.  And who is he?  What's
7     his name again?
8  A.  That would be Herman.  His name is Herman,
9     the one that owned the car.
10  Q.  $50 from Herman and the other $450 was left
11     over from your gambling winnings.  Is that
12     what your testimony is?
13  A.  The $50 he had previously given me -- I had
14     money that I saved.  It may have been the
15     $50.  But I had $1,000 from gambling, you
16     know.  That's what was left over from
17     everything, you know.
18  Q.  So explain to me again how the $50 for the
19     engine ties in with Kevin knowing that you
20     had $500 on you.
21  A.  Because during the time that Herman came to
22     purchase the engine, he gave me $50 toward
23     it.  Kevin would see that I reached in my

Page 147

1     pocket and had more than $50 in my pocket.
2     He was staying with me at the time.
3  Q.  So he just knows that you had more than $50
4     on you?
5  A.  Yes, sir.
6  Q.  Is that what you're telling me?
7  A.  Yeah.
8  Q.  To your knowledge, does he know exactly how
9     much you had on you?
10  A.  No.  I don't think he knows exact amount.
11     He just knows I had more than that.
12  Q.  What damages are you claiming that you're
13     entitled to as a result of Chris West's
14     conduct?
15  A.  Well, for one I can't seem to acquire
16     employment since this incident.  In my
17     field of warehousing every time I apply for
18     a job I'm being turned down since the
19     incident happened.  And I usually acquire
20     employment very rapidly.  I claim the
21     damage to my vehicle that I have lost, my
22     possessions, lost bond money, loss of time
23     of suffering in jail for something I didn't

Page 148

1     have.
2  Q.  Let me stop you there real quick.  Didn't
3     you tell me that your girlfriend put up the
4     bond money?
5  A.  She put up half of it.  The rest of it was
6     mine.
7  Q.  How much did you put up?
8  A.  I put up like 450 --
9  Q.  $450?
10  A.  -- that I recovered from pawning my jewelry
11     and the money left over that I had on the
12     book.  She put up the rest.
13  Q.  I'm sorry.  I interrupted you.  The bond
14     money and what else?
15  A.  Like I said, my vehicle damages I lost
16     there.  And just me sitting in jail for
17     something I didn't do.  I mean, it's just
18     unfair.
19  Q.  You haven't had any medical expenses;
20     right?
21  A.  No, sir.
22  Q.  And you weren't employed at the time?
23  A.  No, sir.

Page 149

). You told me that you still have the knot on your head. Are there any other permanent conditions that you have as far as your body goes as a result of what happened on June 28th?

\. Just that -- Just a lot of mental anguish, just suffering, anxiety attacks. A lot of nights I can't sleep at night for being shot at. I already been robbed. It took me a while to get over that. I had a gun put in my face behind that. It took me a while to get over that.

). I'm not asking about your mental condition right now. I'm just asking about your body condition. Anything besides the knot on your head?

\. Oh, no. Just that knot left when I hit the steering wheel, as far as that.

). Describe your mental anguish for me that you're talking about.

\. I just -- I just have a lot of nights where I can't sleep, just anxiety attacks a lot about the whole ordeal and --

Page 150

). Describe an anxiety attack for me.

\. Just nightmares of being shot at and ran off the road by the police and being suspect every time I'm being sighted in Lowndes County by the police. I'm getting strange looks. Or stopped like the incident where I went to jail. It was supposed to be a traffic stop, but they called Shawn Hutson who was on the drug task force that day. Every time they lay eyes on me they harass me about stuff like that even though I just -- I don't understand.

). Have you seen Chris West again since that day?

\. I haven't seen Chris West since I went to court in January '06.

). So that's the only time you saw him?

\. Uh-huh (positive response).

). So he hasn't pulled you over since then; right?

\. No. I haven't seen him.

MR. WILFORD: Let's take a short

Page 151

1    break.
2        (Brief recess was taken.)
3  Q. Just a few more questions, Mr. Marshall,
4      and we'll be done. With respect to the
5      anxiety attacks and things that you were
6      telling me about, have you tried to get any
7      kind of mental health treatment for that?
8  A. Well, right now I'm in dire straits. I
9      can't afford anything. I haven't seeked
10     any professional help for it. I've just
11     been trying to deal with the stress, you
12     know. Somehow I hope it goes away over
13     time.
14 Q. You say you haven't tried. Your
15     interrogatory responses you told us you
16     couldn't afford it. I'm just asking you if
17     you've tried.
18 A. No, sir, I haven't.
19 Q. Has anybody recommended to you that you try
20     to get some mental health treatment?
21 A. I haven't referred to anybody. It's all on
22     my own.
23 Q. After the robbery that you described for us

Page 152

1      today, did you get any mental health
2      treatment for that?
3  A. No, sir.
4  Q. Did you try?
5  A. No, sir.
6  Q. Did anybody recommend to you that you
7      needed it?
8  A. Just deal with my own -- on my own. I
9      really don't have anybody but me, so I try
10     to deal with things among myself. But it
11     took a little time for me to get my
12     mind-set back, you know, where I can be out
13     around people. Everybody just -- I feel
14     like they out to get me, you know.
15 Q. Are you set back right now as you put it?
16 A. I'm still having some anxiety attacks at
17     night. Still can't sleep some nights. But
18     if I'm somewhere around some people, you
19     know, I'm fairly being compromised. I kind
20     of cope with it.
21 Q. You told me earlier -- I need to go back on
22     you a little more when you were first
23     brought into booking. Chris West said

Page 153

1    something about put him in the hole.
2    A.  Yes, sir.
3    Q.  Were you put in a hole?
4    A.  The holding cell up front.  That's what I
5        meant.
6    Q.  So you were placed in the holding cell?
7    A.  Yes, sir.
8    Q.  At some point you were put back in the
9        back; is that right?
10   A.  I think later that night dressed me out and
11       took me to a cell.
12   Q.  So you stayed in a holding cell for a few
13       hours?
14   A.  Yes, sir.
15   Q.  Is that fair to say?
16   A.  Yes, sir.
17   Q.  I think that's all I have.  Thank you very
18       much.
19   A.  Thanks.
20            EXAMINATION
21   BY MR. LEWIS:
22   Q.  I have one question.  When you're standing
23       up there on the side of the road in your

Page 154

1    boxer shorts, how were you feeling then?
2    A.  Humiliated because traffic was coming along
3        and people seeing me beside the road in
4        cuffs in my underwear.
5            MR. LEWIS:  Okay.  That's it.
6            (Deposition was concluded at
7            approximately 1:55 p.m.)
8
9
10       * * * * * * * * * * * * * *
11       FURTHER DEPONENT SAITH NOT
12       * * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 155

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lyn Daugherty, Certified Shorthand
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8            RICHARD MARSHALL
9    who was duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the
11   matter of:
12           RICHARD MARSHALL,
13           Plaintiff,
14           vs.
15   CHRIS WEST, in his individual
16   capacity, LASHUN HUTSON, in his
17   individual capacity,
18           Defendants.
19   IN THE UNITED STATES DISTRICT COURT
20   FOR THE MIDDLE DISTRICT OF ALABAMA
21   NORTHERN DIVISION
22       Civil Action No. 2:06-cv-701-ID.CSC
23   on Wednesday, November 14, 2007.

Page 156

1        The foregoing 155 computer-printed pages
2    contain a true and correct transcript of the
3    examination of said witness by counsel for the
4    parties set out herein.  The reading and signing is
5    hereby waived.
6        I further certify that I am neither of kin
7    nor of counsel to the parties to said cause nor in
8    any manner interested in the results thereof.
9        This 13th day of December 2007.
10
11
12
         _____
         Lyn Daugherty, ACCR #66
13       Expiration Date: 9-30-2008
         Certified Court Reporter
14       And Commissioner for the
         State of Alabama at Large
15
16
17
18
19
20
21
22
23

# EXHIBIT 1

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

334-548-5900   LOWNDES COUNTY E911   PAGE  03/03

Fingerprinting Req'd Completed
① Yes      ① Yes
② No       ② No

# ALABAMA UNIFORM ARREST REPORT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI# AL0450000 | 2 AGENCY NAME LOWNDES | | 3 CASE# 1415802 | 4 SFX |

| 5 LAST, FIRST, MIDDLE NAME MARSHALL   RICHARD   JAMES | | 6 ALIAS AKA |

| 7 SEX ☒M ☐F | 8 RACE ☐B ☒W ☐A | 9 HGT 5 | 10 WGT 240 | 11 EYE BRO | 12 HAIR BLK | 13 SKIN DRK | 14 ☐ SCARS | 15 ☐ MARKS | 16 ☐ TATOOS | 17 ☐ AMPUTATIONS |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) LOWNDES CO | 16 DATE OF BIRTH 4 2 4 - 9 4 - 2 6 6 0 0 2 2 4 33 | 17 AGE | 18 MISCELLANEOUS ID # |

| 20 SID # | 21 FINGERPRINT CLASS HENRY CLASS / NCIC CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 DL# 60118769 | 23 ST AL |

| 24 FBI # | | 25 IDENTIFICATION COMMENTS ALABAMA DR. LICENSE |

| 26 ☒ RESIDENT ☐ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) 101 S BURBANK DR MENDO MERYAL 36117 | 28 RESIDENCE PHONE 334-227-3444 | 29 OCCUPATION (BE SPECIFIC) |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) UNEMPLOYED | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE ( ) |

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) HWY 21 HAYNEVILLE AL | | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO IN STATE OR OUT STATE AGENCY |

| 37 CONDITION OF ARRESTEE: ① DRUNK ② SOBER ③ DRINKING ☒④ DRUGS | 38 RESIST ARREST? ☐ YES ☒ NO | 39 INJURIES? ☒ NONE ① OFFICER ② ARRESTEE | 40 ARMED? ☐ Y ☒ N | 40 DESCRIPTION OF WEAPON ① HANDGUN ② RIFLE ③ SHOTGUN ① OTHER FIREARM ② OTHER WEAPON |

| 41 DATE OF ARREST 0 6 1 0 7 | 42 TIME OF ARREST 6:15 ① AM ☒② PM ③ MIL | 43 DAY OF ARREST S M T ☒W T F S | 44 TYPE ARREST ☒ ON VIEW ☐ WARRANT | 45 ARRESTED BEFORE? ☒ YES ☐ NO ☐ UNKNOWN |

| 44 CHARGE—1 ☐ FEL ☒ MISD FTA/NO SEATBELT | | | 50 UCR | 45 CHARGE—2 ☐ FEL ☒ MISD FTA/OPER VEH W/O INSURANCE | | | 50 UCR |

| 49 STATE CODE/LOCAL ORDINANCE TR 05 001404 | 51 WARRANT # | 52 DATE ISSUED 0 9 1 6 0 5 | 49 STATE CODE/LOCAL ORDINANCE TR 05 001405 | 51 WARRANT # | 52 DATE ISSUED 0 9 1 6 0 5 |

| 49 CHARGE—3 ☐ FEL ☐ MISD | | | | 49 CHARGE—4 ☐ FEL ☐ MISD | | |

| 49 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED | 49 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED |

| 56 ARREST DISPOSITION ☒ HELD ☐ BAIL ☐ RELEASED ☐ TOT-LE ☐ OTHER | 57 IF OUT ON RELEASE WHAT TYPE? | 58 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
| | | 59 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |

| 78 VIN | | | | 79 IMPOUNDED? ☐ YES ☒ NO | 80 STORAGE LOCATION/IMPOUND # |

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | | | | ☐ CONTINUED IN NARRATIVE |

## JUVENILE

| 82 JUVENILE DISPOSITION: ① HANDLED AND RELEASED ② REF. TO JUVENILE COURT ③ REF. TO WELFARE AGENCY ④ REF. TO OTHER POLICE AGENCY ⑤ REF. TO ADULT COURT | | 83 RELEASED TO |

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE ( ) |

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE ( ) |

## RELEASE

| 91 DATE AND TIME OF RELEASE 06 13 07 1230 ☒AM ☐PM ☐MIL | 92 RELEASING OFFICER NAME Sgt L. Britton | 93 AGENCY/DIVISION 50 | 94 ID # |

| 95 RELEASED TO By Judge | 96 AGENCY/DIVISION 50 | 97 AGENCY ADDRESS P.O. Box 157 Hayneville AL 36040 |

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐ YES ☐ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT | 100 PROPERTY # |

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) 29° Negative V.G. | | |

| 102 SIGNATURE OF RECEIVING OFFICER SGT. MARLYN MEALING | 103 SIGNATURE OF RELEASING OFFICER Sgt Britton | SIGNATURE STATUS |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | ADDITIONAL CASES CLOSED INDICATED |

| 111 ARRESTING OFFICER (LAST, FIRST, M.I.) DURANT, I | 112 ID # 508 | 113 ARRESTING OFFICER (LAST, FIRST, M.I.) | 114 ID # | 115 SUPERVISOR ID # | 116 WATCH CMDR. ID # |

