**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD MARSHALL,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. 2:06-cv-701-ID-CSC** |
| | * | |
| **CHRIS WEST, in his individual capacity,** | * | |
| **LASHUN HUTSON, in his individual capacity** | * | |
| | * | |
| **Defendants.** | | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, in the above styled cause, by and through their counsel of record, and respond to Defendants' Motion for Summary Judgment as follows:

**1.     STATEMENT OF FACTS.**

On the afternoon of June 28, 2005, Richard Marshall was driving his 1971 Chevrolet Nova home on County Road 7 in Lowndes County.  (Ex. 1, Marshall Dep. 27:15-17, 36:8-10, Nov. 14, 2007.)  Riding in the passenger seat was his cousin Kelvin Carmichael.  (Ex. 2, Carmichael Dep. 26:7-10, Nov. 14, 2007.)  Marshall and Carmichael had spent the morning at their aunt's house pulling an engine with their cousins. (Marshall Dep. 23:23-24:11.)  Inside the car the two men sat on a bench-style seat and between them rested a 357 Magnum pistol. (Marshall Dep. 61:14-62:19.)  Carmichael had neither seen the pistol nor seen Marshall with a gun before but did not ask why the pistol was there.  (Carmichael 29:8-31:2.)[1]  County Road 7

---

[1]Marshall did not have a concealed weapon permit, (Marshall Dep. 33:10-11.), but the pistol did not belong to Marshall.  The owner of the pistol had left it in Marshall's car three or four days earlier after receiving a ride.  (Marshall Dep. 30:10-32:21.)

was empty, and Marshall drove down the narrow and curvy rural road around thirty-five to forty miles per hour in the hot afternoon with the windows down and the music playing loudly. (Marshall Dep. 45:10-46:6.)

The only other car on the road Marshall saw that afternoon was a bluish or aquamarine Lincoln Town Car that was traveling towards them in the opposite direction. (West Dep. 21:10-13, Jan. 21, 2008.) After the car passed by, Marshall glanced in his rearview mirror and saw something strange: the passing car appeared to slam on its brakes and started veering off to the side of the road. (Marshall Dep. 39:14-41:2.) Marshall thought that perhaps the driver was drunk or the car's tire had blown out, and he kept driving towards home. (Marshall Dep. 41:1-10.)

Without warning, the aquamarine car suddenly appeared in the passing lane next to them. (Marshall Dep. 41:13-19.) Inside were two black males in black t-shirts that neither Marshall nor Carmichael recognized. (Marshall Dep. 36:8-10; Carmichael Dep. 34:4-5.) The passenger appeared to be motioning Marshall to pull over, but having been robbed before Marshall was not about to simply pull over on a deserted country road for two unknown men crazily driving a civilian car. (Marshall Dep. 46:13-47:23; 50:3-5.) Instead, Marshall yelled at the men, "What the fuck y'all want." (Marshall Dep. 50:1.) Unfortunately for Marshall, he had just unknowingly cursed at Lieutenant Christopher West and Officer Lashun Hutson. (West Dep. 22:17-19; Hutson Dep. 20:10-11, Jan. 21, 2008.)

Also unknown to Marshall, West and Hutson had been looking for him earlier that day. (West Dep. 14:17-20.) The officers had been following up on a tip from an anonymous source claiming that Marshall had been selling drugs. (West Dep. 14:1-11.) The anonymous source was

not a reliable witness.  (West Dep. 17:20-23.)[2]  Neither officer had any prior dealings with

Marshall.  (West Dep. 16-18; Hutson Dep. 12:3-6.)  Additionally, Marshall had never been

arrested for any drug related charges.  (Marshall Dep. 17:8-23:4.)  Thus, the officers had driven

out to Marshall's home merely to do a "knock-and-talk."  (West Dep. 14:1-20.)

        After leaving Marshall's home, the officers were driving their bluish or aquamarine

Lincoln Town Car on County Road 7 when they passed Marshall's car and turned around to

pursue.  (West Dep. 18:23-19:18.)  Marshall was driving the speed limit.  (West Dep. 20:16-17.)

West coincidentally observed that neither Marshall nor Carmichael was wearing a seatbelt,[3]

which provided probable cause to stop Marshall so that West could question him about drugs.

(West Dep. 56:17-57:2.)  While Marshall does not dispute that he was not wearing his seatbelt,

(Marshall Dep. 28:22-23), Carmichael was wearing his.  (Carmichael Dep. 27:16-17.)[4]  West

then pulled alongside Marshall's car.  (West 21:7-9.)

        After Marshall cursed at them, West pulled the aquamarine car back behind Marshall's

but did not activate either a siren or flashing blue lights.  (Marshall Dep. 49:1-9.)  Because

County Road 7 is wavy, Marshall could not speed up, and he continued to drive between thirty-

five and forty miles per hour toward Highway 21 and home.  (Marshall Dep. 53:8-22.)  Although

---

[2]Within the time frame allowed, the officers would have obtained a search warrant had
the anonymous source been reliable.  (West Dep. 17:16-18:8.)

[3]Factually, it is unclear whether West saw that Carmichael was not wearing his seatbelt.
West's incident/offense report originally states that neither the driver nor passenger was wearing
a seat belt.  (West Dep. 52:23-53:2, 56:17-21.)  Subsequently, West states he saw that Marshall
was not wearing his seatbelt.  (West Dep. 19:20-22.)

[4]Although Marshall does not recall wearing his seatbelt, Carmichael recalls that Marshall
was wearing his and in fact told Carmichael to put his belt on.  (Carmichael Dep. 27:18-28:5.)

the aquamarine Lincoln Town Car was riding his bumper, Marshall did not try to speed away because he was afraid of getting hurt on the wavy road. (Marshall Dep 53:23-54:5.) Moreover, Marshall's car could not run very fast anyway. (West Dep. 21:22-23.) Marshall stayed close to the speed limit while on County Road 7. (Hutson Dep. 17:15-21.)

At the intersection of County Road 7 and Highway 21, Marshall performed a rolling stop and then turned right onto Highway 21 towards home. (Marshall Dep. 52:4-10.) The intersection does not have a stop sign; it has a yield sign with a flashing yellow light. (Marshall Dep. 51:15-16; Carmichael Dep. 40:9-18.) Once on Highway 21, Marshall sped up a little. (West Dep. 48:6-7.) Marshall got his slow running car up to about fifty-five miles per hour when the aquamarine car again pulled beside them. (Marshall Dep. 53:6-7.) As Marshall looked over he again saw the unknown man waving him over but this time Marshall also saw a gun in the man's hand.[5] (Marshall Dep. 54:9-23.) Carmichael also saw the man holding the gun and asked who the men in the aquamarine car were. (Carmichael Dep. 41:16-22.) Marshall told Carmichael that he did not know but he thought that they were out to rob them, and he was not going to stop. (Marshall Dep. 57:3-7.) Carmichael then told Marshall not to let the unknown men catch them. (Carmichael Dep. 41:16-22.)

The aquamarine car again fell behind Marshall's car and rammed his car in the rear. (Marshall Dep. 60:2-4.) Marshall almost lost control and slowed from about fifty-five miles per hour to around thirty-five to forty miles per hour. (Marshall Dep. 64:4-9) After about ten

_____

[5]While both Marshall and West stated that they activated their flashing blue light and showed their badges, both Marshall and Carmichael testified that the officers did not activate a blue flashing light or show their badges. (Marshall Dep. 59:14-17; Carmichael Dep. 38:16-7, 55:5-16.)

seconds, Marshall's car was again rammed from the rear.[6]  Carmichael then saw that one of the men appeared to be talking on a radio and then told Marshall that he thinks they may be cops. (Carmichael Dep. 46:21-47:3.)  Immediately after, the aquamarine car rammed Marshall's car on the rear driver's side sending Marshall's car off the road causing Marshall's head to hit the steering wheel.  (Marshall Dep. 69:16-70:3.)

West and Hutson jumped from the car with their weapons drawn and yelled for Marshall to get out of the car.  (West Dep. 30:18-23.)  At some point after exiting their car the officers pulled their badges from under their shirts.  (Carmichael 55:8-18.)  Dazed from hitting his head Marshall opened his door, stepped out of the car, and held his hands up.  (Marshall Dep. 86:8-9.) West ordered Marshall to get on the ground.  (West Dep. 32:1-18.)  Marshall, dazed, confused, and agitated, remained standing with his hands up asking what was going on.  (Marshall Dep. 86:8-87:9.)  West then fired his gun into the ground approximately six to eight feet from where Marshall stood.  (West Dep. 32:18-21; Hutson Dep. 25:14-15.)

Marshall stood frozen while West approached with his gun raised.  (West Dep. 32:22-33:7.)  West then swept Marshall's feet slamming him to the ground face first, put a foot in Marshall's back, and cuffed him.  (Marshall Dep. 90:3-9.)  After cuffing Marshall, West approached Marshall's car and saw the pistol in the seat for the first time.  (West Dep. 33:15-21.)

---

[6]At about this point in the chase, West and Hutson state that Marshall threw out a plastic baggie containing drug evidence and that hit their windshield.  (West 24:1:4; Hutson 22:21-23:2.)  The officers' original statements omitted any mention of an object striking their windshield.  (West Statement, Ex. 5; Hutson Statement, Ex. 6.)  This testimony is highly disputed because lab tests on the baggie found neither fingerprints nor drug residue.  (West Dep. 45:1-10; Forensic Reports, Ex. 8)  Additionally, both Marshall and Carmichael deny that any such baggie was thrown out of the window.  (Marshall Dep. 74:17-21; Carmichael Dep. 48:9-11.)

After West had cuffed Marshall, Hutson got Carmichael out of the car, cuffed him, and put him on the ground. (Hutson Dep. 25:1-6.) Afterward, Hutson walked back to Marshall's car and saw the pistol in the seat for the first time. (Hutson Dep. 28:8-15.)

West then pulled Marshall off of the ground, set Marshall against the car, and began asking why he did not pull over when they showed their badges. (Marshall Dep. 96:1-3.) Marshall stated that he did not see any badges, only a gun. (Marshall Dep. 96:3-4.) West then grabbed Marshall's pants, shoved him against the car, and searched him. (Marshall Dep. 96:5-8.) During the search West removed Marshall's wallet and threw it into the back seat. (Marshall Dep. 96:8-11.) Marshall's wallet contained five hundred dollars at that time. (Marshall Dep. 33:12-16.) West then told Marshall to get in the back of his Nova, but Marshall, because he is a large man, stated he could not fit in the small back seat of his car. (Marshall Dep. 99:13-19.) Angered, West grabbed Marshall by the pants and slammed him against the car breaking the zipper and button causing Marshall's pants to fall to the ground. (Marshall Dep. 99:19-100:1; Carmichael Dep. 69:21-23.) West then choked Marshall until he could not breathe and forced him into the back of the Nova.[7] (Marshall Dep. 101:19-102:36; Carmichael 69:18-70:3.)

By this time cars were driving by on Highway 21. (Marshall Dep. 100:5-6.) West then walked over to the aquamarine car and put the blue light on roof of the aquamarine car. (Marshall Dep. 100:9-10.) At first the blue light would not work, and West had to bang on the light three or four times before it started working. (Marshall Dep. 100:10-22.) After other

---

[7]At this point if West's version of the facts is to be believed, after West had just run Marshall off the road, shot a gun in his direction, slammed him to the ground, and cuffed him, West suddenly became concerned that Marshall, having just lost his pants, might feel humiliated being seen in his boxer shorts; therefore, out of concern for Marshall, West forced him into the backseat of the Nova. (West Dep. 34:3-19.)

officers arrived, Marshall was put in a patrol car and taken in for booking.  (Marshall Dep. 118:3-11.)  At booking Marshall noticed most of his money was missing and called it to a deputy's attention, but West stopped him and told the deputy not to worry about it.  (Marshall Dep. 123:7-18.)  Marshall received a courtesy warning for attempting to elude and a seatbelt violation.  (Ex. 7.)  Marshall was charged with possession of a controlled substance and carrying a pistol without a permit.  (Marshall Dep. 138:10-16.)  All charges against Marshall were dropped.  (Marshall Dep. 139:2-4.)

## II.     STANDARD OF REVIEW.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleading, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party requesting summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions answers to

interrogatories and admission on file,' designate 'specific facts showing that there is a genuine issue for trial'". *Id* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there si some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby , Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must gant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c).

"Under the established rule of law in this Circuit, a plaintiff can survive a motion for summary judgment or for judgment as a matter of law simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964-65 (11th Cir. 1997).

## III.    ARGUMENT.

Under § 1983, police officers may be held accountable when their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). A plaintiff can establish that the law clearly provided notice to the officers that their conduct was unconstitutional by submitting fact-specific precedents or demonstrating that the conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was

readily apparent." *See Id.* at 1355. Here, the grossly disproportionate force used against Marshall for a seatbelt violation is a clearly established constitutional violation because no reasonable officer could have believed that Defendants' actions were legal. Under the totality of the circumstances, Defendants' actions as a whole constituted an unreasonable breach of Marshall's Fourth Amendment rights.

### A.     Crucial Factual Distinctions.

Before proceeding to the legal argument, Plaintiff must address certain facts proffered by Defendants in support of their motions. First, the pistol and bullets discovered in Marshall's car are not relevant. For evidence to be relevant it must be probative of a fact of consequence. Fed. R. Evid. 401. The pistol and bullets are not relevant because, according to their own testimony, Defendants did not know about the pistol or bullets until after Marshall was in handcuffs. (West Dep. 33:15-21; Hutson Dep. 28:8-15.) Thus, Defendants may not justify their precursory actions by the presence of the pistol.

The facts demonstrate that Marshall did not intend to use the pistol against Defendants. After his car was forced off of the road and Marshall was ordered out of his car, he complied. Marshall's movements as he opened the car door, stepped out, and held his hands up clearly distanced him from the pistol. While Hutson testified that he saw Marshall reaching back into his car, and he believed that was the reason West fired his pistol, his testimony is not admissible. Testimony must be based on personal knowledge. Fed. R. Evid. 602. Here, Hutson's testimony attempts to express what was in West's mind when West fired his gun, which is clearly beyond the scope of Hutson's personal knowledge.

West's own testimony disputes Hutson's allegation that Marshall attempted to reenter his

car. West first testified that Marshall was out of his car, standing between the car and open door, and was yelling and cussing. (West Dep. 32:11-14.) West then testified that he then fired his weapon after Marshall did not get on the ground immediately. (West Dep. 32:14-21.) Thus, West demonstrates that he did not see Marshall make an attempt to reach back into his car.

Second, Defendants' allegations about Marshall throwing drug evidence out of his car window is not merely a disputed fact; it is a nonexistent fact. Defendant West improperly proffers that "[a]s the underlined facts show, Lt. West did not execute the PIT maneuver until after a baggy containing a white powdery substance hit his windshield." (West Mem. Supp. Summ. J. 31) (emphasis added). He then went on to improperly claim that the baggie contained illicit drugs. (West Mem. Supp. Summ. J. 31.) These statements are improper and deceptive for the three following reasons: 1) a baggie being thrown from Marshall's window is a disputed fact; 2) the existence of white powder or any drugs in the alleged baggie is a disputed fact; and 3) a baggie containing illicit drugs is a nonexistent fact.

An undisputed fact is an uncontested or admitted fact. *Black's Law Dictionary* 269 (2nd pocket ed. 2001). Here, both Marshall and Carmichael expressly deny that any baggie was thrown out of the window. (Marshall Dep. 74:17-21; Carmichael Dep. 48:9-11.) Additionally, West even testified that at the point the [alleged] baggie was thrown out the window there was no evidence that Marshall threw drugs out of his window or possessed drugs. (West Dep. 49:18-22.) Therefore, these facts are clearly disputed and Defendant's attempt to classify them otherwise in order to influence this Court is clearly improper.

No factual evidence exists that demonstrates Marshall had illicit drugs in his possession. Defendants presented a baggie to the lab for forensic testing; however, the tests found neither

fingerprints nor drug residue.[8]  (West Dep. 45:1-10; Forensic Reports, Ex. 8.)  Instead, the only "evidence" that supports Defendants' allegations is their subjective belief contrary to forensic results and a discarded sandwich bag from somebody's lunch.

**B.    Additional Misrepresentations of Fact**

In addition to the factual errors noted above, the Memorandum Brief in Support of Defendant Chris West's Motion for Summary Judgment proffers more misrepresentations of fact to this Court.

Defendant West erroneously informs this Court that there is no evidence in the record that Marshall ever tried to tell Defendants he did not know they were police officers.  (West Mem. Supp. Summ. J. 10 footnote 4.)  Marshall stated in his deposition, however, that he tried to tell West he thought they were trying to rob him.  (Marshall Dep. 97:1-4.)

Defendant West incorrectly cites to his deposition as stating that both Marshall and Carmichael were not wearing seatbelts when the deposition only mentions Marshall.  (West Mem. Supp. Summ. J. 8) (*citing* West Dep. 19:20)).

Defendant West states they received information that Marshall was selling drugs but avoids bringing a crucial fact to this Court's attention.  (West Mem. Supp. Summ. J. 8) West testified that the tip did not come from a reliable source and was insufficient to show probable cause.  (West Dep. 17:20-23.)

Despite forensic tests and West's testimony to the contrary, Defendant West erroneously states that a baggie with residue was subsequently found by Defendants.  (West Mem. Supp.

---

[8]However, contrary to the laboratory tests, West testified that he still believes the baggie contained residue.  (West Dep. 58:8-10.)

Summ. J. 26.)  West testified that the lab tests prove there were neither drugs nor residue found in the baggie.  (West Dep. 58:2-7.)

Defendant West improperly states that Marshall admitted to fleeing from Defendants. (West Mem. Supp. Summ. J. 32).  Marshall has not admitted to fleeing from Defendants; rather, he has admitted to not pulling over at the demand of two unknown and unidentified persons.

Finally, Defendant West states that West "conceded" there was a high speed chase when clearly this point is not his to concede.  (West Mem. Supp. Summ. J. 32.)  However, Defendant avoids mentioning that West testified that Marshall's 1973 Nova could not run very fast.  (West Dep. 21:22-23.)

Plaintiff has addressed Defendant's factual misrepresentations and errors as well as possible.  However, because West's motion misrepresents numerous facts to this Court, Plaintiff requests this Court summarily deny Defendant West's motion due to the lack of candor and reliability of the brief.  Defendant Hutson's motion does not contain similar factual misrepresentations.  However, due to Defendant Hutson's express adoption of "any and all arguments made by Chris West," (Hutson Mem. Supp. Summ. J. 4.), Plaintiff requests denial of Hutson's motion on the same grounds.

**C.    Defendants' unreasonable actions taken as a whole resulted in a violation of Marshall's Fourth Amendment Rights.**

The touchstone of a court's "analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977).  "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal

security free from arbitrary interference by law officers.'" *Id*. at 109. Here, Marshall's actions were reasonable; conversely, Defendants' actions were not.

Marshall's actions were reasonable. Under the Alabama Code § 32-5A-193, in order to flee or attempt to flee from a police officer, the driver must "willfully" fail to stop his car or flee when given a visual or audible signal. Although his greeting to Defendants when they pulled up beside him was less than ideal, Marshall had no reason to know that Defendants were police officers. First, Defendants' car did not look like a police car. Defendants drove a bluish aquamarine Lincoln Town Car. Defendant West even testified that their car did not look much like a police car. (West Dep. 21:14-15.) Second, Defendants were not dressed in uniform. Marshall saw two unknown men wearing black t-shirts. West testified that they were wearing street clothes. (West Dep. 60:18-22.) Third, Defendants had not activated a flashing blue light or a police siren.[9] Rather, Defendants did not activate the flashing blue light until after Marshall was already in handcuffs and even were unable to activate the light until West banged on it a few times. (Marshall Dep. 100:10-22.) Defendants did not expressly state that they did not activate a police siren; however, because the Lincoln Town Car had been confiscated and acquired through a condemnation proceeding, it likely was not equipped with a siren.[10] (West Dep. 13:13-21.) While Defendants blew the horn and flashed the headlights, (West Dep. 21:7-9), those actions

---

[9]Defendants aver that they deployed the flashing blue lights by plugging it into the cigarette lighter (West Dep. 19:22-21:2); however, in the light most favorable to the nonmoving party and for the purposes of this motion, Defendants did not deploy the flashing blue light. (Marshall Dep. 49:1-9)

[10]Additionally, West's deposition states that he activated a flashing blue light, honked his horn, and flashed his lights, but omits any mention of siren. (West Dep. 19:20-21:9.) In absence of evidence to the contrary under this motion's standard of review, stating that Defendants used no siren is proper.

would alone would not reasonably identify Defendants as police officers. Had the Defendants actually activated a blue flashing light and siren, blowing the horn and flashing the headlights would not have served any purpose.

Marshall's belief that Defendants posed a threat was reasonable. While Marshall's fear was likely motivated in part because he had previously been robbed, his belief that Defendants posed a threat was not irrational. First, as noted above, Defendants did not adequately identify themselves as police officers. Second, this incident occurred on a deserted country road. Third, Defendants were strangers to Marshall. Finally, Defendants' behavior, objectively viewed by someone unaware that they were police officers would be charitably described as erratic. Due to Defendant West's turn-around maneuver, Marshall at first thought either the driver was drunk or had a flat tire. The next time Marshall saw Defendants they had pulled beside him on the narrow country road, were waving their arms at him, and were yelling out the window at him. Defendants then followed him, honked their horn, flashed their lights, and stayed right on his bumper.

Under the circumstances, Marshall's actions were reasonable. While Defendants have framed this incident as a high speed pursuit where Marshall attempted to elude them, the facts demonstrate a rather average speed chase where Marshall simply did not pull over. West even testified that Marshall's car could not run very fast. (West Dep. 21:22-23.) The majority of the so called "chase"[11] took place on County Road 7. While on County Road 7, it is undisputed that Marshall did not exceed the speed limit. (Hutson Dep. 17:15-21; West Dep. 19:12-20:17.)

---

[11]Plaintiff is using the word "chase" rather loosely and does not concede that an actual chase indeed took place but is merely using the word to describe the incident.

While the speed limit was approximately forty-five miles per hour, Marshall was driving between thirty five to forty miles per hour, and did not speed even while Defendants rode his bumper. (Marshall Dep. 45:10-46:6; 48:15-17.)  Once Marshall turned onto Highway 21, he simply continued driving toward home until he was run off of the road by Defendants.

Conversely, Defendants' actions were unreasonable.  What began as a pretextual seatbelt stop,[12] led to Defendants ramming Marshall's car numerous times, running his car off the road, discharging a weapon in his direction, manhandling, strangling, arresting him, and stealing his money.  The test for determining whether officers have acted reasonably under the Fourth Amendment is an objective reasonableness test.  *Graham v. Connor*, 490 U.S. 386, 396 (1989.) While Defendants' pretextual justification for pulling Marshall over may have been objectively reasonable under Defendants' version of the facts at the start of this encounter, that same justification cannot overcome Marshall's reasonable expectation that Defendants would at least adequately identify themselves before running him off the road, shooting at him, manhandling, and then arresting him.

Whether officers' actions are objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396. Here, the severity of Marshall's crime was very low: a seatbelt violation, a non-arrest matter for which only a traffic ticket could be issued.  Marshall also did not pose a threat to anyone's safety.

---

[12]West admits that he wanted to use the seatbelt violation for the purpose of pulling Marshall over to question him about drugs.  (West Dep. 56:17-57:2)

He did not try to outrun the Defendants; instead, he drove the speed limit and merely did not pull over because he did not know that Defendants were police officers.  Conversely, Defendants' actions were unreasonable from the start because they failed to adequately identify themselves and drove behind Marshall in an aggressive manner.  Eventually Defendant West executed a dangerous and destructive PIT maneuver even though Marshall was only driving thirty-five miles per hour at the time.  (West Mem. Supp. Summ. J. 32.)

Additionally Marshall did not resist or attempt to evade.  While driving, Marshall did not attempt to leave the road or lead Defendants on a path through the woods.  (West. Dep. 49:9-13.) After Defendant West executed the PIT maneuver, Marshall exited his car and held his hands up. (Marshall Dep. 86:8-9.)  While he did not get on the ground, and was vociferous because Defendants had just run him off the road, Marshall did not make a violent move against Defendants, never attempted to hit Defendants, and never attempted to run away.  (West Dep. 59:6-12.)  Even so, Defendant West fired his weapon into the ground a mere six to eight feet away from where Marshall stood.  (West Dep. 32:16-21.)   Subsequently, West threw Marshall to the ground, choked him, and arrested him all because of a seat belt violation.

West's warning shot was constitutionally unreasonable.  The Supreme Court has provided guidelines for determining when it is constitutionally reasonable for a police officer to use deadly force when firing a gun at a suspect.  *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir. 1985) (*citing Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).  The *Garner* standard contains the three following elements: 1) the officer must have probable cause to believe the suspect poses a threat; "[p]robable cause of this sort exists where the suspect actually threatens the officer with a weapon or where there is probable cause to believe that the suspect has committed a crime

involving the infliction or threatened infliction of serious physical harm" 2) deadly force must be necessary to prevent escape, and 3) the officer must give fair warning if possible. *Acoff*, 762 F.2d at 1547.

Under the *Garner* standard, West firing his gun in Marshall's direction is clearly unreasonable because Marshall was not armed, was not threatening Defendants with a weapon, and was not attempting to escape. (West Dep. 32:14-21.) Arguably, West did not use deadly force because he was aiming at the ground. However, *Garner* is a reasonableness standard; thus, the determination cannot rest purely on whether the bullet actually hit its mark. Additionally, at least one court has acknowledged that firing a warning shot could possibly constitute a use of deadly force. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1184 (N.D. Cal. 1995). Here, Marshall was subjected to potential deadly force because West aimed and fired his weapon within a mere six to eight from where Marshall stood. (West Dep. 32:18-21.)

Contrary to Defendant West's argument, the Eighth Circuit did not expressly hold that firing warning shots in the air near a crowd does not violate anyone's constitutional rights. (Def. Marshall Mot. Summ. J. 33 (*citing Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997)). Rather, Defendant manufactured that holding out of whole cloth. In *Otey*, the court held that a police chief did not violate a well establish right for failing to properly train a subordinate officer who fired the warning shots into the air. *Otey*, 121 F.3d at 1156. Analyzing the facts, the Eight Circuit discussing the facts reasoned that the subordinates officer's warning shots in a crowd did not violate anyone's rights because there was no evidence that anyone was seized, unconstitutionally or otherwise, because afterward the crowd dispersed and there were no arrests. *Id*. Thus, *Otey* is highly distinguishable from this case and frankly not even on point.

West executing PIT maneuver on Marshall's car was unreasonable.  In *Scott v. Harris*,

police officers clocked a driver going seventy-three in a fifty-five mile per hour zone.  __ U.S.__,

127 S. Ct. 1769, 1772 (2007).  During the chase the driver went at speeds over eighty-five miles

per hour on the freeway, through a parking lot, and even collided with one police car.  *Id.* at

1773.  After being given permission by his supervisor, an officer employed a PIT maneuver.  *Id*.

As a guidepost for determining whether the officer acted reasonably in executing a PIT

maneuver, the Supreme Court stated "[w]e think it appropriate . . . to take into not only the

number of lives at risk, but also their relative culpability.  *Id.* at 1778.  The Court noted that the

facts showed the driver's actions had put the lives of the police officers and other drivers at risk,

had ignored multiple police cars with sirens and flashing lights, and drove recklessly at high

speeds.  *Id*.

Conversely, Marshall's culpability did not rise to anywhere near the level of *Scott*.  First,

Marshall was unaware that Defendants were police officers.  Second, Marshall drove neither

recklessly nor at excessive speeds.  Third, Marshall's driving was not putting anyone's safety at

risk.  Finally, Marshall's sole offense was a pretexual seat belt violation.

West choking Marshall and forcing him into the back seat of the Nova was unreasonable.

In *Vinyard v. Wilson*, a  police officer was sued for excessive force when he stopped his patrol

car, roughly grabbed his handcuffed prisoner, pulled her by the hair, and then sprayed her in the

face with pepper spray.  311 F.3d 1340, 1343-44 (11th Cir. 2002).  Factors determining whether

such use of force is constitutional include the severity of the crime, whether the suspect poses an

immediate threat to safety, and whether she is actively resisting arrest.  *Graham v. Connor*, 490

U.S. 386, 396 (1989).  In *Vinyard*, the Eleventh Circuit ruled in the plaintiff's favor and found

the factors from *Graham* heavily favored the plaintiff because she was "under arrest for offenses of minor severity, handcuffed, secured in the back of a patrol car, and posing no threat to [the officer], herself or the public." *Vinyard*, 311 F.3d at 1348-49. Similarly, Marshall was handcuffed, posed no threat to Defendants, and had been arrested for a minor offense. Additionally, Marshall was not posing a threat when West threw him on the ground face first.

While Defendant Hutson's actions did not rise to the level of West's, he is not excused because he participated in the entire encounter without any determination of probable cause. When asked about their purpose for pulling Marshall over Hutson stated "I don't know. Whatever Lieutenant West told you his probable cause was for stopping him." (Hutson Dep. 15:15-19.) Hutson further testified that he did not see probable cause, was not looking for probable cause, and any such determination was made solely by West. (Hutson Dep. 15:20-16:21.) Thus, while West was running Marshall off the road, shooting at him, manhandling, and arresting him, Hutson acted as wing man without an inkling of probable cause and apparently without questioning or voicing any reservations to West. Additionally, Hutson held Marshall and gun point and participated in his arrest.

Unfortunately for Hutson, there is no "just following orders" defense. *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004). In *O'Rourke*, the Eleventh Circuit found that other officers' unconstitutional behavior did not relieve a defendant officer from the responsibility of deciding for himself whether to violate clearly established constitutional rights. *Id*. at 1210. The court further noted that even when the offending officer was a superior, subordinate officers may be subject to liability under § 1983 if there is a "reason why any of them should question the validity of that order." *Id*. at 1210 n.5. Here, Hudson should have

questioned West's behavior based on his belief that no probable cause existed, or he at least should have made the effort to ask.

## IV.    CONCLUSION

WHEREFORE, the premises considered, Plaintiff prays this Court will deny Defendants' motions for summary judgment.

RESPECTFULLY SUBMITTED on this the 12th day of March, 2008.

/s/ FRED CLEMENTS
Fred Clements
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)
FredClements@JayLewisLaw.com
ASB-5682-R39C

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties or counsel, or by hand delivery, or by facsimile, or by placing a copy of the same in the United States mail, properly addressed and first-class postage prepaid on this 12th day of March, 2008.

Gary Willford
Daryl Masters
Webb & Eley
P.O. Box 240909
Montgomery, AL 36124

Rick Howard
Alex Holtsford
April McKay
Nix Holtsford Gilliland Higgins & Hitson
P.O. Box 4128
Montgomery, AL 36103-4128


/s/ FRED CLEMENTS
Fred Clements
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Fax)
FredClements@JayLewisLaw.com
ASB-5682-R39C

# DEPOSITION OF RICHARD MARSHALL

## November 14, 2007

## Pages 1 through 156

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



EXHIBIT
1

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5   RICHARD MARSHALL,
 6         Plaintiff,
 7   vs.              CIVIL ACTION NO.
                      2:06-cv-701-ID.CSC
 8
 9   CHRIS WEST, in his individual
     capacity, LASHUN HUTSON, in his
     individual capacity,
10
11         Defendants.
12
13
          * * * * * * * * * * * *
14
15
     DEPOSITION OF RICHARD MARSHALL, taken
16
     pursuant to stipulation and agreement before Lyn
17
     Daugherty, ACCR #66, Certified Court Reporter and
18
     Commissioner for the State of Alabama at Large, in
19
     the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20
     Drive, Montgomery, Alabama, on Wednesday, November
21
     14, 2007, commencing at approximately 10:00 a.m.
22
23        * * * * * * * * * * * *
```

Page 2

```
 1            APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Jay Lewis
     Mr. Fred L. Clements
 4   LAW OFFICES OF JAY LEWIS
     Attorneys at Law
 5   847 South McDonough Street
     Montgomery, Alabama 36104
 6
 7   FOR THE DEFENDANT WEST:
 8   Mr. Gary Wilford
     Mr. Daryl L. Masters
 9   WEBB & ELEY, P.C.
     Attorneys at Law
10   7475 Halcyon Pointe Drive
     P.O. Box 240909
11   Montgomery, Alabama 36124
12
13        * * * * * * * * * * * *
14        EXAMINATION INDEX
15
16   RICHARD MARSHALL
17   BY MR. WILFORD . . . . . . . . . . 5
     BY MR. LEWIS . . . . . . . . . . . 153
18
19        EXHIBIT INDEX
20                   MAR
     Defendant
21   1   Alabama uniform arrest report      17
22
23      (Index continued on next page)
```

Page 3

```
 1   2   Photograph                      28
 2   3   Photograph                      29
 3   4   Photograph                      31
 4   5   MapQuest map                    36
 5   6   Interview sheet                 58
 6   7   Photograph                      79
 7   8   Photograph                      79
 8   9   Photograph                     107
 9   10  Photograph                     108
10   11  Photograph                     108
11   12  Inmate property release slip   133
12
13
14
15
16
          * * * * * * * * * * * * *
17
18
19
20
21
22
23
```

Page 4

```
 1            STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of RICHARD MARSHALL is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4                * * * * * * * * * * *
5           RICHARD MARSHALL
6      The witness, after having first been duly sworn
7  to speak the truth, the whole truth and nothing but
8  the truth testified as follows:
9                EXAMINATION
10 BY MR. WILFORD:
11 Q.  Would you please state your name for the
12     record, sir.
13 A.  Richard Marshall.
14 Q.  Mr. Marshall, my name is Gary Wilford, and
15     together with Daryl Masters, who is also
16     here in the room, we're representing the
17     defendants that you have sued in this
18     case -- well, excuse me -- one of the
19     defendants that you've sued in this case,
20     Chris West.  Where do you live?
21 A.  Lowndes County, Farmersville.
22 Q.  How long have you lived there?
23 A.  Basically all my life.

Page 6

1  Q.  Have you ever given a deposition before?
2  A.  No, sir.
3  Q.  Let me cover just a few ground rules here.
4      As you can see, we've got a court reporter,
5      and one of the things that she's doing is
6      she's taking down everything that we're
7      saying in the room here today; okay?  And
8      I'm going to be asking you some questions
9      and you're going to be answering those
10     questions for me.  And when you do that,
11     because we've got the court reporter here,
12     there's a couple of things we need to keep
13     in mind.  The first thing is let's try not
14     to talk over the top of each other because
15     it makes it difficult for her to get a good
16     transcription down.  Wait for me to ask my
17     question completely and then go ahead and
18     give me a verbal response.  And by that I
19     mean a yes, no, or whatever it may be.
20     Shaking your head and saying huh-uh and
21     uh-huh as we tend to do in normal
22     conversation is, again, one of those things
23     that's kind of hard for the court reporter

Page 7

1  to get down.  If I ask a question that you
2  don't understand, please let me know and
3  I'll be happy to rephrase it, try to put it
4  another way so that you know exactly what
5  it is that I'm asking you; all right?
6  A.  Okay.
7  Q.  Because when I ask you a question and you
8      give me an answer, I'm expecting that you
9      understood my question.  Can we have that
10     understanding?
11 A.  Okay.
12 Q.  This isn't an inquisition.  If you need a
13     break, if you need to talk to your lawyer,
14     get something to drink, whatever the case
15     may be, let me know and we can take a
16     break; all right?
17 A.  Okay.
18 Q.  And we'll probably do it on our end once or
19     twice as well.
20 A.  All right.
21 Q.  Other than your lawyers, who are with you
22     here today, have you spoken with anyone to
23     prepare for your deposition today?

Page 8

1  A.  No, sir.
2  Q.  I noticed when you came in this morning I
3      saw you and Mr. Carmichael walking up
4      together.  Did y'all ride in together
5      today?
6  A.  Yes, sir.
7  Q.  Did y'all talk about this case on the ride
8      up?
9  A.  No, sir.
10 Q.  Have you ever talked to Mr. Carmichael
11     about this case?
12 A.  No, sir.
13 Q.  At any time?
14 A.  No, sir.
15 Q.  Are you related to Mr. Carmichael?
16 A.  Yes.  My cousin.
17 Q.  Cousin?
18 A.  (Witness nods head).
19 Q.  Did you review any documents in preparing
20     for your deposition today?
21 A.  Not today, but I have -- through my lawyer
22     I have.
23 Q.  To prepare for this deposition?

**Page 9**

1   A.  Not to prepare for the deposition, but for
2      the case.
3   Q.  What documents did you review?
4   A.  Just basically disclosure, whatever from
5      the other party.
6   Q.  The information that we gave you?
7   A.  Yeah.
8   Q.  Anything that you provided your attorneys,
9      any documents you provided your attorneys?
10  A.  None other than what y'all requested.
11  Q.  What's your date of birth, sir?
12  A.  2/24/74.
13  Q.  And how old does that make you?  I'm not
14     very good at math.
15  A.  33.
16  Q.  Where were you born?
17  A.  Lowndes County.  Well, Farmersville through
18     the -- what did they call it back then?
19     Housewife?  Selma Hospital is where I was
20     taken.  I was born at home.
21  Q.  With a midwife?
22  A.  Midwife, yeah.
23  Q.  Okay.  I got you.

**Page 10**

1      Are you married?
2   A.  No, sir.
3   Q.  Have you ever been married?
4   A.  Yes, sir.
5   Q.  How many times have you been married?
6   A.  Once.
7   Q.  And who were you married to?
8   A.  Stephanie Mallory.
9   Q.  When were y'all married?
10  A.  In '97.  May, I think.
11  Q.  How long did y'all stay married?
12  A.  Well, the divorce hasn't been finalized.
13  Q.  So technically you're still married to her;
14     is that right?
15  A.  Yes.
16  Q.  When did y'all file for divorce?
17  A.  Well, she was in the service.  She was
18     really supposed to be handling that.  And I
19     haven't really been in contact with her
20     over the years.  Just hasn't been
21     finalized.
22  Q.  When was the last time that y'all lived
23     together?

**Page 11**

1   A.  We never actually lived together.  She was
2     in the service at the time.  Never shared a
3     residence.
4   Q.  All right.  Do you work now, sir?
5   A.  No, sir.
6   Q.  What was the last job that you held?
7   A.  M & M Logging last -- I think I was laid
8     off January of last year.
9   Q.  January of '06?
10  A.  Yes, sir.
11  Q.  How long did you work for them?
12  A.  I think I was employed around August '05,
13     somewhere August '05.
14  Q.  And worked with them until January of '06?
15  A.  Yes, sir.
16  Q.  What did you do for them?
17  A.  I was a topper.  Operate power saw.
18  Q.  How much did you get paid there?
19  A.  I was making $10 an hour.
20  Q.  Who was your supervisor?
21  A.  David Matthews.
22  Q.  Did you work prior to August of '05?
23  A.  The last job before that was Alabama

**Page 12**

1     Power.  I got laid off in '04.
2   Q.  Do you remember about what month that was?
3   A.  January.
4   Q.  January is not a good month for you, huh?
5   A.  Well, you know, it was shutdown jobs.
6     Contract's up.  Layoff time.
7   Q.  How long did you work for Alabama Power?
8   A.  I started December the previous year.  That
9     would be '03, December '03.
10  Q.  So that was only about a two-month temp
11     job?  Is that about right?
12  A.  Somewhere around there.  I caught the end
13     part of the contract.  I worked through my
14     uncle.  He was the supervisor.
15  Q.  Who was your uncle?
16  A.  Curtis Marshall.
17  Q.  Prior to December of '03, when was the last
18     time that you worked?
19  A.  I have to say it would have to be Big Lots
20     in Montgomery.  I think that's what ...
21  Q.  When did you start working for Big Lots?
22  A.  I would say September of '99.
23  Q.  And you worked for them until when?

Page 13

```
 1    A.  I want to say November -- I think it was
 2        November 2000, somewhere along in there.
 3    Q.  What did you do for Big Lots?
 4    A.  Forklift operator.
 5    Q.  Forklift operator?
 6    A.  Yeah.
 7    Q.  And what did you do for Alabama Power?  Let
 8        me go back to that.
 9    A.  I was a cement finisher helper.  Mixed
10        mortar, poured concrete.
11    Q.  And what did you get paid when you were at
12        Alabama Power?
13    A.  I was making 15.50, something like that.
14    Q.  What was your rate of pay at Big Lots?
15    A.  Start pay was 7.50 and off at like $10.
16    Q.  Have you ever owned your own business?
17    A.  No, sir.
18    Q.  Never been self-employed?
19    A.  Not really.  Well, I contract barber, a
20        trade of mine, hair cutting.  But I never
21        owned my own business.
22    Q.  When did you do that?
23    A.  '93 out of high school a couple of years
```

Page 14

```
 1        off and on.
 2    Q.  Did you graduate from high school?
 3    A.  Yes, sir.
 4    Q.  What high school did you graduate from?
 5    A.  Central High, Hayneville.
 6    Q.  What year did you graduate?
 7    A.  '92.
 8    Q.  Have you ever attended a college?
 9    A.  Briefly J.P. Tech for barbering.  But I
10        found out I have to have a license to cut
11        hair.  Went straight to the barber shop.
12    Q.  And that was here in Montgomery; right?
13    A.  Yeah.
14    Q.  When did you attend J.P. Tech?
15    A.  I think it was '93.
16    Q.  Any other college or trade school that you
17        have?
18    A.  No, sir.
19    Q.  Now, you live at 64 Youngblood Road in
20        Farmersville; is that right?
21    A.  Yes, sir.
22    Q.  And how long did you tell me that you've
23        lived there?  You said you've lived in
```

Page 15

```
 1        Lowndes County pretty much all your life.
 2        How long have you lived at that address?
 3    A.  That's my mother's address.  Most all my
 4        life I stayed next door with my grandmother
 5        most of my life until I moved out with a
 6        friend or two.
 7    Q.  Where were you living in 2005?
 8    A.  Still Lowndes County off of Highway 21 with
 9        a friend.
10    Q.  The whole year?
11    A.  Yeah.  Yeah.
12    Q.  What's the address at your grandmother's
13        house that you said is next door?
14    A.  It's probably be -- Probably --
15        I'm not sure.  The address has changed.  It
16        used to be Route 2, Box 140, but I'm not
17        sure.  I'm not sure right now.  I know
18        that's the old address, Route 2, Box 140.
19    Q.  Do you have any children, Mr. Marshall?
20    A.  Yes.
21    Q.  How many children do you have?
22    A.  Two boys.
23    Q.  Are any of them 19 or older?
```

Page 16

```
 1    A.  No, sir.
 2    Q.  Do you have a lot of relatives in Lowndes
 3        County?
 4    A.  Fairly, but not a lot.  Close relatives.
 5            MR. WILFORD:  Jay, can we get a
 6        stipulation, just for the
 7        venire information, that he'll
 8        give us a list of relatives in
 9        the middle district?
10            MR. LEWIS:  Sure.
11            MR. WILFORD:  That will save us
12        some time.
13    Q.  Are you a member of a trade union?
14    A.  No, sir.
15    Q.  Do you go to church?
16    A.  I used to.  I haven't been in a while.
17    Q.  When you went to church, what church did
18        you attend?
19    A.  First Baptist in Farmersville.
20    Q.  Are you a member of any social
21        organizations like, you know, Elks, VFW,
22        anything like that?
23    A.  No, sir.
```

Page 17

1  Q.  Other than this lawsuit that we're here on
2      today, have you ever been a party in any
3      other lawsuit either as a plaintiff or a
4      defendant?
5  A.  No, sir.
6  Q.  So this is your first one?
7  A.  Yes.
8  Q.  We had asked you in the interrogatories if
9      you had ever been arrested before, and you
10     gave us three arrests; one in April 25th --
11     25 of '97 in Butler County, the second one
12     was the one that we're here -- I'm sorry --
13     the second one was in '98 in Tuscaloosa,
14     and the third one was the one that we're on
15     here today. Do you have any other arrests
16     besides those?
17 A.  No, sir.
18         (Defendant's Exhibit 1 was marked
19          for identification.)
20 Q.  Let me show you what I'm going to mark as
21     Defendant's Exhibit 1. Let me give you
22     just a minute to take a look at that,
23     Mr. Marshall.

Page 18

1          (Brief pause.)
2  Q.  Have you had a chance to take a look at
3      that?
4  A.  Yeah.
5  Q.  Does that refresh your recollection as to
6      any other arrests you might have had?
7  A.  Yeah. I forgot about that. Seat belt,
8      whatever it was. I think it was June -- I
9      want to say June.
10 Q.  June of this year?
11 A.  Yeah.
12 Q.  Were you actually incarcerated as a result
13     of that arrest? Put in jail?
14 A.  Yeah. I was taken in for three days, but I
15     got a chance to talk to the judge. It was
16     a miss -- following the incident we're here
17     now on. They suspended my license for a
18     ticket that I already sat out while I was
19     in there. She took the ticket up plus the
20     ticket that they wrote me that day and
21     released me.
22 Q.  So you spent two days in jail on this
23     charge and then the judge dismissed all the

Page 19

1      charges?
2  A.  Yes.
3  Q.  Is that what you're telling me?
4  A.  Yeah.
5  Q.  Do you remember who it was that arrested
6      you on this June of '07 arrest?
7  A.  The officer -- my first time seeing him.
8      But they did call Shawn Hutson up. When
9      they ran my name, he was the first officer
10     pulled up. So they pulled him up and they
11     took me in.
12 Q.  Oh, you're saying Shawn Hutson came to
13     the --
14 A.  Yes, sir.
15 Q.  -- to the stop?
16 A.  Yep.
17 Q.  But he wasn't the one who originally pulled
18     you over; correct?
19 A.  He didn't pull me over.
20 Q.  Do you remember what department that
21     officer might have worked from, the one who
22     originally pulled you over?
23 A.  Oh, it was Lowndes County.

Page 20

1  Q.  Was it the DTF?
2  A.  Just a regular city cop, whatever.
3  Q.  City or county?
4  A.  County, city. I mean, I don't exactly know
5      which one it was.
6  Q.  Do you remember what color uniform the
7      officer wore?
8  A.  I want to say dark-colored, dark-colored
9      uniforms. May be county. In a white
10     vehicle.
11 Q.  All right. Other than this one and the
12     three that you told us about in the
13     interrogatories, any other arrests?
14 A.  No.
15 Q.  On the first arrest in April of '97, did
16     you have to spend any time in jail on that
17     one?
18 A.  '97, yeah.
19 Q.  How long did you spend in jail on that one?
20 A.  Approximately two or three weeks before the
21     charge was dropped.
22 Q.  Do you know why the charges were dismissed?
23 A.  Yeah. It was bogus charges. It was a

Page 21

1   misunderstanding between me and my kids'
2   mom. She went down there to make false
3   statements about a vehicle we purchased
4   together, and two or three weeks later she
5   came to an agreement and dropped the
6   charge.
7   Q.  You say your kids' mom. Is that the lady
8       that you're currently married to?
9   A.  No, sir.
10  Q.  What was that lady's name?
11  A.  Which one?
12  Q.  The mother of your children.
13  A.  Shavonne Bailey.
14  Q.  Do you know where she lives now?
15  A.  Tuscaloosa.
16  Q.  Was she the one that was involved in the
17      arrest in Tuscaloosa in '98?
18  A.  Yes, sir.
19  Q.  Do you have an address on Ms. Bailey?
20  A.  Not off the top of my head, but I have it.
21      I have an address, but I don't know it by
22      heart.
23  Q.  Do you know her phone number?

Page 22

1   A.  I don't know it by heart either.
2   Q.  When was the last time you talked to her?
3   A.  Last month.
4   Q.  Did you spend any time in jail in
5       Tuscaloosa?
6   A.  Overnight.
7   Q.  Just overnight?
8   A.  Yeah.
9   Q.  That was in Tuscaloosa City Jail?
10  A.  Yeah.
11  Q.  Or the county jail?
12  A.  I'm not sure. I'd have to look at the
13      paper and see. It's been a while.
14  Q.  The arrest in Butler County, were you in
15      the Butler County Jail? It says you were
16      arrested by the Butler City Police
17      Department.
18  A.  Well, they only have one jail. I don't
19      know whether it's under the city or the
20      county. It's the only one they have --
21      still have.
22  Q.  All right. And you've been in the Lowndes
23      County jail twice; is that correct?

Page 23

1   A.  Yes, sir.
2   Q.  Any other times that you've been in jail
3       that we haven't talked about?
4   A.  No, sir.
5   Q.  Have you ever been treated for alcohol or
6       drug addiction?
7   A.  No, sir.
8   Q.  Ever been treated for mental illness?
9   A.  No, sir.
10  Q.  All right. Let me draw your attention to
11      the day that this incident that this
12      lawsuit is about occurred. Would you agree
13      with me that that was June 28th of 2005?
14  A.  I would agree.
15  Q.  Do you recall what day of the week that
16      was?
17  A.  I think it was Tuesday.
18  Q.  You weren't employed on June 28th of '05,
19      were you?
20  A.  No, sir.
21  Q.  What did you have to do that day, if
22      anything?
23  A.  Early that morning I went to my aunt's

Page 24

1   house and we pulled the motor and
2   transmission out of a vehicle.
3   Q.  You said we. Who is we?
4   A.  Me and Kevin and two more cousins.
5   Q.  Kevin Carmichael?
6   A.  Yes, sir.
7   Q.  Who were the other two cousins?
8   A.  Darrell Howard, Charles Howard.
9   Q.  And you said you were pulling a motor out
10      of a car?
11  A.  Yeah.
12  Q.  Was it your aunt's car?
13  A.  No. It was my cousin's car.
14  Q.  Were you being paid to do that?
15  A.  No.
16  Q.  What time did you get up to go pull that
17      motor?
18  A.  Probably about eight o'clock.
19  Q.  Did you have anything to eat when you woke
20      up?
21  A.  No, sir.
22  Q.  Just went straight over there and started
23      working on a motor?

| Page 25 |
|---|
| 1   A.  (Witness nods head). |
| 2   Q.  Did y'all eat anything while you were over |
| 3       there? |
| 4   A.  No, sir. |
| 5   Q.  Did you have anything alcoholic to drink |
| 6       while y'all were working on that motor? |
| 7   A.  No, sir. |
| 8   Q.  Take any drugs that day? |
| 9   A.  No, sir. |
| 10  Q.  Prescription drugs? |
| 11  A.  No drugs. |
| 12  Q.  Where is your aunt's house at? |
| 13  A.  It's in Farmersville also. |
| 14  Q.  What's the address there? |
| 15  A.  I don't know the address right off the top |
| 16      of my head. |
| 17  Q.  How far is it from your house? |
| 18  A.  Approximately a mile. |
| 19  Q.  So did you get that motor out that day? |
| 20  A.  Yes, sir. |
| 21  Q.  How were you dressed? |
| 22  A.  T-shirt and shorts. |
| 23  Q.  Pretty hot that day? |

| Page 26 |
|---|
| 1   A.  Yeah.  It was a pretty hot summer.  It was |
| 2       warm that day. |
| 3   Q.  How long did it take y'all to get that |
| 4       motor out? |
| 5   A.  I think we finished up sometime between |
| 6       11:30 -- sometime before noon. |
| 7   Q.  What were you going to do after that? |
| 8   A.  Go home and take a bath and get some rest. |
| 9   Q.  And was that -- When you say going home, |
| 10      was that the 64 Youngblood Road address? |
| 11  A.  No.  That's the residence of of 21 where I |
| 12      was residing at the time. |
| 13  Q.  Off of Highway 21? |
| 14  A.  Yes, sir. |
| 15  Q.  Is that on County Road 7? |
| 16  A.  Off of County Road 7, right off of the |
| 17      State Highway 21. |
| 18  Q.  Is that at the intersection of County Road |
| 19      7 and Highway 21? |
| 20  A.  Yeah. |
| 21  Q.  Where did Mr. Howard -- well, the two |
| 22      Mr. Howards, Darrell and Charles, go after |
| 23      y'all got done with that engine? |

| Page 27 |
|---|
| 1   A.  They was at their house where we took it |
| 2       out.  That's his mother. |
| 3   Q.  So they didn't go anywhere? |
| 4   A.  They were home already. |
| 5   Q.  Did you have any plans for the rest of the |
| 6       day other than just going home? |
| 7   A.  No plans. |
| 8   Q.  Was there anybody in the car with you when |
| 9       you went home? |
| 10  A.  Kevin Carmichael. |
| 11  Q.  Did you stop anywhere between your aunt's |
| 12      house and where your encounter with the |
| 13      defendants began? |
| 14  A.  No, sir. |
| 15  Q.  Can you describe for me the vehicle that |
| 16      you were in? |
| 17  A.  1971 blue Nova. |
| 18  Q.  '71? |
| 19  A.  Yes, sir. |
| 20  Q.  That's a Chevrolet; right? |
| 21  A.  Yes. |
| 22  Q.  Was that your car? |
| 23  A.  Yes. |

| Page 28 |
|---|
| 1   Q.  How long had you had that car? |
| 2   A.  I think I purchased it in July of '04. |
| 3           (Defendant's Exhibit 2 was marked |
| 4           for identification.) |
| 5   Q.  Let me show you what we'll mark as |
| 6       Defendant's Exhibit 2 after your attorneys |
| 7       get a chance to look at it.  Is that your |
| 8       car? |
| 9   A.  That's my car. |
| 10  Q.  That's in Defendant's Exhibit 2? |
| 11  A.  That's it. |
| 12  Q.  Who all besides you had access to that car? |
| 13  A.  No one. |
| 14  Q.  So you had the only set of keys; correct? |
| 15  A.  That's correct. |
| 16  Q.  Had you loaned it to anyone recently? |
| 17  A.  No, sir. |
| 18  Q.  I'm sorry? |
| 19  A.  No, sir. |
| 20  Q.  Was that car equipped with seat belts? |
| 21  A.  Yes, sir. |
| 22  Q.  Were you wearing your seat belt that day? |
| 23  A.  No, sir. |

Page 29

1  Q.  What about Kevin, was he wearing his?
2  A.  No.
3  Q.  Was there any alcohol in that car?
4  A.  No, sir.
5         (Defendant's Exhibit 3 was marked
6         for identification.)
7  Q.  Let me show you what we're going to mark as
8         Defendant's Exhibit 3.  Let me ask you,
9         does that look like the front seat of your
10        car on June 28th, 2005, Defendant's Exhibit
11        3?
12  A.  That's it.
13  Q.  Fairly and accurately depict what was on
14        the front seat of your car that day?
15  A.  Yes, sir.
16  Q.  What was in that flask that's there on the
17        seat next to the gun?
18  A.  At one time it had contained alcohol, but
19        it was no alcohol in it that day.
20  Q.  Well, what was in it when it was -- What
21        was the alcohol that was in there?
22  A.  Vodka.
23  Q.  When did you drink that -- or did you --

Page 30

1         let me back up.  Did you drink that?
2  A.  It's been in there for some while.
3         Probably a week prior when I had a drink.
4  Q.  So you had emptied it about a week prior;
5         is that right?
6  A.  Yeah.
7  Q.  Now, Defendant's Exhibit 3 also has a gun
8         in that picture; correct?
9  A.  Uh-huh (positive response).
10  Q.  Was that your gun?
11  A.  No, sir.
12  Q.  But you knew it was in the car that day;
13        right?
14  A.  Yes, sir.
15  Q.  Whose gun is it?
16  A.  It belongs to D.C. McWilliams.
17  Q.  Who is D.C. McWilliams?
18  A.  A friend of mine.
19  Q.  How did it get in the car?
20  A.  Well, he left it in there.  One day I give
21        him a ride when he was having car trouble.
22        It was starting to rain.  He came along and
23        said he wanted to go back and get his gun

Page 31

1         and his books.  And I give him a ride home
2         right before dark.  It started raining even
3         harder before we got there.  When I pulled
4         up in his driveway, he jumped out of the
5         car and left the gun.
6  Q.  How long ago before -- Let me back up and
7         regroup.  How long before June 28th, 2005
8         did you give Mr. McWilliams a ride?
9  A.  Approximately three or four days earlier
10        than that.
11  Q.  Where does Mr. McWilliams live?
12  A.  Right off of Highway 21.
13  Q.  Do you know the address?
14  A.  Not right offhand.
15  Q.  How far is it from your house?
16  A.  Approximately three or four miles.
17        (Defendant's Exhibit 4 was marked
18        for identification.)
19  Q.  Let me show you what we'll mark as
20        Defendant's Exhibit 4.  Does that look like
21        the ashtray that was in your Nova?
22  A.  It is.
23  Q.  And you can see in there there's some

Page 32

1         bullets in there; right?
2  A.  Yes, sir.
3  Q.  Why were those bullets in your ashtray?
4  A.  Like I said, he left the box of bullets in
5         there which had got wet from the rain.  The
6         box was deteriorating, therefore tearing
7         up.  So I took the bullets, put them in the
8         ashtray.  And there probably was some on
9         the seat also because all of them couldn't
10        fit in there.
11  Q.  If you look back at Defendant's 3,
12        I believe it is, I think you're right.
13        There is a bullet lying there on the seat,
14        isn't there?
15  A.  Yeah.
16  Q.  So he left the gun and a box of bullets in
17        your car?
18  A.  Yes, sir.
19  Q.  And he left it there for three to four
20        days?
21  A.  That's approximately how long it was.
22  Q.  Had he tried to get ahold of you to get his
23        gun and his bullets back prior to that

Page 33

1    time?
2  A.  He may have, but I was in and out of my
3    residence probably and missed him. I even
4    called him, but I couldn't get up with him.
5  Q.  Does Mr. McWilliams still live there off
6    Highway 21?
7  A.  I'm certain he does.
8  Q.  Did you have a concealed weapon permit?
9  A.  No, sir.
10  Q.  Had you ever had a concealed weapon permit?
11  A.  No, sir.
12  Q.  How much money did you have on you that
13    day?
14  A.  500.
15  Q.  Exactly 500?
16  A.  Yes, sir.
17  Q.  In what denomination were the bills?
18  A.  I know two $100 bills and the rest were
19    twenties.
20  Q.  Where did that money come from?
21  A.  I previously was drawing unemployment when
22    I got laid off from one job and I saved
23    money. And during that time I was having a

Page 34

1    fairly decent streak at the gambling
2    casinos. During the time I won a
3    substantial amount of money.
4  Q.  Which casino?
5  A.  White Hall Gaming Casino. Also Biloxi,
6    Mississippi I won some money.
7  Q.  Which casino in Biloxi?
8  A.  I'm not sure right offhand. I'd have to
9    check receipts or something. I don't want
10    to say the wrong one.
11  Q.  When did you win that money?
12  A.  I won the money in Mississippi in '04. The
13    month I'm not exactly -- I'm not sure of
14    the month. I won money in White Hall in
15    '05, March.
16  Q.  Well, how much did you win in Biloxi?
17  A.  About 1600.
18  Q.  And how much at White Hall?
19  A.  3600.
20  Q.  And you're saying that this money was
21    left -- what was left of your winnings? Am
22    I understanding you correctly?
23  A.  Yeah.

Page 35

1  Q.  Did you report those winnings on your
2    income tax?
3  A.  I took a waiver out -- tax waiver out each
4    time.
5  Q.  Tax waiver. You have to explain that to me
6    because I'm not a gambler.
7  A.  When you have to sign to have your taxes
8    taken out of winnings to report your W-2s
9    from the casino.
10  Q.  Right. Okay. But when you filed your
11    income tax at the end of the year, did you
12    report that income?
13  A.  I haven't filed but once since '05. I
14    think child support ended up being on
15    that. I'm not sure if I had it in there or
16    not.
17  Q.  Where was that money at?
18  A.  What money?
19  Q.  The $500 that we're talking about. That's
20    a good point. When I ask a bad question,
21    you go right ahead and ask me to clarify.
22    I'm talking about the $500 now. Where did
23    you have that at?

Page 36

1  A.  In my short right-hand pocket.
2  Q.  Was it in a wallet, or how were you
3    carrying it?
4  A.  Just together folded.
5  Q.  When was the first time that you remember
6    seeing the two officers that you ran into
7    later that day?
8  A.  The first time that I seen two unknown
9    persons was on County Road 7 immediately
10    coming from my aunt's house.
11  Q.  That's good. Let's back up and regroup on
12    that just a minute. Did you turn off of
13    Highway 21 going down County Road 7 to your
14    house?
15  A.  I turned off of Highway 16 onto County Road
16    7 where I met the officers.
17        (Defendant's Exhibit 5 was marked
18        for identification.)
19  Q.  Just so I'm clear, I'm going to show you
20    what we're going to mark as Defendant's
21    Exhibit 5, which I'll tell you is just a
22    little map that I got off the Internet of
23    the area. Kind of centered in it is County

Page 37

1    Road 7 and Highway 21 and we'll just kind
2    of refer to that. Now, you said you came
3    off -- was it County Road 16 and onto --
4    I'm sorry. Let me move all this stuff out
5    of your way. I don't see County Road 16 on
6    that map, and I might not have it zoomed in
7    in enough detail.
8    A.   Well, it's -- the road coming from
9         Farmersville I think leads to be County
10        Road 16 and then you make a right on County
11        Road 7.
12   Q.   There's Farmersville right there. So does
13        County Road 16 kind of come --
14   A.   Yeah. And you make a right onto County
15        Road 7. Then you make another right on
16        Highway 21.
17   Q.   I tell you what. Let me give you my pen
18        here and if you would just kind of draw a
19        little line there from that dot under
20        Farmersville. Just your best guess at how
21        County Road 16 goes into County Road 7.
22   A.   It would have to be coming from this
23        direction and make a right on County Road

Page 38

1    7.
2    Q.   Just draw that to where it intersects into
3         County Road 7. Just make your line go into
4         County Road 7.
5    A.   (Witness complies).
6    Q.   There we go. That's good. And if you
7         would, just put a 16 under that so we'll
8         know what we're talking about.
9    A.   (Witness complies).
10   Q.   All right. Now, if you would on here just
11        put a little X about where your house was
12        back in June of '05.
13   A.   The residence where I was going to?
14   Q.   Yes, sir.
15   A.   Well, it's off of Highway 21. Braggs.
16        This is 263 exit. I stayed approximately a
17        mile or two, three miles from the 263
18        exit. So I would have to say somewhere in
19        here approximately.
20   Q.   Can you put a little bit larger X so when
21        we copy that?
22   A.   (Witness complies).
23   Q.   And if you would, just write home under

Page 39

1    that.
2    A.   (Witness complies).
3    Q.   All right. So make sure I understand what
4         you're telling me. You left Farmersville
5         where your aunt's house was?
6    A.   Yes, sir.
7    Q.   Traveled down County Road 16?
8    A.   Uh-huh (positive response).
9    Q.   Took a right on County Road 7 from County
10        Road 16?
11   A.   (Witness nods head).
12   Q.   Where did you first see who you later
13        learned to be the defendants in this case?
14   A.   Approximately a quarter mile after turning
15        on County Road 7 I met a dark-colored
16        Lincoln Town Car, who I first thought was a
17        drunken driver or something that slowed
18        down, hit the brakes hard. And I didn't
19        know who it was, so I kept driving.
20   Q.   Okay. There's a whole bunch of things I
21        need to ask you about there. You said it
22        was a dark-colored Lincoln Town Car?
23   A.   Yes, sir.

Page 40

1    Q.   Had you ever seen that car before?
2    A.   No, sir.
3    Q.   Did it have any distinguishing features on
4         it, like a license plate on the front or
5         anything that stood out in your mind?
6    A.   Didn't even pay it no attention. Wasn't
7         registering in my mind. Just another
8         vehicle.
9    Q.   Had you passed any vehicles on County Road
10        7 prior to seeing that dark-colored
11        Lincoln?
12   A.   No, sir. That's the first vehicle I saw.
13   Q.   Had you passed any on County Road 16?
14   A.   No, sir.
15   Q.   So you're all alone on a road there?
16   A.   Yes, sir.
17   Q.   All right. You also said that you thought
18        it was a drunk driver. What made you think
19        it was a drunk driver?
20   A.   Because immediately upon meeting the car
21        the car slammed on brakes and took a nose
22        dive, and I thought that to be strange at
23        the time. Looked in my rear view mirror,

Page 41

1    saw that the car was veering off to the
2    side of the road. So I thought maybe they
3    had a flat or something, so I kept driving.
4    Q.  You didn't see it swerving in the road as
5        it was coming towards you; right?
6    A.  No, sir.
7    Q.  So the only thing that made you think it
8        was a drunk driver was it slammed on the
9        brakes and then veered off the road?
10   A.  Yes, sir.
11   Q.  Did you get a look at who was in the
12       vehicle as it went by you?
13   A.  No, sir.
14   Q.  County Road 7 where you encountered this
15       dark-colored Lincoln, is that a two-lane
16       road?
17   A.  It's a small rural road, one lane.
18   Q.  One lane in each direction?
19   A.  Yeah. One lane in each direction.
20   Q.  Did you see any kind of blue lights on the
21       vehicle when it went by you?
22   A.  There was no lights.
23   Q.  When you say no lights, no blue lights?

Page 42

1    A.  Right.
2    Q.  It had headlights; right?
3    A.  I'm certain it did.
4    Q.  Had you ever seen Chris West before that
5        day?
6    A.  No, sir.
7    Q.  How about LaShun Hutson, had you ever seen
8        him before that day?
9    A.  No, sir.
10   Q.  Did you know of them?
11   A.  I never know of Shawn Hutson, but I have
12       heard Chris West's name.
13   Q.  You'd heard Chris West's name prior to the
14       28th of June of '05?
15   A.  Yes, sir.
16   Q.  What did you know about Chris West prior to
17       June 28 of '05?
18   A.  Only that he was a law enforcement officer.
19   Q.  Do you remember who you heard that from or
20       how you heard it?
21   A.  No, sir. Just open conversation.
22   Q.  Do you know who might have told you that?
23   A.  No one told me. Just heard it. Just heard

Page 43

1    of him.
2    Q.  Did you know he worked with the drug task
3        force?
4    A.  No, sir.
5    Q.  Other than slamming on the brakes and
6        veering off the road, did they do anything
7        else unusual?
8    A.  That's all I know is right then.
9    Q.  You say right then. Did they do anything
10       else after that?
11   A.  Yeah. Next thing I know is they was upside
12       my car.
13   Q.  So from the time -- Let me make sure I got
14       your testimony right. From the time you
15       saw them slam on brakes and veer off the
16       road until they were next to you, you
17       didn't see them. Is that what you're
18       telling me?
19   A.  Yes, sir.
20   Q.  Were there any cars coming behind that
21       Lincoln that you saw?
22   A.  No, sir.
23   Q.  Okay. Now, you said they came alongside of

Page 44

1    you. How did they do that? Describe that
2    for me.
3    A.  After seeing the car slam on brakes and,
4        like I said, I looked in my back mirror and
5        saw them veer off. I kept driving. Didn't
6        know what was happening. Approximately 30
7        seconds to a minute later they had pulled
8        up beside me in the passing lane. All I
9        saw was two black males in black T-shirts
10       trying to flag me to pull over on first
11       glance.
12   Q.  You said trying to flag you. What were
13       they doing?
14   A.  I just seen the hand signal (indicating)
15       and pull over.
16   Q.  Was there anything -- Let me back up. Who
17       was doing the hand signal? Was it the
18       passenger or the driver?
19   A.  Passenger.
20   Q.  And just kind of describe what you did a
21       second ago. For the record you were using
22       your right hand and kind of pushing at
23       shoulder level off to the side?

Page 45

1    A.  Yes, sir.
2    Q.  Did you later learn who the passenger was
3        that was giving you the hand signal?
4    A.  I believe it was Shawn Hutson.
5    Q.  So Chris West was driving; is that right?
6    A.  I think he was.  Had to be.
7    Q.  Was there anybody else in the car besides
8        those two?
9    A.  No, sir.
10   Q.  Was your window up or down in your car?
11   A.  Down.
12   Q.  Does the air conditioning work in that car?
13   A.  No, sir.
14   Q.  So you had 2 by 55 air conditioning?
15   A.  I mean, wind?
16   Q.  Yeah.
17   A.  Yeah.  That's it.
18   Q.  And I'm just going to start referring to
19       them by name now.  We know that based on
20       your testimony Shawn was the passenger and
21       Chris was the driver.  Did Shawn say
22       anything to you when he was initially
23       giving you that hand signal?

Page 46

1    A.  I really couldn't hear if he had said
2        anything anyway.  As you can see in my
3        trunk, I had amplifiers and music that was
4        blasting during the time.  I was driving
5        35, 40 miles per hour.  All I could really
6        see was a hand signal.
7    Q.  Well, did it look like he was trying to say
8        something?
9    A.  I can't recollect.  I can't say that
10       because it happened so quick.  Just a brief
11       glance and that's all I looked over there.
12   Q.  Let me back up and ask you something here.
13       In paragraph 16 of your amended complaint
14       you alleged that you've been robbed
15       before.
16   A.  Yes, sir.
17   Q.  How many times had you been robbed before?
18   A.  Once.
19   Q.  When was that?
20   A.  August '03.
21   Q.  Where was it?
22   A.  In Montgomery.
23   Q.  What happened?

Page 47

1    A.  I was at the hotel, Peddler's Inn, and I
2        had a guy pull a gun on me and demanded
3        money.
4    Q.  Were you in a car or were you just
5        walking?  Where were you?
6    A.  Coming out my room -- hotel room.
7    Q.  Did he get any money off of you?
8    A.  He took some money.
9    Q.  Did you report it to the police?
10   A.  Yeah.  I went in for questioning and made a
11       statement.
12   Q.  Did they ever catch the guy who did it?
13   A.  Yes.
14   Q.  What was his name?
15   A.  I want to say Jerome Titus.
16   Q.  What happened with Mr. Titus?
17   A.  I guess they prosecuted him or whatever.  I
18       don't know the full extent.
19   Q.  Did you ever have to testify at trial?
20   A.  No.  I got a letter from the DA, Ellen
21       Brooks, saying it wasn't enough evidence or
22       something.  I don't know.  It was
23       dismissed.

Page 48

1    Q.  So he wasn't convicted?
2    A.  Not to my knowledge.
3    Q.  All right.  So that was the only time that
4        you were robbed previously?
5    A.  Yes, sir.
6    Q.  Have you been robbed since?
7    A.  No, sir.
8    Q.  All right.  So we got to the point where
9        their car -- are they about even with you
10       going down County Road 7?
11   A.  Yeah.  They pulled right up beside me.
12   Q.  Going about 35, 40 miles an hour; is that
13       right?
14   A.  Yeah.  I wasn't driving fast.
15   Q.  What's the speed limit there?
16   A.  Approximately 45, 50 maybe, anywhere in
17       that range.
18   Q.  About how long did they stay alongside of
19       you like that?
20   A.  Approximately 10 seconds.
21   Q.  What did they do after that 10 seconds?
22   A.  They veered behind me and trailed me out to
23       Highway 21.

12 (Pages 45 to 48)

Page 49

1   Q.   Did they try to come up alongside of you
2        again prior to getting to Highway 21?
3   A.   No, sir.
4   Q.   Did you look at them in your rear view
5        mirror?
6   A.   I took a glance in my rear view mirror and
7        noticed that they was riding my bumper.
8   Q.   Did you see a blue light at that time?
9   A.   There was no blue light.
10  Q.   Could you see what the two occupants of the
11       car were doing in your rear view mirror?
12  A.   No, sir.  I didn't glance.  Just quick
13       glance to see that they was still behind
14       me.
15  Q.   Let me back up for just a second.  When
16       they were alongside of you here this first
17       time, did you say anything to them?
18  A.   On first glance when they pulled up, yeah,
19       I may have said -- asked them what they
20       want, not in that nice a way, though.
21  Q.   Not in a nice way?
22  A.   Yeah.  Not in a nice way.
23  Q.   Can you tell me exactly what you said?

Page 50

1   A.   What the fuck y'all want.
2   Q.   Did you think to turn the stereo down?
3   A.   No.  Because it was my first understanding
4        that it was somebody trying to rob me and
5        I'm not going to be courteous to them.
6   Q.   So you couldn't hear what they were saying
7        to you; right?
8   A.   No, sir.
9   Q.   And you asked them what you asked them?
10  A.   Yes, sir.
11  Q.   And the stereo is still going the whole
12       time?
13  A.   Yes, sir.
14  Q.   Did it look like either one of them
15       responded when you asked them that question?
16  A.   No, sir.
17  Q.   Because you just glanced at them real
18       quick; right?
19  A.   Yes, sir.
20  Q.   All right.  They trailed you all the way up
21       to Highway 21; correct?
22  A.   Yes, sir.
23  Q.   What did you do when you got to Highway 21?

Page 51

1   A.   I turned right.  Turned going toward my
2        residence.
3   Q.   Turned right going towards your house?
4   A.   Yes, sir.
5   Q.   Which I guess on this map takes us back to
6        the west; is that right?  I think this is
7        west over here on the left-hand side.
8   A.   I don't know if it's west or not.  All I
9        knew --
10  Q.   Kind of southwest really?
11  A.   I turned right on Highway 21.
12  Q.   We'll go with that.  You turned right on
13       Highway 21 heading towards your house.  Is
14       there a stop sign there at 7 and 21?
15  A.   Caution light, yield sign.
16  Q.   A yield sign?
17  A.   Uh-huh (positive response).
18  Q.   Was there any traffic coming on Highway 21?
19  A.   No, sir.  I didn't see any traffic.
20  Q.   Either way?
21  A.   No, sir.
22  Q.   What is Highway 21?  Is it another
23       two-lane, one lane each way, or is it

Page 52

1        four-lane?
2   A.   Two-lane, one lane each way.  State
3        highway.
4   Q.   Did you stop at the intersection of 7 and
5        21?
6   A.   Brief caution, brake in the road at the
7        yield sign and proceeded to go right toward
8        my residence.
9   Q.   Kind of a rolling stop?
10  A.   Yeah.  Rolling stop.
11  Q.   Wheels never really came to a complete
12       rest?
13  A.   No, sir.
14  Q.   And you took the right going onto Highway
15       21?
16  A.   Yes, sir.
17  Q.   What did the Lincoln do?
18  A.   Still behind me.
19  Q.   It followed you out on Highway 21?
20  A.   Yes, sir.
21  Q.   Did you get a chance to look in your rear
22       view mirror as you were going down 21?
23  A.   Well, right after turning on Highway 21 the

Deposition of Richard Marshall

Page 53

1     vehicle pulled up beside me again.
2   Q.  So up again on the left-hand side of your
3       vehicle coming in the oncoming traffic
4       lane; is that right?
5   A.  Yes, sir.
6   Q.  How fast were you going at that time?
7   A.  Approximately 55, somewhere around there.
8   Q.  What's the speed limit on Highway 21?
9   A.  I'm quite sure it's 55.
10  Q.  And I should have asked you this before.
11      The rest of the time that you were on
12      County Road 7, did you stay going 35, 40
13      miles an hour?
14  A.  Around 35, 40 miles an hour.  Because they
15      were bumper to bumper on me.
16  Q.  So you sped up a little bit?
17  A.  It was a wavy road, so I really didn't want
18      to travel fast.
19  Q.  Well, you did speed up a little if you got
20      up to 45; right?
21  A.  Well, like I said, I was driving around 35
22      to 45 on County Road 7.
23  Q.  Well, were you trying to get them off your

Page 54

1       bumper at all?
2   A.  I wasn't trying to because I knew I
3       couldn't.  They was trailing my bumper.
4       And like I said, it was a wavy road.  I
5       didn't want to hurt myself.
6   Q.  So you turned onto Highway 21 and they came
7       up alongside of you.  What happened when
8       they came alongside of you?
9   A.  They came alongside me and I saw the same
10      thing again, hand motion and I glanced and
11      kept driving.
12  Q.  Was there anything in -- And you said the
13      hand motion.  Was that the passenger again,
14      Shawn?
15  A.  Yes.
16  Q.  Could you see anything that Chris might be
17      doing?
18  A.  I didn't have time to just lock in on him.
19  Q.  Did Shawn have anything in his hands this
20      time when they pulled up alongside of you
21      on 21?
22  A.  On second glance it appeared to be a weapon
23      at a glance and kept driving.

Page 55

1   Q.  Did you see anything besides the weapon?
2   A.  No, sir.  I just seen the right hand.
3   Q.  I'm sorry?
4   A.  I just saw his right hand gesturing and I
5       just kept driving.
6   Q.  Is that the only hand he had in view?
7   A.  That's the only hand I saw.
8   Q.  Did he say anything to you?
9   A.  I didn't hear him say anything if he did
10      for the music.
11  Q.  You still had the music going?
12  A.  Yes, sir.
13  Q.  Could you tell that he was trying to say
14      anything to you?  Could you see his lips
15      moving?
16  A.  I didn't have time to just lock on to what
17      he was saying, lips moving, because I'm
18      watching traffic and watch the incident.
19      All I did is glance.  When the car pulled
20      up beside me, I glanced, put my eyes back
21      on the highway and kept driving.
22  Q.  You just said watching traffic.  Are there
23      cars coming now?

Page 56

1   A.  No cars coming, but I'm looking for a car.
2   Q.  So still y'all are the only two vehicles on
3       the road?
4   A.  Yes, sir.
5   Q.  Describe that weapon that you saw for me.
6   A.  I can't describe it.  All I know is I saw a
7       weapon.  I don't know what brand --
8   Q.  Was it a knife?  A gun?
9   A.  A gun, yeah.  A gun.
10  Q.  Was it black?  Shiny?
11  A.  It was black.
12  Q.  Big gun?  Little gun?
13  A.  I don't know.  I can't lock in on the
14      size.  I glanced at the weapon I saw.
15  Q.  Was it pointed at you?
16  A.  I can't say that it was pointed at me.  All
17      I seen was a hand gesture going like to
18      pull over or whatever.
19  Q.  He was gesturing with the gun?
20  A.  That's what I saw.
21  Q.  Did you say anything to him?
22  A.  I didn't say anything else.  I was still
23      just driving.

Page 57

1　Q.　While all this was going on up to this
2　　　point, what's Kevin doing?
3　A.　Sitting in the seat asking me, Cuz, who is
4　　　this trying to run us off the road? I tell
5　　　him I don't know; looks like somebody
6　　　trying to rob us; I'm not going to stop.
7　　　He was scared.
8　Q.　Well, I understand that you were driving
9　　　the vehicle. Was he watching them?
10　A.　He wasn't watching them. He was just aware
11　　　of what was going on.
12　Q.　Did he tell you at some point that the
13　　　police were behind you?
14　A.　He didn't tell me that.
15　Q.　He did not tell you that?
16　A.　No, sir.
17　Q.　Well, did he ever tell you to pull over at
18　　　any time?
19　A.　He didn't tell me to pull over. He's
20　　　asking me who is this and what they trying
21　　　to do. He just said, it looked like
22　　　they're going to run us off the road and
23　　　kill us if we don't pull over.

Page 58

1　　　　(Defendant's Exhibit 6 was marked
2　　　　　for identification.)
3　Q.　Let me show you what we'll mark as
4　　　Defendant's Exhibit 6. Let me give you
5　　　just a minute to look at Defendant's
6　　　Exhibit 6.
7　　　　(Brief pause.)
8　Q.　Had you ever seen that document before
9　　　today, Mr. Marshall?
10　A.　I have.
11　Q.　When did you get a chance to see that
12　　　document?
13　A.　When we turned the information over.
14　Q.　Those initial disclosures; is that right?
15　A.　Yeah.
16　Q.　Now, this is a statement that Kevin gave to
17　　　the police that day. And in it he says
18　　　that he saw that it was the police and he
19　　　advised you to pull over. Is it your
20　　　testimony that he didn't tell you to pull
21　　　over?
22　A.　He didn't tell me to pull over, because by
23　　　the time we both realized it was the police

Page 59

1　　　we already had been spun off the road
2　　　before we realized who it was.
3　Q.　Now, you still had the music going pretty
4　　　good at that time?
5　A.　The music was going until Chris West turned
6　　　it off.
7　Q.　Is it possible that you just didn't hear
8　　　what Kevin was saying to you because of the
9　　　music?
10　A.　It's possible.
11　Q.　All right. How long did they stay up
12　　　alongside of you the second time?
13　A.　Still approximately 10 seconds.
14　Q.　Did you see a blue light this time?
15　A.　I didn't see a light.
16　Q.　Did you see a badge?
17　A.　I didn't see a badge either.
18　Q.　And you told me before that they were
19　　　wearing black T-shirts. Did those black
20　　　T-shirts have any writing on them?
21　A.　Not that I can recollect. I just seen it
22　　　was black T-shirts.
23　Q.　What did they do after that 10 seconds of

Page 60

1　　　being alongside of you?
2　A.　Veered back behind me and trailed me
3　　　approximately another mile and a half or
4　　　two and they started to ram the vehicle.
5　Q.　Between the time that they pulled back
6　　　behind you and as you described the ramming
7　　　started, did you get a chance to look in
8　　　your rear view mirror at them?
9　A.　I didn't look in the mirror.
10　Q.　You didn't look again?
11　A.　(Witness shakes head.)
12　Q.　So you couldn't see anything that they were
13　　　doing back there?
14　A.　I don't know what they was doing.
15　Q.　Let me back up again to the second time
16　　　they were beside you. I might have asked
17　　　you this before. If I did, I apologize.
18　　　Did you say anything to the passenger that
19　　　second time?
20　A.　No, sir.
21　Q.　Make any motions to him?
22　A.　I don't remember making any motions. I
23　　　just remember glancing at him and keep

Page 61

1    driving.
2    Q.  While all this was going on, where was this
3        gun that's in Defendant's 3?
4    A.  Laying on the seat.
5    Q.  About where it is in Defendant's 3?
6    A.  Approximately somewhere.
7    Q.  Let me show it to you again.  And is
8        that -- you can see in the left-hand side,
9        is that the steering wheel?
10   A.  Yes, sir.
11   Q.  So it's -- is it fair to say that it's
12       fairly close to the driver?
13   A.  Yes, sir.
14   Q.  Was that gun just out in the open like
15       that, or was it tucked up under you
16       somehow?  How was that gun?
17   A.  It was down between the seat.
18   Q.  What do you mean down between the seat?
19   A.  Approximately somewhere around here where
20       it wouldn't be sliding.  It was laying
21       there.
22   Q.  You're pointing to the right-hand side what
23       looks like seat belts.  Are those seat

Page 62

1    belts there?
2    A.  Yeah.
3    Q.  Those little black things on the right-hand
4        side?
5    A.  Uh-huh (positive response).
6    Q.  So was it -- How was it in there?  You've
7        got it barrel down.  Describe for me how
8        it's in between the seats there.
9    A.  I'm certain the barrel was in there so it
10       wouldn't be moving pointing toward the --
11       back in the seat.
12   Q.  Did you touch the gun at any time while
13       this pursuit was going on?
14   A.  I don't know.  I probably touched it if it
15       was moving or whatever, but I didn't reach
16       for it or nothing.
17   Q.  Was the gun loaded?
18   A.  Yes, sir.
19   Q.  What kind of gun is that?
20   A.  .357.
21   Q.  Do you know what kind of bullets were in
22       it?
23   A.  .357 hollow points.

Page 63

1    Q.  At any time during this pursuit did you
2        pick that gun up?
3    A.  No, sir.
4    Q.  So it's just there kind of tucked down in
5        the seat?
6    A.  Yeah.  Until they was ramming.  It probably
7        was moving when they was ramming the
8        vehicle.  That's probably about the only
9        time I probably touched it.
10   Q.  Did the gun move at any time during the
11       pursuit?  Did it stay here until the
12       ramming started?
13   A.  I'm quite sure it did.  But when they was
14       ramming the car, my head was jerking.  I'm
15       quite sure it was moving along with
16       everything else on the seat.
17   Q.  Let's talk about the ramming.  Describe for
18       me what you mean when you say they rammed
19       you.
20   A.  Like I say, after they pulled beside me for
21       the second time, they veered back behind me
22       approximately a mile and they started
23       hitting -- hitting the back end of my

Page 64

1    vehicle like two or three times.  Each time
2    it was knocking the car in a wiggling
3    motion off the highway.
4    Q.  How fast were you going at that point?
5    A.  Initially I probably was going about 55
6        until they started ramming me and I was
7        losing control of the car and I slowed down
8        approximately about 35, 40 miles an hour
9        because I didn't want the car to flip out
10       of control.
11   Q.  What part of their car was striking your
12       car?
13   A.  I would have to say their bumper to
14       bumper.  I wasn't aware of the ramming
15       until I was hit.
16   Q.  Okay.  Was it -- And when you say ramming,
17       were they hitting you center on; or were
18       they off to one side or the other?  How was
19       that?
20   A.  They were hitting me center on up until the
21       point where they spinned me out.  And
22       that's when they hit me on the driver's
23       side bumper and spinned me out of control.

Page 65

1   MR. WILFORD: Let's take a quick
2       break. We've been going for
3       an hour.
4       (Brief recess was taken.)
5   Q. Okay. When we broke, Mr. Marshall, we were
6       talking about the ramming had begun. About
7       how many times did the Lincoln come into
8       contact with your car?
9   A. First ramming I'm quite sure he rammed me
10      twice -- two or three times. Made the car
11      sort of lose control and then I regained.
12  Q. That's what I want to do. I want to take
13      them one by one so you can tell me what
14      happened each time he made contact with
15      you. The first time that he hit you, was
16      that, again, head-on his front to roughly
17      the center of your bumper; is that right?
18  A. Yes, sir.
19  Q. And how fast were you going at the time
20      when he first hit you?
21  A. I may have been going approximately 45 to
22      55 miles an hour at the first ramming.
23  Q. What did you do when you felt the impact?

Page 66

1   A. Well, on impact it jerked my neck and for a
2       brief moment I lost control of the car like
3       swerved from the ramming. And I looked in
4       the mirror at this time to see what was
5       going on, but I still couldn't see what
6       they was doing back there. I drove
7       approximately another quarter mile.
8   Q. Hang on just a second. You said you looked
9       back in the rear view mirror. About how
10      long did you look?
11  A. Just a glance up after they rammed.
12  Q. Could you see what they were doing?
13  A. No. I couldn't make visual what they were
14      doing.
15  Q. Did you see a blue light?
16  A. No, sir.
17  Q. Did you see any badges?
18  A. No, sir.
19      COURT REPORTER: Can I stop for
20      two seconds?
21      MR. WILFORD: Sure.
22      (Brief pause.)
23  Q. All right. After you got control of the

Page 67

1       car after the first hit, what, if anything,
2       did you do?
3   A. Continued to drive.
4   Q. Did you slow down or speed up?
5   A. Yeah. I slowed down.
6   Q. How slow did you get down to?
7   A. Probably I want to say around 30, 35 miles
8       an hour.
9   Q. Did you make any moves to pull the vehicle
10      off the road?
11  A. No.
12  Q. You said your neck got jerked around. Did
13      you come in contact with anything in the
14      car?
15  A. Not -- At that time I didn't.
16  Q. How long did you drive at 35 miles an hour
17      before something else happened?
18  A. Approximately 10 seconds and got rammed
19      again.
20  Q. So this would be ram number two; correct?
21  A. Yes, sir.
22  Q. How did he hit you that time?
23  A. Same way, bumper.

Page 68

1   Q. Center on?
2   A. Yes, sir.
3   Q. Do you have any estimate of how fast they
4       were going? Let's go back to the first
5       time he hit you. Do you have any idea how
6       fast he was going when he hit you?
7   A. I would estimate not too much faster than
8       me, because they were riding my bumper the
9       whole time.
10  Q. So he couldn't have accelerated too much
11      before he came in contact; right?
12  A. I guess not.
13  Q. What about the second time, do you have any
14      idea how fast he was going?
15  A. I can't approximate how fast he was going.
16      I just know the impact was variably the
17      same.
18  Q. Did he stay on your bumper between the
19      first and the second impact?
20  A. After the first impact I don't think he was
21      riding my bumper as close. Because like I
22      say, I sort of lost control. He probably
23      fell back a little until I regained control

Page 69

1    and then I felt the ram again.
2    Q.  About how far did he fall back?
3    A.  I can't say how far because I really didn't
4        look back.  I just know I was swerving and
5        I'm quite sure he wasn't on my bumper while
6        I'm swerving.
7    Q.  Right.  When you did that glance into the
8        rear view mirror, though, about where was
9        he?  Was he still back on your bumper?  Had
10       he fallen back?
11   A.  No.  He had fell back approximately 20, 30
12       yards after he first bumped me.
13   Q.  All right.  So the second impact was about
14       as hard as the first impact; right?
15   A.  Yes, sir.
16   Q.  What happened immediately after the second
17       impact?
18   A.  Immediately after the second impact, the
19       car veered a little more, and immediately
20       following that that's when he bumped it
21       again on my driver's side bumper and
22       spinned me out of control.  That's when my
23       head hit the steering wheel.  I snatched

Page 70

1    the vehicle.  It jumped Highway 21 and
2    landed on the opposite side of the highway
3    in a ditch on a spinout.
4    Q.  Okay.  So you're saying that the hit where
5        he spun you out came fairly quickly after
6        the second ram; is that right?
7    A.  Yes, sir.
8    Q.  Were you still going about 35 miles an hour
9        when the spinout hit occurred?
10   A.  Yes, sir.  Approximately.
11   Q.  Were you able to take any kind of
12       corrective action with the car between the
13       time of the second hit and the spinout hit?
14   A.  After he rammed me the second time, like I
15       say, I guess because I wasn't going as
16       fast, the car just like jerked.  And before
17       I can regroup, he had hit me again on the
18       bumper.  And that's when I spinned out
19       toward the bluff.  My head hit the steering
20       wheel.  Knowing it's a deep bluff right
21       here, I snatched the steering wheel, and
22       all I know the car jumped or skid across
23       Highway 21.  Because when my head came up,

Page 71

1    I was on the opposite side of the road in a
2    daze.  By the time I opened the car door
3    they was already out of their vehicle with
4    guns drawn.
5    Q.  Let's talk about your head hitting the
6        steering wheel.  What part of your head hit
7        the steering while?
8    A.  My right -- left temple.
9    Q.  Right above your eye there?
10   A.  Yeah.  I've still got a knot up there from
11       it.
12   Q.  And you weren't wearing your seat belt at
13       the time; right?
14   A.  No, sir.
15   Q.  Was that from the second hit or the spinout
16       hit that sent your head into the steering
17       wheel?
18   A.  Had to be the spinout, because when he hit
19       me, it like threw me off the seat out of
20       control and I just snatched the wheel and
21       the car just went where it went.
22   Q.  So it went all the way across the oncoming
23       lane; is that right?

Page 72

1    A.  Yeah.  It went -- When he spinned me out,
2        the car went off the bluff toward the bluff
3        to the right of the road on two wheels.  I
4        snatched it and all I can remember is it
5        clearing the highway or whatever.  I ended
6        on the opposite side of the road facing the
7        way we just came.
8    Q.  So you went off to the left from your
9        direction of travel; is that right?
10   A.  That's where --
11   Q.  Your car went to the left?
12   A.  That's where it landed.
13   Q.  Your initial direction of travel?
14   A.  Yes, sir.
15   Q.  And the stereo was still going the whole
16       time; right?
17   A.  Whole time.
18   Q.  Between the first time that you were hit
19       and what we're calling the spinout hit
20       here, did Kevin say anything to you that
21       you heard?
22   A.  No, sir.
23   Q.  Do you recall saying anything?

Page 73

1   A.  I was probably mumbling to myself, they're
2       trying to kill me, what they doing,
3       something to that effect.
4   Q.  Did you ever think to pick up that gun and
5       defend yourself with it?
6   A.  No, sir.
7   Q.  Did you have a cell phone with you that day?
8   A.  I'm quite sure I did.
9   Q.  Do you remember what the phone number was?
10  A.  I don't remember.
11  Q.  Did you try to call anybody?
12  A.  No, sir.  I didn't have time.
13  Q.  That's a good point.  From the time that
14      you saw that Lincoln break back on County
15      Road 7 until the time that you came to a
16      stop on Highway 21, how much time had
17      passed?
18  A.  If I had to estimate, I'd approximately say
19      anywhere from five to 10 minutes.
20  Q.  Did Kevin have a cell phone?
21  A.  No, sir.
22  Q.  All right.  So in that entire five- to
23      10-minute period, you never picked up the

Page 74

1       phone to make a call?
2   A.  No, sir.
3   Q.  Never thought to call for help?
4   A.  It's a panic situation.  You think you're
5       getting robbed.  You ain't got time to call
6       for no help when I'm driving.
7   Q.  The entire time that passed between the
8       first time that you were hit until you were
9       spun out, were there any vehicles on the
10      road besides yours and the Lincoln?
11  A.  I didn't meet any traffic on County Road 7,
12      and I don't recall meeting any traffic on
13      County Road 21 until after the incident was
14      over.
15  Q.  Did you throw anything out the window at
16      any time?
17  A.  The only thing I had in my hand was a
18      cigarette butt.  I was smoking previous to
19      the whole incident.  If anything was
20      thrown, it had to be a cigarette butt
21      because I didn't have anything else.
22  Q.  Where did you throw that cigarette butt
23      out?  Was it on County Road 7 or Highway

Page 75

1       21?
2   A.  Probably had to be on Highway 21.
3   Q.  What is this area here in this intersection
4       of 7 and 21 like?  Is it built up?  Are
5       there a lot of buildings?  Is it wooded?
6       Give me an idea of what the area around
7       there looks like.
8   A.  This area where --
9   Q.  I tell you what.  Let's start on County
10      Road 7 from basically where you turned off
11      on 16 up to 21.  Are there any houses or
12      churches or anything like that there?
13  A.  Well, after coming through what's called
14      the swamp on County Road 16, swampy area,
15      no houses.  I don't know what's in the
16      woods.  No houses.  Two bridges.  On County
17      Road 7 there's a church right to your
18      left.  As soon as you turn onto it there's
19      a church.
20  Q.  At the intersection of 16 and 7?
21  A.  Yeah.  That's the intersection.  It's a
22      church there.  And immediately turning on
23      County Road 7 I know there's a house and

Page 76

1       another house or two on your left.  And
2       after that --
3   Q.  Is this as you're traveling towards 21 that
4       you're describing for me?
5   A.  Immediately turning onto County Road 7
6       approximately a quarter mile you'll run up
7       on a house and a trailer and approximately
8       two houses on your left.  Then it's just
9       another wooded stretch and a bridge.
10  Q.  What about on 21 where you turned right
11      there, what's the area like around there?
12  A.  It's a caution light.  It's a big -- two
13      big ponds and used to be a junkyard.  Guy
14      owned a big house on the hill up from the
15      ponds and probably two older model houses
16      on your left.  Then you've got a another
17      stretch -- bridge and stretch or whatever.
18  Q.  Any churches or anything like that around
19      there?
20  A.  Not right there on Highway 21.  Not right
21      there.
22  Q.  Any gas stations or stores?
23  A.  Yeah.  There's a store probably a quarter

Deposition of Richard Marshall

---

Page 77

1    mile to your left from the caution light.
2    Q.   Going back to Braggs?
3    A.   Yeah.  Going back towards Braggs.
4         Community store right there.
5    Q.   What about in the direction that you
6         traveled on 21, are there any stores or gas
7         stations or anything like that?
8    A.   The direction I traveled that day going
9         home?
10   Q.   Yes, sir.
11   A.   No gas station.  No store.
12   Q.   And your house is on Highway 21?
13   A.   Right off the dirt road.  Turn right off of
14        21.
15   Q.   About how far back off of 21?
16   A.   Just a couple hundred yards.
17   Q.   Are there any other houses around that one?
18   A.   Yeah.  It's a couple houses right at the
19        caution light about a quarter -- about 2,
20        300 yards from where I live, caution light,
21        and there's a couple more residences in the
22        area.
23   Q.   Is that a different caution light than the

---

Page 78

1    one you've been telling me about on 7/21?
2    A.   Yeah.
3    Q.   So that's further on down?
4    A.   Yeah.  Right down from my home there's
5         another caution light right down there.
6    Q.   You're pointing right about where 21
7         intersects the Lowndes/Wilcox County line.
8    A.   Yeah.
9    Q.   I'm just trying to describe for the record
10        where you were pointing.
11   A.   Wilcox County line actually was about a
12        mile from the --
13   Q.   From your home or from where you wound up?
14   A.   From my home.
15   Q.   How far were you from your home when you
16        were spun out?
17   A.   Approximately a mile.
18   Q.   Did your car hit anything when it was spun
19        out other than the Lincoln?
20   A.   Probably embankment is all I can say.
21   Q.   Didn't hit a mailbox or --
22   A.   No.  It's no mailbox in the area.
23   Q.   And we showed you already Defendant's

---

Page 79

1    Exhibit 2.  Is that where your car came to
2    rest?  Does that depict where your car came
3    to rest after being spun out?
4    A.   Yes, sir.
5         (Defendant's Exhibits 7 and 8 was
6          marked for identification.)
7    Q.   I'm going to show you a couple more
8         pictures here.  I want to show you what
9         we're going to mark as Defendant's 7 and 8
10        and let you and your lawyers take a look at
11        those pictures.  Now, do those pictures
12        also show the way your car wound up on
13        Highway 21 on June 28th, 2005?
14   A.   Yes, sir.
15   Q.   And we can also see another car in
16        Defendant's 7 and 8.  Is that the Lincoln
17        that you've been describing?
18   A.   Yes, sir.
19   Q.   Is that how the Lincoln wound up after you
20        were spun out?
21   A.   They pulled down in the direction.  They
22        pulled off the road in front of me.
23   Q.   And then they turned around and came back;

---

Page 80

1    is that right?
2    A.   No.  They pulled down after -- This is
3         where I landed.
4    Q.   Right.
5    A.   And by the time my head is up off the
6         steering wheel, my door -- they had already
7         pulled down and standing in the doorway
8         with guns drawn.
9    Q.   That's -- Actually you make a good point
10        there.  Let me -- Did you see what happened
11        to the Lincoln after it made contact --
12        made the contact with your vehicle that
13        spun you out?
14   A.   No.  Once I went spinning, I didn't see
15        anything else until the car came to rest.
16        And like I say, my head hit the steering
17        wheel.  I had like a daze.  And when I
18        leaned back and opened my eyes, the Lincoln
19        was pulling down right there and they
20        jumped out of the car with pistols drawn.
21        I didn't have an opportunity to get out.  I
22        just opened the door and they was already
23        up.

---

Page 81

1   Q.   So you saw the Lincoln -- I want to make
2        sure I got you right.  You saw the Lincoln
3        come to that position that we see it in in
4        Defendant's 7 and 8; is that right?
5   A.   Yeah.  I saw it pull down.
6   Q.   And is that where that car was when, as you
7        described, they got out with their guns
8        drawn?
9   A.   Yes, sir.
10  Q.   So the two cars in 7 and 8 are where they
11       were at that time that they got out and
12       drew down on you; is that right?
13  A.   Yes, sir.
14  Q.   Defendant's Exhibit 7, that's the rear of
15       your car; correct?
16  A.   Yes, sir.
17  Q.   What is that license plate?
18  A.   BRich3.
19  Q.   That's a personalized plate; is that right?
20  A.   Yes, sir.
21  Q.   Did you select that?
22  A.   Yes, sir.
23  Q.   What does that mean?

Page 82

1   A.   Just a nickname.  I had the same license on
2        two other vehicles.  That's just the third
3        vehicle I had purchased.  I had another
4        Nova.
5   Q.   So your nickname is B Rich; is that right?
6   A.   Uh-huh (positive response).
7   Q.   Where does that come from?
8   A.   Just a nickname.  Gained a little weight
9        over the years.  People started calling me
10       Big Rich.  I used to be a skinny guy.
11  Q.   I got you.  So the Rich is short for
12       Richard?
13  A.   Yeah.
14  Q.   I got you.  So you at some point had
15       vehicles that had BRich1 and BRich2 on
16       them?
17  A.   Yeah.
18  Q.   When you hit your head on the steering
19       wheel, did it get cut?
20  A.   No, sir.  Just a knot.
21  Q.   All right.  You saw the Lincoln pull up to
22       where we see it on 7 and 8 and they got out
23       with guns drawn.  Did both officers get out

Page 83

1        with guns drawn?
2   A.   Yes, sir.
3   Q.   You saw the guns, then, at that time?
4   A.   Yes, sir.
5   Q.   Now, when they got out -- and I want to
6        make sure I understood what you told me --
7        were you still inside the car or had you
8        gotten out?
9   A.   No.  I hadn't gotten out.  When they was
10       rolling up and jumped out of the car with
11       guns, I hadn't had an opportunity to get
12       out.  I had opened the door, but like I
13       say, I was in a daze.  And I got out of the
14       car after that and that's when they started
15       yelling commands.  At that time is where I
16       seen a shield or whatever they had hanging
17       around their neck.
18  Q.   Both of them?
19  A.   Well, I know I saw the passenger because he
20       was more out, which was Chris West.  He was
21       on the passenger's side at this time.  I
22       really couldn't see what Mr. Hutson had on.
23  Q.   Chris West was on the passenger side when

Page 84

1        you saw him?
2   A.   Yeah.
3   Q.   And where was Hutson?
4   A.   On the other side of the door.
5   Q.   On the driver's door?
6   A.   Uh-huh (positive response).
7   Q.   Did you see how they got to that position?
8        Because I think you told me earlier that
9        Chris was driving.
10  A.   No.  I didn't say he was driving.  I said
11       that they got out with their guns drawn.  I
12       never said Chris was driving because Shawn
13       Hutson was on the passenger side.  But all
14       I knew is when I leaned up Chris West was
15       on this side of the car because he's the
16       one that took me down.  Shawn Hutson was on
17       the other door.
18  Q.   Okay.  I'm a bit confused here, so we've
19       got to get this right.  When the car pulled
20       up alongside of you twice, it was Shawn
21       Hutson who was gesturing at you to pull
22       over; right?
23  A.   Yeah.

Deposition of Richard Marshall

---

Page 85

1  Q.  And he was on the passenger's side; right?
2      Is that right?
3  A.  I understood it to be him. I know it was a
4      skinnier guy.
5  Q.  I understand you didn't know him at the
6      time.
7  A.  Uh-huh (positive response).
8  Q.  And Chris and Shawn were the only two in
9      the Lincoln; right?
10  A.  Yes, sir. The only two.
11  Q.  So doesn't that basically mean that Chris
12      had to have been driving?
13  A.  Yeah. I guess he was driving, yeah.
14  Q.  So let me go back to my question. Did you
15      see how it was that Chris wound up on the
16      passenger's side of the car after you were
17      spun out and Shawn wound up on the driver's
18      side?
19  A.  I didn't see that, but it was Chris West
20      that was on the passenger's side with the
21      gun on me.
22  Q.  And you said you saw the shield on Shawn;
23      is that right?

---

Page 86

1  A.  Saw the shield on Chris. I really couldn't
2      see --
3  Q.  Keep me straight. Shield on Chris. Did
4      you get out of the car on their command or
5      on your own?
6  A.  Well, after -- Like I say, they was already
7      out. They may have commanded me, but I was
8      dizzy in the head. I got out of the car
9      and stood in the door with my hands up.
10      And I was asking them what's going on, and
11      they were just telling me, get on the
12      ground, get on the ground, get on the
13      ground.
14  Q.  So you could hear them now; right?
15  A.  Yeah. I could hear them.
16  Q.  Music still going?
17  A.  Still going.
18  Q.  But now you can hear them?
19  A.  Yeah. I'm out of the car.
20  Q.  At this time is the gun that was in your
21      car where it is in Defendant's 3?
22  A.  Yes, sir. It was laying there.
23  Q.  Just like that?

---

Page 87

1  A.  (Witness nods head).
2  Q.  When they told you to get on the ground,
3      did you get on the ground?
4  A.  No, sir.
5  Q.  Why did you not get on the ground?
6  A.  Because I was agitated. I didn't know what
7      was going on, why this was happening. But
8      I still had my hands on top of the door
9      letting them know I wasn't posing a threat,
10      but I just didn't feel like getting on the
11      ground at the time.
12  Q.  Did you say anything to them?
13  A.  I'm quite sure I did.
14  Q.  What did you say?
15  A.  Why y'all doing this, what's going on,
16      something to that effect, what's this all
17      about.
18  Q.  At this point you'd seen the badge on
19      Chris; right?
20  A.  Yeah, I saw it.
21  Q.  So you knew they were police at this time;
22      right?
23  A.  I did.

---

Page 88

1  Q.  What did they say, if anything, when you
2      said what you said to them?
3  A.  Shawn Hutson, he wasn't focusing on me. He
4      didn't say anything. Chris West was just
5      saying get on the ground. He said a couple
6      of dirty words, too; get on the ground, get
7      on the ground, get on the ground. And he
8      just eased up on me and slammed me to the
9      ground.
10  Q.  You said Shawn wasn't focused on you. What
11      was he doing?
12  A.  He was more or less watching my cousin.
13  Q.  After y'all came to a stop, what did Kevin
14      do?
15  A.  I really couldn't tell you what he was
16      doing. I was focusing on them. After the
17      car came to a stop and they drawed out, my
18      attention was on them. So I really don't
19      know what he was doing.
20  Q.  Well, when was the next time that you
21      became aware of what Kevin was doing?
22  A.  When Shawn Hutson came around and got him
23      out of the car and put him in cuffs.

Page 89

1  Q.  Was that before or after Chris West had
2      approached you?
3  A.  He had already came along and subdued me.
4  Q.  Other than commanding you to get on the
5      ground initially, did Chris or Shawn say
6      anything else?
7  A.  At that time I can't recollect. Up until
8      the point where he -- Chris West put me on
9      the ground I can't recall anything they
10     said besides get down.
11 Q.  Did they identify themselves, DTF or
12     sheriff's department or anything like that?
13 A.  They didn't identify nothing.
14 Q.  Other than the badges that they had on --
15     well, the badge that Chris had on?
16 A.  The badge.
17 Q.  All right. You said Chris came and
18     approached you and you were still standing
19     up at that time; right?
20 A.  Yes, sir.
21 Q.  What happened when he got to you?
22 A.  He got to me, kick slammed me to the
23     ground.

Page 90

1  Q.  Describe that for me. You say kick slammed
2      you to the ground. How did that happen?
3  A.  I had my hands up right above my door. He
4      eased up on me with the gun drawn and he
5      got close enough until he grabbed me and
6      swept my feet with his feet and slammed me
7      face down on the ground. He put his foot
8      on my back and handcuffed me. Then he had
9      his foot on my neck.
10 Q.  He cuffed you behind your back?
11 A.  Yes, sir.
12 Q.  As he was approaching you, did he say
13     anything to you?
14 A.  I don't remember him saying anything but
15     just get down and he walked up on me.
16 Q.  Did you say anything back to him as he was
17     coming up on you?
18 A.  I didn't say anything then.
19 Q.  Did you ever at any time make any move back
20     inside that car?
21 A.  No, I didn't. I was standing in the car in
22     a daze and --
23 Q.  You said your hands were up on top of the

Page 91

1      car. Were they on top of the --
2  A.  Top of the door. I was standing in the
3      door with my hands like this (indicating)
4      so he can clearly see.
5  Q.  We're going to look at Defendant's 2
6      again. You can see here you've got both
7      the driver's side front and rear door
8      open. I'm sure the driver's side rear door
9      wasn't open while all this was going on;
10     right? That was later?
11 A.  Yes, sir.
12 Q.  Was the front door open about like it is --
13 A.  Yes.
14 Q.  -- while this initial confrontation between
15     you and the officers was going on?
16 A.  Yes, sir. I was standing in my doorway
17     with my hands up right here on top while
18     they was drawn and commanding me.
19 Q.  Did anybody give any commands to Kevin that
20     you heard?
21 A.  Like I say, I really can't recall any
22     commands being given to Kevin, because the
23     music is still loud and I'm just focusing

Page 92

1      on this gun is drawn on me and I can
2      clearly see what he's doing.
3  Q.  Now, at the point from where Chris drew
4      down on you until he came up on you, you
5      got a pretty good look at him; right?
6  A.  Uh-huh (positive response).
7  Q.  What else did he have on him, if anything,
8      as far as on his person? Did you see any
9      equipment belt or anything like that?
10 A.  Only thing I can recognize is he had on a
11     black T-shirt with the shield and he had on
12     regular short pants like I had on, tennis
13     shoes or something to that effect.
14 Q.  Did you see anything on his belt?
15 A.  I can't recall. I wasn't paying any
16     attention to that. All I was focusing on
17     was the gun on me.
18 Q.  From the time Chris initially yelled at you
19     to get on the ground until the time that he
20     approached you and as you said foot-swept
21     you and cuffed you, did he do anything else
22     that we haven't talked about?
23 A.  Not from the time he came from there and

Deposition of Richard Marshall

Page 93

1    foot-swept me on the ground he didn't.
2    Q.  After you were in cuffs and on the ground,
3    I think you told me earlier that's when
4    they cuffed Kevin; right?
5    A.  Yes.  Shawn Hutson went and pulled him out.
6    Q.  Were you able to see that --
7    A.  Yes.
8    Q.  -- from where you were?
9    A.  Yeah.
10   Q.  How were you -- Let's go back to
11   Defendant's Exhibit 2 again.  Once you were
12   cuffed and on the ground, can you show me
13   how you were laying by referencing
14   Defendant's 2?
15   A.  Well, when he foot-swept me and kicked me
16   on the ground, I was laying out toward --
17   like in this direction headed toward this
18   direction.
19   Q.  So you're out --
20   A.  Out from the door.
21   Q.  -- to the lower part of the picture
22   underneath the door -- the front door?
23   A.  Out from the door, yeah.

Page 94

1    Q.  Is that with your head facing back towards
2    Highway 21?
3    A.  My head is out this way where I can see
4    Highway 21 and I can see in my car.
5    Q.  Looking at Defendant's 2, where is the
6    Lincoln at?  Can you point for me the
7    general direction the Lincoln was in?
8    A.  The Lincoln was still up here at the front
9    where it was.
10   Q.  You're kind of pointing off to the
11   left-hand side of Defendant's 2 kind of in
12   the middle; is that right?
13   A.  Up in front of the vehicle where it was
14   resting on the other picture.  The Lincoln
15   was still there.
16   Q.  How did Kevin get out of the car?
17   A.  Shawn Hutson pulled him out of it.
18   Q.  I understand that.  But what side of the
19   car did he come out of?
20   A.  Passenger's side.
21   Q.  So Shawn came around to the passenger's
22   side of the car and took him out?
23   A.  Yes, sir.

Page 95

1    Q.  How did he take him out?  Describe that
2    process for me.
3    A.  Only thing I can see he grabbed him and
4    pulled him out of the car.
5    Q.  Was it through an open door or through the
6    window?
7    A.  The door.  The door was open.
8    Q.  And what did he do to him once he pulled
9    him out of the car?
10   A.  Put him in handcuffs and set him up there
11   on that hill.
12   Q.  Where we see him in Defendant's 7 and 8?
13   A.  Yeah.
14   Q.  Did he pretty much stay there for the rest
15   of the time until he was taken from the
16   scene?
17   A.  Yes, sir.
18   Q.  All right.  Once Kevin was cuffed, what
19   happened?
20   A.  Chris West got me up off the ground and put
21   me back upside my car door.  My back door
22   wasn't open at the time.  My back is
23   against my door and in cuffs, and he

Page 96

1    started asking me, you ain't seen the
2    badge, you ain't see this, you ain't see
3    that.  I said, man, I ain't seen nothing
4    but the gun.  He didn't like what I was
5    saying, so he grabbed my pants and he
6    shoved me against the car.  I said, man,
7    what you doing.  He started going in my
8    pockets.  I know he took my wallet out.  I
9    didn't even see him take the money out.  He
10   took my wallet out, open it up, throw it
11   inside my car on the seat.
12   Q.  Which seat?  The back seat or the front
13   seat?
14   A.  It was on the front seat.
15   Q.  Did we see your wallet in any of these
16   pictures?
17   A.  I didn't see it.
18   Q.  So he searched your pants?
19   A.  Yeah.  He put his hands in all my pockets
20   and he came out with the wallet and looked
21   in it.  And like I say, I didn't see him
22   come out with the money.  But I was still
23   standing there.  He was raving on about why

Page 97

1   I ain't stopped, this and that. I told him
2   I didn't know who he was; I thought you was
3   somebody trying to rob me. You know who I
4   was, this and that back and forth.
5   Q.  Let me stop you right there. Other than
6       your wallet -- You said you didn't see him
7       take the money out?
8   A.  I didn't see him take it out, but he put
9       his hand in the pocket where my money was.
10      I didn't see him take it out.
11  Q.  Did he take anything else out of your
12      pockets?
13  A.  Just my wallet in my sight. I saw him take
14      the wallet out and go through it and throw
15      it down.
16  Q.  Did he search any other part of your person
17      other than the pockets of your pants?
18  A.  He had -- Like I say, he had his hands
19      verbally in -- like in the belt part of my
20      pants and pulled them first like shoved me
21      against the car. Then he started searching
22      me. After that he went to the trunk of the
23      car and started tearing it up, opening it

Page 98

1   up.
2   Q.  Okay. About how long did his search of
3       your person take?
4   A.  I would approximately say 10 minutes.
5   Q.  10 minutes?
6   A.  Approximately. Because he went through the
7       trunk and everything.
8   Q.  I'm just talking about your person.
9   A.  Oh, me?
10  Q.  Yeah. Your person.
11  A.  Couple of minutes. Couple of minutes.
12  Q.  While this was going on, were you able to
13      see or hear what was going on with Kevin?
14  A.  No. I ain't heard -- As far as I know,
15      Shawn had placed him over there sitting
16      down. He wasn't going nowhere.
17  Q.  Was Shawn present while you were being
18      searched by Chris West?
19  A.  Yes, sir.
20  Q.  Was he standing there?
21  A.  He was more or less out around the Lincoln
22      Town Car around the vehicle. Chris was
23      searching me, searching the trunk or

Page 99

1   whatever. Shawn was more or less over by
2   the vehicle.
3   Q.  I'm just focusing on the time right now
4       while Chris was searching your person, not
5       the vehicle yet. Was Shawn standing
6       nearby?
7   A.  I can't recollect where he was then. I
8       know he had got Kevin out of the car and he
9       wasn't in our immediate space.
10  Q.  All right. Once he got done -- Once Chris
11      got done searching you, what did he do with
12      you, if anything?
13  A.  I was standing right there, as I say, in my
14      car door. The passenger rear door is still
15      closed. He wanted me to get in the back
16      seat of the car. I said, man, you see this
17      tight space; I can't get in there with my
18      handcuffs on; I'm a big guy; I can't get in
19      there. He got mad and grabbed me inside my
20      pants and rammed me against the car and he
21      snatched me back. That's when my pants hit
22      the ground off my leg because he busted the
23      zipper and the button. My pants was on the

Page 100

1   ground. I said, man, what you doing. I
2   said, you see I can't get in there; put me
3   in the patrol car or whatever you're going
4   to do. You're going to get in here; such
5   and such, such and such. So at this time
6   cars started coming up Highway 21. He
7   stopped doing what he's doing, went to the
8   Lincoln Town Car, reached in there, got a
9   light. He put the light on top of the
10  car. The light wouldn't even work. He
11  beat on the light three or four times
12  before the light started flashing. That's
13  how I was able to know there was no light
14  present throughout the whole incident. He
15  put the light on the car after he had did
16  all this and I'm watching him doing this.
17  Q.  You watched him take the light out of the
18      car and put it up on --
19  A.  I watched him reach inside the car and come
20      out with a light. He stuck it on top of
21      the car and he beat on it three times
22      before it even started flashing.
23  Q.  How much did you weigh in June of '05?

Page 101

1    A.  I was probably weighing about 275, 280 back
2        then.
3    Q.  How tall were you?
4    A.  5-9.
5    Q.  The shorts you were wearing that day, were
6        they tight on you?  Baggy?  Were you
7        wearing them low slung?
8    A.  Just snug fit, average fit.
9    Q.  Did you have a belt on?
10   A.  No belt.
11   Q.  You were wearing boxers underneath them; is
12       that right?
13   A.  Yes, sir.
14   Q.  You said the zipper broke on the shorts?
15   A.  The zipper bust and the button popped off,
16       because he stuck his hands in the inside of
17       my crotch and gripped the pants and forced
18       me back in the car while I'm already in
19       cuffs.  Then he choked me because I was
20       asking what he was doing.  I said, man,
21       what this all about.  When I wouldn't get
22       in the car -- That's what made me get in
23       the back seat of the car.  He verbally

Page 102

1        choked me until I couldn't breathe, and
2        that's when I subdued and got in the back
3        seat of the car.
4    Q.  Describe for me how he choked you.
5    A.  Doing the motion.  When he slammed me
6        against the car, I still wouldn't get in
7        the back seat of the car because I
8        couldn't -- it's a small car.  I know I
9        couldn't hardly get in there.  And I
10       wouldn't obey what he was doing.  He said,
11       you're going to get in the back seat of
12       this car because traffic coming at the
13       time.  He grabbed one hand on the back of
14       my neck some kind of full nelson choke and
15       my head was like this (indicating).  You're
16       going to get in the car.  That's what he
17       said.  You're going to get in there.  And
18       when I stopped -- couldn't breathe, I gave
19       up and crawled in the back seat of the
20       car.  You see my legs are still out.  I
21       couldn't get my whole body in there.
22   Q.  So he had one arm in the front of your neck
23       and one arm in the back of your neck; is

Page 103

1        that right?
2    A.  Full nelson, some type of chokehold.
3        That's all I know.  I can't describe
4        exactly how it was.  All I know I was being
5        choked.  He was in front of me and he was
6        choking me.  Cut my air off.
7    Q.  Once you got in the car, did he stop
8        choking you?
9    A.  He stopped choking me while I was still
10       standing there because I gave up
11       resisting.  I told him, okay, I'll get in
12       the car because I couldn't breathe.
13   Q.  So you agreed to get in the car and he
14       released his hold; is that right?
15   A.  Yes.
16   Q.  About how long were you in that hold?
17   A.  Long enough for my breath to get cut off.
18   Q.  Seconds?  Minutes?
19   A.  Seconds.  Wasn't no minutes.  Seconds.
20   Q.  10 seconds?  Five seconds?
21   A.  I don't know how many seconds.
22       Approximately five to 10 seconds.
23   Q.  We do see you in the car in these pictures;

Page 104

1        right?  Let's look at Defendant's 7.  Is
2        that you in the back seat of the car there?
3    A.  Yes, sir.
4    Q.  And Defendant's 8, is that you in the back
5        seat of the car?
6    A.  Yes, sir.
7    Q.  And I think you told me he searched your
8        car too.  Was that before or after he put
9        you in the back seat of your car?
10   A.  I know he searched it -- the inside part
11       with me standing right here just reaching
12       in.  I'm standing here.  He just reached in
13       and he got the keys out during that time
14       and he went to the trunk of the car, opened
15       it with the keys and started going through
16       the trunk while I was standing there.  And
17       he came back and slammed the trunk or
18       whatever and came back around.
19   Q.  At some point did he find the gun?
20   A.  Oh, he already saw the gun.
21   Q.  Tell me when you first became aware that he
22       was aware of the gun.
23   A.  After he had slammed me down on the ground

Page 105

1    and put me in cuffs they saw the gun,
2    because they was making little smart
3    comments about the gun on the seat and this
4    and that.
5  Q.  Who made the comment about the gun?
6  A.  Shawn Hutson. Oh, he got a big gun; oh, it
7    ain't no cheap gun either; all this and
8    that. I told them it's not my gun. That's
9    your gun? I said, it ain't my gun, man.
10  Q.  Had the radio been turned off at this
11    point?
12  A.  Chris West turned the radio down after he
13    put me in cuffs.
14  Q.  After he put you in cuffs?
15  A.  Yeah.
16  Q.  Is that about the same time that he found
17    the gun?
18  A.  Yeah. He saw the gun right after he
19    reached in the car or whatever.
20  Q.  Did he take the gun, did he move the gun,
21    or did he just leave it right there where
22    we see it?
23  A.  He left it right there.

Page 106

1  Q.  All right. Then he did a complete search
2    of your car; is that right?
3  A.  He went to the trunk. He already had
4    visually searched the little front part,
5    which is not too much concealed. He went
6    to the trunk and that's where he did most
7    of the searching, moving stuff doing this
8    and that, whatever he was doing back
9    there. He came back a little while where I
10    was.
11  Q.  Did he bring anything with him when he came
12    back up there where you were?
13  A.  No, sir.
14  Q.  Did he tell you that he had found anything?
15  A.  No, sir.
16  Q.  About how long did it take him to search
17    the car?
18  A.  I'd say the whole search probably I'd say
19    five to 10 minutes.
20  Q.  While Chris was searching the car, what was
21    Shawn doing?
22  A.  Shawn was back toward the Lincoln Town Car
23    and Chris made the statement about the gun

Page 107

1    or whatever. Then Shawn came over where he
2    was and they were making little small talk
3    about the caliber and the model of the gun
4    or whatever, this and that.
5  Q.  Any other conversation that you heard?
6  A.  No, sir. After that incident, Chris West
7    took me up there and put me on the hill
8    beside Kevin.
9  Q.  Took you back out of your car?
10  A.  Yes, sir.
11        (Defendant's Exhibit 9 was marked
12        for identification.)
13  Q.  I'm going to show you what we'll mark as
14    Defendant's Exhibit 9.
15  A.  Uh-huh (positive response).
16  Q.  Mr. Marshall, do you recognize what's in
17    Defendant's Exhibit 9?
18  A.  Appear to be some money.
19  Q.  Looks like it's on some carpet too; right?
20  A.  Appear to be.
21  Q.  Is that the same kind of carpet that you
22    have in your Nova?
23  A.  My Nova doesn't even have carpet in it, so

Page 108

1    I don't know what that is.
2  Q.  Did you have money like that that day, a
3    five and what looks like a bunch of ones?
4  A.  I had $500. If that's the money, I don't
5    know whose it is. It ain't mine. I had
6    two $100 bills and the rest in twenties.
7  Q.  So it's your testimony that that money
8    wasn't in your car that day?
9  A.  I can't say it wasn't in my car. It may
10    have been Kevin's money, but it's not mine.
11  Q.  So you don't recognize anything in
12    Defendant's Exhibit 9 at all?
13  A.  It's not my money.
14  Q.  That's not what I asked you. I understand
15    that you know that it's money. Do you
16    recognize what Defendant's Exhibit 9 shows?
17  A.  I don't recognize that.
18        (Defendant's Exhibits 10 and 11
19        were marked for identification.)
20  Q.  Mr. Marshall, I'm going to show you two
21    more pictures, Defendant's 10 and 11. Were
22    those pictures taken of you on June 28th,
23    2005?

Page 109

1  A.  Yes.
2  Q.  Is that what you were wearing at the time?
3  A.  Yes.
4  Q.  And that is you in those pictures; right?
5  A.  Yes.
6       MR. WILFORD:  Let's get something
7       to eat.
8       (Whereupon lunch recess was taken.)
9  Q.  (Continuing by Mr. Wilford)  Mr. Marshall,
10      you testified before we took a break that
11      at some point you were taken and put over
12      on the side of the hill there next to
13      Kevin; right?
14 A.  Yes.
15 Q.  What, if anything, happened after you were
16      put over there by Kevin?
17 A.  They ran my name, his name in and --
18 Q.  What do you mean they ran his name in?
19 A.  Warrant check or whatever, social security
20      number.  Ran both our names and --
21 Q.  Did any other police units arrive?
22 A.  Probably 30 to 45 minutes later they called
23      back to Hayneville for a sheriff's deputy

Page 110

1       vehicle.  It arrived, which I was placed
2       in.
3  Q.  I'm sorry I interrupted you.  So they
4       called his information in?
5  A.  Called both of us in.
6  Q.  Anything happen after they called that in?
7  A.  No.  We just was sitting there on the grass
8       and they was walking around talking among
9       themselves.  I heard them calling in for
10      the vehicle.
11 Q.  Did they call over a radio or cell phone,
12      or how did they do that?
13 A.  Over the dispatch (indicating).
14 Q.  You're doing --
15 A.  Police dispatch.
16 Q.  Over the radio?
17 A.  I saw them reach in the car, yeah.
18 Q.  Could you hear what they were saying?
19 A.  Only what I could make out of it my social
20      security number and name being called and
21      they was running or whatever over the loud
22      speaker.
23 Q.  And so you sat there on the side of the

Page 111

1       hill for 30 to 45 minutes before another
2       vehicle came?
3  A.  Yes.  Before the police vehicle came.
4  Q.  Anything else happen during that time
5       besides your information being called in?
6  A.  Not during that time I was sitting on the
7       hill.  Nothing happened then.
8  Q.  So nothing happened between that time and
9       the time that another police unit showed
10      up; is that right?
11 A.  No.  Nothing happened.  The only thing that
12      I forgot to leave out that happened is
13      backing up to when Chris West initially
14      drawed down on me he did fire his weapon in
15      my direction.
16 Q.  You forgot to mention that?
17 A.  Yeah.
18 Q.  Was that after you had a chance to talk to
19      your lawyers at lunchtime?
20      MR. LEWIS:  Object.
21 A.  I just --
22      MR. LEWIS:  Don't discuss anything
23      that you and I might have

Page 112

1       talked about.
2  Q.  I'm not asking about the substance of the
3       conversation.  I'm just -- Were you
4       reminded of it at lunchtime?
5  A.  No, I wasn't reminded of it.
6  Q.  Well, what happened with this shooting?
7  A.  It just -- That's the first thing -- After
8       he drew down, he fired the weapon before
9       coming to approach me.
10 Q.  Before who approached you?
11 A.  Before he approached me he had already
12      fired the weapon.
13 Q.  Let's back up, then, and as you say
14      completely regroup.  He got out of the car
15      and he had his weapon pointed at you; is
16      that right?
17 A.  Yes, sir.
18 Q.  Did he give you commands?
19 A.  He said get on the ground or something to
20      that effect.
21 Q.  And you didn't comply with those commands.
22      You told me that earlier; right?
23 A.  No, I didn't comply.

Page 113

1  Q.  So you were still standing there?
2  A.  In the doorway, yeah.
3  Q.  In the doorway of the car?
4  A.  Uh-huh (positive response).
5  Q.  And he fired?
6  A.  Yeah.
7  Q.  This was after giving you commands and you
8      not complying; right?
9  A.  Yeah.  He had given some kind of command.
10  Q.  And you hadn't complied?
11  A.  No.
12  Q.  Where did he shoot?
13  A.  Right out -- if I may.
14  Q.  Sure.
15  A.  In this general direction (indicating).
16  Q.  We're looking at Defendant's Exhibit 2.
17  A.  Right down past the doorway.
18  Q.  You're making a pretty broad motion there.
19  A.  I'm standing in the doorway, but he fired
20      right out from -- past the doorway in this
21      direction down --
22  Q.  Towards the front of your car or --
23  A.  I heard the bullet hit the ground.  I heard

Page 114

1      the gunshot.  It hit the ground somewhere
2      in this direction.  He fired down there.
3  Q.  Did the bullet strike the ground in front
4      of you or off to the side of you?
5  A.  I can't say exactly where it struck,
6      gunfire.  But I did hear it hit the ground
7      in this area right here.  I heard it.
8  Q.  How many times did he shoot?
9  A.  One shot.
10  Q.  And did you comply with his commands after
11      he shot at the ground?
12  A.  I still had my hands up over the vehicle.
13      I asked him, why are you shooting at me,
14      what are you doing, and he was just still
15      saying, get on the ground, this or that,
16      get on the ground.  That's when he was
17      walking up on me.
18  Q.  Okay.  So this man just fired a round at
19      your feet?  This man that you know to be a
20      police officer and you still didn't do what
21      he said?
22  A.  He fired at me, but I didn't -- like I
23      said, I didn't run out to jump on the

Page 115

1      ground.  I've been arrested before.  That's
2      why I had my hands up to show I wasn't
3      posing a threat.  But I didn't see any
4      reason why he had to fire at me.
5  Q.  Well, when you were arrested before, did
6      you do what the police told you to do?
7  A.  Yeah.
8  Q.  And you have no idea where the round hit
9      the ground other than it was generally
10      somewhere out in front of your car on the
11      passenger's side?
12  A.  I can't specifically say where it hit, but
13      I know it was right in the direction of the
14      front driver's door somewhere before the
15      end of the car.  I heard it hit the ground
16      when he shot.
17  Q.  Did it kick up any dirt or grass or
18      anything like that?
19  A.  Just like (indicating) quick.
20  Q.  Did any of it hit you?
21  A.  No.  Didn't no dirt or -- it didn't hit me.
22  Q.  All right.  Up until the point that another
23      police vehicle arrived, have you told me

Page 116

1      everything that happened out there after
2      you were put on the side of the road?
3  A.  Yeah.  Up until he placed me beside Kevin.
4      The only other thing happened is the
5      vehicle pulled up and they placed me in
6      that vehicle and put Kevin in the Lincoln
7      Town Car.
8  Q.  Let's talk about -- How many other vehicles
9      showed up?
10  A.  Just one.
11  Q.  What kind of car was it?
12  A.  Brown Ford Crown Vic, county sheriff.
13  Q.  It was a county sheriff's vehicle?
14  A.  Yeah.
15  Q.  All right.  Do you know -- How many
16      officers showed up in that car?
17  A.  One officer.
18  Q.  Do you know the name of that officer?
19  A.  No, I don't.
20  Q.  Can you describe him for me?
21  A.  Appeared to be a younger white guy, kind of
22      stocky build, Army cut.
23  Q.  And you were placed in the back of his car?

Page 117

1    A.   Yes, sir.
2    Q.   When did that occur?  Was it right after he
3         arrived, or how much time passed?
4    A.   Well, I'll say approximately 10 minutes, 15
5         minutes max after he arrived after they
6         figured out who was going to get in what.
7         The guy placed me in the back of the county
8         sheriff car and placed Kevin in the front
9         seat of the Lincoln Town Car.  And Shawn
10        Hutson drove off in my car.
11   Q.   You watched him drive off in your car?
12   A.   Uh-huh (positive response).  He left first.
13   Q.   You were still there on the scene?
14   A.   Uh-huh (positive response).
15   Q.   How long did you stay there on the scene
16        after your car was driven off?
17   A.   Approximately five minutes.
18   Q.   Did anything happen during that five
19        minutes?
20   A.   No.  I just was driven off by the county
21        deputy sheriff.
22   Q.   Did you leave first, or did Chris leave
23        first?

Page 118

1    A.   Shawn Hutson left first.
2    Q.   Yeah.  We established that.
3    A.   Then I left in the deputy sheriff car.  And
4         we only went halfway up 21 when they
5         stopped and got out of the car and started
6         looking for something.  Shawn Hutson turned
7         around in my vehicle and came back and
8         stopped and got out with Chris West walking
9         down 21 appeared to be looking for
10        something.  I was in the county sheriff
11        car.  Kevin was in the Lincoln Town Car
12        behind us.
13   Q.   All right.  Where did you stop?  Was it
14        before County Road 7 or after County Road
15        7?
16   A.   On Highway 21 right up the road.  After
17        turning on Highway 21, they stopped right
18        there and -- all three vehicles.
19   Q.   I understand it was on Highway 21.  I'm
20        just trying to figure out.  Let's go back
21        and look at Defendant's Exhibit 5.  About
22        where on County Road 21 did they stop and
23        look?

Page 119

1    A.   This would be 263 crossing.
2    Q.   Right.
3    A.   I would say somewhere in here right down
4         from the turn on County Road -- off County
5         Road 7 on 21.
6    Q.   Looks like you're kind of pointing -- and
7         correct me if I'm wrong -- about halfway
8         between County Road 7 and your home on
9         Highway 21.
10   A.   Right off County Road 7 probably a couple
11        hundred feet.  That's where they stopped.
12   Q.   Did they find anything?
13   A.   Not to my knowledge.  I didn't see them
14        find anything.
15   Q.   Has it come to your attention at some point
16        later that they found anything?
17   A.   It was said that he picked a baggy up
18        beside the road or something.
19   Q.   Did you ever see the baggy?
20   A.   No, sir.
21   Q.   How long did it take them to search on the
22        side of Highway 21?
23   A.   I'll say approximately 15 minutes or so.

Page 120

1    Q.   Was Kevin there, too, in their car?
2    A.   He was in the Lincoln.
3    Q.   What happened after they got done
4         searching?
5    A.   Chris West came back to the Lincoln, waved
6         Shawn Hutson to go on.  And the sheriff car
7         pulled off with me and then they stopped at
8         the store right up the road I was telling
9         you about, Howard's Country Store.  Shawn
10        Hutson pulled up on the gas tank, put gas
11        in my vehicle.  Chris West, the deputy, and
12        Shawn Hutson went inside the store.
13        Probably got something to drink or
14        whatever.  I had a flat -- They had a flat
15        on the sheriff's car.  They changed the
16        flat while I was still in the car, Chris
17        West and the deputy sheriff.
18   Q.   There at the gas station?
19   A.   Yes, sir.  They changed the flat.  And
20        Shawn Hutson, he left about 10 minutes
21        earlier and went up 21 in my car.
22   Q.   Was your car almost out of gas?
23   A.   Yeah.  It was on E.

Page 121

1    Q.  How long did that take there at the gas
2        station for them to do all that?
3    A.  I'll say approximately another 20 minutes.
4    Q.  Was there any conversation with you that
5        took place at that time?
6    A.  No.  I was in the back seat of the patrol
7        car the whole time.
8    Q.  Nobody talked to you?
9    A.  No, sir.
10   Q.  Did anything else happen as far as
11       something happening to you personally while
12       you were there at the gas station?
13   A.  No, sir.
14   Q.  Just sat there and waited for them?
15   A.  (Witness nods head).  Yes, sir.
16   Q.  What happened after the gas station?
17   A.  After changing the tire, Chris West got in
18       the Lincoln.  He left first.  The deputy
19       sheriff got in and proceeded to go to the
20       Lowndes County Detention Facility.
21   Q.  Between the gas station and the detention
22       facility, did you have any conversation
23       with the deputy?

Page 122

1    A.  No.  He didn't say anything.
2    Q.  Did you hear anything on the radio?
3    A.  No, sir.
4    Q.  What happened when you got to the jail --
5        excuse me -- detention facility?
6    A.  The deputy radioed to come in through the
7        gate and Chris West came in also.  And he
8        brought -- Deputy got me out of the back
9        seat of the car and brought us into the
10       facility into booking.
11   Q.  Anything out of the ordinary happen from
12       the time you got out of the car and you got
13       to the booking area?
14   A.  No.
15   Q.  Did you have any conversation with the
16       deputy?
17   A.  No.
18   Q.  Who escorted you from the car to the
19       booking area?
20   A.  The deputy.
21   Q.  What happened when you got to the booking
22       area?
23   A.  I think Chris West told us to stand back

Page 123

1       toward the wall.  The deputy was standing
2       over to the right by the counter.  Told me
3       to take off -- Well, he took the cuffs
4       off.  He told me to take off jewelry,
5       et cetera.
6    Q.  Who told you to do that?
7    A.  Chris West.  Told me to take off the
8       jewelry.  So I took the jewelry off, put it
9       on the counter.  And at this point they was
10       fixing to log whatever possessions in the
11       booking.  Chris West put what was supposed
12       to have been my money on the counter, which
13       I see was only five twenties, $100 bill.  I
14       immediately asked him where is the rest of
15       my money.  The deputy reached to get the
16       money and tried to count it.  Chris West
17       snatched it out of his hand and told him
18       don't worry about it, put him in the hole.
19       They put me in the hole.
20   Q.  How much did he put on the counter?
21   A.  $100, five twenties.
22   Q.  Five twenties?
23   A.  Uh-huh (positive response).

Page 124

1    Q.  I take it at some point you had to have
2        been taken out of handcuffs, right --
3    A.  Yes, sir.
4    Q.  -- to take all your stuff off?
5    A.  Yes, sir.
6    Q.  When were you taken out of handcuffs?
7    A.  Not -- A couple of minutes after coming
8        into booking after Chris got behind the
9        desk and told them to take me out of the
10       cuffs so I can take my belongings off.
11   Q.  Who took you out of the cuffs?
12   A.  The deputy.
13   Q.  Was there anybody present in the room
14       besides you, the deputy, and Chris?
15   A.  Kevin.  And another lady in booking was
16       behind the desk.
17   Q.  There was a lady in booking?
18   A.  Uh-huh (positive response).
19   Q.  What about Shawn Hutson, was he present?
20   A.  Shawn Hutson wasn't in there.
21   Q.  Where was the lady that you described being
22       in booking when the discussion of the money
23       occurred?

Page 125

1  A.  Standing right there.  She was in her
2     desk.  But when Chris came in, she got up
3     and Chris got in the desk and started
4     getting the paper or whatever.  She was
5     standing right beside him when he put the
6     money on the counter and I immediately
7     said, man, that's not all my money, where
8     is the rest of my money.  And the deputy
9     reached for it to start counting it and
10    Chris snatched it from him and told him,
11    don't worry about it, put him in the hole.
12 Q.  Do you remember what this lady's name was?
13 A.  I can't recall.
14 Q.  Can you describe her for me?
15 A.  I probably know her if I see her.  It's
16    been a while.  I've seen her since I've
17    been back up there.  But I probably have to
18    see her.  I'm not sure if it's
19    Ms. Cottrell.  It's one of them.  I don't
20    know who is in booking.  It was around
21    two -- between two and 2:30 when we finally
22    reached the facility that evening.  From 12
23    that evening when the incident started, it

Page 126

1     was two to 2:30 when I finally reached the
2     building.
3  Q.  You're saying evening.  12 noon?
4  A.  It was somewhere around 12 noon when the
5     incident began.  When I finally arrived
6     there, it was somewhere between two --
7     after two o'clock.
8  Q.  P.m. or a.m.?
9  A.  P.m.
10 Q.  Okay.  I'm just making sure.
11    All right.  Now, you made a statement
12    about your money there, a verbal statement;
13    correct?
14 A.  Yes, sir.
15 Q.  At any time did you ever make a written
16    statement about your money while you were
17    in the jail?
18 A.  No, sir.
19 Q.  Did you ever file a grievance?
20 A.  No, sir.
21 Q.  Have you ever filed a report with any
22    police agency about your money being taken?
23 A.  No, sir.

Page 127

1  Q.  Did you ever talk to the sheriff about it?
2  A.  No, sir.
3  Q.  Did you ask for any medical attention?
4  A.  I did upon going to jail, but I never did
5     get any.
6  Q.  When did you first ask for medical
7     attention?
8  A.  Approximately the next morning I told them
9     I had a headache and I had bumped my head;
10    I had lacerations on my wrists from the
11    cuffs being tight; I need to see a doctor;
12    but no response.
13 Q.  How did you ask to get treatment?
14 A.  They have a -- press the button for verbal
15    response and you have to fill out a paper,
16    a request or something for it.  But I never
17    did get a chance to go.
18 Q.  Did you fill out the paper?
19 A.  Actually, I don't even recall.  I can't
20    really be certain.  But I know I mashed the
21    intercom to request a doctor.
22 Q.  Do you know who you would have spoken to?
23 A.  At the time it was just the jailer on duty

Page 128

1     in the booth, whoever was in the booth at
2     that time.
3  Q.  And you don't know who that is?
4  A.  I can't recall.
5  Q.  Was that the only time you asked?
6  A.  Yes.  After I didn't get no reply, I just
7     left it alone.
8  Q.  Was there anyone who witnessed you asking
9     for medical attention besides the person
10    you talked to in the booth?
11 A.  Inmates.
12 Q.  Do you recall any of their names?
13 A.  I don't really -- didn't know anybody in
14    there.  Just dayroom area people.  I don't
15    know any of them.
16 Q.  You didn't know any of them at the time?
17 A.  Not the present day when I requested
18    medical treatment.
19 Q.  Have you spoken to anybody who was an
20    inmate in there with you since then?
21 A.  No.
22 Q.  As you sit here today, you can't tell me
23    any names of any of the inmates who were in

Page 129

1    there with you?
2    A.  Maybe one or two that I got to know while I
3       was in there, but I haven't seen them since
4       I made bond.
5    Q.  Who are they?
6    A.  I know Joshua Bullard.  He was in there.  I
7       know it was somebody else in there I knew.
8       I can't really recall right now off the top
9       of my head.
10   Q.  How long were you in the jail after being
11      placed in there on the 28th of June?
12   A.  I made bond August 5th.
13   Q.  How did you make bond?
14   A.  Bail bondsman.
15   Q.  Who arranged that?
16   A.  My girlfriend and me.
17   Q.  Who was your girlfriend?
18   A.  Ernestine Powell.
19   Q.  Ernestine?
20   A.  Uh-huh (positive response).
21   Q.  Powell?
22   A.  Yes, sir.
23   Q.  Are you still in contact with Ms. Powell?

Page 130

1    A.  Yes.
2    Q.  Where does she live?
3    A.  Greenville.
4    Q.  Have you got an address?
5    A.  22 Cherrywood Lane.  She was on my bond.
6    Q.  Did she put up the money?
7    A.  Half of it.
8    Q.  Half?
9    A.  (Witness nods head).
10   Q.  How much was your bond?
11   A.  Initially 10,000.  10,000.
12   Q.  There's an allegation in your amended
13      complaint at paragraph 39 that an aunt
14      tried to do a property bond for you.  Who
15      was that aunt?
16   A.  Marzett Wright.
17   Q.  Can you spell that first name for me?
18   A.  M-A-R-Z-E-T-T.
19   Q.  W-R-I-G-H-T?
20   A.  Yes, sir.
21   Q.  Where does she live?
22   A.  Mosses Highway.
23   Q.  Do you have an address for that?

Page 131

1    A.  Not right off the top of my head I don't.
2    Q.  Was it her property that she was going to
3       put up for you?
4    A.  Yes, sir.
5    Q.  Do you know where that property is?
6    A.  It's in Mosses.
7    Q.  Is it her residence?
8    A.  Yeah.  Brick home.
9    Q.  What happened with that?
10   A.  From my understanding I talked with her
11      three times on the phone.  She told me that
12      she contacted Sheriff Vaughner and he told
13      her that on first account that he would
14      give it some thought.  Second account he
15      said -- he just blew it off.  And the third
16      time he seen her that Wednesday and asked
17      him was he going to let her sign my bond.
18      He told her something to the effect I'm
19      going to let him sit there a while; I'll
20      have to think about it.  And after that I
21      didn't even get in contact with her
22      anymore.  She wouldn't try to do it, I
23      guess.

Page 132

1    Q.  That's what supposedly Sheriff Vaughner
2       told her?
3    A.  Yeah.  That's what she told me Sheriff
4       Vaughner told her.  She's the county
5       commissioner over District 5.
6    Q.  Do you know what the value of her property
7       is there in Mosses?
8    A.  Not exactly.  I know it's a Jim Walter Home
9       she had purchased some years ago.
10   Q.  Did she own it outright?
11   A.  Yes, sir.
12   Q.  Did you ever personally speak with Sheriff
13      Vaughner about your bond?
14   A.  I requested to talk to Sheriff Vaughner but
15      never came through with the request.  But
16      one day he did happen to come in the back
17      area where I did verbally ask him why
18      wouldn't he let my aunt sign my bond, and
19      he act as if he didn't know what I was
20      talking about.  He told me, you give her a
21      call and he'll see what he can do.  That's
22      what he told me that day.
23   Q.  When was that?

Deposition of Richard Marshall

Page 133

1  A.  Approximately a week after I had been in
2  there, after she told me she had did all of
3  that.
4  Q.  Okay.  Did you have any visitation while
5  you were in jail?
6  A.  Yes.
7  Q.  Who came to visit you?
8  A.  My aunt came once to retrieve my jewelry
9  and the $100.
10 Q.  Is that the same aunt that was going to put
11 up the house?
12 A.  Shirley Marshall.  It's my aunt.  It's who
13 I released $99 to because I took a dollar
14 for two aspirin I took in there.  She took
15 my jewelry and $99 off the book to go
16 toward my bond.
17         (Defendant's Exhibit 12 was marked
18          for identification.)
19 Q.  Since we're talking about that, let me show
20 you Defendant's Exhibit 12.  Have you ever
21 seen Defendant's Exhibit 12 before,
22 Mr. Marshall?
23 A.  Yes.  I had to sign that to release my

Page 134

1  jewelry and the money.
2  Q.  That's your signature there?
3  A.  Yes, sir.
4  Q.  And that's where Ms. Marshall came and
5  picked up your property and your $99.50 it
6  says?
7  A.  Yes, sir.
8  Q.  Anybody else besides Ms. Marshall come and
9  visit you?
10 A.  Girlfriend, Ernestine.
11 Q.  Anyone else?
12 A.  If anyone else came, I never saw them.
13 Q.  And you were able to make some telephone
14 calls because you were telling me about
15 talking to your Aunt Wright.
16 A.  Yes, sir.
17 Q.  Did you make any other telephone calls -- I
18 tell you what.  Let's back up and talk
19 about the 28th of June when you were
20 initially brought to the detention
21 facility.  Were you able to make a phone
22 call that day?
23 A.  Yeah.

Page 135

1  Q.  Who did you call?
2  A.  My aunt, Shirley Marshall.
3  Q.  Shirley Marshall?
4  A.  Yes, sir.
5  Q.  And what did y'all talk about?
6  A.  I told her that I had been arrested and I
7  needed her to come up here and see could
8  she get me out.
9  Q.  And what did she say?
10 A.  Asked me what happened and where is she
11 going to get the money from.  I told her to
12 come get my money and come get my jewelry
13 and pawn it and try to get some bail when I
14 get -- when I get a bond.
15 Q.  What kind of telephone did you use to make
16 that call?
17 A.  Phone right there on the desk.
18 Q.  Just a regular old phone?
19 A.  I guess the office phone they use in
20 booking.  The phone in booking.
21 Q.  Do they have phones in the detention
22 facility back in the dayroom areas and the
23 cell blocks?

Page 136

1  A.  Yes, sir.
2  Q.  Did you ever make any phone calls on those
3  phones?
4  A.  Yes, sir.
5  Q.  How does that work?
6  A.  Got to call collect and get somebody on the
7  other end to accept.
8  Q.  And who did you call on that phone -- on
9  those phones?
10 A.  In the back?
11 Q.  Yes, sir.
12 A.  Called Marzett Wright a couple of times.  I
13 called my uncle.  Uncle tried to post
14 bond.  Didn't come through.
15 Q.  Which uncle was that?
16 A.  My father -- father's brother from New
17 York.  Now stays in Selma.
18 Q.  What's his name?
19 A.  John -- I want to say John Cowans.  Call
20 him Bip.
21 Q.  Bip?
22 A.  Yeah.  That's all I know him from my
23 childhood.  Just moved from New York about

Page 137

1    three years ago.
2    Q.   Anybody else?
3    A.   I called Shirley and her daughter on
4         three-way. That's mostly who I was getting
5         to call. And I had her to call my lawyer,
6         Charlotte, and go to Charlotte's office for
7         me.
8    Q.   Who is Shirley's daughter? You said her
9         daughter.
10   A.   Cherry Marshall.
11   Q.   How old is she?
12   A.   Just estimating. I don't know. She go
13        along with Kevin. However old Kevin is.
14        I'm the oldest of all of them. However old
15        he is. 20-something. They're the same
16        age.
17   Q.   Did anything happen to you while you were
18        there at the detention facility?
19   A.   Nothing physical, no.
20   Q.   And you said you were there until the 5th
21        of August; is that right?
22   A.   Yes, sir.
23   Q.   And you were released on bond?

Page 138

1    A.   Yes, sir.
2    Q.   You didn't miss any work while you were in
3         the jail; right?
4    A.   I wasn't working at the time.
5    Q.   So you didn't miss any work?
6    A.   No.
7    Q.   What happened after you got out of jail?
8    A.   Started trying to get a lawyer to see what
9         was going on with the charges.
10   Q.   What charges did you have as a result of
11        the June 28th incident?
12   A.   Pistol carrying without a permit and
13        possession of a controlled substance.
14   Q.   What was the controlled substance?
15   A.   I don't know. That's all they told me,
16        possession of a controlled substance.
17   Q.   They never told you what it was?
18   A.   No, sir.
19   Q.   Did you ever have to go to trial on those
20        charges?
21   A.   Yes, sir.
22   Q.   What happened at trial?
23   A.   I came to trial with my lawyer. They

Page 139

1    called my name on the docket. And Chris
2    West called my lawyer in the corner and she
3    told me that he was throwing it out and I
4    can go home.
5    Q.   That Chris West was throwing it out?
6    A.   That's who she was in the corner and, you
7         know, had a little mediation with and came
8         back to me.
9    Q.   Did you ever learn why it was thrown out?
10   A.   No. I ain't ever known. No. She just
11        told me they was throwing it out. He asked
12        her permission to come speak to me and told
13        me I can pick my vehicle up the next day,
14        which they had it impounded since that
15        incident. This was January 4th or 5th I
16        want to say before the 6th when I went to
17        court.
18   Q.   Was there any damage to your vehicle?
19   A.   Yeah. Knocked out of alignment. Pipes was
20        hanging down.
21   Q.   What kind of pipes?
22   A.   Exhaust. Exhaust pipe was rattling. Rear
23        bumper bent.

Page 140

1    Q.   Can you show me where on the pictures?
2    A.   You can see right there the bumper is bent
3         up on the light where he rammed me at. And
4         you can't really tell, but after I got it
5         back out of the pound, it just drive like
6         it wasn't the same car no more.
7    Q.   Looks like when you were describing where
8         he hit you it was the -- was it the back --
9    A.   Yeah. It was pushed up.
10   Q.   -- driver's side right underneath the
11        taillight there?
12   A.   And it have been also burglarized while it
13        was in the pound. All the music equipment
14        was stolen out, radio. The lock was
15        jimmied out and the side glass was broke.
16   Q.   Where was the impound at?
17   A.   Randy's Impound in Ft. Deposit.
18   Q.   Did you ever get any money out of them or
19        any redress for what happened to your car?
20   A.   They told me to call Chris West.
21   Q.   What all was taken out of the car?
22   A.   Stereo from the inside, all speakers,
23        woofers and amps out of the trunk, CDs,

Deposition of Richard Marshall

November 14, 2007

Page 141

1    et cetera.
2    Q.  Anything else?
3    A.  That's it.
4    Q.  What happened to the gun?
5    A.  I don't even know.  All I know they stopped
6         the case.  I don't know anything else about
7         it.
8    Q.  Did they drop the charge on that too?
9    A.  Yes.
10   Q.  Has Mr. McWilliams ever come to you and
11        asked for his gun back?
12   A.  He asked me what happened to it.  I told
13        him it was in the car that day and as far
14        as I know the police got it.
15   Q.  How many times have y'all talked about that
16        gun?
17   A.  I've seen him on two or three occasions in
18        the past two years since the incident and
19        he asked me about whatever happened to his
20        gun and I told him as far as I know the
21        police got it.
22   Q.  Well, has he blamed you for losing his gun?
23   A.  I mean, he knows what happened that day.

Page 142

1         He ain't really pointing no blame.  He just
2         asked me was it -- what happened, can he
3         go -- can he pick it up.  I told him I
4         don't know.  I went to court and they
5         tossed it is all I know.
6    Q.  Do you know if he's ever tried to get it
7         back?
8    A.  I don't.
9    Q.  When's the last time you talked to him?
10   A.  I would have to say a couple months ago.
11        Probably a couple months ago last incident.
12   Q.  Did he ask you about the gun then?
13   A.  Yeah.
14   Q.  I'm sorry?
15   A.  Yes, sir.
16   Q.  Do you know who the prosecutor was in your
17        case?
18   A.  I really don't even know.
19   Q.  Other than, of course, Kevin who was in the
20        car with you, do you know of anybody else
21        who claims to have witnessed the chase from
22        County Road 7 up to where you wound up on
23        Highway 21?

Page 143

1    A.  No.  I don't know anybody who have
2         claimed.  All I know it was vehicles
3         passing along.  I'm not sure who witnessed
4         it.  But not anyone to my knowledge that I
5         know.
6    Q.  You're talking about after y'all came to a
7         stop on 21?
8    A.  Yeah.  After we came to a stop it was some
9         vehicles started passing by.
10   Q.  Did you recognize any of those vehicles?
11   A.  I recognized one vehicle that stopped when
12        I was standing beside the road in my
13        boxers.  It was relative -- a distant
14        relative that stay down the road from me.
15        And she turned around.  Actually that's
16        when Chris stopped doing what he was doing
17        to go get the light and put on top of the
18        car because she slowed down when she saw me
19        beside the road and turned around and came
20        back down the road and they was waving them
21        on.  And after that she went back up the
22        road.  I ain't see her again.
23   Q.  What's her name?

Page 144

1    A.  Margaret, Margaret Wright.
2    Q.  Margaret Wright?
3    A.  Yes, sir.
4    Q.  And where does she live at?  Do you have an
5         address?
6    A.  Right down the road.  Dutch Bend area.  I
7         don't know the number -- address.  It's
8         right down the road from the residence
9         where I was residing at the time.
10   Q.  Which way?
11   A.  Approximately this far from where I'm at.
12        It's a caution light there.
13   Q.  She lives down by the caution light past
14        your house going out towards Wilcox County?
15   A.  Yeah.
16   Q.  Any other vehicles that you recognized pass
17        by that day?
18   A.  I didn't recognize any other vehicle.
19   Q.  Has anyone come up to you and said they
20        witnessed your vehicle being knocked off
21        the road?
22   A.  No, sir.
23   Q.  Do you know of anyone who has claimed to

Page 145

1    have witnessed that?
2    A.  No, sir.
3    Q.  And, again, I'm excluding Kevin because I
4        know he was involved.
5            Anyone besides Margaret Wright that
6        you're aware of who witnessed what happened
7        after you were stopped there at the side of
8        the road?
9    A.  No, sir.
10   Q.  Is there anyone else besides you who can
11       testify about the $500 that you supposedly
12       had on you that day?
13   A.  As far as I know Kevin.  No one else.
14   Q.  How would Kevin know that you had $500 on
15       you that day?
16   A.  Because the motor we was pulling out for
17       one I had took small -- a payment on from
18       my cousin.  I had sold him the engine.  We
19       was pulling the engine out of his car to
20       put the engine that I sold him in.
21   Q.  You had already collected payment for that?
22   A.  He had gave me like $50 toward it.  But he
23       still owed me the balance after we get the

Page 146

1    car back running.  We was pulling the dead
2    engine out.  But I had sold him an engine,
3    but we hadn't ever got a chance to put it
4    in.
5    Q.  So that money that you had that day $50 of
6        it was from him.  And who is he?  What's
7        his name again?
8    A.  That would be Herman.  His name is Herman,
9        the one that owned the car.
10   Q.  $50 from Herman and the other $450 was left
11       over from your gambling winnings.  Is that
12       what your testimony is?
13   A.  The $50 he had previously given me -- I had
14       money that I saved.  It may have been the
15       $50.  But I had $1,000 from gambling, you
16       know.  That's what was left over from
17       everything, you know.
18   Q.  So explain to me again how the $50 for the
19       engine ties in with Kevin knowing that you
20       had $500 on you.
21   A.  Because during the time that Herman came to
22       purchase the engine, he gave me $50 toward
23       it.  Kevin would see that I reached in my

Page 147

1    pocket and had more than $50 in my pocket.
2    He was staying with me at the time.
3    Q.  So he just knows that you had more than $50
4        on you?
5    A.  Yes, sir.
6    Q.  Is that what you're telling me?
7    A.  Yeah.
8    Q.  To your knowledge, does he know exactly how
9        much you had on you?
10   A.  No.  I don't think he knows exact amount.
11       He just knows I had more than that.
12   Q.  What damages are you claiming that you're
13       entitled to as a result of Chris West's
14       conduct?
15   A.  Well, for one I can't seem to acquire
16       employment since this incident.  In my
17       field of warehousing every time I apply for
18       a job I'm being turned down since the
19       incident happened.  And I usually acquire
20       employment very rapidly.  I claim the
21       damage to my vehicle that I have lost, my
22       possessions, lost bond money, loss of time
23       of suffering in jail for something I didn't

Page 148

1    have.
2    Q.  Let me stop you there real quick.  Didn't
3        you tell me that your girlfriend put up the
4        bond money?
5    A.  She put up half of it.  The rest of it was
6        mine.
7    Q.  How much did you put up?
8    A.  I put up like 450 --
9    Q.  $450?
10   A.  -- that I recovered from pawning my jewelry
11       and the money left over that I had on the
12       book.  She put up the rest.
13   Q.  I'm sorry.  I interrupted you.  The bond
14       money and what else?
15   A.  Like I said, my vehicle damages I lost
16       there.  And just me sitting in jail for
17       something I didn't do.  I mean, it's just
18       unfair.
19   Q.  You haven't had any medical expenses;
20       right?
21   A.  No, sir.
22   Q.  And you weren't employed at the time?
23   A.  No, sir.

Page 149

1    Q.   You told me that you still have the knot on
2         your head.  Are there any other permanent
3         conditions that you have as far as your
4         body goes as a result of what happened on
5         June 28th?
6    A.   Just that -- Just a lot of mental anguish,
7         just suffering, anxiety attacks.  A lot of
8         nights I can't sleep at night for being
9         shot at.  I already been robbed.  It took
10        me a while to get over that.  I had a gun
11        put in my face behind that.  It took me a
12        while to get over that.
13   Q.   I'm not asking about your mental condition
14        right now.  I'm just asking about your body
15        condition.  Anything besides the knot on
16        your head?
17   A.   Oh, no.  Just that knot left when I hit the
18        steering wheel, as far as that.
19   Q.   Describe your mental anguish for me that
20        you're talking about.
21   A.   I just -- I just have a lot of nights where
22        I can't sleep, just anxiety attacks a lot
23        about the whole ordeal and --

Page 150

1    Q.   Describe an anxiety attack for me.
2    A.   Just nightmares of being shot at and ran
3         off the road by the police and being
4         suspect every time I'm being sighted in
5         Lowndes County by the police.  I'm getting
6         strange looks.  Or stopped like the
7         incident where I went to jail.  It was
8         supposed to be a traffic stop, but they
9         called Shawn Hutson who was on the drug
10        task force that day.  Every time they lay
11        eyes on me they harass me about stuff like
12        that even though I just -- I don't
13        understand.
14   Q.   Have you seen Chris West again since that
15        day?
16   A.   I haven't seen Chris West since I went to
17        court in January '06.
18   Q.   So that's the only time you saw him?
19   A.   Uh-huh (positive response).
20   Q.   So he hasn't pulled you over since then;
21        right?
22   A.   No.  I haven't seen him.
23            MR. WILFORD:  Let's take a short

Page 151

1         break.
2            (Brief recess was taken.)
3    Q.   Just a few more questions, Mr. Marshall,
4         and we'll be done.  With respect to the
5         anxiety attacks and things that you were
6         telling me about, have you tried to get any
7         kind of mental health treatment for that?
8    A.   Well, right now I'm in dire straits.  I
9         can't afford anything.  I haven't sought
10        any professional help for it.  I've just
11        been trying to deal with the stress, you
12        know.  Somehow I hope it goes away over
13        time.
14   Q.   You say you haven't tried.  Your
15        interrogatory responses you told us you
16        couldn't afford it.  I'm just asking you if
17        you've tried.
18   A.   No, sir, I haven't.
19   Q.   Has anybody recommended to you that you try
20        to get some mental health treatment?
21   A.   I haven't referred to anybody.  It's all on
22        my own.
23   Q.   After the robbery that you described for us

Page 152

1         today, did you get any mental health
2         treatment for that?
3    A.   No, sir.
4    Q.   Did you try?
5    A.   No, sir.
6    Q.   Did anybody recommend to you that you
7         needed it?
8    A.   Just deal with my own -- on my own.  I
9         really don't have anybody but me, so I try
10        to deal with things among myself.  But it
11        took a little time for me to get my
12        mind-set back, you know, where I can be out
13        around people.  Everybody just -- I feel
14        like they out to get me, you know.
15   Q.   Are you set back right now as you put it?
16   A.   I'm still having some anxiety attacks at
17        night.  Still can't sleep some nights.  But
18        if I'm somewhere around some people, you
19        know, I'm fairly being compromised.  I kind
20        of cope with it.
21   Q.   You told me earlier -- I need to go back on
22        you a little more when you were first
23        brought into booking.  Chris West said

Page 153

1    something about put him in the hole.
2  A.  Yes, sir.
3  Q.  Were you put in a hole?
4  A.  The holding cell up front.  That's what I
5    meant.
6  Q.  So you were placed in the holding cell?
7  A.  Yes, sir.
8  Q.  At some point you were put back in the
9    back; is that right?
10 A.  I think later that night dressed me out and
11    took me to a cell.
12 Q.  So you stayed in a holding cell for a few
13    hours?
14 A.  Yes, sir.
15 Q.  Is that fair to say?
16 A.  Yes, sir.
17 Q.  I think that's all I have.  Thank you very
18    much.
19 A.  Thanks.
20         EXAMINATION
21 BY MR. LEWIS:
22 Q.  I have one question.  When you're standing
23    up there on the side of the road in your

Page 154

1    boxer shorts, how were you feeling then?
2  A.  Humiliated because traffic was coming along
3    and people seeing me beside the road in
4    cuffs in my underwear.
5         MR. LEWIS:  Okay.  That's it.
6    (Deposition was concluded at
7    approximately 1:55 p.m.)
8
9
10   * * * * * * * * * * * * * *
11   FURTHER DEPONENT SAITH NOT
12   * * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 155

1         REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4    I, Lyn Daugherty, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8         RICHARD MARSHALL
9  who was duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the
11  matter of:
12         RICHARD MARSHALL,
13         Plaintiff,
14         vs.
15    CHRIS WEST, in his individual
16    capacity, LASHUN HUTSON, in his
17    individual capacity,
18    Defendants.
19    IN THE UNITED STATES DISTRICT COURT
20    FOR THE MIDDLE DISTRICT OF ALABAMA
21    NORTHERN DIVISION
22    Civil Action No. 2:06-cv-701-ID.CSC
23  on Wednesday, November 14, 2007.

Page 156

1    The foregoing 155 computer-printed pages
2  contain a true and correct transcript of the
3  examination of said witness by counsel for the
4  parties set out herein.  The reading and signing is
5  hereby waived.
6    I further certify that I am neither of kin
7  nor of counsel to the parties to said cause nor in
8  any manner interested in the results thereof.
9    This 13th day of December 2007.
10
11
12
         _____
13       Lyn Daugherty, ACCR #66
         Expiration Date: 9-30-2008
         Certified Court Reporter
14       And Commissioner for the
         State of Alabama at Large
15
16
17
18
19
20
21
22
23

# DEPOSITION OF KELVIN CARMICHAEL

## November 14, 2007

## Pages 1 through 89

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

PENGAD 800-631-6989

EXHIBIT
2



**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5   RICHARD MARSHALL,
 6        Plaintiff,
 7   vs.              CIVIL ACTION NO.
                      2:06-cv-701-ID.CSC
 8
     CHRIS WEST, in his individual
 9   capacity, LASHUN HUTSON, in his
     individual capacity,
10
          Defendants.
11
12
13        * * * * * * * * * * * * *
14
15        DEPOSITION OF KELVIN CARMICHAEL, taken
16   pursuant to stipulation and agreement before Lyn
17   Daugherty, ACCR #66, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on Wednesday, November
21   14, 2007, commencing at approximately 1:55 p.m.
22
          * * * * * * * * * * * * *
23
```

**Page 2**

```
 1              APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Jay Lewis
     Mr. Fred L. Clements
 4   LAW OFFICES OF JAY LEWIS
     Attorneys at Law
 5   847 South McDonough Street
     Montgomery, Alabama 36104
 6
 7   FOR THE DEFENDANT WEST:
 8   Mr. Gary Wilford
     Mr. Daryl L. Masters
 9   WEBB & ELEY, P.C.
     Attorneys at Law
10   7475 Halcyon Pointe Drive
     P.O. Box 240909
11   Montgomery, Alabama 36124
12
     ALSO PRESENT: Mr. Richard Marshall
13
14        * * * * * * * * * * * * *
15        EXAMINATION INDEX
16
     KELVIN CARMICHAEL
17
        BY MR. WILFORD . . . . . . . . . .  4
18
19
20        EXHIBIT INDEX
                         MAR
21   Defendant
22   13  Photograph                    73
23
```

**Page 3**

```
 1              STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of KELVIN CARMICHAEL is taken pursuant
 5   to the Federal Rules of Civil Procedure and that
 6   said deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

**Page 4**

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby waived.
 4        * * * * * * * * * * * *
 5            KELVIN CARMICHAEL
 6        The witness, after having first been duly sworn
 7   to speak the truth, the whole truth and nothing but
 8   the truth testified as follows:
 9              EXAMINATION
10   BY MR. WILFORD:
11   Q.  Would you please state your name for the
12        record, sir.
13   A.  Kelvin Carmichael.
14   Q.  Could you spell your first name for me,
15        please.
16   A.  K-E-L-V-I-N.
17   Q.  Is it pronounced Kevin or Kelvin?
18   A.  Kelvin.
19   Q.  Mr. Carmichael, have you ever given a
20        deposition before?
21   A.  No.
22   Q.  What we've got here is we've got a court
23        reporter who is going to be taking down
```

Deposition of Kelvin Carmichael

November 14, 2007

Page 5

```
1    every word you and I say and anybody else
2    says here in the courtroom today -- I'm
3    sorry -- this conference room today.  And
4    so it's going to be important that we stick
5    to certain rules as we're going through
6    this thing.  And one of those is that I
7    need you to wait until I finish asking you
8    a question before you answer it; all right?
9    A.   (Witness nods head).
10   Q.   And one of the things that I need you to do
11       when you answer it, unlike what you did
12       right there, is answer out loud for me
13       either yes, no, or whatever the explanation
14       might be, because it's very difficult for
15       her to get down head shakes and noddings of
16       the head like you just did there; all
17       right?
18   A.   All right.
19   Q.   And as we kind of go through this, if you
20       do that, hopefully I'll catch it and remind
21       you of it.  If I ask you a question and you
22       don't understand the question, let me know
23       and I'll be happy to rephrase it for you.
```

Page 6

```
1    A.   All right.
2    Q.   Because what I'm going to do is if I ask
3        you a question and you answer me, I'm going
4        to assume you understood my question.  Is
5        that fair?
6    A.   Yes.
7    Q.   If for whatever reason you need a break,
8        let me know.  We can go ahead and take a
9        break.  I think you noticed during
10       Mr. Marshall's deposition we took a couple
11       of breaks.  And all you've got to do is
12       just let me know and we can do that; all
13       right?
14   A.   All right.
15   Q.   Okay.  In preparing for your deposition
16       today, did you speak with anyone?
17   A.   No.
18   Q.   You didn't speak with Mr. Marshall?
19   A.   He called me and told me that we had to
20       come here.
21   Q.   Is that all he told you?
22   A.   Yes.
23   Q.   When did he call you?
```

Page 7

```
1    A.   The day before we had to go meet at his
2        office.
3    Q.   Who is his office?
4    A.   We went to talk to him because they wanted
5        to see me.
6    Q.   You're saying him.  I don't know who him
7        is.
8    A.   I don't know his --
9    Q.   This gentleman sitting next to you right
10       here?
11   A.   Yes.
12   Q.   From Mr. Lewis's office?
13   A.   Yes.
14   Q.   And y'all spoke about this deposition here
15       today?
16   A.   They just told us that we had to come here
17       and how to get here and all that.
18   Q.   Did you talk about your testimony with him?
19   A.   No.
20   Q.   Did they ask you about the facts of the
21       case?
22   A.   No.
23   Q.   Did you look at any documents?
```

Page 8

```
1    A.   No.
2    Q.   What's your date of birth?
3    A.   September 25th, 1980.
4    Q.   That makes you 27; is that right?
5    A.   Yes.
6    Q.   Where were you born?
7    A.   Montgomery.
8    Q.   Do you work right now?
9    A.   Yes.
10   Q.   Where do you work?
11   A.   At Quincy's Triple Seven in Shorter.
12   Q.   How long have you been at Quincy's Triple
13       Seven?
14   A.   Almost three weeks.
15   Q.   And what do you do for them?
16   A.   Housekeeping.
17   Q.   Did you work before Quincy's Triple Seven?
18   A.   Yes.
19   Q.   Who did you work for?
20   A.   I worked for Big Lots.
21   Q.   When did you work for Big Lots?
22   A.   About four years.  But up until then I've
23       been working with my uncle painting.  Up
```

Page 9

1     until now --
2     Q.   So you were working -- I'm sorry.
3     A.   Up until now when I stopped working at Big
4          Lots. I think it was in '05, '06,
5          something like that.
6     Q.   That's when you started or when you
7          stopped?
8     A.   When I stopped.
9     Q.   When did you start with them?
10    A.   I think it was in '01, '02.
11    Q.   And you said after you left Big Lots you
12         worked with your uncle?
13    A.   Painting.
14    Q.   Did you work at Big Lots the same time
15         Mr. Marshall did?
16    A.   Huh-uh (negative response).
17    Q.   Is that a no?
18    A.   No.
19    Q.   What about before Big Lots, who did you
20         work for, if anybody, then?
21    A.   Long John Silver.
22    Q.   Where at?
23    A.   On Norman Bridge Road.

Page 10

1     Q.   How long did you work for them?
2     A.   I worked for them when I was in school
3          since about '98.
4     Q.   Why did you leave Long John Silver's?
5     A.   Because I started working at Big Lots.
6     Q.   And then why did you leave Big Lots?
7     A.   I got terminated.
8     Q.   And why did you get terminated?
9     A.   Missing too many days.
10    Q.   Have you ever been married?
11    A.   No.
12    Q.   Where do you live?
13    A.   Norman Bridge Road.
14    Q.   What's the address there?
15    A.   3468 Apartment A.
16    Q.   Did you graduate from high school?
17    A.   Yes.
18    Q.   What high school did you graduate from?
19    A.   Sidney Lanier.
20    Q.   And when did you graduate?
21    A.   '99.
22    Q.   Have you ever been to college?
23    A.   No.

Page 11

1     Q.   Ever been to trade school?
2     A.   No.
3     Q.   How long have you lived on Norman Bridge
4          Road?
5     A.   About three months.
6     Q.   Where did you live before that?
7     A.   Davenport Drive.
8     Q.   Is that in Montgomery?
9     A.   Yes.
10    Q.   What's the street number there?
11    A.   I'm not really sure of that. I just know
12         it's Davenport because I was staying there
13         with a girl. But it wasn't nothing but
14         like a year.
15    Q.   How long did you live on Davenport Drive?
16    A.   About a year.
17    Q.   So that would have been about '06; is that
18         right?
19    A.   Yes.
20    Q.   And where did you live before that?
21    A.   In Stone Crossing.
22    Q.   Where is that?
23    A.   On Woodley Road.

Page 12

1     Q.   How long did you live in Stone Crossing?
2     A.   About six months.
3     Q.   Were you living in Stone Crossing at the
4          time of the traffic stop that led to this
5          lawsuit?
6     A.   No.
7     Q.   Where were you -- Then let's keep going
8          back. Where did you live before Stone
9          Crossing?
10    A.   I had my own apartment in the Colonies.
11         But it's Cypress Court now. They changed
12         the name of it. It's on -- what street --
13         Troy Highway, right off Troy Highway.
14    Q.   Is that where you were living at the time
15         of the traffic stop?
16    A.   No. I think I had got put out my apartment
17         and I had went to stay with my grandmother
18         for a minute.
19    Q.   So you were living with your grandmother at
20         that time?
21    A.   I was just staying with her for a minute.
22    Q.   Well, you have to explain to me what you
23         mean for a minute. How long a time are we

Deposition of Kelvin Carmichael

---

Page 13

1  talking about?
2  A.  It was probably about two, three months,
3      something like that.
4  Q.  Was there anyplace that you lived at
5      between your grandmother's house and
6      Cypress Court?
7  A.  No.
8  Q.  Where is your grandmother's house at?
9  A.  In Farmersville.
10 Q.  What's the address there?
11 A.  I don't know.  I just know it's on
12     Youngblood Road.  I don't know the address.
13 Q.  So that's not too far from where
14     Mr. Marshall was living at the time?
15 A.  Not that far.
16 Q.  About how far would you say?
17 A.  Maybe five, 10 miles, I guess.
18 Q.  Are you and Mr. Marshall related?
19 A.  Yes.
20 Q.  How are you related?
21 A.  My cousin.
22 Q.  Do you have any children?
23 A.  Yes.

---

Page 14

1  Q.  How many?
2  A.  One.
3  Q.  How old is the child?
4  A.  She's five, fixing to be six.
5      MR. WILFORD:  Can we get the same
6          stipulation with this witness,
7          Jay, on the relatives?
8      MR. LEWIS:  Right.
9  Q.  Do you go to church?
10 A.  No.
11 Q.  Have you ever gone to church?
12 A.  Yes.
13 Q.  Last time you went to church where did you
14     go?
15 A.  Morning Pilgrim.
16 Q.  Where is that at?
17 A.  On Rosa Parks.
18 Q.  In Montgomery?
19 A.  Yes.
20 Q.  Have you ever been a member of a union?
21 A.  No.
22 Q.  Any kind of social organization?
23 A.  No.

---

Page 15

1  Q.  Have you ever been a party to a lawsuit?
2  A.  No.
3  Q.  Never been sued?
4  A.  No.
5  Q.  Never sued anybody?
6  A.  No.
7  Q.  Have you ever been arrested before?
8  A.  Yes.
9  Q.  How many times have you been arrested?
10 A.  Maybe five times, I guess.  Just tickets.
11 Q.  Okay.  I'm not talking about -- What kind
12     of tickets are you talking about?
13 A.  Like tickets that I got I didn't pay and
14     they stopped me.
15 Q.  So you've been arrested five times for not
16     paying tickets?
17 A.  Yes.
18 Q.  Is that what you're telling me?
19     When was the first time you were
20     arrested?
21 A.  That's kind of hard to say.  I don't
22     remember how long that's been.  Maybe 2000.
23 Q.  Where were you arrested in 2000?

---

Page 16

1  A.  Montgomery.
2  Q.  Who was it that arrested you?  City
3      police?  County police?
4  A.  City.
5  Q.  And what specifically did they arrest you
6      for?
7  A.  Warrants for not -- unpaid ticket.
8  Q.  What was the unpaid ticket?
9  A.  I think it was a noise ordinance ticket.
10 Q.  Anything else besides the noise ordinance
11     ticket?
12 A.  At that time?
13 Q.  Yes, sir.
14 A.  Just speeding tickets.  I got arrested
15     like --
16 Q.  I'm just asking you about the 2000 arrest
17     right now.  We're going to go through each
18     of them.
19 A.  Not that I remember.
20 Q.  What happened with that arrest?  Were you
21     put in jail?
22 A.  Yes.
23 Q.  How long did you stay in jail?

---

Page 17

1   A.  A few hours.
2   Q.  Did you pay the tickets?
3   A.  Yes.
4   Q.  Is that how you got out?
5   A.  Yes.
6   Q.  What about your second arrest, when was
7       that?
8   A.  I think it was an unpaid speeding ticket.
9   Q.  Do you remember when that was?
10  A.  No.
11  Q.  How long after the 2000 arrest was it?
12  A.  Maybe a year, year later.
13  Q.  So maybe sometime in '03?
14  A.  Yeah.  Yes.
15  Q.  And where were you arrested then?
16  A.  Montgomery.
17  Q.  By the Montgomery Police Department?
18  A.  Yes.
19  Q.  Spend time in jail on that one?
20  A.  Couple of hours.
21  Q.  Did you pay the tickets?
22  A.  Yes.
23  Q.  How about arrest number three, when did

Page 18

1       that take place?
2   A.  Probably was another year later.
3   Q.  So sometime in '04?
4   A.  Yes.
5   Q.  And who arrested you that time?
6   A.  Montgomery city.
7   Q.  And what was that arrest for?
8   A.  I think it was -- I had a driving while
9       suspended I didn't pay.
10  Q.  What was your driver's license suspended
11      for?
12  A.  A speeding ticket.
13  Q.  A speeding ticket?
14  A.  Yes.
15  Q.  How did you get your license suspended for
16      a speeding ticket?
17  A.  Not paying the ticket.
18  Q.  All right.  What happened as a result of
19      the '04 arrest?
20  A.  What happened?
21  Q.  Yes, sir.  Were you put in jail again?
22  A.  Yes.
23  Q.  How long were you in jail that time?

Page 19

1   A.  Couple hours.
2   Q.  Was it the Montgomery City Jail?
3   A.  Yes.
4   Q.  And what happened with the driving while
5       suspended charge?
6   A.  I had to pay a fine.
7   Q.  Did you ever get your license back?
8   A.  No.
9   Q.  So sitting here today you don't have a
10      driver's license?
11  A.  No.
12  Q.  The fourth arrest, when did that take
13      place?
14  A.  I was arrested about -- I think it was
15      about two, three months ago.
16  Q.  Sometime in '07?
17  A.  Yes.
18  Q.  What was that arrest for?
19  A.  Smoking in a nightclub.
20  Q.  Smoking in a nightclub?
21  A.  (Witness nods head).
22  Q.  Where was that at?
23  A.  The name of the club?  The Martini Bar.

Page 20

1   Q.  Is that in Montgomery?
2   A.  Yes.
3   Q.  Who arrested you?
4   A.  I have no idea, because it wasn't the city
5       and it wasn't the county.  But they took me
6       to the county, though.
7   Q.  The Montgomery County Jail?
8   A.  Yes.
9   Q.  What happened when you got to the
10      Montgomery County Jail?
11  A.  I stayed there a couple hours and got out.
12  Q.  Was that on bond?
13  A.  Uh-huh (positive response).
14  Q.  What's the bond for smoking in a bar?
15  A.  I think it was about, yeah, 150.
16  Q.  I take it those charges are still
17      pending --
18  A.  Uh-huh (positive response).
19  Q.  -- or that charge is still pending?
20  A.  I already went to court for it.
21  Q.  What happened?
22  A.  They put me in a class.
23  Q.  Did you have to pay a fine?

Page 21

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. How much? |
| 3 | A. I think it was like about $400 and I've got |
| 4 | to pay for the class. |
| 5 | Q. What is the class on? Do you know? |
| 6 | A. Put me in a class with alcoholics and |
| 7 | stuff. |
| 8 | Q. Okay. The fifth arrest, what was that? |
| 9 | A. I haven't been arrested since that. |
| 10 | Q. So really it was four times and not five |
| 11 | times you've been arrested? |
| 12 | A. Yeah. It ain't been nothing but just |
| 13 | tickets. |
| 14 | MR. WILFORD: Off the record. |
| 15 | (Off-the-record discussion.) |
| 16 | Q. Other than this class that you're going to |
| 17 | have to attend for smoking in a bar, have |
| 18 | you ever been treated for alcohol or drug |
| 19 | addiction? |
| 20 | A. No. |
| 21 | Q. Have you ever been treated for mental |
| 22 | illness? |
| 23 | A. No. |

Page 23

| | |
|---|---|
| 1 | Q. Watching who take a motor out of the car? |
| 2 | A. Two of my cousins. |
| 3 | Q. And who were the two cousins? |
| 4 | A. His name is -- because we call him by his |
| 5 | nickname. His name is Herman, though. |
| 6 | Q. And who else? |
| 7 | A. And my other cousin Steven. |
| 8 | Q. Steven? |
| 9 | A. Yes. |
| 10 | Q. Do you know what Herman and Steven's last |
| 11 | names are? |
| 12 | A. I know Steven's last name is Howard. I'm |
| 13 | not sure what Herman's last name is. |
| 14 | Q. Was there anybody else present that day? |
| 15 | A. Yes. |
| 16 | Q. Who? |
| 17 | A. Richard Marshall. |
| 18 | Q. Anybody else? |
| 19 | A. No. |
| 20 | Q. All right. Where were you taking this -- |
| 21 | or where were they taking this motor out |
| 22 | at? |
| 23 | A. At my aunt's house. |

Page 22

| | |
|---|---|
| 1 | Q. You know the event that we're here on |
| 2 | today; right? |
| 3 | A. Yes. |
| 4 | Q. Something happened out on Highway 21 in |
| 5 | Lowndes County? |
| 6 | A. Yes. |
| 7 | Q. Would you agree with me that that happened |
| 8 | on June 28th of 2005? |
| 9 | A. I'm not sure of the date. |
| 10 | Q. You don't have an independent recollection |
| 11 | of the date? |
| 12 | A. No. |
| 13 | Q. Would you have any reason to disagree that |
| 14 | June 28th, 2005 was the date this occurred? |
| 15 | A. I'm just not sure of the date. |
| 16 | Q. That's fine. Do you remember what you were |
| 17 | doing the day that this occurred? |
| 18 | A. Before or after? |
| 19 | Q. Before. |
| 20 | A. Yes. |
| 21 | Q. What were y'all doing? What were you |
| 22 | doing? Excuse me. |
| 23 | A. Watching them take a motor out of the car. |

Page 24

| | |
|---|---|
| 1 | Q. What's your aunt's name? |
| 2 | A. Gwendolyn Howard. |
| 3 | Q. Where does she live? Where did she live at |
| 4 | the time? Excuse me. |
| 5 | A. Probably about a mile or two from my |
| 6 | grandma's house. |
| 7 | Q. That's in Farmersville? |
| 8 | A. Yes. |
| 9 | Q. When did you first get to your aunt's house |
| 10 | that morning? |
| 11 | A. I'm really not sure what time it was. I |
| 12 | know it was like -- kind of like in the |
| 13 | morning. Maybe ten, nine, something like |
| 14 | that. |
| 15 | Q. How did you get there? |
| 16 | A. In the car with Richard. |
| 17 | Q. How did you come to be in the car with |
| 18 | Richard? |
| 19 | A. Because I spent the night at his house that |
| 20 | night. |
| 21 | Q. The night before? |
| 22 | A. Yes. |
| 23 | Q. What did y'all do the night before? |

Page 25

1   A.  Nothing.  Just at his house.
2   Q.  And y'all didn't go anywhere?
3   A.  No.
4   Q.  Did y'all have anything to drink that
5       night?
6   A.  No.
7   Q.  Do any drugs that night?
8   A.  No.
9   Q.  What time did y'all get up on the morning
10      of the 28th?  And I understand that you
11      don't have an independent recollection it
12      was the 28th.  I'm just going to use that
13      as a kind of shorthand for right now.
14  A.  Maybe eight, something like that.
15  Q.  Did you go straight to your aunt's house
16      from there?
17  A.  Yes.
18  Q.  Did y'all have any breakfast that morning?
19  A.  No.
20  Q.  How long did it take to take that motor out
21      of the car?
22  A.  Maybe an hour.  Probably less than that.
23  Q.  Were they doing anything else while they

Page 26

1       were taking the motor out?
2   A.  Nothing but talking and laughing.
3   Q.  Anybody have a beer?
4   A.  No.
5   Q.  Nothing to drink at all?
6   A.  No.
7   Q.  All right.  What happened after the motor
8       was out of the car?
9   A.  Me and my cousin got in the car and we was
10      on our way back to his house.
11  Q.  In Richard's car?
12  A.  Yes.
13  Q.  What kind of car did Richard have?
14  A.  Blue Nova.
15  Q.  I'm going to show you what was previously
16      marked as Defendant's Exhibit 2 to Richard
17      Marshall's deposition.  Is that Richard's
18      car?
19  A.  Yes.
20  Q.  What were you going to do when you got back
21      to Richard's house?
22  A.  Nothing.  Watch TV.
23  Q.  Do you remember what day of the week it

Page 27

1       was?
2   A.  No.
3   Q.  Were y'all meeting anybody at Richard's
4       house?
5   A.  No.
6   Q.  Between your aunt's house and the time that
7       you first encountered my client in his car,
8       did y'all stop anywhere?
9   A.  No.
10  Q.  Who was driving the car?
11  A.  Richard.
12  Q.  Where were you at in the car?
13  A.  In the passenger's side.
14  Q.  Are there any seat belts in that car?
15  A.  Yes.
16  Q.  Were you wearing yours?
17  A.  Yes.
18  Q.  Was Richard wearing his?
19  A.  Yes.
20  Q.  So if Richard says he wasn't, he was
21      mistaken?
22  A.  He be telling me to put mine on, so I'm
23      pretty sure he had his on.

Page 28

1   Q.  Do you actually remember him having his
2       seat belt on, or you're just pretty sure?
3   A.  I'm sure, because he told me to put mine
4       on.  That's how he drive with his seat belt
5       on.
6   Q.  Was there any alcohol in that car?
7   A.  No.
8   Q.  Let me show you what was previously marked
9       as Defendant's Exhibit 3.  What was in that
10      flask?
11  A.  Nothing.
12  Q.  Do you know what had been in that flask?
13  A.  No.  But I know nothing was in it, though.
14  Q.  That flask was in the car that day, though;
15      right?
16  A.  Yeah.
17  Q.  Whose Swishers were those?
18  A.  I don't know.
19  Q.  Were they yours?
20  A.  No.
21  Q.  That was Richard's car; right?
22  A.  Huh?
23  Q.  That was Richard's car; right?

Page 29

1   A.   Yes.
2   Q.   Do you see anything in Defendant's Exhibit
3        3 that belonged to you?
4   A.   No.
5   Q.   You see that gun in Defendant's Exhibit 3;
6        right?
7   A.   Yes.
8   Q.   Whose gun was that?
9   A.   I don't know.
10  Q.   Was it in the car when you got in the car
11       that morning?
12  A.   Yes.
13  Q.   Where was it when you got in the car that
14       morning?
15  A.   On the seat.
16  Q.   About where it is in Defendant's Exhibit 3?
17  A.   Yes.
18  Q.   Is that the front seat of Richard's car in
19       Defendant's Exhibit 3?
20  A.   Yes.
21  Q.   Is that gun loaded?
22  A.   I don't know.
23  Q.   Did you ever pick that gun up?

Page 30

1   A.   I just seen it and I ain't asked nothing
2        about it because it wasn't my business,
3        so ...
4   Q.   The gun looks to me like it's pointing
5        toward the passenger's side of the car.
6        Does that look like it's pointing that way
7        to you?
8   A.   Yes.
9   Q.   Make you nervous having a gun pointed at
10       you?
11  A.   No.
12  Q.   So you didn't pay it no mind?
13  A.   No.
14  Q.   All right.  Did you ever see Richard with
15       that gun before?
16  A.   No.
17  Q.   That's the first time you saw it was that
18       day?
19  A.   Yes.  That's why I didn't ask him nothing
20       about it.
21  Q.   Did Richard usually have a gun?
22  A.   No.
23  Q.   Was that the first time you had ever seen

Page 31

1        Richard with a gun?
2   A.   Yes.
3   Q.   So that's the first time you've ever seen
4        him with a gun and you didn't ask him
5        anything about it?
6   A.   No.
7   Q.   Do you know if Richard had any money on him
8        that day?
9   A.   I know he had just sold my cousin a motor,
10       but I don't know what he sold it for,
11       though.
12  Q.   Did you see any money change hands?
13  A.   Not really.  But he told me that my cousin
14       was fixing to buy it.  That's why we went
15       over there to watch him take it out.
16  Q.   But you didn't see him give him any money;
17       right?
18  A.   Not at the time.
19  Q.   Did you ever see him give him any money
20       later?
21  A.   No.  I know my cousin told me he bought the
22       motor from him.
23  Q.   Which cousin was that?

Page 32

1   A.   Herman.
2   Q.   Did you ever actually see Richard with any
3        money that day?
4   A.   Yes.
5   Q.   When did you see him with money?
6   A.   That morning before we left.
7   Q.   How much did he have on him?  Were you able
8        to see how much?
9   A.   No.
10  Q.   Were you able to see any particular bill?
11  A.   No.
12  Q.   How was he carrying the money?
13  A.   In his pocket.
14  Q.   Did he just take it out and show it to you?
15  A.   No.  We were fixing to go to the store and
16       get some gas, but he just said we're going
17       to go ahead on down there because they were
18       waiting on us.
19  Q.   Okay.  So how did you seeing his money come
20       into play there?
21  A.   Because he was counting it because he said
22       he was fixing to go get gas, but he was
23       going to go ahead on and go to my auntee's

Page 33

1    house first and he would just get it when
2    we left there.
3  Q.  All right. When was the first time you
4    noticed the car that my client was in?
5  A.  When they pulled up on the side with a
6    pistol.
7  Q.  Where was that at?
8  A.  The same road that you turn off to go to my
9    grandmother's house. It wasn't 21. I'm
10   not for sure what the name of the road
11   was. But I remember them pulling up on the
12   side of us with a gun.
13 Q.  That's the first time you saw them?
14 A.  Yeah.
15 Q.  You didn't see them at any point before
16   that?
17 A.  No.
18 Q.  What happened when they pulled up alongside
19   of you?
20 A.  He was pointing the gun and pointing at the
21   side of the road and telling us to pull
22   over.
23 Q.  Who was he?

Page 34

1  A.  The guy on the passenger's side.
2  Q.  Do you know who was on the passenger's
3    side?
4  A.  No. I never saw them before. They had on
5    regular clothes.
6  Q.  Have you learned since then who was on the
7    passenger's side?
8  A.  I know now he was the police, but I don't
9    know his name.
10 Q.  That's what I'm asking you. Have you found
11   out what his name was?
12 A.  No.
13 Q.  Can you describe him for me?
14 A.  I know he was like -- he wasn't that tall.
15   Had a low haircut all over. Kind of slim
16   guy. He wasn't that big, not like the
17   driver.
18 Q.  Black guy? White guy?
19 A.  Who? The passenger?
20 Q.  Yes, sir.
21 A.  Black guy.
22 Q.  Did he have any facial hair?
23 A.  Yes. I think he had a mustache.

Page 35

1  Q.  Just a mustache?
2  A.  I think he did. He might have had a
3    full -- I know he just had a little beard
4    or something, I guess. I wasn't really
5    looking at him like that.
6  Q.  You got a chance to look at him later,
7    though; right?
8  A.  Uh-huh (positive response).
9  Q.  Were you able to see the driver?
10 A.  Yes.
11 Q.  Did you know who the driver was prior to
12   that time?
13 A.  No.
14 Q.  Have you since learned who the driver was?
15 A.  Yes.
16 Q.  Who was the driver?
17 A.  Guy named Chris West.
18 Q.  And you didn't know Chris prior to this?
19 A.  No. I never saw neither one of them.
20 Q.  Did you know of either one of them prior to
21   this?
22 A.  No.
23 Q.  All right. So the car pulls up next to you

Page 36

1    and you said he had a gun?
2  A.  Yeah.
3  Q.  What kind of gun are we talking about?
4  A.  I just know it was black. Because when I
5    seen him, I asked my cousin who is it, and
6    he say he don't know, might be somebody
7    trying to rob him or something. So -- I
8    don't know.
9  Q.  Were you able to hear your cousin say that?
10 A.  Huh?
11 Q.  You were able to hear Richard say that?
12 A.  When I asked him who is it, I heard him say
13   he didn't know.
14 Q.  What hand did the person with the gun have
15   the gun in?
16 A.  I think it was his right because he was
17   pointing with his -- this arm right here
18   (indicating). He was telling us to pull
19   over.
20 Q.  How was he holding the gun?
21 A.  Pointing it at us through his window.
22 Q.  You say he was pointing it at you and using
23   his other hand to point to the side of the

Page 37

1    road?
2    A.  Yes.
3    Q.  What did Richard do, if anything, when he
4        did that?
5    A.  We speeded up because we didn't know who
6        they was.  They was in regular clothes in a
7        regular car, so we speeded up.
8    Q.  What happened after you sped up?  Let me
9        back up.  I'm sorry.  Did Richard say
10       anything to them?
11   A.  No, not that I remember.
12   Q.  Was there anything going on that would
13       prevent you from hearing what Richard might
14       have said to them?
15   A.  He had the radio on, but I would have heard
16       if he said anything.  I mean, he didn't say
17       nothing to them because they had their
18       windows up and his window was down -- well,
19       our window was down.
20   Q.  Richard's window was down, but their window
21       was up?
22   A.  (Witness nods head).
23   Q.  So he's pointing through the glass with the

Page 38

1        gun?  Is that what you're telling me?
2    A.  Yes.
3    Q.  What kind of car did they have?
4    A.  It was a Lincoln.
5    Q.  Do you remember anything else about the
6        car?
7    A.  I think it was like a dark gray.
8    Q.  Was it a newer one or an older one?
9    A.  It was a newer one, but not that new.  I
10       think it was like about '98, '99.  It
11       wasn't no old model.
12   Q.  Did you see anything that stood out on the
13       car; antennas, license plates, anything
14       like that?
15   A.  No.  It was just regular car.
16   Q.  Did you see any blue lights on the vehicle?
17   A.  No.
18   Q.  The road that you were on when the car came
19       up alongside of you, is that a two-lane or
20       four-lane or some other lane?
21   A.  Two.
22   Q.  All right.  So you said Richard sped up.
23       What happened after he sped up?

Page 39

1    A.  They got behind us.
2    Q.  Did you watch them?
3    A.  I was looking in the rear view mirror, like
4        the little mirror on the side.  But I was
5        just looking at the car.  I wasn't watching
6        them.
7    Q.  You didn't turn around and look at them?
8    A.  Huh-uh (negative response).  I was trying
9        to tell him to go because I thought it was
10       somebody trying to rob us, too, or rob him
11       and they had a gun.  I ain't trying to get
12       shot.
13   Q.  Have you ever heard of any problems like
14       that happening in that part of the county
15       before?
16   A.  What?  People getting robbed?
17   Q.  Well, people coming up alongside in cars
18       and trying to rob people in a car.
19   A.  No.  But I'm from Montgomery.  I know it
20       happens.
21   Q.  Okay.  So you're watching in the side view
22       mirror.  What happens next?
23   A.  We turned on the road to go home.

Page 40

1    Q.  And what road is that that you turned on to
2        go home?
3    A.  I think that's -- I think it's 21.
4    Q.  Which way did you turn?
5    A.  Right.
6    Q.  Is that an intersection there that you
7        turned at?
8    A.  Yes.
9    Q.  Is there a stop sign, traffic light,
10       something there?
11   A.  A yellow flashing light.
12   Q.  Did Richard stop at that light?
13   A.  He yield.  He slowed down.  But then we
14       took off again because we didn't know who
15       they was.
16   Q.  Did he ever actually stop, though, at the
17       intersection?
18   A.  No.  Because there's a yield sign.
19   Q.  Was there any traffic around?
20   A.  No.  Not at that time.
21   Q.  Had you seen any other cars besides yours
22       and the Lincoln --
23   A.  No.

Page 41

1   Q.  -- up to that point?
2   A.  No.
3   Q.  What happened when you made the right onto
4       Highway 21?
5   A.  We took off again.
6   Q.  After the Lincoln fell in behind you before
7       the turn, did y'all -- you and Richard talk
8       about anything up until you turned right on
9       21?
10  A.  No.  Because I was really scared.  I was
11      wondering myself who they was.
12  Q.  You did say you were urging him to go on;
13      right?
14  A.  Because I didn't know who it was, yes.
15  Q.  What did you tell him?
16  A.  I just kept asking him who that is, and he
17      just kept shrugging his shoulders he didn't
18      know.  And I didn't know, so I just told
19      him, man, don't let them catch us because
20      we don't know who they is -- well, I don't
21      know who they is and then they're pointing
22      a gun too.
23  Q.  Did Richard appear to be mad?

Page 42

1   A.  No.
2   Q.  He didn't yell at anybody up to that point?
3   A.  No.
4   Q.  All right.  You make the right-hand turn
5       onto Highway 21.  What happens next?
6   A.  We rode down a little while and they were
7       still behind us.  And they ran to the back
8       of the car.
9   Q.  So they followed behind you and then just
10      ran into the back of the car?
11  A.  Yes.
12  Q.  How long from the time you turned right
13      onto 21 until they ran into the back of the
14      car?
15  A.  Maybe it was about a mile.
16  Q.  How fast was Richard going at that point?
17  A.  I don't know.
18  Q.  Did he go faster than he had been before he
19      turned off, about the same speed or slower?
20  A.  It was about the same speed.
21  Q.  Did you turn around at any point while you
22      were on Highway 21 to look at the car
23      behind you?

Page 43

1   A.  After they hit us the second time that's
2       when I looked back.
3   Q.  After they hit you the second time?
4   A.  (Witness nods head).
5   Q.  Prior to them hitting you, did you turn
6       around and look back at them?
7   A.  No.
8   Q.  What happened when, as you said, they ran
9       into you the first time?
10  A.  I just was like, they done hit us.  Because
11      by the time I was fixing to turn around
12      again and they hit us again.  That's when I
13      turned around and looked.
14  Q.  Let's just keep talking about the first
15      time for right now; okay?
16  A.  Uh-huh (positive response).
17  Q.  How hard a hit was it?
18  A.  Enough to turn the back of the car a little
19      bit.
20  Q.  Turn it how?
21  A.  Like the back end swerved a little, like
22      swerved to the right like they were trying
23      to knock us off the road.

Page 44

1   Q.  Did you actually see the Lincoln hit you?
2   A.  I know it was them because they were right
3       behind us.
4   Q.  I understand that.  What I'm asking you is,
5       were you able to see them actually hit
6       you?  Were you looking at them when they
7       hit you?
8   A.  Not the first time.
9   Q.  So you said it knocked -- it swerved the
10      back end a little bit?
11  A.  (Witness nods head).
12  Q.  Did it do anything else to the car?
13  A.  No.
14  Q.  They hit you a second time; is that right?
15  A.  Yes.
16  Q.  How much time passed between the first time
17      they hit you and the second time they hit
18      you?
19  A.  Maybe a couple of seconds.
20  Q.  And did you tell me that you were able to
21      turn around then and look at the car?
22  A.  After they hit us the second time?
23  Q.  No.  Between the first time and the second

Page 45

1    time.
2    A.  I was fixing to look when they hit us the
3        first time.  But by the time I looked, they
4        hit us again.  And I turned back around to
5        make sure we wasn't fixing to go off the
6        road.  Then I turned back and looked again.
7    Q.  After the second time?
8    A.  Yes.
9    Q.  Tell me about the second hit.  How hard was
10       it?
11   A.  Probably about the same as the first.
12   Q.  Did the speed of Richard's car change
13       between the first time and the second time?
14   A.  A little, because when they hit us, it was
15       like it knocked us forward a little bit.
16   Q.  So up until the second time they hit you,
17       you still hadn't had a chance to turn
18       around and look back; right?
19   A.  Huh-uh (negative response).  I almost did
20       after the first one.  But when they hit us
21       I turned back around to make sure we wasn't
22       going off the road.
23   Q.  After they hit you the second time, what

Page 46

1    happened?
2    A.  That's when I turned around and looked.
3        And it looked like he was on the radio or
4        something.  So I said --
5    Q.  What made you think he was on the radio?
6    A.  Because I saw him with something in his
7        hand talking in it.
8    Q.  Can you describe for me what it was in his
9        hand that he was talking into?
10   A.  Looked like a CB.
11   Q.  Did you see anything else besides the CB --
12       what you described as looking like a CB?
13   A.  No.
14   Q.  How long were you able to look back?
15   A.  Maybe a couple seconds, because that's when
16       he hit us again and he went off the road
17       that time.
18   Q.  Who was it that was talking on the CB?  Was
19       it the driver or the passenger?
20   A.  The passenger.
21   Q.  Did you see any blue lights at that time?
22   A.  No.  I didn't see any lights until after
23       people was pulling over and they were

Page 47

1    grabbing him around his neck and people
2    were stopping.  Then he grabbed something
3    and put it on top of the car.
4    Q.  All right.  At what point did you tell
5        Richard that it was the police behind you?
6    A.  I said, I think it's the police, and then
7        he started talking in the thing.  But by
8        then he had hit us again and knocked us off
9        the road.
10   Q.  Did you start to say that before that third
11       hit or after the third hit?
12   A.  It was like time I was saying it he was
13       running into us again.  And that time he
14       knocked us off the road.
15   Q.  So you did recognize then that it was the
16       police that was behind you?
17   A.  I ain't -- I wasn't sure it was the
18       police.  I said I think it's the police
19       because I saw him talking in a CB.  And I'm
20       pretty sure if somebody robbing you they
21       probably wouldn't have no CB.
22   Q.  Had Richard ever said anything to you
23       before about being robbed?

Page 48

1    A.  No.
2    Q.  So you didn't know before that day that
3        he'd said he had been robbed before?
4    A.  No.
5    Q.  From the time you turned onto Highway 21
6        until they hit you that third time, did you
7        see any other cars on the road?
8    A.  No.
9    Q.  Did you see Richard throw something out the
10       window?
11   A.  No.
12   Q.  You did see his arm out the window, though;
13       right?
14   A.  He rides with his arm on his mirror.
15   Q.  Well, was he riding with his arm on the
16       mirror at the time?
17   A.  Talking about at the time when they was
18       riding behind us like that?
19   Q.  Right.
20   A.  I wasn't really paying attention to his
21       hand then, not to be riding with it on the
22       mirror, because I was scared.
23   Q.  Afterwards you made a statement, didn't

Page 49

1     you?
2  A.  Yes.
3  Q.  And you told the police at that time that
4     you had put your -- or that he -- sorry.
5     Told the police at that time that you saw
6     that he put his arm out the window?
7  A.  Put his arm out the window?
8  Q.  Actually what you said was I saw that he
9     put his arm out the window.
10  A.  Probably on his mirror, because he usually
11     drive holding his mirror while he drives.
12  Q.  You didn't tell the police he was holding
13     his mirror, though, did you? Let me show
14     you Defendant's Exhibit 6. See if you can
15     show for me there where you said he had his
16     hand on the mirror.
17  A.  No.
18  Q.  It doesn't say that, does it?
19  A.  No.
20  Q.  Just says he had his arm out the window;
21     right?
22  A.  I'm looking for where it says that at.
23  Q.  Starting right here.

Page 50

1  A.  Uh-huh (positive response).
2  Q.  That is your statement that you made to the
3     police, right, Defendant's Exhibit 6?
4  A.  Yes.
5  Q.  Did you have a cell phone that day?
6  A.  No.
7  Q.  Did Richard?
8  A.  No.
9  Q.  What happened to that gun that was on the
10     seat there while all this bumping was going
11     on?
12  A.  What happened to it?
13  Q.  Uh-huh (positive response). If anything.
14  A.  Nothing.
15  Q.  Where was it while all of this bumping was
16     going on?
17  A.  Up on the seat.
18  Q.  Still right there on the seat?
19  A.  Yes.
20  Q.  Wasn't moving around at all?
21  A.  No.
22  Q.  Still pointing at you?
23  A.  I guess. I wasn't really paying attention

Page 51

1     if he was pointing at me.
2  Q.  Did you ever ask Richard to stop and let
3     you out of the car?
4  A.  No.
5  Q.  Okay. What happened after that third hit?
6  A.  He went off the road.
7  Q.  How did you go off the road? Describe that
8     for me.
9  A.  The car spun around, almost turned over,
10     but it didn't.
11  Q.  Which way did it go off the road?
12  A.  To the left.
13  Q.  Did it cross over the center line?
14  A.  Yes.
15  Q.  You said it almost turned over. How did it
16     almost turn over?
17  A.  Because it's like they hit the edge of his
18     bumper and it spun us around. And the car
19     felt like it was fixing to turn over, but
20     it didn't once we went off in the grass.
21  Q.  On the opposite side of the road?
22  A.  Yeah.
23  Q.  Let me show you what we marked as

Page 52

1     Defendant's Exhibit 8. Is that where
2     the -- where Richard's car wound up?
3  A.  Yes.
4  Q.  While it was spinning, what happened inside
5     of the car?
6  A.  Nothing happened. When it stopped, he was
7     fixing to get out. That's when they shot
8     right there at the ground.
9  Q.  We're not quite to that point yet. We'll
10     get to that in a minute. Did anything fly
11     around inside the car? You know, did you
12     hit anything inside the car? Did anything
13     hit you?
14  A.  Huh-uh (negative response).
15  Q.  Nothing happened inside the car while it
16     was spinning?
17  A.  No.
18  Q.  Did either you or Richard say anything
19     while the car was spinning?
20  A.  No. I was trying to hold on because I
21     thought the car was fixing to turn over.
22  Q.  Did you see when the Lincoln hit your car
23     that third time?

| | Page 53 |
|---|---|

1  A.  Uh-huh (positive response).
2  Q.  How did it hit you the third time?
3  A.  Just like he put the edge of his bumper
4      on -- on the corner of my cousin's bumper.
5  Q.  The edge of his front bumper?
6  A.  Yeah.  Like the driver's side, he pushed it
7      with the passenger's side of my cousin's
8      car.
9  Q.  And you were looking at him when that
10     happened?
11 A.  (Witness nods head).
12 Q.  Did Richard's car hit anything between the
13     time that it was hit the third time and the
14     time that it came to rest?
15 A.  Huh-uh (negative response).
16 Q.  Is that a no?
17 A.  No.
18 Q.  Did you suffer any injuries at all in -- or
19     as a result of the car being forced off the
20     road?
21 A.  No.
22 Q.  Was Richard hurt?
23 A.  No.

| | Page 54 |
|---|---|

1  Q.  Okay.  What happened with the Lincoln after
2      y'all were spun out?
3  A.  They pulled up right in like on the side of
4      the car.
5  Q.  About like what you see there in
6      Defendant's 8?
7  A.  About like that.  Like they were back a
8      little bit.
9  Q.  Okay.  Is that the Lincoln in Defendant's
10     Exhibit 8 that we can just barely see there?
11 A.  Yes.
12 Q.  What happened once everybody came to a rest
13     or a stop?
14 A.  They got out the car.  And when my cousin
15     was getting out, they shot like right at
16     the door.
17 Q.  Let's take this kind of slow and walk
18     through this whole thing.  They got out of
19     the car; is that right?
20 A.  Yes.
21 Q.  Did you get out of the car?
22 A.  I was fixing to get out.
23 Q.  Did you actually get out?

| | Page 55 |
|---|---|

1  A.  No.  I was fixing to, though, until they
2      shot.
3  Q.  Did Richard get out?
4  A.  He was fixing to.
5  Q.  When they got out of the car -- the two
6      officers I'm talking about -- did they say
7      anything?
8  A.  They got out and pointed the guns.
9  Q.  Did they say anything?
10 A.  Not that I recall.
11 Q.  Were you able to see any badges on them at
12     that point?
13 A.  Yeah.  After they pulled them out of their
14     shirts.
15 Q.  When did they pull them out of their
16     shirts?
17 A.  When they jumped out of the car and they
18     pointed their guns.
19 Q.  So they jumped out of the car pointing
20     their guns, pull their badges out of their
21     shirts?
22 A.  Because they was on a chain.
23 Q.  Around their necks?

| | Page 56 |
|---|---|

1  A.  (Witness nods head).
2  Q.  Did they give any commands to get on the
3      ground?
4  A.  Not when they first -- at first they
5      didn't.
6  Q.  So at some point they did?
7  A.  They told him to get out the car.
8  Q.  Told him to get out of the car first?
9  A.  Uh-huh (positive response).
10 Q.  Did he do that?
11 A.  Yes.
12 Q.  How far did he get out of the car?
13 A.  Just standing up in the doorway.
14 Q.  Where were his hands?
15 A.  On his side until they told him to put them
16     up.
17 Q.  Until they told him to put his hands up?
18 A.  Yes.
19 Q.  Did he put his hands up?
20 A.  Yes.
21 Q.  Where were your hands while all this was
22     going on?
23 A.  In my lap.  I was still in the car.

Page 57

1   Q.  Were you watching what was going on?
2   A.  Yeah.
3   Q.  Were any of the guns pointed at you?
4   A.  When he walked on my side.
5   Q.  I'm talking about that point right there in
6       time when Richard is out of the car with
7       his hands up. Is anybody pointing their
8       guns at you?
9   A.  He was like standing right in front of me,
10      so it was like they were pointing them at
11      me.
12   Q.  So Richard was between you and them; is
13      that right?
14   A.  Yes.
15   Q.  All right. Richard puts his hands up.
16      What happens next?
17   A.  They put the handcuffs on him and started
18      snatching him around.
19   Q.  Hang on just a second because we're
20      skipping something here obviously. Because
21      you told me there was a shot fired
22      somewhere in here and there was some
23      commands to get on the ground. So let's go

Page 58

1      back. After Richard puts his hands up,
2      what's the next thing that happens?
3   A.  They shot before they told me to get out.
4      At the time the car stopped, he opened the
5      door. That's when they shot.
6   Q.  He was still in the car?
7   A.  Uh-huh (positive response).
8   Q.  How much time passed between the time that
9      they told him to get out of the car and
10      there was a shot fired?
11   A.  Maybe 30 seconds.
12   Q.  Where was the shot fired?
13   A.  Like right at the ground with -- if he
14      would have stepped out where his foot would
15      have been like right at the door.
16   Q.  Explain to me how you were able to see that
17      if he wasn't out of the car yet.
18   A.  Because I can see the dirt jumping off the
19      ground.
20   Q.  Was the car door open?
21   A.  Yes.
22   Q.  But Richard was still in the car?
23   A.  Yeah. He was fixing to get out, but they

Page 59

1      shot.
2   Q.  So you were able to see past Richard to
3      where this round hit?
4   A.  How the car was it was like my side was up
5      on the hill, so I look at the ground
6      from -- with his door open.
7   Q.  Okay. Fair enough. How far from the car
8      did the round hit?
9   A.  It was like right by if he would have
10      stepped out.
11   Q.  Let's look at Defendant's Exhibit 2. Show
12      for me on Defendant's Exhibit 2 where that
13      round hit.
14   A.  Maybe right there somewhere.
15   Q.  All right. So you were showing -- Please
16      put your finger back there. I need to
17      describe it for the record. You've got
18      your finger it looks like right in between
19      the front door and the back door; is that
20      right?
21   A.  Uh-huh (positive response).
22   Q.  And at least the way the picture is kind of
23      at the bottom -- even with the bottom of

Page 60

1      the front door --
2   A.  Uh-huh (positive response).
3   Q.  -- where it's open?
4         MR. MASTERS: Is that yes or no?
5   A.  Yes.
6   Q.  About how far in feet would you say that
7      was from the car?
8   A.  Maybe one.
9   Q.  Other than the badges and the guns, did you
10      see any other kind of equipment on the two
11      officers?
12   A.  I think they had handcuffs.
13   Q.  Anything else?
14   A.  No.
15   Q.  Do you know what a Taser is?
16   A.  Yes.
17   Q.  You've seen one before?
18   A.  Yes.
19   Q.  Did they have a Taser?
20   A.  No.
21   Q.  Do you know what pepper spray is?
22   A.  Yes.
23   Q.  Did they have pepper spray?

|  | Page 61 |
|---|---|
| 1 | A. No. |
| 2 | Q. Other than telling Richard to get out of |
| 3 | the car, did they say anything else before |
| 4 | firing a shot? |
| 5 | A. No. |
| 6 | Q. Did they identify themselves as police? |
| 7 | A. Yeah. After they shot. |
| 8 | Q. After they shot. How long after they shot? |
| 9 | A. Probably a couple of seconds. |
| 10 | Q. What did they say to identify themselves as |
| 11 | police? |
| 12 | A. They pulled their badges out of their |
| 13 | shirts and said they was the police. |
| 14 | Q. Okay. You told me just a minute ago they |
| 15 | pulled their badges out of their shirt as |
| 16 | they were getting out of the car. |
| 17 | A. I'm saying when they first got out of the |
| 18 | car they shot. Then he pulled the badge |
| 19 | out of his shirt. |
| 20 | Q. Did they tell him to get out of the car |
| 21 | before or after they pulled the badges out? |
| 22 | A. After. |
| 23 | Q. How many times did they shoot? |

|  | Page 62 |
|---|---|
| 1 | A. One. |
| 2 | Q. Who was it that shot? |
| 3 | A. I'm not sure which one of them shot. |
| 4 | Q. When they got out of the car, how far out |
| 5 | of the car did they go? |
| 6 | A. Like behind the door. |
| 7 | Q. So the one who got out of the passenger's |
| 8 | side, where did he go? |
| 9 | A. He was behind his door. |
| 10 | Q. And the driver? |
| 11 | A. Behind his door. |
| 12 | Q. Where was the gun in your car while all |
| 13 | this was going on? |
| 14 | A. On the seat. |
| 15 | Q. Where were Richard's hands? |
| 16 | A. When? |
| 17 | Q. Before he got out of the car. |
| 18 | A. He took his seat belt off. |
| 19 | Q. So he had to reach down to his side to do |
| 20 | that; right? |
| 21 | A. Uh-huh (positive response). |
| 22 | Q. Onto his right side? |
| 23 | A. Yeah. |

|  | Page 63 |
|---|---|
| 1 | Q. And that's where that gun was, wasn't it? |
| 2 | A. It was like in the middle of the seat. |
| 3 | Q. But it was to his right side; correct? |
| 4 | A. Uh-huh (positive response). |
| 5 | Q. Is that a yes? |
| 6 | A. Yes. |
| 7 | Q. Okay. Let's move forward in time. Richard |
| 8 | has gotten out of the car. He's got his |
| 9 | hands up? |
| 10 | A. Uh-huh (positive response). |
| 11 | Q. Now what happens? |
| 12 | A. They put the handcuffs on him. |
| 13 | Q. Was he ordered to get to the ground? |
| 14 | A. Yes. |
| 15 | Q. Did he go to the ground? |
| 16 | A. Yes. |
| 17 | Q. By himself? |
| 18 | A. Halfway by himself until they started |
| 19 | grabbing him. |
| 20 | Q. So he tried to go to the ground before they |
| 21 | grabbed him? Is that what you're telling |
| 22 | me? |
| 23 | A. Yeah. He was going to the ground getting |

|  | Page 64 |
|---|---|
| 1 | on his knees and they just forced him on |
| 2 | down. |
| 3 | Q. You're saying they. Did both officers come |
| 4 | over to the car? |
| 5 | A. Yes. |
| 6 | Q. Describe for me how that happened. |
| 7 | A. How it happened? |
| 8 | Q. Yes, sir. |
| 9 | A. The passenger came from behind his door and |
| 10 | then the driver came from behind his door. |
| 11 | And when they got him on the ground, that's |
| 12 | when the passenger's side -- I mean, the |
| 13 | officer on the passenger's side came to my |
| 14 | side. |
| 15 | Q. Did Richard already start going towards the |
| 16 | ground before they left out from behind |
| 17 | their doors? |
| 18 | A. He was getting on his knees. |
| 19 | Q. Was he on his knees before they left their |
| 20 | doors? |
| 21 | A. Yes. He was getting on his knees when they |
| 22 | told him to get down. |
| 23 | Q. How long did it take them to get from where |

Page 65

| | |
|---|---|
| 1 | they started outside of their doors to |
| 2 | Richard? |
| 3 | A.  Maybe two seconds, because they were right |
| 4 | in front of us. |
| 5 | Q.  When they got to Richard, what did they do? |
| 6 | A.  The one on the driver's side pushed him on |
| 7 | the ground. |
| 8 | Q.  How? |
| 9 | A.  Like from his back.  He just pushed him on |
| 10 | the ground. |
| 11 | Q.  One hand?  Two hands? |
| 12 | A.  One, because he had a gun in his other |
| 13 | hand. |
| 14 | Q.  Which hand did he use to push him on the |
| 15 | ground with? |
| 16 | A.  I guess his left. |
| 17 | Q.  So the gun was in his right hand; is that |
| 18 | right? |
| 19 | A.  If I'm not mistaken. |
| 20 | Q.  What was the other one doing? |
| 21 | A.  Like had his knees on the back of his neck |
| 22 | once he got on the ground. |
| 23 | Q.  Before he got on the ground while the |

Page 66

| | |
|---|---|
| 1 | driver was pushing him down, what was the |
| 2 | one that came from the passenger's side |
| 3 | doing? |
| 4 | A.  Looking at me telling me don't move. |
| 5 | Q.  What was he doing with his weapon? |
| 6 | A.  Pointing it at me. |
| 7 | Q.  So Richard then goes to the ground? |
| 8 | A.  Uh-huh (positive response). |
| 9 | Q.  And after he gets to the ground what |
| 10 | happens? |
| 11 | A.  That's when they put the handcuffs on him. |
| 12 | Q.  Who put the handcuffs on him? |
| 13 | A.  Chris West. |
| 14 | Q.  How did they cuff him?  How did Chris cuff |
| 15 | him?  Excuse me. |
| 16 | A.  With his hands behind his back. |
| 17 | Q.  What did Chris do with his gun? |
| 18 | A.  He put it in his holster after he put the |
| 19 | handcuffs on him.  But the other one still |
| 20 | had his out. |
| 21 | Q.  Where was that pointed? |
| 22 | A.  At me. |
| 23 | Q.  So he's still pointing at you? |

Page 67

| | |
|---|---|
| 1 | A.  Uh-huh (positive response). |
| 2 | Q.  With his knee on Richard's back? |
| 3 | A.  Yeah.  Because they was right in front of |
| 4 | the door and he had his knee on his back |
| 5 | and he was looking at me pointing the gun |
| 6 | at me telling me not to move. |
| 7 | Q.  Once they got him cuffed, what did they do |
| 8 | next? |
| 9 | A.  Snatched him up off the ground and started |
| 10 | grabbing on his neck and stuff.  And his |
| 11 | pants and all that. |
| 12 | Q.  Did he just forget about you? |
| 13 | A.  No.  The big one did once they got the |
| 14 | handcuffs on him.  The other one that was |
| 15 | on the passenger's side walked on my side |
| 16 | and told me to get out of the car. |
| 17 | Q.  How did he go?  How did he get to your |
| 18 | side? |
| 19 | A.  He walked around the front. |
| 20 | Q.  What did he do once he got to your side? |
| 21 | A.  Told me to get out the car. |
| 22 | Q.  Were you paying attention to him at that |
| 23 | point in time? |

Page 68

| | |
|---|---|
| 1 | A.  Which one? |
| 2 | Q.  The one who was around on your side of the |
| 3 | car now. |
| 4 | A.  Yes. |
| 5 | Q.  And when he told you to get out of the car, |
| 6 | what did you do? |
| 7 | A.  Get out. |
| 8 | Q.  How did you get out? |
| 9 | A.  Through the passenger's side. |
| 10 | Q.  Did you open the door?  Did you go out the |
| 11 | window?  How did you get out? |
| 12 | A.  Open the door. |
| 13 | Q.  And he let you do that? |
| 14 | A.  Uh-huh (positive response). |
| 15 | Q.  Is that a yes? |
| 16 | A.  Yes. |
| 17 | Q.  Once you got out of the car, what happened |
| 18 | next? |
| 19 | A.  They put the handcuffs on me. |
| 20 | Q.  Who put the handcuffs on you? |
| 21 | A.  The officer on the passenger side. |
| 22 | Q.  Explain for me the handcuffing process for |
| 23 | you.  How did he get cuffs on you? |

Page 69

1　A.　He just told me to stand on the side of the
2　　　car and he grabbed one of my arms and put
3　　　it behind my back and grabbed the other
4　　　one.
5　Q.　Didn't put you on the ground?
6　A.　Huh-uh (negative response).
7　Q.　Is that a no?
8　A.　No.
9　Q.　Once he got the handcuffs on you, what
10　　　happened next?
11　A.　He made me sit in the grass.
12　Q.　Where we see you on Defendant's Exhibit 8?
13　A.　Yes.
14　Q.　Is that right?
15　A.　Yes.
16　Q.　So he took you over there?
17　A.　Yes.
18　Q.　Were you able to -- What, if anything, were
19　　　you able to see that was going on with
20　　　Richard while this was happening?
21　A.　I just saw the bigger one that was driving
22　　　the car just had his hand around his neck
23　　　telling him to shut up and don't move and

Page 70

1　　　pulling all on his pants and stuff.
2　Q.　Was Richard resisting him in any way?
3　A.　No.
4　Q.　Was he telling him he wasn't going to go
5　　　anywhere?
6　A.　No. He just kept asking him why did they
7　　　pull him over and knock him off the road.
8　　　Just told him to shut up.
9　Q.　Was your radio still on at this point?
10　A.　No.
11　Q.　What happened with Richard? What did they
12　　　do with him?
13　A.　They put him -- I think they put him in
14　　　another car because I was in the Lincoln.
15　Q.　That's a little bit further down the road,
16　　　though, right, in time?
17　A.　What?
18　Q.　Because they put you over here sitting on
19　　　the side of the hill initially; right?
20　A.　Uh-huh (positive response).
21　Q.　While you were sitting over here on the
22　　　hill, what did they do with Richard?
23　A.　I think he was in the back seat of that car

Page 71

1　　　and another car pulled up. I know we
2　　　wasn't in the same car.
3　Q.　Back seat of what car?
4　A.　That Lincoln. I think that's what he was
5　　　in. Because after they sat me on the
6　　　ground it was like the car -- the Nova, it
7　　　was kind of like blocking because they had
8　　　him over there on the ground.
9　Q.　When you say blocking, does that mean you
10　　　couldn't see what was going on?
11　A.　After they sat me in the grass.
12　Q.　Did you see anything else happen before --
13　　　Let me back up. Another police car came at
14　　　some point?
15　A.　Yes. Because I remember he was in -- when
16　　　they stopped at the store, he was in
17　　　another car. He wasn't in the car with me.
18　Q.　What happened between the time that you
19　　　were sat there on the hill and that other
20　　　police car came?
21　A.　They were looking through his car.
22　Q.　Who was looking through his car?
23　A.　Chris West.

Page 72

1　Q.　Just Chris?
2　A.　And the other guy was, too, but he wasn't
3　　　looking in it like the other guy was.
4　Q.　Did they take anything out of the car?
5　A.　Their gun.
6　Q.　What did they do with the gun?
7　A.　I think they sat it on the hood of their
8　　　car.
9　Q.　How soon after you guys came to a rest
10　　　after being knocked off the road did they
11　　　get the gun?
12　A.　Probably after they sat me in the grass.
13　　　Probably about maybe two, three minutes
14　　　later, because time they looked in there
15　　　that's when they seen it.
16　Q.　When did they first -- When did you first
17　　　know that they knew that there was a gun in
18　　　the car?
19　A.　Because I heard one of the officers said
20　　　something about we pointing our guns at
21　　　them and he got a gun in here bigger than
22　　　ours.
23　Q.　First of all, who made that comment?

Page 73

1    A.   The guy that was on the passenger side.
2    Q.   And when did he make that comment?
3    A.   Once they looked in the car.
4    Q.   Was that before or after they cuffed
5         Richard?
6    A.   After.
7    Q.   How long after they cuffed Richard?
8    A.   Probably about three, four minutes.  It
9         wasn't that long.
10   Q.   Did they take some pictures that day?
11   A.   They took a picture of me.
12            (Defendant's Exhibit 13 was marked
13            for identification.)
14   Q.   Let me show you Defendant's Exhibit 13.  Is
15        that the picture they took of you?
16   A.   Yes.
17   Q.   Did you see them taking these other
18        pictures that we've been talking about
19        today?
20   A.   Not really.  I remember they took this
21        picture right here.  Not this one, but the
22        one where I was sitting in the grass.
23   Q.   Defendant's 8?

Page 74

1    A.   Uh-huh (positive response).
2    Q.   Is that a yes?
3    A.   Yes.
4    Q.   Well, everything that we've showed you so
5         far, that is the way it was on that day;
6         correct?
7    A.   Yes.
8    Q.   They took a picture of Richard too; right?
9    A.   Yes.
10   Q.   Let me show you Defendant's 11.  Is that
11        how he looked that day?
12   A.   Yes.
13   Q.   Let me show you Defendant's 9.  What is
14        that?
15   A.   Looks like about $15.
16   Q.   Can you tell where that's at?
17   A.   Looks like under a bed.
18   Q.   That's not in Richard's car?
19   A.   No.  He don't have carpet.
20   Q.   Let me show you Defendant's 4.  Is that a
21        picture of the inside of Richard's car that
22        day?
23   A.   Yes.

Page 75

1    Q.   Is that his ashtray?
2    A.   Yes.
3    Q.   And those bullets were in the ashtray that
4         day?
5    A.   I guess.  I didn't look in the ashtray.
6    Q.   But you do recognize that as his ashtray;
7         correct?
8    A.   Yeah.  That's the inside of his car.
9    Q.   At any point after Richard got out of the
10        car but before he was placed in handcuffs
11        did he try to get back in the car?
12   A.   No.  Because as soon as he opened the door,
13        they shot and he didn't ever move until
14        they told him to get out.
15   Q.   Did he ever try to reach back into the car?
16   A.   No.
17   Q.   Other than the gun, did they take anything
18        else out of the car during the search?
19   A.   No.
20   Q.   Did anybody search you?
21   A.   Yes.
22   Q.   Who searched you?
23   A.   Officer on the passenger side.

Page 76

1    Q.   Did they take anything from you?
2    A.   No.
3    Q.   Did you see anybody search Richard?
4    A.   Yes.
5    Q.   Who searched Richard?
6    A.   Chris West.
7    Q.   Did you see them take anything from
8         Richard?
9    A.   I seen them snatching all on his pants.
10        That's when they made me sit down in the
11        grass.
12   Q.   Did you see them take anything from him,
13        though?
14   A.   No.
15   Q.   How long were you sitting there in the
16        grass before that police car showed up?
17   A.   Maybe about 30, 45 minutes.
18   Q.   And you said they put you in what car?
19   A.   That Lincoln.
20   Q.   Did they put you in the car after that
21        other police car showed up?
22   A.   After they put him in the car, yes.
23   Q.   After they put who in the car?

Page 77

| | |
|---|---|
| 1 | A. Richard. |
| 2 | Q. And they put him in which car? |
| 3 | A. The police car. |
| 4 | Q. Then they came and got you and put you in |
| 5 | the Lincoln; is that right? |
| 6 | A. Yes. |
| 7 | Q. What happened after y'all got put in the |
| 8 | cars? |
| 9 | A. The other officer got in Richard's car. |
| 10 | Q. Which other officer? |
| 11 | A. The one that was on the passenger's side. |
| 12 | Q. What happened then? |
| 13 | A. We drove up the road about a little less |
| 14 | than a mile. That's when Chris West pulled |
| 15 | over on the side of the road and picked up |
| 16 | something. |
| 17 | Q. Did you see what it was he picked up? |
| 18 | A. No. He put it in a bag. |
| 19 | Q. Did you ever come to learn what it was that |
| 20 | he picked up? |
| 21 | A. No. I just know what he said when he got |
| 22 | back in the car. |
| 23 | Q. What did he say? |

Page 78

| | |
|---|---|
| 1 | A. We got your cousin's ass now. |
| 2 | Q. Did he say anything else besides that? |
| 3 | A. No. |
| 4 | Q. Did you know what he meant by that? |
| 5 | A. No. |
| 6 | Q. How did he know at that point that you were |
| 7 | cousins? |
| 8 | A. Because they -- he asked me. |
| 9 | Q. When did he ask you that? |
| 10 | A. While I was sitting on the ground, they |
| 11 | asked me how did I know him. |
| 12 | Q. All right. Once Chris gets back in the |
| 13 | car, what happens after that? |
| 14 | A. They go on down the road to the store. |
| 15 | Q. What store did they go to? |
| 16 | A. Howard, Howard Hooks. |
| 17 | Q. Where is that at? |
| 18 | A. Probably about a mile from where we was at. |
| 19 | Q. Towards Hayneville? Towards Wilcox County? |
| 20 | A. Towards Hayneville. |
| 21 | Q. And what happened when you got to the |
| 22 | store? |
| 23 | A. The police car pulled up and they pulled up |

Page 79

| | |
|---|---|
| 1 | in his car and was putting gas in it. And |
| 2 | the police car had a flat and we had to sit |
| 3 | there until they fixed the flat. |
| 4 | Q. How long did that take? |
| 5 | A. Probably about 30 minutes. |
| 6 | Q. Anything else happen there at the gas |
| 7 | station besides putting gas in Richard's |
| 8 | car and fixing the flat? |
| 9 | A. No. The other officer left in the car |
| 10 | after that, after he put the gas in. |
| 11 | Q. Left in Richard's car? |
| 12 | A. Yeah. |
| 13 | Q. Was the passenger still driving Richard's |
| 14 | car? |
| 15 | A. Yes. |
| 16 | Q. He left before you did? |
| 17 | A. Yes. After he put the gas in, he left and |
| 18 | got out and was fixing his tire and Chris |
| 19 | West stayed there until he got through. |
| 20 | Q. After the tire was fixed, then what |
| 21 | happened? |
| 22 | A. They took us to the Hayneville jail. |
| 23 | Q. How long did it take you to get to the |

Page 80

| | |
|---|---|
| 1 | Hayneville jail? |
| 2 | A. Maybe five minutes. Five, 10 minutes. |
| 3 | Q. Other than the comment that Chris made to |
| 4 | you when he found whatever it was he found |
| 5 | on the side of the road, did y'all have any |
| 6 | other conversation at any time before you |
| 7 | got to the jail? |
| 8 | A. No. He had the radio up. |
| 9 | Q. Did he talk on that CB radio as you |
| 10 | described it while y'all were going to the |
| 11 | jail? |
| 12 | A. No. |
| 13 | Q. How long does it take to get from that |
| 14 | store to the jail? |
| 15 | A. Maybe five, 10 minutes. |
| 16 | Q. What happened once you got to the jail? |
| 17 | A. They started dressing my cousin out. Well, |
| 18 | made him change clothes. |
| 19 | Q. What happened with you once you got to the |
| 20 | jail? |
| 21 | A. Nothing. |
| 22 | Q. Nothing? |
| 23 | A. No. |

Page 81

1   Q.   Okay.  You arrive in the Lincoln.  You're
2        still in handcuffs; right?
3   A.   Yes.
4   Q.   Car stops?
5   A.   Yes.
6   Q.   What happens after the car stops?
7   A.   They just take me on the inside where they
8        book you at, where they put you in there
9        at.
10  Q.   Were you booked?
11  A.   No.
12  Q.   What did they do with you?
13  A.   He just took me in a room and started
14       asking me questions.  Then he told me to
15       call me a ride because I ain't who they
16       want.
17  Q.   How long were you in the booking area
18       before being taken to that room?
19  A.   Maybe 30, 45 minutes.
20  Q.   Were you able to see Richard get booked?
21  A.   Yes.
22  Q.   What happened with Richard's booking?
23  A.   They took him in the back and made him

Page 82

1        change clothes back there with Chris West.
2        And when they came back to the front, they
3        put his stuff on the counter and they got
4        into it about that wasn't the money that he
5        had.
6   Q.   Who is they that got into it?
7   A.   He told Chris West that that wasn't the
8        money that he had in his pocket, that some
9        of it was missing.
10  Q.   What did Chris say?
11  A.   Told him to shut up and told the people to
12       put him in a -- like a little cell right
13       beside.
14  Q.   Did they do that?
15  A.   Yes.
16  Q.   How many people besides you, Chris West,
17       and Richard were there in the booking area?
18  A.   It was a lady at the desk and another guy.
19  Q.   Was the deputy who transported Richard, was
20       he there?
21  A.   Not that I remember.
22  Q.   Who was the other guy?
23  A.   Someone up behind the desk with the girl.

Page 83

1   Q.   Was he wearing a uniform?
2   A.   Yes.
3   Q.   Was it a jail uniform?
4   A.   It was like he worked there.
5   Q.   What about the girl as you described her,
6        was she somebody who worked there too?
7   A.   Yes.
8   Q.   Do you know who she was?
9   A.   No.
10  Q.   Haven't seen them since?
11  A.   No.
12  Q.   Who took you back into that room that you
13       were telling me about?
14  A.   Chris West.
15  Q.   And how long were you back there with him?
16  A.   Maybe 20 minutes.
17  Q.   What did y'all talk about?
18  A.   He just was asking me questions.  Then
19       another guy came in.
20  Q.   Who was the other guy?
21  A.   I don't know.  He had on like a suit.
22  Q.   White guy or black guy?
23  A.   Black guy.

Page 84

1   Q.   Did he have a badge?
2   A.   Yes.
3   Q.   And a gun?
4   A.   Yes.
5   Q.   Did he ask you questions?
6   A.   Yes.
7   Q.   Did you make this statement that's
8        Defendant's Exhibit 6 while you were back
9        there in that room?
10  A.   I think that's the paper.  I know they had
11       me write something.
12  Q.   I'll let you look at it again and you tell
13       me if that's what you did that day.
14  A.   Yes.
15  Q.   Anybody else besides Chris and the guy in
16       the suit come back there and talk to you?
17  A.   No.
18  Q.   And what happened after you made the
19       statement?
20  A.   He told me he would call me a ride.
21  Q.   And did you do that?
22  A.   Yes.
23  Q.   Who did you call?



Page 85

1   A.  My aunt.  But --
2   Q.  Which aunt?
3   A.  Shirley Marshall.  But she wasn't there, so
4       they told one of the police guys to take me
5       home.
6   Q.  After you were taken back to that room
7       where you made the statement, did you see
8       Richard again that day?
9   A.  No.
10  Q.  Were there ever any charges pressed against
11      you?
12  A.  No.
13  Q.  Other than you and Richard, do you know of
14      anybody else who claims that they witnessed
15      the chase?
16  A.  No.
17  Q.  Do you know of anybody who claims to have
18      witnessed them ramming you off the road?
19  A.  No.
20  Q.  Do you know of anybody who claims to have
21      gone by and saw y'all on the side of the
22      road?
23  A.  I seen cars stopping, but I ain't know who

Page 87

1   Q.  When you see him every now and then, do
2       y'all do the same things you used to do?
3   A.  Like when he come up here, we'll probably
4       go to the mall or something.  But that's
5       been probably a year ago.
6   Q.  That's just because y'all are separated by
7       distance now; right?
8   A.  Yes.
9   Q.  Have you noticed any changes in his
10      behavior?
11  A.  No.
12          MR. WILFORD:  I think that's all I
13      have.
14          MR. LEWIS:  That's it.
15      (Deposition was concluded at
16      approximately 3:25 p.m.)
17
18      * * * * * * * * * * * * * *
19      FURTHER DEPONENT SAITH NOT
20      * * * * * * * * * * * * * *
21
22
23

Page 86

1       they was.
2   Q.  You didn't recognize anybody?
3   A.  No.
4   Q.  Do you know what happened to that gun?
5   A.  No.
6           MR. WILFORD:  Let's take a break.
7       (Brief recess was taken.)
8   Q.  Mr. Carmichael, what kind of stuff did you
9       and your cousin Richard do before this
10      incident?
11  A.  At his house?
12  Q.  Just in general.  What kind of stuff did
13      y'all do?
14  A.  Just sit around, watch TV, and used to go
15      to the casino.
16  Q.  Which casino?
17  A.  In White Hall.
18  Q.  Anything else?
19  A.  Just around my cousin's house.
20  Q.  Do y'all still do those same things now?
21  A.  I'm back up in Montgomery.
22  Q.  You don't hang around with him anymore?
23  A.  I see him every now and then.

Page 88

1           REPORTER'S CERTIFICATE
2   STATE OF ALABAMA:
3   MONTGOMERY COUNTY:
4           I, Lyn Daugherty, Certified Shorthand
5   Reporter and Commissioner for the State of Alabama
6   at Large, do hereby certify that I reported the
7   deposition of:
8           KELVIN CARMICHAEL
9   who was duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the
11  matter of:
12          RICHARD MARSHALL,
13          Plaintiff,
14      vs.
15      CHRIS WEST, in his individual
16      capacity, LASHUN HUTSON, in his
17      individual capacity,
18      Defendants.
19      IN THE UNITED STATES DISTRICT COURT
20      FOR THE MIDDLE DISTRICT OF ALABAMA
21      NORTHERN DIVISION
22      Civil Action No. 2:06-cv-701-ID.CSC
23  on Wednesday, November 14, 2007.

Deposition of Kelvin Carmichael                                    November 14, 2007

Page 89

1        The foregoing 87 computer-printed pages
2    contain a true and correct transcript of the
3    examination of said witness by counsel for the
4    parties set out herein.  The reading and signing is
5    hereby waived.
6        I further certify that I am neither of kin
7    nor of counsel to the parties to said cause nor in
8    any manner interested in the results thereof.
9        This 13th day of December 2007.
10
11
12
              _____
13            Lyn Daugherty, ACCR #66
              Expiration Date:  9-30-2008
              Certified Court Reporter
14            And Commissioner for the
              State of Alabama at Large
15
16
17
18
19
20
21
22
23

# DEPOSITION OF CHRISTOPHER WEST

## January 21, 2008

## Pages 1 through 64

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

PENGAD 800-631-6989

EXHIBIT

3

Deposition of Christopher West    Marshall vs. West; Hutson    January 21, 2008

---

Page 1

1
2          IN THE UNITED STATES DISTRICT COURT
3          FOR THE MIDDLE DISTRICT OF ALABAMA
4                    NORTHERN DIVISION
5
6    RICHARD MARSHALL,
7          Plaintiff,
8    vs.              CIVIL ACTION NO.
                    2:06-cv-701-ID.CSC
9
     CHRIS WEST, in his individual
10   capacity, LASHUN HUTSON, in his
     individual capacity,
11
12         Defendants.
13         * * * * * * * * * * * *
14
15         DEPOSITION OF CHRISTOPHER WEST, taken
16   pursuant to stipulation and agreement before Tracye
17   Sadler Blackwell, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20   Drive, Montgomery, Alabama, on January 21, 2008,
21   commencing at approximately 9:10 a.m.
22
23         * * * * * * * * * * * *

---

Page 2

1              APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4    Mr. Jay Lewis
     Law Offices of Jay Lewis
5    Attorney at Law
     847 South McDonough Street
6    Montgomery, Alabama
7
8    ON BEHALF OF THE DEFENDANTS:
9    Mr. Daryl L. Masters
     WEBB & ELEY, P.C.
10   Attorneys at Law
     7475 Halcyon Pointe Drive
11   Montgomery, AL 36117
12   Mr. Rick A. Howard
     NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
13   Attorneys at Law
     Suite 300
14   4001 Carmichael Road
     Montgomery, AL 36106
15
16
     ALSO PRESENT:
17
     Mr. Lashun Hutson
18
19
20         * * * * * * * * * * * *
21
22
23

---

Page 3

1              EXAMINATION INDEX
2
     BY MR. LEWIS . . . . . . . . . .  5
3
4          PLAINTIFF'S EXHIBITS
5
1    Evidence Submission/Analysis Forms     42
6
2    Courtesy Warning                       46
7
3    Deposition                             47
8
4    Complaint and Warrant                  51
9
5    Alabama Uniform Incident/Offense Report  52
10
6    6-28-05 Statement Form of Christopher   55
11   West
12         * * * * * * * * * * *
13
14
15         STIPULATIONS
16       It is hereby stipulated and agreed by and
17   between counsel representing the parties that the
18   deposition of CHRISTOPHER WEST is taken pursuant to
19   the Federal Rules of Civil Procedure and that said
20   deposition may be taken before Tracye Sadler
21   Blackwell, Certified Court Reporter and
22   Commissioner for the State of Alabama at Large,
23   without the formality of a commission, that

---

Page 4

1    objections to questions other than objections as to
2    the form of the question need not be made at this
3    time but may be reserved for a ruling at such time
4    as the said deposition may be offered in evidence
5    or used for any other purpose by either party
6    provided for by the Statute.
7        It is further stipulated and agreed by and
8    between counsel representing the parties in this
9    case that the filing of said deposition is hereby
10   waived and may be introduced at the trial of this
11   case or used in any other manner by either party
12   hereto provided for by the Statute regardless of
13   the waiving of the filing of the same.
14       It is further stipulated and agreed by and
15   between the parties hereto and the witness that the
16   signature of the witness to this deposition is
17   hereby waived.
18
19
20         * * * * * * * * * * * *
21
22
23

Page 5

1    THE COURT REPORTER: Usual
2        stipulations?
3    MR. MASTERS: Yes.
4    MR. LEWIS: Yes.
5
6        CHRISTOPHER WEST
7    The witness, after having first been duly sworn
8    to speak the truth, the whole truth, and nothing
9    but the truth, testified as follows:
10        EXAMINATION
11   BY MR. LEWIS:
12   Q.  Tell us your name, please.
13   A.  Christopher Stewart West.
14   Q.  And how are you employed, Mr. West?
15   A.  By the Lowndes County Sheriff's Department.
16   Q.  And how long have you been employed by the
17       Lowndes County Sheriff's Department?
18   A.  About 11, 12 years, I think.
19   Q.  And what's your position with Lowndes
20       County Sheriff's Department?
21   A.  I'm a deputy sheriff.
22   Q.  Do you hold any particular rank as a deputy
23       sheriff?

Page 6

1    A.  I'm a lieutenant.
2    Q.  How many people are employed in the Lowndes
3        County Sheriff's Office? And by that I
4        mean people who are in law enforcement as
5        opposed to jail work.
6    A.  Between 10 and 12 deputies, I think.
7    Q.  And what is your particular job as
8        lieutenant? Do you have any particular
9        responsibility in that position?
10   A.  Yes, sir. I'm drug task force commander.
11   Q.  And help me understand the drug task force
12       because there's always some confusion about
13       whether it's a legal entity, whether it has
14       its own personnel practices, whether it has
15       its own policies. Tell me, if you will,
16       what the 2nd Judicial Drug Task Force is.
17       MR. MASTERS: Object to the form.
18           Go ahead and answer as best as
19           you can, Chris.
20   A.  The drug task force is a task force that's
21       made up of several agencies. We're funded
22       by the Department of Justice through the
23       Alabama Department of Economic and

Page 7

1    Community Affairs through a grant. There
2    are several law enforcement agencies,
3    including district attorney's office,
4    within our three-county circuit.
5        Each year an agency -- all the agencies
6    are allowed to place an agent or an officer
7    on the drug task force. Some agencies
8    choose to participate. Most don't because
9    of funding issues. Currently there's the
10   Lowndes County Sheriff's Office, the
11   Hayneville Police Department, and the
12   district attorney's office that are
13   participating on the drug task force as
14   part of the grant.
15   Q.  Okay. So those three agencies make up the
16       drug task force?
17   A.  Yes, sir.
18   Q.  Are there federal agents assigned to that?
19   A.  No, sir.
20   Q.  But your salary continues to come from the
21       Lowndes County Sheriff's Office?
22   A.  That's correct.
23   Q.  And the Lowndes County Sheriff's Office in

Page 8

1    turn receives a grant to cover your
2    activity with the drug task force?
3    A.  The Lowndes County Commission does, not the
4        sheriff's office.
5    Q.  Does the Lowndes County -- does the drug
6        task force have a separate policies and
7        procedures manual for you to follow?
8    A.  Yes, sir, we do.
9    Q.  And are the policies and procedures in that
10       promulgated by the Department of Justice or
11       by some individual agency or the task force
12       as a group?
13   A.  A board of directors that form up the drug
14       task force. We have a board of directors
15       that meet periodically, and if new rules or
16       guidelines need to be established, then the
17       board members will collectively make a
18       decision on how to establish that.
19   Q.  Okay. And do those guidelines include
20       tactical operations, the way you perform
21       your duties, the day-to-day activities in
22       which you're involved?
23   A.  Yes, sir.

Deposition of Christopher West                Marshall vs. West; Hutson                January 21, 2008

Page 9

1    Q.  Does the Lowndes County Sheriff's Office
2         have its own set of rules and regulations
3         for you to go by?
4    A.  Yes.
5    Q.  And who puts those out?
6    A.  The sheriff.
7    Q.  Have you discovered any conflicts between
8         the sheriff's guidelines and policies and
9         those of the drug task force?
10   A.  No, sir.
11   Q.  So they're pretty much consistent?
12   A.  Yes, sir.
13   Q.  Let me get a little personal information on
14        you.  What's your address?
15   A.  Physical or mailing?
16   Q.  Physical.
17   A.  235 -- no.  214 Norman Drive, Fort Deposit.
18   Q.  Okay.  214 Norman Drive?
19   A.  Yes.
20   Q.  And what's your educational background?
21   A.  I graduated high school, currently in
22        college.
23   Q.  And where are you in college?

Page 10

1    A.  Herzing in Birmingham.
2    Q.  Where?
3    A.  Herzing.  Herzing College in Birmingham.
4    Q.  Herzing?
5    A.  Yes, sir.
6    Q.  What sort of school is that?
7    A.  It's a private school.
8    Q.  And you're looking for a four-year degree
9         from there?
10   A.  Yes, sir.
11   Q.  What year are you at Herzing?
12   A.  My final year.
13   Q.  And what's your major?
14   A.  Homeland security and public safety.
15   Q.  When did you graduate from high school?
16   A.  In '86.
17   Q.  Have you had any additional training since
18        1986 other than what you're getting at
19        Herzing College?
20   A.  In regards to ...
21   Q.  Your position, your job --
22   A.  Yes, sir.
23   Q.  -- criminal justice, that sort of thing.

Page 11

1    A.  Yes, sir.
2    Q.  Tell me about those.
3    A.  It's just a --
4    Q.  And I don't want the two-day seminars and
5         stuff like that.
6    A.  Yeah.  There's just numerous ...
7    Q.  Okay.  Have you been to the FBI Academy?
8    A.  Yes, sir.
9    Q.  How long a course was that?
10   A.  Ten weeks.
11        MR. HOWARD:  Can we take a second?
12        MR. LEWIS:  Sure.
13        (A brief recess was taken.)
14   Q.  (Mr. Lewis continuing:)  Have you had any
15        other training courses that have been six
16        weeks or longer?
17   A.  No, sir, I don't believe so.
18   Q.  Have you been to any law enforcement
19        advanced driving academies?
20   A.  No, sir.
21   Q.  Let me call your attention to June 28th,
22        2005.  And I'll represent to you that's the
23        date that everybody agrees that the

Page 12

1         incident with Mr. Marshall about which
2         we're here today occurred.  What had you
3         been doing that entire day?
4    A.  At my office.  Got up out of bed that
5         morning and went to work.
6    Q.  Okay.  What projects were you working on
7         that day?
8    A.  I don't remember.
9    Q.  Okay.  Do you remember when you left your
10        office?
11   A.  No, sir, not exactly.
12   Q.  Okay.  At some point that day did you hook
13        up with Mr. Hutson?
14   A.  Yes, sir.
15   Q.  At what point did you do that?
16   A.  I don't really remember.  He may have -- we
17        may have been in the office together that
18        morning and discussed Mr. Marshall, or I
19        may have picked him up at another
20        location.  I just don't remember.
21   Q.  When you say you might have picked him up,
22        do you recall who was driving?
23   A.  I was driving.

Page 13

1  Q.  Do you recall what you were driving?
2  A.  Yes, sir.
3  Q.  What were you driving?
4  A.  A Lincoln.
5  Q.  What model?
6  A.  Town Car.
7  Q.  What year?  Do you remember?
8  A.  No, sir, I don't remember.
9  Q.  And why were you driving a Lincoln Town
10     Car?
11  A.  I don't remember exactly why we were
12     driving the Lincoln that day.
13  Q.  Was that Lincoln a vehicle that had been
14     confiscated?
15  A.  Yes, sir.
16  Q.  And had there been a condemnation
17     proceeding as to that Lincoln?
18  A.  Yes, sir.
19  Q.  And it had been condemned and your office
20     had it?
21  A.  Yes, sir.
22  Q.  Why were you discussing Mr. Marshall that
23     day?

Page 14

1  A.  I had received information that
2     Mr. Marshall was selling dope at his
3     residence, selling illegal drugs at his
4     residence.
5  Q.  Where did you get that information?
6  A.  I don't remember.
7  Q.  Did you make any notes of where you got
8     that information from?
9  A.  I may have.
10  Q.  Would you have preserved those notes?
11  A.  No, sir.
12  Q.  Did your information indicate what sort of
13     drugs he was supposed to be selling?
14  A.  Crack cocaine and marijuana.
15  Q.  And based on that information what, if
16     anything, did you do?
17  A.  We drove out to Mr. Marshall's residence to
18     do a knock-and-talk and to just discuss
19     with him the information that we had
20     received.
21  Q.  And where was Mr. Marshall's residence?
22  A.  Just off Highway 21 on a little dirt road.
23     I don't recall the name of the dirt road.

Page 15

1     And it wasn't -- I don't know if you really
2     could consider it a dirt road.  It's more
3     like a -- more like a big driveway that
4     kind of went up a hill and then it took a
5     right right in front of the mobile home
6     where he was living at at the time.  And as
7     it went on past his house, I guess maybe
8     less than a hundred yards or so it kind of
9     turned into a little more narrow trail so
10     to speak.  So I don't even know if it's
11     considered -- if it has a name.  It could
12     be a private drive.
13  Q.  All right.  Did you know Mr. Marshall prior
14     to this time?
15  A.  No, sir.
16  Q.  Had you had any law enforcement contact
17     with Mr. Marshall prior to this time?
18  A.  Never met him.  Never seen him before.
19  Q.  Had you received any prior information
20     about Mr. Marshall prior to that time?
21  A.  Yes, sir.
22  Q.  And what information had you received?
23  A.  The same information in reference to drug

Page 16

1     activity.
2  Q.  When you got to his house, what, if
3     anything, did you do?
4  A.  I believe that we knocked on the door and
5     no one came to the door.  We got back in
6     our vehicles and -- or got back in our
7     vehicle and left the residence.  Agent
8     Hutson had some information about another
9     place that was, I think -- I think it's
10     referred to as the Casey community.  It's
11     kind of in that area.  It's not in the
12     exact same area, but it's in that part of
13     the county.  And when we were leaving
14     Mr. Marshall's residence, we were going to
15     go to this home down in the Casey
16     community.
17  Q.  And what information did you have about the
18     Casey community that led you to go down
19     there?
20  A.  Agent Hutson had that.  I'm not exactly --
21     I'm not exactly sure.
22  Q.  So you were looking for Mr. Marshall?
23  A.  Yes, sir.

Deposition of Christopher West          Marshall vs. West; Hutson                    January 21, 2008

Page 17

1    Q.   Did you know what kind of car Mr. Marshall
2         was likely to be driving?
3    A.   Yes, sir.
4    Q.   And what were you on the lookout for?
5    A.   A blue Chevy Nova, older -- older -- older
6         type vehicle.
7    Q.   And just so I'm clear, you did not -- you
8         do not recall today when you received the
9         information about Mr. Marshall allegedly
10        selling drugs?
11   A.   No, sir.  It could have been someone we
12        interviewed and I just made a note on
13        some -- a small Post-it, or it could have
14        been a phone call.  I know we received it
15        on more than one occasion.
16   Q.   And when you received that information, do
17        you have a present sense of whether or not
18        you believed that information to be
19        reliable?
20   A.   If -- if it was a source that was a
21        reliable source and the time frame allowed,
22        I would have obtained a search warrant for
23        his residence.  But we're doing a

Page 18

1         knock-and-talk, so maybe -- it could have
2         been a reliable informant that just knew
3         that activity was going on and just
4         referred it to me and we went out to do the
5         knock-and-talk.  If it was reliable, we
6         would obtain -- I mean, if it was reliable
7         and within the time frame allowed, we would
8         have gotten a search warrant.
9    Q.   Okay.  So the fact that you didn't get a
10        search warrant would seem to indicate that
11        it was not the sort of information that you
12        would have taken to a judge at that time;
13        correct?
14   A.   That's correct.  Not at that time.
15   Q.   All right.  So you're on your way to the
16        Casey community.  How do you get to the
17        Casey community from where Mr. Marshall's
18        residence is?
19   A.   You know, I'm not exactly sure because I
20        don't think I've ever been there before.
21        But, now, Agent Hutson is familiar with it.
22   Q.   Okay.
23   A.   But I know it's -- you got to -- in the

Page 19

1         direction we were coming from, you have to
2         go down County Road 7.  Because we were on
3         21.  I mean, he -- where he lives is just
4         off 21.
5    Q.   Right.
6    A.   So if you're coming back toward Hayneville
7         from Mr. Marshall's residence, you take a
8         left on County Road 7.
9    Q.   And prior to your encountering Mr. Marshall
10        had you taken that left?
11   A.   Yes, sir.
12   Q.   So you were on County Road 7 at that time?
13   A.   That's right.
14   Q.   What, if anything, happened then?
15   A.   We met Mr. Marshall's vehicle, and I -- I
16        said, well, that's his vehicle right
17        there.  We turned around and got behind his
18        vehicle.
19   Q.   Okay.  And what then?
20   A.   Mr. Marshall didn't have on a seatbelt.  I
21        observed that he didn't have on a
22        seatbelt.  And we've got a blue-and-white
23        warning light that is powered -- it's a

Page 20

1         12-volt power that you plug into the
2         cigarette lighter.  And I placed it on the
3         dash of the vehicle and activated that
4         light behind his vehicle.
5    Q.   What did Mr. Marshall do in response to
6         that?
7    A.   Kept driving.
8    Q.   How fast were you going at the time you
9         first activated this light?
10   A.   I don't -- I don't recall.
11   Q.   Well, would you consider it an excessive
12        rate of -- without regard to miles per
13        hour, an excessive rate of speed, an
14        ordinary rate of speed, a slow rate of
15        speed?
16   A.   An ordinary rate.  It wasn't exceeding the
17        speed limit.
18   Q.   And your position is that Mr. Marshall --
19        that you activated this light?
20   A.   That's correct.
21   Q.   And the light was working at the time?
22   A.   Yes, sir.
23   Q.   And there were blue-and-white strobes or

Page 21

1     flashes coming off the light?
2     A.  That's correct.
3     Q.  All right.  So Mr. Marshall kept on
4        driving?
5     A.  That's right.
6     Q.  What did you do then?
7     A.  Blew the horn, flashed the headlights, and
8        even at one point pulled alongside his
9        vehicle.
10    Q.  What color was this Lincoln Town Car you
11       were in?
12    A.  It's kind of a bluish/aquamarine type
13       color.
14    Q.  Doesn't look much like a police car though?
15    A.  No.
16    Q.  So you blew the horn, and Mr. Marshall just
17       continued to keep driving; right?
18    A.  Yes, sir.
19    Q.  You say you pulled up alongside him.  Tell
20       me about that.
21    A.  We pulled alongside the vehicle.  And, like
22       I said, it -- he's got an older car.  It
23       doesn't run that fast.  Pulled alongside

Page 22

1     the vehicle.  Our windows are down.  I
2     think Agent Hutson holds up his badge.  And
3     it's a pretty good -- it's a pretty good
4     size badge.  It's round and it has a
5     leather cover around it.  It's a gold badge
6     with a black background.  And he holds it
7     up.  I mean, we're probably as close from
8     me to you.  And he holds up the badge and
9     says pull over.  And Mr. Marshall is
10    yelling and cussing, and he's very -- has a
11    very defensive appearance about himself.
12         And so Agent Hutson is holding up the
13    badge.  And then at one point we even
14    removed the light from the dash and we've
15    got the badge in one hand and the light in
16    the other saying pull over.  And he's
17    looking, I mean, directly at us.  And he
18    says, you know, fuck y'all or something to
19    that nature, you know, I'm not pulling
20    over, you know.  And so he keeps on going.
21    And so we pull -- you know, we back off and
22    pull back in behind the vehicle just
23    following behind him.

Page 23

1     Q.  At some point you're -- setting the scene
2        here, you have turned onto Highway 7.  You
3        meet him.  He's coming toward you?
4     A.  That's correct.
5     Q.  You turn around and you're going back,
6        what, south on Highway 7 approximately?
7     A.  Yeah.
8     Q.  Back toward Highway 21?
9     A.  That's correct.
10    Q.  And when I say Highway 7, I mean County
11       Road 7.
12    A.  That's right.
13    Q.  Heading back toward Highway 21?
14    A.  Uh-huh (positive response).
15    Q.  What, if anything, happened when you hit
16       Highway 21?
17    A.  He speeds up a little bit.  It's a little
18       wider highway than the county road.
19    Q.  Did he turn onto Highway 21?
20    A.  Yes, he did.
21    Q.  Which direction did he turn?
22    A.  Going toward his residence, away from
23       Hayneville toward Wilcox County.

Page 24

1     And less than maybe 50 to 75 yards he
2     throws something out the window that
3     actually hits us in the windshield, a
4     plastic baggy.  I seen enough of those in
5     my years.  I know what a plastic baggy
6     looks like.  It hits us and just kind of
7     flies off to the side.  So I'm making
8     mental notes to try to remember where this
9     evidence or whatever came out of the
10    window.
11         And he continues to go in the direction
12    of Wilcox County.  So we pull up beside him
13    again, you know, hey, pull over.  We got
14    the badge just like this right here and the
15    light, you know, pull over.  And he's just
16    yelling and cussing, you know, fuck you
17    all, I'm not doing it, I'm not pulling
18    over, you know.
19         And so we back off.  And I tell Shun, I
20    says, hold on.  Because he's moving around
21    in his seat.  There's -- you know, he's
22    like looking down.  He's -- there's a lot
23    of movement going on in the seat with him.

Page 25

1    And I tell Shun, I says, you know, you hold
2  on because something is going on here.
3    And so I bump his vehicle a couple of
4  times thinking that that will, you know,
5  make him pull over, but he still -- you
6  know, he's yelling and he's -- and he sees
7  us. I mean, he's looking in the mirror.
8  He sees us back -- he sees the blue light.
9    And so he ducked, and then I just kind
10  of, you know, pushed his bumper a little
11  bit. And his vehicle swerves and comes up
12  on this side of the road. Never harm
13  anything. I don't even think it hurt the
14  grass. And he came to rest in the
15  vehicle. The vehicle came to rest up on
16  the embankment. And I believe I backed up
17  because I took a position -- a defensive
18  position -- his vehicle -- if my wrist is
19  the front of his vehicle, then the nose of
20  my vehicle took a position like -- at an
21  angle like this.
22    And we opened our doors with our
23  weapons drawn behind our -- behind the

Page 26

1  doors. And I said to him -- I said, get
2  out of your vehicle and get on the ground.
3  And he just sat there cussing and just
4  sweating, and his eyes were red. It was a
5  bad situation.
6  Q. Let's go back just a little bit. Earlier
7  you had said that when you pulled up next
8  to him you were as close as you were to
9  me --
10  A. Yeah.
11  Q. -- right now. And I estimate that distance
12  to be about four to five feet. Would that
13  be accurate?
14  A. Or maybe further. Something like that. I
15  mean, I could see his face and I'm
16  driving. And Shun is even closer than I
17  am. But I'm driving. There's nothing else
18  on the road. And I'm looking him in his
19  face and he's looking at us. And he sees
20  the light and the badge is just like this.
21  And, like I say, it's a gold badge with a
22  black background and a blue-and-white
23  strobe just flashing.

Page 27

1  Q. I understand --
2    MR. MASTERS: Object to the form
3    of the previous question.
4    Just listen to his questions
5    and answer his questions.
6    THE WITNESS: Okay. I'm sorry.
7  Q. The question -- the cars would have been
8  approximately four to five feet apart?
9  A. Yes, sir.
10  Q. And when you say you pulled alongside him,
11  I'm assuming that you mean that your car's
12  passenger's side was next to his car's
13  driver's side?
14  A. Yes, sir.
15  Q. And to clarify what you said about how you
16  stopped --
17    MR. MASTERS: Excuse me. Object
18    to the form of the previous
19    question.
20    Did you hear the
21    question, Chris? Which side
22    was closest to which?
23    THE WITNESS: Shun's side was

Page 28

1  closest to his driver's side.
2    MR. MASTERS: So your car's
3    passenger's side was close to
4    his car's driver's side?
5    THE WITNESS: That's right.
6    MR. MASTERS: I think you said the
7    opposite, Jay. I may be
8    mistaken.
9    MR. LEWIS: Well, I'll -- we'll go
10    with the fact that his car --
11    that Mr. West's car's
12    passenger's side was next to
13    Mr. Marshall's driver's side.
14    MR. MASTERS: I may be mistaken,
15    but I thought you said the
16    opposite.
17    MR. LEWIS: That's fine.
18  Q. But to clarify, you didn't pull over to the
19  right to get up next to his car. You
20  pulled to the left?
21  A. Yeah. I pulled as if I was passing his
22  car.
23  Q. Right. Okay. And this is a two-lane

Page 29

1  highway?
2  A.  Yes, sir.
3  Q.  Are you familiar with what a PIT is?
4  A.  Yes, sir.
5  Q.  What is a PIT?
6  A.  It's a -- what's referred to as PIT
7  maneuver.
8  Q.  And that's a precision intervention
9  technique or precision interdiction
10  technique?
11  A.  Yes, sir.
12  Q.  And is that what you performed on
13  Mr. Marshall's car?
14  A.  Yes, sir.
15  Q.  And to clarify -- correct me if I'm
16  wrong -- that's a procedure by which you
17  pull up next to the car with your front
18  fender next to his rear fender and you
19  slow down and simultaneously turn into his
20  car bumping it into a turn; correct?
21  A.  Something of that nature.
22  Q.  And that's pretty much what you did on that
23  occasion?

Page 30

1  A.  Yes, sir.
2  Q.  And his car came to rest off the road;
3  correct?
4  A.  Yes, sir.
5  Q.  Based on what you said.
6      And did it come to rest facing back in
7  the direction from what you had come?
8  A.  Yes, sir.
9  Q.  So instead of going toward Wilcox County,
10  it is now headed away from Wilcox County in
11  the grass?
12  A.  That's correct.
13  Q.  On the opposite side of the road?
14  A.  Yes, sir.
15  Q.  You then backed up and angled your car
16  toward his car just off the road?
17  A.  That's correct.
18  Q.  Okay.  I think we've got the scene set.
19      And you indicated that you jumped out
20  of the car and Mr. Hutson jumped out of the
21  car, weapons drawn, and yelled at
22  Mr. Marshall to get out of the car?
23  A.  That's correct.

Page 31

1  Q.  And what, if anything, was Mr. Marshall
2  saying to you at the time?
3  A.  Cursing.
4  Q.  Okay.  Have any recollection of the
5  specific language he was using?
6  A.  Fuck y'all, why y'all fucking with me,
7  things of that nature.
8  Q.  Going back to when you say he threw a baggy
9  out of the car and hit your car.  In what
10  way did he -- I mean, tell me what you saw
11  as that baggy came out of the car.
12  A.  I saw his arm go up and the bag come out.
13  Like I said, we could see him moving around
14  in the car.
15  Q.  And you made note of where that baggy had
16  gone off the road?
17  A.  Yes, sir.
18  Q.  You've got him in the car.  Did he have a
19  passenger with him?
20  A.  Yes, sir.
21  Q.  And what did the passenger do, if
22  anything?
23  A.  Nothing really.

Page 32

1  Q.  Just sat there?
2  A.  Yes, sir.
3  Q.  Did you hear the passenger cursing?
4  A.  No, sir.
5  Q.  And Mr. Marshall's window, was it up or
6  down?
7  A.  Down.
8  Q.  What's the next thing that happened?
9      I know I sound like a prosecutor, but
10  what happened then?
11  A.  Mr. Marshall -- he got out of his car.  He
12  was standing -- he had the door open and
13  was standing between the car and the door.
14  And he's yelling and cussing.  And I tell
15  him several times to get on the ground.  He
16  will not comply.  And several more times I
17  say get on the ground, get on the ground
18  now.  He won't comply.  And I fired my
19  weapon in the ground, I guess, some
20  seven -- six to eight feet out from him
21  into the ground.
22      At that point he was shocked that that
23  even happened.  I could see the appearance

Page 33

1 on his face. That's when I left from
2 behind my door, my weapon still pointed at
3 him -- or my weapon pointed at him, and as
4 I approached him, I grabbed him. I don't
5 remember where I grabbed him, but I know I
6 grabbed him and I put him on the ground.
7 And he -- he was very resistant.
8    But he was cussing and just combative.
9 Not very combative, but just not wanting to
10 comply at all. But I was able to get my
11 handcuffs out and put the handcuffs on
12 him. And I think Agent Hutson got the
13 passenger out and placed the handcuffs on
14 him.
15    I left him there on the ground after I
16 got him handcuffed and looked into the
17 vehicle. On the driver's seat right there
18 in the middle was a .357 Magnum. And in
19 the ashtray was .357 rounds. There was
20 some rounds in the floorboard and might
21 have been some loose rounds in the seat.
22 But I know the gun was loaded. And there
23 was a -- like a liquor flask there in the

Page 34

1 seat and, I think, a pack of Swisher Sweet
2 cigars, a partial pack or something.
3    I get him -- after I see this stuff
4 right here, I'm -- I pat him down. And I
5 think -- when I -- when I'm trying to get
6 him -- when I get him to the ground, he's
7 got these big -- real big shorts on that
8 are the bagging shorts. So they basically
9 come off of him. He doesn't have on a belt
10 or anything. And so cars are coming by and
11 he's there in his underwear. So I'm trying
12 to get him to get into the back seat of the
13 car, basically trying to save him from some
14 humiliation because he's standing there in
15 his boxers, so -- but he won't comply. He
16 just won't do nothing I'm asking him. So
17 eventually I get him pushed into the back
18 seat because, like I say, traffic is coming
19 by.
20    And the other guy, I think Agent Hutson
21 sits him over on the embankment. He's
22 cool. He's not saying anything. He's not
23 resisting in any manner. I call a marked

Page 35

1 unit. The marked unit comes out and
2 transports them. I take some photos. And
3 that's pretty much the gist of it.
4 Q.  Going back to when you had him on the
5    ground and were doing the search of the
6    vehicle. Did you also do a search of him,
7    did you say?
8 A.  I patted him, patted his pockets to see if
9    he had any weapons or anything in his
10   pockets.
11 Q.  Did you remove a wallet?
12 A.  I may have. I don't remember.
13 Q.  Did you remove any money from him?
14 A.  I may have.
15 Q.  If you removed any money from him, did you
16   turn in all of the money you removed from
17   him?
18 A.  Yes, sir.
19 Q.  Turned it in to whom?
20 A.  The jail.
21 Q.  Okay. Anything else you turned in to the
22   jail other than possibly money?
23 A.  No, sir.

Page 36

1 Q.  Okay.
2 A.  If he didn't have any weapons --
3    MR. MASTERS: Chris, just answer
4    his question.
5    THE WITNESS: Okay.
6 Q.  Well, what would have been your normal
7    procedure for dealing with confiscated
8    property?
9 A.  If he didn't have any weapons, normally I
10   would leave it in his pockets because the
11   jail is going to pick that stuff up when he
12   gets there anyway.
13 Q.  Do you recall whether you did that in this
14   case or not?
15 A.  No, sir.
16 Q.  What did you do then after he was trans --
17   let me go back.
18    You said that you called for a marked
19   unit?
20 A.  Yes, sir.
21 Q.  And did a marked unit arrive?
22 A.  Yes, sir.
23 Q.  From what jurisdiction was that marked

Page 37

1    unit?
2    A.  Lowndes County.
3    Q.  And do you recall who was in that marked
4        unit?
5    A.  Yes, sir.
6    Q.  Who was that?
7    A.  Deputy Phil Harding.
8    Q.  And what did Deputy Phil Harding do when he
9        got on the scene?
10   A.  Took Mr. Marshall and put him in the back
11       seat of his vehicle.
12   Q.  By that time had Mr. Marshall calmed down?
13   A.  No, sir.
14   Q.  Still combative?
15   A.  No, sir, not combative.  Just still ...
16   Q.  Hostile?
17   A.  Yes, sir.
18   Q.  But you didn't have to -- nobody had to
19       fight him to get him in the patrol car?
20   A.  I don't recall, no, sir.
21   Q.  And did the patrol car then leave with
22       Mr. Marshall?
23   A.  Yes, sir.

Page 38

1    Q.  What happened to the passenger?
2    A.  He rode with me.
3    Q.  And did you have any trouble out of him at
4        all?
5    A.  No, sir.
6    Q.  Do you recall who he was?
7    A.  What's that boy's last name?
8        I know, but I can't remember right now.
9    Q.  Had you had any contact with him before?
10   A.  No, sir.
11   Q.  Didn't know him?
12   A.  No, sir.
13   Q.  When's the next time you saw Mr. Marshall?
14   A.  I went to interview him a few days later.
15   Q.  At that time had he been charged with
16       anything?
17   A.  Yes, sir.
18   Q.  And do you recall how long he was held
19       before he was charged?
20   A.  He was charged the day that I arrested him.
21   Q.  And you signed a warrant on him?
22   A.  Yes, sir.
23   Q.  Do you recall whether it was you or

Page 39

1    Mr. Hutson who did the paperwork and the
2    deposition and got the charge --
3    A.  I think it was me.  I think.
4    Q.  And the only reason I ask that is I
5        couldn't read the signatures.
6    A.  Okay.
7    Q.  And tell me about the interview you had
8        with Mr. Marshall.
9    A.  He was calm.  We talked just like you and I
10       are talking now.  And I asked him for a
11       statement, and he says, I -- he didn't want
12       to give me a statement.  And so I told him
13       I understood, and that was the end of it.
14   Q.  Any sense of how long that interview took?
15   A.  20, 30 minutes, something like that.
16   Q.  Going back to the time that Mr. Marshall
17       was transported in the deputy's patrol
18       car.  What did you do after that, after
19       Mr. Marshall had been taken away?
20   A.  We -- we actually all left together.  I
21       think Agent Hutson drove Mr. Marshall's car
22       because it was still fine.  And I drove the
23       Lincoln.  Phil Harding came on the marked

Page 40

1    unit.  He had Mr. Marshall.  His --
2    Mr. Marshall's cousin was with me.  And
3    Shun drove the Nova.
4        I think we may have stopped alongside
5    the road looking for the evidence or the
6    bag that was thrown out.  And I think Phil
7    pulled over too.  And I think when he
8    pulled over he caught a nail in his tire,
9    and so he had -- he sprung a leak in his
10   tire.  So we were maybe a mile -- less than
11   a mile from Howard Hooks' store.  So Phil
12   drove his car up to Howard Hooks' store.  I
13   went up with him while he changed the tire,
14   and Shun took the Nova on back to the jail.
15   Q.  When you pulled over to the side of the
16       road, did you retrieve anything?
17   A.  I don't remember whether we did at that
18       time or not.  I think we went back and
19       later retrieved it.  I don't remember.
20       Maybe we did.  I don't remember exactly.
21   Q.  What did you retrieve?
22   A.  A baggy containing residue.
23   Q.  And what did you do with that baggy?

Page 41

1   A.  I sent it to forensics.
2   Q.  Tell me about how you, quote, sent it to
3       forensics.
4   A.  I bagged it up in a brown paper bag because
5       we were seeking a fingerprint analysis.  I
6       labeled it to get -- for fingerprint
7       analysis.  The fingerprint analysts weren't
8       able to recover any fingerprints off of
9       it.  Once I received it from fingerprint
10      analysis, I sent it to forensics, to drug
11      analysis, and they weren't able to
12      determine because there was just not enough
13      residue in the bag.
14          So I got both of those back, and they
15      were just both -- both of the results.  And
16      there was --
17  Q.  There was sufficient residue for you to see
18      that there was residue?
19  A.  Yes, sir.
20  Q.  And yet it was not sufficient for forensics
21      to make a determination?
22  A.  That's correct.
23  Q.  And you received a report back from

Page 42

1       forensics?
2   A.  Yes, sir.
3   Q.  Let me show you what we will mark as
4       Plaintiff's Exhibit Number 1.
5           (Plaintiff's Exhibit 1 was marked
6           for identification.)
7   Q.  I'm showing you what we've marked as
8       Plaintiff's Exhibit Number 1 and ask you if
9       you recognize that.
10  A.  Yes, sir.
11  Q.  And what is that, please?
12  A.  It's an evidence submission form.
13  Q.  And that's page 1?
14  A.  That's the submission form.
15  Q.  Okay.  Let's go to page 2.  What is that?
16  A.  That's the receipt of submission from
17      forensic sciences.
18  Q.  And that's done in order to preserve what
19      we call the chain of custody?
20  A.  Yes, sir.
21  Q.  What is the next page?
22  A.  This is the certificate of analysis from
23      forensic sciences.

Page 43

1   Q.  And the following page?
2   A.  It's the evidence submission form for
3       latent prints.
4   Q.  And the following page?
5   A.  It's the -- it's just a copy of the same
6       form.
7   Q.  And down at the bottom it would indicate --
8       it would seem to indicate that the chain of
9       custody as to the page we're on was not as
10      complete as the previous page?
11  A.  Say what, now?
12  Q.  The previous page of the fingerprint
13      examination request seems to show a full
14      chain of custody down at the bottom.  In
15      other words, it shows it was received by,
16      returned to, and then returned by.
17  A.  Oh, okay.
18  Q.  And there's three signatures.  And the next
19      page seems to just be the original
20      submission.
21  A.  You mean the final page?
22  Q.  No, no.
23  A.  Oh, okay.

Page 44

1   Q.  Okay.
2   A.  So are you saying that this guy, Shannon
3       Fitzgerald, received it from me and then on
4       this page right here is the one where the
5       actual examination took place?
6   Q.  Right.
7   A.  Okay.
8   Q.  Is that pretty much the way it looks to
9       you?
10  A.  That's the way it appears.
11  Q.  Okay.  And then let's go to the last page.
12      What is that?
13  A.  This is the -- I guess the findings from
14      the examination.
15  Q.  All right.  Let's go back to this third,
16      fourth -- yeah, the third page, the
17      certificate of analysis.
18  A.  Yeah.
19  Q.  What was the result of that analysis as far
20      as you can tell?
21  A.  That the analysis of the residue failed to
22      reveal the presence of any controlled
23      substances.

Page 45

1   Q.  So they were able to perform an analysis?
2   A.  Yes, sir.
3   Q.  But simply couldn't find any controlled
4       substance?
5   A.  Couldn't find any controlled substance.
6   Q.  And the last page, which is the report of
7       the fingerprint analysis, what was the
8       finding there?
9   A.  No latent prints of value were found on the
10      evidence.
11  Q.  Okay.  But Mr. Marshall was in fact charged
12      with possession of controlled substance?
13  A.  That's correct.
14  Q.  Was he charged with anything else?
15  A.  I don't remember.  Pistol without a permit,
16      I think.
17  Q.  Had you seen that pistol in Mr. Marshall's
18      possession prior to the time you executed
19      the PIT maneuver?
20  A.  No, sir.
21          (Plaintiff's Exhibit 2 was marked
22          for identification.)
23  Q.  Let me show you what's marked as

Page 46

1       Plaintiff's Exhibit Number 2 and see if you
2       recognize that.  What is that, please?
3   A.  It's a warning citation.
4   Q.  And it was for attempting to elude and no
5       seatbelt; correct?
6   A.  That's correct.
7   Q.  With regard to that seatbelt violation, do
8       you have any idea whether 1971 Chevrolets
9       were even equipped with shoulder harnesses?
10  A.  No, sir.
11  Q.  Okay.  So it may well be that shoulder
12      harnesses were not even available as far as
13      you know in 1971?
14  A.  As far as I know.
15          MR. MASTERS:  Object to the form.
16  A.  That's correct.
17  Q.  And if he had had a seatbelt and not a
18      shoulder harness, would you have been able
19      to see that from your perspective while
20      following him?
21  A.  No, sir.
22          (Plaintiff's Exhibit 3 was marked
23          for identification.)

Page 47

1   Q.  Let me show you what I've marked as
2       Plaintiff's Exhibit Number 3 and see if you
3       recognize that.
4   A.  Yes, sir.
5   Q.  What is that?
6   A.  It's a deposition.
7   Q.  And what is a deposition used for in this
8       context?
9   A.  Probable cause for the clerk to issue a
10      warrant.
11  Q.  And this is the deposition relating to
12      possession of controlled substance and
13      pistol without a permit; correct?
14  A.  Yes, sir.
15  Q.  Who filled out this form?
16  A.  I did.
17  Q.  Okay.  Looking on the second page up at the
18      top where it says complainant, whose
19      signature is that?
20  A.  That's my signature.
21  Q.  And it says offender attempted to elude DTF
22      agents at the same time throwing drug
23      evidence out the window.

Page 48

1       Going back to what you had said a
2       little earlier.  You had said when
3       Mr. Marshall turned onto Highway 21 toward
4       Wilcox County --
5   A.  Yes, sir.
6   Q.  -- he sped up a little --
7   A.  Yes, sir.
8   Q.  -- but that his car really was not capable
9       of going very fast?
10  A.  No, sir.
11  Q.  How fast, if you have a judgment, was
12      Mr. Marshall going at the time that you
13      executed the PIT maneuver?
14  A.  I'm not sure.
15  Q.  But you weren't exceeding the speed limit?
16  A.  I don't remember.
17  Q.  But you don't have a sense that you were --
18      as of today -- and since you don't
19      remember, I'm just trying to clarify this.
20      Do you have a sense today that you were in
21      a high speed chase?
22  A.  I would say so, yes, sir.
23  Q.  Okay.  So how high do you think the speed

Page 49

1    was?
2    A.  I just -- I don't remember.
3    Q.  So it said attempted to elude DTF agents at
4        the same time.  Isn't is it true what you
5        meant by that was he simply failed to stop?
6            MR. MASTERS:  Object to the form.
7    A.  I don't know.  I mean, I guess that depends
8        on how you look at it.
9    Q.  I guess it does.  But he didn't attempt to
10       turn on to any other roads and lead you on
11       this path through the woods or anything
12       like that?
13   A.  No, sir.
14   Q.  Okay.  He simply turned back toward what
15       you knew to be his residence?
16   A.  Yes, sir.
17           MR. MASTERS:  Object to the form.
18   Q.  And it says throwing drug evidence out of
19       the window.  But at this point you don't
20       have any evidence whatsoever that he
21       actually threw drug evidence out?
22   A.  No, sir.
23   Q.  Offender was forced from the roadway onto

Page 50

1        the opposite side of the roadway where his
2        vehicle came to rest.  Offender was not
3        wearing seatbelt and was highly
4        belligerent, cursing, very combative, and
5        obviously highly agitated.  Have you told
6        me everything about that that you can
7        recall when you described it earlier?
8    A.  His demeanor?
9    Q.  Yeah.
10   A.  Yeah, I guess.  I mean, if I could think of
11       a few more words to use, I'd use them.
12   Q.  Okay.  There also was a passenger in the
13       vehicle.  Both individuals were detained
14       and transported to the Lowndes County
15       Detention Facility.  And have you told me
16       everything you can recall about their
17       arrest and transportation?
18   A.  Yes, sir.
19           (Plaintiff's Exhibit 4 was marked
20           for identification.)
21   Q.  Okay.  Let me show you what's marked as
22       Plaintiff's Exhibit Number 4.  And this is
23       simply a two-page document.  Tell me what

Page 51

1        this is, please.
2    A.  It's the complaint and the warrant.
3    Q.  Okay.  And this also bears your signature?
4    A.  Yes, sir.
5    Q.  On the first page?
6    A.  Yes, sir.
7    Q.  And on the second page down at the bottom
8        where it says sheriff, by, is that also
9        your signature?
10   A.  Yes, sir.
11   Q.  And that's simply the document that makes
12       the charge against Mr. Marshall --
13   A.  That's right.
14   Q.  -- on the first page, and on the second
15       page it's a warrant to arrest him?
16   A.  That's correct.
17           (Plaintiff's Exhibit 5 was marked
18           for identification.)
19   Q.  Okay.  And I think the last thing is
20       Plaintiff's Exhibit Number 5.  Tell me what
21       that is, please.
22   A.  It's an incident/offense report.
23   Q.  Okay.  We've gone through several pieces of

Page 52

1        paper that you have either authored or had
2        something to do with.  Tell me all of the
3        paperwork that you have to fill out in
4        making an arrest such as you made on
5        Mr. Marshall.
6    A.  You mean for a case file or --
7    Q.  Yeah.  Yeah.  Have we in front of us all of
8        the paperwork that you have executed on
9        Mr. Marshall?
10   A.  You don't -- my statement form is not here.
11   Q.  Right.  But other than that.
12   A.  There's an arrest report that's not here.
13   Q.  Okay.  Look on the third page of the
14       exhibit I've just handed you.
15   A.  Okay.
16   Q.  Is that the arrest report?
17   A.  This is the arrest report right here.
18   Q.  Is what you have in these exhibits that
19       I've given you all of the paperwork you
20       would have completed on Mr. Marshall?
21   A.  Yes, sir, I believe so.
22   Q.  All right.  Let's go to Plaintiff's Exhibit
23       Number 5.  That's a uniform

Page 53

1     incident/offense report?
2     A.   That's right.
3     Q.   And tell me what that's for.  What's the
4        purpose of that?
5     A.   It just lists myself as whoever is making
6        out the report, the agency, the charges or
7        the incident, the place of occurrence, the
8        date and time.  And there's an area in here
9        where you will list items that will be
10       recovered or whatever.  And then down at
11       the bottom -- underneath that it will list
12       the dollar amount for the items recovered,
13       vehicle information.
14          On the back page is the information for
15       the offender or whoever, suspect, and then
16       an area for the witnesses, a narrative, and
17       then an area for the signature of the
18       officer or whoever the complainant is and
19       case disposition area.
20    Q.   And did you fill out these first two
21       pages?
22    A.   Yes, sir.
23    Q.   And that's your signature at the bottom of

Page 54

1        the second page?
2     A.   Yes, sir.
3     Q.   And then tell me about this third page,
4        which is the Alabama Uniform Arrest Report.
5     A.   Basically the jail does this.  They do this
6        in booking.  And it has the -- you see the
7        defendant's name up at the top, his height,
8        weight, color, all of his information, the
9        place -- the occurrence of the arrest and
10       the charges and then the officer that did
11       the booking.
12    Q.   And that would be Marilyn Mealing?
13    A.   That's correct.
14    Q.   Do you know her?
15    A.   Yes, sir.
16    Q.   And is that her signature?
17    A.   I guess it is.
18    Q.   Have you seen her signature before?
19    A.   No.
20    Q.   Okay.  Did you retain a copy of this
21       Alabama Uniform Arrest Report?
22    A.   Yes.
23    Q.   And is this a true and correct copy of that

Page 55

1        arrest report?
2     A.   Yes.
3     Q.   And you normally maintain those in your
4        case file --
5     A.   That's correct.
6     Q.   -- in the normal course of business?
7     A.   That's correct.
8     Q.   All right.  Now, you had mentioned that you
9        had a statement also that you wrote out.
10       I'm going to show you Plaintiff's Exhibit
11       Number 6 and ask you if that's a copy of
12       your statement.
13          (Plaintiff's Exhibit 6 was marked
14          for identification.)
15    A.   Yes, sir.
16    Q.   Okay.  Let's go through this for just a
17       second if we could.
18    A.   Okay.
19    Q.   And I think this will be close to the last
20       thing that we're going to do today.
21          This was June 28th, 2005.  Is that the
22       date that all this happened?
23    A.   Yes, sir.

Page 56

1     Q.   And the time, 7:32 p.m., is that the time
2        that you wrote the statement?
3     A.   Yes, sir.
4     Q.   This indicates that the incident happened
5        sometime at about one o'clock this
6        afternoon --
7     A.   That's right.
8     Q.   -- that afternoon.
9     A.   Uh-huh (positive response).
10    Q.   And you say that you were traveling with
11       Mr. Hutson north on Lowndes County Road 7
12       and met Mr. Marshall's blue Chevrolet Nova.
13    A.   Yes, sir.
14    Q.   You turned around in an attempt to catch up
15       with the vehicle.
16    A.   That's correct.
17    Q.   As we caught up with the vehicle, I
18       observed that neither the driver nor the
19       passenger were wearing seat belts.  Why was
20       that important to you?  Why did you put
21       that in there?
22    A.   Probable cause for the stop.
23    Q.   But what you really wanted to talk to him

Page 57

1       about was drugs?
2    A.   That's correct.
3    Q.   And you placed your blue light on the dash
4       to gain the attention of the driver.  And
5       you pulled beside his vehicle, showed
6       badges.  It says here we showed the driver
7       our badges.  Earlier you mentioned that
8       Mr. Hutson showed the driver his badge.
9       Did you show the driver your badge as well?
10   A.   If that's what the state -- but it also
11      says that the driver looked out the window
12      and screamed that he wasn't going to pull
13      the vehicle over.
14   Q.   No.  The question was, did you show him
15      your badge as well?
16   A.   If that's what the statement says, then I
17      did it.
18   Q.   Do you have any independent recollection of
19      showing him your badge?
20   A.   It's been two years, almost three years.  I
21      don't -- I can't remember whether I did or
22      not.
23   Q.   Fair enough.  And it says that he threw

Page 58

1       drug evidence out the window at about the
2       102 mile marker.  And if I'm correct, based
3       on the analysis and your recollection of
4       that analysis, there was nothing to
5       indicate it was drug evidence, correct, in
6       the final analysis?
7    A.   That's correct.
8    Q.   But at that time you thought it was drug
9       residue?
10   A.   I still believe that.
11   Q.   Okay.  Did you do any field tests on that
12      residue?
13   A.   No, sir.
14   Q.   Have you got the equipment to do field
15      tests?
16   A.   Yes, sir.
17   Q.   You don't have gas chromatography?
18   A.   No, sir.
19   Q.   Pursued Mr. Marshall for 2.4 miles.
20      Marshall was still responding violently.
21      Did he ever make a violent move toward you?
22   A.   Where are you at?
23   Q.   I'm down here at the -- close to the bottom

Page 59

1       of the page.  I instructed Mr. Marshall to
2       exit his vehicle and get on the ground.
3    A.   Okay.
4    Q.   You see that?
5    A.   Yes.
6    Q.   Did he ever make a violent move toward you?
7    A.   No.  We had weapons drawn.
8    Q.   Okay.  Never attempted to hit you or
9       anything else?
10   A.   No.  He's at his vehicle.  We're at ours.
11   Q.   Never attempted to run away?
12   A.   No, sir.
13   Q.   Fired my service weapon into the ground.  I
14      meant to ask you about that.  Does the
15      Lowndes County Sheriff's Office have a use
16      of force policy?
17   A.   Yes, sir.
18   Q.   And what does that use of force policy say
19      about discharging a firearm?
20   A.   I'm not exactly sure.
21   Q.   Okay.  On the second page it says, again,
22      that you located and recovered an empty
23      torn baggy that at one time had contained

Page 60

1       cocaine.  And you've signed that?
2    A.   Yes, sir.
3    Q.   Okay.  Are you sure that at one time that
4       it contained cocaine?
5        MR. MASTERS:  Object to the form.
6    A.   Yes, sir.
7    Q.   And that is your statement that you wrote
8       in connection with this case?
9    A.   Yes, sir.
10   Q.   How were you dressed that day?
11   A.   I don't remember.
12   Q.   Middle of June -- or end of June.  Pretty
13      hot.  Were you probably -- were you
14      wearing -- do you recall whether or not you
15      would have been wearing short-sleeve shirts
16      at that time?
17   A.   Probably.
18   Q.   Okay.  And the drug task force operates in
19      some cases undercover; correct?
20   A.   That's correct.
21   Q.   You operate in plain clothes?
22   A.   That's correct.
23       MR. LEWIS:  Let me have about five

Page 61

```
 1              minutes, Daryl.
 2          MR. MASTERS.  That's fine.  Take
 3          whatever time you need.
 4          (A brief recess was taken.)
 5   Q.  (Mr. Lewis continuing:)  I have just a
 6       couple more questions.
 7          Did you fill out a use of force report
 8       form following the discharge of your
 9       weapon?
10   A.  At that time I don't believe our department
11       had one.  And I still don't believe we had
12       one, but what I did do was I did a
13       statement and gave it to the sheriff.
14   Q.  Is that this statement that we've just
15       seen?
16   A.  I think it's the same statement.
17   Q.  Were you reprimanded in any way for doing
18       that?
19   A.  No, sir.
20   Q.  Have you ever been reprimanded during your
21       period with the Lowndes County Sheriff's
22       Office?
23   A.  Not one time.
```

Page 62

```
 1   Q.  Are you aware of any citizen complaints
 2       against you that were investigated?
 3   A.  I'm sure citizens have complained.
 4          MR. LEWIS:  I believe that's all I
 5          have.  Thank you.
 6
 7          (Deposition concluded at
 8          approximately 10:35 a.m.)
 9
10
11          * * * * * * * * *
12       FURTHER DEPONENT SAITH NOT
13          * * * * * * * * *
14
15       REPORTER'S CERTIFICATE
16
17   STATE OF ALABAMA:
18   MONTGOMERY COUNTY:
19
20       I, Tracye Sadler Blackwell, Certified
21   Court Reporter and Commissioner for the State of
22   Alabama at Large, do hereby certify that I reported
23   the deposition of:
```

Page 63

```
 1              CHRISTOPHER WEST
 2   who was duly sworn by me to speak the truth, the
 3   whole truth and nothing but the truth, in the
 4   matter of:
 5          RICHARD MARSHALL,
 6          Plaintiff,
 7          vs.
 8          CHRIS WEST, in his individual
 9          Capacity, LASHUN HUTSON, in his
10          Individual capacity,
11          Defendants.
12       IN THE UNITED STATES DISTRICT COURT
13       FOR THE MIDDLE DISTRICT OF ALABAMA
14       NORTHERN DIVISION
15          Case Number 2:06-cv-701-ID.CSC
16   on January 21, 2008.
17       The foregoing 62 computer-printed pages
18   contain a true and correct transcript of the
19   examination of said witness by counsel for the
20   parties set out herein.  The reading and signing of
21   same is hereby waived.
22       I further certify that I am neither of
23   kin nor of counsel to the parties to said cause nor
```

Page 64

```
 1   in any manner interested in the results thereof.
 2       This 6th day of February 2008.
 3
 4
 5
 6          Tracye Sadler Blackwell
            ACCR No. 294
 7          Expiration date: 9-30-2008
            Certified Court Reporter
 8          and Commissioner for the State
            of Alabama at Large
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

# DEPOSITION OF G. LASHUN HUTSON

## January 21, 2008

## Pages 1 through 38

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

4

PENGAD 800-631-6989



Page 1

```
 1
 2               IN THE UNITED STATES DISTRICT COURT
 3                FOR THE MIDDLE DISTRICT OF ALABAMA
 4                        NORTHERN DIVISION
 5
 6      RICHARD MARSHALL,
 7           Plaintiff,
 8      vs.              CIVIL ACTION NO.
                         2:06-cv-701-ID.CSC
 9
        CHRIS WEST, in his individual
10      capacity, LASHUN HUTSON, in his
        individual capacity,
11
        Defendants.
12
13           * * * * * * * * * * * * *
14
15           DEPOSITION OF G. LASHUN HUTSON, taken
16      pursuant to stipulation and agreement before Tracye
17      Sadler Blackwell, Certified Court Reporter and
18      Commissioner for the State of Alabama at Large, in
19      the Law Offices of Webb & Eley, 7475 Halcyon Pointe
20      Drive, Montgomery, Alabama, on January 21, 2008,
21      commencing at approximately 10:40 a.m.
22
23           * * * * * * * * * * * * *
```

Page 2

```
 1           APPEARANCES
 2
 3      ON BEHALF OF THE PLAINTIFF:
 4      Mr. Jay Lewis
        Law Offices of Jay Lewis
 5      Attorney at Law
        847 South McDonough Street
 6      Montgomery, Alabama
 7
 8      ON BEHALF OF THE DEFENDANTS:
 9      Mr. Daryl L. Masters
        WEBB & ELEY, P.C.
10      Attorneys at Law
        7475 Halcyon Pointe Drive
11      Montgomery, AL 36117
12      Mr. Rick A. Howard
        NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
13      Attorneys at Law
        Suite 300
14      4001 Carmichael Road
        Montgomery, AL 36106
15
16
17      ALSO PRESENT:

        Mr. Christopher West
18
19
20
21           * * * * * * * * * * * * *
22
23
```

Page 3

```
 1           EXAMINATION INDEX
 2
 3      BY MR. LEWIS . . . . . . . . . . 5
 4
 5
 6
 7      6-28-05 Statement Form of Lashun Hutson     34
 8
 9           * * * * * * * * * * * *
10
11
12
13           STIPULATIONS
14
          It is hereby stipulated and agreed by and
15
        between counsel representing the parties that the
16
        deposition of G. LASHUN HUTSON is taken pursuant to
17
        the Federal Rules of Civil Procedure and that said
18
        deposition may be taken before Tracye Sadler
19
        Blackwell, Certified Court Reporter and
20
        Commissioner for the State of Alabama at Large,
21
        without the formality of a commission, that
22
        objections to questions other than objections as to
23
        the form of the question need not be made at this
```

Page 4

```
 1      as the said deposition may be offered in evidence
 2      or used for any other purpose by either party
 3      provided for by the Statute.
 4           It is further stipulated and agreed by and
 5      between counsel representing the parties in this
 6      case that the filing of said deposition is hereby
 7      waived and may be introduced at the trial of this
 8      case or used in any other manner by either party
 9      hereto provided for by the Statute regardless of
10      the waiving of the filing of the same.
11           It is further stipulated and agreed by and
12      between the parties hereto and the witness that the
13      signature of the witness to this deposition is
14      hereby waived.
15
16           * * * * * * * * * * * * *
17
18           THE COURT REPORTER:  Usual
19           stipulations?
20           MR. HOWARD:  Sure.
21           MR. MASTERS:  Sure.
22
23
```

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson                    January 21, 2008

Page 5

1              G. LASHUN HUTSON
2       The witness, after having first been duly sworn
3    to speak the truth, the whole truth, and nothing
4    but the truth, testified as follows:
5              EXAMINATION
6    BY MR. LEWIS:
7    Q.  Tell us your name, please.
8    A.  G. Lashun Hutson.
9    Q.  Mr. Hutson, how are you employed?
10   A.  Lowndes County Sheriff's Department.
11   Q.  And what's your position there?
12   A.  Sheriff's deputy.
13   Q.  Do you have any particular rank?
14   A.  No.
15   Q.  On June 28th, 2005, where were you
16       employed?
17   A.  2nd Judicial Drug Task Force.
18   Q.  Were you employed with any city police
19       agency?
20   A.  Hayneville Police, yes, sir.
21   Q.  But now you're with the Lowndes County
22       Sheriff's Office?
23   A.  Uh-huh (positive response).

Page 6

1    Q.  You're going to have to say yes or no.
2    A.  Yes.
3    Q.  Okay.  Tell me about your educational
4        background.
5    A.  My educational background?
6    Q.  Yeah.
7    A.  High school graduate.  I've got some
8        college.  Marine Corps.  I've got a lot of
9        training from there.
10   Q.  How much college?
11   A.  Couple of semesters.
12   Q.  When did you graduate from high school?
13   A.  '77.
14   Q.  All right.  Have you been to any advanced
15       law enforcement training?
16   A.  I've been to a few.
17   Q.  All right.  Have you been to the FBI
18       Academy at Quantico?
19   A.  No.
20   Q.  Any law enforcement experience outside of
21       the academy that's required for POST
22       certification, any long-term -- by that I
23       mean over six weeks -- courses in law

Page 7

1        enforcement?
2    A.  Not over six weeks.  Some two-week
3        courses.  No six-week courses.
4    Q.  Do you have any particular certifications
5        in any special branch of law enforcement?
6    A.  Drug enforcement.
7    Q.  How did you get your training for drug
8        enforcement?
9    A.  The academy in Mississippi.
10   Q.  How long a course was that?
11   A.  I think that course is three weeks, two
12       weeks.
13   Q.  When did you go to that?
14   A.  About three and a half years ago.
15   Q.  Okay.  And what's your address?
16   A.  My work address or --
17   Q.  Physical, home address.
18   A.  It's going to be 3716 Fieldcrest Drive.
19   Q.  3716 --
20   A.  16.
21   Q.  -- Fieldcrest?
22   A.  Uh-huh (positive response).
23   Q.  And what city is that?

Page 8

1    A.  Montgomery.
2    Q.  Is that in the Fieldcrest Apartments?
3    A.  No.  Those are houses.
4    Q.  Houses.  Okay.  What's your date of birth?
5    A.  9-21-58.
6    Q.  And did you tell me when you graduated from
7        high school?
8    A.  1977.
9    Q.  And what college have you attended?
10   A.  Albany State.
11   Q.  Where?
12   A.  Albany State in Georgia.
13   Q.  Albany State.  Okay.  And when did you join
14       the -- well, tell me about your law
15       enforcement employment experience.  When
16       did you first get into law enforcement?
17   A.  First got into law enforcement in 1995
18       after I got out of the Marine Corps with
19       the Dougherty County Sheriff's Department.
20       I worked corrections with them from '95
21       until '98 when I came to Lowndes County.
22   Q.  And in 1998 what agency did you work for?
23   A.  Sheriff's department.  Lowndes County

Page 9

```
 1          Sheriff's Department.
 2     Q.   How long did you stay with Lowndes County
 3          Sheriff's Office?
 4     A.   About two years, three years.  I can't
 5          remember.
 6     Q.   Where did you go from there?
 7     A.   Hayneville Police Department.
 8     Q.   And did you remain at the Hayneville Police
 9          Department from the time you left the
10          sheriff's office until the time you
11          returned to the sheriff's office?
12     A.   Right.
13     Q.   So that would have -- when did you return
14          to the sheriff's office?
15     A.   I can't give you the -- I don't -- I don't
16          know.
17     Q.   But during 2005 you were still with
18          Hayneville Police Department?
19     A.   Right.
20     Q.   All right.  Are you familiar with the use
21          of force policy of the Lowndes County
22          Sheriff's Office?
23     A.   I'm not familiar with it, but I think they
```

Page 10

```
 1          have one.
 2     Q.   All right.  Have you ever filled out a use
 3          of force report?
 4     A.   No.
 5     Q.   Tell me what you were doing on June 28th,
 6          2005, which we all agree is the date of the
 7          incident involving Mr. Marshall.
 8     A.   What I was doing at what time?
 9     Q.   Well, starting early in that day what were
10          you -- when you got to work, what were you
11          doing?
12     A.   It's hard to say exactly what I was doing.
13     Q.   At what time did you -- if you did, did you
14          leave the sheriff's office?
15     A.   You mean the DTF office?
16     Q.   I'm sorry.  The DTF office.
17     A.   It's hard to say exactly what time I left.
18     Q.   And the DTF office is a separate facility;
19          correct?
20     A.   Correct.
21     Q.   And where is the DTF office?
22     A.   It's down the street from the sheriff's
23          office.
```

Page 11

```
 1     Q.   In Hayneville?
 2     A.   In Hayneville.
 3     Q.   Do you recall who else was on duty that day
 4          with the DTF?
 5               By DTF, I mean drug task force.
 6     A.   I can't tell you exactly who was on and who
 7          was off.  That would be up to Lieutenant
 8          West.  But I was on and Lieutenant West was
 9          on.
10     Q.   Do you recall why you left the DTF office?
11     A.   I probably left more than one time.  But
12          the last time I left it was with Lieutenant
13          West.
14     Q.   All right.  What did you leave in?
15     A.   We left in a blue Lincoln.
16     Q.   What was the purpose of leaving with
17          Mr. West?
18     A.   We were going to a gentleman's house by the
19          name of -- I know him as "Blood."  You guys
20          keep calling him Mr. Marshall -- that lives
21          up in the -- south of Hayneville.
22     Q.   Did you know Mr. Marshall?
23     A.   I had heard his name, "Blood."
```

Page 12

```
 1     Q.   Had you met him?
 2     A.   Not yet.
 3     Q.   Okay.  So prior to the time that you went
 4          out with Mr. West you had not had any law
 5          enforcement contact with Mr. Marshall?
 6     A.   No, I hadn't.
 7     Q.   Do you know why you were going out looking
 8          for Mr. Marshall?
 9     A.   I was going with Lieutenant West.  He
10          needed to talk to him.
11     Q.   You didn't have any independent knowledge
12          of why you were out there?
13     A.   No.  I had an inkling why we were out
14          there, but as far as specifics, no.
15     Q.   All right.  What was that inkling?
16     A.   Dope.
17     Q.   Had you personally received any information
18          about Mr. Marshall and any dope?
19     A.   I had heard his name.
20     Q.   In connection with what?
21     A.   In connection with the sale of drugs.
22     Q.   From whom did you hear his name?
23     A.   People.
```

Page 13

1  Q.  You want to elaborate on that?
2  A.  No.
3  Q.  Do you recall what people you heard talking
4      about Mr. Marshall with drugs?
5  A.  People in that line of business.
6  Q.  And what people are you talking about?
7  A.  People I may have arrested that wanted to
8      help themselves out.
9  Q.  Do you have any specific names of people?
10 A.  No.
11 Q.  All right.  So you leave with
12     Mr. Marshall.  Tell me what happens then.
13 A.  Lieutenant and I, we go to Mr. Marshall's
14     house.  He wasn't there.  We did knock.
15     Nobody came to the door.  We left and we
16     was having a conversation on the way back
17     about a little community I was familiar
18     with called Casey.
19 Q.  Is that C-A-S-E-Y?
20 A.  Correct.
21 Q.  And what did you tell Mr. Marshall about --
22     I mean, Mr. West about the Casey community?
23 A.  He asked me -- he said, where is it?  I

Page 14

1      said, it's right down on County Road 7.  I
2      said, he might be down there.  And so we
3      were going to head down there.  I was
4      looking for another individual.  And as we
5      were going down County Road 7, Lieutenant
6      perks up and said, there he goes right
7      there.  And I'm looking and I see the blue
8      Nova coming at us.
9  Q.  Who is driving the car?
10 A.  Which car?
11 Q.  Your car.
12 A.  Lieutenant West.
13 Q.  All right.  What reason did you have to
14     believe that Mr. Marshall might be at the
15     Casey community?
16 A.  I've heard his name in the community of the
17     drug community that he's a drug dealer and
18     he, you know, frequents different
19     communities and Casey was one of them.
20 Q.  Other than this incident on June 28th,
21     2005, have you ever arrested Mr. Marshall?
22 A.  No.
23 Q.  Since this incident have you had occasion

Page 15

1      to arrest Mr. Marshall?
2  A.  No.
3  Q.  Since this incident have you had occasion
4      to know whether Mr. Marshall has been
5      arrested by anybody else?
6  A.  No.
7  Q.  So you see a blue Chevrolet Nova after
8      Mr. West says there's his car or there he
9      is?
10 A.  Uh-huh (positive response).
11 Q.  Okay.  What happens then?
12 A.  Lieutenant goes down.  We pass each other.
13     Lieutenant turns around and we come back up
14     behind him to make a stop.
15 Q.  And what was your purpose for making a
16     stop?
17 A.  I -- I don't know.  Whatever Lieutenant
18     West told you his probable cause was for
19     stopping him.
20 Q.  Did you see any probable cause for making a
21     stop?
22 A.  I wasn't driving.
23 Q.  No.  That wasn't the question.  Did you see

Page 16

1      any probable cause for making a stop?
2  A.  I wasn't driving.
3  Q.  Let me rephrase the question.
4  A.  Okay.
5  Q.  Did you see any probable cause for making a
6      stop?
7  A.  Let me see if I can -- I wasn't driving.
8          MR. HOWARD:  If you saw it, yes.
9          If you didn't see it, no, or
10         were you looking?  Just answer
11         his question.
12 A.  No.  I just looked -- when he said there he
13     is, I looked and I identified the subject.
14     I wasn't looking for a probable cause.
15 Q.  So you didn't see any probable cause
16     because you weren't looking for any?
17 A.  Right.
18 Q.  Okay.  So if there was probable cause
19     determined, it was Mr. West who determined
20     it?
21 A.  Correct.
22 Q.  Okay.  You said that you looked and you saw
23     that it was Mr. Marshall?

Page 17

```
 1    A.  I looked and saw an individual driving the
 2         car.  There was two individuals in it, and
 3         I looked and saw the individual driving the
 4         car.
 5    Q.  You didn't know him as Mr. Marshall?
 6    A.  No.
 7    Q.  Because you had never met Mr. Marshall?
 8    A.  No.
 9    Q.  All right.  So Lieutenant West turns his
10         car around and pulls in behind
11         Mr. Marshall's car or the car that you've
12         identified as being the blue Nova you were
13         looking for?
14    A.  Right.
15    Q.  How fast was that Nova going?
16    A.  I would have guessed the speed limit.
17    Q.  Did he speed up after you pulled in behind
18         it?
19    A.  Once we got on 21 he did.
20    Q.  But he didn't until you got to 21?
21    A.  No.
22    Q.  All right.  What happened after you pulled
23         in behind him?
```

Page 18

```
 1    A.  I looked -- just looked in the car just to
 2         see -- nobody was moving and Lieutenant
 3         said, go ahead and light them up.
 4    Q.  And what did you take that to mean?
 5    A.  Turn the blue light on.
 6    Q.  Did you do that?
 7    A.  Yes.
 8    Q.  That car doesn't have built-in blue lights?
 9    A.  No.
10    Q.  You had a portable blue light?
11    A.  Had a portable blue light.
12    Q.  Like anybody could buy?
13    A.  Any law enforcement agency could buy.
14    Q.  All right.  And where did you put that blue
15         light?
16    A.  I put it on the dash initially.
17    Q.  Okay.  And what happened then?
18    A.  Mr. Marshall looked in his rear-view
19         mirror, he looked down in his side mirror,
20         and he just kept driving.
21    Q.  At some point did your car pull up next to
22         his car while you were still on County
23         Road 7?
```

Page 19

```
 1    A.  Yes.  We had came out of the curve.  When
 2         we got on the straightaway, Lieutenant got
 3         to the side of them.
 4    Q.  What, if anything, did you do at that time?
 5    A.  At that time I rolled my window down, I
 6         pulled my badge, and I said, pull over.
 7         And he looked, and he said, what y'all
 8         want, man?  And I said, pull over.  And he
 9         kept driving.
10    Q.  What happened then?
11    A.  After he got back behind him -- I can't
12         remember if it's because of oncoming
13         traffic or for whatever reason he got back
14         behind him.  And the blue light was still
15         going.  And then we had came to the
16         intersection of 21.
17    Q.  All right.  Which way did Mr. Marshall
18         turn?
19    A.  He turned right.
20    Q.  And that's headed toward Wilcox County?
21    A.  South on 21, yes.
22    Q.  So you got onto Highway 21, which is a
23         larger highway?
```

Page 20

```
 1    A.  You could say larger.
 2    Q.  Still two-lane?
 3    A.  Correct.
 4    Q.  Okay.  What happened then?
 5    A.  We continued behind him.  LT found a spot.
 6         He got beside him again.  And I reached up.
 7         I got the light off of the dash.  It's
 8         still blinking blue.  And I got my badge
 9         and I held it up.  I said, pull over.  And
10         he said, mother fuck y'all, I ain't
11         stopping.  And about that time LT yells in
12         my ear and says, pull over, and he -- he's
13         got his badge up.  And we're both yelling,
14         windows down -- you can imagine how close
15         we were -- to pull over, but he still
16         refused.
17    Q.  What were you wearing?
18    A.  I can't tell you exactly what I was
19         wearing.
20    Q.  Civilian clothes?
21    A.  Probably.
22    Q.  Was that just a blue light or was it a
23         blue-and-white light?
```

Page 21

1    A.   It's a blue light.
2    Q.   Blue light.  All right.  So after he did
3         not pull over, what did you do then?
4    A.   I told LT I don't think he's going to
5         stop.  And I put the light back on the dash
6         and I sat back.  LT dropped back behind
7         him.
8    Q.   At any point did you display a weapon --
9    A.   No.
10   Q.   -- at the time you were driving?
11   A.   No.
12   Q.   All right.  So Lieutenant West -- and when
13        you say LT, you're talking about Lieutenant
14        West?
15   A.   I'm talking about Lieutenant West.
16   Q.   Okay.  Lieutenant West pulls back behind
17        him; correct?
18   A.   Correct.
19   Q.   What's the next thing that happens?
20   A.   We come up on a cattle truck.  There's a
21        cattle truck.  It slows us down.  And LT
22        went to the side, and he "pitted" him.
23   Q.   Okay.  When you say he "pitted" him, you're

Page 22

1         talking about executing a precision
2         intervention technique?
3    A.   If that's what you're calling it now.
4    Q.   Well, what do you call it?
5    A.   I don't call it anything.
6    Q.   Okay.  You just "pitted" him?
7    A.   Right.
8    Q.   And basically that's hitting the driver's
9         side fender of his car with the front
10        passenger's side bumper or fender of your
11        car?
12   A.   You can do it that way or vice versa.
13   Q.   Well, which way was it done this time?
14   A.   The way you just stated.
15   Q.   Okay.  And it spun his car out?
16   A.   Correct.
17   Q.   He ended up going the opposite direction on
18        the other side of the road?
19   A.   On the shoulder, yes.
20   Q.   Did you observe anything else while you
21        were driving down the road behind
22        Mr. Marshall?
23   A.   I observed his hand when it came out of the

Page 23

1         window and when he tossed something.  It
2         hit our windshield to be exact.
3    Q.   And did you identify what it was at that
4         time?
5    A.   Not at that time, no.
6    Q.   You said you came up behind a cattle truck
7         and slowed down.  How slow were you going?
8    A.   We were going less than the speed limit at
9         that time.
10   Q.   Had you been going at any time prior to
11        that faster than the speed limit?
12   A.   Yes.
13   Q.   How fast would you say is the fastest you
14        were going?
15   A.   If I had to guess -- and it's purely a
16        guess -- I would say about 70.
17   Q.   Okay.  And the speed limit on that road
18        is --
19   A.   55.
20   Q.   55.  Okay.
21             All right.  So setting the scene, we've
22        now got Mr. Marshall's car on the shoulder
23        of the road facing back toward Hayneville,

Page 24

1         and Lieutenant West pulls his car so it's
2         angled toward Mr. Marshall's car?
3    A.   Correct.
4    Q.   What did you do then?
5    A.   We both exited the vehicles, but we stayed
6         behind the doors for protection.
7    Q.   What did you say, if anything?
8    A.   Lieutenant was yelling to the driver.  I
9         just yelled to the passenger, passenger,
10        don't move.
11   Q.   And did the passenger move?
12   A.   No.  He sat there like a statue.
13   Q.   And did the driver move?
14   A.   Yes.
15   Q.   And what was Mr. West yelling to the
16        driver?
17   A.   He told him to exit the vehicle and get on
18        the ground.
19   Q.   All right.  What, if anything, did Mr. West
20        do -- or did Mr. Marshall do in response to
21        that?
22   A.   He opened the door.  He got out, but he
23        stayed between the door and his vehicle.

Page 25

1   Q.  So he obeyed the command to get out of the
2       car?
3   A.  Yes.
4   Q.  Was he saying anything at that time?
5   A.  He was cursing, being very belligerent.
6   Q.  What, if anything, did Mr. West do?
7   A.  He kept yelling the order for him to get on
8       the ground.
9   Q.  All right.  Did he take any other action?
10  A.  Did who take any action?
11  Q.  Mr. West.
12  A.  He kept yelling for Mr. Marshall to get on
13      the ground.
14  Q.  All right.  Did he fire his weapon?
15  A.  Yes.
16  Q.  In what direction did he fire his weapon?
17  A.  In Mr. Marshall's direction but into the
18      ground.
19  Q.  And at that time were you looking at the
20      passenger or were you looking at
21      Mr. Marshall?  Where were you looking?
22  A.  My angle, I could see them both.  I could
23      look at Mr. Marshall and right past him I

Page 26

1       could see the passenger.
2   Q.  All right.  And after Mr. West fired the
3       shot, what, if anything, did Mr. Marshall
4       do?
5   A.  It froze him.  Because Mr. Marshall was
6       reaching back into his vehicle, and I
7       believe that's the reason Lieutenant fired
8       his weapon.  When he fired the weapon, it
9       froze Mr. Marshall, and he came out.
10      Because I don't think he expected that to
11      happen, so it froze him.
12  Q.  So you're holding your hands up.  He came
13      out with his hands up?
14  A.  Yeah, one on the window of the car and he
15      had the other one like stunned.
16  Q.  Up in the air?
17  A.  (Witness nods head.)
18  Q.  Yes?
19  A.  Yes.
20  Q.  Did he get on the ground then?
21  A.  No.
22  Q.  What happened?
23  A.  Lieutenant approached him, and once he got

Page 27

1       close enough to him where he could put his
2       hands on him, he put him on the ground.
3   Q.  At some point did his pants come off?  Did
4       Mr. Marshall's pants come off?
5   A.  During the tussle with the lieutenant they
6       did.
7   Q.  Did you see Mr. Marshall ever take a swing
8       at the lieutenant, ever try to run away,
9       anything like that?
10  A.  Nothing like that, no.
11  Q.  So Mr. Marshall ends up on the ground with
12      his hands behind him cuffed?
13  A.  After Lieutenant put his hands behind him
14      cuffed.
15  Q.  Right.  And what's happening with the
16      passenger all this time?
17  A.  I've still got my weapon on him and he's
18      still sitting there like a statue.
19  Q.  At any time did you feel the need to go to
20      the aid of the lieutenant?
21  A.  No.  He was doing pretty good.
22  Q.  All right.  At what point did the passenger
23      emerge from the vehicle?

Page 28

1   A.  Once Lieutenant got the cuffs on
2       Mr. Marshall, then I proceeded around to
3       the passenger.
4   Q.  And did the passenger cooperate with you?
5   A.  Yes, sir.
6   Q.  And you cuffed him and put him on the
7       ground?
8   A.  Got him out and then I sat him on the bank
9       there.
10  Q.  Tell me what happened then.
11  A.  I walked back to the vehicle where
12      Lieutenant was with Mr. Marshall.  When I
13      looked inside, I saw the .357 on the seat.
14  Q.  And that was a .357 Magnum revolver?
15  A.  Yes.
16  Q.  Did you search the vehicle?
17  A.  I can't remember if we searched it right
18      then or if we searched it later.  But we
19      looked in it enough to see that there was a
20      .357 on the seat, bullets on the floorboard
21      and in the ashtray.
22  Q.  Do you recall whether or not, whether you
23      searched it at the scene or you searched it

Page 29

1    later, you found anything else of
2    contraband nature?
3    A. Nothing that I can think of, no, sir.
4    Q. Just kind of cutting to the chase, did you
5    see Mr. West serve Mr. Marshall?
6    A. I saw him pat him down.
7    Q. Did you see him remove anything from his
8    pants?
9    A. No.
10    Q. Did you see him remove any money?
11    A. No.
12    Q. Were you watching him enough to know
13    whether or not he removed any money?
14    A. I watched him enough to know that he had
15    him secured so I could go secure the
16    passenger.
17    Q. So there was a period of time that you just
18    lost sight of what Mr. West and
19    Mr. Marshall were doing?
20    A. Yes.
21    Q. Because you were concentrating on the
22    passenger?
23    A. Correct.

Page 30

1    Q. I think we've already heard that at that
2    point Mr. West called for a transportation
3    unit, a marked unit, and that another
4    deputy came, took Mr. Marshall away, and
5    the passenger rode with you; is that
6    correct?
7    A. No.
8    Q. Okay. Tell me what happened.
9    A. The passenger rode with the lieutenant. I
10    drove the Nova.
11    Q. Okay. All right. Following the incident
12    at which Mr. Marshall was handcuffed, did
13    you see Mr. Marshall become violent in any
14    way?
15    A. While the lieutenant was in the car, he had
16    gotten back up off the ground. And I told
17    him -- I said, get back on the ground. And
18    I had to go over and put him back on the
19    ground.
20    Q. But he didn't attempt to run away?
21    A. I don't know if he was attempting to run
22    away or not, but he got up.
23    Q. But you walked over to him and put him back

Page 31

1    on the ground?
2    A. Right.
3    Q. And could that have been while the
4    lieutenant was searching the vehicle?
5    A. The lieutenant was leaned over in the
6    vehicle, yes.
7    Q. On the way back to the sheriff's office
8    what, if anything, happened?
9    A. Happened with me?
10    Q. Yeah.
11    A. Nothing happened with me.
12    Q. You didn't stop at the side of the road?
13    A. We stopped when the marked unit got -- tire
14    started to go down. And I don't remember
15    that whole incident fully because I wasn't
16    concentrating on that.
17    Q. Did you assist in the roadside search for
18    any contraband?
19    A. Yes.
20    Q. And was any contraband located?
21    A. We located a corner-torn baggy.
22    Q. And describe that baggy for me.
23    A. A sandwich bag where you would take the

Page 32

1    corner end and tear it off and tie a knot
2    in it. That's what it looked like.
3    Q. And who took custody of that?
4    A. The lieutenant did.
5    Q. During that period of time was the
6    passenger in Mr. Marshall's vehicle still
7    in the lieutenant's vehicle?
8    A. I can't recall.
9    Q. Did you have any role in booking
10    Mr. Marshall or the passenger?
11    A. No.
12    Q. You delivered the passenger where?
13    A. I didn't deliver the passenger.
14    Q. Oh, that's right. Mr. West did, didn't he?
15    A. Uh-huh (positive response).
16    Q. What did you do with the vehicle?
17    A. I parked it in front of the jail.
18    Q. Do you know whether or not that vehicle was
19    moved during the period of time that
20    Mr. Marshall was in jail?
21    A. Lieutenant came out from where I had parked
22    it. He told me to put it inside. They had
23    a secure gate there that locks, and he told

Page 33

1    me to move it and put it inside. That's
2    the only other incident of it being moved
3    from where I originally parked it.
4    Q.   Do you know whether that car was driven
5    during any time other than that while
6    Mr. Marshall was incarcerated?
7    A.   No.
8    Q.   Did that Chevrolet Nova have shoulder
9    harnesses?
10   A.   I can't recall. I wish I could.
11   Q.   All right. I have shown you what's marked
12   as Plaintiff's --
13        (Brief interruption.)
14        (Plaintiff's Exhibit 7 was marked
15        for identification.)
16   Q.   I'll show you this one instead of that
17   one. Do you recognize what I've marked as
18   Plaintiff's Exhibit Number 7?
19   A.   Uh-huh (positive response). Yes.
20   Q.   Turn to the second page of that. Whose
21   signature is that?
22   A.   That's mine.
23   Q.   And did you write this yourself?

Page 34

1    A.   Yes.
2    Q.   All right. And I just want to take a look
3    at it for just a second.
4         About two-thirds down the front page it
5    indicates that Mr. Marshall accelerated at
6    one point throwing something from the
7    driver's side window that was later found
8    to be drug evidence between the 102 and 104
9    mile marker.
10   A.   Uh-huh (positive response).
11   Q.   Did you later discover that there was no
12   drug residue found in that baggy?
13   A.   Yes. Later, after Lieutenant had got the
14   analysis back from forensics, he told me
15   that it turned out to be no evidence in it.
16   Q.   Okay. I may have asked you this, and if I
17   did, I apologize. Did you fill out a use
18   of force form with regard to any activity
19   in which you engaged on June 28th, 2005?
20   A.   No.
21   Q.   Is there a policy of the drug task force
22   that such reports be filled out?
23   A.   If use of force was used -- I'm not sure of

Page 35

1    a policy -- we would put it in our
2    statement.
3    Q.   So this Plaintiff's Exhibit Number 7 would
4    constitute any report that you would be
5    required to file?
6    A.   If I had used force.
7    Q.   Were you reprimanded for anything that
8    happened on that date?
9    A.   No.
10   Q.   Have you ever been reprimanded by the
11   Lowndes County Sheriff's Office?
12   A.   Yes.
13   Q.   For what?
14   A.   Oh, I can't remember. It was during
15   Sheriff Varner's time.
16   Q.   You can't recall anything that you were
17   reprimanded for?
18   A.   Once about a radio. That's -- not
19   answering the radio or the radio not being
20   loud -- I can't remember. It was a radio
21   though.
22   Q.   Anything having to do with citizen
23   complaints?

Page 36

1    A.   I'm pretty sure some citizens have
2    complained.
3    Q.   But were you ever disciplined in connection
4    with citizen complaints?
5    A.   No. No.
6    Q.   Has your POST certification ever been
7    suspended?
8    A.   No.
9         MR. LEWIS: Give us a minute.
10        (A brief recess was taken.)
11   Q.   (Mr. Lewis continuing:) Did you have
12   any -- and I may have asked you this already.
13        Did you have any part to play other
14   than writing that statement that's been
15   marked as Plaintiff's Exhibit Number 7 in
16   the booking or prosecution of Mr. Marshall?
17   A.   No, sir.
18   Q.   Did you appear at court in connection with
19   a case against Mr. Marshall?
20   A.   No.
21        MR. LEWIS: That's all I have.
22        (Deposition concluded at
23        approximately 11:15 a.m.)

Deposition of G. Lashun Hutson          Marshall vs. West; Hutson          January 21, 2008

Page 37

```
1         * * * * * * * * * *
2         FURTHER DEPONENT SAITH NOT
3         * * * * * * * * * *
4         REPORTER'S CERTIFICATE
5    STATE OF ALABAMA:
6    MONTGOMERY COUNTY:
7         I, Tracye Sadler Blackwell, Certified
8    Court Reporter and Commissioner for the State of
9    Alabama at Large, do hereby certify that I reported
10   the deposition of:
11        G. LASHUN HUTSON
12   who was duly sworn by me to speak the truth, the
13   whole truth and nothing but the truth, in the
14   matter of:
15        RICHARD MARSHALL,
16        Plaintiff,
17        vs.
18        CHRIS WEST, in his individual
19        Capacity, LASHUN HUTSON, in his
20        Individual capacity,
21        Defendants.
22        IN THE UNITED STATES DISTRICT COURT
23        FOR THE MIDDLE DISTRICT OF ALABAMA
```

Page 38

```
1         NORTHERN DIVISION
2         Case Number 2:06-cv-701-ID.CSC
3    on January 21, 2008.
4         The foregoing 37 computer-printed pages
5    contain a true and correct transcript of the
6    examination of said witness by counsel for the
7    parties set out herein. The reading and signing of
8    same is hereby waived.
9         I further certify that I am neither of
10   kin nor of counsel to the parties to said cause nor
11   in any manner interested in the results thereof.
12        This 6th day of February 2008.
13
14
15        _____
          Tracye Sadler Blackwell
16        ACCR No. 294
          Expiration date: 9-30-2008
17        Certified Court Reporter
          and Commissioner for the State
18        of Alabama at Large
19
          20
21
22
23
```

10 (Pages 37 to 38)

2nd Judicial Drug Task Force
Drug Agent
Statement Form

Date: June 28, 2005

Time: 7:32pm

Today at about 1:00 pm I along with Agent Lashun Hutson were traveling
North on Lowndes County Road 7 when we met Mr. Richard Marshall's blue
Chevrolet Nova. I immediately turned around in an attempt to catch up with
the vehicle. As we caught up with the vehicle I observed that neither the
driver or the passenger were wearing seatbelts, we placed our blue light on the
dash of our vehicle to gain the attention of the driver to pull the vehicle over.
The driver looked out the window and screamed that he wasn't going to pull
the vehicle over. I then pulled beside his vehicle and we showed the driver
Mr. Marshall our badges identifying ourselves as law enforcement officers.
He still insisted that he would not pull his vehicle over responding in a very
violent manner. This incident occurred approximately 2 miles from the
Lowndes County Road 7 and Alabama Highway 21 intersection. As we got to
the intersection Mr. Marshall turned right onto highway 21 picking up speed
and throwing drug evidence out of the driver's window at about the 102 mile
marker. We also observed Mr. Marshall moving around in the seat and with
his right hand constantly doing something down in the seat. We pursued Mr.
Marshall for another 2.4 miles before forcing his vehicle from the roadway.
The vehicle came to rest on the embankment on the opposite side of the
highway. Once off the highway Agent Hutson and I took cover behind the
doors of our vehicle (weapons drawn). I instructed Mr. Marshall to exit his
vehicle and get on the ground. He got out of the vehicle but stood in the door
still responding violently and not complying with us, at that time I fired my
service weapon into the ground in an attempt to quicken Mr. Marshall into
compliance but still he did not comply. Next I approached Mr. Marshall and
forced him to the ground experiencing some resistance yet having to force his
hands behind his back so as to handcuff him. Agent Hutson approached the
passenger's side of the vehicle and removed the passenger after I secured Mr.
Marshall. After securing Mr. Marshall I noticed a revolver style handgun on
the seat of the vehicle and bullets lying on the seat and in the floor. Mr.
Marshall was arrested and transported to the Lowndes County Detention

EXHIBIT
5
PENGAD 800-631-6989

Facility.  I later returned to the area of highway 21 where I observed Mr.
Marshall throwing out the evidence.  While walking the roadway I located and
recovered an empty torn baggie that at one time had contained cocaine.

Signature_____

2nd Judicial Circuit
Drug Task Force
Statement Form

**Date: June 28, 2005**

**Time: 18:20**

**Name:** Agent G. LaShun Hutson

On above date at approximately 1:00 pm myself and Lt. C.S.West were traveling North on County Road 7 in Lowndes County when we met Mr. Richard Marshall traveling South in a early model blue Chevrolet Nova. Lt. West stated "That's the vehicle" and began to turn around in an attempt to catch up to the vehicle. Once behind the vehicle the blue light was placed on the dash of our vehicle to alert the driver that he was being stopped, the driver looked in his rear view mirror and left side mirror and continued to drive and began to move around in the seat and appeared to be reaching for something in the seat with his right hand, I stated to Lt. West " Lt. he's moving around a lot I don't think he's going to stop" at which time Lt. West stated  "I don't either," at that point we were approximately 2 ½ miles from the intersection of County Road 7 and State Highway 21. Lt. West pulled our vehicle along side Mr. Marshall and I showed him my badge and the blue light and yelled for him to pull over at which time Mr. Marshall stated " Man what the fuck ya'll want" and continued to drive North on County Road 7. We reached State Highway 21 and Mr. Marshall turned south and accelerated at one point throwing something from the driver side window that we later found to be drug evidence between the 102 and 104 mile marker. Mr. Marshall continued South on State Highway 21, Lt. West came along side Mr. Marshall for a second time and I again yelled to Mr. Marshall to pull over at which time he stated "Motherfuck ya'll, I ain't stoppin" At that point Lt. West forced Mr. Marshall to the shoulder of the road and we exited our vehicle with our guns drawn and ordered Mr. Marshall to exit his vehicle with his hands where we could see them, Mr. Marshall exited his vehicle with a very belligerent attitude and cursing. Lt. West ordered Mr. Marshall to get on the ground and Mr. Marshall turned as if he was



EXHIBIT

6

PENGAD 800-631-6989

getting back into the vehicle and Lt. West fired his service weapon into the ground and stated "Don't get back in that vehicle, get on the ground" Mr. Marshall paused , still being belligerent and cursing at which time Lt. West approached him and put him on the ground by force and cuffed him during which time I had turned my attention to the passenger and approached his side of the vehicle and removed him without incident and cuffed. Once both parties were secure Lt. West and I looked into the vehicle and saw what later became known to us as a Rossi .357 Revolver fully loaded with 6 (six) Hollow Point bullets and an additional 34 (thirty-four) more bullets in the ash tray and on the floor, I asked Mr. Marshall was that his weapon on the seat and he stated "What ever you see is yours because you put it there, ya'll motherfuckers good for that shit."  Mr. Marshall and his passenger were taken to the John Hullett Detention Facility to be processed by a Lowndes County Sheriff Deputy as Lt. West and I returned to the area where we saw Mr. Marshall throw something from the car and Lt. west recovered a empty torn baggie that at one time had contained a controlled substance.


**Signature:**

2ND JUDICIAL DRUG TASK FORCE

SERVING BUTLER, CRENSHAW AND LOWNDES COUNTIES
146 EAST FOURTH STREET
LUVERNE, ALABAMA 36049
334-335-3340

**COURTESY WARNING**          DATE 6-30-05 TIME 2:00 pm
                             For: 6-2t-05

SPEEDING _____ MPH _____ MPH ZONE

IMPROPER LANE USAGE                    FAILURE TO YIELD

IMPROPER TAG                           FAILURE TO SIGNAL

RED LIGHT                              FOLLOWING TO CLOSE

STOP SIGN                             IMPROPER TURN

DEFECTIVE EQUIPMENT _____

OTHER/REMARKS *Attempted to Elude, No Seat Belt*

MAKE OF VEHICLE *Chevrolet* YEAR *1971* COLOR *Blue*

VEHICLE TAG # _____ STATE *AL*

LOCATION *Hwy 21 S. Lowndes County*

THIS IS A COURTESY WARNING ONLY AND WILL NOT REFLECT ON YOUR
OPERATORS LICENSE

x_____  6018769 _____ STATE *AL*
VIOLATOR                   DRIVERS LICENSE #

_____       ID *DE-1*
AGENT

THE LIFE YOU SAVE MAY BE YOUR OWN

EXHIBIT
7
PENGAD 800-631-6989

06MG00466
SubH 1 Received (11/28/2005)
2nd Judicial Drug Task Force
Case# 05-06-011

Evidence Submis

Date: 11-28-05                                                    County: Lowndes

Suspect(s): Richard J. Marshall                Race: B    Sex: M    DOB: Adult
Suspect(s):                                                    Race:        Sex:        DOB:

Subject(s):                                                     Race:        Sex:        DOB:
Subject(s):                                                     Race:        Sex:        DOB:

Requesting Agent: C.S. West                    Title: Commander

Office No. (334) 335-3340          Fax No. (334) 335-6401          Normal Duty Hours: 9am-5pm

Agency:  2d Judicial Circuit Drug Task Force

Mailing Address: PO Box 795 North Tuskeena Street Hayneville, Alabama 36040

Law Enforcement Case No: 05-06-011          Property No.: 01

Type Case (CHARGE): Possession

Brief History of Case: Offender found to be in possession while attempting to elude

*Evidence Submitted: residue

Examination Requested: Drug Analysis

**\*NOTES THAT EVIDENCE IS IN A CLEAR SEALED PLASTIC BAG**

EXHIBIT
8
PENGAD 800-631-6989

ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |
| FACSIMILE (334) 240-3284 | FACSIMILE (334) 260-8734 |

## EVIDENCE RECEIPT

CASE NUMBER: 06MG00466    ID: 1   TYPE: Controlled Substances   REFERENCES:    LAB: MG

AGENCY NUMBER: 05-06-011    ORI NUMBER: AL045TASK DATE: 11/28/05    TIME: 1:22 pm

| CASE NAMES | TYPE | RACE | SEX | DOB | AGE | STATUS |
|---|---|---|---|---|---|---|
| Richard J Marshall | S | B | M | | | |

| CHAIN OF CUSTODY | DATE | TIME |
|---|---|---|
| Secured at Montgomery Regional Laboratory Evidence Intake Area | 11/28/05 | 1:22 pm |

DESCRIPTION OF EVIDENCE:                                          SERVICE REQUESTED:
  1  One brown paper bag identified to contain drug evidence      DRUG CHEMISTRY

*ALL ITEMS LISTED ABOVE ARE AS DESCRIBED BY THE SUBMITTING AGENCY AND ARE SUBJECT TO VERIFICATION UPON INSPECTION BY THE ANALYST*

REPORT TO:                    SUBMITTED BY:

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

G. Lashun Hutson

STACY                                                      Page 1 of 1



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

| REGIONAL LABORATORY | MEDICAL EXAMINER |
|---|---|
| P.O. BOX 210516 | P.O. BOX 240591 |
| MONTGOMERY, AL 36121-0516 | MONTGOMERY, AL 36124-0591 |
| (334) 242-2938 | (334) 242-3093 |

CERTIFICATE OF ANALYSIS

Commander C. S. West
2nd Judicial Drug Task Force
146 East 4th Street
Luverne, AL 36049

CASE NUMBER:    06MG00466          SUBMITTING AGENCY CASE NUMBER:    05-06-011

|  |  | Race | Sex | Date of Birth | Status |
|---|---|---|---|---|---|
| SUSPECT(S): | Richard J Marshall | B | M |  | Adult |

SERVICE REQUESTED:  Drug Analysis

CHAIN OF CUSTODY:

|  | DATE | TIME |
|---|---|---|
| G. Lashun Hutson from 2nd Judicial Drug Task Force | 11/28/2005 | 13:22 |
| Michael L. Hitchcock | 12/01/2005 | 14:35 |
| Robert Agee | 01/13/2006 | 08:59 |

DESCRIPTION OF EVIDENCE:

1.          One brown paper bag containing residue

RESULTS OF ANALYSES:                    DATE(S) OF ANALYSES:    01/26/2006

1.    Laboratory analyses of the residue failed to reveal the presence of any controlled substances.

Sworn to and subscribed to me this the ___2nd___ Day of __Feb__. 20_06_ as true and correct



*An ASCLD/LAB Accredited Laboratory since October 2003*

Page 1 of 2

Alabama Department of
**Public Safety**

BUREAU OF INVESTIGATION

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

RETURN TO: LATENT PRINT UNIT
P.O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| 1. CONTRIBUTOR TITLE: 2nd Judicial Drug Task Force | 6. CONTRIBUTOR CASE NO: 05-06-011 |
|---|---|
| 2. NAME Christopher S. Dust | 7. TYPE OF CRIME: Drug |
| 3. AGENCY: Selma | 8. DATE OF CRIME: 6-28-05 |
| ADDRESS 196 E. 4th street    P.O. BOX | 9. VICTIM OF CRIME: |
| CITY Loverde    STATE AL.    ZIP 36649 | 10. DPS LATENT CASE NO: 09-1108-35-05 |
| 4. PHONE NO: 334-235-3340 | 11. NEW CASE: ✓    12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: Selma | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY:    PRINT NAME Christopher S. Dust | 15. SIGNATURE | 16. AGENCY 2nd JDTF | 17. DATE/TIME 7-13-05/1:09 |
|---|---|---|---|

18. DETAILED LIST OF ITEMS SUBMITTED; INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

① Brown Paper Bag Containing clear

plastic baggie.

19. FOR DPS USE ONLY

| RECEIVED BY:    PRINT NAME | SIGNATURE | HOW RECEIVED personally | DATE/TIME 7-13-05  1:09 |
|---|---|---|---|
| EVIDENCE RETURNED TO:    PRINT NAME | SIGNATURE | AGENCY 2nd JDTF | DATE/TIME 8-25-05 |
| EVIDENCE RETURNED BY:    PRINT NAME | SIGNATURE | HOW RETURNED mail | DATE/TIME |

| LOG NO: 099 | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |
|---|---|---|---|---|---|---|---|---|

Alabama Department of
**Public Safety**

BUREAU OF INVESTIGATION

*10 7049*

FINGERPRINT EXAMINATION REQUEST
ABI-28 (2-95)

RETURN TO: LATENT PRINT UNIT
P. O. BOX 1511
Montgomery, AL 36192-0501
Phone: (334) 242-4244

TYPE OR PRINT CLEARLY (USE BLACK INK) AND SUBMIT IN TRIPLICATE

| 1. CONTRIBUTOR TITLE: *2nd Judicial Drug Task Force* | 6. CONTRIBUTOR CASE NO: *05-06-011* |
| 2. NAME *Christopher S. West* | 7. TYPE OF CRIME: *Drug* |
| 3. AGENCY: *Same* | 8. DATE OF CRIME: *6-28-05* |
| ADDRESS *146 E. 4th Street*    P.O. BOX | 9. VICTIM OF CRIME: |
| CITY *Luverne*  STATE *AL.*  ZIP *36049* | 10. DPS LATENT CASE NO: *09-1108-35-05* |
| 4. PHONE NO: *334-335-3390* | 11. NEW CASE: ✓   12. ADDITIONAL EVIDENCE OR SUSPECT |
| 5. REPORT TO: *Same* | 13. SPECIAL INSTRUCTIONS: |

| 14. SUBMITTED BY: PRINT NAME *Christopher S. West* | 15. SIGNATURE | 16. AGENCY *2nd JDTF* | 17. DATE/TIME *7-12-05 1:09* |

18. DETAILED LIST OF ITEMS SUBMITTED: INCLUDE NAME, RACE, SEX, DOB, OF ALL SUSPECTS. USE EXTRA SHEETS IF NECESSARY

① *Brown Paper Bag Containing Clear plastic baggie.*

19. FOR DPS USE ONLY

| RECEIVED BY: PRINT NAME *SA Shannon Fitzgerald* | SIGNATURE | HOW RECEIVED *Personally* | DATE/TIME *7-13-05 1:09 pm* |
| EVIDENCE RETURNED TO: PRINT NAME | SIGNATURE | AGENCY | DATE/TIME |
| EVIDENCE RETURNED BY: PRINT NAME | SIGNATURE | HOW RETURNED | DATE/TIME |

| LOG NO: *049* | AS | CAS | CLTR | LTR | NLV | TYPE | REV. | EXHIBIT NO: |

Alabama Department of

# Public Safety

REPLY MAY BE MADE TO:

Shannon Fitzgerald
ABI Headquarters

Date: _B-25-05_

Dear Contributor:

The enclosed case file is being returned to your department for the following reason:

_____Statute of Limitations Has Expired

_X_ No latent prints of value were found on the evidence which:

_X_ is enclosed

_____ is being forwarded to the Department of Forensic Sciences.

_____ is being retained for pick up by your department.

Retention of this file is recommended until such time your department determine it
Has no evidentiary value.

This file is the original and no copy will be retained by this department.

If this department can be of further assistance to you, please do not hesitate to
Contact me at (334) 395-4320.

Sincerely,

Shannon Fitzgerald
Certified Latent Print Examiner
Alabama Bureau of Investigation

SF/ss

Headquarters
Post Office Box 1511
Montgomery, Alabama 36102 - 1511

Driver License
Post Office Box 1471
Montgomery, Alabama 36102 - 1471