**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD MARSHALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIV. ACT. NO. 2:06cv701-ID** |
| **v.** | ) | **(WO)** |
| | ) | |
| **CHRIS WEST, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiff Richard Marshall ("Plaintiff") brings this 42 U.S.C. § 1983 lawsuit
against Defendants Chris West and Lashun Hutson, individually, for allegedly using
excessive force in violation of his Fourth Amendment rights.[1]  This action is before the
court on Defendants' motions for summary judgment, which are accompanied by briefs
and evidentiary submissions.  (Doc. Nos. 30-33.)  Plaintiff filed a response and evidence
in opposition to the motion (Doc. No. 38), to which Defendants filed replies.  (Doc. Nos.
39-40.)  After careful consideration of the arguments of counsel, the relevant law and the
record as a whole, the court finds that West's motion for summary judgment is due to be
granted in part and denied in part and that Hutson's motion for summary judgment is due
to be granted.

---

[1] The court refers to Defendants collectively as "Defendants" and individually as
"West" and "Hutson."

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (civil rights jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of each.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting

2

evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  FACTS

Plaintiff brings suit against Defendants based on an incident which occurred on June 28, 2005.  In the early afternoon on June 28, Defendants, dressed in plain clothes and driving an unmarked Lincoln Town Car, went to Plaintiff's home in Lowndes County, Alabama, to attempt a "knock-and-talk" investigation, having received prior information that Plaintiff was selling crack cocaine and marijuana at his residence and other locations.[2]  (West Dep. at 13-14, 17-18); (Pl. Dep. at 25-26.)  They knocked on the door of Plaintiff's home; when no one answered, they left, but with hopes of finding

---

[2] At the time of the incident, West, a lieutenant with the Lowndes County Sheriff's Department, was the Commander of the Second Judicial Drug Task Force ("DTF"), with approximately fifteen years experience as a narcotics officer.  Hutson, a police officer with the City of Hayneville, served on the DTF under West's command.

3

Plaintiff elsewhere.  (West Dep. at 16.)  While Plaintiff and Defendants had never met, their paths would soon cross on Lowndes County Road 7.  (Hutson Dep. at 17.)

On Lowndes County Road 7, Plaintiff was driving a Chevrolet Nova.  Seated in the passenger seat was Plaintiff's cousin, Kevin Carmichael ("Carmichael").  Plaintiff had the windows down, and the amplifiers and music were "blasting."  (Pl. Dep. at 46, 48.) He was not exceeding the fifty-five-mile-per-hour speed limit, but neither Plaintiff nor his passenger was wearing a seatbelt.  (Id. at 28-29, 71); (West Dep. at 20.)  No other vehicles were in the vicinity, but then a "dark-colored Lincoln Town Car" with no "blue lights," passed Plaintiff in the opposite lane of traffic.  (Pl. Dep. at 39-41.)  "Look[ing] in his rear view mirror," Plaintiff saw the Town Car "hit the brakes hard" and "veer[] off to the side of the road."  (Id. at 40-41.)  Plaintiff thought that perhaps the car had a flat tire "or something."  (Id. at 41.)  Plaintiff "kept driving," without paying further attention to the Town Car.  (Id. at 44.)

Defendants were in the dark-colored Lincoln Town Car, with West driving and Hutson in the front passenger seat.  After leaving Plaintiff's home and looking for Plaintiff, West turned onto Lowndes County Road 7, a two-lane rural road (one lane in each direction).  Defendants saw a blue Chevrolet Nova approaching in the oncoming lane of traffic.  Having received information that Plaintiff drove an "older" blue Chevrolet Nova (West Dep. at 17), West turned the Town Car around and approached Plaintiff's car from behind.  (Id. at 19.)  At that time, West saw that Plaintiff and his passenger were not wearing seatbelts and, thus, determined that he had probable cause to stop the vehicle.

4

(Id. at 19-20, 56.)  West placed the Town Car's blue light on the dashboard, and, at West's direction, Hutson activated the strobe by plugging an adapter into the car's cigarette lighter.  (Id. at 19-20); (Hutson Dep. at 18.)  According to West, the lights were working at the time and emitted blue and white flashes of light.  (West Dep. at 20-21.)

Plaintiff, though, did not stop.  (Id. at 20.)  West next tried blowing his horn and flashing his headlights – all without effect.  (Id. at 21.)  Indeed, according to Plaintiff, he was unaware that the Town Car was following him.  Rather, the "next thing" Plaintiff recalled after seeing the Town Car veer off the road occurred thirty to sixty seconds later when the Town Car appeared alongside his car, traveling in the same direction as Plaintiff, but in the passing lane.  (Pl. Dep. at 43-44.)  On his "first glance," Plaintiff saw two "males in black T-shirts trying to flag [him] to pull over."  (Id. at 44, 46.)  By "flag," Plaintiff testified that the Town Car's passenger, who was Hutson, gave a "hand signal."  (Id. at 44-45.)  If Hutson said anything at that moment, Plaintiff "really couldn't hear" because the music was "blasting."  (Id. at 46, 50.)  In fact, Hutson was saying something; with the windows down on the Town Car and at a distance of four to five feet from Plaintiff's window, Hutson "pulled [his] badge" and demanded that Plaintiff "pull over."[3] (Hutson Dep. at 19); (West Dep. at 22, stating that Hutson "h[e]ld[] up his badge" within four to five feet of Plaintiff and said, "Pull over!"); (West Dep. at 26-27, describing the distance between the Town Car and the Nova and testifying, "I could see [Plaintiff's]

---

[3] West described the badge as round and gold, with a "leather cover around it." (West Dep. at 22.)  He said the badge was a "pretty good size."  (Id.); (see also id. at 26.)

face").  West also "showed" Plaintiff his badge.  (West Statement at 1 (Doc. No. 33-3).)

West "look[ed]" at Plaintiff, and Plaintiff "look[ed]" or, according to Plaintiff, "glanced"

at least twice at West and Huston.  (West Dep. at 25); (Pl. Dep. at 49-50.)  Plaintiff,

between glimpses, screamed through his open window, "What the fuck y'all want?"[4]  (Pl.

Dep. at 50.)  According to Plaintiff, Defendants did not respond to his question, and

Plaintiff did not pull over.  Rather, Plaintiff continued driving with his speed fluctuating

between thirty-five and forty-five miles per hour.  (Id. at 50, 53.)  After about ten

seconds, the Town Car pulled back behind Plaintiff's vehicle.  Plaintiff took a "quick

glance" in his rearview mirror again and saw that the Town Car was "riding [his]

bumper."  (Id. at 49.)  Plaintiff says that, "at that time" on that "glance," there "was no

blue light."  (Id.)

        With no traffic approaching from either direction, Plaintiff turned right at a yield

sign onto Highway 21, also a two-lane road, with Defendants still "trail[ing]."  (Id.

at 50-52.)  To the left, there were several gas stations, but no business establishments

were to the right.  (Id. at 76-77.)  Defendants continued to follow Plaintiff.  Approxi-

mately fifty- to seventy-five yards out on Highway 21, a "plastic baggy" hit the Town

Car's windshield.  (West Dep. at 24.)  Plaintiff testified that he did not throw a baggy out

_____

        [4] Plaintiff said that he was not "going to be courteous to them" because he was
afraid that they were out to "rob" him.  (Pl. Dep. at 50.)  The court notes also that,
according to Plaintiff, Carmichael also did not know that the individuals in the Town Car
were law enforcement officers.  Rather, Plaintiff says that, during the pursuit, his cousin
was "scared," and feared that the Town Car was trying to run them off the road and its
occupants kill them.  (Id. at 57); (see also Carmichael Dep. at 46-47.)

of his car window, but may have thrown out a "cigarette butt." (Pl. Dep. at 74.) West

made a mental note of the location because in his experience, drugs were kept in baggies

like the one that hit his windshield, and he believed that the baggy came from the

Plaintiff's car.[5] (West Decl. ¶¶ 6, 8.)

Defendants continued to pursue Plaintiff's car after being struck by the baggy.

West, driving in the oncoming traffic lane, pulled his vehicle alongside Plaintiff's car on

Highway 21 in an attempt to get Plaintiff to stop. (Pl. Dep. at 52-53.) According to

Hutson, he [Hutson] "got the light off of the dash." (Hutson Dep. at 20.) Hutson also

"got [his] badge[,] and [he] held it up" and yelled, "Pull over!" (Id.) West also had "his

badge up," yelling for Plaintiff to pull over. (Id.) At this point, Plaintiff was traveling

approximately fifty-five miles per hour (which was the posted speed limit, see Pl. Dep.

at 53), and no other traffic was on the road. (Id. at 56.) Plaintiff "glanced" and saw a

right-hand "motion" from the passenger (i.e., Hutson), gesturing Plaintiff to pull over.