## TYPE OR PRINT IN BLACK INK ONLY

ACJIC—34 REV. 10-90

# EXHIBIT 2

**EXHIBIT 3**

# EXHIBIT 4



# EXHIBIT 5

Map of Hayneville, AL by MapQuest



All rights reserved. Use Subject to License/Copyright
This map is informational only. No representation is made or warranty given as to its content. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# EXHIBIT 6

LOWNDES COUNTY
SHERIFF'S DEPARTMENT

INTERVIEW
SHEET

| 1. NAME (Last, First, Middle) Carmichael, Kelvin Jerome | | | | | | 2. FILE NUMBER | |
|---|---|---|---|---|---|---|---|
| 3. ALIAS(ES)/NICKNAME(S) "K.C." | 4. DATE 6-28-05 | S Ⓜ T S M W F | TIME 3:25pm | | 5. PLACE OF INTERVIEW L.C. Det. Facility | | |
| 6. HOME ADDRESS 3571 Wilmington Rd. Montgomery, AL. | | | | | 7. HOME PHONE None Robbie 334-281-6733 (mom) | | |
| 8. NAME & ADDRESS OF EMPLOYER | | | | | 9. BUSINESS PHONE | | |
| 10. RACE Blk | 11. SEX M | 12. D.O.B. 9-25-80 | 13. P.O.B. Montgomery | 14. SOC 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 | 15. DLN | | 16. STATE |
| 17. HGT 510 | 18. WGT 210 | 19. HAIR Blk | 20. EYES Bro | 21. SCARS, MARKS, TATTOOS, AMPUTATIONS "Flexo" Rt. Bicep | | | |
| 22. VEH. YEAR | 23. MAKE | 24. MODEL | 25. COLOR | 26. VIN | 27. LICENSE | | 28. STATE |

29. STATEMENT

When my cousins got threw taking a motor out we were heading to his house when a car pulled up on the side of us. at first I didn't know who it was and I kept asking my cousin who it was but he said he didn't know but by the time I looked for myself and realized that it was the police I adviced my cousin to pull over but by that time we were already sliding off the road. I didn't have a gun or anything because I had just left my aunts house taking a motor I don't know what was thrown out the window because I really weren't paying attention because I was tired from taking a motor out earlier this morning. All I saw was that he put his arm out the window. I saw the gun but it wasn't mine while I was riding with my cousin Richard Marshall. (357 revolver chrome) KC.
It was a

| 30. ACJIC/NCIC CHECK YES ☒ NO ☐ | 31. FINGERPRINTED YES ☐ NO ☐ BY WHAT AGENCY: PHOTOGRAPHED YES ☐ NO ☐ BY WHAT AGENCY: | | |
|---|---|---|---|
| 32. SUBJECT ☐  VICTIM ☐  WITNESS ☒ RIGHTS GIVEN BY: | 33. DATE ENDED 6-28-05 | TIME ENDED 3:50 AM PM | 34. INTERVIEW CONDUCTED BY: |
| Witness Statement | | 35. PAGE   OF | 36. EXHIBIT NO. |

**EXHIBIT 7**



# EXHIBIT 8



# EXHIBIT 9



# EXHIBIT 10



# EXHIBIT 11



# EXHIBIT 12

# LOWNDES COUNTY DETENTION FACILITY

## INMATE PROPERTY RELEASE SLIP

I _Shirley Marshall_ picked up the property of

_Richard Marshall_ from the Lowndes County

Detention Facility.

List of property: _2 neckles   2 Braclets   3 rings   1 earpin_

_and 100.00 $99.50_

Sign: _Richard Marshall_

Date: _7-1-05_

Correction Officer _Lt. Jeanil McDaney_

Correction Officer _____

DEFENDANT'S
EXHIBIT
12

PENGAD 800-631-6989

# EXHIBIT F

**Drug Task Force Case File for Case No: 05-06-011, "Case File",
Alabama Uniform Incident/Offense Report**

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| VICTIM SSN - - | COMPLAINANT SSN - - | ☐ 1 INCIDENT  ☒ 2 OFFENSE  ☐ 3 SUPPLEMENT | 2 CASE # 0 5 - 0 6 - 0 1 1 | 3 SFX |
|---|---|---|---|---|

| 4 ORI# 0 4 5 0 7 0 0 | 5 DATE AND TIME OF THIS REPORT 0 6 2 8 0 5  8 :21 ☐AM ☒PM ☐MIL | 6 AGENCY NAME 2nd Judicial Circuit Drug Task Force | | 7 IF SUPPLEMENT ORIGINAL OFFENSE DATE M D Y |

6 REPORTED BY ☐ VICTIM OR: Commander Christopher S. West
9 ADDRESS (STREET, CITY, STATE, ZIP): 146 East 4th Street Luverne, Alabama 36049
10 PHONE: ( 334 ) 335-3340

12 VICTIM (LAST, FIRST, MIDDLE NAME) ☐1P ☐2B ☐3S   13 ADDRESS (STREET, CITY, STATE, ZIP)   14 PHONE ( )

15 EMPLOYER/SCHOOL   16 OCCUPATION   17 ADDRESS (STREET, CITY, STATE, ZIP)   18 PHONE ( )

☐ RESIDENT  ☐ NON-RESIDENT   20 INJURY ☐Y ☐N   21 RACE ☐W ☐B ☐A   22 SEX ☐MALE ☐FEMALE   23 HGT   24 WGT   25 DOB M D Y   26 AGE   27 WAS OFFENDER KNOWN TO VICTIM? ☐Y ☐N   28 VICTIM WAS (EXPLAIN RELATIONSHIP)   29 CODE

| 30 TYPE INCIDENT OR OFFENSE ☒ FEL. ☐ MISD Unlawful possession of Controlled Substance | 31 DEGREE (CIRCLE) 1  2  3 | 32 UCR CODE 3 5 3 2 | 33 STATE CODE/LOCAL ORDINANCE 13A-12-212 |
|---|---|---|---|
| 34 TYPE INCIDENT OR OFFENSE ☐ FEL. ☒ MISD Pistol w/o Permit | 35 DEGREE 1  2  3 | 36 UCR CODE | 37 STATE CODE/LOCAL ORIDNANCE 13A-11-073 |

38 PLACE OF OCCURRENCE: Highway 21 South, Dutch Bend Community, Lowndes County   39 SECTOR

| 40 POINT OF ENTRY ☐DOOR ☐WINDOW ☐ROOF ☐OTHER | 41 METHOD OF ENTRY ☐FORCIBLE ☐NO FORCE ☐ATT. FORCIBLE | 42 ASSAULT ☐SIMPLE ☐AGGR. | 43 TREATMENT FOR ASSAULT INJURY ☐Y ☐N |

EVENT

| 44 OCCURRED ON OR BETWEEN 0 6 2 8 0 5 | 45 TIME 1 :00 ☐AM ☒PM ☐MIL | 46 S M T W T F S | 47 LIGHTING ☒1- NATURAL ☐2- MOON ☐3- ART. EXT. ☐4- ART. INT. ☐5- UNK. | 48 WEATHER ☒1 - CLEAR ☐2 - CLOUDY ☐3 - RAIN ☐4 - FOG ☐5 - SNOW ☐6 - HAIL ☐7 - UNK | 49 PREMISE ☒A - HWY.-ST.-ALLEY ☐B - RAILROAD ☐C - RESIDENCE ☐D - CHURCH ☐E - SCHOOL ☐F - CONVENIENCE ☐G - INDUSTRIAL ☐H - SERVICE STA. | ☐I- BANK ☐J - DRUG STORE ☐K - ART/TWN. HSE. ☐L - SHOPPING CENTER ☐M - PARKING LOT ☐N - OTHER COMMER. ☐O - OTHER | 50 CODE |
|---|---|---|---|---|---|---|---|
| 51 | 52 TIME 2 :30 ☐AM ☐PM ☐MIL | 53 S M T W T F S | | | | | |

54 VERIFY FOR RAPE EXAM ☐Y ☐N   55 TREAT. FOR RAPE INJURY ☐Y ☐N   56 CIRCUMSTANCES HOMICIDE & ASSAULT   CODE   LOCATION: RAPE

58 WEAPON USED ☐FIREARM ☐KNIFE ☐HANDS, FISTS, VOICE, ETC. ☐OTHER DANGEROUS   59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE ☐HANDGUN ☐RIFLE ☐SHOTGUN ☐UNKNOWN   DESCRIBE

PROPERTY DESCRIPTION

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR., ETC.) | 62 DOLLAR VALUE STOLEN | DAMAGED | 63 RECOVERED DATE | VALUE |
|---|---|---|---|---|---|
| 1 | Rossi 357 Magnum s#F161600 & 357 Magnum Rounds | | | 6-28 | $450 |
| 1 | Plastic Baggie containg residue | | | 6-28 | $5 |
| 1 | 1976 Chevrolet Nova | | | 6-28 | $3000 |

☐ CONTINUED IN NARRATIVE

| 64 MOTOR VEHICLE $3,000 S R D C | 65 CURRENCY, NOTES S R D C | 66 JEWELRY S R D C | 67 CLOTHING/ FURS S R D C | 68 FIREARMS $450 S R D C | 69 OFFICE EQUIPMENT S R D C |
|---|---|---|---|---|---|

| 70 ELECTRONICS S R D C | 71 HOUSEHOLD S R D C | 72 CONSUMABLE $5 S R D C | 73 LIVESTOCK S R D C | 74 MISCELLANEOUS S R D C |
|---|---|---|---|---|

VEHICLES

75 CHECK CATEGORIES ☐STOLEN ☐RECOVERED ☐SUSPECTS VEH. ☐VICTIMS VEH. ☐UNAUTH.USE ☐ABANDONED

| 76 #STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR Blue | 81 VIN |
|---|---|---|---|---|---|
| 82 VYR 76 | 83 VMA Chev | 84 VMO Nova | 85 VST Al | 86 VCO | 87 ADDITIONAL DESCRIPTION TOP: BOTTOM: |

STOLEN MTR. VEH ONLY ☐BUS. ☐RES. ☐RUR.   88 AREA STOLEN   89 OWNERSHIP VERIFIED BY:   TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER ☐   90 WARRANT SIGNED YES ☐ NO ☐ #

21 AUTO INSURER NAME (COMPANY)  ADDRESS (STREET, CITY, STATE, ZIP)   92 PHONE ( )

MOTOR VEH.RECOVERY ONLYREQUIRED FOR24XX UCR CODE   93 STOLEN IN YOUR JURISDICTION? YES ☐ NO ☐ WHERE? ☐   94 RECOVERED IN YOUR JURISDICTION? YES ☐ NO ☐ WHERE? ☐

TYPE OR PRINT IN BLACK INK

ACJIC—32 REV. 6-94

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| INCIDENT/OFFENSE REPORT CONTINUED | 95 DATE AND TIME OF REPORT 0 6 2 8 0 5  8 : 21 AM ☒ PM MIL | 96 CASE # 0 5 - 0 6 - 0 1 1 | 97 SFX | 98 ☒ OFFENDER ☐ SUSPECT ☐ MISSING PERSON | ☐ CHECK IF MULTIPLE |

| 99 NAME (LAST, FIRST, MIDDLE) Marshall,  Richard J. | 100 NICKNAME/ALIAS "Blood" | 101 RACE ☐W ☐A ☒B ☐I | 102 SEX ☒M ☐F | 103 DOB 0 2 2 4 7 4 | 104 AGE 31 |

| 105 ADDRESS (STREET, CITY, STATE ZIP) 101 S. Burbank Drive Montgomery, Alabama | 106 HGT 59 | 107 WGT 160 | 108 EYE Bro | 109 HAIR Blk | 110 COMPLEXION Dark |

| 111 PROBABLE DESTINATION | 112 ARMED? ☒Y ☐N ☐UNK | 113 WEAPON Rossi 357 Magnum |

| 114 CLOTHING | ☐ SCARS | ☐ MARKS | ☐ TATTOOS | 115 ☐ ARRESTED ☐ WANTED |

| 116 NAME (LAST, FIRST, MIDDLE) | 117 NICKNAME/ALIAS | 118 RACE ☐W ☐A ☐B ☐I | 119 SEX ☐M ☐F | 120 DOB M  D  Y | 121 AGE |

| 122 ADDRESS (STREET, CITY, STATE, ZIP) | 123 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |

| 128 PROBABLE DESTINATION | 129 ARMED? ☐Y ☐N ☐UNK | 130 WEAPON |

| 131 CLOTHING | ☐ SCARS | ☐ MARKS | ☐ TATTOOS | 132 ☐ ARRESTED ☐ WANTED |

**WITNESSES**

| 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|
| #1 Hutson, L   SEX ☐M ☐F RACE ☐W ☐R ☐A ☐B ☐I  D | DTF | ( ) | ( ) |
| #2   SEX ☐M ☐F RACE ☐W ☐A ☐B ☐I  D | | ( ) | ( ) |
| #3   SEX ☐M ☐F RACE ☐W ☐A ☐B ☐I  D | | ( ) | ( ) |
| #4   SEX ☐M ☐F RACE ☐W ☐B ☐A ☐I  D | | ( ) | ( ) |

| WITNESS #1 SSN | WITNESS #2 SSN | WITNESS #3 SSN | WITNESS #4 SSN |
|---|---|---|---|
| - - | - - | - - | - - |

**NARRATIVE**

137 Offender failed to stop for Agents after being blue lighted throwing drug evidence out of the drivers side window as the chase progressed.  Offender was forced off the road and had to be forced to the ground and forced to comply.  Subject conducted himself in an extremely violent manner as if maybe under the influence of a controlled substance.  Subject was arrested and transported to the Lowndes County Detention Facility.