(Id. at 54-56.) "On second glance," Plaintiff saw "a weapon" in Hutson's right hand, and

Hutson was "gestur[ing] with the gun" for Plaintiff to pull over. (Id.) Plaintiff described

the weapon as a "black gun."[6] (Id. at 56.) When asked if Hutson's right hand was "the

only hand in view," Plaintiff answered, "That's the only hand I saw." (Id. at 55.)

_____

[5] The court notes, as Defendants point out, that after Plaintiff's arrest West recovered the baggy which contained "residue," but the residue tested negative for controlled substances. (West Dep. at 40-41.)

[6] The court notes that Hutson denies that he displayed a weapon. (Hutson Dep. at 21.)

Plaintiff "kept driving," trying to stay focused on the highway in front of him. (<u>Id.</u> at 55-56.) The music still was blaring; thus, Plaintiff could not hear Hutson "say anything if he did." (<u>Id.</u> at 55. 59.) Plaintiff "didn't see a [blue] light" or a "badge." (<u>Id.</u> at 59.) The Town Car rode alongside Plaintiff for approximately ten seconds, but because Plaintiff again refused to pull over, Defendants pulled back behind Plaintiff's car. Defendants continued following Plaintiff for approximately a mile, (<u>id.</u> at 59-60), during which time Plaintiff did not look in the rearview mirror and did not know what the Town Car was doing. (<u>Id.</u> at 60.)

West's next course of action was to "bump" Plaintiff's car in an attempt to get him to pull over. The Town Car "hit[] the back end of [Plaintiff's] vehicle . . . two or three times." (Pl. Dep. at 63-64.) Plaintiff was traveling approximately fifty-five miles per hour, but the "ramming" caused him to "los[e] control," and he "slowed down [to] approximately [thirty-five], [forty-five] miles an hour." (<u>Id.</u> at 64-65.) Plaintiff regained control of his car; he again "glanced" in his rear view mirror, but could not see "what [Defendants] were doing." (<u>Id.</u> at 65-66.) Plaintiff, though, said that on that "glance," he did not see a blue light or "see any badges." (<u>Id.</u> at 66.)

Plaintiff still refused to pull over but, as indicated above, slowed down to approximately thirty-five miles per hour. West decided to execute a pursuit intervention technique ("PIT"). To execute a PIT maneuver, the police vehicle pulls up next to the fleeing suspect's car so that police vehicle's front fender is next to the suspect's rear fender. The officer then slows down and simultaneously turns into the suspect's car.

This was the maneuver that West performed on Plaintiff's car to bring the pursuit to an end. (West Dep. at 29-30.) There were no other vehicles in the vicinity when West performed the PIT maneuver. The Town Car "rammed" Plaintiff's bumper. (Pl. Dep. at 67-69.) On the second bump, Plaintiff's car spun "out of control," causing Plaintiff's "head [to] hit the steering wheel"; Plaintiff's car "landed on the opposite side of the highway in a ditch on a spin out." (Id. at 69-71.) Plaintiff was in a "daze," with a "knot" on his head, and the music still was blaring. (Id. at 71-72, 82.)

After striking Plaintiff's car the second time, West backed up and brought the Town Car to a stop so that it was facing the driver's side front quarter panel of Plaintiff's Nova. Using the doors for protection, Defendants got out of their car with their weapons drawn and pointed at Plaintiff and his passenger. (Hutson Dep. at 24.) West covered Plaintiff, while Hutson covered Carmichael. By the time Plaintiff opened his car door, Defendants were "out of their vehicle with guns drawn." (Pl. Dep. at 71, 80-83.) This whole pursuit lasted approximately ten minutes. (Id. at 73.)

Plaintiff saw a "shield" hanging around Hutson's neck and realized that Defendants were law enforcement officers. (Id. at 83, 85-86, 87.) West ordered Plaintiff to get out of the car and get on the ground. Plaintiff, who was cursing, exited the car with his "hands up," (Pl. Dep. at 86; Hutson Dep. at 25; West Dep. at 30-31), but refused West's repeated commands to "get on the ground." (Pl. Dep. at 86.) Plaintiff testified that he refused because he was "agitated" and "just didn't feel like getting on the ground at the time." (Id.) West remained standing between the driver's door of the Town Car

9

and the body of the car.  West ordered Plaintiff to get on the ground "several" more

times, but Plaintiff still refused.  (West Dep. at 31-32); (Pl. Dep. at 112.)  Consequently,

West fired his weapon into the ground six to eight feet from Plaintiff.  (West Dep. at 32);

(Hutson Dep. at 25-26); (Pl. Dep. at 111-14.)  Plaintiff froze when West fired the shot.

(West Dep. at 32.)  West slowly approached Plaintiff, commanding him to get on the

ground, but Plaintiff still refused.  West reached Plaintiff, "put him on the ground," and

handcuffed Plaintiff's hands behind his back..[7]  (West Dep. at 36); (Pl. Dep. at 88-90);

(Hutson Dep. at 27.)  In Plaintiff's words,

> I had my hands up right above my door.  [West] eased up on me with the
> gun drawn and he got close enough until he grabbed me and swept my feet
> with his feet and slammed me face down on the ground.  He put his foot on
> my back and handcuffed me.  Then he had his foot on my neck.

(Pl. Dep. at 90.)  West "got [Plaintiff] up off the ground," and asked Plaintiff if he had

not seen his badge.  (Id. at 95-96.)  West "grabbed [Plaintiff's] pants and . . . shoved

[Plaintiff] against the car."  (Id. at 96.)  At that point, West looked into Plaintiff's car and

saw a .357 Magnum revolver resting on the bench front seat, next to where Plaintiff had

been seated.  (Pl. Dep. at 21-22, 30-32, 62, 104-06); (West Dep. at 33.)  West observed

"loose rounds" on the floorboard.  (West Dep. at 34.)  Consequently, West conducted a

pat down search of Plaintiff and "call[ed] a marked unit."  (Id. at 34-35.)

    Afterward, West attempted to place Plaintiff in the backseat of the Nova, but

Plaintiff fought against West's efforts.  Plaintiff refused, saying he was too big to fit in

---

[7]After Plaintiff was in handcuffs on the ground, Hutson ordered Carmichael out of
the car and placed him in handcuffs as well.

the backseat of his compact Nova. (Pl. Dep. at 99.) At that point, as described by

Plaintiff, West placed one of his arms in front of Plaintiff's neck and the other arm in

back of Plaintiff's neck and "choked" Plaintiff so that he "couldn't breathe."

(Id. at 102-03.) After five to ten seconds, Plaintiff "gave up" and said he would get in the

car.[8] (Id.) After he was placed in the Nova, West walked back to the Town Car, reached

inside and pulled out a "light." (Id. at 100) He put the light on top of the car, but had to

"beat on the light three or four times before the light started flashing." (Id.) When the

marked unit arrived, Plaintiff was moved to the patrol car and transported to jail.

Seeking redress under federal and state laws, Plaintiff filed this lawsuit on August

8, 2006. In an earlier Memorandum Opinion and Order which addressed Defendants'

motion to dismiss, the court dismissed all of the state-law claims and some of the federal-

law claims. The court directed Plaintiff to replead other claims, and Plaintiff complied by

filing an amended complaint. Subsequently, the court permitted Plaintiff to file a second

amended complaint. The second amended complaint, which is the operative complaint,

narrows the § 1983 claim to a single count of excessive force against West and Hutson in

their individual capacities. As grounds for his Fourth Amendment excessive force claims,

---

[8] During his deposition, West says that he finally "g[ot] [Plaintiff] pushed into the
back seat," but West does not indicate whether he employed a chokehold or other force to
get Plaintiff in the backseat of the car. (West Dep. at 34.) One might be curious, as the
court was, as to why West desired to place Plaintiff in the backseat of Plaintiff's own car
where a loaded firearm had been retrieved. West says that he pushed Plaintiff into the
backseat of the Nova because, during the preceding scuffle, Plaintiff's baggy shorts fell
off and West was trying "to save [Plaintiff] from some humiliation because he [was]
standing there in his boxers." (Id.)