| CONTINUED ON SUPPLEMENT  Y ☐  N ☒ | ASSISTING AGENCY ORI | ASSISTING AGENCY CASE # | SFX |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge.  I will assume full responsibility for notifying the agency if any stolen property or missing person hereby reported is returned

SIGNATURE

| 138 LOCAL USE T A S K |
| 139 STATE USE |

| MULTIPLE CASES CLOSED | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | 146 ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐N |

| ADMIN | 147 CASE STATUS ☐ 1 - PENDING ☐ 2 - INACTIVE ☒ 3 - CLOSED ENTERED ☐Y ACIC/NCIC ☐N DATE | 148 CASE DISPOSITION ☐ 1 - CLEARED BY ARREST (JUV) ☒ 2 - CLEARED BY ARREST (ADULT) ☐ 3 - UNFOUNDED ☐ 5 - ADMINISTRATIVELY CLEARED | ☐ 4 - EXCEPTIONAL CLEARANCE ☐ A - SUSPECT/OFFENDER DEAD ☐ B - OTHER PROSECUTION ☐ C - EXTRADITION DENIED ☐ D - LACK OF PROSECUTION ☐ E - JUVENILE, NO REFERRAL ☐ F - DEATH OF VICTIM | 149 REPORTING OFFICER Cmdr. Christopher S. West | ID # DE-1 |
| | | | | 150 ASSISTING OFFICER | ID # |
| | | | | 151 SUPERVISOR APPROVAL    ID # | 142 WATCH CMDR    ID # |

# EXHIBIT G

**Case File, 2nd Judicial Drug Task Force Drug Agent
Statement Form of Lt. West**

2nd Judicial Drug Task Force
Drug Agent
Statement Form

Date: June 28, 2005

Time: 7:32pm

Today at about 1:00 pm I along with Agent Lashun Hutson were traveling North on Lowndes County Road 7 when we met Mr. Richard Marshall's blue Chevrolet Nova. I immediately turned around in an attempt to catch up with the vehicle. As we caught up with the vehicle I observed that neither the driver or the passenger were wearing seatbelts, we placed our blue light on the dash of our vehicle to gain the attention of the driver to pull the vehicle over. The driver looked out the window and screamed that he wasn't going to pull the vehicle over. I then pulled beside his vehicle and we showed the driver Mr. Marshall our badges identifying ourselves as law enforcement officers. He still insisted that he would not pull his vehicle over responding in a very violent manner. This incident occurred approximately 2 miles from the Lowndes County Road 7 and Alabama Highway 21 intersection. As we got to the intersection Mr. Marshall turned right onto highway 21 picking up speed and throwing drug evidence out of the driver's window at about the 102 mile marker. We also observed Mr. Marshall moving around in the seat and with his right hand constantly doing something down in the seat. We pursued Mr. Marshall for another 2.4 miles before forcing his vehicle from the roadway. The vehicle came to rest on the embankment on the opposite side of the highway. Once off the highway Agent Hutson and I took cover behind the doors of our vehicle (weapons drawn). I instructed Mr. Marshall to exit his vehicle and get on the ground. He got out of the vehicle but stood in the door still responding violently and not complying with us, at that time I fired my service weapon into the ground in an attempt to quicken Mr. Marshall into compliance but still he did not comply. Next I approached Mr. Marshall and forced him to the ground experiencing some resistance yet having to force his hands behind his back so as to handcuff him. Agent Hutson approached the passenger's side of the vehicle and removed the passenger after I secured Mr. Marshall. After securing Mr. Marshall I noticed a revolver style handgun on the seat of the vehicle and bullets lying on the seat and in the floor. Mr. Marshall was arrested and transported to the Lowndes County Detention

Facility. I later returned to the area of highway 21 where I observed Mr. Marshall throwing out the evidence. While walking the roadway I located and recovered an empty torn baggie that at one time had contained cocaine.

Signature

# EXHIBIT H

**Case File, 2nd Judicial Drug Task Force Drug Agent
Statement Form of Agent Hutson**

2nd Judicial Circuit
Drug Task Force
Statement Form

**Date: June 28, 2005**

**Time: 18:20**

**Name:** Agent G. LaShun Hutson


On above date at approximately 1:00 pm myself and Lt. C.S.West were traveling North
on County Road 7 in Lowndes County when we met Mr. Richard Marshall traveling
South in a early model blue Chevrolet Nova. Lt. West stated "That's the vehicle" and
began to turn around in an attempt to catch up to the vehicle. Once behind the vehicle the
blue light was placed on the dash of our vehicle to alert the driver that he was being
stopped, the driver looked in his rear view mirror and left side mirror and continued to
drive and began to move around in the seat and appeared to be reaching for something in
the seat with his right hand, I stated to Lt. West " Lt. he's moving around a lot I don't
think he's going to stop" at which time Lt. West stated  "I don't either," at that point we
were approximately 2 ½ miles from the intersection of County Road 7 and State Highway
21. Lt. West pulled our vehicle along side Mr. Marshall and I showed him my badge and
the blue light and yelled for him to pull over at which time Mr. Marshall stated " Man
what the fuck ya'll want" and continued to drive North on County Road 7. We reached
State Highway 21 and Mr. Marshall turned south and accelerated at one point throwing
something from the driver side window that we later found to be drug evidence between
the 102 and 104 mile marker. Mr. Marshall continued South on State Highway 21, Lt.
West came along side Mr. Marshall for a second time and I again yelled to Mr. Marshall
to pull over at which time he stated "Motherfuck ya'll, I ain't stoppin" At that point Lt.
West forced Mr. Marshall to the shoulder of the road and we exited our vehicle with our
guns drawn and ordered Mr. Marshall to exit his vehicle with his hands where we could
see them, Mr. Marshall exited his vehicle with a very belligerent attitude and cursing. Lt.
West ordered Mr. Marshall to get on the ground and Mr. Marshall turned as if he was

getting back into the vehicle and Lt. West fired his service weapon into the ground and stated "Don't get back in that vehicle, get on the ground" Mr. Marshall paused , still being belligerent and cursing at which time Lt. West approached him and put him on the ground by force and cuffed him during which time I had turned my attention to the passenger and approached his side of the vehicle and removed him without incident and cuffed. Once both parties were secure Lt. West and I looked into the vehicle and saw what later became known to us as a Rossi .357 Revolver fully loaded with 6 (six) Hollow Point bullets and an additional 34 (thirty-four) more bullets in the ash tray and on the floor, I asked Mr. Marshall was that his weapon on the seat and he stated "What ever you see is yours because you put it there, ya'll motherfuckers good for that shit." Mr. Marshall and his passenger were taken to the John Hullett Detention Facility to be processed by a Lowndes County Sheriff Deputy as Lt. West and I returned to the area where we saw Mr. Marshall throw something from the car and Lt. west recovered a empty torn baggie that at one time had contained a controlled substance.

Signature: _____

# EXHIBIT I

**Case File, Interview Sheet of Kelvin Carmichael**

LOWNDES COUNTY
SHERIFF'S DEPARTMENT

INTERVIEW
SHEET

| 1. NAME (Last, First, Middle) Carmichael, Kelvin Jerome | | | | | | 2. FILE NUMBER | |
|---|---|---|---|---|---|---|---|
| 3. ALIAS(ES)/NICKNAME(S) "K.C." | | 4. DATE 6-28-05 | S Ⓣ S M W F | TIME 3:25pm | | 5. PLACE OF INTERVIEW L. C. Det. Facility | |
| 6. HOME ADDRESS 3521 Wilmington Rd. Montgomery, AL. | | | | | | 7. HOME PHONE (Marie Robinson) (334)281-6733 (mom) | |
| 8. NAME & ADDRESS OF EMPLOYER | | | | | | 9. BUSINESS PHONE | |
| 10. RACE Blk | 11. SEX M | 12. D.O.B. 9-25-80 | 13. P.O.B. Montgomery | 14. SOC 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 | | 15. DLN | 16. STATE |
| 17. HGT 5'10 | 18. WGT 215 | 19. HAIR Blk | 20. EYES Bro | 21. SCARS, MARKS, TATTOOS, AMPUTATIONS "5"x10" left B'cep | | | |
| 22. VEH. YEAR | 23. MAKE | 24. MODEL | 25. COLOR | 26. VIN | | 27. LICENSE | 28. STATE |

29. STATEMENT

When my cousins got threw taking a motor out we were heading to his house when a car pulled up on the side of us. at first I didn't know who it was and I kept asking my cousin who it was but he said he didn't know but by the time I looked for myself and realized that it was the police I adviced my cousin to pull over but by that time we were already sliding off the road. I didn't have a gun or anything because I had just left my aunts house taking a motor I don't know what was thrown out the window because I really weren't paying attention because I was tired from taking a motor out earlier this morning. all I saw was that he put his arm out the window. I saw the gun but it wasn't mine while I was riding with my cousin Richard Marshall. (357 revolver chrome) It was a K.C.

| 30. ACJIC/NCIC CHECK YES ☑ NO ☐ | 31. FINGERPRINTED YES ☐ NO ☐ | BY WHAT AGENCY | |
|---|---|---|---|
| | PHOTOGRAPHED YES ☐ NO ☐ | BY WHAT AGENCY | |
| 32. SUBJECT ☐   VICTIM ☐   WITNESS ☑ | 33. DATE ENDED 6-28-05 | TIME ENDED 3:50 AM/PM | 34. INTERVIEW CONDUCTED BY: |
| RIGHTS GIVEN BY: Witness of Martin | | | 35. PAGE   OF | 36. EXHIBIT NO. |

# EXHIBIT J

**Case File, Warrant Deposition**

State of Alabama
Unified Judicial System

Form CR-57 (front)    Rev. 8/98

**DEPOSITION**

Warrant/Summons Number
WK-06-436-036

Case Number

IN THE _District_ _____ COURT OF _Lowndes County_, ALABAMA
(Circuit, District or Municipal)    (Name of Municipality or County)

☐ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. _____

Defendant

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

Name of Accused (or Alias) _Richard J. Marshall_    Telephone Number

| Social Security Number | Driver's License Number | Date of Birth | Age | Race | Sex |
|---|---|---|---|---|---|
| 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 | | 2-29-74 | 21 | 31 | M |

| Height | Weight | Hair | Eyes | Complexion |
|---|---|---|---|---|
| 5 9 | 160 | Blk | Bro | Dark |

| Address of Accused (or Alias) | City | State | Zip Code |
|---|---|---|---|
| 108 S. Burbank Dr. | Montgomery | AL | |

| Name of Employer | Employer's Telephone Number |
|---|---|

| Address of Employer | City | State | Zip Code |
|---|---|---|---|

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense: _Poss. of Controlled Sub. / Pistol w/o Permit_

Date and Time of Offense: _6-28-05_

Place of Occurrence: _Hwy 21 South Hayneville, AL._

Person Attacked or Property Damaged? _Front End of Undercover Police Vehicle_

How Attacked: _____

Was accused under the influence of alcohol or a controlled substance? ☐ Yes ☐ No

Any law enforcement agency contacted? ☐ Yes ☐ No

If yes, which one? _____

Did Accused Possess or Use a Weapon? ☑ Yes ☐ No    Type: _Rossi 357 Magnum_

Did you go to the hospital? ☐ Yes ☑ No

Damage Done or Injuries Received: _____

Value of Property: _Unknown_

Details of Offense: _Offender attempted to elude DTF Agents at the same time throwing drug evidence out of the window. Offender was forced from the roadway onto the shoulder of the roadway where his vehicle came to rest. Offender was not wearing a seat belt and was highly belligerent, cursing, very combative and obviously highly agitated. There also was a passenger in the vehicle. Both individuals were detained and transported to the Lowndes County Detention Facility._

☐ Check if additional pages are necessary.

Form CR-57 (back)    Rev. 8/98

## DEPOSITION

Any Law Enforcement Agency Contacted ? ☐Yes    ☐No
If yes, which one? _____

I make this statement for the purpose of securing a WARRANT/SUMMONS against the named of accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this

_____ day of

_June_ , _05_

_____        _____
Judge/Clerk/Magistrate                                Complainant

                                                      Social Security Number
                                                      _DTF_

                                                      Address
                                                      Phone Number: _____

## WITNESSES

| Name | Address | Telephone Number |
|---|---|---|
| C West | DTF | |
| L Hutson | DTF | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## MAGISTRATE NOTES

Warrant or Summons issued? ☐Yes    ☐No        Warrant Number: _____

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

April 17, 2006
www.atf.gov

IN:   776045 06 0076

...enant Christopher West
...dicial Drug Task Force
...ville, Alabama

...Agent West:

...roperty listed below is currently in your possession.
...the request of the Bureau of Alcohol, Tobacco and
...rms (ATF) that you transfer custody of the property to
...ntil a final conclusion can be made as to the use of
...evidence in a prosecutable case.  ATF will notify you
...iticusly when the property is no longer needed in the
...ral investigation in that the property can be returned.
...evidence/weapons are further described as follows:

- Rossi, .357 caliber revolver, serial number
  F161600.