Plaintiff alleges that West "unreasonably used deadly force" against him (1) "by performing a PIT maneuver against Plaintiff for a suspected seatbelt violation" (2nd Am. Compl. ¶¶ 38-39), (2) "by aiming a weapon at him and discharging the weapon in his general direction and in his immediate vicinity" (id. ¶ 40), and (3) "by choking [him], throwing him to the ground, cuffing [him], and forcing [him] into the back seat of his car." (Id. ¶ 42.) There are no specific allegations against Hutson, other than those which establish Hutson's presence at the scene. As relief, Plaintiff seeks $500,000 in compensatory damages, $500,000 in punitive damages and costs to include attorney's fees. (Id. at 7.)

## V.  DISCUSSION

Defendants move for summary judgment on Plaintiff's § 1983 Fourth Amendment excessive force claims on the ground of qualified immunity. Plaintiff opposes their motions, arguing that Defendants' "actions as a whole constituted an unreasonable breach of [Plaintiff's] Fourth Amendment rights" to be free from excessive force and that "no reasonable officer could have believed that Defendants' actions were legal." (Pl. Br. at 9.)

A law enforcement officer may raise qualified immunity as an affirmative defense to a § 1983 individual-capacity lawsuit. See Wilson v. Strong, 156 F.3d 1131, 1135 (11th Cir. 1998); see also Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1184 n.16 (11th Cir. 1994). The doctrine of qualified immunity generally shields government

12

officials performing discretionary functions from civil liability when their conduct does not violate clearly-established constitutional rights which a reasonable person would have known. See Hope v. Pelzer, 536 U.S. 730, 739-41 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The test for whether a governmental defendant is entitled to qualified immunity involves a two-step analysis. Under the first step, the inquiry concerns whether the government official was engaged in a "discretionary function." Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997). The court finds that Defendants were engaged in discretionary functions during the events which form the basis of Plaintiff's excessive force claims; hence, only the second step of the qualified immunity inquiry is at issue.[9]

Once the government official succeeds in setting forth facts demonstrating that he or she was acting within the scope of his or her discretionary authority, the burden shifts to the plaintiff "to demonstrate that the official is not actually entitled to [qualified immunity]." O'Rourke, 378 F.3d at 1206. The qualified immunity test at this second juncture is twofold. As a "threshold question," the court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show [the government official's] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If under Plaintiff's version of the facts, Plaintiff's constitutional rights would

---

[9] The court notes that whether Defendants engaged in their law enforcement duties in an unconstitutional manner is not a consideration under the first inquiry. See O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004) (when determining whether a government official acted within his or her scope of discretionary authority, "'we do not ask whether [a government official] has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities'").

have been violated, the court must determine "whether the right was clearly established."
Id.  The court reaches the second inquiry "[i]f, and only if, the court finds a violation of a
constitutional right."  Scott v. Harris, ___ U.S. ___, ___, 127 S.Ct. 1769, 1774 (2007).
This inquiry focuses on whether the "state of the law" at the time of the alleged violation
provided Defendants with "fair warning that their alleged treatment of the [Plaintiff] was
unconstitutional."  Hope, 536 U.S. at 741.  "In most cases, fact-specific precedents are
necessary to give an officer fair warning of the applicable law."  Battiste v. Sheriff of
Broward County, 261 Fed. Appx. 199, 202 (11th Cir. 2008).

The constitutional right at issue is the Fourth Amendment's prohibition against the
use of excessive force.  See Graham v. Connor, 490 U.S. 386, 394 (1989) ("[A]ll claims
that law enforcement officers have used excessive force – deadly or not – in the course of
an arrest . . . or other 'seizure' of a free citizen should be analyzed under the Fourth
Amendment and its 'reasonableness' standard[.]").  "The first step in reviewing an
excessive force claim is to determine whether the plaintiff was subjected to . . . a
'seizure' within the meaning of the Fourth Amendment."  Vaughan v. Cox, 343 F.3d
1323, 1328 (11th Cir. 2003).  The second step is to determine whether the force used to
bring about the "seizure" was "objectively reasonable."  Scott, 127 S.Ct. at 1776; Hadley
v. Gutierrez, ___ F.3d ___, ___, 2008 WL 1947008, *3 (11th Cir. 2008) ("In excessive
force cases arising out of an arrest, whether a constitutional violation occurred is
governed by the Fourth Amendment's 'objective reasonableness' standard.") (quoting

14

Brosseau v. Haugen, 543 U.S. 194, 197 (2004)).  The Supreme Court of the United States

has held that:

> The "reasonableness" of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20
> vision of hindsight. . . .  With respect to a claim of excessive force, the
> same standard of reasonableness at the moment applies:  "Not every push or
> shove, even if it may later seem unnecessary in the judge's chambers"
> violates the Fourth Amendment.  The calculus of reasonableness must
> embody allowance for the fact that police officers are often forced to make
> split-second judgments-in circumstances that are tense, uncertain, and
> rapidly evolving-about the amount of force that is necessary in a particular
> situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness"
> inquiry in an excessive force case is an objective one:  the question is
> whether the officers' actions are "objectively reasonable" in light of the
> facts and circumstances confronting them, without regard to their
> underlying intent or motivation.  An officer's evil intentions will not make a
> Fourth Amendment violation out of an objectively reasonable use of force;
> nor will an officer's good intentions make an objectively unreasonable use
> of force constitutional.

Graham, 490 U.S. at 396-97 (internal citations omitted).  The Eleventh Circuit has

identified multiple factors relevant to the assessment of whether a law enforcement's

officer's use of force is objectively reasonable.  See Slicker v. Jackson, 215 F.3d 1225,

1233 (11th Cir. 2000).  These factors include "(1) the need for the application of force,

(2) the relationship between the need and the amount of force used, (3) the extent of the

injury inflicted and, (4) whether the force was applied in good faith or maliciously and

sadistically.'"  Id. (citation omitted).  "A court should also consider 'the severity of the

crime, whether the suspect posed an immediate threat, and whether the suspect [was]

resisting or fleeing'" an arrest.  Id. (citation omitted).

15

The parties agree that there are four separate uses of force which must be analyzed: (1) the PIT maneuver; (2) the warning shot; (3) the "foot sweep"; and (4) the chokehold.  The court analyzes these claims separately as to each Defendant in accordance with the commands of <u>Saucier</u>, *supra*.

### A.  <u>West</u>

#### 1.  *PIT Maneuver*

##### a.  Did West Violate Plaintiff's Fourth Amendment Right To Be Free from Excessive Force?

Defendants do not dispute that the use of the PIT maneuver constituted a "seizure" for purposes of the Fourth Amendment; thus, the court focuses on the level of force used during the seizure and whether it was "objectively reasonable."  <u>Scott</u>, 127 S.Ct. at 1776. The factors upon which the parties concentrate in analyzing the constitutionality of West's use of the PIT maneuver are:  (1) the extent of Plaintiff's injuries; (2) whether Plaintiff was resisting or fleeing an arrest; (3) whether Plaintiff posed an immediate threat; and (4) the severity of the crime.  The court also will direct its analysis to these factors.

###### (i)  The Extent of Plaintiff's Injuries

West argues that the "*de minimis* nature of [] Plaintiff's alleged injuries . . . mandates judgment in [his] favor as a matter of law."  (West Reply Br. at 26.)  As support

for his position, West relies on Nolin v. Isbell, 207 F.3d 1253 (11ᵗʰ Cir. 2000).  In Nolin,

the Eleventh Circuit reiterated the established principle in this circuit "that the application

of *de minimis force*, without more, will not support a claim for excessive force in

violation of the Fourth Amendment."  Id. at 1257; see McReynolds v. Ala. Dep't of

Youth Servs., 204 Fed. Appx. 819, 822 & n. 1 (11ᵗʰ Cir. 2006) (collecting *de minimis*

force cases).  West, though, focuses on the alleged *de minimis* nature of the *injuries*,

while Nolin focuses on the *de minimis* nature of the *force* employed.  While *de minimis*

injuries can correlate to *de minimis* force, the two are not always coterminous.  See Smith

v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002) ("*de minimis* injuries do not necessarily

establish *de minimis* force"); Jones v. Flathmann, 1:06-cv-585-WHA, 2008 WL 918702,

*10 (M.D. Ala. 2008) ("although some sort of injury must be present, the term '*de*

*minimis*  force' refers not solely to the significance or insignificance of the consequent

injury, but the nature and extent of the force used under the circumstances, 'evaluated in

the context in which the force was deployed'") (citation omitted).  The court simply

cannot say that the use of a PIT maneuver, the purpose of which is to force a "two-ton"

moving vehicle (West Reply Br. at 39) to "spin[] . . . out of control" and leave the

roadway (Pl. Dep. at 64), equates *de minimis* force as a matter of law when the injuries

turn out to be relatively minor.  No authority has been cited by West which supports the

conclusion he urges.