- Ammunition.

...he event you should have additional questions or
...erns, please do not hesitate to contact me @ (334) 206-
... or via correspondence at the address above.

...k you in advance.

...pectfully submitted,

...ael J. Durham
...ident Agent in Charge

# EXHIBIT K

**Documents submitted to and received from BATFE**

* AOC COURT # 10DC9700069400 *
* DISP-DISMISSED DATE OF DISP-04/25/97 *
* OFFENSE - LARC-THEFT OF PROP 1ST DEG *
*******************************************************

*ARREST-02 01/16/1998 *
* AGENCY-UNIV OF AL DEPT PUBLIC SAF ORI(AL0630300) *
* LOCAL CASE # 78167 NAME USED-MARSHALL,RICHARD J *
* ------------------------------------------------------- *
* CHARGE 01 : ARREST & DISP BASED ON R84!!-HARASSMENT *
* AOC COURT # 63DC9800042400 *
* DISP-CONVICTED DATE OF DISP-02/11/98 *
* OFFENSE - PUBLIC PEACE-HARASSMENT (NOT/DV ON AOC)MISD *
* SENTENCE- SUSPEND : 30D *

SEQ # 0056 MRI # 115171

2EA.*06/28/2005 14:06 AL0450001 PAGE NO: 2 *
*ATN/AGENT HUTSON *
*OPR/GRESHAM *
*TOTAL NUMBER OF ARRESTS- 2 *
*RECORD UPDATED 03/16/04 *
*ALL ALABAMA ARRESTS RECEIVED BY ACJIC ARE INCLUDED *
*IN THIS REPORT. WHEN EXPLANATION OF A CHARGE OR *
*DISPOSITION IS NEEDED, COMMUNICATE DIRECTLY WITH *
*THE ARRESTING AGENCY THAT FURNISHED THE DATA. *
*RECORD IS CONFIDENTIAL AND INTENDED FOR USE *
*BY CRIMINAL JUSTICE AGENCIES ONLY. *
*ATN/AGENT HUTSON *
*OPR/GRESHAM *
*LAST PAGE ON SSN 424942660 *

SEQ # 0058 MRI # 115174

2EA.14:11 06/28/2005 115176

AL0450001
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON NAM/MARSHALL,RICHARD JAMES SEX/M RAC/B DOB/19740224
SOC/424942660 PUR/C
NAME FBI NO. INQUIRY DATE
MARSHALL,RICHARD JAMES 490191EB7 2005/06/28

SEX RACE BIRTH DATE HEIGHT WEIGHT EYES HAIR BIRTH PLACE PHOTO
M B 1974/02/24 509 160 BRO BLK ALABAMA N

FINGERPRINT CLASS PATTERN CLASS
AA 09 CO CO 08 AU RS AU WU RS AU WU WU LS LS
AA CI CI CI 09 LS WU LS WU
RS

ALIAS NAMES

IN THE DISTRICT COURT OF
TUSCALOOSA COUNTY

STATE OF ALABAMA,

vs.                                          Case Number  DC 98-424

Richard James Marshall
Defendant

EXPLANATION OF RIGHTS

You have a complaint filed against you which is a misdemeanor offense. If you plead guilty to said crime, or
if the Judge finds that you are guilty of said crime, the law provides for punishment by imprisonment in the
County Jail for not less than _____ nor more than _____ days,  for such offense plus a fine of  -0-  to $500.00
nor more than _____ months,                        with costs taxed to you.

Under the Constitution of the United States and of the State of Alabama, you have the right or privilege not
to be compelled to give evidence against yourself. In the trial of your case before the Judge, you have the right to
take the witness stand and to testify on your own behalf, if you so desire, but no one can require you to testify. If
you testify, you can be cross-examined by the State. If you do not testify, no one can even comment to the Judge as
to your failure to testify. You have the right to remain absolutely silent, but anything that you voluntarily say,
with knowledge of your rights may be used against you.

You have the right to have an attorney. If you are unable to afford an attorney because of indigency and face
a possible jail sentence, an attorney will be appointed for you without charge, if you so choose. You should advise
the court that you would like an attorney appointed and make known to the court whether or not you claim
indigency. You claim indigency, you must complete an affidavit of substantial hardship and submit this form to
the court. The court will determine whether or not you are indigent and if so, appoint an attorney to represent you.
Your conversations with you attorney are confidential and cannot, and will not, be disclosed by your attorney.

You have the right to stand on your plea of not guilty, and the right to a public trial before the District Court
Judge. In a trial, the Judge would determine whether you are guilty or whether you are guilty, or whether you
are innocent, based upon the evidence in the case.

In the trial of your case, you or your attorney could subpoena witnesses to testify on your behalf, make legal
objections to matters that you or he feel were objectionable, cross-examine the witnesses of the State, examine your
own witnesses, and argue the matter before the Judge. Your attorney would be bound to do everything that he
could honorably and reasonably do to see that you obtain a fair and impartial trial.

In the trial of your case, you will come into court clothed with a presumption that you are not guilty and this
presumption of innocence will follow you throughout the course of the trial until the evidence produced by the
State convinces the Judge beyond a reasonable doubt of your guilt.

To the charge set out in the complaint, you have the right to enter a plea of guilty, not guilty, not guilty by
reason of insanity or any other special plea. You should enter a plea of guilty only if you are actually guilty of said
crime. If you are in such as to whether you are or are not guilty, this court suggests that you enter a plea of not
guilty and require the prosecution to prove its case against you.

The burden of proof is upon the State of Alabama to convince the Judge from the evidence in the case that
you are guilty beyond a reasonable doubt before the Judge would be authorized to find you guilty. If the State does
not meet such burden of proof, it will be the Judge's duty to find you not guilty. You will have no burden of proof
whatsoever in your trial.

Your attorney will go over these rights with you, but if you have any questions about any of them, please ask
the undersigned Judge, and he will make further explanation thereof to you.

If you plead and are found guilty by the Judge, then you have ____ days to appeal the Judgment to
the Circuit Court and have it tried before a jury.

This the _____ day of _____

**EXPLANATION OF RIGHTS** (JG)

I know that I am charged with the offense of _Harassment_, and I have read the above Rights Form and am completely knowledgeable about these rights guaranteed to me by the Constitution of the United States and the State of Alabama.