    The extent of the *injuries*, though, is one factor which the court should consider.

On one hand, the court agrees with West that the injuries Plaintiff suffered are not severe.

As West points out, Plaintiff suffered a "knot" on his head and was "dazed" as a consequence of the PIT maneuver.  (West Reply Br. at 27); (Pl. Dep. at 71, 82, 149.)  On the other hand, the court finds that Plaintiff's injuries are slightly more severe than West makes them out to be.  For instance, West omits that, as of November 14, 2007 – almost two-and-a-half-years after the incident – Plaintiff said he still had the "knot."  (Pl. Dep. at 71.)  Moreover, while West argues that there is no evidence that Plaintiff "received medical treatment," (West Reply Br. at 27), Plaintiff has submitted evidence that, at the jail the day after his arrest, he requested medical attention because he "had a headache" and "had bumped [his] head," but medical treatment was denied.  (Pl. Dep. at 127.)  Overall, though, the court would agree that Plaintiff's injuries are minor and that this factor weighs in favor of West.

(ii)  Whether Plaintiff Was Resisting or Fleeing Arrest

The court now addresses whether there is evidence that Plaintiff was resisting or fleeing an arrest.  Plaintiff says that he did not stop at Defendants' request because he did not know that Defendants were law enforcement officers.  (Pl. Br. at 16.)  He says that he did not know that Defendants were law enforcement officers because Defendants failed to "adequately identify themselves."  (Id. at 15.)  Defendants disagree.

Initially, the court sets out what facts are uncontradicted.  The facts show that, on June 28, 2005, Defendants were not in uniform, but rather wore plain black t-shirts.  The Lincoln Town Car bore no resemblance to a marked patrol vehicle, and, when yelling out

the window for Plaintiff to "pull over," Hutson did not verbally state that he was a law enforcement officer. (See West Dep. at 21, agreeing that the Town Car did not "look much like a police car"); (Hutson Dep. at 19, 20, demanding that Plaintiff "pull over").

The question of identification boils down to whether the plain-clothed Defendants made a show of authority by plugging in the blue light in the unmarked patrol vehicle and displaying their badges. There appears to be some disagreement among the parties whether, on the summary judgment facts, the blue light actually was emitting blue flashes of light as it would if properly functioning. West argues that Plaintiff cannot dispute his testimony that, initially, Defendants took "the actions necessary to activate the [blue] light" because Plaintiff admits that he did not know that the Town Car had turned around and was following him until it pulled alongside him on Lowndes County Road 7. (Defs. Reply Br. at 13-15.) West, though, yields to the conclusion that Plaintiff is "entitled to a [summary judgment] inference that he did not see it [*i.e.*, the blue light] or, at best, that it *was simply not working*." (Id. at 14 (emphasis added).) Of course, if the blue light was not working, West cannot say that Defendants identified themselves as law enforcement officers by plugging in the blue light and placing it on the dashboard. With that said, it is not clear if West is conceding for purposes of summary judgment that Plaintiff is entitled to an inference that, upon *its initial activation*, the blue light did not function properly and, thus, did not emit blue flashes of light at any time during the pursuit (see West Dep. at 21; West Reply Br. at 13-14), or just whether West is conceding that Plaintiff's "glances" in Defendants' direction at later points during the pursuit entitle Plaintiff to an

19

inference that, at some point, the light quit functioning properly.  The former concession appears more likely because in the section of West's reply brief titled "The Agents Identified Themselves," West mentions the blue light only in passing, instead choosing to focus on Defendants' display of badges.  (West Reply Br. at 21.)  Concerning Plaintiff's evidentiary stance, Plaintiff testified that, on three different occasions during the pursuit, at times when the Town Car was traveling parallel with and behind Plaintiff's car, Plaintiff "glance[d,]" but he "didn't see a [blue] light" and also that there simply "was no blue light."  (Pl. Dep. at 49, 59.)  Plaintiff's position that the blue light did not emit blue flashes until after the pursuit had ended is supported by Plaintiff's testimony that, after handcuffing Plaintiff, West put the blue light on top of the Town Car, but had to "beat on the [it] three or four times before the light started flashing."  (Id. at 100.)

        Although it is admittedly a close call, for purposes of summary judgment, the court finds from the foregoing that there is sufficient evidence to create a genuine issue of material fact as to whether, at any point during Defendants' pursuit of Plaintiff, the blue light in the Town Car functioned properly and emitted blue flashes of light.  So, for

purposes of this discussion, the court finds that Defendants did not make a show of law

enforcement authority by illuminating the blue light.[10]

The court now turns to whether there is a genuine issue of material fact whether

Defendants displayed their badges in a manner which demonstrates that Plaintiff failed to

submit to a proper show of law enforcement authority.  The sum of West's argument is

that Plaintiff has not provided affirmative testimony that Defendants "did not show their

badges during the pursuit."  (West Reply Br. at 21-22, 13.)  West says that Defendants

showed Plaintiff their badges twice, once on Lowndes County Road 7 and once on

Highway 21.  Both times, Defendants' Town Car was driving in the same direction as,

parallel to, and to the left of, Plaintiff's car, meaning that the passenger's side of the

Town Car was next to the driver's side of the Nova.  The first time, the approximate

distance between the Town Car and Plaintiff's Nova was four to five feet, close enough

that West "could see [Plaintiff's] face."  (West Dep. at 26.)  At that time Hutson "pulled

[his] badge," (Hutson Dep. at 19) or, in West's words, Hutson "he[l]d[] up his badge,"

which is "pretty good size[d]."  (West Dep. at 22.)  West also "showed" Plaintiff his

_____

[10] The court notes that there is no videotape or audiotape of the incident in the
record.  In <u>Smith v. City of Chicago</u>, for example, there was an audiotape revealing that
the officer's siren was sounding.  242 F.3d 737 (7th Cir. 2001).  In light of the audiotape,
the Seventh Circuit held that the plaintiff could not survive summary judgment on his
assertion that he did not know that the plain-clothed men in the unmarked car trailing him
were police officers.  The plaintiff's argument that "he did not hear the siren, therefore
there may have been a problem with the fidelity of the siren system or the siren was not
played" was conclusory and speculative, was not sufficient to rebut the audiotape, and
did not create a genuine issue of material fact as to whether the officer played the siren
prior to the investigative stop.  <u>Id.</u> at 742; <u>see</u> <u>also</u> <u>Scott</u>, 127 S.Ct. at 1775-76 (viewing
summary judgment facts as depicted on videotape).

badge. (West Statement at 1.) It is true that Plaintiff has not submitted any evidence

which contradicts West's and Hutson's deposition testimony that, while Defendants were

traveling alongside Plaintiff on Lowndes County Road 7, within Plaintiff's range of

vision, Defendants displayed their badges to Plaintiff. Plaintiff essentially has left that

particular evidence as it is. For instance, Plaintiff does not deny that, when he "glanced"

in Defendants' direction, Defendants had their badges displayed. (Pl. Dep. at 49-50.)

Nor does he say that he did not see the badges upon his "glance." (Id.) Plaintiff says

only that there was "no blue light." (Id. at 49.)

The second time, on Highway 21, West again pulled the Town Car alongside

Plaintiff's car. (Id. at 52-53.) According to Hutson, he held up the blue light in one hand

and his badge in the other hand, while West also had "his badge up." (Hutson Dep.

at 20.) What Plaintiff says he saw, though, while driving fifty miles an hour and glancing

to his left, was Hutson holding a "black gun" in his right hand, "gestur[ing] with the gun"

for Plaintiff to pull over. (Id. at 55-56.) Plaintiff did not see a "badge." (Id. at 59.)

Plaintiff says Hutson was holding a firearm; Hutson says he was holding a badge.

Accepting the factual inferences in the light most favorable to Plaintiff, Plaintiff has put

the fact in issue as to what Hutson was holding.

From the following discourse, the court concludes that there is at least some

undisputed testimony that Hutson or West held up a badge on Lowndes County Road 7.

West would argue that this undisputed evidence that either he or Hutson displayed a

badge to Plaintiff ends the inquiry of whether Plaintiff refused to submit to a law

enforcement officer's directive.  The more troubling aspect, though, is whether, under the facts of this case, the display of badges was sufficient as a matter of law to convey to Plaintiff that Defendants were law enforcement officers.  For the following reasons, the court answers that question in Plaintiff's favor.