I plead     Not Guilty ☐     Guilty ☑

I wish to waive my right to be represented by an attorney ☑

I wish to be represented by an attorney ☐

Defendant: _Richard Marshall_

Address: _101 McConico Hall_
_Tuscaloosa Apt A_

Phone Number: _391-5769_

Employer: _Bite Hide_

Attorney for defendant _____

**FILED**
FEB 11 1998
ELIZABETH HANNER, CLERK
TUSCALOOSA DISTRICT COURT

```
ACSO370        ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: DC 98 000424.00
OPER: KEJ                    CASE ACTION SUMMARY         RUN DATE: 01/21/98
PAGE:   1               DISTRICT   CRIMINAL
=====================================================================JUDGE: DDD
IN THE DISTRICT COURT OF TUSCALOOSA

STATE  OF  ALABAMA              VS      MARSHALL RICHARD JAMES
                                        MCCOVEY HALL 2ND STREET
CASE: DC 98 000424.00                   APT 101
                                        TUSCALOOSA, AL  35407 0000

DOB: 02/24/74        SEX: M  RACE: B  HT: 0 00  WT: 000    HR:      EYES:
SSN: 424942660   ALIAS NAMES:
=====================================================================
CHARGE1: HARASSMENT                    CODE1: HARA LIT: HARASSMENT     TYP: M
MORE?:       OFFENSE DATE: 01/10/98  AGENCY/OFFICER: UAPD         ANDERS

DATE WAR/CAP ISS:                    DATE ARRESTED: 01/16/98
DATE    INDICTED:                    DATE   FILED: 01/21/98
DATE   RELEASED: 01/10/98            DATE HEARING:
BOND    AMOUNT:        $500.00            SURETIES:

DATE 1: 02/11/98    DESC: DOCK           TIME: 0900 A
DATE 2:             DESC:                TIME: 0000
                                                               TYPE:
                            TYPE:
DEF/ATY:
PROSECUTOR:
=====================================================================
OTH CSE:           CHK/TICKET NO: 9800011800      GRAND JURY:
COURT REPORTER:              SID NO:    000000000
                            DEMAND:                      OPER: KEJ
DEF STATUS: BOND
=====================================================================
DATE        ACTIONS, JUDGEMENTS, AND NOTES
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 2/2/98 | Mailer for 2/11/98 on 1/30/98 & w/subp. w/s. |
| 2/11/98 | ΔPG. State lee, Batt Program + 30 days susp for 2 years (AJ) explained length of BP & costs. (AJ) |

2/11/98

> After full rights given by the court, Defendant voluntarily and
> intelligently pleads guilty, Judgment Guilty and Defendant fined
> $_____ and Defendant is hereby sentenced to serve 30
> days at hard labor for Tuscaloosa County. It is hereby ordered
> and adjudged that the execution of the above and foregoing
> sentence be suspended for a period of 2 yrs, pending
> behavior of the Defendant. Defendant to pay costs and
> $ 25 VCA. Clerk may accept partial payments. Case
> continued to 3/11/98    B.P.
>
> _(signature)_
> **District Judge**
>
> $100 + BP 10 2 pt

| | |
|---|---|
| 2/11/98 | Order |
| 2/11/98 | Expl. of rights |
| 2/19/98 | Depositions |
| 2/27/98 | Mailer for 3/11/98 |

ACS0369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: DC 98 000424.00
JUDGE ID: DDD

STATE OF ALABAMA              VS    MARSHALL RICHARD JAMES

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 3/11/98 | D Cost — only to 40-co in BP — <br> — 'd 4-15-98 in jail + BP regot |
| 4/3/98 | Mailer for 4/5/98 |
| 4/15/98 | Cont 2 6/10/98 case to be complete |
| 4/15/98 | FCS |
| 5/29/98 | Mailer for 6/10/98 |
| 6/10/98 | 8 capias (A) |
| 6/10/98 | FCS report |
| 6-12-98 | still ans. CB — jerome capits writ — jail writ |
| 6/18/98 | recall writ — remit 10 — CB |

ORDER FOR DOMESTIC VIOLENCE
INTERVENTION PROGRAM

STATE OF ALABAMA

IN THE DISTRICT COURT OF
TUSCALOOSA COUNTY, ALABAMA

VS.

CASE NO. _DC 98-424_

Richard James Marshall
DEFENDANT.

## ORDER

The Defendant is hereby ordered to the **Domestic Violence Intervention Program**. Accordingly, the Defendant is ORDERED to do each of the following:

1.    Within Seven (7) days of today's date, you will go to Family Counseling Service and pay the fee ($30) to set up your screening interview. You must take this order with you. **You do not need to call.** Family Counseling Service is located at 2020 Bryant Drive, Tuscaloosa, Alabama, 35401, one block west of Alabama Power Company. Office hours are 9:00 A.M. until 4:30 P.M. Monday through Friday.   752-2504

2.    You will attend each scheduled meeting as recommended by the staff of Family Counseling Service. The Domestic Violence Intervention Program is a series of twelve group meetings which you must attend. You will cooperate fully and honestly and you will follow each rule and recommendation of Family Counseling Service and its staff.

3.    You will pay for the twelve group meetings at Family Counseling Service at $30 per session. You must take the fee with you as you attend each meeting.

4.    Family Counseling Service shall provide a brief written report ( referencing the Defendant's name and case number ) regarding your compliance and progress prior to your return court date.

5.    Failure of the Defendant to attend sessions or cooperate fully shall result in termination from the Domestic Violence Intervention Program and further action by the Court.

6.    ANY VIOLATION OF THIS ORDER, OR ANY FUTURE ILLEGAL ACT, WILL RESULT IN TERMINATION FROM THE PROGRAM, AN ARREST WARRANT BEING ISSUED AND A POSSIBLE JAIL SENTENCE.

**FILED**

7.    You will return on court on ____3-11-___, 19_98_.   FEB 11 1998

Done this ___Feb 11___, 19_98_.

ELIZABETH HAMNER, CLERK
TUSCALOOSA DISTRICT COURT

DISTRICT JUDGE

Copy to Family Counseling Service with factual narrative and criminal history.

W A R R A N T

STATE OF ALABAMA         TUSCALOOSA COUNTY              DISTRICT  COURT
AGENCY NUMBER: 9801032              WARRANT NUMBER: WR 98 000118.00
                                    OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:
YOU ARE HEREBY COMMANDED TO ARREST    RICHARD JAMES MARSHALL    AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF TUSCALOOSA COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
                            HARASSMENT   CLASS:C  TYPE:M
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ 19____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 16 DAY OF JANUARY, 1998.

BOND SET AT: (1)        $500.00   BOND TYPE:
             (2) _____
             (3) _____

JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

------------------------------------------------------------------------
CHARGES: HARASSMENT         13A-011-008 (A)(1)    M  MISDEMEANOR
------------------------------------------------------------------------
NAME: RICHARD JAMES MARSHALL          ALIAS:
ADDRESS: MCCOVEY HALL 2ND STREET      ALIAS:
ADDRESS: APT 101
CITY: TUSCALOOSA         STATE: AL      ZIP: 00000 0000

EMPLOYMENT:
DOB: 02/24/74    RACE: B    SEX: M    HAIR:
EYE:      HEIGHT: 0'00"   WEIGHT: 000
SID: 000000000  SSN: 000000000
------------------------------------------------------------------------
                    E X E C U T I O N
       EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND
       (X)  PLACING DEFENDANT IN THE TUSCALOOSA COUNTY JAIL

       (  )  RELEASING DEFENDANT ON APPEARANCE BOND

_____

THIS ___16___ DAY OF ___January_____ 19 _95_

                    SHERIFF
                    Ronald R. Anders     U-TA P.D.
------------------------------------------------------------------------
COMPLAINANT:  RONALD ANDERS
              UA PD
              UNI OF ALABAMA  AL  35486       **FILED**

OPERATOR: GEB    LAST UPDATE: 011698          JAN 21 1998

                    ELIZABETH HAMNER, CLERK
                    TUSCALOOSA DISTRICT COURT

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF TUSCALOOSA COUNTY * * *

AGENCY NUMBER: 9801032                    WARRANT NUMBER: WR 98 000118.00
                                          OTHER CASE NBR:          .

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
TUSCALOOSA COUNTY, ALABAMA, PERSONALLY APPEARED   RONALD ANDERS
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT   RICHARD JAMES MARSHALL
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT

DID ON OR ABOUT    011098        , WITH THE INTENT TO HARASS, ANNOY OR
ALARM ANOTHER PERSON, TO-WIT:  SHERVON BAITY          DID EITHER
(X)  STRIKE, SHOVE, KICK OR OTHERWISE TOUCH THE SAID SHERVON BAITY
     OR SUBJECT HIM/HER TO PHYSICAL CONTACT BY STRIKING HER WITH HIS HANDS    , OR,

( )  DIRECT ABUSIVE OR OBSCENE LANGUAGE, MAKE AN OBSCENE GESTURE OR A
     THREAT, TO-WIT:                                                    ,
     TOWARD ANOTHER PERSON, TO-WIT:              OF THE CODE OF ALABAMA,
IN VIOLATION OF 13A-011-008 (A)(1)
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.


                              _Ronald R Anders_____
                              COMPLAINANT'S SIGNATURE


SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 16 DAY OF JANUARY, 1998.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: HARASSMENT          13A-011-008 (A)(1)    M  MISDEMEANOR

WITNESS FOR THE STATE

RONALD ANDERS/UA PD/UNI OF ALABAMA/35486
SHERVON BAITY/MCCOVEY HALL 2ND STREET/APT 101/TUSCALOOSA/35487
_____
_____
_____

OPERATOR: GEB    DATE: 01/16/98

0098-424

CHARGE: Domestic Violence (Harassment) WARRANT NO. WR98 000118
CASE NO. 98-01-032

## DEPOSITION AND CHARGE SHEET

Personally appeared before me, _Ronald Anders_____, being by me first duly sworn,
deposes and says:

On _01/10/98_____ at _0212mT_____ the following incident occurred:

Def: _Richard James Marshall_____ Alias _none_____

Address: _McCarthy Hall 2ND St 4-1A Tusc. AL 35487___ State _AL_ Zip _35487_

DOB: _02/24/74_____ Race _B_ Sex _m_ Ht: _5'9"_ Hair _BLK_ Eyes _BRO_

did _ON 1-10-98 AT APPROX 0200 WRITER R.R ANDERS RESPONDED TO Apt 101_
_McCARTHY HALL ON A REPORT OF A MAN HITTING A FEMALE. WHEN WRITER_
_ARRIVED AT THE APt THE VICTIM SHERLON BAILY WAS SITTING IN THE HALLWAY_
_WEARING ONLY A PAIR OF PANTIES AND HOLDING A TORN TEE-SHIRT. THE VICTIM_
_HAD SWELLING UNDER HER LEFT EYE AND SCRATCH MARK ON HER NECK. THE_
_COMPLAINANT IS THE VICTIMS EIGHT YEAR OLD DAUGHTER. AT THIS TIME WRITER_
_TALKED WITH THE SUSPECT WHO STATED THEY WERE ARGUING AND HE HIT THE VICTIM._
_THE SUSPECT STATED THE VICTIM HIT HIM ALSO, BUT NO MARKS WERE NOTED_
_BY WRITER. WRITER ARRESTED Richard MARSHALL FOR DOMESTIC VIOLENCE_
_AND PLACED HIM IN THE COUNTY JAIL ON A ARREST TICKET A376._

SWORN to and subscribed
before me this the _16_
day of _January_
19 _98_

_Ronald R Anders_
Complainant's Signature

**FILED**

FEB 1 9 1998

ELIZABETH HAMNER, CLERK
TUSCALOOSA DISTRICT COURT

Magistrate

Code 1: _____ Code 2: _____ Code 3: _____

Agcy-ORI _0630300_ Issued to: _____

WITNESS: _____

**ALABAMA UNIFORM INCIDENT/OFFENSE REPORT**

| INCIDENT | OFFENSE | CASE # | SFX |
|---|---|---|---|
| SUPPLEMENT | | 9.81-01-103.2 | |

AGENCY NAME: UNIV OF AL DEPT OF PUBLIC SAFETY

DATE AND TIME OF THIS REPORT: 01-11-1998  0215

GR# 06.030.001.11.0918

REPORTED BY: BAILY KLARA
ADDRESS: McCORVEY HALL APT 101 UofA TUSC. AL 35456
PHONE: (205) 347-5769

VICTIM (LAST, FIRST, MIDDLE NAME): BAILY SHERWIN R
ADDRESS: McCORVEY HALL APT 100 UofA TUSC. AL 35456
PHONE: (205) 347-5769

EMPLOYER/SCHOOL: UNIV OF AL
OCCUPATION: STUDENT

RESIDENT / NON-RESIDENT

INJURY: N    RACE: W    SEX: MALE / FEMALE    HGT    WGT    DOB: 14-10-2679    AGE: 28

WAS OFFENDER KNOWN TO VICTIM? Y / N    VICTIM WAS (EXPLAIN RELATIONSHIP): GIRLFRIEND

TYPE INCIDENT OR OFFENSE: DOMESTIC VIOLENCE / HARASSMENT