Here, the display of badges occurred while Plaintiff and Defendants were in moving vehicles traveling at speeds between thirty-five and fifty-five miles per hour. Each of the two encounters, when Defendants pulled alongside Plaintiff, lasted no more than ten seconds.  There is no testimony as to how many of those ten seconds the badges were "held up," but, presumably, the display would have occurred for less than the entire ten seconds.  Even allowing West some deference, the court finds that there is a genuine issue of material fact as to whether a reasonable officer, dressed in plain-clothes and traveling in an unmarked police unit with no siren or blue light, would believe that he or she had adequately identified himself as a law enforcement officer by accelerating into the wrong lane of traffic, pulling alongside a suspect's vehicle and flashing a gold badge to a suspect, who is operating an automobile on a highway at speeds up to fifty-five miles per hour.  West has not pointed to any case which supports a finding in his favor on these facts.  The only case cited by West is United States v. Blake, 888 F.2d 795 (11th Cir. 1989).  (West Reply Br. at 22.)  Blake, however, is distinguishable because, in addition to the fact that the sufficiency of the identification was not at issue, the plain-clothes officers displayed their badges, not to a driver of moving vehicle, but, rather, to two passengers who were on foot in an airport corridor.  See id. at 797.  It is worth repeating

that the operative summary judgment facts reveal no other show of authority – no verbal

identification; no blue light; no siren; no marked patrol vehicle; no uniformed officers.

All Plaintiff had to go by is a gold badge which he saw only at a glance.

On these facts, the court finds that a jury could infer that a reasonable officer

would not believe that a suspect would have the ability to focus on the identifying marks

of the badge and then mentally process that the two plain-clothed males, one of whom is

waving a firearm, are law enforcement officers.  Indeed, Plaintiff testified that he did not

make the connection, as he says, that, while driving and trying to stay focused on the

roadway, he only was able to cast glances in Defendants' direction.  Stated differently,

for purposes of assessing whether there is evidence of resistance or flight by Plaintiff, see

Slicker, 215 F.3d at 1233, the court finds that a reasonable jury could conclude that the

failure of Plaintiff to stop when plain-clothed officers in an unmarked vehicle rolled

alongside Plaintiff and displayed their badges to them was not flight from law

enforcement; thus, the factor of whether Plaintiff fled or resisted must be resolved in

favor of Plaintiff at this juncture.  Cf. Johnson v. Grob, 928 F. Supp. 889, 894 & 907

(W.D. Mo. 1996) (finding that a reasonable juror could conclude that motorist who fled

from a roadblock set up by plain-clothes officers was flight from unidentified armed

robbers, rather than flight from justice).

(iii) Whether Plaintiff Posed an Immediate Threat

Plaintiff argues that he did not pose a threat to anyone's safety.  (Pl. Br. at 15.)  He

says that he "did not try to outrun Defendants" and that he "drove the speed limit."  (Pl.

24

Br. at 16.)  West, on the other hand, puts forth three reasons why Plaintiff "posed a threat

to the officers, the general public, [] Carmichael, and himself."  (West Br. at 19.)

First, West emphasizes that Plaintiff "failed to pull over for the Defendants at any

time."  (West Reply Br. at 20.)  That fact, however, is salient only if Defendants properly

identified themselves as law enforcement officers, a fact which as discussed above the

court cannot presume at the summary judgment stage.

Second, West argues that "taking into account the evidence of a possible drug

felony, Plaintiff was an obvious risk to engage in sudden violence against the officers."

(West Br. at 20.)  In support of his argument, West cites Michigan v. Summers, 452 U.S.

692 (1981), in which the Supreme Court explained the rationale for permitting law

enforcement officers to detain an occupant of a premises being searched for contraband

pursuant to a valid warrant, stating that "the execution of a warrant to search for narcotics

is the kind of transaction that may give rise to sudden violence or frantic efforts to

conceal or destroy evidence."  Id. at 702.  But, if Defendants did not identify themselves

as law enforcement officers, as Plaintiff insists through his evidence, borrowing the

rationale of Summers does not help West because the motive for Plaintiff to dispose of

evidence is not present.  Moreover, as discussed in the next section, there is insufficient

evidence from which it can be inferred that Defendants possessed reasonable suspicion,

arguable or actual, to believe that Plaintiff was involved in illegal narcotics activities.

Third, West asserts that, even setting aside the foregoing arguments, Plaintiff "was

still driving a two-ton vehicle at speeds that, by his own admission, reached somewhere

25

around 55 miles per hour." (West Reply Br. at 20.) This argument, which now must stand alone, lacks any Fourth Amendment force; it applies equally to all law-abiding citizens who turn on the ignition of a vehicle and travel the roadways.

At this point, the court addresses Scott v. Harris, which each party says supports their position. See ___ U.S. ___, 127 S.Ct. 1769 (2007); (West Reply Br. at 24); (Pl. Br. at 18.) In Scott, the Supreme Court held that the police officer's termination of a high-speed chase by ramming the fleeing suspect off the road was reasonable under the Fourth Amendment because "[t]he chase that [the fleeing suspect] initiated . . . posed a substantial and immediate risk of serious physical injury to others." Id. at 1779. Notwithstanding West's protestations to the contrary, the court finds that the threat level in this case pales in comparison to that in Scott, which was described by the Court as resembling "a Hollywood-style car chase of the most frightening sort." Id. at 1775-76. In Scott, averting "[m]ultiple police cars, with blue lights flashing and sirens blaring," the fleeing driver "race[d] down narrow, two-lane roads in the dead of night" at speeds exceeding eighty-five miles per hour, "swerve[d] around more than a dozen other cars," escaped a police-car barricade, "cross[ed] the double-yellow line," "force[]d cars traveling in both directions to their respective shoulders to avoid being hit," ran "multiple red lights," and raced in the "occasional center left-turn-only lane." Id. at 1772, 1775, 1778.

Here, by contrast, the evidence establishes that Lowndes County Road 7 and Highway 21 were rural roads devoid of other travelers during the ten-minute daylight

pursuit.  There is no evidence that Plaintiff swerved out of his lane, exceeded the posted

speed limit, endangered bystanders and other vehicles, or flagrantly ignored *a law

enforcement officer*'s demand to pull over.  The type of threat described in <u>Scott</u> simply is

not present in this case.  In short, the inquiry of whether Plaintiff posed an immediate

threat weighs in favor of Plaintiff.

(iv)  Severity of the Crime

Plaintiff characterizes this case as one in which West employed excessive force to

effect an arrest of a misdemeanant.  Plaintiff argues that the use of a PIT maneuver is

force which is "grossly disproportionate" to his crime, *i.e.*, "a seatbelt violation."  (Pl. Br.

at 9, 15.)  It is undisputed that West had probable cause to initiate the stop because he

observed that Plaintiff and his passenger were not wearing their seatbelts, a misdemeanor

under Alabama law.[11]  (Pl. Dep. at 28-29, 71); (West Dep. at 20.)

While Plaintiff focuses solely on his "seatbelt violation" (Pl. Br. at 15), West

asserts that, in light of his fifteen-plus years of experience as a narcotics investigator, the

---

[11] The motive, as conceded by West, was to stop the vehicle in order to investigate his suspicion that Plaintiff was engaging in illegal narcotics activities.  West's motive, though, is irrelevant to the objective Fourth Amendment inquiry.  <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (foreclosing any argument that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); <u>United States v. Robinson</u>, No. 07-12835, 2008 WL 874833, *4 (11th Cir. 2008) ("When an officer has probable cause to believe that a traffic violation has occurred the decision to stop a vehicle will not violate the Fourth Amendment, regardless of the officer's subjective intent or motivation.").

"facts known" to him when he initiated the PIT maneuver would have led a reasonable officer to suspect that the "situation . . . involved possession of narcotics" (West Br. at 30) and a "felony drug suspect."  (West Reply Br. at 19.)  Those facts, as enumerated by West, encompassed the previously-received information that Plaintiff was selling cocaine and marijuana, Plaintiff's failure to pull over when Defendants initiated the traffic stop, and the fact that, while Defendants were following Plaintiff, a "plastic baggy" hit the windshield of the Town Car.  (West Reply Br. at 18-19.)  West argues that the reasonable inferences that he, as a veteran narcotics officer, could draw from those facts demonstrate reasonable suspicion to conduct a <u>Terry</u> stop to investigate potential felonious drug activity.  (West Decl. ¶¶ 5-9, providing that drug dealers commonly store illegal drugs in plastic bags and that it is common for drug dealers/users to "run from law enforcement and attempt to throw away their drugs"); <u>see</u> <u>Marshall v. West</u>, 507 F. Supp.2d 1285, 1295 (M.D. Ala. 2007) (discussing the law pertaining to traffic stops based upon reasonable suspicion).