ORDINANCE (CIRCLE): 1 2 3
STATE CODE/LOCAL ORDINANCE: 13A-11-8(b)

TYPE INCIDENT OF OFFENSE: FEL. / MISD.
DEGREE (CIRCLE): 1 2 3
STATE CODE/LOCAL ORDINANCE:

PLACE OF OCCURRENCE: McCORVEY HALL APT 101 UNIV OF AL CAMPUS TUSC. AL.
SECTOR: 21

POINT OF ENTRY: DOOR / WINDOW / ROOF / OTHER

METHOD OF ENTRY: FORCIBLE / ATT. FORCIBLE / NO FORCE

ASSAULT: SIMPLE / AGGR.
TREATMENT FOR ASSAULT INJURY: Y / N

OCCURRED ON OR BETWEEN:  01-11-1998  TIME: 01:48
04-11-1998  TIME: 01:53

LIGHTING: DAY / NIGHT / ART. EXT. / ART. INT. / UNK.
WEATHER: CLEAR / CLOUDY / RAIN / SNOW / FOG / HAIL / UNK.
PREMISE: HWY-ST-ALLEY / RAILROAD / RESIDENCE / CHURCH / SCHOOL / CONVENIENCE / INDUSTRIAL / SERVICE STA. / BANK / DRUG STORE / APT/TWN. HSE. / SHOPPING CENTER / PARKING LOT / OTHER COMMER. / OTHER

VERIFY FOR: Y / N    TREAT. FOR: Y / N    CIRCUMSTANCES: HOMICIDE & ASSAULT

RAPE EXAM: Y / N    RAPE INJURY: Y / N    LOCATION: RAPE

DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE: HANDGUN / RIFLE / SHOTGUN / UNKNOWN

WEAPON USED: FIREARM / KNIFE / HANDS, FISTS, VOICE, ETC. / OTHER DANGEROUS

**PROPERTY DESCRIPTION**

| QUANTITY | STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | DOLLAR VALUE | | RECOVERED | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | | | | | |

CONTINUED IN NARRATIVE

**DOLLAR VALUE**

| MOTOR VEHICLE | CURRENCY, NOTES | JEWELRY | CLOTHING/FURS | FIREARMS | OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R O D | S R O D | S R O D | S R O D | S R O D | S R O D |

| ELECTRONICS | HOUSEHOLD | CONSUMABLE GOODS | LIVESTOCK | MISCELLANEOUS |
|---|---|---|---|---|
| S R O D | S R O D | S R O D | S R O D | S R O D |

FILED
JAN 21 1998
ELIZABETH HAMNER, CLERK
TUSCALOOSA DISTRICT COURT

CHECK CATEGORIES: STOLEN / RECOVERED / SUSPECTS VEH. / VICTIMS VEH. / UNAUTH. USE / ABANDONED

**VEHICLES**

# STOLEN    LIC.    LIS.    LIV.    TAG COLOR    VIN

YR: NONE    VMA    VMO    VST    VCO    TOP: / BOTTOM:    ADDITIONAL DESCRIPTION

STOLEN MTR. VEH.-ONLY: AREA STOLEN: BUS. / RES. / RUR.    OWNERSHIP: TAG RECEIPT / BILL OF SALE / TITLE / OTHER    VERIFIED BY:    WARRANT SIGNED

AUTO INSURER NAME (COMPANY) ADDRESS (STREET, STATE, ETC.)    PHONE: ( )

MOTOR VEH. RECOVERED ONLY/REQUIRED FOR OTHER JURIS.    STOLEN IN YOUR JURISDICTION? WHERE?    RECOVERED IN YOUR JURISDICTION? WHERE?

**TYPE OR PRINT IN BLACK INK**

ACJIC—32 REV 8-96

ALABAMA **UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT**

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

A GOLD CHAIN HAD BEEN PULLED FROM THE VICTIMS NECK AND HER TEE SHIRT HAD BEEN TORN OFF. WRITER ARRESTED THE LISTED SUSPECT AND TRANSPORTED HIM TO THE TUSCALOOSA COUNTY JAIL AND PLACED INTO THE CUSTODY OF JAIL STAFF. THE SUSPECT WAS PLACED IN ON A COUNTY ARREST TICKET AT 5776 WITH A $500.00 CASH BOND. THE WARRANT WILL BE OBTAINED THROUGH THE CITY WARRANT CLERK. PHOTOGRAPHS AND A WRITTEN STATEMENT WAS OBTAINED FROM THE VICTIM. THE VICTIMS TORN SHIRT WAS TAGGED AND PLACED IN THE EVIDENCE LOCKER.

FILED
JAN 27 1998
ELIZABETH FARMER, CLERK
TUSCALOOSA DISTRICT COURT

TYPE OR PRINT IN BLACK INK ONLY                    ACJIC—33 REV. 11-94



**ALABAMA UNIFORM ARREST REPORT**

| Fingerprinted | R84 Completed |
|---|---|
| ☒ Yes | ☐ Yes |
| ☐ No | ☒ No |

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI # | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 0 6 1 3 0 3 0 0 | Univ of Alabama Dept of Public Safety | 9 8 - 0 1 - 0 3 2 | |

**IDENTIFICATION**

5 LAST, FIRST, MIDDLE NAME: MARSHALL, Richard James — 6 ALIAS AKA: NONE

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | 14 ☐SCARS ☐TATOOS ☐AMPUTATIONS |
|---|---|---|---|---|---|---|---|
| ☒ M ☐ F | ☒ W ☐ B ☐ I ☐ A | 509 | 190 | Brown | Black | Dark | |

15 PLACE OF BIRTH (CITY, COUNTY, STATE): Selma Alabama

| 16 DATE OF BIRTH | 17 AGE | 18 MISCELLANEOUS ID # |
|---|---|---|
| 04 24 74 | 23 | |

| 19 SID # | 20 FINGERPRINT CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 21 DL # |  |
|---|---|---|---|---|---|---|---|---|---|
| | | 42 41 91 71 12 66 0 | | | | | | 6018768 | AL |

HENRY CLASS / NCIC CLASS

| 22 FBI # | | 23 OLS # | 24 IDENTIFICATION COMMENTS |
|---|---|---|---|
| | | 6018768 | AL |

| 25 ☒ RESIDENT ☐ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP): McCorvey Hall Apt 101 2nd St Tusc. Al. | 28 RESIDENCE PHONE (205) 347 5769 | 29 BUSINESS PHONE NONE |
|---|---|---|---|

30 EMPLOYER (NAME OF COMPANY/SCHOOL): NONE — 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP)

**ARREST**

32 LOCATION OF ARREST (STREET, CITY, STATE, ZIP): McCorvey Hall UA Campus Apt 101

| 33 SECTOR # | 34 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO |
|---|---|

| 35 CONDITION OF ☐ DRUNK ☐ SOBER ARRESTEE ☐ DRINKING ☐ DRUGS | 36 RESIST ARREST? ☐ YES ☒ NO | 37 INJURED? ☐ JUVENILE? ☒ NONE ☐ OFFICER ☐ ARRESTEE | 38 ARMED? ☐ Y ☒ N | 39 DESCRIPTION OF WEAPON ☐ HANDGUN ☐ OTHER FIREARM ☐ RIFLE ☐ OTHER WEAPON ☐ SHOTGUN |
|---|---|---|---|---|

| 41 DATE OF ARREST | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED (REPORT) ☐ YES ☒ NO ☐ UNKNOWN |
|---|---|---|---|---|
| 04 11 98 | 02 15 ☒ AM ☐ MIL | | ☐ 1 AM ☐ 2 PM | |

| 46 CHARGE–1 ☐ FEL ☒ MISD | 47 UCR CODE | | 48 UCR CODE |
|---|---|---|---|

49 Domestic Violence Harassment — NONE

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED |
|---|---|---|
| 13A-11-8 (b) | | |

| 53 CHARGE–2 ☐ FEL ☐ MISD | 54 WARRANT # | 55 DATE ISSUED |
|---|---|---|

| 56 CHARGE–3 ☐ FEL ☐ MISD | 57 UCR CODE | 58 CHARGE–4 ☐ FEL ☐ MISD | 59 UCR CODE |
|---|---|---|---|
| NONE | | NONE | |

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 STATE CODE/LOCAL ORDINANCE | 63 WARRANT # | 64 DATE ISSUED |
|---|---|---|---|---|

| 65 ARREST DISPOSITION ☒ HELD ☐ BAIL ☐ RELEASED | 66 TOT-LE ☐ OTHER | 67 IF OUT ON RELEASE WHAT TYPE? |
|---|---|---|

68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME)

69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME)

**VEHICLE**

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP / BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN NONE | 79 IMPOUNDED? ☐ YES ☐ NO | 80 STORAGE LOCATION/IMPOUND # |
|---|---|---|

81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED — ☐ CONTINUED IN NARRATIVE

**JUVENILE**

| 82 JUVENILE DISPOSITION | ☐ HANDLED AND RELEASED ☐ REF. TO JUVENILE COURT | ☐ REF. TO WELFARE AGENCY ☐ REF. TO OTHER POLICE AGENCY | ☐ REF. TO ADULT COURT |
|---|---|---|---|

84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) — 85 ADDRESS (STREET, CITY, STATE, ZIP) — PHONE

86 PARENTS EMPLOYER — 88 OCCUPATION — 87 ADDRESS (STREET, CITY, STATE, ZIP)

**RELEASE**

| 91 DATE AND TIME OF RELEASE ☐ AM ☐ PM ☐ MIL | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION |
|---|---|---|

| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐ YES ☐ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
|---|---|---|

101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE)

| | LOCAL USE | |
|---|---|---|

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | STATE USE |
|---|---|---|

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) | 112 ID # | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR | 116 WATCH CMDR. |
|---|---|---|---|---|---|
| Anders, Ronald R | 40 | Kirsh, Eric | 54 | AH | 46 |

**TYPE OR PRINT IN BLACK INK ONLY**          ACJIC–34 REV. 10-90

FILED JAN 21 1999 ELIZABETH HAMNER CLERK TUSCALOOSA DISTRICT COURT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

**INCIDENT/OFFENSE REPORT CONTINUED**

95 DATE AND TIME OF REPORT: 01/11/98  02:15   AM ☐ PM ☐ MIL ☒

96 CASE # 98-1011-1032

97 SFX   98 ☒ OFFENDER  ☐ SUSPECT  ☐ MISSING PERSON   ☐ CHECK IF MULTIPLE

100 NAME (LAST, FIRST, MIDDLE): MARSHALL Richard JAMES
101 ADDRESS (STREET, CITY, STATE, ZIP): McCurdy Hall Apt 101, UMA Tusc. AL 35486
111 PROBABLE DESTINATION: Same
102 ☐ NO W/C
104 RACE: B   105 SEX: M   107 DOB: 07/24/73   106 AGE: 23
106 HGT: 5'9   107 WGT: 190   108 EYE: Brown   109 HAIR: Black   110 COMPLEXION: Dark
112 ARRESTED   113 WEAPON: NO W/C
115 ☐ ARRESTED  ☒ WANTED   116 AOE

114 CLOTHING: Dark Colored Corduroy Pants, Tee Shirt   ☐ SCARS  ☐ MARKS  ☐ TATOOS

116 NAME (LAST, FIRST, MIDDLE): None
117 NICKNAME/ALIAS
122 ADDRESS (STREET, CITY, STATE, ZIP): None
126 PROBABLE DESTINATION
118 RACE   119 SEX   120 DOB   121 AGE
122 HGT   123 WGT   124 EYE   125 HAIR   127 COMPLEXION
128 ARMED?  ☐ Y  ☐ N  ☐ UNC   130 WEAPON
130 CLOTHING   ☐ SCARS  ☐ MARKS  ☐ TATOOS
135 ☐ ARRESTED  ☒ WANTED

**WITNESSES**

133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE
#1 BAILY, KIARA   SEX F  RACE B  DOB 04/29/89   McCurdy Hall UMA Tusc. AL   (205) 1347-5769   None
#2   SEX   RACE   ( )   ( )
#3   SEX   RACE   ( )   ( )
#4   SEX   RACE   ( )   ( )

WITNESS #1 SSN: No W/C   WITNESS #2 SSN   WITNESS #3 SSN   WITNESS #4 SSN

**NARRATIVE**

ON 01/10/98 AT APPROX 0163 HRS, WRITER R.R. ANDERS RESPONDED TO McCurdy Hall Apt 101 ON A REPORT OF A PHYSICAL ALTERCATION FROM WITNESS #1 THE VICTIM's DAUGHTER. WHEN WRITER ARRIVED AT THE APARTMENT THE VICTIM WAS IN THE HALLWAY WEARING ONLY HER PANTIES AND COVERING HER BREAST WITH A TORN WHITE TEE SPIRIT. THE VICTIM STATED SHE AND HER BOYFRIEND Richard MARSHALL WAS ARGUING ABOUT SOMETHING THAT OCCURRED OVER THE HOLIDAYS WHILE THE VICTIM WAS OUT OF TOWN. VICTIM STATED THE SUSPECT BEGAN HITTING HER WHILE THEY WERE LYING IN BED AND CONTINUED AS SHE CALLED FOR HER DAUGHTER WHO WAS IN THE OTHER BEDROOM, TO CALL THE POLICE. THE VICTIM AND SUSPECT HAVE LIVED TOGETHER FOR THE LAST TWO YEARS. WHILE TALKING WITH THE VICTIM IT WAS NOTICED THAT SHE HAD SWELLING UNDER HER LEFT EYE.

CONTINUED ON SUPPLEMENT ☒ ☐

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

SIGNATURE:

MULTIPLE CASES CLOSED   140 CASE #   141 SFX   142 CASE #   143 SFX   144 CASE #   145 SFX   146 ☐ ASSOCIATED CASES CLOSED ☐ NARRATIVE

**ADMINISTRATION**

147 CASE STATUS: ☐ PENDING  ☐ INACTIVE  ☐ CLOSED
ENTERED BY AGENCY/ID   DATE

148 CASE DISPOSITION:
☐ CLEARED BY ARREST (JUV.)
☐ CLEARED BY ARREST (ADULT)
☐ UNFOUNDED
☐ ADM. CLEARED

☐ EXCEPTIONAL CLEARANCE:
☐ SUSPECT/OFFENDER DEAD
☐ OTHER PROSECUTION
☐ EXTRADITION DENIED
☐ LACK OF PROSECUTION
☐ JUVENILE, NO REFERRAL
☐ DEATH OF VICTIM

149 REPORTING OFFICER: R.R. ANDERS   ID #: 40
150 ASSISTING OFFICER: F. DKirsh   ID #: 54
151 SUPERVISOR APPROVAL: A7   152 WATCH CMDR: 46   ID #




**ALABAMA UNIFORM INCIDENT/OFFENSE REPORT**

| 1 [ ] INCIDENT [X] OFFENSE | 2 CASE # | 3 SFZ |
|---|---|---|
| [ ] SUPPLEMENT | 9 8 - 0 1 1 - 0 1 3 2 | |

**VICTIM SSN** 4.065.039.036.130    **COMPLAINANT SSN**

| 4 ORI # | 5 DATE AND TIME OF THIS REPORT | 6 AGENCY NAME |
|---|---|---|
| 0 6 3 0 3 0 0 | 0 1 1 1 0 9 8 0215 [X] AM [ ] PM [ ] MIL | UNIV OF AL DEPT OF PUBLIC SAFETY |

7 REPORTED BY [X] VICTIM OR
Baity Kiara

9 VICTIM (LAST, FIRST, MIDDLE NAME)
Baity Sherron R

11 EMPLOYER/SCHOOL
Univ of AL Student

8 ADDRESS (STREET, CITY, STATE, ZIP)
McCorvey Hall Apt 101 Univ Tusc. AL 35486    13 PHONE (205) 347-5769

12 ADDRESS (STREET, CITY, STATE, ZIP)
McCorvey Hall Apt 100 Univ AL 35486    14 PHONE (205) 347-5769

16 ADDRESS (STREET, CITY, STATE, ZIP)

| 19 SUS/VIC | 20 INJURY | 22 RACE | 23 SEX | 24 WGT | 25 DOB | 26 AGE | 27 WAS OFFENDER KNOWN TO VICTIM? | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) | 29 CAUC |
|---|---|---|---|---|---|---|---|---|---|
| [ ] RESIDENT [ ] NON-RESIDENT | [ ] Y [ ] N | | [ ] MALE [X] FEMALE | | 1 9 1 0 2 6 7 9 | 28 | [X] Y [ ] N | Girlfriend | |

30 TYPE INCIDENT OF OFFENSE [ ] FEL. [X] MISD.