When a police officer makes "brief investigatory stops of persons or vehicles that fall short of traditional arrest[,] . . . the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot."  <u>U.S. v. Arvizu</u>, 534 U.S. 266, 273 (2002).  In evaluating whether reasonable suspicion existed, the court "look[s] at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  <u>Id.</u> (internal quotation marks omitted).  The court allows police

28

officers "to draw on their own experience and specialized training" in making a vehicle stop.  Id.  Moreover, "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop." U.S. v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003).

Concerning the drug information received by West, the summary judgment record is not sufficiently developed.  During his deposition, West testified only that he "had received information that [Plaintiff] was selling dope at his residence."  (West Dep. at 14.)  When further probed by counsel, West said that he could not recall the source of the information, that he had no notes pertaining to his receipt of the information, and that the information was not the type which would have supported a search warrant.  (Id. at 14, 17-18.)  There simply is no evidence in the record from which it can be determined whether the information bore sufficient "indicia of reliability" to justify a Terry stop. See, e.g., Florida v. J.L., 529 U.S. 266 (2000) (discussing when an anonymous tip bears sufficient "indicia of reliability" to justify a Terry stop).  In other words, the court cannot evaluate the value of the tip vis-a-vis the reasonable suspicion inquiry on such scant facts. Cf. Hayden v. First Nat'l Bank, 595 F.2d 994, 997 (5th Cir. 1979) (cautioning against summary disposition "on a 'potentially inadequate factual presentation'").

Turning to West's second argument – i.e., that Plaintiff fled when West initiated a traffic stop – as discussed above, the material facts are disputed as to whether Defendants properly identified themselves as law enforcement officers during the car pursuit; thus, it

29

cannot be presumed at the summary judgment stage that Plaintiff was eluding law enforcement officers.[12]

On the reasonable suspicion inquiry, the court is left with evidence that Plaintiff threw an object – a cigarette according to Plaintiff – out of his window and that, immediately thereafter, not a cigarette, but a plastic baggy – which when retrieved was thought to contain cocaine, but which later through testing was shown not to contain an illegal drug – hit the front windshield of the Town Car. The court finds that the fact that a clear plastic sandwich bag landed on the front windshield of the Town Car while Defendants were following Plaintiff is insufficient, in and of itself, to render as objective West's (mistaken) belief that Plaintiff threw cocaine out the window so as to justify a Terry stop.[13] West has not argued this precise point, and he has not cited (and could not cite) any authority to support a Terry stop on this limited basis. The severity of the crime, as argued by Plaintiff, remains a misdemeanor seatbelt violation and weighs in favor of Plaintiff.

_____

[12] The court notes, as West points out in his reply brief, that Defendants also cited Plaintiff with a warning for attempting to elude a law enforcement officer, a misdemeanor under Alabama statutory law. See Ala. Code, § 32-5A-193. (West Reply Br. at 19.) The court likewise cannot assume that Plaintiff was violating the law by failing to stop at a law enforcement officer's behest, because the law contains a willful requirement which is disputed in this case.

[13] When the baggy hit the Town Car's windshield, West saw just that – a baggy. (West Dep. at 24.) He did not see the "residue" inside the baggy. Rather, West observed the "residue" after Plaintiff's arrest when he retrieved the baggy from the side of the road. (Id. at 40.)

(v)  Summary

In sum, while the extent of Plaintiff's injuries weighs in favor of West, the court
finds that the other three factors weigh in favor of Plaintiff and tilt the scales toward a
finding that West used excessive force.  Accepting the factual inferences in the light most
favorable to Plaintiff, Plaintiff's crime was a misdemeanor seatbelt infraction; Plaintiff
did not pose an immediate threat to Defendants or innocent bystanders; and Plaintiff
understandably resisted Defendants' demands that he pull over because Defendants failed
to adequately identify themselves to Plaintiff as law enforcement officers.  On these
summary judgment facts, which may not be the actual facts at trial, the court finds that
Plaintiff has established that, when West used the PIT maneuver to bump Plaintiff off the
roadway, he used excessive force in violation of the Fourth Amendment.


b.  Was the Constitutional Right Clearly Established?

The court finds that the law at the time of the incident would have given a
reasonable officer "fair warning" that the use of a PIT maneuver, under the circumstances
with which West was confronted, was excessive force, in violation of the Fourth
Amendment.  Hope, 536 U.S. at 741.  Accepting the truth of Plaintiff's version of the
facts, the court cannot accept that a reasonable plain-clothed officer, without first
adequately identifying himself as a law enforcement officer, would have initiated a PIT
maneuver to effectuate an arrest of Plaintiff for a minor seatbelt infraction.  Since the

31

summary judgment facts do not support the objective reasonableness of West's conduct under clearly-established law, West's claim of qualified immunity must be denied, and resolution of factual disputes must await trial.

### 2. Warning Shot

#### a. Did West Violate Plaintiff's Fourth Amendment Right To Be Free From Excessive Force?

The question turns to whether West's firing of what he calls a "warning shot" constitutes excessive force, in violation of the Fourth Amendment. West says that, despite diligent research, he "cannot find a single case in which a warning shot has been deemed to constitute excessive force," but that, to the contrary, the Eighth Circuit has "expressly held that firing multiple warning shots into the air near a crowd of people 'did not violate anyone's constitutional rights.'" (West. Br. at 33, citing Otey v. Marshall, 121 F.3d 1150, 1156 (8th Cir. 1997).) Otey, though, is not helpful.

In Otey, the Eighth Circuit's conclusion that the officer's "warning shots . . . did not violate anyone's constitutional rights" was premised on the fact that there was "no evidence" that the officer "seized anyone – unconstitutionally or otherwise – when he fired warning shots at the dance hall." 121 F.3d at 1156. The Eighth Circuit noted that, to the contrary, the evidence established that, after the warning shots were fired, the "crowd dispersed," and "no arrests were made." Id. Because there was no seizure, which is the first step of the excessive force inquiry, see Vaughan, 343 F.3d at 1328, the Eighth

32

Circuit did not reach the question of whether the warning shot was objectively reasonable.  Here, there is no dispute that the "warning shot," as denoted by West, was fired to bring about an arrest and resulted in a seizure.  The only question is whether the level of force was objectively reasonable, a question not addressed in Otey.

The sole decision cited by Plaintiff is equally unhelpful.  (Pl. Br. at 17, citing Madrid v. Gomez, 889 F. Supp. 1146, 1184 (N.D. Cal. 1995).)  Madrid applied a prison regulation's prohibition of "deadly force," which included warning shots.  The court in Madrid did not involve consideration of whether a warning shot constitutes deadly force under the Fourth Amendment.  See, e.g., Abney v. Coe, 493 F.3d 412, 419 (4th Cir. 2007) ("It is . . . settled law that a violation of departmental policy does not equate with constitutional unreasonableness") (citing Davis v. Scherer, 468 U.S. 183, 193-96 (1984)).

Although the parties do not cite, and the court has not located, any binding authority regarding the firing of a warning shot in the course of effectuating an arrest, the Seventh Circuit expressly has declined to establish a per se rule that warning shots constitute excessive force in violation of the Fourth Amendment.  Bell v. Milwaukee, 746 F.2d 1205, 1278-79 (7th Cir. 1984), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir. 2005)).  Letting the jury's verdict in favor of the officers stand on the excessive force claim, the Seventh Circuit commented that the warning shots were fired only after the suspected robbery felon "ignored the officers' repeated requests to stop, and the warning shots were truly warning shots, purposefully fired directly upward into

33

the air." Id. at 1279; cf. O'Neal v. Ellison, 15 F.3d 1088 (9th Cir. 1994) (unpublished) (affirming summary judgment on a § 1983 Eighth Amendment excessive force claim in favor of a prison official, who from a prison watchtower, saw the plaintiff and another inmate fighting and fired a warning shot into a "safe area" of the prison yard away from all inmates "in a good faith effort to maintain discipline and order on prison grounds"). At the very least, Bell reaffirms that the question of whether West violated the Fourth Amendment's prohibition on excessive force by discharging his weapon is fact intensive. See King v. Reap, No. 06-15616, 2008 WL 613178, *2 (11th Cir. March 7, 2008) ("Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . we must 'slosh our way through the factbound morass of reasonableness.'"); see Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) ("Use of force must be judged on a case-by-case basis[.]").