Domestic Violence Harassment    31 DEGREE (CIRCLE) 1 2 3    32 STATE CODE/LOCAL ORDINANCE 13A-11-8(b)

34 TYPE INCIDENT OF OFFENSE [ ] FEL. [X] MISD.
None    35 DEGREE (CIRCLE) 1 2 3    36 STATE CODE/LOCAL ORDINANCE

38 PLACE OF OCCURRENCE
McCorvey Hall Apt 101 Univ of AL Campus Tusc. AL    39 SECTOR 211

**EVENT**

| 40 POINT OF ENTRY [ ] DOOR [ ] ROOF [ ] WINDOW [ ] OTHER | 41 METHOD OF ENTRY [ ] FORCIBLE [ ] AFF. FORCIBLE [ ] NO FORCE | 47 ASSAULT [ ] SIMPLE [ ] AGGR. | 48 TREATMENT OF ASSAULT INJURY [ ] Y [X] N |
|---|---|---|---|

44 OCCURRED ON OR BETWEEN
0 1 1 0 9 8    45 TIME 01:45 [X] AM [ ] PM [ ] MIL
0 1 1 0 9 8 01:53 [X] AM [ ] PM [ ] MIL

| 46 LIGHTING | 48 WEATHER | 49 PREMISE |
|---|---|---|
| [ ] NATURAL [ ] MOON. [X] ART. DY. [ ] ART. INT. [ ] UNK. | [ ] CLEAR [ ] CLOUDY [ ] RAIN [ ] FOG [ ] SNOW [ ] HAIL [ ] UNK. | [ ] HWY—ST—ALLEY [ ] BANK [ ] RAILROAD [ ] DRUG STORE [X] RESIDENCE [ ] APT./TWN. HSE. [ ] CHURCH [ ] SHOPPING CENTER [ ] SCHOOL [ ] PARKING LOT [ ] CONVENIENCE [ ] OTHER COMMERL [ ] INDUSTRIAL [ ] OTHER [ ] SERVICE STA. |

54 VERIFY FON [ ] Y [ ] N    55 TREAT. FOR [ ] Y    56 CIRCUMSTANCES Homicide & Assault

RAPE EXAM [ ] Y [ ] N    RAPE INJURY [ ] Y    LOCATION: RAPE    [ ] HANDGUN [ ] RIFLE [ ] SHOTGUN [ ] UNKNOWN

| 58 WEAPON USED [ ] FIREARM [ ] HANDS, FISTS, VOICE, ETC. [ ] KNIFE [ ] OTHER DANGEROUS | 59 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE |
|---|---|

**PROPERTY DESCRIPTION**

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR,ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|
| | DESCRIBE | STOLEN | DAMAGED | DATE | VALUE |
| | | | | | |

[ ] CONTINUED IN NARRATIVE

**DOLLAR VALUE**

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS | |

FILED JAN 21 1998 ELIZABETH HAMNER, CLERK TUSCALOOSA DISTRICT COURT

**VEHICLES**

| 75 CHECK CATEGORIES | [ ] STOLEN | [ ] RECOVERED | [ ] SUSPECTS VEH. | [ ] VICTIMS VEH. | [ ] UNAUTH. USE | [ ] ABANDONED |
|---|---|---|---|---|---|---|

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN |
|---|---|---|---|---|---|

| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO | 87 ADDITIONAL DESCRIPTION |
|---|---|---|---|---|---|
| | None | | | TOP: BOTTOM: | |

| STOLEN MTR. VEH ONLY | 88 AREA STOLEN [ ] BUS. [ ] RES. [ ] RUR. | 89 OWNERSHIP [ ] VERIFIED BY: | 90 TAG RECEIPT [ ] BILL OF SALE [ ] TITLE [ ] OTHER | 90 WARRANT SIGNED [ ] Y [ ] N |
|---|---|---|---|---|

91 AUTO INSURER NAME (COMPANY)  ADDRESS (STREET, CITY, STATE, ZIP)    PHONE ( )

| MOTOR VEH. RECOVERY ONLY REQUIRED FOR 34a UCR CODE | 92 STOLEN IN YOUR JURISDICTION? [ ] WHERE? | 94 RECOVERED IN YOUR JURISDICTION? [ ] WHERE? |
|---|---|---|

**TYPE OR PRINT IN BLACK INK**    ACJIC—32 REV 6-96

INCHES    1    2    3    4    5    6



**FAMILY COUNSELING SERVICE**
2020 Bryant Drive
Tuscaloosa, Alabama 35401
(205) 752-2504

Date: _5 - 29 - 98_

To: Judge Joel Chandler
    Tuscaloosa District Court

F I L E D

JUN 1 0 1998

ELIZABETH HAMNER, CLERK
TUSCALOOSA DISTRICT COURT

From: _Jacqueline Hellms_
      Group Leader

Re:  Richard James Marshall                  Case #: DC98-424     6/10

**ATTENDANCE:**

   _12_ of 12 Sessions       _Ø_ Make-Up Session      _1_ Tardy

| PERFORMANCE  EVALUATION | No Progress | Poor | Average | Good | Excellent |
|---|---|---|---|---|---|
| Accepting responsibility for behavior | 1 | ②ↄ | 3 | 4 | 5 |
| Recognition of violence as unacceptable | 1 | 2 | ③ | 4 | 5 |
| Increased ability to use nonviolent behavior | 1 | 2 | ③ | 4 | 5 |
| Modifying attitude towards opposite sex | 1 | ② | 3 | 4 | 5 |
| Accepting partnership view in relationships | 1 | 2 | ③ | 4 | 5 |
| Development of assertive skills | 1 | ② | 3 | 4 | 5 |
| Development of communication skills | 1 | ② | 3 | 4 | 5 |
| Recognizing irrational thoughts | 1 | 2 | ③ | 4 | 5 |
| Changing irrational thoughts | 1 | 2 | ③ | 4 | 5 |
| Development of negotiation skills | 1 | ② | 3 | 4 | 5 |
| Development of problem-solving skills | 1 | 2 | ③ | 4 | 5 |
| Recognition of stages of abuse cycle | 1 | ② | 3 | 4 | 5 |
| Participation in class discussion | 1 | 2 | ③ | 4 | 5 |
| Progress demonstrated in homework | 1 | ② | 3 | 4 | 5 |
| Completion of homework | 1 | 2 | ③ | 4 | 5 |
| Progress demonstrated in class discussion | 1 | ② | 3 | 4 | 5 |
| Progress demonstrated in interaction with group leaders | 1 | ② | 3 | 4 | 5 |
| Victims report of clients progress | 1 | 2 | 3 | 4 | 5 |

Name: Richard James Marshall          Case #: DC98-424

DISCHARGE RECOMMENDATIONS
_____ Voluntary AA
_____ Voluntary Marriage Counseling
_____ Voluntary Individual Counseling
_____ Other: _____

REFERRAL TO MONTHLY DVIP FOLLOW-UP
___✓__ 3 Months              _____ 12 Months
_____ 6 Months             _____ No Further Recommendations
_____ Full Probationary Period

COMMENTS/NARRATIVE ASSESSMENT

Mr. Marshall's written and verbal responses during his DVIP participation indicated that he seemed to continue to focus on who his partner(s) are, and their behavior(s) as a determinant of his behavior. He expressed little motivation to engage in behavior change activities.

   Completion of the Domestic Violence Intervention Program is no guarantee of a change in the participant's behavior. The program seeks to offer education and insight to encourage change, but the actual change is at the discretion of each participant and remains beyond the ability of this program to control.



# FAMILY COUNSELING SERVICE

2020 BRYANT DRIVE
TUSCALOOSA, AL 35401
205/752-2504

### VERIFICATION OF PARTICIPATION

Family Counseling Service
Board of Directors

*President:*
Juanita Watson

*Vice President:*
Norman Carlson

*Treasurer:*
Tош Ingram

*Secretary:*
David Teasatell

Robin Barton
Lucy Culpepper
James Ford
Kathryn Harwood
Greg Kimball
James Robinson
Carl Albright, Jr.
Keith Bieze
Lenford E. Cluster
Everett Nix
Ted Northington
Sue Shelton
Steve Wilson
J. Rufus Beasle
J. Lee Burchfield, Jr.
Thomas F. Hester
Riley Lumpkin
Dena Pilson
Gilbert Scroll
Constance Waddington
Wilford W. Yeargan

*Executive Director:*
George C. Shelton

To: Tuscaloosa District Judge Chandler

From: Jacueline Hill MSW, LCSW
Group Leader

Subject: Richard Marshall

Case#: DC98-424

This letter is to verify that the above named client is currently participating in the Domestic Violence Intervention Program. This program ends on May 25, 1998 and the final report will follow within 14 days.

If there is additional information I can provide, please feel free to contact me at 752-2504.

4/13/98
Date

Jacueline Hill MSW
Group Leader

# FILED

APR 1 5 1998

ELIZABETH HAMNER, CLERK
TUSCALOOSA DISTRICT COURT

MEMBER AGENCY UNITED WAY

# EXHIBIT L

The remainder of the case file not identified as a separate exhibit

# ALABAMA UNIFORM ARREST REPORT

Fingerprinted? ☐ Yes ☐ No   FBI Completed? ☐ Yes ☐ No

OFFICER'S WORK PRODUCT MAY NOT BE *PUBLIC INFORMATION*

## IDENTIFICATION

| 1 ORI# | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 0 4 5 0 0 0 | D E Judicial Drug Task Force / LOWNDES COUNTY DETENTION FACILITY | 0 5 0 6 8 8 8 4 2 | |

5 LAST, FIRST, MIDDLE NAME: MARSHALL, RICHARD JAMES
6 ALIAS AKA

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | 14 |
|---|---|---|---|---|---|---|---|
| ☒ M ☐ F | ☐ W ☐ A ☒ B ☐ I | 509 | 160 | BRO | BLK | DRK | ☐SCARS ☐MARKS ☐TATTOOS ☐AMPUTATIONS |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|
| ALABAMA | 4 2 4 - 9 4 - 2 6 6 0 | 0 2 2 4 7 4 | 31 | |

| 20 SID # | 21 FINGERPRINT CLASS KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 DL # | 23 ST |
|---|---|---|---|---|---|---|---|---|
| | HENRY CLASS / NCIC CLASS | | | | | | 6018769 | AL |

| 24 FBI # | 25 IDENTIFICATION COMMENTS |
|---|---|

| 26 ☒ RESIDENT ☐ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|
| | 101 S BURBANK DR APT.D-10 MONTGOMERY, AL 36117 | ( ) | UNEMPLOYED |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE |
|---|---|---|
| | N/A | |

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO |
|---|---|---|
| 21 SOUTH HAYNEVILLE ALABAMA | | ☒ IN STATE ☐ OUT STATE ☐ AGENCY |

| 36 CONDITION OF | 37 RESIST ARREST? | 38 INJURIES? | 39 ARMED? | 40 DESCRIPTION OF WEAPON |
|---|---|---|---|---|
| ARRESTEE: ☐ DRUNK ☒ SOBER ☐ DRINKING ☐ DRUGS | ☐ YES ☒ NO | ☒ NONE ☐ OFFICER ☐ ARRESTEE | ☐ Y ☒ N | ☐ HANDGUN ☐ OTHER FIREARM ☐ RIFLE ☐ OTHER WEAPON ☐ SHOTGUN |

| 41 DATE OF ARREST | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED BEFORE? |
|---|---|---|---|---|
| 0 6 2 8 0 5 | 04:00 ☒ 1. AM ☐ MIL | S M T ☒W T F S | ☒ ON VIEW ☐ CALL ☐ WARRANT | ☒ YES ☐ NO ☐ UNKNOWN |

| 46 CHARGE-1 ☒ FEL ☐ MISD | 47 UCR CODE | 48 CHARGE-2 ☐ FEL ☒ MISD | 49 UCR CODE |
|---|---|---|---|
| POSS OF CONTROLLED SUB | 3532 | PISTOL W/O PERMIT | 5299 |

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED |
|---|---|---|---|---|---|
| | | M D Y | | | M D Y |

| 56 CHARGE-3 ☐ FEL ☐ MISD | 57 UCR CODE | 58 CHARGE-4 ☐ FEL ☐ MISD | 59 UCR CODE |
|---|---|---|---|

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED |
|---|---|---|---|---|---|
| | | M D Y | | | M D Y |

| 66 ARREST DISPOSITION | 67 IF OUT ON RELEASE WHAT TYPE ? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| ☒ HELD ☐ TOT-LE ☐ BAIL ☐ OTHER ☐ RELEASED | | 68 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP / BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN | 79 IMPOUNDED? ☐ YES ☐ NO | 80 STORAGE LOCATION / IMPOUND # |
|---|---|---|

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | ☐ CONTINUED IN NARRATIVE |
|---|---|

## JUVENILE

| 82 JUVENILE DISPOSITION: | ☐ HANDLED AND RELEASED ☐ REF. TO JUVENILE COURT | ☐ REF. TO WELFARE AGENCY ☐ REF. TO OTHER POLICE AGENCY | ☐ REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE ( ) |
|---|---|---|

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE ( ) |
|---|---|---|---|

## RELEASE

| 91 DATE AND TIME OF RELEASE | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|
| M D Y : ☐ 1. AM ☐ MIL 2. PM | | | |

| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐ YES ☐ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
|---|---|---|

101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE)

LOCAL USE

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | STATUS |
|---|---|---|
| *Marilyn Mealing* | | |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) | 112 ID # | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR ID # | 116 WATCH CMDR. ID # |
|---|---|---|---|---|---|
| WEST, CHRIS | DE1 | | | | |

**TYPE OR PRINT IN BLACK INK ONLY**

ACJIC-34 REV. 10-90

## WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

I, *Richard J. Marshell* _____, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of *Unlawful Possession of Controlled Substance* in *Lowndes* County, Alabama, on the *30th* day of *June*, *2005*, and have been informed by them of my Rights as follows:

1. That I may remain silent and do not have to make any statement at all.

2. That any statement which I might make may be used against me in Court.

3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.

4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.

5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

After having my Rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I can read and write the English language and fully understand my Rights to an attorney. I have read this Waiver of Counsel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers.

This *30th* day of *June*, *2005*.

x *Richard Marshall*
_____

All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after having read it.

_____

*Commander*
_____
(Title)

Witnessed by:

_____

_____