West argues that, under the objective reasonableness standard of Graham, supra, the warning shot does not amount to "excessive force" because Plaintiff "was belligerent and refusing to obey commands to get on the ground – even with [] West's gun pointed at him." (West Br. at 33.) Plaintiff, on the other hand, argues that West acted objectively unreasonable in firing his weapon because Plaintiff "was not armed, was not threatening Defendants with a weapon, and was not attempting to escape." (Pl. Br. at 17.)

Was West's use of a "warning shot" reasonable under the circumstances? To answer this inquiry, the court considers the relevant factors set out in Slicker, supra.

34

Plaintiff has not argued, and there is no evidence, that he suffered any physical injury when West fired his weapon. Plaintiff also admits that at this point he knew that Defendants were law enforcement officers based upon the "shield" worn around Hutson's neck. (Pl. Dep. at 83, 85-87.) By his statement that he "just didn't feel like getting on the ground at the time," Plaintiff admits that he resisted West's repeated commands to "get on the ground." (Pl. Dep. at 83, 85-87.) While the forgoing considerations – the absence of physical injury to Plaintiff and Plaintiff's resistance – weigh in West's favor, other considerations do not.

On the question of whether Plaintiff posed an immediate threat to the safety of Defendants, the court must answer it in favor of Plaintiff on the summary judgment facts. Although the facts bear out that, at this point, Plaintiff arguably was within arm's reach of a loaded .357 magnum revolver which was resting on the front bench seat in Plaintiff's car, West has not pointed to any authority which would permit the court to consider that danger in deciding whether West acted objectively reasonable. There is no evidence that, at this point, West was aware of Plaintiff's possession of a loaded firearm, nor is there evidence from which it can be inferred that Plaintiff, whose vehicle was forced off the road for a seatbelt violation, was armed. As to the reason why West discharged his weapon, with the round landing some six to eight from Plaintiff, West says that "[a]s a plain clothes narcotics officer, [he] did not . . . carry . . . pepper spray, TASERs or [a]

baton"; thus, West says that the "warning shot" was "the only non-lethal option [he] had" available to him.  (West Decl. ¶¶ 11-12.)

The court finds, though, that a reasonable jury could conclude that the shot fired by West was not a true warning shot based upon the considerations set out in Bell, *supra*, and O'Neal, *supra*.  West did not fire his weapon "directly upward in the air," Bell, 746 F.2d at 1279, or in an area away from Plaintiff.  See O'Neal, 15 F.3d at 1088.  Rather, West undisputedly fired his weapon in the direction of Plaintiff.  Although West says he fired his weapon into the ground, not at Plaintiff, the bullet undisputedly landed a mere six to eight feet from Plaintiff.  Given the close range of the bullet to Plaintiff and the capability of a bullet to ricochet, the court finds that a reasonably jury could infer that West did not fire his weapon in a manner to avoid danger to Plaintiff.  Having considered the totality of the circumstances, including the absence of evidence of a known threat or a crime more serious than a seatbelt violation, the court concludes that the level of force employed – a gunshot in Plaintiff's direction – was not objectively reasonable and that, therefore, Plaintiff has established a constitutional violation.

### b.  Was the Constitutional Right Clearly Established?

The court, though, cannot say that West violated Plaintiff's clearly-established constitutional rights when he discharged his weapon.  The court finds that the state of the law, which as indicated from the court's discussion above, was not sufficiently developed

so as to give West fair warning that he was violating Plaintiff's Fourth Amendment rights when on June 28, 2005, as a warning to Plaintiff, he shot a bullet into the ground six to eight feet from Plaintiff, only after repeatedly commanding, with no success, that Plaintiff "get on the ground." See Hope, 536 U.S. at 741. Accordingly, West is entitled to qualified immunity on Plaintiff's Fourth Amendment claim that he used excessive force when he discharged his weapon.

### 3.  Chokehold

Plaintiff also says that West's actions of "choking [him] and forcing him into the back seat of the Nova w[ere] unreasonable" under the Fourth Amendment.  (Pl. Br. at 18.)  Plaintiff describes the force used by West as "some type of chokehold" which inhibited his ability to breathe.[14]  (Pl. Dep. at 103); (see also id. at 102-03, stating that he could not "describe exactly" the chokehold, but indicating that West placed one of his

---

[14] The court notes that, in a prior opinion, it has explained that, "[a] chokehold is defined as holding the subject's neck in the crook of the officer's forearm and bicep muscle, with pressure applied upward.  A chokehold will not, if applied properly, interfere with the subject's breathing or crush the larynx, producing death." Toth v. City of Dothan, 953 F. Supp. 1502, 1511 n.11 (M.D. Ala. 1996).  On the other hand, "[a] barhold, which is not a proper police procedure, applies pressure at the front of the subject's neck and can be effectuated with a baton or the forearm; it should not be used as it will interfere with the subject's breathing, crush the larynx and choke the subject." Id. In Toth, this court concluded that neither the chokehold nor the barhold "is considered by the court to be reasonable police procedure unless an officer is in danger of death or grievous bodily harm." Id.  As described by Plaintiff, the hold applied by West appears to more closely resemble a barhold, than a chokehold.

arms in front of Plaintiff's neck and the other arm in back of Plaintiff's neck and
"choked" Plaintiff so that he "couldn't breathe").

West says that the chokehold was constitutionally permissible because (1) Plaintiff
was "suspected of committing a narcotics felony" (a premise which, as discussed above,
the court cannot accept on the summary judgment record), (2) Plaintiff "was resisting by
refusing to obey commands," (3) West terminated the chokehold "immediately upon []
Plaintiff's compliance with the command," and (4) Plaintiff's "injuries" were "*de
minimis*." (West Br. at 26; West Reply Br. at 26-27.) Conversely, Plaintiff says that
West acted unreasonably because Plaintiff "was handcuffed, posed no threat to
Defendants, and had been arrested for a minor offense." (Pl. Resp. at 19.) West relies on
Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). Plaintiff relies on Vinyard v.
Wilson, 311 F.3d 1340, 1343-44 (11th Cir. 2002).

In Nolin the Eleventh Circuit held that "the application of *de minimis force*,
without more, will not support a claim for excessive force in violation of the Fourth
Amendment." 270 F.3d at 1257. Nolin involved the use of force to effectuate an arrest.
See id. at 1255-56. Moreover, in Post, which Nolin cited, the five-second chokehold
occurred prior to the plaintiff being handcuffed; "[o]nce [the plaintiff] was handcuffed
. . ., no further force was needed." Post, 7 F.3d at 1559. Here, the chokehold occurred
after Plaintiff's arrest while Plaintiff's hands were cuffed behind his back. Nolin, as well
as Post, is distinguishable.

In Vinyard, the plaintiff was handcuffed and in the backseat of a patrol car behind
a screen, having been arrested for minor crimes, when she "started screaming" at the

38

officer at which point the officer stopped the patrol car, forcibly grabbed the plaintiff (causing bruising) and sprayed the plaintiff with pepper spray. 311 F.3d at 1343-44, 1347. Holding that the force was excessive, the Eleventh Circuit explained that the crimes were "of minor severity" and that the plaintiff's shouting, although a "nuisance," did not pose a threat to the safety of the officer. Id. at 1347. Also, "there [was] no indication that [the plaintiff] actively resisted the initial arrest or attempted to flee at any time." Id. at 1348.

West contends that Vinyard is distinguishable because Plaintiff, not only resisted the initial arrest, but also "actively resist[ed] being placed into the back of the car." (West Reply Br. at 26); (Pl. Dep. at 101-02, admitting that he "wouldn't get in the car.") True, Plaintiff was resisting, but there is no evidence that West employed the chokehold because he believed that Plaintiff, who was handcuffed, posed a flight risk or a threat to his safety. Much less is there any evidence that West believed he was "in danger of death or grievous bodily harm." Toth, 953 F. Supp. at 1511 n.11. Rather, West testified that the sole reason he was attempting to place Plaintiff temporarily in the back seat of Plaintiff's own car was "to save [Plaintiff] from some humiliation because he [was] standing there in his boxers." (Pl. Dep. at 34.) In light of West's testimony, and having considered the relevant factors set out in Slicker, supra, at 1233, the court finds that the quantum of force was objectively unreasonable given the purpose for which it was applied. Accordingly, the court concludes that Plaintiff has demonstrated that, under the facts of this case, the use of the chokehold constitutes excessive force, in violation of the Fourth Amendment.

The next question is whether that constitutional right was clearly established at the time of the violation. Although the parties have not identified, and the court has not found, preexisting binding case law involving similar facts, the court finds that the absence of such a case is not required on these facts. Based upon the state of the law, as discussed above, the court finds that a reasonable officer would have had "fair warning" that employing a suffocating "chokehold" on a handcuffed and detained suspect who did not pose a threat to the officer's safety or a flight risk was unconstitutional. Hope, 536 U.S. at 741.