```
                ALABAMA JUDICIAL INFORMATION SYSTEM

           * * * IN THE DISTRICT COURT OF LOWNDES COUNTY * * *

 AGENCY NUMBER:                        WARRANT NUMBER: WR 2005 000436.00
                                       OTHER CASE NBR:                .

                          C O M P L A I N T

 BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
 LOWNDES COUNTY, ALABAMA, PERSONALLY APPEARED   COMMANDER CHRISTOPHE
 WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
 BELIEVING, AND DOES BELIEVE THAT    RICHARD J MARSHALL          DEFENDANT,
 WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
 NAMED COUNTY AND

 DID ON OR ABOUT JUNE 28, 2005, CARRY A PISTOL, TO-WIT: ROSSI 357 MAGNUM
 IN A VEHICLE, OR CONCEALED ON OR ABOUT HIS PERSON
 WITHOUT FIRST OBTAINING A LICENSE.
 IN VIOLATION OF 13A-011-073                      OF THE CODE OF ALABAMA,
 AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.
```

_____
COMPLAINANT'S SIGNATURE

```
 SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 30 DAY OF JUNE, 2005.
```

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

```
 CHARGES: PISTOL-CARRYING W/O   13A-011-073        M  MISDEMEANOR
```
-------------------------------------------------------------------------
```
 WITNESS FOR THE STATE

 COMMANDER CHRISTOPHE/146 E 4TH STREET/LUVERNE/36049
```
-------------------------------------------------------------------------
-------------------------------------------------------------------------
-------------------------------------------------------------------------
-------------------------------------------------------------------------
-------------------------------------------------------------------------
```
 OPERATOR: CAM    DATE: 06/30/2005
```

# W A R R A N T

STATE OF ALABAMA            LOWNDES COUNTY              DISTRICT COURT

AGENCY NUMBER:                          WARRANT NUMBER: WR 2005 000436.00
                                        OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    RICHARD J MARSHALL   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF LOWNDES COUNTY TO ANSWER THE STATE
 ON A CHARGE(S) OF:
            PISTOL-CARRYING W/O   CLASS: A  TYPE: M  COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 30 DAY OF JUNE, 2005.

BOND SET AT: (1)        $500.00  BOND TYPE:
             (2) _____
             (3) _____

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

---

CHARGES: PISTOL-CARRYING W/O   13A-011-073           M  MISDEMEANOR

---

NAME: RICHARD J MARSHALL              ALIAS:
ADDRESS: 101 S BURBANK DRIVE          ALIAS:
ADDRESS:
CITY: MONTGOMERY          STATE: AL     ZIP: 36116 0000
                                        PHONE: 334 000 0000 EXT: 000

EMPLOYMENT:
DOB: 02/24/1974   RACE: B   SEX: M   HAIR: BLK
EYE: BRO  HEIGHT: 5'09"  WEIGHT: 160
SID: 000000000  SSN: 424942660  DL NUM:

---

# E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ )  PLACING DEFENDANT IN THE LOWNDES COUNTY JAIL

(   )  RELEASING DEFENDANT ON APPEARANCE BOND

_____

THIS ___28th___ DAY OF ____Jan____ 2005

                        _____
                        SHERIFF
                        _____
                        BY

---

COMPLAINANT:  COMMANDER CHRISTOPHE
              146 E 4TH STREET

              LUVERNE  AL  36049

OPERATOR: CAM        DATE: 06/30/2005

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF LOWNDES COUNTY * * *

AGENCY NUMBER:                          WARRANT NUMBER: WR 2005 000435.00
                                        OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT COURT OF
LOWNDES COUNTY, ALABAMA, PERSONALLY APPEARED   COMMANDER CHRISTOPHE
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT   RICHARD J MARSHALL         DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

DID ON OR ABOUT JUNE 28, 2005, WHILE IN LOWNDES COUNTY,
ALABAMA:
(XX) UNLAWFULLY POSSESS A CONTROLLED SUBSTANCE, TO-WIT:COCAINE,
IN VIOLATION OF 13A-012-212                    OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

                                   _____
                                   COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 30 DAY OF JUNE, 2005.

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

CHARGES: POSS/REC CONTR. SUBS  13A-012-212         F  FELONY
-----------------------------------------------------------------------
WITNESS FOR THE STATE

COMMANDER CHRISTOPHE/146 E 4TH STREET/LUVERNE/36049

-----------------------------------------------------------------------
-----------------------------------------------------------------------
-----------------------------------------------------------------------
-----------------------------------------------------------------------

OPERATOR: CAM    DATE: 06/30/2005

STATE OF ALABAMA           LOWNDES COUNTY           DISTRICT COURT

AGENCY NUMBER:                      WARRANT NUMBER: WR 2005 000435.00
                                    OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST   RICHARD J MARSHALL   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF LOWNDES COUNTY TO ANSWER THE STATE
 ON A CHARGE(S) OF:
         POSS/REC CONTR. SUBS  CLASS: C  TYPE: F  COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 30 DAY OF JUNE, 2005.

BOND SET AT: (1)    $10,000.00  BOND TYPE: PROPERTY BOND
             (2) _____
             (3) _____

JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

--------------------------------------------------------------------

CHARGES: POSS/REC CONTR. SUBS  13A-012-212           F FELONY

--------------------------------------------------------------------

NAME: RICHARD J MARSHALL          ALIAS:
ADDRESS: 101 S BURBANK DRIVE      ALIAS:
ADDRESS:
CITY: MONTGOMERY         STATE: AL     ZIP: 36116 0000
                                       PHONE: 334 000 0000 EXT: 000

EMPLOYMENT:
DOB: 02/24/1974    RACE: B    SEX: M    HAIR: BLK
EYE: BRO  HEIGHT: 5'09"   WEIGHT: 160
SID: 000000000  SSN: 424942660  OL NUM:

--------------------------------------------------------------------

                    E X E C U T I O N

      EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

      ( / )  PLACING DEFENDANT IN THE LOWNDES COUNTY JAIL

      (   )  RELEASING DEFENDANT ON APPEARANCE BOND


THIS ___28__ DAY OF ___Jun_____ 2005

                              SHERIFF
                              BY

--------------------------------------------------------------------

COMPLAINANT:   COMMANDER CHRISTOPHE
               146 E 4TH STREET

               LUVERNE  AL  36049

OPERATOR: CAM        DATE: 06/30/2005

06MG00466
Sub# 1 Received (11/28/2005)
2nd Judicial Drug Task Force
Case# 05-06-011

**Evidence Submis**

Date: 11-28-05                                                  County: Lowndes

Suspect(s): Richard J. Marshall                Race: B    Sex: M    DOB: Adult
Suspect(s):                                                   Race:       Sex:       DOB:

Subject(s):                                                    Race:       Sex:       DOB:
Subject(s):                                                    Race:       Sex:       DOB:

Requesting Agent: C.S. West                      Title: Commander

Office No. (334) 335-3340        Fax No. (334) 335-6401      Normal Duty Hours: 9am-5pm

Agency:  2d Judicial Circuit Drug Task Force

Mailing Address: PO Box 795 North Tuskeena Street Hayneville, Alabama 36040

Law Enforcement Case No: 05-06-011            Property No.: 01

Type Case (CHARGE): Possession

Brief History of Case: Offender found to be in possession while attempting to elude

*Evidence Submitted: residue

Examination Requested: Drug Analysis

**\*NOTES THAT EVIDENCE IS IN A CLEAR SEALED PLASTIC BAG**



ALABAMA

# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

### EVIDENCE RECEIPT

**CASE NUMBER:** 06MG00466    **ID:** 1    **TYPE:** Controlled Substances    **REFERENCES:**    **LAB:** MG

**AGENCY NUMBER:** 05-06-011    **ORI NUMBER:** AL045TASK **DATE:** 11/28/05    **TIME:** 1:22 pm

| CASE NAMES | TYPE | RACE | SEX | DOB | AGE | STATUS |
|---|---|---|---|---|---|---|
| Richard J Marshall | S | B | M | | | |

| CHAIN OF CUSTODY | DATE | TIME |
|---|---|---|
| Secured at Montgomery Regional Laboratory  Evidence Intake Area | 11/28/05 | 1:22 pm |

**DESCRIPTION OF EVIDENCE:**    **SERVICE REQUESTED:**

1  One brown paper bag identified to contain drug evidence    DRUG CHEMISTRY

*ALL ITEMS LISTED ABOVE ARE AS DESCRIBED BY THE SUBMITTING AGENCY AND ARE SUBJECT TO VERIFICATION UPON INSPECTION BY THE ANALYST*

**REPORT TO:**    **SUBMITTED BY:**

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

G. Lashun Hutson

STACY    Page 1 of 1



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |

### CERTIFICATE OF ANALYSIS

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

CASE NUMBER:    06MG00466        SUBMITTING AGENCY CASE NUMBER:    05-06-011

| | Race | Sex | Date of Birth | Status |
|---|---|---|---|---|
| SUSPECT(S):    Richard J Marshall | B | M | | Adult |

SERVICE REQUESTED:  Drug Analysis

CHAIN OF CUSTODY:

| | DATE | TIME |
|---|---|---|
| G. Lashun Hutson from 2nd Judicial Drug Task Force | 11/28/2005 | 13:22 |
| Michael L. Hitchcock | 12/01/2005 | 14:35 |
| Robert Agee | 01/13/2006 | 08:59 |

DESCRIPTION OF EVIDENCE:

1.         One brown paper bag containing residue

RESULTS OF ANALYSES:                 DATE(S) OF ANALYSES:    01/26/2006

1.    Laboratory analyses of the residue **failed to reveal the presence of any controlled substances**.

Sworn to and subscribed to me this the 2nd Day of Feb . 2006 as true and correct



*An ASCLD/LAB Accredited Laboratory since October 2003*

Alabama Department of
# Public Safety

## BUREAU OF INVESTIGATION

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

RETURN TO:  LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: | 6. CONTRIBUTOR CASE NO: |
| 2. NAME | 7. TYPE OF CRIME: |
| 3. AGENCY: | 8. DATE OF CRIME: |
| ADDRESS        P. O. BOX | 9. VICTIM OF CRIME: |
| CITY        STATE        ZIP | 10. DPS LATENT CASE NO: |
| 4. PHONE NO: | 11. NEW CASE:        12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY:     PRINT NAME | 15. SIGNATURE | 16. AGENCY | 17. DATE/TIME |
|---|---|---|---|

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

### 19. FOR DPS USE ONLY

| RECEIVED BY:     PRINT NAME | SIGNATURE | HOW RECEIVED | DATE/TIME |
|---|---|---|---|
| EVIDENCE RETURNED TO:     PRINT NAME | SIGNATURE | AGENCY | DATE/TIME |
| EVIDENCE RETURNED BY:     PRINT NAME | SIGNATURE | HOW RETURNED | DATE/TIME |

| LOG NO: | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of
**Public Safety**

## BUREAU OF INVESTIGATION

*10 of 049*

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| | |
|---|---|
| 1. CONTRIBUTOR TITLE: *2d Judicial Drug Task Force* | 6. CONTRIBUTOR CASE NO: *05-06-011* |
| 2. NAME *Christopher S. West* | 7. TYPE OF CRIME: *Drug* |
| 3. AGENCY: *Same* | 8. DATE OF CRIME: *6-28-05* |
| ADDRESS *146 E. 4th Street*  P.O. BOX | 9. VICTIM OF CRIME: |
| CITY *Luverne*  STATE *Al.*  ZIP *36049* | 10. DPS LATENT CASE NO: *09-110B-35-05* |
| 4. PHONE NO: *334-335-3390* | 11. NEW CASE: ✓  12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: *Same* | 13. SPECIAL INSTRUCTIONS: |

| | | | |
|---|---|---|---|
| 14. SUBMITTED BY: PRINT NAME *Christopher S. West* | 15. SIGNATURE | 16. AGENCY *2d JDTF* | 17. DATE/TIME *7-13-05 / 1:09pm* |

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

① *Brown Paper Bag Containing Clear*
*plastic baggie.*

### 19. FOR DPS USE ONLY

| | | | |
|---|---|---|---|
| RECEIVED BY: PRINT NAME *SA Shannon Fitzgerald* | SIGNATURE | HOW RECEIVED *Personally* | DATE/TIME *7-13-05 1:09pm* |
| EVIDENCE RETURNED TO: PRINT NAME | SIGNATURE | AGENCY | DATE/TIME |
| EVIDENCE RETURNED BY: PRINT NAME | SIGNATURE | HOW RETURNED | DATE/TIME |

| LOG NO: *049* | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of

# Public Safety

REPLY MAY BE MADE TO:

Shannon Fitzgerald
ABI Headquarters

Date: _8-25-05_

Dear Contributor:

The enclosed case file is being returned to your department for the following reason:

_____Statute of Limitations Has Expired

___X__No latent prints of value were found on the evidence which:

___X__ is enclosed

_____ is being forwarded to the Department of Forensic Sciences.

_____ is being retained for pick up by your department.

Retention of this file is recommended until such time your department determine it
Has no evidentiary value.

This file is the original and no copy will be retained by this department.

If this department can be of further assistance to you, please do not hesitate to
Contact me at (334) 395-4320.

Sincerely,

Shannon Fitzgerald
Certified Latent Print Examiner
Alabama Bureau of Investigation

SF/ss

Headquarters
Post Office Box 1511
Montgomery, Alabama 36102 - 1511

Driver License
Post Office Box 1471
Montgomery, Alabama 36102 - 1471

# EXHIBIT M

**Case File, Courtesy Warning**

SECOND JUDICIAL DRUG TASK FORCE

SERVING BUTLER, CRENSHAW AND LOWNDES COUNTIES
146 EAST FOURTH STREET
LUVERNE, ALABAMA 36049
334-335-3340

**COURTESY WARNING**                    DATE _6-30-05_ TIME _2:00 p~_
                                        _For: 6-2+-00_

SPEEDING _____ MPH _____ MPH ZONE

IMPROPER LANE USAGE                    FAILURE TO YIELD

IMPROPER TAG                           FAILURE TO SIGNAL

RED LIGHT                              FOLLOWING TO CLOSE

STOP SIGN                              IMPROPER TURN

DEFECTIVE EQUIPMENT _____

OTHER/REMARKS _Attempted to Elude, No Seat Belt_

MAKE OF VEHICLE _Chevrolet_ YEAR _1971_ COLOR _Blue_

VEHICLE TAG # _____ STATE _AL_

LOCATION _Hwy 21 S. Lowndes County_

THIS IS A COURTESY WARNING ONLY AND WILL NOT REFLECT ON YOUR
OPERATORS LICENSE

x_____  _6018769_ _____ STATE _AL_
VIOLATOR                  DRIVERS LICENSE #

_____   ID _DE-1_
AGENT

THE LIFE YOU SAVE MAY BE YOUR OWN