### 4. Foot Sweep

Finally, Plaintiff claims that West's use of a "foot sweep," during the course of an arrest, to subdue Plaintiff who undeniably refused West's commands to "get on the ground" is excessive force. Plaintiff says that the "foot sweep" was unreasonable because Plaintiff "was not posing a threat when West threw him on the ground face first." (Pl. Br. at 19.) The court disagrees with Plaintiff.

The foot sweep was employed because Plaintiff refused West's directives; it resulted in no injury to Plaintiff. Given the totality of the circumstances, the court agrees with West that, pursuant to Nolin, the force used was de minimis and not excessive. 207 F.3d at 1257; Vinyard, 311 F.3d at 1349 n.13 (collecting cases where "force and injury were held to be de minimis and not excessive"). Because Plaintiff fails to demonstrate a constitutional violation, the court need not, and declines to, decide whether the right was

40

"clearly established."  <u>Saucier</u>, 533 U.S. at 201.  Summary judgment is due to be entered in West's favor on this claim.


## B.  <u>Hutson</u>

Hutson also moves for summary judgment on Plaintiff's Fourth Amendment claim alleging excessive force.  Hutson argues that his "only actions in this case were to hold up a flashing light and a badge, and draw his weapon after Plaintiff's automobile came to a rest."  (Hutson Br. at 9-10.)  In sum and substance, Hutson contends that West, not he, engaged in the precise acts which Plaintiff contends constitute excessive force.  In response, Plaintiff says that, "[w]hile Hutson's actions did not rise to the level of West's, [Hutson] is not excused because he participated in the entire encounter[.]"  (Pl. Br. at 19.)  Although Hutson was present, Plaintiff has not submitted any evidence that Hutson "ordered or otherwise actively participated in [West's] use of excessive force" which includes the PIT maneuver, the weapon discharge and the chokehold.  <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 924 (11th Cir. 2000).

On these facts, Hutson's liability, as West's subordinate, would arise, if at all, from Hutson's "failure to intervene."  <u>Id.</u>  A failure-to-intervene theory, however, is not

alleged in Plaintiff's second amended complaint (Doc. No. 45) or in Plaintiff's brief.[15]

(See Pl. Br. at 19-20.)  Making "arguments in opposition to a motion for summary

judgment is the responsibility of the non-moving party, not the court," Blue Cross & Blue

Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990), and, accordingly, the court finds

that Plaintiff has abandoned any argument that he may have had based upon a failure-to-

warn theory of liability.

Alternatively, though, assuming that the theory is properly before the court, the

court rejects it.  "[I]f a police officer, whether supervisory or not, fails or refuses to

intervene when a constitutional violation such as an unprovoked beating takes place in his

presence, the officer is directly liable under Section 1983."  Ensley v. Soper, 142 F.3d

1402, 1407 (11th Cir. 1998).  In other words, an "'officer who is present at the scene and

who fails to take reasonable steps to protect the victim of another officer's use of

excessive force, can be held liable for his nonfeasance.'"  Hadley v. Gutierrez, ___ F.3d

___, ___, 2008 WL 1947008, *4 (11th Cir. 2008) (quoting Velazquez v. City of Hialeah,

484 F.3d 1340, 1341 (11th Cir. 2007)).  "But it must also be true that the non-intervening

officer was in a position to intervene yet failed to do so."  Id.

---

[15] The sole decision cited by Plaintiff is O'Rourke v. Hayes, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004).  In O'Rourke, the Eleventh Circuit was not faced with a scenario where an officer allegedly did nothing to prevent a fellow officer's unconstitutional conduct.  Rather, in that case, the Eleventh Circuit rejected the officer's attempt to justify his own acts – not his failure to act – by arguing that he was "just following orders."  Id. at 1210.  O'Rourke simply does not fit the facts of this case.

Holding that the district court erred in denying qualified immunity to the non-intervening officer, the Hadley court concluded that the plaintiff "presented no evidence from which a reasonable jury could find that [the non-intervening officer] could have anticipated and then stopped [Officer] Ortivero from punching [the plaintiff] once in the stomach." Id.  West's discharge of his weapon falls within this category.  There is no evidence that Hutson, who had his weapon drawn on Carmichael, could have anticipated and prevented West's split-second decision to fire a shot in the ground in front of Plaintiff.  (West Dep. at 32.)  Moreover, since summary judgment is due to be entered in West's favor on West's use of force in discharging a weapon and employing a foot sweep, "there is no derivative claim against" Hutson.  Jackson v. Sauls, 206 F.3d 1156, 1174 (11th Cir. 2000).

Also, Plaintiff has not pointed to any evidence that Hutson was present or aware that West applied a chokehold to Plaintiff when Plaintiff refused West's directive to get in the backseat of the Nova.  (See, e.g., Hutson Dep. at 29, testifying that, for some of the time at the scene, he "lost sight" of West and Plaintiff because he was "concentrating" on Carmicheal); (see West Dep. at 34.)  To the contrary, Plaintiff's testimony indicates that, during this time, Hutson was not in the area and, thus, did not have an opportunity to observe the chokehold, much less to intervene.  (Pl. Dep. at 99, testifying that Hutson "wasn't in our [Plaintiff's and West's] immediate space.")  On these facts, the court finds that Hutson cannot be held liable for failing to stop West's use of the chokehold because he was not in a position to intervene.  See Ensley, 142 F.3d at 1408 (an officer is not "'in a position to intervene'" when he does not "observe[] his fellow officers' alleged abuse");

43

Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996) (an officer who was engaged in arresting a suspect and who did not observe his fellow officer's use of excessive force on a second suspect did not have a duty to intervene).

Finally, there is no evidence that West conferred with Hutson about the prospect of implementing the PIT maneuver, and there is no evidence from which it can be inferred that Hutson otherwise knew that West was about to initiate a PIT maneuver. During depositions, no testimony was elicited concerning Hutson's prior knowledge of the PIT maneuver. (See, e.g., Hutson Dep. at 21-22); (West Dep. at 29.) During that instantaneous moment when West hit the rear bumper of Plaintiff's vehicle, there is no evidence that Hutson could have done anything to prevent that bump. The court recognizes that, according to Plaintiff, West employed the PIT maneuver not once, but twice, and that there was a ten-second delay between the first "ram" and the second "ram." (Pl. Dep. at 65-68.) While Hutson's testimony indicates that he [Hutson] is familiar with the technique of "pitting" a suspect's car for the purpose of forcing it off the road (Hutson Dep. at 21-22), Plaintiff has not presented any evidence from which it can be inferred that, during this ten-second interval, Hutson had sufficient time to process what was occurring and the capability then to take action to prevent the second "ram." Ten seconds is markedly short when compared to the "twenty minute" beating in King, supra, and the "two minute" dog biting incident in Priester, supra. Accordingly, as an alternative holding, the court finds that there is no evidence in the record which supports the theory that Hutson violated Plaintiff's Fourth Amendment rights by failing to intervene when West engaged in excessive force. Because Hutson did not violate

Plaintiff's Fourth Amendment right to be free from excessive force, Hutson is entitled to summary judgment.

## VI. CONCLUSION

On the summary judgment record, Hutson is entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claims. Accordingly, Hutson's motion for summary judgment is due to be granted. West is entitled to qualified immunity on Plaintiff's Fourth Amendment claims alleging that West exerted excessive force when he discharged his weapon and used a "foot sweep" to subdue Plaintiff. Construing the facts in the light most favorable to Plaintiff, however, the court finds that qualified immunity is inappropriate at this juncture on Plaintiff's Fourth Amendment claims against West alleging that he used excessive force when he employed the PIT maneuver and the chokehold. Accordingly, West's motion for summary judgment is due to be granted in part and denied in part.

In closing, as concerns West, the court emphasizes that, as this case is before the court on a summary judgment motion for a qualified immunity ruling, "there have not yet been factual findings by a . . . jury, and [West's] version of events (unsurprisingly) differs substantially from [Plaintiff's] version." Scott, 127 S.Ct. at 1774. "When things are in such a posture, courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" id., and that is what the court has done in this case. These facts, therefore, may not be the actual facts. Whether they are or are not is for the jury to decide.

## VII.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Hutson's motion for summary judgment be and the same is hereby GRANTED.

It is further CONSIDERED and ORDERED that West's motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part.

DONE this 2nd day of June, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE